IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE

|  |  |  |
|---|---|---|
| JONATHAN A. BORDEN and AMY P. BORDEN, | ) ) ) ) | |
| Plaintiffs | ) ) | |
| vs. | ) ) | CIVIL ACTION NO.: 04-175 - E |
| AMICA MUTUAL INSURANCE COMPANY | ) ) ) | |
| Defendant. | ) ) | |

## DEFENDANT'S PRETRIAL STATEMENT

AND NOW, comes the Defendant, AMICA MUTUAL INSURANCE COMPANY, by and through its attorneys, DiBELLA, GEER, McALLISTER & BEST, P.C., and PAUL K. GEER, ESQUIRE, and files it's Pretrial Statement:

### A. NARRATIVE

On February 16, 2003, Dr. Jonathan Borden was working in his basement using Linseed oil. He was the only person at his home at the time. His wife and children were out of town. Sometime after he left the basement area, an accidental fire occurred, presumably from spontaneous combustion of oil soaked rags. Although some of the home was destroyed by fire, an entire wing of the Borden home suffered only smoke damage. Other sections suffered some heat damage, but no flame damage. The areas immediately around where the fire started, as well as above it, were largely destroyed by fire or damaged to the extent that they had to be totally replaced.

Jonathan and Amy Borden had a homeowner's insurance policy with Amica Mutual Insurance Company. That policy contained policy limits of $577,000 for building, $432,750 for personal property and $173,100 for loss of use. The loss was referred to a national large loss adjuster named John Schumann for handling.

John Schumann drove directly from his home in North Carolina to Erie, Pennsylvania, arriving despite a snow emergency in the area. He met with the Bordens, explained the claim process to them, and took them to dinner. Within two days of the loss, Amica had found the Bordens a rental home in the area. They began making arrangements for the Bordens to move there. In addition, a "claims card" was overnighted to the Bordens.

Amica has a unique claim service which involves providing its insureds with a "stored value" card, which allows them to purchase replacement items against their coverage. Most other insurance carriers require a proof of purchase of replacement items before being reimbursed for replacement costs.

On February 8, Amica sent the Bordens a booklet entitled "Guiding You Through Reconstruction". The claims card which they were provided, had a credit limit of $7,500 and the Bordens were instructed to call when they neared the limit on the card, so that it could be recharged with more credit.

Amica paid $1,800 per month to provide the Bordens with a comfortable temporary home. Amica even paid to plow the driveway, rather than wait on the property owner to do so.

John Schumann initially inspected the damaged home in frigid temperatures and insufficient light. In fact, some of the areas were so damaged by the fire and frozen

water that he was unable to gain access to them, due to safety concerns.  As a result, his first estimate was incomplete in terms of addressing all of the damages.  Within a few weeks, Mr. Schumann was able to gain access to the building and completed a detailed repair estimate in the amount of approximately $329,000.

On March 11, 2003, Amica sent the Bordens a check in the amount of $295,098.92 - - the actual cash value of the Schumann estimate minus the $1,000 policy deductible.  The letter accompanying the check indicated that once the repairs were complete, Amica would pay the replacement cost.  The letter also reminded the Bordens of their responsibility to cooperate in the claim adjustment process.

Immediately following the fire, the Bordens were understandably distraught.  As time went forth, however, a number of early decisions which had to be made by policy holders regarding such items as the cleaning of their personal property, storage of their personal property, the removal of water from the basement of the home, preservation of the property from further damage following the fire, presentation of the personal property inventory loss and availability to answer whatever questions may come up during the course of the investigation and adjustment, were ignored.  The letter attempted to address Amica's concerns in this regard.

Following the fire, neither Dr. Borden nor Mrs. Borden was available to make decisions regarding furniture and other items needed in the temporary residence.  Dr. Borden's mother, instead, flew to Erie from Connecticut.  When the Bordens told Amica they did not want to live in a temporary dwelling with used furniture, John Schumann took Mrs. Borden (Dr. Borden's mother) shopping and bought new furniture with the

understanding that it would be returned to Amica after the Bordens were able to move back into their home.

The Bordens rejected the $295,098.92 check and returned it, based upon some bad legal advice from Dr. Borden's brother, who is a Connecticut attorney. Rather than calling Amica and asking any questions they might have about the check, it was rejected. The Schumann estimate, upon which the payment of nearly $300,000 had been based, was supported by Mr. Schumann's consultation with a local fire restoration contractor, Visions, which agreed to make the repairs outlined in the Schumann estimate at that cost.

Amica also instructed Mr. Schumann and Visions to document what personal property was fire damaged and what could be cleaned. Clothing and other contents damaged only by smoke, were removed for cleaning by Visions. The Borden's clothing was sent to VIP Drycleaners in Erie, which had the ability and experience to clean smoke damaged items. In addition to incurring cleaning costs, Amica incurred storage costs for the Borden's furniture.

Following the rejection of their initial payment, Amica requested that the Bordens obtain their own contractor's estimate, so that a second opinion on the cost of repair could be obtained. From the return of the advance payment of nearly $300,000, Amica assumed that the Bordens did not agree with Schumann's estimate. The Bordens did this, obtaining an estimate from John Haller, a builder who has no experience in fire restoration. Despite receiving the estimate, however, they did not send the estimate to Amica or disclose its amount to Amica.

Amica moved forward with the claim process, loading and reloading the Borden's claim card, so that they could purchase replacement contents as needed. In addition, a check in the amount of $39,945.48 which represented an undisputed payment on contents, was sent to the Bordens. Like the building check, this check was rejected and returned to Amica by the Bordens.

Meanwhile, over $4,000 in charges were incurred for drycleaning by Amica. The Bordens refused to accept or use the items and thus, another issue arose.

In March of 2003, the Bordens retained a public adjuster from Connecticut named Anthony Parise. Mr. Parise is not licensed in Pennsylvania, so he was referred to as a "consultant" throughout the claims process.

For his services, the Bordens promised to pay his firm, Giordano and Associates 8% of the proceeds received from Amica. Mr. Parise took issue with Mr. Schumann's estimate and also took issue with the contractor Mr. Schumann relied upon, Visions, questioning Visions' qualifications.

Mr. Parise, who had no ability or capacity to rebuild the structure and no contractor to back up his opinions, prepared an estimate stating that the cost of repair for the Bordens home was $680,492.21. Obviously, Amica and the Bordens were far apart.

One of the primary issues of contention was whether interior walls in smoke damaged areas would have to be torn out, essentially gutting the premises. The Schumann estimate contemplated repair of all fire damaged areas, as well as the cleaning and sealing of the smoke damaged areas, a well established and accepted fire restoration process throughout the United States. The Parise estimate essentially

contemplated gutting the entire structure and rebuilding it. Amica was amenable to tearing out and rebuilding the entire section of the structure damage by fire, but was not in agreement that areas damaged only by smoke should be torn out, gutted and rebuilt from the basement up.

A meeting was held in an attempt to narrow the differences between the parties and to understand the respective positions. Amica expects that at trial, the Bordens will place emphasis on the fact that Anthony Parise showed both John Schumann and David Bennett, the manager of Amica's Pittsburgh office, areas of the Borden home which suffered heat damage and were not addressed in the Schumann estimate, but included in his. They believe it was bad faith for Amica not to immediately accept Mr. Parise's opinions and agree to make a further payment for these items. In reality, however, given the differences between the parties repair estimates, these items were relatively insignificant. Amica decided that the most expedient and cost effective way to resolve the dispute between Mr. Parise's estimate and that obtained from Mr. Schumann and Visions, was to invoke the appraisal provision in the insurance policy.

Like every homeowner's policy issued in Pennsylvania, the Borden's policy contained an appraisal provision. If the parties cannot agree on the amount of loss, each selects a disinterested appraiser who writes his/her own estimate in attempt to narrow their differences or resolve them. If they are unable to resolve the differences, an umpire is selected. The umpire's decision is final. If the appraisers cannot agree upon an umpire, the policy provides that they should petition a court of local jurisdiction to appoint a person qualified to act as an umpire.

Amica retained a well respected local adjuster, Jack Owens, CPC UAIC, to act as its appraiser. Mr. Owens was truly impartial. He had done no work on the Borden loss and never before worked for Amica. He is employed by York Claims Services, Inc. and works out of his home in McKean, Pennsylvania, adjusting losses throughout the United States. The Bordens selected Anthony Parise, who was being paid a percentage of whatever they received from Amica and thus, was far from unbiased or impartial. Ultimately, the Bordens decided they did not want to go through the appraisal process and retained the law firm of McDonald Ilig Jones and Britton to act as their attorneys.

Following the receipt of a representation letter from Attorney Terry Jones, Amica retained Paul K. Geer of DiBella, Geer, McAllister & Best in Pittsburgh. The attorneys for the parties arranged for further meetings at the premises. Amica retained a second contractor, Dan Jones of G.S. Jones & Sons to review and reevaluate the previous estimates. By this time, the building had been boarded up for many months, water remained in the basement and the heat of summer was causing concerns regarding mold. The Borden's concerns about their daughter's health and what they believed to be hidden carcinogens within the walls of the dwelling, were taken into consideration by Mr. Jones, who wrote a replacement cost estimate, which included a larger scope of repairs than that contemplated by Schumann and Visions. The Jones repair estimate totaled $542,598.42. Ultimately, the parties agreed that the cost of repair of the dwelling was $553,982.14. It was also agreed that the Bordens would be paid $459,600 as an actual cash value payment. This amount was paid to the Bordens in various payments beginning with the rejected check in March of 2003.

While issues of the personal property claim delayed the settlement to some extent, they were ultimately resolved.  Amica gave in to the wishes of the Bordens that all of their smoke damaged clothing be replaced.  The Borden's contents claim was not submitted until summer and some parts of the claim were never itemized.  The parties, however, were able to resolve the contents claim through negotiation.

The evidence at trial will show that this claim took much longer to resolve than anyone would have liked.  Amica prides itself in claim handling and in the services it provides to its insureds.  The Bordens were extremely distraught after the fire and provided only minimal help to Amica in the claims process.  While it is certainly understandable that people are upset or even devastated immediately following the fire, in the Borden's case, this condition lasted for an extended period and coupled with the distrust the Bordens had of Amica, caused a significant passage of time before all of the claims could be resolved.

Another issue which caused delays in claim handling, involved the Bordens indecision as to whether to repair, rebuild or raise the structure.  Throughout 2003, no decision was made.  While the Bordens talked to a contractor in Erie about the cost of building a replacement structure, it appears that they never seriously contemplated repairing the structure they had following the fire and it was their aim from the outset to collect an actual cash value payment and then rebuild a different house in Erie or elsewhere.  Ultimately, Dr. Borden decided to move to Cincinnati where they now reside and thus, the house was never repaired or rebuilt.  Instead, it was torn down.

Throughout the time of claim submission process and the Borden's indecision as to whether to rebuild, Amica continued to pay for the Borden's expenses.  By

agreement, Amica paid the Borden's monthly rental expense for their alternative living home until March of 2004.  Thereafter, the Bordens paid their own rent.


## B.  WITNESSES

Jonathan Borden                                      Liability & Damages

Amy Borden                                           Liability & Damages

David Bennett                                        Liability & Damages
Amica Insurance Company
1500 Corporate Drive
Suite 250
Canonsburg, PA 15317

Edene Borden                                         Liability & Damages
37 Candlewood Drive
West Hartford, CT 06117

Richard Borden                                       Liability & Damages
32 Lakeview Drive
West Hartford, CT 06117

Dave Cardo                                           Damages
Dave Cardo Electric
1236 Timber Ridge Drive
Erie, PA 16509

John DiMenno                                         Damages
G.S. Jones & Sons
8347 Ohio River Boulevard
Pittsburgh, PA 15202

Michelle Firman                                      Damages
Coldwell Banker
2100 West 8th Street
Erie, PA 16501

Jim Grieshober                                       Damages
J.E. Grieshober Plumbing Hydronics
857 Ruth Avenue
Erie, PA 16509

David Haller                                      Damages
David J. Haller Construction Inc.
4241 Neptune Drive
Erie, PA 16506

Diane Koker                                       Liability
Pennsylvania Insurance Department
Room 808 Renaissance Center
10th & State Streets
P.O. Box 6142
Erie, PA 16512

Robert Mayo                                       Damages
Giordano Associates, Inc.
71 High Street
East Haven, CT 06512

Chief Kirk McCaslin                               Damages
West Lake Fire Department
3762 West Lake Road
Erie, PA 16505

Joseph Monaco                                     Liability
Pennsylvania Insurance Department
Room 808 Renaissance Center
10th & State Streets
P.O. Box 6142
Erie, PA 16512

Doug Olshenske                                    Liability & Damages
Amica Mutual Insurance Company
1500 Corporate Drive
Suite 2500
Canonsburg, PA 15317

Jack Owens                                        Liability & Damages
York Claims Service, Inc.
P.O. Box 72
McKean, PA 16426

Anthony Parise                                    Damages
Giordano Associates, Inc.
71 High Street
East Haven, CT 06512

Duane Perry                                      Damages
Rent-A-Center
2177 W. 12th Street
Erie, PA 16505

Gerald Riblet                                    Damages
320 West 22nd Street
Erie, PA 16502

Jeff Rindfuss                                    Damages
R. Rindfuss Drilling
13851 Route 19
Waterford, PA 16441

Donna Seifert                                    Damages
Visions Corp.
1903 West 8th
Suite 221
Erie, PA 16505

Dale Seifert                                     Damages
Seifert's Furniture
P.O. Box 312
10390 West Main Road
North East, PA 16428

William Simcox, Sr.                              Liability & Damages
Crawford Investigative Services
National Operations Center
285 W. Esplanade Avenue
Suite 300
Kenner, LA 70065

Amy Speaker                                      Damages
Certified Restoration Drycleaning Network

Lisa St. Onge                                    Liability & Damages
Amica Insurance Company
100 Amica Way
Lincoln, RI 02865

Gerald Wolf, Treasurer                           Damages
Millcreek Township
3608 West 26th Street
Erie, PA 16506

| | |
|---|---|
| Frank's Cleaners<br>1611 West 8th Street<br>Eire, PA 16505 | Damages |
| Pella Window & Door Company<br>5044 Peach Street<br>Erie, PA 16509 | Damages |
| Sipple Electronics, Inc.<br>824 West 12th Street<br>Erie, PA 16501<br>(814) 454-4516 | Damages |
| U Frame It & The Poster Annex<br>731 West 8th Street<br>Erie, PA 16502 | Damages |
| VIP Laundry and Dry Cleaners<br>1227 Powell Avenue<br>Erie, PA 16505 | Damages |
| Young Electric<br>2702 Banksville Avenue<br>Pittsburgh, PA 15216 | Damages |
| Nicole Bean-Grzelak | Damages |
| Peter Hardner<br>223 West 26th Street<br>Erie, PA 16508 | Damages |
| Mark Divoll<br>Amica Insurance Company<br>100 Amica Way<br>Lincoln, RI 02865 | Liability & Damages |
| Peter Reid<br>Amica Insurance Company<br>100 Amica Way<br>Lincoln, RI 02865 | Liability & Damages |
| Mike Turner<br>Amica Insurance Company<br>100 Amica Way<br>Lincoln, RI 02865 | Liability & Damages |

Stuart Towsey                          Liability & Damages
Amica Insurance Company
100 Amica Way
Lincoln, RI 02865

Thomas Taylor                          Liability & Damages
Amica Insurance Company
100 Amica Way
Lincoln, RI 02865

John Lipchik                           Damages
10163 Sampson Road
Erie, PA 16509

Lori Ference                           Damages
Amica Insurance Company


## C.  EXHIBITS

1.    September 30, 2005 deposition transcript of Debbie Seifert.

2.    July 26, 2005 deposition transcript of List St. Onge.

3.    June 10, 2005 deposition transcript of Jonathan Borden.

4.    February 18, 2003 Bennett letter to Borden.  (AM429) (Jonathan Borden
      Deposition Exhibit 1)

5.    March 3, 2003 Bennett letter to Bordens.  (AM495-AM496)  (Jonathan Borden
      Deposition Exhibit 2)

6.    March 7, 2003 Seifert letter to Schumann & Borden.  (AM508)  (Jonathan Borden
      Deposition Exhibit 3)

7.    March 11, 2003 Bennett letter to Bordens.  (AM518-AM519)  (Jonathan Borden
      Deposition Exhibit 4)

8.    March 14, 2003 Bennett letter to Bordens.  (AM535)  (Jonathan Borden
      Deposition Exhibit 5)

9.    March 17, 2003 Bennett letter to Bordens.  (AM537-AM538)  (Jonathan Borden
      Deposition Exhibit 6)

10.   March 20, 2003 Borden note to Bennett.  (AM547)  (Jonathan Borden Deposition Exhibit 7)

11.   March 25, 2003 Bennett letter to Parise.  (AM565-AM566)  (Jonathan Borden Deposition Exhibit 8)

12.   March 26, 2003 Bennett letter to Bordens.  (AM572)  (Jonathan Borden Deposition Exhibit 9)

13.   March 31, 2003 Bennett letter to Bordens.  (AM577)  (Jonathan Borden Deposition Exhibit 10)

14.   April 17, 2003 Borden letter to Koker.  (AM652-AM655)  (Jonathan Borden Deposition Exhibit 11)

15.   May 5, 2003 Bennett letter to Monaco.  (AM657-AM659)  (Jonathan Borden Deposition Exhibit 12)

16.   May 2, 003 Bennett letter to Bordens.  (AM603-AM606)  (Jonathan Borden Deposition Exhibit 13)

17.   June 11, 2003 Haller estimate.  (Jonathan Borden Deposition Exhibit 14)

18.   June 19, 2003 U Frame it & The Poster Annex.  (Jonathan Borden Deposition Exhibit 15)

19.   October 8, 2003 Haller estimate.  (Jonathan Borden Deposition Exhibit 16)

20.   June 10, 2005 deposition transcript of Daniel Jones.

21.   June 6, 2005 report of Jones.  (Daniel Jones Deposition Exhibit A)

22.   June 10, 2005 deposition transcript of Brian Seifert.

23.   February 25, 2005 deposition transcript of Amy Borden.

24.   February 25, 2005 deposition transcript of Richard Borden.

25.   February 25, 2005 deposition transcript of Edene Borden.

26.   December 22, 2004 deposition transcript of John Schumann.

27.   Parise's notes regarding Schumann's estimate.  (John Schumann Deposition Exhibit A)

28.   December 22, 2004 deposition transcript of David Bennett.

29.    Guiding You Through Reconstruction.  (David Bennett Deposition Exhibit A)

30.    Binder assembled by counsel for Plaintiffs.  (David Bennett Deposition Exhibit B)

31.    December 2, 2004 deposition transcript of A. Parise.

32.    April 6, 2003 Parise letter to Bennett.  (Anthony Parise Deposition Exhibit 1)

33.    August 25, 2003 Parise letter to Jones.  (Anthony Parise Deposition Exhibit 2)

34.    October 30, 2003 Parise letter to Jones.  (Anthony Parise Deposition Exhibit 3)

35.    Parise's handwritten notes attached to Schumann's estimate.  (Anthony Parise Deposition Exhibit 4)

36.    May 23, 2003 Parise letter to Jones attached to Schumann's estimate.  (Anthony Parise Deposition Exhibit 5)

37.    Parise's typed notes entitled "Assumptions."  (Anthony Parise Deposition Exhibit 6)

38.    Contents inventory.  (Anthony Parise Deposition Exhibit 7)

39.    Diagram of 1st floor prepared by Parise.  (Anthony Parise Deposition Exhibit 8)

40.    Diagram of 2nd floor prepared by Parise.  (Anthony Parise Deposition Exhibit 9)

41.     December 2, 2004 deposition transcript of David Haller.

42.    June 1, 2003 Grieshober subcontract estimate to Haller.  (David Haller Deposition Exhibit 1)

43.    June 12, 2003 Cardo subcontract estimate to Haller.  (David Haller Deposition Exhibit 2)

44.    June 17, 2003 Pella Window & Door Company estimate to Haller.  (David Haller Deposition Exhibit 3)

45.    June 11, 2003 Haller proposal.  (David Haller Deposition Exhibit 4)

46.    July 28, 2003 Jones report, including estimate, trade breakdown, work area breakdown, drawings, sub-contractor information and photographs.

47.    Policy of insurance 630837-1183.  (AM001-AM043)

48.    Policyholder Release, Acknowledgment of Payment, and Settlement Agreement. (AM044-AM046)

49.    Visions Corp. contents cleaning estimate.  (AM052-AM063)

50.    Misc. Visions Corp. invoices/statements for services provided.  (AM064-AM075, AM500-AM501, AM587)

51.    March 3, 2003 Schumann's contents inventory.  (AM076-AM084)

52.    February 27, 2003 Schumann's building estimate.  (AM085-AM152)

53.    November 21, 2003 Bennett letter to Jones enclosing Jones supplemental report. (AM206)

54.    November 13, 2003 Jones' supplemental report.  (AM207-AM218)

55.    March 9, 2003 Parise's estimate.  (AM224-AM278)

56.    Typed notes re: Borden's Contents Response.  (AM290-AM296)

57.    Mayo's contents inventories.  (AM298-AM369)

58.    Visions Corp. contents inventory.  (AM370-AM393)

59.    February 16, 2003 Loss Telephone Report.  (AM395-AM397)

60.    Homeowners Loss Payment Schedule.  (AM405-AM406)

61.    INTEL lab reports.  (AM409-AM420)

62.    February 14, 2003 Schumann letter to Bennett and VIP invoices.  (AM425 & AM048-AM051)

63.    West Lake Fire Department Fire Report.  (AM426)

64.    February 16, 2003 e-mail from Olshenske to Bennett re: new loss.  (AM427)

65.    February 18, 2003 Bennett fax to St. Onge re: new loss.  (AM428)

66.    February 18, 2003 Bennett letter to Bordens re: initial contact.  (AM429)

67.    February 18, 2003 e-mails between Bennett and Cardholderservices re: claim card.  (AM430)

68.    Amica Claim Card Acknowledge Acceptance.  (AM431)

69.    February 19, 2003 e-mail from Bennett to St. Onge re: Schumann's initial observations.  (AM432)

70.    February 21, 2003 Ference letter to Bordens re: payment of Vision Corp. invoices for emergency services.  (AM442)

71.    February 20-21, 2003 e-mails between St. Onge and Bennett re: ALE.  (AM443-AM444)

72.    February 21, 2003 report of Schumann re: ALE enclosing lease.  (AM445-AM454)

73.    February 25, 2003 report of Schumann re: building repairs.  (AM455-AM458)

74.    February 25, 2003 e-mail from Bennett to St. Onge.  (AM459)

75.    February 25, 2003 letter from Schumann to Bennett re: temporary repairs. (AM460-AM461)

76.    February 27, 2003 e-mail from Bennett to St. Onge.  (AM464)

77.    February 27, 2003 Service Invoice of Schumann.  (AM475-AM480)

78.    February 27, 2003 Dale Seifert letter to Schumann re: furniture.  (AM481)

79.    February 28, 2003 Bennett letter to Dale Seifert re: furniture.  (AM482)

80.    February 28, 2003 Ference letter to Bordens re: furniture.  (AM483)

81.    March 1, 2003 Schumann letter to Bennett.  (AM486-AM487)

82.    March 3, 2003 2003 e-mails between Bennett and Cardholderservices re: claim card.  (AM488)

83.    March 5, 2003 e-mail from Bennett to St. Onge.  (AM502-AM503)

84.    March 7, 2003 e-mail from St. Onge to Bennett.  (AM505)

85.    March 7, 2003 Seifert report.  (AM508)

86.    March 10, 2003 Schumann's report re: preliminary contents inventory.  (AM512-AM515

87.    March 10, 2003 agreement between Borden and Parise.  (AM516)

88.    March 11, 2003 e-mail from Speaker to Bennett re: dry cleaning.  (AM517)

89.    Serious First Party Loss Report.  (AM529-AM532)

90.    March 14, 2003 2003 e-mails between Bennett and Cardholderservices re: claim card.  (AM533)

91.    March 17, 2003 Borden note to Bennett.  (AM544)

92.    March 20, 2003 e-mail from St. Onge to Bennett.  (AM550)

93.    March 11, 2003 thru March 20, 2003 e-mails between Bennett and Speaker re: dry cleaning.  (AM551-AM552)

94.    March 21, 2003 e-mail from Bennett to St. Onge.  (AM553)

95.    March 21, 2003 Bennett letter to Bordens.  (AM554)

96.    March 21, 2003 Bennett letter to  Parise.  (AM555)

97.    March 23, 2003 Parise letter to Schumann, including comments on building estimate and contents inventory.  (AM556-AM564)

98.    March 26, 2003 report from Bennett.  (AM568-AM569)

99.    March 28, 2003 e-mail from St. Onge to Bennett.  (AM573)

100.    April 4, 2003 report from Bennett.  (AM579-AM580)

101.    April 6, 2003 Parise letter to Bennett.  (AM583-AM585)

102.    April 15, 2003 e-mail from Reid to Bennett.  (AM589)

103.    April 30, 2003 report from Bennett.  (AM596-AM597)

104.    May 6, 2003 e-mail from Bennett to St. Onge.  (AM609)

105.    May 7, 2003 Bennett letter to Parise.  (AM612-AM613)

106.    May 8, 2003 fax from Bennett to Schumann.  (AM614)

107.    May 10, 2003 Schumann report re: contents cleaning and list from Visions Corp.  (AM618 & AM370-AM393)

108.    May 20, 2003 Bennett letter to Bordens.  (AM622)

109.    May 22, 2003 Jones letter to Bennett.  (AM625-AM626)

110.    August 13, 2003 Bennett letter to Jones.  (AM627-AM632)

111.    August 27, 2003 Bennett letter to Jones.  (AM643-AM645)

112     December 22, 2003 Bennett letter to Jones.  (AM648)

113.    January 13, 2004 Bennett letter to Jones.  (AM650)

114.    May 28, 2003 Geer letter to Jones.  (AM661-AM663)

115.    June 5, 2003 Jones letter to Geer.  (AM664-AM666)

116.    June 16, 2003 Jones letter to Geer.  (AM667-AM669)

117.    June 16, 2003 Geer letter to Jones.  (AM670)

118.    June 17, 2003 Jones letter to Geer.  (AM671-AM674)

119.    June 20, 2003 Geer letter to Jones.  (AM675-AM678)

120.    June 23, 2003 Jones letter to Geer.  (AM679-AM682)

121.    June 26, 2003 Geer letter to Jones.  (AM682-AM683)

122.    June 30, 2003 Geer letter to Jones.  (AM684-AM685)

123.    July 23, 2003 Geer letter to Jones.  (AM686-AM687)

124.    July 28, 2003 Jones letter to Geer.  (AM688-AM689)

125.    July 30, 2003 Parise letter to Jones.  (AM690-AM691)

126.    August 1, 2003 Jones letter to Geer.  (AM692-AM707)

127.    August 25, 2003 Bennett letter to Jones.  (AM708-AM710)

128.    September 9, 2003 Bennett letter to Jones.  (AM711-AM712)

129.    September 29, 2003 Geer letter to Jones.  (AM713-AM716)

130.    October 20, 2003 Jones letter to Geer.  (AM717-AM725)

131.    October 22, 2003 Geer letter to Jones.  (AM726)

132.   October 24, 2003 Jones letter to Geer.  (AM727-AM729)

133.   November 25, 2003 Geer letter to Jones.  (AM730-AM732)

134.   December 17, 2003 Jones letter to Geer.  (AM733-AM743)

135.   January 14, 2004 Jones letter to Geer.  (AM744-AM745)

136.   January 30, 2004 Jones letter to Geer.  (AM746-AM752)

137.   February 27, 2004 Geer letter to Jones.  (AM753-AM756)

138.   March 17, 2004 Jones letter to Geer.  (AM757-AM764)

139.   April 8, 2004 Jones letter to Geer.  (AM765-AM766)

140.   May 20, 2004 Jones letter to Geer.  (AM767-AM768)

141.   67 photos taken on or about February 21, 2003.  (AM769-AM802)

142.   24 photos taken on or about February 21, 2003.  (AM803-AM814)

143.   6 photos taken on or about February 22, 2003.  (AM815-AM817)

144.   5 photos taken on or about February 22, 2003.  (AM818-AM820)

145.   178 photos taken on or about February 22-25, 2003.  (AM821-AM911)

146.   36 photos taken on or about February 25, 2003.  (AM912-AM929)

147.   26 photos taken on or about February 25, 2003.  (AM930-AM942)

148.   126 photos taken on or about March 1, 2003.  (AM943-AM1003)

149.   44 photos taken by Simcox.  (AM1004-AM1047)

150.   August 12, 2003 Amica check totaling $154,508.92.  (Plaintiffs' Rule 26
       Disclosures)

151.   August 12, 2003 Amica check totaling $1,815.00.  (Plaintiffs' Rule 26
       Disclosures)

152.   August 22, 2003 Amica check totaling $189,438.76.  (Plaintiffs' Rule 26
       Disclosures)

153.   Giordano Associates, Inc. ALE folder.  (Plaintiffs' Rule 26 Disclosures)

154.  Giordano Associates, Inc. contents folder.  (Plaintiffs' Rule 26 Disclosures)

155.  Giordano Associates, Inc. building folder.  (Plaintiffs' Rule 26 Disclosures)

156.  December 19, 2003 Lipchik estimate for demolition.

157.  Guidelines.  (AM1107-AM1120)

158.  August 31, 199 Interoffice Memo from Reid to Branch Claim Managers.  (AM1121)

159.  August 31, 199 Interoffice Memo from Reid to Branch Claim Managers.  (AM1122-1123)

160.  Serious First Party Loss Checklist.  (AM1124-AM1125)

161.  June 28, 2002 Hribar memo to Branch Claim Managers.  (AM1126-AM1127)

162.  August 1999 First Party Property Loss Handling Expectations.  (AM1128-AM1146)

163.  January 12, 1998 Office Memorandum from Reid to Branch Claim Managers.  (AM1147-AM1148)

164.  PLD Coverage Reminders and Recommendations.  (AM1149-AM1150)

165.  ALE Handling Service Expectations Additional Living Expense.  (AM1151-AM1161)

166.  General Instructions.  (AM1162-AM1209)


## D.  LEGAL ISSUES

Amica is aware of no unusual legal issues or of any issues which need to be resolved at the pretrial conference.

Plaintiffs have alleged emotional distress claims, but have submitted to proof of physical injury and no medical bills.  Amica will ask that these claims be withdrawn or dismissed.

## E.  EXPERTS

As disclosed in Defendant Amica Mutual Insurance Company's Expert
Disclosures of August 12, 2005, Defendant identifies:

Daniel Jones
G.S. Jones & Sons
8347 Ohio River Boulevard
Pittsburgh, PA 15202

John Schumann
Property Claims Services
117 Arbor Crest Lane
Lillington, NC 27546

Brian Seifert
Visions Corp.
1903 West 8th
Suite 221
Erie, PA 16505

The reports of all experts are attached hereto.

## F.  ADMISSIONS BY THE PLAINTIFFS
## (FROM REQUESTS FOR ADMISIONS FILED DURING DISCOVERY)

(1)    As of mid-April 2003, the repair estimates for the building supplied by
insureds' public adjuster and Amica's contractor revealed substantial discrepancies.   A
meeting was held on April 15, 2003 to discuss the differences.   At the April 15, 2003
meeting, the parties were unable to resolve their differences regarding estimated damage.
(#13)

(2)    At the point when Amica demanded an appraisal on the building, the
basement of the structure where the fire had originated had not been cleaned or repaired.
(#17)

(3)     Anthony Parise's public adjusting firm had previously signed a contract with the Bordens which provided that the public adjusting firm was to be paid on a contingency fee basis.  (#20)

(4)     In or before June of 2003, the Plaintiffs retained a contractor to estimate the repair cost of the building.  (#21)

(5)     On October 30, 2003, the Plaintiffs' public adjuster provided written material in support of their contents claim.  This included a claim in the amount of $94,178.49 and a proposed agreement that depreciation should be applied to the entire contents list on a 25% basis rather than on an item by item basis.  (#29)

(6)     Amy Borden suffered no physical injury as a result of the fire or Amica's handling of the insurance claim.  (#37)

(7)     Jonathan Borden suffered no out of pocket financial loss for medical or psychiatric treatment of any type as a result of Amica's handling of their insurance claim. (#38)

(8)     Any Borden suffered no out of pocket financial loss for medical or psychiatric treatment of any type as a result of Amica's handling of their insurance claim.  (#39)

(9)     The Plaintiffs retained Giordano & Associates at a cost of 8% of all payments received from Amica, plus costs and expenses.  (#40)

Respectfully submitted,

DiBella, Geer, McAllister & Best, P.C.

By: /s/  Paul K. Geer, Esquire _____
        Paul K. Geer, Esquire
        Attorney for Defendant, Amica
        Mutual Insurance Company