IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE

JONATHAN A. BORDEN and ) 
AMY P. BORDEN, )
    Plaintiffs )
 )
        v. )   NO. 04-175 E
 )
AMICA MUTUAL INSURANCE )
COMPANY, )
    Defendant )   ELECTRONICALLY FILED

**PRETRIAL NARRATIVE STATEMENT OF
PLAINTIFFS JONATHAN A. BORDEN AND AMY P. BORDEN**

Plaintiffs Jonathan A. Borden and Amy P. Borden, by their attorneys, MacDonald, Illig, Jones & Britton LLP, file this Pretrial Narrative Statement, pursuant to LR 16.1.4 of the Local Civil Rules of the United States District Court for the Western District of Pennsylvania:

I.    Narrative Statement of Material Facts

As of February 16, 2003, Jonathan A. and Amy P. Borden ("Bordens") and their three young children lived at 4838 Wolf Road, Erie, Pennsylvania. The home was insured for fire loss by defendant Amica Mutual Insurance Company ("Amica" or "defendant"). The Bordens owned Amica's "Platinum Choice" policy, which provides the broadest coverage, and is the most expensive, of Amica's homeowner's insurance products. Among other coverages, the policy

provided coverage limits for damage to the Bordens dwelling in the amount of $577,0000 (the Bordens had purchased their house only six months before for about $720,000) and limits for damage to their personal property (contents) in the amount of $432,750.

On February 16, 2003, an accidental fire severely damaged[1] the Bordens' home.  The Bordens promptly reported the loss to the defendant.  The claim was assigned to the defendant's Pittsburgh claims office.  Erie is outside of the Pittsburgh claims office's usual geographic area for handling fire claims, so the claims personnel searched for an adjuster to respond to the scene.  In the meantime, the fire department called Brian Seifert, the principal of Visions, Inc., a local roofing, drywalling and painting contractor, to perform emergency board-up.  Seifert was later hired by Amica to perform a variety of fire restoration tasks at the Borden property.

The fire destroyed significant portions of the Borden house and rendered it uninhabitable.  Immediately following the fire, Dr. Borden moved to a hotel, while Mrs. Borden and the children stayed in  Pittsburgh with her family.  Dr. Borden remained in Erie to attend to his duties as a neurosurgeon with Saint Vincent Health Center in Erie.  The weeks following the fire were extraordinarily stressful for the Borden family.  Dr. Borden was in a new job with significant, time-consuming responsibilities, while both Dr. and Mrs. Borden had to deal with being separated from each other as well as the loss of many possessions and the relocation of themselves and their three very young children.  (Later the entire family moved into a rental house paid for by the alternative living expense coverage of the Amica policy.)

---

[1]   The fire began in the basement of the house and burned for many hours.  It totally destroyed one large section of the home, and caused extensive smoke damage throughout the rest of the house.  As discussed below, the Bordens were ultimately forced to hire a public adjuster to assist them with their claim.  That adjuster, Anthony Parise, CPLU, AIC, CIC, has more than ten years of experience adjusting large fire loss claims and has inspected over 100 fire scenes.  He describes this loss as a "very, very bad fire," a "95" on a 1-100 scale of severity.

On February 19, 2003, three days after the fire, an independent adjuster retained by Amica, John Schumann, arrived at the fire scene to begin the adjusting process. On his first day at the scene, Schumann recommended that Amica reserve the structure damage at $250,000 and the contents at $100,000. A week later, Schumann had finalized his estimate of the scope and cost of repair of the dwelling in the amount of $328,999.14.

Although unaware of it at the time, the Bordens soon learned that Schumann's estimated cost of repairs was grossly inadequate. As discussed below, Amica ultimately hired a competent contractor, Daniel Jones of G. S. Jones & Sons, who, some four months later, estimated the same loss at $542,598.42, approximately $214,000 more than Mr. Schumann's estimate.

Mr. Schumann's estimate was unreasonably low, and Amica knew or should have known that long before Mr. Jones provided a reasonable estimate. Schumann is not a builder or contractor, and he had no qualified, experienced contractor advise him that the repairs he estimated would put the house in the condition it was in before the fire. He relied on a review of his estimate by Mr. Seifert, but Mr. Seifert had little or no experience in home building or large-scale home repairs. Neither Mr. Schumann nor Amica's employees made any reasonable effort to assure itself that Mr. Seifert had never built or remodeled a house like the Bordens, or that he was otherwise competent, experienced or knowledgeable. Moreover, Mr. Seifert has acknowledged that Mr. Schumann never asked him if the repairs Mr. Schumann recommended would actually put the house in its pre-fire condition, i.e., without the smell of smoke or other fire residue. To the contrary, Mr. Seifert was merely asked if he thought he could perform the suggested repairs at the estimated price.

The "Platinum Choice" policy owned by the Bordens provided "full replacement" coverage, but Mr. Schumann's estimate called for "covering up" smoke and soot damage behind

the walls by sealing the walls, instead of removing the walls, cleaning and repairing the damaged framing, and rebuilding the walls. The policy did not provide "covering up" coverage but instead for replacement of unrepairable damage.

On or about March 11, 2003, Amica mailed the Bordens a check for approximately $295,000 based on the Schumann estimate. The letter sent with the check did not say the check was a preliminary payment, or that future negotiation could occur, or anything which suggested that the check was anything other than Amica's final payment on the dwelling. Mr. Schumann had been gone from Erie for more than 10 days. The Bordens had no reason to believe that this was anything other than Amica's final payment for the dwelling loss. Because it appeared the estimated repair amount might be inadequate, the Bordens asked for advice from Dr. Borden's brother, Richard Borden, who is an attorney employed by an insurance company in Connecticut. Although he has no claims expertise himself, Richard Borden consulted with an attorney with his company who has claims experience. She recommended returning the check if they did not believe it was an adequate estimate of their loss, so that is what the Bordens did.

Because the Schumann estimate for repair to the house appeared to not consider many damaged items, the Bordens were forced to hire a public adjuster, the aforementioned Mr. Parise, of Giordano Associates, Inc., to assist them. Mr. Parise wrote to Mr. Schumann on March 23, 2003 and advised him of the significant concerns the Bordens had regarding his inadequate estimate. In that letter, he told Mr. Schumann several things that Mr. Schumann and Amica already knew, i.e., that the estimate was inadequate to remove all smoke-damaged items in the

home and that the Bordens had a particular concern about carcinogens and other toxins released following a fire because of the frailty of one of the Borden children.[2]

In March 2003, Mr. Parise inspected the loss and found numerous, obvious deficiencies in Mr. Schumann's estimate. He prepared a five page letter for Mr. Schumann and Amica pointing out with specificity the areas in which Mr. Schumann's estimate was deficient, and he asked to meet with Schumann/Amica to discuss his findings. Mr. Parise also toured the damaged house with Mr. Seifert, who admitted that he did not believe the house could be put in its pre-fire condition for the amount estimated by Mr. Schumann.

After inspecting the house with Mr. Seifert, Mr. Parise spoke with Mr. Schumann and brought to his attention several very obvious mistakes/omissions in Mr. Schumann's estimate, including simple matters such as no plumbing allowance, and the fact Schumann had included lesser quality flooring and countertops than that which was in the house, and he also advised Schumann that Mr. Seifert had admitted that all the necessary work could not be done at Mr. Schumann's price. Nevertheless, Mr. Schumann and Amica refused to reconsider any part of Schumann's estimate.

In early April 2003, Mr. Parise provided Amica with a detailed estimate of repair totaling $680,492.21, and at the same time attempted to arrange a meeting at the house with Mr. Schumann and the person handling the claim for Amica, Mr. David Bennett. Mr. Parise felt an Amica employee should be present because it was obvious to him that an insurance professional would recognize the gross deficiencies in Mr. Schumann's estimate.

---

[2]   At the time of the fire the Bordens had three year old twin girls, Sara and Emma, and a one year old boy, David. Emma was born prematurely, weighing only about one and a half pounds at birth. She suffers from mild cerebral palsy, a significant visual impairment and global development delay. She has numerous environmental sensitivities, including sensitivity to various perfuming agents and cleaning products. The Bordens, very reasonably, believed that reintroducing their daughter to a home with residual smoke damage was a dangerous thing to do, and they repeatedly advised Amica of their concern.

The meeting was held at the Borden house on or about April 15, 2003, and attended by Mr. Parise, Mr. Seifert, Mr. Schumann and Mr. Bennett. The group toured the house, and Mr. Parise highlighted the necessary repairs which were absent from Mr. Schumann's estimate. Mr. Parise showed the group the soot and smoke damage in the framing behind the walls and under the floors throughout the house. (It was apparent that neither Mr. Schumann nor Mr. Seifert had opened the walls to inspect for hidden damage.) Mr. Schumann defended himself, saying such things as perhaps the black substance was not residue from a fire, or if it was maybe it was present before the fire.

During the meeting, Mr. Schumann and/or Mr. Bennett contacted their superiors at Amica. At this point, Amica had several options to adjust the claim in good faith. It could have evaluated Mr. Parise's comments and asked Mr. Schumann to revisit his estimate, or it could have commenced negotiations with the Bordens if it really believed Mr. Parise's estimate was too high, or it could have located a competent contractor to review the loss and provide a realistic repair estimate. However, Amica did none of these things, but instead invoked the appraisal provision of the policy, evidently hoping to reach a compromise of the claim rather than pay its fair value.

Following the meeting and demand for appraisal, Dr. Borden sent a letter of complaint to the Pennsylvania Insurance Department, dated April 17, 2003, and hired an attorney, T. Warren Jones and the firm of MacDonald, Illig, Jones & Britton LLP, to assist the Bordens with the now adversarial process. Amica obtained counsel, and ultimately changed its mind about appraisal and instead chose to retain a contractor Amica knew to be competent, the aforementioned Daniel Jones, who estimated the dwelling loss at $542,598.42, which ultimately fostered a dwelling settlement of $553,982.13. Thus, after being forced to hire a public adjuster, complain to the

Insurance Department and retain an attorney, the Bordens ultimately obtained a structure loss settlement in an amount $213,599.28 greater than Amica's original offer.

Mr. Jones' estimate was provided to Amica on or about July 28, 2003.  Amica knew long before then, and at the latest on or about the meeting of April 15, 2003, that Mr. Schumann's estimate was grossly inadequate.  Nevertheless, Amica attempted to force an appraisal with an unrepresented insured and only after the Bordens obtained counsel did Amica suddenly reverse field and do what a reasonable insurer would have done long before, i.e., hire a contractor they knew to be competent to provide an adequate estimate.  When they finally did that, the structure loss matter was quickly resolved.

Amica will attempt to defend itself at trial by blaming the Bordens, despite the fact Amica admits that a catastrophic fire loss is often devastating to a family, making it difficult for the insureds to quickly and fully participate in the adjustment of a claim.  Amica will claim that it was the Bordens' responsibility to identify the contractor they wanted to do the repair work and that somehow this excuses their lowball estimate and offer.  The evidence at trial will show that this is nonsense.  First, at one of his first meetings with Mr. Schumann, Dr. Borden did give Mr. Schumann the names of two local contractors who had done work in the Wolf Road area with whom Mr. Schumann could consult on the cost of repairs.  Instead, Mr. Schumann did not follow up on those recommendations and allegedly relied on the expertise of the board-up contractor called to the scene by the fire department without doing any investigation to speak of regarding that person's experience or abilities as a residential builder.  Second, Mr. Schumann's obligation was to estimate the reasonable cost of putting the house in its pre-loss condition, regardless of the identity of the particular contractor who the Bordens might select for a rebuild. Indeed, Mr. Schumann had his estimate prepared within seven days of his arrival on site.  He

obviously did not see the need to consult with a contractor selected by the Bordens.  (Amica's interest in the identity of the Bordens' rebuild contractor was more likely related to their efforts to reduce their alternative living expense exposure -- the sooner the house is rebuilt the sooner that expense ends.)

This claim was poorly handled in a number of other ways.  Amica failed to keep an adequate balance on the "claim" card issued to the Bordens, causing embarrassment when the family tried to use it for necessary post-fire purchases.  The Bordens' clothes suffered considerable smoke damage, but Amica attempted to dry clean them anyway.  When they came back from the cleaners, they still smelled of smoke so the Bordens rejected them.  Amica insisted that the Bordens accept the clothes, until Mr. Bennett finally personally inspected the clothes and noticed a smell.  An annoyed Mr. Schumann had the clothes dumped into the garage of the still wrecked house instead of incurring the cost of storing them professionally.  The contents of the home were handled in an unprofessional manner.  A competent fire restoration company has warehouse space adequate to clean, deodorize, store and catalog fire, smoke and water damaged items, but the fire restoration contractor used by Amica, i.e., the same Mr. Seifert and Visions, Inc., did not have or use such a facility, instead cramming items into rented storage garages, so that even relatively undamaged items were exposed to fire, smoke and water damaged items.  All of these occurrences, together with others discussed in the pleadings and discovery, were known to, but not timely corrected by, Amica.

II.     Damages Claimed

42 Pa.C.S.A. § 8371 allows for the recovery of punitive damages, attorney's fees and costs, and interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%. Pennsylvania case law also allows for the recovery of compensatory damages caused by the insurer's bad faith:

1)   **Punitive Damages** - Under Pennsylvania law, a finding of bad faith is the only prerequisite to an award of punitive damages. *Hollock v. Erie Ins. Exchange*, 842 A.2d 409 (Pa. Super. 2004). The three factors to be considered in determining the appropriate amount of punitive damages are, "1) the character of the act; 2) the nature and extent of the harm; and 3) the wealth of the defendant." *Hollock*, 842 A.2d at 409. The amount also must not offend the due process concerns articulated in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513, 155 L.Ed.2d 585 (2003). With regard to the wealth of the defendant, the net worth of an insurance company has been considered to be adequate evidence upon which a court can gauge an appropriate punitive damage award. See *Hollock*, 842 A.2d at p. 420; *Wood v. Allstate Ins. Co.*, 1997 WL 602796, *7 (E.D. Pa. 1997). ("The Third Circuit has endorsed a ratio of around one percent of a defendant's net worth for a punitive damage award.")

Amica has admitted that its net worth as of December 2004 was $3,131,997,000.00, one percent of which equals $31,319,970.00. Thus, it is obvious that any appropriate award in this case will not approach the proportionate amount generally approved of by the courts of the Third Circuit.

2)   **Attorney's Fees and Costs** - A successful plaintiff in a bad faith action can collect attorneys' fees and costs for prosecution of both the underlying lawsuit and the bad faith action. *Polselli v. Nationwide Mut. Fire Ins. Co.*, 126 F.3d 524, 525 (3d Cir. 1997). In this case, the Bordens incurred attorney's fees and costs of $15,809.01 in the underlying case. The Bordens continue to incur fees and costs in the bad faith lawsuit. In the underlying case, the Bordens' attorneys charged $210 per hour. In the bad faith case, the Bordens' are represented on a contingent fee basis, hence the Bordens are entitled to an "enhancement" of the $210 per hour rate in light of their attorney's risk of non-payment. See *Polselli*, 126 F.3d at 535. In the *Polselli* litigation, the parties agreed that $300 per hour was a reasonable billing rate, even before enhancement because of a contingent fee. *Polselli v. Nationwide Mutual Fire Ins. Co.*, 1998 WL 855494 (E.D. Pa. 1998). The Bordens will offer detailed, current attorney's fee proofs at trial, and will ask for an award equal to the hours spent by the Bordens' attorney multiplied by $300

per hour for partners, $225 per hour for associates and $100 per hour for paralegals.

3) **Interest** - The Bordens seek an award of interest only on the amount of the difference between Amica's original structure damage offer of $328,999.14 extended March 11, 2003 and the agreed-upon cost of repairs of $553,982.14, which agreement was made on or about November 3, 2003. Interest at the applicable prime rate plus 3% for the period March 11, 2003 through November 3, 2003 on this $224,983.00 deficiency equals $10,686.73.

4) **Compensatory Damages** - A successful plaintiff in a Pennsylvania bad faith case is also entitled to compensatory damages. *The Birth Center v. St. Paul Companies, Inc.*, 727 A.2d 1144 (Pa. Super. 1999). In this case, Amica's conduct required the Bordens to incur the costs of retaining a public adjuster, Anthony J. Parise of Giordano Associates, Inc., who was paid 8% of the total amount of the claim (plaintiffs will provide a summary of the specific payments made to Giordano Associates before trial), and for another contractor, David J. Haller, for assistance in developing their estimate. Mr. Haller was paid $2,000.

III.    Witnesses

Plaintiffs Jonathan A. Borden and Amy P. Borden may call some or all of the following witnesses during the trial of this case:

|     |                                                                              | Liability | Damages |
|-----|------------------------------------------------------------------------------|-----------|---------|
| (1) | Jonathan A. Borden<br>5434 East Galbraith Road<br>Cincinnati, OH 45236       | X         | X       |
| (2) | Amy P. Borden<br>5434 East Galbraith Road<br>Cincinnati, OH 45236            | X         | X       |
| (3) | Richard M. Borden, Esquire<br>32 Lakeview Drive<br>West Hartford, CT 06117   | X         | X       |

|  |  | Liability | Damages |
|---|---|:---:|:---:|
| (4) | Edene Borden<br>37 Candlewood Drive<br>West Hartford, CT 06117 | X | X |
| (5) | Peter Hardner<br>223 West 26th Street<br>Erie, PA 16508 | X | X |
| (6) | Brian Seifert, Debbie Seifert and/or<br>Representatives of Visions Corporation<br>Building Services<br>3331 West 12th Street<br>Erie, PA 16505 | X | X |
| (7) | John Schumann<br>Property Claims Services<br>117 Arbor Crest Lane<br>Lillington, NC 27546 | X | X |
| (8) | David J. Bennett, CPCU, AIC<br>Branch Manager<br>Amica Mutual Insurance Company<br>Pittsburgh Regional Office<br>1500 Corporate Drive, Suite 250<br>Canonsburg, PA 15317-8574 | X | X |
| (9) | Lisa St. Onge<br>Amica Insurance Company<br>100 Amica Way<br>Lincoln, RI 02865 | X | X |
| (10) | Anthony N. Parise, CIC, CPCU, AIC<br>Robert Mayo<br>Giordano Associates, Inc.<br>71 High Street<br>P.O. Box 469<br>East Haven, CT 06512 | X | X |
| (11) | David J. Haller<br>David J. Haller Construction, Inc.<br>4845 West Lake Road<br>Erie, PA 16506 | X | X |

|  |  | Liability | Damages |
|---|---|:---:|:---:|
| (12) | Daniel J. Jones<br>G.S. Jones and Sons<br>8347 Ohio River Boulevard<br>Pittsburgh, PA 15202 | X | X |
| (13) | Representatives of VIP Laundry & Dry Cleaning<br>1215 Powell Road<br>Erie, PA 16506 | X | X |
| (14) | T. Warren Jones, Esquire<br>MacDonald, Illig, Jones & Britton LLP<br>100 State Street, Suite 700<br>Erie, PA 16507 | X | X |
| (15) | Paul K. Geer, Esq.<br>DiBella, Geer, McAllister, Best<br>312 Boulevard of the Allies, Suite 300<br>Pittsburgh, PA 15222 | X | X |

In addition, plaintiffs Jonathan A. Borden and Amy P. Borden reserve the right to call any witnesses listed in Plaintiff's Pretrial Narrative as well as any other witnesses identified during the course of pretrial discovery.

IV.   Exhibits

Plaintiffs Jonathan A. Borden and Amy P. Borden may introduce some or all of the following exhibits during the trial of this case, all of which are in the possession of defendant's counsel, unless otherwise noted:

    (1)    Copy of Amica's Platinum Homeowners Insurance Policy issued to Dr. and Mrs. Borden;

    (2)    Copy of Amica's original repair estimate prepared by John Schumann;

(3)     Copy of the repair estimates prepared by Anthony Parise;

(4)     Copy of the repair estimates prepared by Daniel J. Jones;

(5)     Copy of the Release executed by Dr. and Mrs. Borden regarding the building and contents loss as a result of the subject fire;

(6)     Copy of the transcripts of all discovery depositions, including exhibits, taken in discovery of this matter, including:

  a)  Jonathan A. Borden, M.D.

  b)  Amy P. Borden

  c)  Edene Borden

  d)  Richard M. Borden

  e)  John Schumann

  f)  David J. Bennett

  g)  Lisa St. Onge

  h)  Brian Seifert

  i)  Debbie Seifert

  j)  Anthony N. Parise

  k)  David J. Haller

  l)  Daniel J. Jones

(7)     Copies of all claims notes, correspondence, and any other document of any type appearing in Amica's claim file for the Borden claim;

(8)     Copy of letter from Dr. Borden to Pennsylvania Insurance Department dated April 17, 2003;

(9)     Copies of all letters exchanged between counsel for plaintiffs and counsel for Amica during the course of the claim;

(10)    Contingent Fee Agreement between Bordens and MacDonald, Illig, Jones & Britton LLP dated February 19, 2004;

(11)    Amica Mutual Insurance Company 2004 Annual Report; and

(12)   Amica Mutual claim documents including Guiding You Through Reconstruction packet and all claim handling memos, instructions and guidelines produced in discovery, including those identified by Bates Nos. AM 1107 through AM 1209 inclusive.

In addition, plaintiffs Jonathan A. Borden and Amy P. Borden reserve the right to introduce any exhibits listed in Defendants Pretrial Narrative as well as any other exhibits identified or produced during the course of pretrial discovery.

V.   Unusual Legal Issues

None.

VI.   Experts

As disclosed in Expert Disclosures of Plaintiffs Jonathan A. Borden and Amy P. Borden served August 19, 2005, plaintiffs identify:

1.   Anthony N. Parise, CIC, CPCU, AIC (Reports attached).

2.   David J. Haller (No report, Mr. Haller has been deposed).

Respectfully submitted,


 /s/ Craig Murphey
Craig Murphey
PA ID# 53324
MacDONALD, ILLIG, JONES & BRITTON LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507-1459
(814) 870-7655
FAX (814) 454-4647
cmurphey@mijb.com

Attorneys for Plaintiffs
  Jonathan A. Borden and Amy P. Borden

917726

- 15 -