IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE

| | |
|---|---|
| JONATHAN A. BORDEN and<br>AMY P. BORDEN,<br><br>    Plaintiffs<br><br>    vs.<br><br>AMICA MUTUAL INSURANCE<br>COMPANY<br><br>    Defendant. | CIVIL ACTION NO.: 04-175 - E |

## AMICA'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Amica Mutual Insurance Company respectfully submits the following Proposed Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Amica issued a Homeowner's Policy No. 6308371183 to Jonathan and Amy Borden for the time period 8/30/02 to 8/30/03. The fire occurred at the Borden's home at 4838 Wolf Road on February 16, 2003 and thus, the policy was in effect at the time of the loss.

2. Although some portions of the Borden's home was destroyed by fire, an entire wing of the Borden home suffered only smoke damage.

3. The applicable insurance contract contained policy limits of $577,000 for the building, $432,750 for personal property and $173,100 for loss of use.

4. The applicable insurance contract contained the following policy conditions, which set forth the duties the Bordens had to follow after the loss. Of the various duties, the following were applicable to the issues of this lawsuit:

    **B.**     **Duties After Loss**

        1.     Give prompt notice to us or our agent;

        4.     Protect the property from further damage. If repairs to the property are required, you must:

            a.     Make reasonable and necessary repairs to protect the property; and

            b.     Keep an accurate record of repair expenses;

        5.     Cooperate with us in the investigation of a claim;

        6.     Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

5. There is no evidence that following the fire, the Bordens made any effort to protect their property from further damage. Amica retained Visions, which conducted emergency repairs at Amica's expense. The evidence indicates that Amica made efforts to protect the Borden's property, both real and personal.

6. After the loss, Amica promptly retained the services of an independent adjuster named John Schumann, who met with the Plaintiffs, took them to dinner and explained the policy requirements regarding loss presentation. (See Defendant's Second Request for Admission and the Plaintiffs' Response to it.).

7. Amica's adjuster, John Schumann, prepared a preliminary estimate of the damage to the property and submitted it to the Plaintiffs on or about February 19, 2003. (See Defendant's Third Request for Admission and the Plaintiffs' Response to it.)

8. Within days of the loss, Amica found a comfortable temporary home for the Bordens to live in at a cost (to Amica) of $1,800 per month. In order to permit the Bordens to move into the home, Amica paid to plow the driveway, rather than waiting on the property owner to do so. (See Amica's Twelfth Request for Admission and the Borden's Response.)

9. The applicable insurance contract contained the following provisions pertaining to loss settlement, which are applicable to the facts of this case:

> **C.   Loss Settlement**
>
> In this Condition **C.**, the terms "cost to repair or replace" and "replacement cost" do not include the increased costs incurred to comply with the enforcement of any ordinance or law, except to the extent that coverage for these increased costs are provided in **E.II.** Ordinance or Law under Section I – Property Coverages. Covered property losses are settled as follows:
>
>> (4) For the purpose of settling that loss only, the following applies:
>>
>>> (a) We will pay no more than the smallest of the following amounts:
>>>
>>>> 1. Replacement costs at the time of loss without deduction for appreciation;
>>>>
>>>> 2. The full cost of repair at the time of loss;
>>>>
>>>> 3. Limited liability that applies to Coverage C, if applicable;
>>>>
>>>> 4. If the cost to repair or replace the property described in 4 and 5 above is more than $500, we will pay no more than the actual cash value of the

>loss until the actual repair or replacement is complete. (See Amica's Fifth Request for Admission to Plaintiffs and their Response).

10. The terms of the applicable insurance policy permitted the Bordens to collect repair costs if they decided to repair the premises. The Bordens also had the option of the policy to be paid the actual cash value of the loss, in which case, they did not have to repair it.

11. Pursuant to the initial repair estimate prepared by John Schumann, the repair cost of the building was $329,000. The actual cash value of the damage was $295,098.92.

12. In late February or early March 2003, the Bordens retained Giordano Associates. Giordano Associates is a public adjusting firm. Because Giordano was not licensed to adjust claims in Pennsylvania, they were referred to as an insurance consultant throughout this claim. For all intensive purposes, however, Giordano Associates carried out the duties and responsibilities which are traditionally handled by public adjusters. The agreement between the Bordens and Giordano Associates required the Bordens to pay to Giordano 8% of the total insurance proceeds received from Amica.

13. On March 11, 2003 Amica sent to the Bordens a check in the amount of $295,098.92 representing the undisputed actual cash value of the building, less the $1,000 policy deductible. The check contained no language that the payment represented a "full and final payment" or any other words to that effect. (See Amica's Eighth and Ninth Request for Admissions to Plaintiff and the Borden's Response, neither admitting nor denying the same.)

14. In March of 2003, Amica paid Plaintiffs the sum of $39,945.38 as a partial contents payment. There was no language on this check which indicated that it was a final payment. The Plaintiffs rejected this check. (This was admitted by Plaintiffs in their Response for the Eleventh Request for Admission.)

15. Throughout the claim period, Amica communicated frequently the Bordens and their representatives and also made a variety of payments and provided a number of services to them, despite the dispute which existed regarding the building loss. Those included the following:

   a. Rental payment in the amount of $10,800 for the rental home through March of 2004;

   b. $11,976.94 for temporary new furniture to be used in the rental home;

   c. $15,500 in credit placed upon a claim card provided to the Bordens;

   d. Three payments for emergency repairs to the house were made by Amica in the amounts of $11,874.20, $8,013.80 and $3,860.40.

16. The consulting agreement between Anthony Parise of Giordano Associates and the Bordens reveals that they retained the public adjuster in late February or early March 2005. The undisputed payment rejected by the Bordens was sent to the Bordens on March 11, 2003 and thus, Mr. Parise and Giordano were retained prior to existence of any dispute between the Bordens and Amica, as the Bordens contend.

17. During the months of March and April 2003, the parties exchanged documents pertaining to the repair of the premises and more specifically, items which Anthony Parise believe were left off of the estimate prepared by Amica's adjuster, John Schumann.

18. On March 26, 2003, Amica wrote a letter to the Bordens explaining that the checks which they had returned were not sent to them in an attempt to settle the claim. Amica explained that these were undisputed payments and offered to resend them.

19. On April 6, 2003, the Borden's adjuster, Anthony Parise, requested a meeting with all parties at the house to discuss the differences between the estimates, to inspect the clothes which had been cleaned by VIP Cleaners of Erie, but not cleaned to the Borden's satisfaction and to discuss various other issues. Amica agreed to the meeting, which was ultimately held on 4/15/03.

20. Anthony Parise of Giordano Associates wrote a Preliminary Estimate of $680,492. In May of 2003, this was increased to $691,117.98.

21. As of mid-April 203, the repair estimates for the building supplied by the insurance public adjuster, Anthony Parise and Amica's contractor, John Schumann, revealed substantial discrepancies. A meeting was held on April 15, 2003 to discuss the differences. At the April 15, 2003 meeting, the parties were unable to resolve their differences regarding estimated damage. (See Amica's Thirteenth Request for Admissions directed to Plaintiffs and the Plaintiffs' Answer, admitting this.)

22. The insurance policy provides for an appraisal in the event the parties failed to agree on the amount of the loss. The appraisal provision states:

> **E.   Appraisal**
>
> > If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where

> the **residence premises** is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss. (See Amica's Fourteenth Request for Admission directed by Amica to the Bordens and the Borden's admission of same.)

23. On May 2, 2003, Amica sent the Plaintiffs a letter invoking the appraisal provision in the policy. Amica advised the Bordens of the appointment of Mr. Jack Owens as Amica's appraiser. In the same letter, Amica advised the Borden's of its concern regarding the failure to clean up the damage to the basement, despite the insurance coverage made available to the Plaintiffs to do so. (See Amica's Fifteenth Request for Admission to the Plaintiffs and the Plaintiffs' Admission of same.)

24. At the point when Amica demanded an appraisal of the building, over two and a half months had passed since the fire had occurred. The Bordens had not provided Amica with a contents inventory, nor had they provided a building estimate from a contractor who was willing to repair the premises. (See Amica's Sixteenth Request for Admission to Plaintiffs and the Bordens Response of same.)

25. At the point when Amica demanded an appraisal on the building, the basement of the structure where the fire had originated had not been cleaned or repaired. (See Amica's Seventeenth Request for Admission and the Borden's Response, admitting it.)

26. In response to Amica's demand for appraisal, the Bordens appointed their public adjuster, Anthony Parise, as a "competent and impartial appraiser". (See Amica's Nineteenth Request for Admission and the Borden's Response admitting it.)

27. At the time when the Bordens appointed Anthony Parise as their appraiser, he and his firm, Giordano Associates assigned a contract with the Bordens which provided that the public adjusting firm was to be paid on a contingency fee basis. The contingency fee would be 8%. (See Amica's Twentieth and Fortieth Requests for Admission and the Borden's Response admitting each.)

28. The total amount paid to Giordano Associates by the Bordens for their representation in the claim submission process was $57,100.77. This amount does not include any fees or expenses which may be paid to Giordano Associates and/or Anthony Parise in connection with his appearance at the trial in this matter.

29. Following the request for an appraisal, the Bordens retained counsel, attorney Terry Jones of the firm MacDonald Illig Jones & Britton.

30. Following the hire of counsel by the Bordens, Amica did the same, retaining Paul K. Geer of the firm of DiBella & Geer.

31. Pursuant to discussions which occurred between the parties following the selection of counsel, it was mutually agreed that the appraisal proceedings would be put off until a later date.

32. The Bordens first submitted their claim for contents damage to Amica in late June of 2003, over four months after the fire. (See Amica's Twenty-Fourth Request for Admission and the Borden's Response, admitting that the Borden's contents claim was submitted in June of 2003 and that Amica had made payment on the contents claim in March of 2003.)

33. In June 2003, Amica retained Dan Jones of G.S. Jones & Sons to provide a second opinion on the repair cost of the building.

34. On June 20, 2003, the Bordens accepted the undisputed payments sent to them in March.

35. On or about August 12, 2003, Amica sent a copy of the revised estimate prepared by G.S. Jones & Sons which included repairs to the dwelling in the amount of $540,788.42. In addition, landscaping damage was included for a total estimate of $542,598.42. Amica submitted a check in the amount of $154,508.92 which represented the actual cash value of the repairs less the previous payment of $295,098.92 which was based upon the G.S Jones depreciation schedule. Amica also promised to issue a check for the balance after the Bordens completed repairs. (See Amica's Twenty-Fifth Request for Admission to the Bordens and the Borden's Response, admitting it.)

36. On August 25, 2003, Amica paid the Plaintiffs $189,439.76 representing a partial payment of the Borden's contents loss. (See Amica's Twenty-Sixth Request for Admission to the Bordens and the Borden's Response, admitting it.)

37. On or about September 9, 2003, Amica paid the Bordens an additional $22,959.55 for 30 additional contents items. (See Amica's Twenty-Seventh Request for Admission to the Bordens and the Borden's Response, admitting it.)

38. On October 30, 2003, the Plaintiffs' public adjuster, Anthony Parise, provided written material in support of their contents claim. This included a claim in the amount of $94,178.49 and a proposed agreement that depreciation should be applied to the entire contents list on a 25% basis rather than on an item by item basis. (See Amica's Twenty-Ninth Request for Admission to the Bordens and the Borden's Response, admitting it.)

39. In January of 2004, the Plaintiffs advised Amica that they had decided to demolish the building instead of repairing it.  (See Amica's Thirtieth Request for Admission to the Bordens and the Borden's Response, admitting it.)

40. Amica continued paying the additional living expense cost to the Bordens through March of 2004 – 14 months after the fire occurred.  (See Amica's Thirty-First Request for Admission to the Bordens and the Borden's Response, admitting it.)

41. The claim was resolved in December of 2003.

42. Amounts paid to the Bordens as of the date of trial total $880,156.34 and are divided by coverage as follows:  (See Amica's Thirty-Second Request for Admission to Plaintiffs and the Borden's Response, admitting it.)

Payments

| | |
|---|---|
| Coverage A – Dwelling | $472,629.90 |
| Coverage B – Other Structures | $   1,815.00 |
| Coverage C – Personal Property | $364,666.62 |
| Coverage D – Loss Of Use | $  41,044.82 |
| **Total Payments to date** | **$880,156.34** |

43. The parties agreed that the cost of repair to the building was $553, 982.

44. The Bordens are still entitled to the agreed upon replacement cost of the building, should they build a home on or off site.

## **CONCLUSIONS OF LAW**

1. There is no common law action for bad faith against an insurer in Pennsylvania. The Pennsylvania legislature provided for a statutory bad faith cause of action in 42 Pa. C.S.A. §8371. No definition of bad faith was provided in the statute.

2. In an insurance context, the term "bad faith" has been defined as follows:

> Bad faith on the part of an insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and meets a breach of a known duty through some motive of self interest or ill will; mere negligence or bad judgment is not bad faith.

*Terletsky v. Prudential Property and Casualty Insurance Co.,* 649 A.2d 680 (Pa. Super.) app. Den. 659 A.2d 560 (1994).

3. The *Terletsky* definition has been relied upon in decisions by the Third Circuit Court of Appeals, as well as the District Courts. See, *Polselli v. Nationwide Mutual Fire Insurance Co.*, 23 F. 3d 747 (3d Cir. 1994); *Coyne v. Allstate Insurance Co.*, 771 F. Supp. 673 E.D. (Pa. 1991) and *Klinger v. State Farm Mut. Auto. Ins. Co.*, 895 F. Supp. 709 (M.D. Pa. 1995).

4. In the *Polselli* decision, the above definition, which was quoted from Black's Law Dictionary, was cited as "peculiar [to] and universally acknowledged" in the insurance arena. *Polselli*, 223 F.3d at 751.

5. In the context of the case where coverage was not denied, payment was made and a full policy release has been executed, the definition of bad faith requires that the Plaintiff prove that the insurer acted frivolously or without foundation, with a dishonest purpose and through some ill-will or self-interest. *Terletsky*, Supra. 649 A.2d at 688.

6. Negligence, and even gross negligence cannot support a finding of bad faith. *Klinger v. State Farm Mut. Auto. Ins. Co.*, 895 F. Supp. 709 (M.D. Pa. 1995).

7. Where an insured alleges an insurer has committed bad faith based upon unreasonable delay, the delay can be grounds for liability only when an insurer knows of or recklessly disregards the lack of any reasonable basis for its delay. The delay, for all practical purposes, must "function as the equivalent of a denial". *Ania v. Allstate Insurance Company,* 161 F. Supp. 2d 424, 430 n.7 (E.D. Pa. 2001).

8. Bad faith must be proven by clear and convincing evidence. *Polselli v. Nationwide Mutual Fire Insurance Co.*, 23 F. 3d 747 (3d Cir. 1994).

9. Appraisal is a contractual means of resolving disputes between insureds and insurers which has been utilized to resolve disputed claims throughout the country for many, many years. In fact, the inclusion of an appraisal provision in an homeowner's fire insurance policy is required by Pennsylvania law. 60 P.S. §636.

10. The appraisal provision in the Borden's policy reads as follows and is fair and reasonable:

> If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within twenty days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within fifteen days, you or we may request that the choice be made by a Judge of a court of record in the state where the residence premises is located. The appraisers will separately set the amount of loss. If the appraisers submit a report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two, will set the amount of loss.

Each party will:

1. Pay its own appraiser; and

        2.      Bear the other expenses of the appraisal and umpire equally.

11. The appraisal language in the policy would not have necessarily resulted in the Bordens receiving anything less than the fair repair cost of the building, as believed by the Bordens. To the contrary, the language strongly implies that if the appraisers cannot agree on the amount of loss, then the decision of the umpire and any one appraiser will set the amount of loss.

12. Following the request for an appraisal, Amica retained an independent insurance adjuster, Jack Owens of McKean, Pennsylvania to act as its appraiser. Mr. Owens was impartial, having no previous connection with this loss and having never before worked for Amica.

13. The act of demanding an appraisal was not an act of bad faith by Amica. To the contrary, the demand for an appraisal was a reasonable means of resolving the differences between the parties and was contractually agreed to by the Bordens when they purchased their insurance policy.

14. The retention of counsel by the Bordens in response to the request for appraisal was not caused by any wrongful act of Amica.

15. Amica demonstrated good faith and open mindedness in considering the Borden's request that they consider retaining a second contractor to evaluate the damage to the building.

16. There is no credible evidence which would indicate that any of the payments made to the Bordens by Amica contain the words "full and final payment" or any other words to that effect.

17. Amica's decision to submit the disputed damage claims to appraisal in approximately April of 2003 was consistent with the contractual provisions, which

Plaintiffs and Amica agreed to at the inception of the policy and therefore, was not an act of bad faith.

18. The Borden's selection of Anthony Parise as an appraiser was incompatible with the policy provision, which required that each appraiser choose an "impartial appraiser" because Mr. Parise's firm, Giordano Associates was being paid 8% of the loss recovered by the Bordens. Thus, Amica's objection to the appointment of Mr. Parise was appropriate and not an act of bad faith.

19. The evidence reveals that the Bordens did not supply a contents inventory to Amica until late June of 2003, over four months after the fire. At this point, Amica had already submitted payment to the Bordens for contents in excess of $39,900 based upon the undisputed value of the property Mr. Schumann was able to observe within the property. The evidence reveals that the Bordens continued to supplement their contents claim throughout the year of 2003, including a submission of a claim in the amount of $94,178 on or about October 30. Additional contents submissions were made after that time. Therefore, there was no bad faith or unreasonable delay in Amica's resolution of the Borden's contents losses.

20. The Bordens failed and refused to accept Amica's undisputed payments on both building and contents, until June 2003. The evidence reveals that Amica's checks written to the Bordens on March 11 and March 17 were negotiated by Amy Borden on June 20, 2003.

21. The fact that the Bordens failed to accept any payments from Amica until June 20, 2003 and did not make a decision to repair the premises renders many of the Borden's complaints about Amica moot, for Amica was paying for the Bordens temporary living space, a house described by the Bordens as "comfortable", and Amica

continued to make payments to the Bordens for building and contents as liability became clear. In fact, the Bordens had made no decision to repair the building until December 2003, when they decided to demolish it instead of repairing it.

22. Amica never denied the Borden claim. In fact, Amica has paid the Bordens $880,156.34. There is no dispute regarding the amount paid or that it was fair and reasonable.

23. Amica did not demonstrate perfect or mistake free claim evaluation in this case. However, it did demonstrate a determined attempt to act reasonably, consider the Borden's requests and to advance monies to the Bordens throughout the claim period.

24. When considered in total, Amica demonstrated good faith attempts to fairly resolve the Bordens claims, first by appraisal and then by negotiation.

25. The Bordens have not proven by clear and convincing evidence that Amica acted in bad faith.

Respectfully submitted,

DiBella, Geer, McAllister & Best, P.C.

By:  /s/  PAUL K. GEER
Paul K. Geer, Esquire
PA I.D. NO 27675
Firm I.D. No. 099
312 Boulevard of the Allies
Pittsburgh, PA  15222
(412)261-2900

Attorney for Defendant, Amica Mutual Insurance Company