IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE

| | | |
|---|---|---|
| JONATHAN A. BORDEN and | ) | |
| AMY P. BORDEN, | ) | |
|     Plaintiffs | ) | |
| | ) | |
|       v. | ) | NO. 04-175 E |
| | ) | |
| AMICA MUTUAL INSURANCE | ) | |
| COMPANY, | ) | |
|     Defendant | ) | ELECTRONICALLY FILED |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiffs JONATHAN A. BORDEN and AMY P. BORDEN (hereinafter "Bordens"), by their attorneys, MacDonald, Illig, Jones & Britton LLP, hereby submit the following Proposed Findings of Fact and Conclusions of Law:

I.     <u>Findings of Fact</u>

      A.    <u>Liability</u>

1.    On August 30, 2002, the Bordens purchased a home at 4838 Wolf Road, Erie, Pennsylvania for $720,000.

2.    As of February 16, 2003, the Bordens lived in the Wolf Road home with their three children, three-year-old twin girls (Sara and Emma) and a one-year-old boy (David).

3.      On Sunday, February 16, 2003, an accidental fire severely damaged the Bordens' home.  It was apparently caused by spontaneous combustion of cotton rags used to apply linseed oil by Jonathan "Jon" Borden in a wood-working project.

4.      The fire began in the basement of the house and burned for many hours.

5.      The fire totally destroyed one section of the house and caused extensive smoke damage throughout the rest of the structure.

6.      As of the day of the fire, the Bordens owned an Amica Mutual Insurance Company "Platinum Choice" homeowner's insurance policy, no. 630837-1183.

7.      The Amica policy was in full force and effect as of the date of the fire.

8.      The Amica policy provided coverage to the Bordens for fire loss occurring to the Wolf Road house and the contents of the home.

9.      Amica does not dispute its liability under the policy to reimburse the Bordens for the damage to the Bordens' home and contents resulting from the February 16, 2003 fire.

10.      The "Platinum Choice" policy owned by the Bordens provided the broadest coverage of any Amica homeowner's policy form available in 2003.

11.      The Bordens' policy had the following relevant coverage limits:

    Coverage A (Dwelling) – $577,000
    Coverage C (Personal Property, *i.e.,* Contents) – $432,750
    Coverage D (Loss of Use – including Additional Living Expense) – $173,100

12.      The "Platinum Choice" policy contained the following provision:

    C.      **Loss Settlement**

                           *   *   *

        2.      ... If loss to the building insured under Coverage **A** does
                not exceed the Limit of Liability shown in the
                Declarations, losses will be settled as follows:

- 2 -

> a.  Buildings covered under Coverage **A** ... at replacement cost without deduction for depreciation ....

Amica Policy, pp. 14-15 of 26.  The building insured under "Coverage A" was the Bordens' house.

13.    If the fire had totally destroyed the Bordens' house, the cost to replace it by rebuilding would have been $762,913.

14.    Jon Borden was the only family member at home when the fire started, and he escaped without injury.

15.    Jon Borden promptly reported the fire to the authorities and to Amica.

16.    On the afternoon of the fire, February 16, 2003, from various sources, Amica received the following information:

> a.  The fire started in the basement of the west part of the house.
>
> b.  The smoke damage was "very extensive."
>
> c.  The whole house had been affected by the fire and smoke damage.
>
> d.  The fire department told Jon Borden that all the floors in the home were "bowed."
>
> e.  The attached garage was damaged by the fire.
>
> f.  The fire department had to cut a "large hole" in the roof.
>
> g.  The west part of the home was so severely damaged, including collapse of portions of the roof, that the fire marshal sought permission to demolish the structure, although they ultimately decided to wait until daylight on February 17th to decide whether demolition would be necessary.
>
> h.  There was approximately five feet of water in the basement of the home.
>
> i.  The home was not habitable.

17.    Adjustment of the claim was coordinated by Amica's Pittsburgh Regional Claims Office, primarily Claims Manager David J. Bennett.

18.    As of the Borden fire, Amica had in place several sets of guidelines and/or instructions governing the handling of fire loss claims such as the Bordens.  Among those guidelines was a 19 page document called First Party Property Loss Handling Expectations, dated August 1999.

19.    Amica's Pittsburgh claim handlers did not have contacts in the Erie area adequate to allow them to identify a "board-up" contractor to undertake the measures necessary to protect the damaged house against the elements.  On February 16, 2003, Amica learned that a board-up contractor called Visions, Inc. had arrived at the scene.  Visions, the owner of which was named Brian Seifert, had been called by someone with the volunteer fire company which had responded to the scene.

20.    Also on the same day as the fire, someone working on Amica's behalf contacted a well-known Erie fire restoration and building contractor, Peter Hardner of Peter Hardner & Son, Inc., to perform board-up services.  Mr. Hardner called Jon Borden, said he had been called by Amica and explained what services he would provide.  Later the same day, Hardner called Borden back and said that Seifert was already on the scene and Amica had decided to use Seifert instead of Hardner.  Borden asked Hardner about Seifert, but Hardner said he did not know him.

21.    On February 17, 2003, the day after the fire, Claims Manager Bennett assigned an adjuster named John Schumann to adjust the claim.

22.    At the time, Schumann was the principal of a firm called Property Claims Services based in Schumann's home in Lillington, North Carolina.

23.    Although not an employee of Amica, from the time Schumann formed Property Claims Services in 2001, the vast majority of his work had been for Amica.

24.    Before arriving in Erie, Schumann spoke with Jon Borden on the phone.  They discussed the call Borden had received from Peter Hardner.  Jon Borden told Schumann that he had visited the house and spoken with Seifert, and he had concerns about Seifert's experience and qualifications.  Seifert had not done some of the emergency work which Hardner, in his phone call with Borden, had suggested was necessary.  Borden told Schumann that Hardner seemed more reputable and experienced, but Schumann told Borden that Schumann would sort everything out when he got to Erie.

25.    Schumann arrived in Erie on February 19, 2003.

26.    Schumann went to the Bordens' house where he met Brian Seifert, and the two agreed to work together to develop an estimate of repair of the house.

27.    As of February 19, 2003, neither Schumann nor Amica had any information of any kind about Seifert and/or Visions, Inc.  They knew nothing about his qualifications or experience as a fire restoration contractor, general contractor, or homebuilder.  At the time, neither Seifert nor Visions were listed in the Erie yellow pages under "Building Contractors," "Contractors – General," "Home Builders," "Home Improvements," or "Fire Damage Restoration."  The only listing was in the white pages, as "Visions Corp. Building Services" and "Visions Painting & Drywall."

28.    On February 19, 2003, Schumann completed an initial walkthrough of the damaged house and recommended that Amica place a $250,000 reserve on the dwelling coverage.

29.    On the evening of February 19, 2003, Schumann had dinner with the Bordens, at which time Schumann was very pleasant and reassuring.  He explained to the Bordens that he "worked for them" and he would take care of everything.

30.     During the February 19, 2003 meeting, the Bordens expressed "serious concerns" to Schumann about hiring the correct contractor to perform the repairs. Jon Borden reiterated his concerns about Seifert. Jon Borden also gave Schumann the names of two contractors whom the Bordens would consider for repair/rebuild, David J. Haller Construction and Laughlin Builders, whose names Borden knew because of their work on neighboring houses. Schumann wrote the names down, but said that it was too early in the process to contact anyone.

31.     At some point between February 20 and 25, Borden reiterated to Schumann his concerns about Seifert/Visions. Borden related that he had been told that Seifert was not known as either a fire restoration contractor or a general contractor. Rather, he was a roofing subcontractor. Borden suggested that Hardner seemed more experienced, but Schumann said he needed "warm bodies" at the scene and Visions was already there.

32.     Later, on February 25, 2003, Schumann reported to Amica that the Bordens had serious reservations about Seifert and Visions, and it was unlikely that the Bordens would select Seifert/Visions to repair the house.

33.     During the time Schumann was in Erie inspecting the loss (February 19-27, 2003), Amica, through Bennett, also learned the following about the Bordens:

    a.     The Bordens were "devastated" by the fire.

    b.     One of the Bordens' children, three-year-old Emma, "was born with serious health issues which require specific attention to safety, exposure and assistance." (Also by letter of February 28, 2003, Schumann reported that Emma "is subject to allergies and reaction from pollutants to an extreme degree.")

    c.     Because their home was uninhabitable, Amy Borden and the three children were staying in Pittsburgh with her family. Amy Borden was extremely distressed by the fire, relocation, and disruption to the family's life.

  d.  Jon Borden's professional obligations required him to stay in Erie without his family. Borden is a neurosurgeon and had moved to Erie only six months before to implement a new neurosurgical team at St. Vincent Health Center. The job entailed "enormous" and time-consuming responsibilities.

  e.  The above-referenced circumstances prevented the Bordens from being fully involved in the adjustment of their claims, but that the Bordens had made Jon Borden's brother and mother available to assist. Jon's mother came to Erie from her home in Connecticut to assist with the process.

34.  In a report dated February 25, 2003, Schumann told Amica the following about the house and the fire damage:

  a.  The house contained approximately 5,500 square feet of heated living area, and was located on a two-acre lot in an upscale neighborhood.

  b.  The fire started in the basement, which was present below about 50% of the main structure.

  c.  In their fire fighting efforts, the fire department broke out "several" windows and "cut numerous large openings" in the roof.

  d.  The basement was essentially totally destroyed, and the main thirty-four foot long steel support I-beam in the basement was twisted due to the extreme heat of the fire. A structural engineer was called to evaluate the basic integrity of the house.

  e.  The rooms above the basement, the kitchen, den and formal dining room, were largely destroyed, requiring replacement of interior walls and ceiling joists.

  f.  The areas of the main level and second level of the house which were not completely destroyed but "sustained significant smoke and soot damage to drywall ceilings and walls and floor coverings."

35.  Between February 20 to 26, 2005, Schumann inspected the house and found significant damage – the dining room floor had collapsed, the kitchen floor had collapsed, part of the family room floor had collapsed, and there was smoke damage throughout the remainder of the house. He noted extreme smoke and soot damage on the main level of the house, and smoke

damage throughout the two-story structure.  Using a computer software program, Schumann developed an estimate for the cost of repair of the house.

36.    On February 26, 2005, Schumann "reviewed" his estimate with Seifert.

37.    Schumann estimated that it would cost $328,999.14 to repair or replace the damage to the structure to put the house back in its pre-fire condition.

38.    On February 26, 2005, Schumann provided copies of his estimate to Amica and the Bordens.

39.    Schumann never at any time revised his $328,999.14 estimate.

40.    On February 27, 2005, Schumann spoke with Jon Borden's brother about the estimate and "met with some resistance concerning cleaning vs. removal and replacement of drywall throughout interior of dwelling."  Jon Borden's brother also raised with Schumann specific mistakes or omissions in the estimate, such as an omission of an estimate to replace the plumbing in the totally destroyed basement.  Schumann flatly refused to consider changing his estimate.

41.    Also on February 27, 2005, Schumann and Jon Borden had a conversation in which Borden raised the subject of hiring a public adjuster to assist with the damage evaluation. Schumann discouraged Borden from hiring a public adjuster, telling him that they are "ambulance chasers," and that hiring a public adjuster would not change Schumann's estimate.

42.    On February 27, 2003, Schumann left Erie, without considering the Bordens' objections and without revising his estimate.

43.    In early March, the Bordens retained the services of an insurance consultant, Anthony N. Parise, of Giordano Associates, Inc. to review Schumann's estimate and, if necessary, prepare his own estimate of the cost of repairs.

44.    On March 1, 2003, Schumann told Amica his estimated cost of rebuilding the Borden house from the ground up would be $762, 913.00.

45.    On March 3, 2003, Bennett wrote to the Bordens and advised them that Schumann had completed his dwelling repair estimate and that Visions was willing to complete the repairs based on the estimate.  At this point, Amica still had no information whatsoever regarding Visions'/Seifert's competence or experience.

46.    As of March 2003, Parise had nearly fifteen years of experience adjusting large fire losses and had inspected over 100 fire scenes.  Parise held several insurance certificates, including Certified Insurance Consultant, Associate in Claims, and Chartered Property Casualty Underwriter.  He was licensed to adjust claims in Connecticut and New York.  (Although Amica knew throughout that Parise was not licensed in Pennsylvania, they never objected to Parise serving as the Bordens' consultant in this case.)

47.    Parise came to Erie on or about March 2, 2003.  Before inspecting the damage, Parise spoke with Schumann, who indicated that he was pleased that Parise was now involved because of the difficulty the Bordens' were having in assisting with the adjustment.

48.    In their initial conversation, Schumann also advised Parise that Schumann was confident about his estimate because it was "backed up" by Seifert/Visions.

49.    Parise inspected the house the week of March 2, 2003.

50.    Parise found significant damage.  He rated the damage a "95" on a scale of 1-100.

51.    In preparing his estimate, Parise originally used Schumann's estimate as a guide, with the intent of revising Schumann's estimate in places where necessary.  However, Parise found Schumann's estimate to be so inaccurate he needed to set it aside and start from scratch.

52.    In the part of the house which was not completely gutted by the fire, Parise noted heavy smoke damage throughout.  He found soot and other evidence of smoke damage in the wiring and plumbing chases throughout the house.  Thus, Parise created an estimate which involved stripping the entire house down to its framing, taking out the flooring, cleaning and repairing the framing, and rebuilding from that point.  The Parise estimate also included obviously damaged items which were not included in Schumann's estimate.

53.    On March 5, 2003, Amica received a verbal report that Parise had found significant deficiencies in Schumann's estimate and that Parise's estimated cost of repair would likely be much greater.

54.    Before making any payments on this claim, Bennett was required to obtain approval from Lisa St. Onge, a claims examiner working out of Amica's corporate headquarters in Lincoln, Rhode Island.

55.    On March 7, 2003, St. Onge gave Bennett authority to make a payment to the Bordens based on Schumann's $328,999.14 repair estimate.

56.    At the same time she was instructing Bennett to make payment for repair of the dwelling based on Schumann's estimate, St. Onge also asked Bennett to investigate the experience and qualifications of Seifert/Visions by asking how many years they had been in business, how large of a company they are, and whether they normally handle losses of this size.

57.    Also on March 7, 2003, St. Onge told Bennett that she believed the claim was "heading towards appraisal," although Amica had yet to see Parise's estimate or report.

58.    Finally, also on March 7, 2003, St. Onge asked Bennett to investigate the Bordens' concerns about residual carcinogens or other toxins by contacting a dry cleaning expert who may have information on the subject.  (Bennett contacted the dry cleaning expert on or

about March 11, 2003, but never received a substantive response to address the Bordens' concerns.)

59.    On March 11, 2003, Bennett sent the Bordens a letter enclosing a check in the amount of $295,098.92, which he said "represents the actual cash value of the dwelling repairs less our $1,000.00 deductible." (This payment was based upon Schumann's repair estimate of $328,999.14 with a "hold-back", permitted by the policy, of the difference between the actual cash value and the replacement cost. The "hold-back" would be paid after reconstruction of the house, assuming the cost of repair was equal to or greater than the estimate.)

60.    The March 11, 2003 letter did not say that the $295,098.92 payment was negotiable, or preliminary, or anything else which would indicate that further payments (other than the "hold-back") would be forthcoming or that the payment was for anything other than Amica's final estimate of the cost to repair the house.

61.    The March 11, 2003 letter also referred the Bordens to a portion of their policy entitled "Duties After Loss" which said, in part, as follows:

> In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed by either you ... or a representative:
>
>     4.    Protect the property from further damage. If repairs to the property are required, you must:
>
>         a.    Make reasonable and necessary repairs to protect the property.

62.    After receiving the March 11th letter with the settlement check, the Bordens believed Amica was threatening to withdraw coverage unless the Borden's accepted the check and began to make repairs immediately.

63.    After consulting with Jon Borden's brother and Parise, by letter of March 17, 2003, the Bordens returned the Amica settlement check because the amount was obviously inadequate to repair the house.

64.    On or about March 18, 2003, clothes which were dry cleaned per Schumann's instructions were delivered to the Bordens at their rental house.  Upon opening the dry cleaning bags, the Bordens noticed a distinct smoke odor and, therefore, advised Schumann that they could not accept the clothes.  Schumann asked Visions to store the items, but learned that they did not have the facilities to do so.  Schumann, therefore, instructed Visions to store the cleaning in the garage of the fire-damaged house.

65.    On or about March 21, 2003, Bennett spoke with Brian Seifert about his qualifications and experience.  Seifert told him he had been in business for 3 years, although he claimed to have "grown up" in the construction business working for his father.  Seifert said that Visions "specialized" in fire restoration work and had done work on projects with a value up to $300,000.00 in the past.  They claimed to have as clients at least two other insurance companies.

66.    Neither Schumann nor Bennett, nor anyone else form Amica, ever further investigated Seifert or Visions in any way, *i.e.*, they never spoke directly to any insurance companies or homeowners for whom Visions had worked, nor did they inspect, or even view, any of the homes or buildings repaired or constructed by Visions.

67.    Sometime in March, 2003, Parise met with Seifert at the house to review Parise's thoughts on the damage, because Schumann had said that he was confident about his estimate because Seifert was willing to do the repairs for the estimated amount.

68.    After touring the damaged house with Seifert, Seifert admitted to Parise that the house could **not** be restored to its pre-fire condition for the amount estimated by Schumann.

69.    Later in the process, Seifert also told Jon Borden that Seifert had never agreed that Schumann's estimate would put the house in its pre-loss condition.  Seifert said he had simply told Schumann and Amica that he could do the estimated work at the estimated price.

70.    On March 23, 2003, Parise sent Schumann a letter, which was forwarded to Amica, which contained his 55-page estimate of repairs and a five-page report outlining the major areas of disagreement between his estimate and Schumann's.

71.    Parise's estimate of repair was $680,492.21 and was later amended slightly to $691,117.98.

72.    Parise's March 23, 2003 report also advised Schumann and Amica that Seifert was no longer comfortable with Schumann's original estimate.

73.    Parise's March 23, 2003 report also specifically identified 19 different areas of the house for which Parise believed Schumann's estimate was inadequate, and identified a number of obviously destroyed items which Schumann completely failed to mention in this estimate.

74.    On March 25, 2003, Bennett wrote to Parise and, for the first time, indicated that the $295,098.22 check previously sent to the Bordens could be accepted by the Bordens without prejudice against pursuing further damages.  (On those terms, and after retaining counsel, the Bordens later accepted the check.)

75.    Bennett's letter to Parise of March 25, 2003 also insisted that the Bordens must accept delivery of the dry cleaned clothes because "these items have been cleaned according to industry standards and we disagree with the contention that they were not cleaned satisfactorily." At this time, the Bordens knew the clothes were being stored in the garage of their fire-damaged home.

76.     On or about March 28, 2003, Amica received the West Lake Fire Department Fire Report for the Borden fire.  It indicated that the fire began in the basement and extended to "entire basement, fire & structural damage 1st floor, fire damage in attic, smoke & heat damage throughout remainder of home."

77.     On or about April 4, 2003, Bennett sent Schumann Parise's estimate and asked for his review and comments.

78.     On or about April 4, 2003, Bennett investigated the Bordens' assertion that the dry cleaned clothes still smelled of smoke.  He spoke with the dry cleaning firm, and one of their employees confirmed that the clothes still smelled of smoke when delivered to the Bordens.

79.     Sometime before April 6, 2003, Parise spoke with Schumann and pointed out obvious inaccuracies in Schumann's estimate, such as pricing for vinyl flooring and plastic laminate countertops instead of the house's ceramic floors and Corian countertops.   But Schumann inexplicably refused to consider changing his estimate.

80.     On April 6, 2003, Parise wrote to Bennett and addressed several items:

a.      That, as Parise's estimate indicated, the necessary repairs would cost far in excess of Schumann's estimate.

b.      That Seifert had acknowledged that Schumann's estimate was too low.

c.      That Parise had personally inspected the clothes and they smelled of smoke and many were stained.

d.      That Parise did not understand how Bennett could say the clothes were clean when no one from Amica, or working on their behalf, had personally seen the clothes.

e.      That Parise believed a meeting including himself, Schumann, and Amica representatives could help Amica understand the obvious deficiencies in Schumann's estimate.

81.    The meeting proposed by Parise was held at the Bordens' fire-damaged house on April 15, 2003.

82.    At the April 15, 2003 meeting, Parise toured the house with Schumann and Bennett.

83.    The April 15, 2003 visit was Bennett's first to the scene.  At no time before that did any employee of Amica visit Erie to inspect the fire scene or meet with anyone involved in adjusting the claim.

84.    Parise pointed out numerous locations throughout the house where soot and other evidence of smoke damage was present behind walls, in insulation materials, under tubs, and in other "hidden" areas.  Schumann and Bennett refused to consider revision of his estimate. Instead, Schumann responded by saying that the soot and smoke smell could be covered up with sealer and paint, and that the black substance on insulation may not be soot, and that if there was soot behind the walls, there is no way to tell if the soot was caused by the February 16, 2005 fire.

85.    Parise also pointed out ceramic flooring and Corian countertops, (which Schumann had priced as vinyl flooring) including a countertop with a Corian sticker on the underside (which Schumann had priced as plastic laminate), but neither Schumann nor Bennett conceded that the estimate should be changed.

86.    Parise recommended that Amica bring in another contractor to review the estimates, because Parise thought it would be obvious to any competent contractor that Schumann's estimate was low.

87.    After spending the morning of April 15, 2003 touring the house with Parise, Schumann and Bennett conversed and agreed that Schumann's estimate should be revised by at least $20,000.00.  But instead of telling Parise about the increased estimate, or accepting Parise's

offer to have another contractor inspect the loss, over the noon hour Schumann and Bennett telephoned Amica Senior Assistant Vice President Peter Reid at Amica's corporate headquarters and received instructions to invoke the Appraisal clause of the policy.

88.     On the afternoon of April 15, 2003, Parise, Schumann, and Bennett examined the clothes and other contents which were in the process of being cleaned.   Bennett personally examined the clothes which Amica had previously insisted were adequately cleaned, and agreed that a good portion of the clothing was still stained or smelled of smoke.

89.     The Bordens' Amica policy contains the following Appraisal provision:

> **E.     Appraisal**
>
> If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss.  In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other.  The two appraisers will choose an umpire.  If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the **residence premises** is located.   The appraisers will separately set the amount of loss.  If the appraisers submit a written report of an agreement to sue, the amount agreed upon will be the amount of loss.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two will set the amount of loss.
>
> Each party will:
>
> **1.**     Pay its own appraiser; and
>
> **2.**     Bear the other expenses of the appraisal and umpire equally.

90.     In the insurance industry, appraisal is regarded as a remedy of last resort.  In his approximately 15 years of handling fire loss claims for both homeowners and insurance companies, Parise had been through the appraisal process only three times.   Appraisal is

expensive for both parties, since often both parties must bring in yet another contractor to estimate the loss, and also pay for the services of their appraiser and the umpire.

91.     After the unsuccessful meeting of April 15, 2003, Jon Borden sent a letter of complaint, dated April 17, 2003, to the Pennsylvania Insurance Department, with a copy to Amica.  The letter outlined the obvious deficiencies in the Schumann estimate, and expressed disappointment that Amica had continued to refuse to revise its estimate in the face of overwhelming evidence that it was inadequate.

92.     On or about May 1, 2003, in response to Amica's demand for appraisal, the Bordens hired T. Warren Jones and the firm of MacDonald, Illig, Jones & Britton LLP to represent them in further pursuit of adequate payment from Amica.

93.     By letter of May 2, 2003, Amica appointed Jack Owens of York Claim Services, Inc. of McKean, Pennsylvania to serve as its appraiser.

94.     At the same time, Amica also hired Owens to replace Schumann as its adjuster for further handling of the Bordens' claim for damage to the contents of the house.

95.     Bennett wrote to the Bordens on May 2, 2003 and May 22, 2003 asking them to appoint an appraiser.

96.     On May 22, 2003, Attorney Jones wrote to Bennett, advised him of his representation of the Bordens, appointed Anthony Parise to serve as the Bordens' appraiser, offered to provide suggestions for an umpire, and noted his surprise that Amica had invoked the appraisal process despite the "obvious flaws, omissions and errors" in Schumann's estimate.

97.     On May 27, 2003, Attorney Paul Geer of DiBella & Geer, P.C. contacted Attorney Jones to advise of his representation of Amica.

98.    Attorney Geer followed the conversation with a letter dated May 28, 2003.  In the May 28th letter, Attorney Geer wrote that Amica objected to the appointment of Parise as the Bordens' appraiser, on the grounds that Parise had been serving as the Bordens' adjuster in the case.  The letter did not, however, disclose that Amica's appraiser, Jack Owens, had also been hired by Amica to adjust the remaining contents claim presented by the Bordens.

99.    Attorney Geer's May 28th letter also indicated that one of the reasons that Amica invoked the Appraisal clause was because appraisal had been suggested by the Pennsylvania Insurance Department investigator who had been assigned the case after the Bordens' complaint. The letter failed to note that Amica had decided to cut off negotiations with the Bordens and demand appraisal on April 15, 2005, two days before the Bordens' letter was written to the Insurance Department.

100.    Also in his letter of May 28, 2003, Attorney Geer noted that Amica did not believe its policy required them to pay for repairs of items damaged only by "smoke or water." Thus, at this point, Amica apparently believed that "covering up" damaged areas was adequate, rather than repairing or replacing damaged structures.

101.    On June 5, 2003, Attorney Jones wrote to Attorney Geer about several topics. Among them, Attorney Jones addressed Amica's contention that the smoke damage evident in "hidden" places in the house could be covered up with sealant and/or paint:

> I am somewhat curious about the question which you asked on the second page of your letter as follows:  "Why should Amica accept a proposed scope of damage presented by your clients and their adjuster which suggests that areas damaged only by smoke and water should be gutted and rebuilt?"  It would appear to me that to ask the question is to answer it.  This is Amica's Platinum policy; and it purports to provide for replacement cost of that part of the building damaged, with materials of like kind and quality.  Simply stated, therefore, it would seem that areas damaged by smoke and water should be "replaced."  This is precisely the

sort of problem which caused my clients to become concerned about whether Amica is acting in good faith.

102.    In the letter of June 5, 2003, Attorney Jones also advised that he had scheduled a meeting with Parise and a building contractor selected by the Bordens to assist with the process (David J. Haller of David J. Haller Construction), at which they would review the estimates and then be in touch with Schumann and Amica to further discuss the claim.

103.    On June 16, 2003, Attorney Jones again wrote to Attorney Geer and advised him of several things, including:

   a.    The meeting involving Parise and Haller had been held.

   b.    Attorney Jones was scheduling a meeting among Schumann, Parise, and Haller so that Schumann could again hear the Bordens' position regarding his estimate, and so Schumann could review Haller's estimate, which would be available at that meeting.

104.    The Attorney Jones letter of June 5, 2003 also posed two questions to Amica:

   a.    Could Amica please clarify its position regarding the scope of its policy obligations in light of Attorney Geer's prior comment that Amica should not be required to replace damaged structures?

   b.    How had Amica gone about hiring Seifert/Visions, and "what did Amica do to assure itself that Visions was a capable, qualified and well-regarded building contractor experienced in the construction of 'high-end' residential dwellings?"

105.    Amica never responded to Attorney Jones' question about how it had come to select Seifert/Visions or about the investigation it had done to assure itself he was competent and adequately experienced.

106.    David Haller is a general contractor with over 24 years of experience in residential and commercial construction in the Erie area. He has constructed and/or extensively remodeled numerous "high-end" homes in the Erie market, including several in the

neighborhood of the Borden house. In fact, Haller had done remodeling work on the Borden house a number of years before the Bordens took possession.

107. In preparing his estimate of the cost necessary to restore the house to its pre-fire condition, Haller closely examined the house and the damage thereto, and obtained estimates from framing, plumbing, and electrical subcontractors, and quotes from door and window suppliers.

108. Haller reviewed Schumann's estimate when he began his own work. He describes Schumann's estimate as so inadequate that he "laughed" at it.

109. Haller's estimated cost of repair, dated June 11, 2003, was $700,000.00.

110. By letter of June 16, 2003, Attorney Geer advised that Amica had decided to select a second contractor, Daniel J. Jones of G.S. Jones and Sons, to estimate the loss.

111. The parties agreed to postpone the appraisal process until after Daniel Jones prepared his estimate.

112. On June 25, 2003, Daniel Jones inspected the Borden house to prepare his estimate of loss.

113. On July 23, 2003, Attorney Geer wrote to Attorney Jones and admitted that, "[i]t appears that the scope of damage to the building is broader than what was previously estimated" by Amica.

114. Also in his letter of July 23, 2003, Attorney Geer asked if the Bordens could supply Daniel Jones with copies of the subcontractor's estimates Haller had obtained so Jones could incorporate them into his estimate. The Bordens complied and provided those estimates.

115. Daniel Jones prepared a Report and Estimate dated July 28, 2003.

116.    Jones' Report described the damage to the basement and rooms above it as "catastrophic."

117.    Jones further described the damage evident in the "hidden" areas of the house:

> Due to the extreme heat and burn time, significant pressure was created in the home which caused hot smoke residue to drive throughout the crawl space area and balance of the home discoloring finishes, driving behind trim and casings, penetrating unducted air return cavities, tub cavities, pipe chases and penetrating stud wall and joist cavities at the floor line and at each electrical device penetration.

118.    Jones' Report also noted that deodorization of the structure would be difficult, "[d]ue to the severity of the smoke and heat."

119.    Jones' estimate for repair of the home was $542,598.42.

120.    With his letter of August 13, 2003 enclosing the estimate, Bennett enclosed a check to the Bordens calculated pursuant to the Jones estimate.

121.    The Bordens had Parise review the Jones estimate.

122.    With Attorney Jones' letter of October 20, 2003, the Bordens provided Amica with Parise's seven-page letter commenting on various areas of disagreement he had with the Jones estimate.  However, in that report Parise also noted that he found Jones' report to be "more logical and detailed" than Amica's original estimate.

123.    The parties negotiated the dwelling loss claim in October and November, 2003.

124.    On or about November 30, 2003, the parties came to a substantial agreement regarding the dwelling loss claim.

125.    Amica ultimately agreed upon a cost of repair of approximately $11,000.00 more than the Jones estimate.

126.    On April 5, 2004, the parties entered into a settlement agreement whereby the Bordens signed a release in favor of Amica which called for payment of $553,982.14, minus a

- 21 -

$1,000.00 deductible, for repair of the fire-damaged house. Amica has complied with the settlement agreement. The release excepted extra-contractual claims such as the present one.

127.    On or about May 20, 2004, the Bordens filed the Complaint in this action.


B.    Damages


128.    As of December 2004, Amica's net worth was $3,131,997,000.00.

129.    The Bordens incurred the following attorney's fees, paid to the firm of MacDonald, Illig, Jones & Britton LLP ("MacDonald, Illig"), and litigation costs in pursuit of their underlying fire loss claim: **Fees $15,383.50; Costs $425.51**.

130.    The Bordens retained MacDonald Illig to represent them in this bad faith lawsuit on a contingent fee basis, pursuant to which MacDonald Illig's fee would be equal to 33-1/3% of the recovery from the defendant, or 40% if the case was resolved after a second trial or appeal.

131.    Through November 30, 2005, the following number of hours had been worked by MacDonald Illig professionals on the Bordens' bad faith lawsuit. The hourly rate for each professional, charged at the same billing rates paid by the Bordens in the underlying case, are also set forth:

| Professional | Hours | Hourly Rate |
|---|---|---|
| T. Warren Jones (Partner) | 83.5 | $210.00 |
| Craig Murphey (Partner) | 223.3 | $210.00 |
| Matthew Fuchs (Associate) | 7.0 | $150.00 |
| Marissa Savastana (Associate) | 32.2 | $150.00 |
| Meredith Schultz (Associate) | 4.2 | $150.00 |
| Laurie Skelly (Paralegal) | 38.0 | $80.00 |
| Jennifer Belton (Paralegal) | 14.6 | $80.00 |

The Court will hold the record of this trial open for submission of supplemental evidence of attorney's fees incurred.

132.    Through November 30, 2005, the Bordens have incurred the following litigation costs, advanced by the MacDonald, Illig firm, in pursuit of the bad faith lawsuit:

| Expense | Amount |
|---|---|
| Deposition transcripts | $3,543.75 |
| Expert fees | $612.50 |
| Travel expenses | $1,006.54 |
| Photocopying | $1,836.08 |
| Online legal research | $298.57 |
| Filing fees | $100.50 |
| Long distance telephone/fax/postage | $234.04 |
| Witness fees | $89.70 |
| Miscellaneous | $32.21 |
| **Total** | **$77,753.89** |

The Court will hold the record of this trial open for submission of supplemental evidence of litigation costs incurred.

133.    Through November 30, 2005, the Bordens have incurred the following expense to obtain the services of its insurance consultant, Anthony J. Parise of Giordano Associates:

**$61,135.55**

The Court will hold the record of this trial open for submission of supplemental evidence of Parise's fees incurred.

134.    Through November 30, 2005, the Bordens have incurred the following expense to obtain the services of a contractor to estimate the fire-related damages, David J. Haller:

**$2,000.00**

The Court will hold the record of this trial open for submission of supplemental evidence of Haller's fees incurred.

135.    Interest on the difference between Amica's original dwelling loss offer of $328,999.14, extended March 11, 2003, and the agreed-upon cost of repairs of $553,982.14, which agreement was made November 30, 2003, at the applicable prime rate plus 3% for the period March 11, 2003 – November 30, 2003 equals:

**$10,686.73**

II.    Conclusions of Law

1.    This Complaint was brought pursuant to 42 Pa.C.S. § 8371, and alleges the bad faith conduct of Amica in handling the fire loss claim of Jon and Amy Borden.

2.    Jurisdiction lies with this Court pursuant to diversity of citizenship, 28 U.S.C.A. § 1441(a).

3.    Accordingly, Pennsylvania law applies to this case.

4.    "It is well settled that an insurer is obligated to act in good faith and fair dealing with its insured."  *O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901 (Pa. Super. 1999).

5.    The Court finds that Amica did not adjust the Bordens' fire loss fairly and in good faith.

6.    Under Pennsylvania case law, in order to prevail on a bad faith claim, an insured must present clear and convincing evidence of the following:

a.    that the insurer did not have a reasonable basis for denying benefits on a policy; and

b.    that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying a claim.

*Klinger v. State Farm Mutual Auto. Ins. Co.*, 115 F.3d 230 (3d Cir. 1997); *Anderson v. Nationwide Insurance Enterprise*, 187 F. Supp.2d 447, 458 (W.D. Pa. 2002); *MGA Ins. Co. v. Bakos*, 699 A.2d 751, 754 (Pa. Super. 1997).

7.    In order to prevail in a section 8371 bad faith case, the plaintiff is not required to prove anything more than these two elements. For example, the plaintiff need not prove that the carrier's conduct was motivated by some evil motive, or ill-will or self-interest. *Klinger*, 115 F.3d at 233, citing *Terletsky v. Prudential Property & Casualty Ins. Co.*, 649 A.2d 680 (Pa. Super. 1994), *app. den.* 659 A.2d 560 (Pa. 1995).

8.    The Court finds that the Schumann dwelling estimate was unreasonably low, Amica was unreasonable in relying upon it, Amica unreasonably failed to increase its offer and Amica unreasonably invoked the Appraisal clause of the policy instead of increasing its offer, hiring a reputable, experienced contractor to estimate the loss or continuing to negotiate with the Bordens. The Court further finds that Amica continued to base its offer on the Schumann estimated even after it knew or should have known that the estimate was inadequate, failed to increase its offer even after it knew or should have known that the estimate was too low, and invoked the Appraisal process even after it knew or should have known that the Schumann estimate was inadequate to put the Borden house in its pre-fire condition.

9.    In evaluating the conduct of an insurer under section 8371, the court may consider those insurance practices which Pennsylvania's legislature considers "unfair" as set forth in Pennsylvania's Unfair Insurance Practices Act, 40 P.S. § 1171.5. *Hayes v. Harleysville Mut. Ins.*

*Co.*, 841 A.2d 121, 125 (Pa. Super. 2003); *O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa. Super. 1999).

      10. The Unfair Insurance Practices Act proscribes the following acts by an insurer:

> (10)(iv)  Refusing to pay claims without conducting a reasonable investigation based upon all available information.
>
> (10)(vi)  Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear.
>
> (10)(vii)  Compelling persons to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts due and ultimately recovered in actions brought by such persons.

40 P.S. § 1171.5(10).

      11. The Court finds Amica violated 40 P.S. § 1171.5(10)(iv) by failing to conduct a reasonable investigation of the adequacy of Schumann's estimate after being provided information that the estimate was unreasonably low.  The Court finds that Amica violated 40 P.S. § 1171.5(10)(vi) by failing to increase its settlement offer when it became reasonably clear that Schumann's estimate was inadequate.  The Court finds that Amica violated 40 P.S. § 1171.5(10)(vii) by invoking the Appraisal clause of the policy, after offering substantially less than the amounts due, instead of increasing its offer after receiving information which made it reasonably clear that Schumann's estimate was inadequate.

      12. An insurer's failure to follow its own internal guidelines with regard to a claim can also be evidence of bad faith.  *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 381 (Pa. Super. 2002); *W.V. Realty, Inc. v. Northern Ins. Co.*, 334 F.3d 306, 317-8 (3d Cir. 2003).

      13. Amica had internal guidelines which governed the handling of this claim, set forth in a document called First Party Property Loss Handling Expectations, dated August 1999

(hereinafter "Expectations").  Amica's handling of this claim was inconsistent with its guidelines in numerous respects, including the following:

    a.    Failing to have an Amica adjuster meet with the Bordens within two hours of the loss report (Expectations, p. 3).  In this case the Amica adjuster (Schumann) did not arrive at the scene until three days after the fire;

    b.    Failing to have a supervisor visit the loss site within the first week (Expectations, P. 6).  In this case, the supervisor was Bennett, and he did not visit the site until two months after the fire;

    c.    Failing to clearly explain that the initial "ACV" offer, based on Schumann's estimate, was not Amica's final offer and did not foreclose future negotiation of the ultimate payment.  (Expectations, p. 7, 12).  Instead, Amica sent the original "ACV" payment, based on Schumann's estimate, with no indication whatsoever that it was anything other than Amica's one and only final offer on the dwelling;

    d.    Failing to offer the Bordens the choice to initiate the Appraisal process. (Expectation, p. 7).  Instead, Amica demanded Appraisal;

    e.    Relying on an independent adjuster (Schumann's) estimate of the loss instead of hiring a competent repair contractor to estimate the loss. (Expectations, p. 17).  Amica hired a competent repair contractor only after the Bordens hired an insurance consultant (Parise), complained to the insurance department, hired an attorney and hired the Bordens' own repair contractor (Haller).

14. An insurer can be liable for bad faith for extending an unreasonably low settlement offer, and failing or refusing to increase an offer despite the presence of evidence which would lead a reasonable insurer to conclude that its offer understates the amount of its contractual liability.  See, e.g., *Hollock v. Erie Ins. Exchange*, 54 Pa. D. & C.4th 449 (Luzerne Co. 2002), *aff'd*, 842 A.2d 409 (Pa. Super 2004), *appeal gr. in part*, 878 A.2d 864 (Pa. 2005); *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378 (Pa. Super. 2002).

15. An insurer can be liable for bad faith for extending an unreasonably low offer and compelling the insured to institute litigation, even if the "litigation" is a dispute resolution mechanism provided for in the insurance policy, such as arbitration or appraisal.  See, e.g.,

*Hollock*, 54 Pa. C. & C.4th at 518 (Bad faith for insurer to compel the insured to institute litigation, in the form of arbitration under the insured's underinsured motorist policy, by extending an unreasonably low offer and paying the amount owed only after an arbitration award.)

16. Amica acted in bad faith by extending an unreasonably low settlement offer based on Schumann's flawed estimate, and persisting with that offer despite the presence of evidence which would lead a reasonable insurer to conclude that its offer understates the amount owed. Amica also acted in bad faith by attempting to compel Appraisal instead of increasing its unreasonably low settlement offer after receipt of information which would have led a reasonable insurer to know its offer was inadequate.

17. Section 8371 allows a successful claimant to recover punitive damages, attorney's fees and costs and interest of the prime rate plus 3% on the unpaid claim. 42 Pa.C.S.A. § 8371.

18. A finding of bad faith is the <u>only</u> prerequisite to an award of punitive damages. *Hollock v. Erie Ins. Exchange*, 842 A.2d at 418-19. The three factors to be considered in determining the appropriate amount of punitive damages are, "1) the character of the act; 2) the nature and extent of the harm; and 3) the wealth of the defendant." *Hollock*, 842 A.2d at 409. The amount also must not offend the due process concerns articulated in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513, 155 L.Ed.2d 585 (2003). In *Hollock*, the Superior Court approved a compensatory/ punitive ratio of 10 to 1, i.e. a punitive damage award of $2.8 million with a compensatory award of almost $280,000. *Hollock*, 842 A.2d at 422. In these cases, compensatory damages include attorney's fees, costs and litigation expenses. See *Hollock*, 842 A.2d at 413. With regard to the wealth of the defendant, the net worth of an insurance company has been considered to be adequate evidence upon which a court can gauge

an appropriate punitive damage award.  See *Hollock*, 842 A.2d at p. 420; *Wood v. Allstate Ins. Co.*, 1997 WL 602796, *7 (E.D. Pa. 1997).  ("The Third Circuit has endorsed a ratio of around one percent of a defendant's net worth for a punitive damage award.")

19. Amica has admitted that its net worth as of December 2004 was $3,131,997,000.00, one percent of which equals $31,319,970.00.  The Court finds that a punitive damage award of ten times the compensatory damages proven in this case will adequately punish the defendant and deter similar conduct in the future, without effecting the defendant's ability to meet its obligations.

20. A successful plaintiff in a bad faith action can collect attorney's fees and costs for prosecution of both the underlying lawsuit and the bad faith action.  *Polselli v. Nationwide Mut. Fire Ins. Co.*, 126 F.3d 524, 525 (3d Cir. 1997).  In this case, the Bordens incurred attorney's fees and costs of $15,809.01 in the underlying case.  The Bordens continue to incur fees and costs in the bad faith lawsuit.  In the underlying case, the Bordens' attorneys charged hourly rates of $210.00 (partners), $150.00 (associates), and $80.00 (paralegals).  In the bad faith case, the Bordens are represented on a contingent fee basis, hence, assuming a finding of bad faith, the Bordens are entitled to an "enhancement" of the $210.00 per hour rate in light of their attorney's risk of non-payment.  See *Polselli*, 126 F.3d at 535.  In the *Polselli* litigation, the parties agreed that $300.00 per hour was a reasonable billing rate, even before enhancement because of a contingent fee.  *Polselli v. Nationwide Mutual Fire Ins. Co.*, 1998 WL 855494 (E.D. Pa. 1998).

21. The Court finds Amica liable to the Bordens under 42 Pa.C.S.A. § 8371.  The Court finds the Bordens are entitled to an award of $15,809.01 for the attorney's fees and costs in the underlying claim, and further finds the Bordens are entitled to an award equal to the hours spent by the Bordens' attorneys multiplied by $300.00 per hour for partners, $225.00 per hour for

associates, and $100.00 per hour for paralegals, plus the costs of litigation of the bad faith lawsuit.

22. The Court finds the Bordens are also entitled to an award of interest on the amount of the difference between Amica's original structure damage offer of $328,999.14, extended March 11, 2003, and the agreed-upon cost of repairs of $553,982.14, which agreement was made on or about November 3, 2003.  Interest at the applicable prime rate plus 3% for the period March 11, 2003 through November 3, 2003 on this $224,983.00 deficiency equals $10,686.73.

23. A successful plaintiff in a Pennsylvania bad faith case is also entitled to compensatory damages.  *The Birth Center v. St. Paul Companies, Inc.*, 727 A.2d 1144 (Pa. Super. 1999).  In this case, Amica's bad faith conduct required the Bordens to incur the costs of retaining a public adjuster, Anthony J. Parise of Giordano Associates, Inc., who was paid $61,135.55 through November 30, 2004, and for another contractor, David J. Haller, for assistance in developing their estimate.  Mr. Haller was paid $2,000.00 through November 30, 2004.  The Court finds that the plaintiffs are entitled to an award equal to the amounts paid Mr. Parise and Mr. Haller through November 30, 2004, plus any other amounts reasonably paid to them to assist the plaintiffs in pursuit of the bad faith claim.

<u>PROPOSED VERDICT</u>

AND NOW, this _____ day of December, 2005, following a non-jury trial, the Court finds in favor of the plaintiffs, Jonathan and Amy Borden, and against the defendant, Amica Mutual Insurance Company, and awards damages to plaintiffs pursuant to 42 Pa.C.S. § 8371 as follows:

| | |
|---|---|
| Interest on the difference between the original offer of $328,999.14 and the agreed upon costs of repairs of $553,982.14 for the period March 11, 2003 through November 3, 2003 | $ 10,686.73 |
| Attorneys' fees and litigation costs for the underlying fire loss claim | $ 15,809.01 |
| Costs for the services of Anthony N. Parise for both the underlying fire loss claim and the bad faith claim | $ 61,135.55 plus costs incurred after 11/30/05 |
| Costs for the services of David J. Haller for the underlying fire loss claim and the bad faith claim | $ 2,000.00 plus costs incurred after 11/30/05 |
| Punitive damages | (Ten times the above-referenced compensatory award) |
| TOTAL VERDICT | $ _____ |

Respectfully submitted,


 /s/ Craig Murphey
Craig Murphey
Pa Bar ID No. 53324
MacDONALD, ILLIG, JONES & BRITTON LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507-1459
(814) 870-7655
FAX (814) 454-4647
cmurphey@mijb.com

Attorneys for Plaintiffs
  Jonathan A. Borden and Amy P. Borden