Plaintiffs' Exhibit 4

**First Party Property Loss Handling Expectations**                    **August 1999**

## INTRODUCTION

Our goal is to address what we expect in our serious first party property claims. For the purpose of this discussion, we define serious property losses as those claims where insureds are forced to move out of their homes for a period of time to effect repairs.

First things first: immediately after any sizeable dwelling loss, our insureds may have emotions that run differently than the norm. Mood swings, stress, depression and anxiety are a few of the more typical emotions we encounter. We need to recognize the power emotions have on all under stressful times. Your empathetic, concerned approach is truly important. We need, however, to provide the services promised by the contract. There's much we can accomplish before we must have the focused attention of the insureds. In most situations, we cannot wait to initiate our response. We have contractual obligations to the insureds and mortgagee which must be timely addressed.

While we say this is what we expect, we all know every loss is unique and contains its own nuances. Your role, whether in the capacity of Service Representative, Adjuster, Supervisor or Manager, is to be certain you do all in your power and authority to provide "Best in Service" to our policyholders. It's during a serious property loss when our insureds most expect and deserve our best.

This guide is not designed nor intended to limit your creative approach to resolving claim issues. Nor is it designed to be all inclusive. This is a beginning. We believe our handlers are in the best position to know what needs to be accomplished in most claim file work. Our "Best in Service" goal actually requires your flexible, creative insight. You'll not be second guessed by taking action and explaining needs in the file. Communicating with our insureds and to the claim file is critically important.

Since our service expectations are high in all our claims, each should receive our best. Much of this guide may be applied to all first party property claims.

Teamwork is essential. Supervisors must work closely with adjusters and examiners. Our task is to move toward the perfection we seek. Flexible response is the key. Where we cannot meet our goals, file explanation is expected.

PLD is charged to ensure our service delivery is to corporate standards. We will involve ourselves earlier in your files to accomplish our goals. We're working with you toward the same goals. Working together and involving our insureds is the path to success.

All state Laws and Regulations must be adhered to in all our dealings with insureds and third parties.

PENGAD 800-631-6989    **PLAINTIFF'S EXHIBIT** ___4___

AM1128

I

## A. Telephone Report:

It all starts here! There is a lot we need to learn quickly.

Express concern for the insureds. We're here to serve. We will have someone to your home within two hours. This is a high commitment to service delivery. Make certain the telephone report is immediately given to a supervisor.

Insured info: telephone numbers to be reached at immediately, other numbers for contact (cell phone #, work, e-mail address and pager#).

Cause of loss? If uncertain, advise insured to not disturb the site, we may need to order a cause and origin inspection.

Rough estimate of damage – how many rooms damaged? Hole in the roof? Why is house not fit to live in (no heat, smoke/soot, authorities condemned building, etc)? Water damage, soot damage? Reminder: this is not the right time to question insureds about what constitutes untenable - we're fact gathering.

Valuables? Does insured have possession of valuable (scheduled?) items or do they remain in the house? If available, advise insured to place in a safe location. Need for site security beyond board up?

Advance Payment Needs. Ask insured if they have any unusual advance payment needs – we will issue a modest amount ($5,000 - $10,000), but if more is needed, we'll certainly accommodate as best we can. Bear in mind our single advance payments are meant to assist insureds in emergencies - only until we can pay what we know we owe. We're in business to settle and pay losses not provide continuing advanced payments.

Contractor. Does insured have a contractor / repairer in mind? If no choice voiced, ask if we may send someone out now for emergency services and board up. Insureds are certainly free to choose a contractor, but we can send one out immediately for use now. Insureds make a separate election later for repairs. If your area is serviced by the HO Direct Repair Network, offer use and guarantee to the insured. If they do have a repairer already selected, our contractor will work with the insureds' to reach a fair estimate of loss. At this point, we're offering options for insureds not seeking binding decisions.

Does insured have any specific questions at this time?

File PILR immediately.

Our telephone reports need to document insureds' impressions. We need to ask specific questions. Continuing training is necessary.

AM1129

2

**B. Adjuster First Call & Day One / Day Two Activities:**

<u>Contact</u>: Answer your beeper page within 15 minutes. Speak to insureds immediately. Arrange to meet within two hours. Express our concern for the insureds, our understanding how traumatic this event is, and how we are here to serve.

**Immediate response** to serious first party losses is critical to ensure we meet our service goals and build trust with our policyholders. Our adjusters should go to the loss site on assignment. Holidays, weekends and late nights are part of our jobs. Board up and emergency repairs to prevent further damage should be initiated at first notice. Adjusters meeting emergency service crews on site make lasting impressions on our policyholders and contractors.

<u>Dress</u> appropriately for site inspection. Don't wear dress shoes to help insureds inspect rubble. Wear boots over the ankle, steel shanked. Don't wear a business suit while you're wearing boots. Coveralls or workpants/shirt are appropriate wear for fire scene work (while you're in the mess). Discuss with your supervisor. Adjuster safety begins before arrival. Know what you are doing. Build a site kit to include a good flashlight and work gloves.

<u>Coverage Review</u>: As soon as possible after assignment received, review policy and applicable endorsements with attention to sufficient coverages, unusual exposures / issues. When you arrive at the residence and see substantial damage, the insured will want to know "Can we rebuild our house?" Knowing whether insured carries HO-500 is critical to a correct answer. Many policies are eliminating Fair Rental Value, see Special Provisions. Knowing that up front enables us to properly inform insureds regarding their options. If we know insured has scheduled property, we can ask the right questions. The more you know going in, the more precise your responses can be.

<u>Introduce our estimators</u> and explain their role. Similarly, introduce cause and origin expert. C&O origin not there yet? Then it's probably too late. If C&O is warranted, it needs to be completed within the first few hours. Any other consultants immediately necessary? Discuss with your supervisor. Branch databases on all loss consultants should be up-to-date. Availability 24X7 assured.

Deliver and review **"Guiding You through Reconstruction"** with the insureds. Remember that much of what takes place in the first hours is lost/forgotten. Let the insureds know using the **Guide** helps. Use as they see fit for the life of the claim. Here is a real chance for AMICA to shine. Create realistic expectations and timeframes. Contractors typically require insured and adjuster involvement. Contractors can be quickly on site for initial and major work, and slower to finish. Supplements are common. Document need, seek approval and pay promptly.

**"Guiding You Through Reconstruction"** requires your constant attention. Read through regularly to stay familiar with it. This **Guide** was made for our insureds but works equally well to remind us all on areas for our focus, our responsibilities.

<u>Coverage Explanations</u>: Give insureds an overview. You'll need to revisit often. Coverage D may be most confusing. If FRV is an option, we need a realtor

3

involved. Insured is unable to make an educated decision on Cov D without knowing what the FRV figures are. Most times, FRV is beneficial and easier for the insured. Not always. Whichever Cov D option insureds choose, document by letter.

Coordinate pack out between insured, reputable cleaner. The cleaner should be on site immediately, with commitment to clean necessary items promptly and work with all involved to facilitate personal property resolution. Ask the insureds: "what items do you need to get through the next week or so?" Have cleaner take those items, with a promise to return them within 24 hours. This gives insureds opportunity to "test the waters". (Did cleaner perform to insureds' satisfaction?) This gives the cleaner an opportunity to build trust, by meeting insureds' and our expectations. Once done, cleaner can then bring back a second load, to get insured through the next month. This procedure continues to completion.

Be wary of any one who states all soft fabrics are lost due to fumes and soot. A second cleaner opinion may be necessary. Test cleaning is appropriate in most non limit cases. Know your area cleaners before the next loss – know their qualifications and capacity. Check their references. We need to be reasonable in our responses. An insured may not want clothing cleaned, but if cleanable, that's our duty to the policy and all other insureds. We cannot overpay simply to ease an insured toward settlement. All our actions must be based on reasonable needs given the particular circumstances.

Mitigation of damage and Salvage concerns should be addressed immediately. The best mitigators may not be general contractors. Salvage concerns can be very specific – ask insureds if there's property of special value for special handling. While we may not succeed, we need to ask.

Photograph (videotape – many contractors have the capacity) EVERYTHING – interior/exterior, damaged/undamaged. If you don't in the first few hours / days, all this visible evidence will begin to disappear forever. 35 mm photos are better than digital. Use the office camera. Take more photos than you think are adequate. You won't get another chance.

Ask insureds' permission to be on the premises. Let them know you'll be on site with the cleaner and contractor for as long as it takes to get the process going smoothly. Your availability on site and work to separate damaged from non damaged contents sets the right expectations for insureds. We are working with them.

**Contents Inventory** - Dictate inventory EVERYTHING – undamaged, damaged, totaled. If our adjuster cannot complete an inventory personally, we need to bring another employee to the site to do so or hire outside assistance. ***We complete our own inventories* within three days.** Price it within a week. The critical issue is separating damaged property from cleanable and salvageable. Key to the inventory process is to assure our insureds the estimated prices aren't fixed. If insufficient for replacement, send the replacement receipt for further consideration. The purpose of a contents inventory is to identify the property involved and ACV or replacement valuation. Not all property is replaced. Boeckh doesn't furnish details. Adjusters must furnish adequate specifics to justify the suggested settlement dollars. The cleaner will assist in inventorying items packed out for cleaning.

4

Inventory everything thrown away. Along with our estimator, the cleaner and you, our first response should include a dumpster. If an item is beyond repair or salvage, photograph, inventory and throw it away. Agree with insured it is totaled and what exactly the item is: date of purchase, estimated price if immediately known, serial number, size, condition, etc. <u>We should be pricing items not insureds</u>. Pricing with insureds is next best course. Don't abandon the process to others.

The inventory process is critically important. Once the dumpster leaves, we'll never be certain unless we have photographed and inventoried with details.

Between items taken by cleaner and items disposed of, much of the personal property will be accounted for. The remaining items sustained no damage. Decide what we need to do with them. If left in a smoke filled room or wet environment, they'll eventually be damaged. These items need to be documented so any damage incurred in course of moving/storage can be properly accounted for and responsible party held accountable.

Our commitment to fully, properly and immediately address the personal property issues is the only way to assure we meet the insureds' needs/expectations while fairly and cost effectively settling Cov C. There is no excuse or correction for delay. We know Cov C is difficult, time consuming and plain hard work, but it is work that needs to be done. The sooner addressed, the easier and better for all involved. Insureds may be reluctant to start the process – they maybe in shock. We offer to begin the work. Separate damaged property, but don't discard without insured involvement.

Secure, send carpet samples for ITEL evaluation.

Before leaving, let the insureds know what they can expect in the next 24 hours. Ask them if they have any concerns / questions / needs. Leave copies of any estimates, scope of loss, etc. Write agreements on statement paper, copy for insureds and copy for the file. Openly solicit continuing dialog and questions.

Immediately follow with a letter, now and at least weekly. Initial letter will cover the many actions taken in the first day and where we stand. Subsequently, weekly letters will confirm what was done and what all parties are presently working on. Confirming letters are better than reports to file. They tell all involved where we stand, they encourage co-operative efforts, they invite discussion, they make promises and commitments that we will honor, and they show to all our desire to provide the best in good faith claims handling at a most difficult time for the insured. Each letter should summarize payments made by coverage. Remaining coverage limits available appropriate in some files.

**Your primary task is this large loss.** Discuss time needs with your supervisor daily. You may need several days to create the right start for all activities. Your supervisor will workout your time needs. You control the tempo of file activity. While insureds may wish to defer, you need to counsel toward initiating action to avoid delay. Your constant presence on site during the first few days, assisting insureds sort through damaged property and directing other activity, establishes our good faith effort. Your availability on site to help insureds, sets the right stage for all activity.

5

## C. **Notify PLD:**

On verifying the loss is of serious potential exposure. Service delivery is premised on proper timing. Early notification facilitates best team response.

Any questions? Supervisors e-mail your PLD examiner – we are here to help. Unusual - first of a kind - claims should be made Regular and sent to PLD immediately. We may have seen it before, and help will come quickly. If we haven't seen it, we should. We need to know about all the "unusuals" in this strange world. Your examiner is always an e-mail away. Ask for time to discuss your issues and concerns outlined in your e-mail. Give your examiner a heads up and some time before initiating a phone call – everyone's busy. Your examiner will call you.

Let us know your estimate of damage. Guesses at dollar amounts are not necessary – we need to know how much of the home is damaged, type of damage by number of rooms. Adjusters may send jpeg files of more telling photos to examiners. Home consistent with Underwriting's understanding of risk? Does it appear properly insured? How much personal property damaged? How long do we estimate insureds will be displaced? Is scheduled property lost or accounted for?

Adjusters should telephone supervisors with their initial impressions on the first day. Supervisors and examiners will be discussing the loss and needed handling daily during the first week. Large losses are time critical. We need specific work accomplished in the first few days or our opportunity to provide superior service may be lost forever. Examiners may ask for teleconferences with managers, supervisors and adjusters on these losses to ensure all are on the same page.

These losses take more time on site than most other claims. Several days straight may not be sufficient. Adjuster work assignments need review. Supervisors will ensure adequate time is available for site work.

Supervisors should visit the loss site to meet insureds during the first week, whenever possible. Managers may also need to be involved with site visits. We recognize the risk of "going over the head" possibilities, and urge you to make the visits work for better file handling and communications. We are a team addressing insureds' concerns. Encourage open communications at all times. Insureds' needs = our goals, whenever possible. Adjuster is the first contact, but we need to let insureds know there's always another set of eyes and ears.

How much have we advanced? Adequate for the interim? Prompt partial payments on contents items should begin immediately. Don't hold an inventory to completion – room-by-room and larger items first makes more sense. *Our goal really is to never leave an insured out-of-pocket, fronting funds we owe.*

Confirm we have our contractor on site. Need for C & O is always present in serious losses. We cannot rely on official reports as our means of documenting cause. Get examiner permission to forego the C & O.

Are there any unusual circumstances which should be addressed?

**D. Repair Contractors:**

Services we need from contractors:

A. Immediate response – on site in two hours or less
B. Emergency board up and perhaps site security
C. Damage mitigation
D. Estimating reconstruction costs...scope analysis and costs
E. Line Estimate vs. Square Foot method – what's best for your claim?  Total loss with low limits = SF.
F. Information ... materials and techniques required by this job
G. Timely communication and feedback
H. Prompt repairs, if chosen
I. Consultation

We need to provide contractors with:

A. Consistency in approach, communications and follow up
B. Clear understanding of what we expect on the job
C. Insurance data required, e.g. deductible and coverage info
D. We MUST scope the loss with the contractor
E. Prompt payment
F. Continuing re-inspections for feedback

Our **primary function** is to establish a reasonable repair cost upon which we can pay for reconstruction.  This repair cost is not, necessarily, an agreed price with insured's repairer.  We must establish our own position as quickly as possible.  We pay ACV based on our numbers when we establish it.  We do not wait for an agreed price.

Once ACV is paid and explained, we will attempt to reach an agreed repair cost with the insured and insured's repairer.  Both are integral to the process.  Joint meetings with all parties attending are suggested.

Agreement on scope of loss usually provides the best foundation for repair cost agreement.  Items in dispute should be reduced to writing.  Letters are our best evidence of good faith handling.  We do not negotiate property claims like injuries.  Any change in our dollar approach must be explained to the file.  What did we miss?  Why are we under/over specifically?  Our contractor becomes a construction consultant and should be paid for time spent working the numbers.

If an impasse develops, explain Appraisal to the insured and document by letter offering the insured the choice to initiate.  Prior consultation with your examiner is required.

We will file for Appraisal if there's no resolution and insured declines to request Appraisal.  Some states may require other forms of resolution, e.g.  FL Mediation.

We anticipate most losses will continue to reach agreed repair contract costs.  All should understand these agreed numbers are a product of our earliest work to establish a reasonable foundation.

## E. HO Direct Repair Program:

We believe a network of repair contractors is in our insureds' best interests. Managing losses to prompt, reasonable conclusions is our goal. Your handling of losses with direct repair contractors doesn't change dramatically. We don't envision an exclusive use program tying you to any particular contractor.

Amica will honor our insured's choice of repairer. We will attempt to obtain agreed repair costs with all repairers. We will not settle to avoid complaint. We'll not over pay to avoid a complaint. Agreements must make sense based on the circumstances involved and be fully explained in file.

Direct repair contractors still require adjuster interaction, certainly on all the serious losses considered within this discussion. Our adjusters must assist in the initial scope of loss decisions. When we find scoping decisions beyond our own capabilities, hire appropriate consultants. Our adjusters' primary function is to "adjust" our insureds. Secondary functions are continuing re-inspections (with photos) to ensure contractor and insured are still working well together and as planned. On large losses, weekly site visits are appropriate for months.

Any questions, any time, e-mail your examiner.

*DKI and PRISM/repairNet* are in your areas now or will be soon. They are our current direct repair networks. If your long used favorites aren't involved with any of the networks, take the time to tell them where we're headed. The Auto Glass Replacement Industry holds a lesson for all these independently minded business people. Networks are here and will thrive. Networks are already providing new services never received from locals. Internet accessible database storage is an example to cite.

If you believe your office is best served by another solution, e.g. a combination of existing contractors, write to PLD. Explain your circumstances. No single contractor should become the focus of our business. Competition, in all commercial ventures, makes sense. Your proposed solution will need to cover the services now provided by the networks. We'll approve the right solutions.

AM1135

8

**F. Damage Estimates:**

We expect our estimator to provide a detailed scope and takeoff off within 48 hours – they must NOT wait to obtain an agreed price with insured's chosen contractor before getting us the numbers. Remember, we pay what we owe based on our file documentation. Agreed figures come later in the process. If, under the circumstances, 48 hours is unattainable, explain the circumstances in file. We need positive interaction with all parties to explain needs and timeframes. Keep the insureds within the info loop.

We always remain open for discussion with insured's chosen contractor. We pay for our estimator's services, they become our consultants – use them when necessary to help reach a/p. They get the repair contract, deduct estimate fee.

Encourage commencing work, agreed upon preliminary work, while we try to reach a/p. Architect, if necessary, building permits, demolition (if scope agreed to), can all begin while our estimator and insured contractor hash numbers. Again, we have an obligation not to delay the process. If Cov D exhausts due to our delay or that of our proffered contractor, insured may have an argument to go beyond limits. We need to do all within our power to assure repairs begin timely and move forward. Confirming letters to insureds are always our best evidence of our good faith handling and our action toward mutual goals resolution.

AM1136

## G. Public Adjusters:

Unless specifically advised by the insured, PA's do not have the right to keep us from the insured – their capacity is not that of an attorney.

We have every right and, in fact an obligation, to the insured and company to personally inspect all property. Demand to be present during any inspection and inventory. In keeping with procedures outlined above, we will make our own inventory, fully documenting / photographing. Any items of disagreement should be outlined in a letter and retention of the items secured.

*All letters are sent to the insured* with cc to PA, unless insured personally instructs us otherwise. Our letter requirements usually increase with PA involvement. Don't take assertions made as a personal attack. Our weekly letter recaps will convince any reviewer our efforts are directed at the timely completion of our responsibilities.

We should be in control of our settlement process and be waiting on nothing from a PA. Our investigation can dictate offers, payments, and settlement. If insured or PA want to discuss after we've paid what we know we owe, we are more than willing to do so. In the meantime, we'll pay based upon information we have been able to obtain. Our immediate task is not to reach final agreements. We pay what we think we owe when we document it. Agreements come later.

In cases of disagreement, outline the disagreement specifics and options in writing. Options include second opinions from qualified experts, review of any support insured has, appraisal / reference.

AM1137

10

## H. Cleaning Companies:

Cleaning companies are a vital element from both a service and cost perspective. With respect to service, they must: respond on a moment's notice, distinguish accurately between items which can be cleaned and those that cannot, honor their commitment, and do all within their power to achieve the desired results as quickly and efficiently as possible. As with all aspects of loss, confirm agreements in writing.

With respect to costs, the cleaning company must: treat the property and money involved as though it were their own. We cannot allow a cleaning company to spend money trying to clean what can't be cleaned. It costs the insured money through reduction of available limits; it costs Amica money through sheer waste. We have a duty not only to the involved insured, but all policyholders simultaneously, to handle claims effectively and fairly.

Cleaning companies are vitally important for damage mitigation. They clean damaged personal property and may be qualified for dwelling work as well. You need to know your area cleaner capabilities. Cleaners should not routinely do construction preparation or post construction cleaning – those costs are built into contractors' estimates.

Cleaners should be able to "salvage" most items not directly damaged by the cause of loss. The critical question is a balance between cost to clean and repair against value. Clothing not scorched by fire should nearly always be cleanable. If not, find out why not. Second opinions may be necessary. Controlled test cleaning of samples may be appropriate. Insureds may resist any cleaning preferring replacements. Our task is to provide reasonable solutions. Test cleaning is a first step. We cannot simply take for granted cleaning fumes will remain after cleaning. Speak with your cleaners. What is reasonable for your specific circumstances? Document the file.

AM1138

11

## I. **Payments:**

Advance payment should be presented at first contact.  If that contact is "after hours", advance should be delivered as soon as available.  Fully explain the advance is made to assist insured and will be accounted for in future payments, credited to a coverage settlement.  Be certain insureds are aware they need to keep track of how/where advance was spent.  Hand delivering confirming letters is better than mailing.  Immediate explanations work best.

As outlined in "PLD BASICS" memo, pay what we know we owe.  If estimator and insured contractor have not reached a/p, pay our estimator's ACV figure, with letter clearly indicating we remain open for discussion/further review to reach agreement.

We make full ACV payments as soon as we have the figures.  ACV should be determined by contractor/estimator.  If not broken down line-by-line, do not delay payment – reach agreement on an overall percentage (80%?, 90%?) taking into account age of home, overall condition/upkeep, type of construction, etc.  If we determine ACV is "X", we pay the full amount.  We do not pay with installments.

There are a few states which mandate a market value approach.  Good arguments may be made in these states to pay Replacement Cost upfront when we don't have a question about reconstruction.

We should <u>verify current loss payee status with insureds directly</u>. Changes happen quite frequently.  Underwriting may not be aware of all.  Review within our early meetings should under score the need for insured early notification to learn the process involved.  All loss payees may not actually be required on our checks – verify outstanding amounts.  Be aware of the process insureds endure when you add second and third mortgagees to checks unnecessarily.

Once ACV payment is made, insured has 180 days to "make claim" for full R/C (assuming insurance to value provision met or HO-290 in effect).  This does not require insured actually replace / repair any item.  When ACV payment made, ask insured if they intend to make claim for R/C.  If they do, they've met their obligation – when repaired/replaced, we settle the holdback.  Refer to Intranet Q&A for more on the 180 day topic.  The 180 day limit is, in our book of business, not a major consideration.

Do not be swayed by insureds' suggestion they "don't want any money now", "we'd prefer we settle all at once" or something similar.  We have no reason to discuss whether the insured would like us to send a partial payment – we pay what we know we owe when we know we owe it.  There's nothing to stop an insured from returning a partial payment, but it seldom happens.  Should it, we've done our job by documenting our good faith efforts to make payment.  Proper explanation that a check is not a release and cashing the check does nothing to end discussion should be all that's needed to satisfy the insured.  Early payment facilitates smooth workings with the mortgage holding company.  Special letters should be used to document payments and our continuing discussions after cashing the check.

**AM1 139**

12

Batch items, but do not seek to settle any element of the loss in totality at the expense of creating delay. If we have a partial list of items, let's pay what we owe and close out that aspect. Update insureds with inventory copies on payments.

When paying vendors, consider the benefits of placing insureds' names on the checks. Delivering the check to insureds, gives them notification and control even if the insured has signed a satisfaction form.

Sales tax issues can be confusing. We pay all applicable taxes. We pay sales taxes when we pay for replacements. If we are fronting replacement cost, based on our belief replacement will be made, front the sales tax as well.

Letters to insureds should recap payments made by coverage.

Once the exposure on the entire claim exceeds Branch Authority, you need PLD approval for every payment. Keep the file up-to-date.

AM1140

## J. Endorsements:

Copies of all triggered endorsements should be placed in file. Do not overlook Special Provisions. Major policy changes are now commonly placed there.

HO-500 -- We need to know as soon as possible if potential exists to exceed Cov A limits and trigger this endorsement. Keep in mind, the endorsement is only triggered if loss exceeds Cov A limit - loss exceeding other limits does not activate HO-500 increases.

All limits (B,C,D) increase in accordance with standard percentages as a derivative of Cov A. If Cov A moves from 100k to 150K, B,C,&D increase to 10%, 75% (50% in some states) and 20% of the new Cov A figure.

Watch for Building Code Upgrade coverage within the policy and by endorsement.

**AM1141**

### K. Subrogation:

It's never too early to commence investigation (cause and origin expert, acquisition of all fire / other reports, research regarding product defects, recalls). Be creative – use the Internet, speak with our Subro attorneys, speak with independents / contractors – any have similar cases/losses. It is quickly too late to commence investigation. If our C&O expert must rely upon others' investigation or reports, it's probably too late – needs to be on the scene asap. We cannot wait for and depend upon the Fire Marshall or other public agency work. Separate adjusters for subro work is a consideration.

Separate adjusters for first party work and third party investigation is a consideration. The greater the exposure, the more need for immediate separation.

Identify, examine, label, secure and limit access to all evidence. Fully document chain of possession. On major losses consider involving your subro attorney early on for advice.

If subro involves municipality / city / state be certain to determine statute of limitations and reporting requirements – they are typically very short / conservative.

Keep insured's interest in mind. Not just deductible, but non-covered or other out of pocket losses. If we choose to initiate suit, discuss with insured – are they willing to be the named Plaintiff? If not, discuss how that impacts our case with our subro atty.

Discuss fee schedule / arrangement with subro atty prior to assignment. If subro atty unwilling to handle on contingency basis, what does that tell us about our chances of prevailing? Continue active settlement discussions with responsible party – while our objective is full recovery, remember a bird in hand is worth …

## L. Miscellaneous Handling Issues:

If multiple adjuster approach is used (Adjuster X handles Cov A, B; Adj Y Cov C, D, for example), it must not be done to the inconvenience of the insured. We assume greater coordination responsibilities between the adjusters and among the adjusters and management team. If insured is speaking with Adj X, any topic is open. We retain the obligation of getting any information / message / etc. to the proper adjuster. At the same time, be careful not to give insured conflicting advice. There are benefits to split handling, there are also concerns and co-ordination issues that need to be monitored. Best in Service is the objective, regardless of approach.

If risk appears underinsured, immediate research and attention is required. Speak with Underwriting Dept. Any correspondence or account servicing issues that may affect our decision? Make copies and notes on local Underwriters position and forward to PLD. We need a qualified R/C estimate (copy to Und) as well as ACV breakdown of damage to assess whether Loss Settlement Provision should be implemented. Run the numbers - what would imposing the penalty amount to from a dollar perspective? Is insured aware they are underinsured? What is their position? This is a serious matter with significant ramifications to insured and must be handled accordingly. Insured may always choose ACV. Coinsurance application remains rare.

EOR considerations.

Notify all involved municipalities as required. Before large payments are made, we should verify the tax lien status on the property. Many states now require set offs to protect municipal interests. Makes a good practice.

AM1 143

## M. Independent Adjusters

For the most part, we need our independent adjusters to perform at the same service level as that of our best staff. These goals should be shared with your usual independents before large loss assignment happens to facilitate discussion, understanding. Usually your independents are quite good. If there's an area to focus on with independents it's the contents loss. We don't approve of leaving inventory sheets with insureds to complete on their own. Additional help may be required here as well. Proactive adjuster time on contents begins on assignment and continues through conclusion. The process should never require months without specific file explanation. Letters to insureds should document our willingness to proceed without delay. Delay is rarely acceptable, and will not be without specific explanation..

Assignment to independents is a now fact of life for all branches. We can no longer presume our staff adjusters routinely provide better service than quality trained independents with property backgrounds. Each branch should find the right resources to deliver superior service to our insureds in conjunction with our approach. You need to assign during normal times to build and maintain relationships which will serve our insureds and company well during the busy times. If your staff adjusters haven't the necessary experience for a serious first party claim, you certainly may team them with an appropriate, well briefed independent for training, awareness purposes. Assignment to an advanced property independent is preferable to an inexperienced staff adjuster. However, we have seen superior work on serious losses from some of our associates. The key to success is attitude. Your supervisory approach and connection to your associate makes the difference.

Using independents can increase our supervisory tasks. We urge you not to rely on independents for bottomline estimating. Repair contractors make our best consultants on actual dollar exposures. Repairers are more believable to our insureds. Even if your independent has estimating skills, we need to offer our insureds a repair contractor who can put it all together. Your independent remains as necessary as staff adjusters on these losses.

Any questions should be e-mailed to your examiner.

AM1144

## SERIOUS FIRST PARTY LOSS CHECKLIST

### WITHIN 2 HOURS:

Personal contact with insured
     Advance given
     S/S secured – flexibility necessary (insureds may not be able)
     Coverages / options discussed and fully explained
     Guiding You Through Reconstruction delivered and reviewed with insureds
     Advise insured of payment procedures (mortgagee, direct payment, etc)
     Adjuster photos everything – damaged and not damaged
Emergency services needs identified – water extraction, smoke ventilation, carpets etc.
Need for C&O determined – if necessary, C&O expert contacted
Contractor/estimator on site – board up / site security?

### WITHIN 24 HOURS:

Adjuster inventory – major personal property items photo and document for prompt settlement
Cleaning company rep on scene to assist sorting items by "cleanability" (cleanable,
     cleanable with minor residual, total loss not worth cleaning attempt)
Cleaning company takes initial load of clothes to get insured/family through next
     7 days – with promise to return them next day.
     Not singed – 90%+ should be cleanable
Dumpster on site to dispose of photographed total loss items
Contractor/estimator walk-through initiated
PILR filed
Be wary of any suggested delay: delay works against effective claims handling
Adjuster conferences with supervisor
Supervisor telephone conferences with examiner to discuss progress and needs

### WITHIN 48 HOURS:

FRV (if applicable) figure secured – use a realtor consultant
Local rental property evaluated
Insured chooses Cov D option (If FRV, costs to this point can be paid as ALE with
     understanding conversion to FRV now takes effect)
Cleaner returns first load of cleanable items necessary to get insured/family through
     next 7 days.
Adjuster conferences with supervisor
Supervisor teleconferences with examiner
Adjuster's confirming letter to insureds

### WITHIN 7 DAYS:

Initial adjuster contents inventory list compiled and reviewed with insured for accuracy
Insured in temporary housing
Cleaner has returned sufficient cleaned clothing articles to get insured/family
     through next 3 weeks
Supervisor / manager (bring Und along?) visits insureds at site
Supervisor teleconferences with examiner
Examiner follows progress closely for timely project completion
Adjuster's progress letter to insureds

AM1145

18

## WITHIN 2 WEEKS:

Full first report received in PLD with Cov A ACV auth request – amount we know we owe
Cov C authority request submitted – R/C for items agreed to and likely to be replaced;
  ACV for items agreed to and not going to be replaced; ACV with R/C holdback for
  items agreed to and may be replaced; Insured and Adjuster differing figures on
  items not yet agreed to; R/C on to be replaced items.
Cov D first auth request submitted with estimate of timeframe of temp housing
Captioned "Work to be Done" list
Indication whether insured has chosen own contractor or will utilize ours / DRP
If repairs not yet begun, reasons for delay and what needs to be done to start the
  repair process
Document progress and needs in letter to insureds
Supervisor teleconference with examiner

## Handling Through Closing:

Promptly address remaining issues.
Reinspect weekly for three months. Photo progress.
Stay in contact with insureds and repairer – weekly for three months.
What else can we do for insureds?

**AM1146**

19