Plaintiffs' Exhibit 14
(Part 1 of 2)

```
1                  IN THE UNITED STATES DISTRICT COURT
2              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
                                     ERIE
3

4                                          NO. 04-175 E

5

6        JONATHAN A. BORDEN and
         AMY P. BORDEN,
7                Plaintiffs

8

9           Vs.

10

11       AMICA MUTUAL INSURANCE              COPY
         COMPANY,
12               Defendant
         ----------------------------------------------------
13

14                       DEPOSITION of LISA ST. ONGE, in the
         above-entitled cause, taken on behalf of the
         Plaintiffs, pursuant to Notice, before Kristen M.
15       Bengtson, RPR, Notary Public in and for the State
         of Rhode Island, at the Law Office of James V.
16       Murray, 10 Amica Center Boulevard, Lincoln, Rhode
         Island, on Tuesday, July 26, 2005, at 1:10 p.m.
17

18       APPEARANCES:

19       MacDonald, Illig, Jones & Britton, LLP
         BY:  CRAIG MURPHEY, ESQUIRE
20          Counsel for the Plaintiffs

21       DiBella, Geer, McAllister & Best, P.C.
         BY:  PAUL K. GEER, ESQUIRE
22          Counsel for the Defendant

23                       REPORTING ASSOCIATES
                         Shorthand Reporters
24                       10 Dorrance Street
                         Providence, RI   02903
25                        (401) 351-1660
```

PLAINTIFF'S
EXHIBIT
14

PENGAD 800-631-6989

```
 1                           I-N-D-E-X

 2     WITNESS                                         PAGE

 3     LISA ST. ONGE

 4         Examination By Mr. Murphey                    3

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **LISA ST. ONGE,**

2          A witness called on behalf of the Plaintiffs,

3                    having been first duly sworn,

4                    deposes and says as follows:

5

6      **DIRECT EXAMINATION**:

7      Q.   (By Mr. Murphey)   Lisa, we met very briefly

8          before the deposition, but allow me to introduce

9          myself again.   My name is Craig Murphey, and I'm

10         an attorney from Erie, Pennsylvania.   I represent

11         Dr. and Mrs. Jonathan Borden in a lawsuit against

12         Amica Mutual arising from the handling of a fire

13         loss claim, and I know that you know that that's

14         why I'm here.   Have you ever given deposition

15         testimony before?

16     A.   I have not.

17     Q.   Your attorney, the attorney for Amica, Mr. Geer,

18         is here with you, and I assume that he gave you

19         some ground rules, but allow me to repeat them

20         for the record.   First of all, as you know,

21         you're under oath, and I know you're going to

22         give the best and most honest answers that you

23         can to my questions, but we don't, neither Paul

24         nor I, want you to guess or speculate.

25               So if you don't know the answer to a

|    |    |                                                              |
|----|----|--------------------------------------------------------------|
| 1  |    | question or perhaps you think you may have known             |
| 2  |    | it at one time but you don't remember, please               |
| 3  |    | tell us that.  I don't know or I don't remember             |
| 4  |    | is a perfectly acceptable answer.  Okay?                     |
| 5  | A. | Okay.                                                        |
| 6  | Q. | We also need you to answer verbally rather than             |
| 7  |    | with a nod of the head or a shake of the head.              |
| 8  |    | Because the court reporter is here taking down             |
| 9  |    | what we say, it's going to be difficult to                  |
| 10 |    | interpret later with uh-huhs or other                       |
| 11 |    | unintelligible sounds, so either a yes or no               |
| 12 |    | rather than a nod of the head or an                         |
| 13 |    | unintelligible sound.  I'd appreciate that.                |
| 14 |    | Okay?                                                        |
| 15 | A. | Okay.                                                        |
| 16 | Q. | Also, if at any time you -- we'll probably be              |
| 17 |    | here for a couple hours today, so if at any time            |
| 18 |    | you want to take a break, if you want to talk to            |
| 19 |    | Mr. Geer outside of my presence, if you need to             |
| 20 |    | get a drink or something, please let me know and            |
| 21 |    | I'll be happy to accommodate you.  Okay?                     |
| 22 | A. | Thank you.                                                   |
| 23 | Q. | Also, if I ask complicated question or I misstate           |
| 24 |    | something, or you think I've misstated something            |
| 25 |    | or I've asked an awkward question, which I                   |

```
 1          unfortunately do on a regular basis, please let
 2          me know that you don't understand the question
 3          and that you want it to be rephrased, and I'll be
 4          happy to try to accommodate you.  All right?
 5     A.   All right.
 6     Q.   Just for the record, could you please state your
 7          full name and your address, please.
 8     A.   Yes.  It's Lisa Katherine St. Onge.  My address
 9          is 52 Nora Way in Attleboro, Massachusetts.
10     Q.   What's your date of birth?
11     A.   11/12/70.
12     Q.   Is St. Onge your married name?
13     A.   Correct.
14     Q.   What's your maiden name?
15     A.   Hiney, H-I-N-E-Y.
16     Q.   You are employed by Amica Mutual Insurance
17          Company?
18     A.   Correct.
19     Q.   How long have you been employed by Amica?
20     A.   Since 1992.
21     Q.   What's your office address?
22     A.   100 Amica Way in Lincoln, Rhode Island.
23     Q.   What's your current job title?
24     A.   Assistant property loss manager.
25     Q.   Where did you go to college?
```

1        policies by internet, phone, mail, et cetera.

2    Q.  So you don't have agents?

3    A.  No.

4    Q.  During your career with Amica, did they

5        previously have agents and change to being a

6        direct writer?

7    A.  Not that I'm aware.

8    Q.  Okay.  At the time that the Borden loss happened,

9        you said that you were an assistant or, I'm

10       sorry, you were an examiner that handled property

11       claims.  Can you just generally tell me what your

12       duties were at that time in that job.

13   A.  My duties as an examiner are to set reserves and

14       to oversee larger losses, as well as provide

15       authority and coverage decisions.

16   Q.  What would trigger a property examiner's

17       involvement in a case as of -- my questions are

18       going to be focused on the spring of 2002 when

19       this loss happened.

20   A.  Sure.  There would be two triggers:  One would be

21       a dollar value of a particular claim, another

22       trigger would be a coverage question, and

23       actually a third trigger would be a complaint

24       filed.

25   Q.  What was the dollar value at the time in the

1    spring of 2002?

2    A.    I believe $20,000, but I'm not 100 percent sure.

3    Q.    So would that mean that the branch adjusters

4          would not have any authority over -- for a claim

5          that had a value of greater than $20,000?

6    A.    Not necessarily.

7    Q.    It would simply trigger your involvement in the

8          case?

9    A.    Correct.

10   Q.    As a practical matter, how would you get notified

11         that there's now a claim that should be converted

12         to a home office claim or however you would

13         describe it?

14   A.    There can be a couple of different ways.

15         Sometimes an e-mail, sometimes a fax, but most

16         common is just a paper file of the file materials

17         being forwarded via regular mail.

18   Q.    From the adjuster?

19   A.    From the branch.

20   Q.    From the branch office.

21   A.    It could be the adjuster, could be the

22         supervisor, could be the manager.

23   Q.    Do you recall why you became involved in the

24         Borden claim?

25   A.    Because of the dollar trigger.

```
 1         coverage for the dwelling.  But again, I'd want
 2         to check the policy to be accurate.
 3    Q.   I understand that, and I understand if I have a
 4         specific question that we would need to do that,
 5         but I'm just asking generally what endorsements
 6         are embedded within the Platinum Choice Policy?
 7         Do you have another word for it, do you call it
 8         an 0500 policy or something like that?
 9    A.   Generally the Platinum.
10    Q.   That's what you call it?
11    A.   (The deponent nodded.)
12    Q.   Okay.  Between the Platinum Policy and what you
13         referred to as the standard homeowner's policy,
14         what endorsements generally speaking would be
15         embedded within the Platinum Policy that are
16         optional with regard to the standard homeowner's
17         policy?
18    A.   One is the increased limits endorsement.
19    Q.   What does that mean?
20    A.   What that means is if our policyholder had a
21         loss, a total loss fire and with the damage was
22         $200,000, but they only had coverage to $150,000,
23         the policy would automatically increase to that
24         amount as long as they had provided the necessary
25         information, et cetera.
```

1   Q.   Do you have that available to you in your office

2        somewhere?

3   A.   I might.

4   Q.   How long ago did you get that?

5   A.   It would have been a while ago.

6   Q.   Before the Borden case?

7   A.   Correct.

8   Q.   Do you know whether Amica has any other

9        information about Mr. Schumann other than his fee

10       structure and the resume that you have?

11  A.   I don't know.

12  Q.   Have you ever discussed the Borden claim directly

13       with Mr. Schumann?

14  A.   I might have.

15  Q.   You don't remember?

16  A.   I don't remember a direct conversation with John

17       regarding this file.

18  Q.   So you don't know?  You don't remember one?

19  A.   Correct.  It's been awhile.

20  Q.   Okay.  I couldn't tell from your answer.

21  A.   Sure.  I'm sorry.

22  Q.   You originally said that you don't know, and then

23       you said that you don't remember.

24  A.   I apologize.

25  Q.   That's fine.

1    A.  I don't remember.

2    Q.  If you had a conversation with Mr. Schumann on

3        this file, would it be reflected in the claim

4        file?

5    A.  Most likely, whether it be in his report or in

6        some sort of an e-mail that I would have

7        submitted to Dave.

8    Q.  So it's possible that you did not talk to

9        Mr. Schumann?

10   A.  Again, I just do not recall.

11   Q.  You don't recall, all right.  Did you ever talk

12       to Mr. Schumann about the Borden claim after it

13       was settled?  For instance, maybe discuss, you

14       know, the problems that he had with the claim or

15       kind of postmortem the claim at all?

16   A.  Sure.  No, not that I recall.

17   Q.  Do you know if Amica expressed any

18       dissatisfaction to Mr. Schumann regarding his

19       handling of this claim?

20   A.  There was some discussion in terms of the

21       contents evaluation, in terms of his not doing a

22       thorough review of the pricing which there was

23       some discussion with John about.

24   Q.  When was that discussion?  Again, relative to --

25       I don't need specific dates, but relative to the

1      handling of the claim.

2   A.  I believe when we received a copy of his

3      recommendation and his report regarding the

4      contents of inventory.

5   Q.  Was the discussion between you and him or your

6      supervisor or who?

7   A.  I do know that Dave did speak with John.

8   Q.  Dave Bennett?

9   A.  Correct.  I'm sorry.  And actually, I -- I'm not

10      sure.  I don't want to speculate.

11   Q.  Okay.  You may have talked to him about it, I

12      take it, but you don't remember specifics?

13   A.  Again, I don't want to speculate.

14   Q.  Was it you that were critical of the quality of

15      his work on the contents?

16   A.  Both Dave and I were hoping for additional

17      details on the contents of inventory.

18   Q.  So your recollection is that both of you reached

19      the conclusion that the work needed to be more

20      detailed?

21   A.  Correct.

22   Q.  And you talked to John about that?

23   A.  Again, I'm not sure.

24   Q.  I'm sorry.  When I said you, I meant Amica.  So

25      you're confident that at least Dave talked to him

1  about it?

2 A. I believe so.

3 Q. Did John respond in any way, did he defend

4  himself or say he thought he did a good job?

5 A. Again, I wasn't involved in that discussion.

6 Q. So you believe Dave had that discussion with

7  John?

8 A. I believe so.

9 Q. Do you know whether that discussion's documented

10  anywhere with regard?

11 A. I don't.

12 Q. Was there any other discussion with John that you

13  know of regarding his handling of the Borden

14  claim?

15 A. No.

16    MR. GEER:  You're talking about a

17  discussion where they were critical of his

18  effort?

19    MR. MURPHEY:  That's right.  I think she

20  understood that.  Thanks.

21 Q. You said that Amica continues to use

22  Mr. Schumann; is that correct?

23 A. Correct.

24 Q. Do you know whether Amica has asked Mr. Schumann

25  to change the way in which he approaches losses

1       as a result of the Borden claim?

2   A.  Not that I'm aware.

3   Q.  Do you know if the frequency of assignments to

4       Mr. Schumann has changed in any way following the

5       Borden claim?

6   A.  As a result of the Borden claim?

7   Q.  Well, I'll ask a two-part question.  First,

8       whether the frequency of assignments to him has

9       changed at all since the Borden claim.

10  A.  The assignments are based on the losses that come

11      in.  Again, fire losses are thankfully not that

12      common.

13  Q.  Sure.

14  A.  So in terms of is the volume exactly the same, I

15      wouldn't be able to say.

16  Q.  That really wasn't my question.  The point of my

17      question is whether the volume of claims that he

18      would be expected to be assigned, whether that

19      has changed at all since the Borden claim?

20  A.  Not that I'm aware.  We use different adjusters

21      for large losses, and I don't believe the

22      distribution of assignments is greatly different

23      than what it was prior to the Borden loss.

24  Q.  So I take it I know the answer to the next

25      question and that is whether the frequency of

```
 1              assignments to Mr. Schumann has changed because

 2              of the Borden loss?

 3    A.    That has not occurred.

 4    Q.    I take it your answer is no?

 5    A.    Correct.

 6    Q.    Has the protocol or the supervision of

 7              Mr. Schumann or any of the other independent

 8              adjusters, has that changed at all since the

 9              Borden claim?

10    A.    No.

11    Q.    If you could look back, put that stack of papers

12              back together, and documents 1051, 1052 --

13                      THE DEPONENT:  Actually, would you mind

14              if we just take a short break?

15                      MR. MURPHEY:  Absolutely, that's fine.

16                      (Break takes place at 2:00 p.m.)

17                      (Back on the record at 2:05 p.m.)

18    Q.    Lisa, you indicated during the break that you had

19              an answer that you wanted to clarify?

20    A.    Correct.  In giving some additional thought, when

21              we were talking about a prior complaint, I don't

22              remember if the complaint was regarding John

23              Schumann as opposed to the amount that was paid,

24              so for that, I didn't want to mislead you that it

25              was one or the other.  I'm just not comfortable
```

1    A.   The reserves are set by the home office

2          examiners.

3    Q.   Why is it that Amica doesn't want suggested

4          reserves from an independent?

5    A.   Because we're confident that we can set the

6          reserves appropriately.

7    Q.   But you don't want their input with regard to

8          reserves?

9    A.   They provide input in terms of their reports,

10        their description, what they see and hear, but

11        it's up to the examiner to make the determination

12        of the reserve.  We certainly obtain all

13        available information to make that assessment.

14    Q.   Including their estimates --

15    A.   Correct.

16    Q.   -- of the loss?

17    A.   Correct.

18    Q.   Are the reserves usually set before you receive

19        their estimates?

20    A.   It's an ongoing process.

21    Q.   How quickly do you set a reserve from the time

22        that the fire loss is reported?

23    A.   It varies.  We generally set a reserve once we

24        have some basic preliminary information, based on

25        the worst case, the information that we have.  As

1         information is provided, we might re-examine that

2         reserve to see if it needs to be changed.

3   Q.  Is there an internal protocol for how quickly a

4         reserve is supposed to be set, recognizing it can

5         be changed over time?

6   A.  Until we have enough information to put a number

7         on it.  In other words, you need some information

8         in order to be able to set an appropriate

9         reserve.

10  Q.  Well, I know some companies will -- you can't

11        even open a claim file without putting a reserve,

12        and then it can be adjusted over time.

13  A.  Claim file can be opened prior to a reserve being

14        set.

15  Q.  In Amica's case?

16  A.  Correct.  The branch opens the claim file.  We

17        handle the reserve here in the home office.

18  Q.  At any given time, I take it from your answer

19        before that, the reserve is to be the worst case

20        scenario, that is, the most that you believe that

21        you'll ever have to pay on a claim; is that what

22        your reserving protocol is?

23  A.  Exactly.

24  Q.  It is not what you estimate you are going to pay

25        on a claim?

```
 1   A.  No, they're not necessarily the same.
 2   Q.  I understand that, and I know that companies have
 3       different reserving philosophies.  I take it from
 4       your answer, and you correct me if I'm wrong,
 5       that Amica's reserving philosophy is a worst case
 6       scenario, that is, the most that you believe
 7       you'll ever have to pay on a claim, that's the
 8       amount that the reserve is set at?
 9   A.  Within reason.  All of our claims aren't reserved
10       at the policy limits.
11   Q.  But again, the reserve is set as a worst case
12       scenario, again, exercising your judgment, of
13       course?
14   A.  Exactly.
15   Q.  But as a worst case scenario, rather than what
16       you believe that you will ultimately pay on a
17       claim?
18   A.  Correct.
19   Q.  You understand those are two different
20       philosophies?
21   A.  Yes.
22   Q.  And Amica's philosophy is a worst case scenario
23       philosophy?
24   A.  Correct.
25   Q.  Is that impacted by state law at all?  For
```

```
 1        example, is your reserving philosophy any

 2        different for a Pennsylvania case than it would

 3        be for a New York case?

 4   A.   No, it is not.

 5   Q.   Now, I have a memo that is document 1121.  Do you

 6        have that in front of you?  It is from Peter Reid

 7        who you identified before, and this is entitled a

 8        First Party Property Loss Handling Guide.  Do you

 9        recognize this memo?

10   A.   I do.

11   Q.   It describes a guide which is attached to it.  Is

12        that the guide which starts at AM1128 and goes

13        through AM1146?

14   A.   I believe so.

15   Q.   Mr. Reid's memorandum says that the guide that we

16        just talked about "details our service

17        expectations on our most serious homeowner

18        claims.  We record around 100 losses every year

19        in this category from around the country."  To

20        your knowledge, would the Borden loss fall within

21        the categories of "our most serious homeowner

22        claims"?

23   A.   Yes.

24   Q.   So would you agree with me that this document

25        entitled First Party Property Loss Handling
```

1       Expectations would apply to the Borden claim?

2  A.  The First Party Property Loss Handling Guide

3       would apply, yes.

4  Q.  Okay.  I see it is dated August 1999, so that

5       would have been a couple of years before the

6       Borden claim?

7  A.  Correct.

8  Q.  Correct?  Is this still a guideline that is used

9       by Amica with regard to its most serious

10      homeowner's claims?

11  A.  I believe so.

12  Q.  I'll ask you the same questions I did before

13      about the Independent Adjuster Guidelines.  Was

14      this disseminated to your independent adjusters,

15      including Mr. Schumann?

16  A.  I know that a copy was given to Mr. Schumann.

17  Q.  Do you know that a copy was given to Mr. Schumann

18      before the Borden claim?

19  A.  Yes.

20  Q.  Then I take it the branch claims managers would

21      also have a copy of this?

22  A.  Correct.

23  Q.  Now, there is another document marked 1124.  I'm

24      sorry.  Yeah, 1124 and 1125, and it's entitled

25      Serious First Party Loss Checklist.  Is this part

1    Q.    Further down, about the third paragraph from the

2          bottom, it says, "Supervisors should visit the

3          loss site to meet insureds during the first week,

4          whenever possible."  Was the supervisor in this

5          case Dave Bennett?

6    A.    Correct.

7    Q.    On page 1134, about four paragraphs from the

8          bottom, in the paragraph beginning with the

9          words, Agreement on scope of loss, do you see

10         that paragraph?

11   A.    Yes.

12   Q.    The last sentence says, "Our contractor becomes a

13         construction consultant and should be paid for

14         time spent working the numbers."  What does that

15         mean?  Who's your contractor?

16   A.    If we brought in a direct repair contractor or

17         hired a consultant, a contractor to write up

18         their own estimate, they should be paid for that

19         as opposed to a situation where we make a

20         recommendation to an insured of a contractor,

21         that insured decides to use that contractor.  We

22         should clarify the difference between someone who

23         is bidding for a job versus someone who's coming

24         in at our request to complete a complete detailed

25         estimate.

```
 1    Q.   So sometimes you hire contractors to provide you
 2         with an estimate in addition to the adjuster?
 3    A.   Yes.
 4    Q.   Not in every case but in some cases?
 5    A.   Correct.
 6    Q.   What cases would you hire a consultant contractor
 7         rather than simply rely on the estimate prepared
 8         by your general adjuster?
 9    A.   If we have a copy of an estimate from our
10         insured's contractor that's significantly
11         different than our adjuster's scope and we feel
12         that it would be warranted to have a construction
13         expert go out and assist us with that process,
14         there would be that time.
15    Q.   And you know from reviewing the Borden claim that
16         that eventually happened in the Borden case?
17    A.   We never received an estimate from Dr. and Mrs.
18         Borden.
19    Q.   But you did retain your own contractor to provide
20         you an estimate?
21    A.   Correct.
22    Q.   So that's not unusual then, that's something you
23         would do on a regular basis?
24    A.   To retain a contractor?
25    Q.   Yes.
```

1  A.  I wouldn't say we do it on a regular basis.

2  Q.  It was typical enough to be included in your

3     guidelines?

4  A.  Sure, but I don't know what the current

5     environment was back in 1999.

6  Q.  Okay.  The next two sentences on page 1134 says,

7     "If an impass develops, explain Appraisal to the

8     insured and document by letter offering the

9     insured the choice to initiate."  And then the

10    next paragraph says, "We will file for Appraisal

11    if there's no resolution and insured declines to

12    request Appraisal."  So at that time anyway the

13    guidelines suggested that the insured should be

14    asked to initiate appraisal before the company

15    will initiate the appraisal system?

16 A.  That is what's stated here.

17 Q.  Is that your practical experience?

18 A.  I have seen it done that way, but I've also seen

19    it the way it was done in the Borden file.

20 Q.  That is where the company initiates the

21    appraisal?

22 A.  Correct.

23 Q.  Section H, page 1138, that refers to Cleaning

24    Companies.  Does that section refer to all

25    different types of cleaners, people who clean

```
 1              contents, people who clean clothes?

 2      A.     It appears so.

 3      Q.     The middle sentence of the third paragraph says,

 4              "You need to know your area cleaner

 5              capabilities."  Do you have any idea what the

 6              Pittsburgh branch knew about cleaning services in

 7              the Erie area?

 8      A.     I don't.

 9      Q.     You don't know one way or the other?

10      A.     No.

11      Q.     On page 1139, there's a section referring to

12              Payments, and in the second paragraph it refers

13              to another document called the "PLD Basics" memo.

14              Do you know what that is?

15      A.     I believe that's what's Bates stamped AM1147 and

16              AM1148.

17      Q.     So I see that that has the same title.  You don't

18              know of any other PLD Basics memo?

19      A.     Not that I can think of.

20      Q.     Reading the second paragraph of the Payments

21              subsection on page 1139, it states, "As outlined

22              in 'PLD BASICS' memo, pay what we know we owe.

23              If estimator and insured contractor have not

24              reached a/p," what does that mean?

25      A.     Agreed payment would be my guess.
```

1    A.    You had mentioned a log that indicates every

2          reserve --

3    Q.    Right.

4    A.    -- that's ever been, occurred.  In other words, I

5          assumed your question to be interpreted one piece

6          of paper that lists every single reserve.

7    Q.    Yes, or some access to some information that

8          shows that.

9    A.    There is some information that shows what the

10         reserves were.

11   Q.    All right.  So at any given time we can

12         determine what your reserve was at a certain

13         time?

14   A.    Yes.

15   Q.    With regard to this claim?

16   A.    Yes.

17   Q.    And you testified that it did change over time?

18   A.    Yes.

19   Q.    On page 432, there is an e-mail that indicates

20         that, "He guesses Coverage A damages of $250,000

21         and Coverage C of $100,000."  Is that the e-mail

22         that you referred to that gave you some

23         information regarding setting a reserve?

24   A.    Yes.

25   Q.    Other than that information and your own claims

1      handling experience, was there any particular

2      information that you used to set a reserve in

3      this case?

4  A.  Not other than my claims.

5           MR. GEER:  Are you talking about at this

6      point in time?

7           MR. MURPHEY:  Yes, at this point in

8      time, at this point in time.

9  A.  Other than my claims experience and this

10     information, my recommendations on the reserve

11     were then passed along.

12 Q.  Then were your recommendations regarding

13     reserves?

14 A.  Correct.  As you can see from the numbers, the

15     value would exceed my authority as the property

16     examiner.

17 Q.  The numbers that you gave us before?

18 A.  Correct.

19 Q.  So Mr. Divoll then had to approve the setting of

20     a reserve that was greater than your authority?

21 A.  Correct.

22 Q.  What information, following up on what Mr. Geer

23     said, what information did you receive later in

24     the claim file that caused you to change your

25     reserve?

1    A.    We're always looking at what new information that

2          comes in and reevaluating the reserve at that

3          time.

4    Q.    So what information in this case caused you to

5          reevaluate your reserve?

6    A.    It's an ongoing process.

7    Q.    Okay.

8    A.    I don't know if I can point to any specific items

9          within the file, but as new information is

10         brought in, it's then -- my reserve is reviewed

11         in the context of any new information that's

12         obtained to see if that worst case scenario has

13         changed from what was initially projected.

14   Q.    Ultimately you paid more than what Mr. Schumann

15         estimated; is that correct?

16   A.    Yes.

17   Q.    Obviously then your reserve was changed at least

18         before the final payment was made --

19   A.    Yes.

20   Q.    -- right, because it's greater than this amount?

21         Was it changed at any time between your initial

22         reserve and the time that it was changed to -- or

23         at the time that you made the final payment?

24   A.    Might have been.  I can't recall.

25   Q.    Does the company discourage reserving in steps?

```
 1          submitted this information.

 2     Q.   My question is, did he send you copies of the

 3          letters or did he summarize them for you in some

 4          fashion?

 5     A.   I did receive a copy of this, AM455 and 456.

 6     Q.   Let me ask you a general question regarding the

 7          letters, because there's a number of them.

 8          There's letters from Mr. Schumann to Mr. Bennett.

 9          He was reporting Mr. Bennett.

10     A.   Yes.

11     Q.   Were you provided routinely copies of the letters

12          that Mr. Schumann sent to Mr. Bennett?

13     A.   Yes, when Dave Bennett submitted that information

14          to me.

15     Q.   He wouldn't just summarize them in a letter, he'd

16          actually send you copies of the letter?

17     A.   Correct.

18     Q.   Is that routine?

19     A.   Yes.

20     Q.   So that wasn't special for this case --

21     A.   No.

22     Q.   -- because of any problems or anything?  Now,

23          there is a section called Customer Overview and

24          Reaction on page 456, if you could just read that

25          paragraph to yourself.  Okay.  You'll agree with
```

1        me that that documents that the Borden family and

2        Mrs. Borden in particular were having an

3        emotional reaction or response to the fire; is

4        that correct?

5    A.   It appears so.

6    Q.   Is that something unusual in your experience in

7        handling fire losses?

8    A.   Fire losses can be very traumatic to our

9        policyholders.

10   Q.   That's something that the company recognizes an

11       incorporates, and in their guidelines, in fact,

12       there's reference to that; is that correct?

13   A.   Yes.

14   Q.   So that's not something unusual?

15   A.   That our insureds have an emotional reaction to

16       the fire?

17   Q.   Yes.

18   A.   No, that's not unusual.

19   Q.   Is it unusual that the emotional reaction will be

20       such that it's difficult for them to make

21       decisions especially in a time closely proximate

22       to the fire?

23   A.   What time frame are you referring to?

24   Q.   In the first week after the fire.

25   A.   It varies.  Everyone is different in terms of

1       the alternative living expenses and then your

2       speculating regarding Mr. Jones's estimate, was

3       there any other aspect of this claim that was

4       handled in a special or different way as a result

5       of the reports from the Borden family about

6       medical needs of their children?

7  A.   Not that I can think of.

8  Q.   Another statement Mr. Schumann made in this memo

9       was that Dr. Borden's brother is an attorney and

10      works for the Hartford Insurance Company in

11      Hartford.  Did that affect your handling of the

12      claim in any way?

13  A.   No.

14  Q.   From your observation of the manner in which

15      others handled the claim, did that affect that at

16      all?

17  A.   Not that I could see.

18  Q.   Now, on page 458, you'll see under Coverage A,

19      Recommendations, Mr. Schumann was recommending

20      that a check in the amount of $295,000 and some

21      dollars be issued.  Now, that means that

22      Mr. Schumann had completed his estimate; is that

23      right?

24  A.   Yes.

25  Q.   Would that ordinarily end Mr. Schumann's

1     participation in the claim or at least the

2     dwelling part of the claim?

3  A.  Our ultimate goal is to receive or to speak with

4     the insureds' chosen contractor so that we can

5     work to reach an agreed figure.  So there are

6     times when Mr. Schumann completes an estimate and

7     we're notified that the insured has chosen a

8     contractor, and Mr. Schumann will go back and

9     talk with the contractor to work to reach an

10    agreed figure.

11  Q.  And he'll do that after preparing his own

12    estimate?

13  A.  If the contractor was not available at the time

14    that he was preparing his estimate.

15  Q.  Let's say they are available.  Just help me out

16    here.  Let's say that the day after the fire the

17    insured tells you that I want to use Mr. Smith to

18    be my contractor to rebuild my home.  In that

19    case, does your adjuster, whether it's, whoever

20    is doing the adjusting for you, create their own

21    estimate, report to you and then discuss with the

22    contractor, you know, negotiate with the

23    contractor on an ultimate agreed upon figure, or

24    does the adjuster work with that identified

25    contractor and create an estimate for you?

1    A.    Generally the adjuster will meet with the

2          contractor, what I've seen before is walk through

3          the building and get a consensus on scope, then

4          complete his or her numbers and then speak with

5          the contractor to see if an agreed figure can be

6          reached.  This may occur even before he's

7          completed his first report and payment

8          recommendations, or it could occur afterwards.

9          It depends.

10   Q.    But you don't require them to provide their own

11         estimate and then compare it?

12   A.    We do have the adjuster complete an estimate

13         either way, if that's what you're referring to.

14         Our adjuster will always complete an estimate.

15   Q.    Sure.

16   A.    So I guess I don't understand your question.

17   Q.    You don't require your adjusters to do it

18         independently of the identified contractor?

19   A.    They are completing an independent estimate, in

20         terms of they're completing their own estimate

21         with numbers.  Do they try to reach consensus on

22         some of these items in terms of scope,

23         absolutely.

24   Q.    There is a reference, there's several references

25         in the file, we don't need to look at particular

1    ones, to the "need" for the Bordens to identify a

2    contractor.  I guess my question is how does that

3    affect Amica's responsibilities with regard to

4    the claim?

5    A.  It allows us to reach an agreed figure and

6    therefore a resolution of the claim.  The claim

7    isn't resolved until the contractor has been

8    chosen and numbers have been given and that

9    contractor agrees to stand by the work in terms

10    of the eyes of our policyholder, and once that's

11    done, then we know we have agreement and the

12    claim has, in fact, been resolved.

13    Q.  But it doesn't change your obligations under the

14    contract; is that correct?

15    A.  In terms of preparing an estimate?

16    Q.  Yes.

17    A.  No.

18    Q.  In terms paying what you owe?

19    A.  It does not.

20    Q.  Now, on page 459, this is an e-mail from

21    Mr. Bennett to you, and it states under the

22    Coverage A section, John, who is Schumann, feels

23    that he, who is the insured, will not choose

24    Visions.  He is trying to impress on the insureds

25    for their need to select a contractor.  At that

```
 1          month?

 2     A.   I couldn't even guess.

 3     Q.   Did you ever conclude, during your handling of

 4          this case, that you were not being kept

 5          up-to-date by Mr. Bennett?

 6     A.   No.

 7     Q.   He was keeping you up-to-date as activities

 8          occurred?

 9     A.   As far as I can tell.

10     Q.   You testified before that you found the handling

11          of the furniture for the alternative living

12          arrangement to be unusual in this case?

13     A.   (The deponent nodded.)

14     Q.   Where Amica bought the furniture and it was going

15          to be sold back to Amica or taken back to Amica

16          at the end of the Borden's use of it?

17     A.   Correct.

18     Q.   Had you ever handled a file where that occurred

19          in the past?

20     A.   No.

21     Q.   Did you find the Bordens to be unreasonable in

22          asking for that arrangement rather than renting

23          furniture?

24     A.   We agreed to provide it, so it was -- if it was a

25          request -- I can understand their concerns, and
```

1        that's why we agreed to provide it.

2    Q.  During the life of this case, and I know that you

3        reviewed the claim file and you're knowledgeable

4        about the case, was there anything that Amica did

5        that they weren't required to do under the

6        contract?

7    A.  We had a previous discussion in terms of paying

8        the full replacement cost of the contents as

9        opposed to the actual cash value, certainly one

10       area that I can think of.

11   Q.  You don't know whether Pennsylvania law requires

12       that?

13   A.  I know that there was some information -- I know

14       that Dave Bennett reported to me that they were.

15       I'm not so sure that that was accurate.

16   Q.  Did you conclude that that might not have been

17       accurate during the life of this claim or did you

18       just figure this out later?

19   A.  Again, I'm not completely sure.

20   Q.  What I'm trying to get is, my question was

21       whether Amica went beyond its policy obligations

22       in this case, and you gave me a specific example

23       and then --

24            MR. GEER:  Let me object to the form of

25       the question.  Here's the reason, the use of the

```
 1    Q.   But you don't know whether you reached that
 2         conclusion before or after you made the payment?
 3    A.   Again, this happened a while ago.
 4    Q.   Sure, I understand.  We can look at the claim
 5         file ourselves.
 6    A.   Sure.
 7    Q.   I asked you whether you thought the Bordens were
 8         being unreasonable with respect to the purchase
 9         of the furniture, and you gave me an answer.  Do
10         you believe the Bordens were unreasonable with
11         regard to any other aspect of this claim?
12    A.   Not that I can think of.
13    Q.   Page 486, this refers to an RCT Evaluation.
14         What's that?
15    A.   That's a replacement cost tool.  It's the name of
16         the software that's used in order to determine
17         what it would cost to rebuild that same home in
18         an event of a total loss fire.
19    Q.   And that number was $762,000 something dollars.
20         Why is that piece of information important to the
21         handling of the claim?
22    A.   It's important for a couple of reasons.  It's
23         important to notify our underwriting counterparts
24         if the insurance is accurate.  It also assists us
25         in getting an idea when we review the estimate
```

 1        Anthony Parise?

 2    A.   That's my understanding.

 3    Q.   And you said that you never spoke with Mr. Parise

 4        during the course of this file; is that right?

 5    A.   That's my recollection.

 6    Q.   Had you ever dealt with Giordano and Associates

 7        before?

 8    A.   Not that I can recall.

 9    Q.   Had you ever dealt with Mr. Parise before?

10    A.   Not that I can recall.

11    Q.   I take it that you have examined files where

12        public adjusters were involved?

13    A.   That's correct.

14    Q.   Does that change the way in which you handle a

15        file?

16    A.   No, it does not.

17    Q.   Does it make it more difficult for to you handle

18        a file based on your own experience?

19    A.   Not necessarily.

20    Q.   What do you mean by that?  You said not

21        necessarily.  Sometimes it will, sometimes it

22        won't?

23    A.   Just there are good PA's and there are bad PA's

24        just like there's good attorneys and bad

25        attorneys.  Some add something to the process,

1      some don't.

2   Q.  In this case, did you think that Mr. Parise added

3       something to the process?

4   A.  I don't know what was Mr. Parise as opposed to

5       Dr. and Mrs. Borden, so I'm not privy to their

6       discussions.

7   Q.  I noticed that there is a discussion in Dave

8       Bennett's memo about whether Mr. Parise was a

9       public adjuster licensed in Pennsylvania or

10      whether he was just acting as a consultant.  Did

11      you investigate at all whether Mr. Parise was

12      licensed in Pennsylvania?

13  A.  No, I did not.

14  Q.  Did that affect your handling of the case at all

15      in any way?

16  A.  No, it did not.

17  Q.  Were you ever provided any information to suggest

18      that Mr. Parise was not qualified to serve as

19      either a public adjuster or a consultant to help

20      the Bordens in this case?

21  A.  I can't recall any information to that effect.

22  Q.  Nobody told you that he doesn't know what he's

23      doing or --

24  A.  Not that I can recall.

25  Q.  You said that you have examined files in which

1    A.    I can't think of anything.

2    Q.    At the bottom of the next paragraph, it says --

3          the paragraph that starts with, "Insured has a

4          brother," do you see that?

5    A.    Yes.

6    Q.    The last three sentences say, "Schumann feels the

7          insured will never move into the house.  Mrs. has

8          been traumatized by the event.  He feels the

9          insured will want to cut the best deal possible

10         and sell the house as is."  Does the fact that

11         Dr. Borden and his family may or may not move

12         back into the house, does that affect Amica's

13         obligations under the insurance policy in any

14         way?

15   A.    The only way it would affect it is whether or not

16         we'd be responsible for providing holdback on an

17         actual cash value basis.

18   Q.    But it would not affect the estimate of the loss

19         or the amount that you were required to pay under

20         the loss except for the holdback; is that

21         correct?

22   A.    Correct.

23   Q.    And the holdback would apply if they never

24         rebuilt; is that correct?

25   A.    Could you rephrase the question?

1      Dr. Borden for whatever reason is being

2      unreasonable and not assisting Amica with its

3      subrogation investigation?

4  A.  I'd have to review the file.

5  Q.  Paragraph six of your e-mail on AM505 says that

6      Mr. Bennett should obtain an estimate from

7      Visions or confirmation in writing that they

8      agreed to John's scope.  Did you ever get that?

9      Did you ever get an estimate from them?

10  A.  I don't remember seeing an estimate from Visions.

11  Q.  Did you ever get confirmation in writing that

12      they agreed to the scope?

13  A.  I believe there was something in the file to that

14      effect.

15  Q.  The next sentence says, "Please also obtain more

16      information on the builder.  How large of a

17      company?  Do they normally handle this type and

18      size of loss?  How many years have they been in

19      business?"  What was the purpose of that inquiry?

20  A.  I had never heard of Visions before, so I wanted

21      some additional information regarding that

22      company.

23  Q.  At that point, had you received any questions

24      about their competence?

25  A.  Not that I'm aware of.

```
 1    Q.   About whether they were capable of providing a
 2         useful estimate for a loss of that size?
 3    A.   I'm not aware of any.
 4    Q.   Would that be something that you would routinely
 5         do if you were unfamiliar with the contractor,
 6         try to obtain more information about them?
 7    A.   If I'm unfamiliar with them and our policyholder
 8         has not yet chosen a contractor and that is
 9         something that the independent adjuster had
10         indicated that a contractor agrees to the figure,
11         then I probably would ask for some additional
12         information regarding that contractor.
13    Q.   What would you do if that information wasn't
14         forthcoming or if it was inadequate?
15    A.   If it was determined that it was inadequate, that
16         would just be something, again the adjuster
17         completed his estimate.  But it was something I
18         would file away.  If there was, in fact, a
19         disagreement, it would be something that I would
20         want to take a closer look at.
21    Q.   Then paragraph seven, you say, "Let's talk with
22         cleaning company regarding insured's concerns."
23         Now, when you said the cleaning company there,
24         Lisa, were you referring to the dry cleaner or
25         the fire restoration contractor who was cleaning
```

1    clothes did not seem to be clean and that the

2    family was not satisfied with the cleaning

3    process.  These are three factors she's already

4    mentioned in her testimony.  Okay, so those are

5    three things that influenced her decision.

6    Q.  Were those three things that influenced your

7    decision?

8    A.  Yes.

9              MR. GEER:  Were there more things that

10   you can recall other than those three things?

11             THE DEPONENT:  Not at this time.

12   Q.  AM505 at the end, the last full paragraph, it

13   says, "It appears we may be heading towards

14   appraisal given the outstanding issues with the

15   contents and PA allegation that Coverage A damage

16   is double what we estimated.  Let's identify what

17   we need to do to complete our assessment of the

18   damages."

19             At this time, did you consider or did

20   you feel that it was clear that this case was

21   going to go to appraisal or did you think that

22   there could be things that were done to resolve

23   the claim short of appraisal?

24   A.  We always try to resolve the claims.  At that

25   point in time, there were some concerns and there

1       were some issues that without having a

2       contractor, some allegations of double the

3       estimate, some issues in terms of allowing the

4       contents to be cleaned with comments that

5       contents would be, you know, would not be

6       acceptable.  Those are some issues that would

7       raise my concern that we want to make sure we're

8       doing everything we can to assess the damages.

9   Q.  Well, my question was whether you felt that there

10      was anything that you could do to avoid the case

11      going to appraisal?

12  A.  We always try to work to resolve the claim.

13  Q.  At that time, did you think that there was

14      anything that you could do to avoid appraisal as

15      of March 7th, 2003?

16  A.  In my role as an examiner?

17  Q.  Yes.

18  A.  No.

19  Q.  Okay.  So you thought that it was clear that the

20      case was going to go to appraisal?

21  A.  No, that's not what I said.

22  Q.  Okay.

23  A.  What I said is there were some areas of concern

24      where we weren't reaching consensus on the claim,

25      and therefore that it was a possibility that we

```
 1         might be going -- we might need to resolve this
 2         in the appraisal process.
 3    Q.   Did you make any recommendations at that time to
 4         do anything that you thought might avoid the
 5         appraisal process?
 6    A.   Our normal adjusting handling.
 7    Q.   At this time, did you recommend that Amica retain
 8         its own contractor to estimate the damages?
 9    A.   At this point, I didn't see that we needed to
10         since we were still waiting to obtain Dr. and
11         Mrs. Borden's contractor in order to reach an
12         agreed figure.
13    Q.   So the answer is no, that you did not recommend
14         hiring your own contractor to do an estimate at
15         that time?
16    A.   That's correct.
17    Q.   Go to AM508.  Now, this is a letter from
18         Mr. Seifert addressed to John Schumann and copied
19         to Dr. Borden.  Did you ever get this?
20    A.   I did.
21    Q.   Did you ever get anything else from Visions
22         Corporation regarding their opinions of the
23         estimate that had been prepared by Mr. Schumann?
24    A.   Not that I can recall.
25    Q.   I think I asked you this before, but you don't
```

1         have any idea what Visions Corporation did in

2         order to reach this conclusion?

3    A.   That's correct.

4    Q.   That Mr. Schumann's estimate was adequate?

5    A.   That's correct.

6    Q.   517, this is the e-mail from Amy Speaker to Dave

7         Bennett, and we know from prior documents that

8         Amy Speaker is the representative of the Dry

9         Cleaning Network.  Were you included on these

10         e-mails or were you copied them from Dave

11         Bennett?

12    A.   I was not, according to this e-mail, I wasn't in

13         a to or from, but I did receive a copy of this

14         e-mail at some point in time when Dave Bennett

15         forwarded the file information to my attention.

16    Q.   She refers to another source, and right in the

17         middle of that e-mail, The International

18         Fabricare Institute, it might have additional

19         data on the carcinogenic effect of dry cleaning

20         or smoke damage.  Did you ever follow up with the

21         International Fabricare Institute?

22    A.   I did not.

23    Q.   Did David?

24    A.   I do not know.

25    Q.   Was there ever an effort made as far as you know

```
 1              to obtain information regarding the carcinogenic

 2              effect of fire or smoke damage to what you

 3              called, I think, what do you call, hard goods,

 4              hard?  What was that phrase that you used?  You

 5              referred to clothes as soft something.

 6     A.       You'll have to -- Okay.  Hard goods more in the

 7              context of those items that can't go in the

 8              washing machine.

 9     Q.       Like furniture?

10     A.       Exactly.

11     Q.       Or building materials?

12     A.       Or books, et cetera.

13     Q.       Do you know if there was any effort made during

14              the course of this file to learn more about the

15              carcinogenic effect of smoke or fire damage to

16              hard goods like furniture or building materials?

17     A.       I don't know.

18     Q.       As opposed to soft goods like the dry cleaning of

19              clothes?

20     A.       I do not know.

21     Q.       If there was, it would appear in the file, right?

22     A.       Correct.

23     Q.       AM518, the first paragraph of this letter

24              indicates that Mr. Bennett was enclosing a check

25              in the amount of $295,098.92 representing the
```

1       Actual Cash Value of the estimate done by

2       Mr. Schumann; is that correct?

3   A.  Yes.

4   Q.  Can you take a look at this letter and tell me

5       whether there's any indication in this letter

6       that that payment was an initial payment or a

7       preliminary payment or subject to further

8       negotiation?

9   A.  Could you ask the question again, please?

10  Q.  Yes.  Take a look at this letter for me and tell

11      me whether this letter indicates anywhere that

12      this payment that was being made was preliminary

13      or subject to further negotiation or anything

14      other than a final payment.

15  A.  I did not see any.

16  Q.  Did you get a copy of this letter when it was

17      sent?

18  A.  I don't know when I received a copy, but I did

19      receive a copy.

20  Q.  When you received a copy of this, did you talk to

21      Mr. Bennett at all about making it clear to the

22      insured that this was just an initial payment,

23      that it was subject to further negotiation?

24  A.  Not that I can recall.

25  Q.  I'm going to 529.  Under Service Expectations --

1    A.    No.

2    Q.    And you don't recall following up in any way on

3          that?

4    A.    Not that I can recall.

5    Q.    Under Coverage A, there is information regarding

6          Visions Corporation.  Can you read that, please,

7          that paragraph starting with, "I spoke with the

8          owner of Visions."

9    A.    You'd like me to read the paragraph to you?

10   Q.    Not out loud, no, just to yourself.  I just have

11         a question.

12   A.    I misunderstood your question.

13   Q.    You'll agree with me that Dave Bennett is telling

14         you that the owner of Visions Corp. had told him

15         that they did work for State Farm and for Farmers

16         Insurance?

17   A.    Correct.

18   Q.    Is that correct?  Did you follow up with anybody

19         from State Farm or Farmers Insurance to get a

20         reference for Visions Corporation?

21   A.    That wouldn't be my role.

22   Q.    Do you know if anybody from Amica did, contacted

23         State Farm or Farmers to talk to an adjuster who

24         had worked with this company before?

25   A.    I don't know.

1    Q.   Is there any indication in the file that that was

2         ever done?

3    A.   Not that I could see.

4    Q.   Did you do anything in response to this

5         information?  Did you attempt to get a customer

6         list or talk to any of the customers of Visions

7         Corporation about the work that they had done for

8         them in the past or get a photograph or anything

9         of houses they had built?

10   A.   Again, that wouldn't be my role.

11   Q.   So you didn't do anything other than read this

12        e-mail with respect to that question that you had

13        posed before about what qualifications Visions

14        Corporation had?

15   A.   I had asked the question, and the questions were

16        answered.

17   Q.   Okay.  So if there was any follow-up to be done

18        with regard to that, that would be Dave Bennett's

19        job?  You said it's not your role?

20   A.   Exactly, it's not my role to follow up on

21        references of a company on a particular claim.

22   Q.   But if somebody felt that it was necessary, it

23        would be Dave Bennett's role to do that?

24   A.   Or his delegate.

25   Q.   Because you had recommended that that information

```
 1          be obtained --
 2    A.    Exactly.
 3    Q.    -- in a prior e-mail?
 4    A.    Exactly.
 5    Q.    So this information is obtained and it's e-mailed
 6          to you?
 7    A.    Correct.
 8    Q.    If the information was inadequate, for example,
 9          if for whatever reason you deemed it inadequate,
10          that it didn't provide the information that you
11          thought it should, that is, Visions Corporation
12          perhaps said this is the first fire we've ever
13          worked on, would it be Dave Bennett's role to
14          follow up on that or yours?
15    A.    I would discuss that with Dave, but yes, in terms
16          of additional research --
17    Q.    Yes.
18    A.    -- that would be the file handler's
19          responsibility.
20    Q.    But your role as an examiner is to provide some
21          input, perhaps pose some questions that they may
22          need to follow up on?
23    A.    When necessary.
24    Q.    Page 556 is a letter to Mr. Schumann from Anthony
25          Parise, and then through page 564 is a report
```