Plaintiffs' Exhibit 14
(Part 2 of 2)

```
1          from Mr. Parise. Did you receive and review this
2          report from Mr. Parise?
3     A.   At some point, yes.
4     Q.   Did you do anything in reaction to it, did you
5          follow up in any way? Did you ask Mr. Bennett to
6          address any of the issues that were raised by
7          Mr. Parise, did you ask Mr. Schumann to address
8          any of those issues?
9     A.   I don't remember exactly when I received this in
10         terms of what had already transpired.
11    Q.   Can you tell me anything that you did in reaction
12         to or in response to receiving this report?
13    A.   I'd have to review the file.
14    Q.   It would be reflected in the file? You don't
15         remember offhand doing anything?
16    A.   Correct.
17    Q.   565 is a letter to Mr. Parise from Dave Bennett.
18         The last paragraph on the first page discusses
19         the delivery of the dry cleaning to the Bordens
20         and their indicating that it was not cleaned to
21         their satisfaction. Then the last sentence says,
22         "According to VIP Cleaners, these items have been
23         cleaned according to industry standards and we
24         disagree with the contention that they were not
25         cleaned satisfactorily." Do you know whether at
```

```
 1         this time Mr. Bennett had seen any of the clothes
 2         and personally inspected them?
 3    A.   I do not.
 4    Q.   Of course you never did, right?
 5    A.   Correct.
 6    Q.   You never spoke to the dry cleaners either, did
 7         you?
 8    A.   Correct.
 9    Q.   572, this is a letter from Mr. Bennett to Dr. and
10         Mrs. Borden regarding the return of the two
11         checks. Did you play any role in drafting this
12         letter?
13    A.   Not that I can recall.
14    Q.   Did you recommend to Mr. Bennett that it be sent
15         or did he do that on his own?
16    A.   I agree with his assessment. Whether I was
17         involved in the decision making, I can't recall.
18    Q.   Do you remember advising Mr. Bennett that now
19         that the two checks have been returned, we should
20         send a letter to the insured?
21    A.   Again, I don't recall.
22    Q.   575, this is an e-mail from you to Dave Bennett.
23         It says, "Let's outline the 2 month minimum is
24         all we will pay for the contents storage in our
25         payment letter." What does that mean?
```

```
 1            temporary living, then certainly we would pay for
 2            storage.
 3       Q.   What is the two month number?  What's so magic
 4            about that?
 5       A.   I don't recall.
 6       Q.   That was just your judgment at that time?
 7       A.   Again, I don't recall.
 8       Q.   On 579, this is a memo To File from Mr. Bennett
 9            that says that the Public Adjuster's dwelling
10            estimate has been obtained and the estimate total
11            of $680,492.21.  Did you get a copy of the
12            estimate from Mr. Parise?
13       A.   At some point I did, yes.
14       Q.   What did you do when you obtained it?
15       A.   I don't remember exactly when I obtained it, so
16            in terms of putting it in the context of any
17            e-mails that I might have had.
18       Q.   Do you remember what you did?  I mean, like I
19            said, I can read the claim file.
20       A.   Sure.
21       Q.   But did you send it to somebody, did you talk to
22            your supervisor about it?
23       A.   Not that I can recall.
24       Q.   You don't recall doing anything with it?  Did you
25            review it?
```

| | | |
|---|---|---|
| 1 | A. | I would have reviewed it, yes. |
| 2 | Q. | Did you reach any conclusions regarding its |
| 3 | | adequacy or whether you disagreed with any of the |
| 4 | | conclusions he reached? |
| 5 | A. | Again, not being on site, I would have to rely on |
| 6 | | our experts to provide that information to us. |
| 7 | Q. | So you weren't doing an independent assessment of |
| 8 | | whether Mr. Parise's estimate was more accurate |
| 9 | | than Mr. Schumann's estimate? |
| 10 | A. | I certainly reviewed the estimate, but not being |
| 11 | | on site, it would be difficult to determine which |
| 12 | | is more accurate. |
| 13 | Q. | On 583, this is a letter from the public adjuster |
| 14 | | to Mr. Bennett. Referring to the bottom of page |
| 15 | | one of that letter, which would be page 583, I'm |
| 16 | | going to read a couple sentences. "Your letter |
| 17 | | dated March 11, 2003 indicated that Visions |
| 18 | | Incorporated was in agreement with your estimate. |
| 19 | | After our joint inspection Mr. Seifert explained |
| 20 | | he originally thought Mr. Schumann's estimate was |
| 21 | | reasonable but after our joint inspection he |
| 22 | | couldn't repair the home or guarantee a smoke |
| 23 | | free home with the estimate as it is. I |
| 24 | | explained the," probably to, "Mr. Seifert the |
| 25 | | scope of repairs that I was proposing and he |

```
1         agreed it was necessary to rid the home of
2         smoke."
3              Did you investigate that statement at
4         all, and what I mean by that is investigate
5         whether what Mr. Parise reported Visions
6         Corporation said was true?  You said you never
7         talked to Mr. Seifert, right?
8    A.   Correct.
9    Q.   Did you talk to Dave Bennett about whether
10        Visions Corporation, in fact, had told the public
11        adjuster that now looking at it he couldn't rid
12        the home of smoke for the amount that
13        Mr. Schumann had estimated?
14   A.   I don't recall.
15   Q.   Do you agree that the goal is to rid the house of
16        smoke and the smell of smoke?
17   A.   Yes.
18   Q.   That that would be necessary to put the house
19        back in the condition it was in?
20   A.   Sure.  There's restoration techniques that can be
21        used, but yes.
22   Q.   But that's the goal or one of the goals?
23   A.   Sure, to put the insured back to preloss
24        condition.
25   Q.   And that would include a smoke-free home,
```

1       correct?
2   A.  Yes.
3   Q.  Now, page 589 is an e-mail from Peter Reid to Dave Bennett copying you, and this discusses the appraisal. Why was Mr. Reid involved at this point?
7   A.  I don't know.
8   Q.  Did you get him involved?
9   A.  I did not.
10  Q.  Was Mr. Reid's approval necessary to move the case to appraisal?
12  A.  The property loss manager would need to be involved in that sort of a decision, yes.
14  Q.  He was the property loss manager at that time?
15  A.  That is correct.
16  Q.  But you didn't get him involved?
17  A.  I did not.
18  Q.  Had you been involved in cases that went to appraisal before, before this one?
20  A.  Yes, I have been.
21  Q.  How many?
22  A.  One that I can think of. There might be more.
23  Q.  Was Mr. Reid involved in any other aspect of this claim that you can recall other than approving the demand for appraisal?

| | | |
|---|---|---|
| 1 | | Do you know that to be the case? |
| 2 | A. | From reviewing the file, it appears that they |
| 3 | | did. |
| 4 | Q. | Did you play a role at all in scheduling the |
| 5 | | meeting or determining what would be discussed at |
| 6 | | the meeting? |
| 7 | A. | I did not. |
| 8 | Q. | Did you learn anything about what occurred at the |
| 9 | | meeting other than Mr. Bennett's description of |
| 10 | | the meeting in his file note? |
| 11 | A. | That's my understanding of the meeting, is based |
| 12 | | on the file material. |
| 13 | Q. | Now, following that meeting, you will agree that |
| 14 | | Amica initiated the appraisal option; is that |
| 15 | | correct? |
| 16 | A. | Correct. |
| 17 | Q. | 603 is a letter from Mr. Bennett to the Bordens |
| 18 | | initiating the appraisal process, and that letter |
| 19 | | was actually reviewed by you before it went out; |
| 20 | | is that correct? |
| 21 | A. | Correct. |
| 22 | Q. | Now, why was it at this time that Amica chose to |
| 23 | | initiate the appraisal process rather than do |
| 24 | | something else such as getting another contractor |
| 25 | | to do an estimate of the loss? |

| | | |
|---|---|---|
| 1 | A. | I wasn't involved in this decision. |
| 2 | Q. | Not in any way? |
| 3 | A. | Correct. |
| 4 | Q. | Do you know why the decision was made? |
| 5 | A. | Other than the file materials. |
| 6 | Q. | Okay. Nobody talked to you and said this is the |
| 7 | | reason we're invoking appraisal rather than doing |
| 8 | | anything else? |
| 9 | A. | Other than the file materials. |
| 10 | Q. | Did you make any recommendations regarding |
| 11 | | further activity in the file other than |
| 12 | | appraisal, such as retaining your own contractor |
| 13 | | to do your own estimate? |
| 14 | A. | Not at this time, no. |
| 15 | Q. | You didn't make that recommendation? |
| 16 | A. | Not that I can recall. |
| 17 | Q. | Do you know why it is that Amica initiated |
| 18 | | appraisal rather than asking the insured whether |
| 19 | | they wanted to initiate appraisal? |
| 20 | A. | I don't. I wasn't involved in this decision. |
| 21 | Q. | That decision was made by Peter Reid? |
| 22 | A. | Correct. |
| 23 | Q. | 609 is an e-mail from Dave Bennett to you |
| 24 | | regarding an insurance department complaint which |
| 25 | | had been made by the Bordens, correct? |

```
 1   A.   I'm not sure what discussions Dave Bennett might
 2        have had with Dan Jones other than what's in the
 3        file.
 4   Q.   I have a couple of questions about the answer to
 5        the complaint and then we'll get you out of here.
 6             MR. MURPHEY:  Do you have a copy of the
 7        answer, Paul?
 8             MR. GEER:  I'm not sure.  I don't think
 9        I do.
10             MR. MURPHEY:  I do.  I was just seeing
11        if you had one that she could look at.
12   Q.   Okay.  May I come over here?  This is a copy of
13        the answer that has been filed in this complaint
14        or in this lawsuit.  Have you ever seen this
15        document before?
16   A.   I have.
17   Q.   There are a series of defenses that are pleaded,
18        and the First Affirmative Defense lists or
19        recopies or sets forth some of the policy
20        provisions, and the Second Affirmative Defense
21        says that the plaintiffs failed to satisfy
22        certain of these policy requirements.  For
23        example, it says that the Bordens failed to
24        satisfy policy requirement 4A.  4A is that the
25        insured has the duty to protect the property from
```

```
 1         further damage.  If repairs to the property are
 2         required, you must make reasonable and necessary
 3         repairs to protect the property.
 4              Lisa, do you know how it is that the
 5         Bordens failed to comply with that policy
 6         requirement?
 7    A.   I'd want to review the file.
 8    Q.   Without reviewing the file, can you tell me how
 9         it is that the Bordens failed to comply with that
10         policy requirement?
11    A.   I do remember that there was an issue of mold in
12         the basement.  That was done as Dr. and Mrs.
13         Borden did not make any additional efforts to
14         protect their property from further damage.
15         Again, I'm just going by memory.
16    Q.   Okay.  How was it that the Bordens didn't make
17         any effort to protect their property?
18    A.   There was mold, and the mold seemed to be
19         expanding in its nature.  I don't know what
20         efforts Dr. and Mrs. Borden made to prevent mold
21         from occurring and from spreading in the
22         basement.
23    Q.   But Brian Seifert was on scene with Visions
24         Corporation; is that right?
25    A.   To secure the residence, yes.
```

1   but I am entitled to ask you what information you
2   have which would support the answers. If you
3   can't think of them now or if you think that you
4   would need to look at the file, that's fine, you
5   can tell me that. But I am entitled to ask you
6   these questions, and if you have an answer to
7   them, you give me the answer as best you can.
8   Okay?
9            THE DEPONENT: I understand.
10           MR. MURPHEY: Okay, good.
11  Q.  You are familiar with the policy terms, correct?
12  A.  Correct.
13  Q.  That's part of your job, right?
14  A.  Correct.
15  Q.  Anyway, my last question was with respect to
16      paragraph B5, which is the Borden's duty to
17      cooperate with us in the investigation of the
18      claim, and it's been pleaded here that they did
19      not do that. Now, what is your knowledge of
20      that, whether the Bordens, whether anything the
21      Bordens did violated that policy requirement?
22  A.  Again, I would want to review the file.
23  Q.  You can't offer me anything without reviewing the
24      file?
25  A.  I don't want to speculate.

```
 1            a proof of loss in this case?
 2       A.   I'd have to review the file, but I don't think
 3            so.
 4       Q.   Okay.  I didn't see one in the file.  Would that
 5            be a surprise to you if there was not a request
 6            for a sworn proof of loss?
 7       A.   No.
 8       Q.   Next, the 10th Affirmative Defense says that
 9            Amica undertook the task of attempting to
10            determine the repair cost of the building by
11            obtaining an estimate from John Schumann who
12            wrote an estimate with minimal help, input or
13            cooperation of the plaintiffs.  My question to
14            that is, with regard to the repair cost of the
15            building, what input would be required of the
16            Bordens and how would that input assist
17            Mr. Schumann in evaluating the damage to the
18            building?
19       A.   I wasn't privy to discussions that John Schumann
20            had with Dr. and Mrs. Borden regarding the
21            condition of their home before the loss and after
22            loss, so I wouldn't be able to answer that
23            question.
24       Q.   So you don't know?
25       A.   Correct.
```

1  Q. In your experience as a property examiner, what
2     role does a homeowner play with respect to
3     estimates for repair of the building?  I
4     understand the role with respect to contents, but
5     what about with repair of the building?
6  A. If there is some parts of the building that are
7     damaged beyond recognition, we would need the
8     input of the policyholder to determine exactly
9     what was there before if it's not something that
10    would be readily accessible.
11 Q. As we sit here today, do you know of any
12    information that Mr. Schumann wanted from the
13    Bordens with respect to the damage to the
14    building that he was unable to get?
15 A. I'd have to review the file.
16 Q. So you don't know any off the top of your head?
17 A. I don't.  I'd have to look at the file.
18 Q. The 40th Affirmative Defense says, "As of the
19    date of the filing of this answer nearly a year
20    and-a-half after the loss, Plaintiffs have not
21    completed the repair or replacement of their
22    home."  I think I had asked you before, but now
23    in the context of this defense, how does the
24    plaintiffs' delay in repairing or replacing their
25    home affect Amica's responsibilities under the

```
 1              insurance policy?
 2       A.     The impact that would be present would be whether
 3              or not the holdback would be something that they
 4              would be entitled to.
 5       Q.     Okay.  Is there anything else that you can think
 6              of?
 7       A.     I'd have to review the file.
 8       Q.     Finally, 41st Affirmative Defense says, "The
 9              claims, complaints and resulting damages alleged
10              in the complaint were caused and contributed to
11              by the Plaintiffs' failure to cooperate in
12              Amica's investigation of loss and damage, failure
13              to submit accurate timely claims and failure to
14              comply with contractual provisions and
15              requirements."  Can you tell me in what ways the
16              Bordens failed to cooperate in Amica's
17              investigation of the loss and the damage?
18       A.     Again, I'd want to review the file.
19       Q.     Do you know whether the Bordens at any time
20              submitted inaccurate claims?
21       A.     In what context?
22       Q.     Well, this is pleaded.  It says failure to submit
23              accurate timely claims.  At some time did the
24              Bordens submit inaccurate claims, that is, a
25              claim overstating the amount of damage or
```

|    |    |    |
|----|----|----|
| 1  |    | misstating? |
| 2  | A. | The original estimate that was supplied by the |
| 3  |    | public adjuster was not the final estimate in |
| 4  |    | which a payment was issued.  I'm not making any |
| 5  |    | statements in terms of or not, but you had asked |
| 6  |    | the questions in terms of was something claimed |
| 7  |    | more that was not the same amount that ultimately |
| 8  |    | the claim was resolved for.  Again, I'd want to |
| 9  |    | review the file in the context of those issues as |
| 10 |    | well as inventory, et cetera. |
| 11 | Q. | Okay. |
| 12 | A. | I just don't know. |
| 13 |    | MR. MURPHEY:  Okay.  I don't have |
| 14 |    | anything else for you, Lisa.  Thank you very |
| 15 |    | much. |
| 16 |    | MR. GEER:  No questions.  We'll read. |
| 17 |    | (The deposition of Lisa St. Onge |
| 18 |    | concluded at 6:00 p.m.) |

```
1    STATE OF RHODE ISLAND
            ss. Providence, Rhode Island
2    COUNTY OF PROVIDENCE

3

         BE IT KNOWN that I, Kristen M. Bengtson,
4    Shorthand Reporter and Notary Public, reported
     stenographically the foregoing deposition
5    pursuant to notice at the time and place stated
     in the caption hereof; that I was then and there
6    a Notary Public in and for the State of Rhode
     Island; that by virtue thereof I was authorized
7    to administer an oath;  that the witness before
     testifying was duly sworn to tell the truth, the
8    whole truth and nothing but the truth; that the
     testimony of said witness was transcribed by me;
9    that the foregoing contains a full, true and
     correct transcription of the notes of said
10   deposition.

11       I FURTHER CERTIFY that a review of the
     deposition by deponent was requested, and a copy
12   of the deposition transcript and signature and
     correction sheets were furnished to deponent (or
13   to deponent through his/her counsel).

14       I FURTHER CERTIFY that I am not of counsel nor
     attorney for either or any of the parties to said
15   action or otherwise interested in the event
     thereof, and that I am not related to either or
16   any of the parties to said cause.

17       IN WITNESS WHEREOF I have hereunto subscribed
     my name and affixed my seal of office this 9th
18   day of August, 2005.

19

20       _____
         KRISTEN M. BENGTSON, NOTARY PUBLIC
21       CERTIFIED SHORTHAND REPORTER
         REGISTERED PROFESSIONAL REPORTER
22
     MY COMMISSION EXPIRES:
23   March 16, 2007

24

25
```