**Page 1**

```
IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JONATHAN A. BORDEN and      :
AMY P. BORDEN,              :
        Plaintiffs          :
                            :
        v.                  : CIVIL ACTION NO: 04-175-E
                            :
AMICA MUTUAL INSURANCE      :
COMPANY,                    :
        Defendant           :


        Deposition of RICHARD M. BORDEN, taken before
and by Sonya Hoffman, Notary Public in and for the
Commonwealth of Pennsylvania on Friday, February
25, 2005, commencing at 2:40 p.m., at the offices of
MacDonald Illig Jones & Britton, LLP, 100 State
Street, Suite 700, Erie, PA 16507.


For the Plaintiffs:

    Craig R. F. Murphey, Esquire
    MacDonald Illig Jones & Britton, LLP
    100 State Street, Suite 700
    Erie, PA 16507

For the Defendant:

    Paul K. Geer, Esquire
    DiBella Geer McAllister Best
    312 Boulevard of the Allies
    Pittsburgh, PA 15222


                Reported by Sonya Hoffman
```

**Page 2**

```
                    I N D E X


RICHARD M. BORDEN

    Direct Examination by Mr. Geer . . . . . . . . . 3
```

[DEFENDANT'S EXHIBIT stamp]

**Page 3**

1 RICHARD M. BORDEN, first having
2 been duly sworn, testified as follows:
3
4           DIRECT EXAMINATION
5 BY MR. GEER:
6
7     Q. Would you state your full name for the record,
8 please.
9     A. Richard Michael Borden.
10    Q. And you are an attorney; are you not?
11    A. I am.
12    Q. And could you just give me, briefly, your
13 educational background.
14    A. I graduated in 1987 with a degree in psychology
15 from Amherst College, and graduated in 1990 from New York
16 University School of Law.
17    Q. And how are you presently employed?
18    A. I am an attorney with the Hartford Financial
19 Services Group.
20    Q. And what type of work do you do?
21    A. I'm a technology lawyer.
22    Q. Do you have any experience in insurance law?
23    A. No, never even taken a class.
24    Q. And where do you physically work, what's the
25 address of your workplace?

**Page 4**

1     A. Hartford Plaza, Hartford, Connecticut.
2     Q. You're at home office?
3     A. Home office.
4     Q. Okay. How did you first find out about the
5 fire -- first, you are Jon Borden's brother, correct?
6     A. Correct.
7     Q. Is he an older brother or younger brother?
8     A. He is my older brother.
9     Q. How did you first find out about the fire at Jon's
10 house?
11    A. I got a call from Jon while he was still at the
12 scene some minutes or something after the fire -- after he
13 got out of the house.
14    Q. And what did he tell you, he had a fire, anything
15 else?
16    A. Well, he told me that the fire had started, he was
17 in the house at the time, that the alarm had gone off. And
18 that he was going around the house, he thought about taking
19 some stuff out of the house, but the alarm kept telling him,
20 fire, get out of the house, fire, get out of the house. So
21 he decided it was probably best to listen to it and left.
22        And then he was describing the -- you know,
23 actually, it must have been a little while after because he
24 was telling me how the firefighters were trying to put out
25 the fire and they couldn't put it out and they might have to

## Page 5

1 bulldoze the house to get the flames out.
2   Q. Did you ever see the house in fire-damage
3 condition?
4   A. I did not come to Erie to see it. The only thing
5 that I saw was online in a newspaper article, which had some
6 pictures.
7   Q. From your observation, what impact did the fire
8 have on your brother from an emotional standpoint?
9   A. Oh, he was very upset about it.
10  Q. Can you describe how he expressed that degree -- I
11 mean, how upset was he? How did he express it?
12  A. Well, Jon's -- he doesn't necessarily show things,
13 he didn't break down crying or anything like that. But you
14 could hear it in his voice, he sounded very tense just
15 generally about it. He was, I mean, as you'd expect, a --
16 he wasn't sure what to do next kind of thing, the fire was
17 still going on, so he wasn't sure exactly what to do. My
18 parents were away so I was talking to him and trying to help
19 him out.
20  Q. At some point in time did he ask for your help in
21 connection with some aspect of the insurance claim?
22  A. Well, I'd say my brother and I are close, so I was
23 talking to him daily at that point about what was going on
24 and how things were happening, you know, there about the
25 meetings he was having and so forth. So I was getting

## Page 6

1 general information about what it was that was going on and
2 I gave him my opinion all the way through.
3   Q. What was he concerned about, what were the issues?
4   A. Well, initially he was concerned about getting
5 clothes and getting them a place to stay, because Amy was
6 coming back up, and just making sure that they were settled.
7 And then trying to figure out how to -- you know, what to do
8 after that.
9       Then he was concerned about having a place for the
10 family to stay, so he was very relieved when my mother came
11 in and was able to take over that aspect of it and do a
12 large bulk of getting that together.
13  Q. All right. And at some point were you aware of a
14 problem that arose with Amica?
15  A. Well, it -- there wasn't a problem at first. You
16 know, Amica, from my understanding, has a very good
17 reputation, that's what I always heard. And so I thought
18 that he would be treated fairly and treated well and that
19 Amica would do what you would hope from something like this.
20 So at first there wasn't any sort of issue.
21      But as time went on, there were concerns that
22 Mr. Schumann together with Mr. Seifert were -- really
23 weren't looking at things in the appropriate way. It wasn't
24 so much that things were necessarily being missed -- well,
25 at first it was that they just -- you know, that they were

## Page 7

1 looking at it as if the fire wasn't as bad it seemed to have
2 been.
3   Q. Okay. And then as time moved on, did it become
4 another issue?
5   A. Well, when that happened, you know, the concern
6 was that perhaps they -- that Amica wasn't going to
7 necessarily be looking at things in as balanced a way as
8 they should and so perhaps it was time to get some outside
9 help. And that's when Jon decided to get Mr. Parise
10 involved.
11  Q. Did you put him in touch with Mr. Parise?
12  A. Yes and no. My parents had spoken to an insurance
13 agent that they've known for a long time who had suggested
14 getting Mr. Parise -- or Mr. Parise's group involved. And
15 so they gave me the name, I made the initial contact there,
16 and put Jon in contact with them and helped kind of work
17 through getting them out there.
18  Q. Okay. So you didn't know Mr. Parise or Giordano
19 and Associates as a company you worked with?
20  A. No. I had never heard of them before.
21  Q. Did there come a time Jon asked your opinion as to
22 whether or not to accept a check for building damage that
23 had been given to him by Mr. Schumann or Amica?
24  A. Actually, it wasn't Jon, it was Amy.
25  Q. Okay.

## Page 8

1   A. Yeah. What happened is that Amy had received the
2 check -- and she received a check for contents earlier, but
3 she received a check for, you know, the building and, you
4 know, didn't really think too much of it, that it would be
5 fine. But I just asked her, does it say anything on the
6 check, itself, and she said, yes, and she read it to me.
7 And I do not recall exactly what it said, but it was
8 something like full payment or something like that, which
9 seemed odd to me.
10      So, you know, I told her, I said, look, just hold
11 onto it, don't do anything with the check at this point, let
12 me go and ask somebody and see if that's an unusual thing.
13 I mean, normally for other types of things I wouldn't accept
14 a check that said that unless it was really for the full
15 amount, but I didn't know in this case.
16      So I went and talked to somebody in my
17 organization who heads the claims area for the law
18 department. She's not in the claims area, but she heads the
19 claims area for the law department. And she told me that
20 really isn't right, you shouldn't accept that check.
21  Q. Who was that that you talked to?
22  A. Her name is Joan Gentile.
23  Q. How do you spell the last name, G-E-N-T-I-L-E?
24  A. G-E-N-T-I-L-E.
25  Q. And there was also an issue regarding a contents

Borden, et al v. Amica Mutual Ins.
February 25, 2005
Case 1:04-cv-00175-SJM   Document 29-12   Filed 12/20/2005   Page 3 of 5
Multi-Page™
Richard M. Borden

Page 17

1  A. It wasn't until they hired counsel and after Amica
2  brought in another contractor, Mr. Jones, I believe was the
3  name. And then it was sometime after that when -- I guess
4  when Mr. Jones provided a revised estimate. And, you know,
5  as I recall the estimate wasn't immediately agreed upon, but
6  it was close enough that they knew that it was being
7  reviewed appropriately at that point, they believed.
8      Q. Okay. In terms of the -- and I'm not trying to
9  put words in your mouth, but are you telling me that after
10 counsel got involved, whatever that date was, and then
11 subsequently the Dan Jones' estimate was prepared, from your
12 observation Amy and Jon's stress level went down?
13     A. Somewhat. They weren't -- it didn't really fully
14 go down until it was settled. They were still both upset
15 until it was -- it was finally settled. And I think, in
16 truth, they're still upset about how they were treated --
17 how they felt that they were treated on this.
18     Q. What specifically -- in what way did they feel
19 they were mistreated?
20     A. Not on a one-to-one personal treatment, I'm
21 talking about treated by Amica as a whole. The whole way
22 that the estimate was done and how it was -- how it seemed
23 to be inappropriately done at first. And then it took a
24 public adjustor or whatever he is and then took a lawyer
25 getting involved to get to the point where they should have

Page 18

1  been in the first place, and you shouldn't have to do that.
2  That was their feeling.
3      Q. All right. And just so I'm clear on one issue
4  that I'm going to come back to, there was only the one check
5  that was issued to them that you told them you thought they
6  shouldn't cash.
7      A. The one check where there was that -- whatever
8  that particular wording was on it.
9      Q. Did you consider picking up the phone and calling
10 Mr. Schumann or calling Amica and saying, hey, is this the
11 final payment or is this just an interim payment?
12     A. Well, at that point I had heard the descriptions
13 from Mr. Parise about the interactions that he had had with
14 Mr. Bennett and with Mr. Schumann, which sounded like --
15 they just didn't sound like that -- it didn't sound like
16 Amica was really listening to any of their issues at that
17 point.
18         And so, no, I wasn't going to contact Mr. Bennett
19 myself directly at that point. As I said, it was right
20 around that point that I decided the best thing to do would
21 be to get counsel. But I didn't think that -- I didn't know
22 how long that was going to take and I didn't think it would
23 be good to keep the check.
24     Q. Let me refresh your recollection. I'm reading
25 from the Complaint, I'll let you see this after I'm done.

Page 19

1  The Complaint says that on or about March 11, 2003 Amica
2  furnished the Bordens a check in the amount of $328,999 and
3  change, and I think that is the check that you advised them
4  to reject; is that correct?
5      A. Wasn't the check for less than that? Isn't that
6  the -- wasn't the actual cash value less than that?
7      Q. Let me just show you --
8      A. Was it $300,000?
9      Q. -- that's Paragraph 34 of the Complaint.
10     A. Oh, maybe that is correct. I never saw the check
11 personally.
12     Q. Well, just read on because the dates involved are
13 what I'm going to question you about and question your
14 recollection of the events.
15     A. Okay. That could be, yeah.
16     Q. So that was March 11th.
17     A. Yep.
18     Q. That was the check that you advised them to
19 reject.
20     A. Yes.
21     Q. And at that point in time, if you read down,
22 Mr. Parise had not been retained yet and Terry Jones had not
23 been retained yet, and those meetings had not been held yet
24 that you just related.
25     A. Oh, okay. Perhaps -- so then it must have been

Page 20

1  conversations that my brother had had with Mr. Schumann then
2  at that point because there was something that -- that made
3  me concerned. That's right, there was something that made
4  me concerned at that point. So, I guess you're right, I'm
5  recalling that incorrectly. But what I did was I followed
6  the advice that my colleague at work had given when she said
7  to send it back.
8      Q. So it wasn't related to anything other than what
9  was your brother's -- you referenced something between your
10 brother and Mr. Schumann; what was that?
11     A. Just conversations at the house. I believe there
12 was one conversation and -- there was one conversation that
13 my brother had had with Mr. Schumann, I believe -- although,
14 I'm not positive about the chain of events or the timing,
15 which Mr. Schumann hadn't understood the word carcinogen,
16 which certainly concerned my brother. So I don't know.
17        At this point, by March 11th, I don't believe that
18 we were -- well, I know we weren't completely comfortable
19 with how this was going.
20     Q. This was less than three weeks after the fire,
21 correct?
22     A. Yeah, I know. So that's right. So that's when
23 this happened that we decided not to hire counsel but to
24 hire Mr. Parise to go in there and take a look at it. So
25 when we got this check and the check came back and it said

### Page 21

1 whatever, full payment or whatever it was, we said, okay,
2 send it back, let's get Mr. Parise to take a look at it, and
3 see if we can figure this thing out, maybe we can just get
4 it fixed.
5    Q. Your recollection was it said full payment.
6    A. I'm not sure that those are the exact words. But
7 it was -- actually, I remember, I recall, it was some kind
8 of strange wording for whatever it was.
9    Q. Something you are not accustomed to seeing?
10   A. I wasn't accustomed to seeing, but it also
11 suggested full payment or something like that.
12   Q. Okay.
13   A. Which was why I decided to go and ask somebody. I
14 went and asked somebody who would know better.
15   Q. Okay. We're less than a month after the fire and
16 your brother gets a check for in excess of $300,000 --
17   A. Uh-huh.
18      MR. MURPHEY: For the record, I believe that the
19      documents are going to establish that the original
20      check was for slightly less than $300,000,
21      $295,000 is what I recalled. And then there was
22      an additional $39,000 check which was sent that
23      may have been for contents.
24         So the Complaint may have lumped those two
25      together initially, but we'll let the letters

### Page 22

1       speak for themselves. I think the initial check
2       may have been $295,000 rather than $328,000.
3    A. That's the number that I recall.
4    Q. My question to you is this then: I had asked you
5 the question before, why didn't you pick up the phone and
6 call Mr. Schumann or call Mr. -- Mr. Schumann had said to
7 you, call me if you need or anything or have any questions
8 or something to that nature.
9    A. Actually, I said that to him.
10   Q. You said it, okay, whatever. Were you just not
11 comfortable calling him and asking him the question of is
12 this an interim payment or is this the final payment because
13 apparently these other events --
14   A. I guess I wasn't.
15   Q. Okay. And so it wasn't anything that Mr. Parise
16 had told you or anything that Mr. Jones had told you because
17 they hadn't been hired yet?
18   A. Correct.
19      MR. GEER: Okay. That's all I have. Thank you.
20      MR. MURPHEY: We'll read his transcript.
21
22      (Deposition concluded at 3:19 p.m.)
23
24
25

```
 1

 2

 3                    C E R T I F I C A T I O N

 4

 5        I, Sonya Hoffman, a Court Reporter and

 6   Notary Public in and for the Commonwealth of

 7   Pennsylvania, do hereby certify that the foregoing

 8   is a true and accurate transcript of my

 9   stenographic notes in the above-captioned matter.

10

11

12

13                    _____
                              Sonya Hoffman
14                    Court Reporter and Notary Public

15

16

17        Dated:   March 3, 2005

18

19

20
             NOTARIAL SEAL
21     SONYA A. HOFFMAN, NOTARY PUBLIC
          CITY OF ERIE, ERIE COUNTY
22     MY COMMISSION EXPIRES NOV. 9, 2008

23

24

25
```