1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2
  JONATHAN BORDEN and AMY BORDEN,        :
3           Plaintiffs                    :
                                          :
4           v.                            : Case No. 04-175 Erie
                                          :
5  AMICA MUTUAL INSURANCE COMPANY,        :
            Defendant                     :
6

7

8                            Volume I

9

10        Trial held in the above-captioned matter on

11      Thursday, December 8, 2005, commencing at 9:19 a.m.,

12      before the Honorable Sean J. McLaughlin, in the United

13      States District Court, 17 South Park Row, Erie,

14      Pennsylvania 16501.

15

16

17  For the Plaintiff:

18      Craig R. F. Murphey, Esquire
        MacDonald Illi Jones & Britton, LLP
19      100 State Street, Suite 700
        Erie, PA 16507
20
  For the Defendant:
21
        Paul K. Geer, Esquire
22      DiBella Geer McAllister Best
        312 Blvd of the Allies, 3rd Floor
23      Pittsburgh, PA 15222

24

25              Reported by Sondra A. Black
            Ferguson & Holdnack Reporting, Inc.

1                              I N D E X

2

3     DAVID BENNETT

4           Cross-Examination by Mr. Murphey......................34

5           Direct Examination by Mr. Geer.......................139

6           Recross-Examination by Mr. Murphey..................155

7

8     JONATHAN BORDEN

9           Direct Examination by Mr. Murphey...................156

10          Cross-Examination by Mr. Geer.......................199

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    EXHIBITS

2         Plaintiff's Exhibit No. 1............................172
          Plaintiff's Exhibit No. 2............................199
3         Plaintiff's Exhibit No. 3.............................46
          Plaintiff's Exhibit No. 3-1..........................50
4         Plaintiff's Exhibit No. 3-2..........................51
          Plaintiff's Exhibit No. 3-3..........................48
5         Plaintiff's Exhibit No. 3-5..........................49
          Plaintiff's Exhibit No. 3-6..........................59
6         Plaintiff's Exhibit No. 3-7..........................52
          Plaintiff's Exhibit No. 3-8..........................63
7         Plaintiff's Exhibit No. 3-10.........................69
          Plaintiff's Exhibit No. 3-12.........................72
8         Plaintiff's Exhibit No. 3-15.........................82
          Plaintiff's Exhibit No. 3-17.........................88
9         Plaintiff's Exhibit No. 3-18.........................92
          Plaintiff's Exhibit No. 3-19.........................88
10        Plaintiff's Exhibit No. 3-23.........................92
          Plaintiff's Exhibit No. 3-25........................106
11        Plaintiff's Exhibit No. 3-28........................112
          Plaintiff's Exhibit No. 3-34........................114
12        Plaintiff's Exhibit No. 3-35........................117
          Plaintiff's Exhibit No. 3-36........................117
13        Plaintiff's Exhibit No. 4...........................130
          Plaintiff's Exhibit No. 5............................38
14        Plaintiff's Exhibit No. 6...........................168
          Plaintiff's Exhibit No. 9...........................126
15
          Defendant's Exhibit A-1.............................145
16        Defendant's Exhibit A-2.............................146
          Defendant's Exhibit A-3.............................147
17        Defendant's Exhibit A-4.............................149
          Defendant's Exhibit A-5.............................202
18        Defendant's Exhibit A-6.............................208
          Defendant's Exhibit A-7.............................211
19        Defendant's Exhibit A-8.............................212

20

21

22

23

24

25

1          THE COURT:  Before we get started, it's always

2    helpful for me, in a nonjury trial, to give both parties an

3    opportunity to give a brief opening statement which kind of

4    summarizes their respective positions.  I find it useful as I

5    follow the evidence.  Mr. Murphey, what do you want to tell

6    me?

7          MR. MURPHEY:  Thank you, Your Honor.  First, as you

8    know from pretrial proceedings, Judge, my clients are Jon and

9    Amy Borden.  They moved to Erie in August of 2002, they

10   bought a home on Wolf Road, paid $720,000 for it.  They had a

11   terrible fire on February 16, 2003.  The fire started in the

12   basement, and essentially the basement exploded.  It's

13   undisputed that there was catastrophic damage in the basement

14   and the areas of the home above the basement, heat and smoke

15   damage throughout the house.

16         We have a number of photographs, Judge, I won't

17   spend too much time with them, but, for example, Judge, this

18   is the basement of the house after the fire.

19         THE COURT:  For the record, you'll have to

20   indicate -- are they marked as exhibits?

21         MR. MURPHEY:  Yes, Your Honor.  This is -- the

22   photographs are in a binder, they are Exhibit No. 1, and then

23   the photos are separately marked within that binder, and this

24   is Photo No. 61 in Exhibit 1, and that's just one of many

25   photographs that were taken showing the extreme damage to the

4

1    basement of the home.

2          The kitchen was one of the rooms above the basement,

3    that's just one of the photographs of the damage to the

4    kitchen and the first floor of the home.  This is some --

5    another photo of the damage to the kitchen.  I think Your

6    Honor's getting the flavor for the extent of the damage.

7    Very, very serious fire.  This, for example, Judge, is a

8    photograph -- this is Photograph No. 68.  This is the damage

9    which was in a hidden area of the house, underneath the

10   jacuzzi on the first floor of the home.  You can see the

11   damage to all the piping and plumbing underneath the jacuzzi.

12         The damage extended into the den of the upstairs.

13   This is Photograph No. 36, Your Honor.  There's two photos on

14   that page, as you can see.  You'll see, Judge, in that upper

15   photo that is a floor that has collapsed into the basement.

16   Photograph below shows some more of the damage in the room

17   and the hole into the basement.  That hole occurred in the

18   den, in the kitchen, and in various other places in the

19   house.

20         This is a photograph of the dining room area of the

21   home, this is Photograph No. 38, Your Honor.  It shows the

22   damage to the ceiling of the first floor.  You'll see in the

23   upper photo -- and, Your Honor, you have these exhibits, the

24   upper photo, the destruction of the ceiling of the dining

25   room on the first floor.  The fire started in the basement

1    and just went up.  Extremely hot fire, very smoky, went

2    through all the hidden areas of the house, all the plumbing

3    chases, the electrical chases, all the way through the house.

4         All the way, indeed, Your Honor, to the attic.  I

5    have a photograph of damage which was documented by the

6    insurance company's adjuster, this is Photograph No. 23, to

7    the rafters in the attic.  Looking at the photographs

8    themselves will probably do it better justice.  But suffice

9    to say, the damage extended from the basement all the way to

10   the attic.

11        And, in fact, we also have a photograph of a study,

12   one of the rooms of the house that is above the garage, and

13   that room also incurred damage.  So this is the study that's

14   above the garage.  This is Photograph No. 64, Your Honor.

15   And you'll see how devastating the fire was.  Again, that's

16   above the garage, and the fire started in the basement.

17        Now, fortunately, Jon Borden was the only person

18   home at the time of the fire.  He and Amy have three

19   children, but Amy and the children were visiting family in

20   Pittsburgh.  Jon was the only one home, he was able to escape

21   without injury.

22        At the time, Jon was insured by the Defendant, Amica

23   Mutual Insurance Company, under their Platinum policy, which

24   is the policy that provides the broadest coverage, it's the

25   most expensive policy you can get from Amica.  It had several

6

1    coverages.  One of the coverages is for the dwelling, and

2    that is for the amount of money that it would take to put the

3    house back into its prefire condition.  There was also

4    coverage for personal contents inside the house, also

5    coverages for alternative living expenses which are made

6    necessary when somebody has to leave their house because of a

7    fire.

8         Now, as we have discussed, the Complaint in this

9    case included allegations of bad faith under at least two of

10   those three coverages, and that is the dwelling and the

11   personalty.  However, at trial we are going to focus on the

12   dwelling.  The Bordens recognize the significant burden of

13   proof in a bad faith case, and they believe that the clearest

14   evidence of bad faith on the part of the insurance company in

15   this case was with respect to the dwelling.

16        Again, the obligation of Amica, as they have

17   acknowledged and it's clear for this policy, is to pay

18   whatever amount is necessary to put the house back in its

19   prefire condition.  And we have a burden of proof in this

20   case, we have to prove that Amica's conduct was unreasonable

21   and that they knew or had reason to know of their

22   unreasonable conduct, and we believe the evidence is going to

23   clearly prove both of those.

24        THE COURT:  And by clear and convincing evidence.

25        MR. MURPHEY:  That's correct.  In this case, the

1    dwelling estimate was originally prepared by an independent

2    adjuster hired by Amica named John Schumann, and Mr. Schumann

3    prepared an estimate dated February 26th of 2003 --

4           THE COURT:  What was the date?

5           MR. MURPHEY:  February 26th of 2003.  And in that

6    estimate, Your Honor, Mr. Schumann estimated the cost of

7    repairs at about $328,000.  We will offer evidence that there

8    were obvious errors and omissions in that estimate, and when

9    that was brought to Mr. Schumann's attention, he refused to

10   consider any revision, refused to consider any change to the

11   estimate.  He claimed that his estimate was backed up by the

12   opinion of a local contractor who was willing to do the work

13   at that price.

14          That local contractor was a man named Brian Seifert

15   of a company called Visions.  Mr. Seifert was not hired by

16   the Bordens; in fact, he was not hired by Amica.  He was a

17   board-up contractor, an emergency repair guy, who showed up

18   with the volunteer firemen.  Amica didn't know anything about

19   him; Mr. Schumann didn't know anything about him.  And,

20   nevertheless, they relied on his opinion that this was the

21   amount of work that was necessary.  That is despite the fact

22   that Mr. Seifert is not a home builder, he's not a home

23   remodeler.  He's a snowplower and roofer and a

24   Jack-of-all-trades.  And, in fact, he's simply not someone

25   the Bordens would have ever chosen to rebuild their house.

1    And Amica knew that and nevertheless continued to rely on

2    this gentleman's opinion.

3         And after the Bordens brought to Mr. Schumann's

4    attention the obvious errors and omissions in his estimate,

5    Schumann refused to do anything about it; Amica didn't do

6    anything about it.  Schumann left Erie, and the estimate was

7    what the estimate was, and the Bordens were under the

8    impression that that was all the money they were ever going

9    to get for their dwelling.

10        Therefore, they hired a public adjuster named

11   Anthony Parise, and he reviewed the Schumann estimate and

12   found it to be willfully short.  He investigated the damage,

13   investigated it very closely; you will hear Mr. Parise's

14   testimony --

15        THE COURT:  Just so I keep my time line straight,

16   when will the record reflect that Mr. Parise was retained,

17   and when did he produce his estimate?

18        MR. MURPHEY:  He was retained on or about March 1st

19   or 2nd of 2003, and he produced his estimate on or about

20   March 23, 2003.

21        And Mr. Parise went through the house and found that

22   Mr. Schumann had not opened up any of the walls to see if

23   there was any damage behind the walls.  To see if there was

24   any smoke or soot or anything in the wiring or the plumbing

25   or any of the other hidden areas of the house.  And Parise

1    concluded very quickly that the house needed to be gutted.

2    It needed to be gutted down to the frame and cleaned and

3    rebuilt.  Therefore, Mr. Parise's estimate was over $680,000,

4    which is more than twice what Mr. Schumann's estimate was.

5              THE COURT:  Just so I'm clear, when you say the

6    house needed to be rebuilt, did he mean the house needed to

7    be completely torn down or would some portion of the original

8    structure remain and they would build around it?

9              MR. MURPHEY:  Some portion of the original structure

10   would remain and they would build around it.

11             THE COURT:  What was his figure again?

12             MR. MURPHEY:  $680,000, approximately, Your Honor.

13   And that was revised slightly to just over $690,000 soon

14   after his original estimate, after doing some more work.

15             So they brought the fact that the Schumann estimate

16   was extraordinarily low to Amica's attention, and they still

17   didn't do anything about it.  So Mr. Parise arranged a

18   meeting which would include Mr. Schumann, who was the

19   estimator; Mr. Bennett, who is the Pittsburgh regional

20   manager, who is the person from Amica who was primarily

21   responsible for the claim.  And they had a meeting at the

22   house where Mr. Parise showed very clearly that

23   Mr. Schumann's estimate had missed all kinds of stuff, and

24   that the house, in order to be put back in its prefire

25   condition, in order to eliminate the soot, eliminate the

1    smoke odor, was going to have to be gutted down to its frame

2    and rebuilt.

3           Nevertheless, Amica at that point in time refused to

4    acknowledge that there was any problem with the Schumann

5    estimate, refused to revise their estimate in any way.  The

6    meeting really was a sham because at noon on the day of the

7    meeting Amica broke off and called their home office and

8    received approval to not offer any more money, to not hire

9    another contractor to look at the damages, to not further

10   negotiate, but instead to demand appraisal under the

11   contract, which is a contractual dispute resolution forum for

12   property claims such as this.  So they decided to do that

13   after a couple hours at the house without acknowledging that

14   there were any problems.

15          Now, following that meeting, the Bordens were very

16   upset.  At the meeting, for example, the independent

17   adjuster, upon seeing some soot in the walls, suggested that

18   maybe the fire hadn't caused the soot.  That somehow it was

19   in the walls miraculously from some other event that no one

20   knew anything about.

21          THE COURT:  When you say "independent adjuster," you

22   mean Mr. Schumann?

23          MR. MURPHEY:  That's correct.  Mr. Schumann, who, as

24   you know, Judge, was working on behalf of Amica.

25          So the Bordens complained to the Insurance

1    Department.  They sent a letter laying out, among other

2    things, their version of what had happened at the meeting,

3    the meeting was April 15, 2003, and how offended they were,

4    and how they didn't think they were being treated fairly by

5    Amica, and they also hired an attorney because the appraisal

6    had been demanded and they didn't know what else to do.

7            THE COURT:  I'm sure this will come out in the

8    testimony, but explain to me the mechanism for appraisal

9    under the policy.

10           MR. MURPHEY:  Under the policy, each party is to

11   appoint an appraiser who will act as their representative on

12   the panel, and then those two appraisers will select an

13   umpire who would be the neutral.  The analogy, Judge, would

14   be like an underinsured motorist arbitration, where each side

15   appoints somebody and then there's a third.  And just like

16   most underinsured motorist arbitrations, it's a common law

17   proceeding with no appeal rights.  It's an -- you know,

18   obviously an added expense to anybody who's involved in it.

19   And, essentially, the Bordens felt it was just an effort by

20   Amica to try to split the baby rather than to try to come to

21   a considered conclusion as to what amounts they owe.

22           So after the Bordens retained counsel, they also

23   hired a local contractor named Dave Haller.  Now, early on in

24   the case, Dave Haller's name had come to the Bordens'

25   attention because he is a builder who's well-regarded

1    locally, has built a number of houses in the Wolf Road area,

2    and, in fact, remodeled many houses in the Wolf Road area.

3    He was working on one of the neighbor's houses at the time.

4    And Mr. Haller had actually worked on this very house in the

5    past; although, the Bordens didn't know that at the time.

6          And they had told Mr. Schumann they were considering

7    hiring Dave Haller or Laughlin Brothers, another local

8    contractor, early on in the proceedings.  But Mr. Schumann

9    had said, now's not the time for that.  I have Mr. Seifert

10   here, we'll just get some emergency repairs done, and at a

11   later time we can decide who's going to rebuild your house.

12         But at any rate, at this point, when the appraisal

13   had been demanded, the Bordens thought, we need to talk to a

14   contractor.  So they talked to Mr. Haller.  He went in, took

15   a look at Mr. Schumann's estimate, took a look at the house,

16   and said he found Mr. Schumann's estimate to be laughable it

17   was so low.  Mr. Haller's estimate for repairing the house

18   was $700,000.  Now, of course, the house cost $720,000.  So

19   that's essentially -- it would make more sense to demolish it

20   and rebuild it.

21         However, Haller understood that the insurance

22   company's obligation, as was told to him, was to put the

23   house back in its prefire condition.  His estimate was

24   $700,000 to do that, and he's very confident that that's what

25   needed to be done.  He agreed with Mr. Parise that the house

1    needed to be gutted and rebuilt.  And, in fact,

2    Mr. Haller came up with an estimate slightly greater than

3    Mr. Parise's.

4         After the appraisal was demanded, Amica and the

5    Bordens got counsel -- Amica also got counsel, and that was

6    Mr. Geer.  And after Amica got counsel, the appraisal then

7    suddenly went on hold and Amica agreed to get a contractor to

8    come in and take a look at it -- another contractor.  They

9    didn't use Seifert or Visions, it was never explained why

10   they didn't use them.  But presumably it's because everybody

11   acknowledged that Seifert doesn't have the type of

12   qualifications or experience to rebuild a house of this type.

13   So they hired a contractor named Dan Jones from Pittsburgh.

14        Mr. Jones came up and did an estimate.  His estimate

15   was lower than Mr. Parise's, but much, much higher than

16   Mr. Schumann's.  His estimate was more than $200,000 more

17   than Mr. Schumann's.  His estimate was $542,000, and the date

18   of his estimate is July 28, 2003.

19        And Mr. Parise took a look at that estimate and

20   found that he thought it was low; however, he also said this

21   is much more logical, makes much more sense than the original

22   Schumann estimate, and this is something we can work with.

23   So, ultimately, there was a settlement reached in the case

24   where both sides acknowledged that the cost of repair was

25   $553,000, which is ultimately the amount that the parties

1    settled on in the fall of 2003.

2         Now, Your Honor, the focus of the proof is what

3    changed about the damage to the house between the time that

4    Mr. Schumann originally estimated it at $328,000, and the

5    time that Mr. Borden -- I'm sorry, Mr. Jones later estimated

6    it at $542,000, both working for Amica.  Well, nothing had

7    changed.  Except for the fact that the Bordens had hired a

8    public adjuster, had complained to the Insurance Department,

9    and had hired an attorney.  And that's what it took for Amica

10   to get a reasonable contractor with a reasonable estimate in

11   the case.

12        And, Your Honor, when you listen to the evidence in

13   this case, what we ask you to do is think about this:  Think

14   about where the Bordens would have been if they hadn't hired

15   an adjuster, if they hadn't complained to the Insurance

16   Department, if they hadn't hired a lawyer.  They would have

17   had a $328,000 estimate and be sent on their way to rebuild

18   their house.  And that would have been about $225,000 less

19   than they ultimately settled for.

20        And our position, Your Honor, is, under the bad

21   faith statute that's the way you need to look at it.  How did

22   the insurance company treat this person, and what would the

23   outcome had been had the person not fought back and hired an

24   adjuster and complained to the insurance department and hired

25   a lawyer.

1              THE COURT:  Let me ask one other question.  When on

2      this time line that you just told me is it your position that

3      the carrier knew or reasonably should have known, and yet

4      recklessly disregarded the fact that its estimate was too

5      low?

6              MR. MURPHEY:  We believe that they should have known

7      at the time that Mr. Parise's report and estimate was

8      provided to them on or about March 23rd of 2003.

9              THE COURT:  So --

10             MR. MURPHEY:  I'm sorry, Your Honor, and then there

11     was -- there was that, we believe, was adequate, that they

12     should have known or that they recklessly disregarded the

13     fact that Mr. Schumann's estimate was too low.  And then,

14     April 15, 2003 is the next date because that's the date they

15     toured the house.

16             And, in fact, Your Honor, on April 15th, Mr.

17     Schumann acknowledged to Amica, well, there's obviously some

18     problems with my estimate.  In fact, I would raise it at

19     least $20,000.  But Amica didn't come back and offer that.

20     Amica didn't revise Schumann's estimate.  In fact, Schumann's

21     estimate was never revised at any time.  Instead what they

22     did was they invoked the appraisal, and it was only after

23     counsel got involved that they did what they should have

24     done, and that was get a contractor who came in and gave them

25     a reasonable estimate.

1          THE COURT:  So I'm clear, though, your position

2    would be, I take it, that while Mr. Schumann's original --

3    actually, there was an estimate even before 3/28, if I

4    remember from the papers, 200-some thousand --

5          MR. MURPHEY:  No.  328 was the first estimate.  What

6    you're thinking of, I think, Your Honor, was the payment was

7    $295,000 because they're allowed to hold back a percentage

8    until the repairs are done.

9          THE COURT:  But in any event, it is your position

10   with respect to the first estimate of 328,000, while that

11   estimate, in your view, was way too low, and perhaps was

12   negligently way too low, that the quality of knowledge

13   possessed by Amica at that time was not sufficient to raise

14   it to the bad faith standard; is that correct?

15         MR. MURPHEY:  That's right, Your Honor.

16         THE COURT:  I get your point.

17         MR. MURPHEY:  Thank you, Judge.

18         THE COURT:  Mr. Geer.

19         MR. GEER:  Thank you, Your Honor.  As the Court's

20   aware, I represent Amica Mutual Insurance Company in this

21   matter, the Defendant.  We do not dispute this policy

22   provided that following the fire Amica's duty to the insureds

23   was to return the place to its prefire condition assuming

24   they wanted to repair the premises.  Ultimately they decided

25   not to.  Ultimately they decided to tear it down.  But in the

1    context of the claim, the anticipation at all times was, we

2    have to expect them to repair, and that was exactly what

3    Amica was looking for.

4          Mr. Murphey showed the Court a number of

5    photographs.  Those photographs are germane to this case only

6    in one respect.  Yes, there was terrible fire damage to this

7    house.  The fire started in the basement and moved up from

8    there.  Yes, it burned holes up above where it started.

9    That's very germane to the case because it made it very

10   difficult for Mr. Schumann, the adjuster, who was in there

11   shortly after the fire, to gain access to all the areas.

12         He did a preliminary estimate, Your Honor -- the

13   fire occurred on February 16th, and by February 26th or 27th

14   he had gotten around the building, despite very dangerous

15   conditions, and he wrote what he calls a preliminary estimate

16   and submitted it to Amica.  The reason he did that was so

17   Amica could put some undisputed moneys in its insured's

18   hands.

19              THE COURT:  What was his preliminary estimate?

20              MR. GEER:  It was the 3 --

21              MR. MURPHEY:  328,000.

22              MR. GEER:  328 and change.

23              THE COURT:  Will the evidence show that it was

24   characterized as a preliminary estimate?

25              MR. GEER:  Well, certainly there's correspondence

1    sent to the Bordens to that effect, yes.  That it was not a

2    final thing and that type thing.

3         But Mr. Murphey correctly represented to the Court

4    that the Bordens misunderstood the intent of Amica at that

5    time.  Because what Amica did was, after receiving this

6    estimate from Mr. Schumann in late February, sent a check in

7    the amount of the actual cash value of the building.  As

8    Mr. Murphey said, under the policy the policyholder is

9    entitled to actual cash value until they repair, and when

10   they repair, they're entitled to the repair cost.  Therefore,

11   the check was $295,000.  The check said actual cash value,

12   but it said nothing about this is your final payment.  It

13   said nothing about settling the claim.  And the Bordens did

14   not understand that, and they were a little cautious or

15   suspicious of Amica's motives in sending them $295,000 with a

16   check that says actual cash value, and so they returned the

17   check.

18        THE COURT:  Just out of curiosity, maybe it's

19   neither here nor there, but as a matter of practice or

20   procedure, would it have been Amica's -- will the evidence

21   inform me on this point as to whether, in a loss like this,

22   it would have been Amica's practice or custom to send checks

23   piecemeal?  In other words, the cash value first, followed by

24   the balance, which would be the replacement cost?

25        MR. GEER:  Yes, Your Honor.  The procedure would be

1    that if the -- first of all, Amica makes payments generally,

2    assuming the insureds are willing to accept payments, as

3    liability becomes obvious to them.  So after they received

4    Schumann's estimate, Schumann's estimate said 328 or 329,000

5    was the cost of repair that he estimated when he was in their

6    after the fire, the actual cash value was $295,000, they sent

7    the Bordens a check for $295,000.

8         When the Borden's returned the check, Amica then

9    immediately, the same day, wrote a letter to the Bordens

10   explaining that this was an undisputed payment, that they can

11   take the money, it was not going to prejudice them in any

12   way.  And I believe that letter was sent, you know, in March.

13   The day that Amica got the check back.  So from approximately

14   March 25th on, the Bordens were certainly aware that these

15   moneys which had been offered were not offered under any

16   condition except that Amica said they owed them.

17        The Bordens, of course, had an obligation under the

18   policy to submit a contents inventory at some point in time,

19   but Amica had Mr. Schumann go in and look, shortly after the

20   fire, and try to make a preliminary estimate of what was

21   absolutely damaged.  Now, some of the things in the basement

22   that had been burned Mr. Schumann could not tell what they

23   were or anticipate their value, but items that were partially

24   burned he was able to estimate.  So on March 17th they were

25   sent a check for a little under $40,000 for contents.  That

1    was also returned.

2          In addition, and I know that none of this is in

3    dispute, but I think it's relevant to understanding how Amica

4    treated its insureds, they found the Bordens a very

5    comfortable living space in their neighborhood, they moved

6    them there, they bought them new furniture to put in, at

7    Amica's expense because the Bordens didn't want to select

8    their new furniture in a hurry.

9          THE COURT:  What was the comfortable living space?

10   Was it a home?

11         MR. GEER:  It was a home.  It was a home.  And I

12   believe Dr. Borden will testify it was very comfortable.  In

13   a neighborhood very close to where they lived before.

14         They were living there, they were given a claim

15   card, the claim card -- they were given what's called a claim

16   card.  This is a debit card.  It had $7,500 in credit for

17   them to pick up whatever they needed.  Obviously they were

18   going to need clothing.  Obviously they were going to need

19   other household items.  And they were told, we'll reload the

20   claim card as you need it.  So Amica attempted to do the best

21   they could for them.  In addition, Mr. Schumann was sent out

22   that day, and, I think, arrived two days later driving up

23   from the east coast.

24         Your Honor, the battleground in this case, so to

25   speak, and the reason we're here, is not because of the

1    damage that Mr. Murphey showed you in his photographs.  What

2    was really at issue here was a large section of the house

3    which was away from the fire damage -- I can show the Court

4    some photographs.  Certainly there's bad fire damage in the

5    house, but in Mr. Schumann's estimate, he had replaced that.

6    In other words, he agreed that needed to be gutted.  So we're

7    not disputing that.

8         THE COURT:  In the house proper?  The main part of

9    the house?

10        MR. GEER:  Yes.  In the basement area which was

11   burned and in the areas above that, which the fire spread to,

12   where there was holes in the floor.  There was absolutely no

13   dispute that needed to be gutted and replaced.  And I don't

14   think we have a dispute with his estimate that those were

15   reasonable.

16        But there was a very substantial disagreement -- I'm

17   going to show the Court some photographs, so the Court will

18   understand why there's a disagreement.  Mr. Schumann is aware

19   of fire restoration technology, and a lot of this house only

20   had smoke damage -- and I don't mean to demean the smoke

21   damage.  Smoke damage should be a concern to a policyholder,

22   and it was of concern to the Bordens.  But as these

23   photographs indicate, Your Honor, there were areas here which

24   were not -- they were not totally destroyed.

25        THE COURT:  What am I looking at?

1          MR. GEER:  These are other areas of the house.  For

2     instance, this is the stairway to the second level down to

3     the foyer.  This is an area that was smoke damaged.  For

4     instance, in this photograph, you can see the --

5          THE COURT:  You should probably identify it as

6     you're going through it.

7          MR. GEER:  This is Photograph 45, Your Honor.  This

8     is the foyer and steps up to the second level.  Here

9     Mr. Schumann will testify that the carpeting was stained by

10    smoke, and he was going to replace all the carpeting, but he

11    believed that the areas I'm pointing to, the spindles and the

12    stair rail, could be cleaned, repainted, and replaced --

13         THE COURT:  Not by way --

14         MR. GEER:  I'm sorry, cleaned and repaired.

15         THE COURT:  This isn't by way of cutting you off.

16    You can go through and show me whatever photographs you want.

17    But is this the point that, in your opinion, the lion's

18    share, if not all, of the discrepancy between Mr. Parise's

19    estimate and Mr. Schumann's estimate involved a fundamental

20    disagreement as to whether those portions of the house that

21    only suffered smoke damage needed to be drastically torn up

22    and rebuilt, or in some less drastic fashion, cleaned?

23         MR. GEER:  That is correct.

24         THE COURT:  Is that essentially what you're telling

25    me?

1          MR. GEER:  Essentially.  The lion's share, yes.

2   That was the largest single dispute they had.  We did not

3   dispute that Mr. Schumann missed things in his preliminary

4   estimate.  That has never been an issue.  There were things

5   he could not get to.  He'll testify about the conditions that

6   he was working under when he was in that house following the

7   fire.  He indisputably missed those.

8          What Amica was having issues with was not that.

9   They had already put $340,000 in the insured's hand, and the

10  Bordens had returned the money.  It was the 295 payment,

11  which was the payment on the building, and the payment on the

12  contents, which was 39,9, 40,000.  So with all that money

13  placed in their hands, they didn't seem willing to accept it.

14  And even when Amica wrote to them and said this is an

15  undisputed payment, they still wouldn't take it.

16         So the Bordens set a policy as of late March that

17  they were not accepting Amica's money.  They were

18  distrustful, and I'm sure we're going to hear all the

19  evidence of why they were distrustful, but -- there was some

20  misunderstanding here.  But what it really came down to was,

21  many of these issues could have been resolved, but this

22  particular issue involving areas such as this, this is 59,

23  upstairs hallway, bathroom, as the Court can see, while there

24  is smoke damage, which may not be obvious from the

25  photograph, this is not an area which is obviously something

1    that needs to be totally gutted; tear out the walls, strip

2    the house down to the bare walls, and let's start

3    construction all over again.  That is what Mr. Parise, their

4    public adjuster, anticipated in his estimate.

5            THE COURT:  Just so I -- in order to ameliorate the

6    smoke damage problem, for instance, as reflected in that

7    exhibit -- what is it 51?  Photograph 51 that's up on the

8    screen right now?

9            MR. GEER:  This is 59, Your Honor.  Photograph 59.

10           THE COURT:  So I'm clear, what method or methodology

11   did Mr. Schumann suggest as opposed to Mr. Parise?

12           MR. GEER:  I think the term that's used -- that

13   he'll use is probably clean, seal, and paint.  Clean it, seal

14   it, and assuming that's successful, then you paint it.  It's

15   a much less expensive -- it's a much less expensive process,

16   and both Mr. Parise and Dan Jones, the contractor who kind of

17   ultimately resolved this, can testify as to the fact that

18   that works.  It doesn't always work, but it works frequently.

19           THE COURT:  When you seal it, does that mean, for

20   instance, if there's smoke or soot damage behind the wall,

21   you somehow make sure you've sealed any cracks so that you

22   don't smell it, that type of thing?

23           MR. GEER:  That's correct, Your Honor.  The process

24   that is used -- we're not talking about scrubbing it down

25   with soap.  We're talking about scrubbing it down with

1    substances which, first of all, take the dangerous particles

2    off of the walls, and then, secondly, take the odor out.  And

3    there are various technologies available if that doesn't work

4    the first time.

5         We never got that far because what really happened

6    here was, Mr. Parise was absolutely determined that he wanted

7    to have all the walls gutted, and, you know, you'll hear

8    testimony that he was walking around kicking holes in walls.

9    And from the Plaintiff's perspective, he's kicking holes in

10   the walls to show insurance company representatives that

11   there's a little smoke or discoloration in the insulation.

12        But the other concern is, once you've kicked a hole

13   in the wall, then you have to replace the wall.  So he's

14   walking through the rooms kicking holes in the walls.  And

15   that occurred at the meeting and perhaps was one of the

16   things that's somewhat alarming because he's causing damage

17   while he's trying to demonstrate what his opinions are.

18        Mr. Murphey characterized all of this as Amica's

19   unwillingness to listen or Mr. Schumann's unwillingness to

20   change his estimate.  Mr. Schumann can testify about the

21   meeting and what his feelings were when he was shown the

22   shortcomings in his estimate by Mr. Parise.  But he does not

23   dispute he missed things, Your Honor.

24        The point, though, is this:  There may have been

25   $20,000 in items that were missed by Mr. Parise, and that

1    might have taken the 328, $329,000 estimate up $20,000;

2    however, consider that Amica has already put more money than

3    that in the Bordens' hands and they refused to take it.

4         The other thing that came into play here was, at the

5    April 15th meeting it became very obvious to Amica that this

6    bidding was a mold hazard --

7         THE COURT:  Was a what?

8         MR. GEER:  Was a mold hazard.  Because while there

9    had been actions taken by Visions right after the fire to

10   clean up the space, pump the water out of the basement, that

11   type of thing, when this meeting occurred, it was April, and

12   we've moved now two months from the date of the fire, and

13   everyone is at the scene, no one has started repairs.  I

14   mean, constructive repairs to put the building back in its

15   prefire condition.

16        And Amica wanted to do something to get the claim

17   moving.  So what Amica did at this point in time was to

18   demand an appraisal.  Mr. Murphey said they should have

19   brought in a second contractor.  In an appraisal, under this

20   policy, the provision is very clear, it says each party shall

21   pick an impartial and qualified appraiser, they'll pick an

22   umpire, and the umpire -- after the two appraisers present

23   their numbers, the umpire shall select and set the amount,

24   which contemplates he's going to pick one or the other.  I

25   guess he could --

1          THE COURT:  Or something in between.

2          MR. GEER:  Well, he could, but any two of them have

3     to agree.  So it's not a situation where the umpire just

4     decides.  So I don't agree with Mr. Murphey that this was an

5     attempt to split the baby.

6          THE COURT:  So the umpire sides with one side or the

7     other?

8          MR. GEER:  Yes.

9          THE COURT:  So it doesn't split the baby.

10         MR. GEER:  There's nothing in the policy language

11    that says that.  I mean, I guess the umpire and the appraiser

12    could agree on a number, but the two of them have to agree.

13    For instance, if their number was 680 and he felt that was

14    the fairer of the two numbers, and he thinks the better

15    number is 550 and they're not willing to come down, we go to

16    court.  But in reality what actually happens is, the umpire

17    and one of these other appraisers is going to agree, and that

18    contemplates that it will be resolved.  That sets the

19    damages.

20         So this is not an attempt to force upon the Bordens

21    a settlement for what the claims were.  This is an attempt to

22    get it resolved, an attempt to get it moving, and an attempt

23    to do it promptly.  These issues pertaining to this section

24    of the building, the concern Amica had -- I'm going to show

25    the Court a picture of the playroom, Photograph 113, that

1    while we're arguing --

2          THE COURT:  Are those defense exhibits or

3    Plaintiff's exhibits?

4          MR. GEER:  These will be defense exhibits.

5          While the parties were arguing about whether or not

6    those walls should be completely stripped or whether they

7    could be cleaned and painted, we could have mold in the

8    basement or any number of things that could happen.  So our

9    position is the appraisal proceeding is contractually

10   mandated.  It says, if you and me fail to agree -- yes,

11   Mr. Schumann made mistakes in his estimate, that is not an

12   issue.  But the point where there is a huge dispute, and

13   these photographs demonstrate the huge dispute, we felt that

14   the appraisal was the way to go.

15         Now, Mr. Murphey talked about Mr. Haller coming in

16   and looking at Mr. Schumann's estimate and laughing.  Our

17   response to that is, we wish they had told us because they

18   didn't.  And Mr. Bennett's letters sent to Amica suggested

19   numerous times, please select a contractor.  Please select a

20   contractor.  Well, they never put Mr. Haller in contact with

21   Amica.  They never sent Amica a copy of Mr. Haller's

22   estimate.  Certainly that would be something worthy of

23   consideration, if there was a local contractor who had an

24   opinion.  But that was never made known to us.  So to walk

25   into court today and try to use Mr. Haller's estimate, which

1    was, in effect, secret, and to say that somehow indicates

2    that Amica was acting in bad faith I think is totally unfair

3    and irrelevant.

4         In the end what happened was, the appraisal

5    proceeding would have required a competent and independent

6    second opinion.  So under that appraisal language we cannot

7    select -- you know, Mr. Murphey said, why didn't we select

8    Visions, why didn't we select Schumann, we can't.  They would

9    not be impartial.  I don't think it would be fair for me to

10   say to the Court that the person who did the first estimate

11   is totally impartial.  He's now been called into question,

12   he's not impartial anymore.  They selected Mr. Parise as

13   their umpire despite the fact he had an 8 percent interest in

14   the outcome.  He's certainly not impartial either.

15        Amica wrote a letter to the Bordens objecting saying

16   that we don't agree with your appointment with Mr. Parise as

17   an appraiser because he's not impartial, and that became an

18   allegation of bad faith.  Bad faith for us to challenge their

19   appointment of their appraiser.  That was what was mandated

20   by the policy.  So in the end Amica was prepared to do an

21   appraisal, they had named an appraiser they had never worked

22   with before, and knew nothing about the lawsuit, named Jack

23   Owens.  The Bordens had prepared to do that but had not.

24        And at that point, as Mr. Murphey told you, counsel

25   got involved.  The suggestion was made, if you're going to

1    have to have an independent appraisal anyway, why don't we

2    send a contractor up there.  So Amica hired Dan Jones, a

3    contractor out of Pittsburgh.  He came up, he looked at it,

4    and he set the damages.  Mr. Murphey was so fearful of

5    splitting the baby between the figure which was set forth by

6    Mr. Parise and the figure which was set forth by Mr.

7    Schumann, but that was exactly what the parties agreed to.

8    $553,000 was what they agreed to.

9         THE COURT:  Could you have compelled the insureds to

10   go to appraisal under the policy?

11        MR. GEER:  Yes, Your Honor.  They could compel us,

12   too.  Either party can compel the other.  That's an alternate

13   dispute resolution measure in the policy.  The policy says,

14   if you and we fail to agree.  We really weren't that

15   concerned at this point about the cost of repairs.  The real

16   issue was what needs to be repaired.

17        THE COURT:  Finally, what did your growing concern

18   about mold -- did anything have to do with the ultimate

19   resolution of the claim?

20        MR. GEER:  Well, it never became an issue because

21   the Bordens more or less agreed that Amica wasn't responsible

22   for the mold growing there.  Mold is such a problem today in

23   insurance claims, and just generally.  So I think everyone is

24   very, very aware of it, very concerned about it, and

25   therefore, following a fire loss -- its nature, firemen go

1    out and put water on the building.  And very often that's not
2    a big problem in the winter, but if the weather warms up, you
3    have moister and --
4         THE COURT:  And then, was there -- I take it that
5    there was a fundamental difference of opinion as between
6    Amica and then eventually Bordens' counsel -- not as to
7    whether the policy provided for restoration to the prefire
8    condition, because the policy, I gather, says what it says,
9    but as to whether or not the restoration to the prefire
10   condition requirement in the policy reasonably envisioned
11   knocking the walls down where you have soot behind them; is
12   that right?
13        MR. GEER:  I don't know that that was a dispute with
14   counsel.  I think that was the initial dispute with
15   Mr. Parise.
16        THE COURT:  With Mr. Parise.  Okay.
17        MR. GEER:  And because of that issue -- that was the
18   issue we were going to deal with in appraisal, bring in two
19   impartials and an umpire and let them decide.  And then
20   ultimately it was suggested that perhaps, rather than going
21   through the appraisal proceeding, Amica could just bring in a
22   second contractor to look at it.  That was suggested, we
23   listened, we brought in a second contractor, and that
24   contractor went up -- they will testify they were very
25   impressed with him.  Mr. Parise said, I had a level of

1    comfort as soon as he got there.  I felt like he knew what he

2    was doing.  And even though his level is 140, 150,000 below

3    Parise's, they agreed to it.

4            So ultimately we have -- this is an unusual case

5    because we have a release, and everyone's agreed what the

6    damages are, and everyone has agreed, in theory, that 553, or

7    whatever the number is, is what it would take to restore the

8    house to its prefire condition.  And everyone agreed that the

9    actual cash value payment which was high $400,000 range, that

10   was a reasonable payment to the Bordens.  They now have that

11   money.  They are still entitled, if they ever replace -- even

12   though they have moved to Cincinnati, they are entitled to

13   take the difference between those two numbers and build a

14   house up to $553,000 on Amica.

15           But, you know, instead what they decided to do here

16   was they demolished the entire house when they moved.  So we

17   don't have a house to look at anymore, but we have plenty of

18   photographs.

19           THE COURT:  All right.  I have to make a quick phone

20   call.

21           (Pause in the proceedings.)

22           THE COURT:  Call your first witness.

23           MR. MURPHEY:  Yes, Your Honor, we call David

24   Bennett.

25           THE COURT:  Mr. Bennett, come on up and spell your

```
 1    name for the court reporter, and then my deputy clerk will

 2    swear you in.

 3              THE WITNESS:  David Bennett, B-E-N-N-E-T-T.

 4

 5              D A V I D   B E N N E T T, first having

 6              been duly sworn, testified as follows:

 7

 8              THE COURT:  All right, Mr. Murphey.

 9              MR. MURPHEY:  Thank you, Your Honor.

10

11                         CROSS-EXAMINATION

12    BY MR. MURPHEY:

13

14        Q.   Good morning, Mr. Bennett.

15        A.   Good morning.

16        Q.   Can you please tell us your professional address.

17        A.   It's 1500 Corporate Drive --

18              THE COURT:  You're going to have to --

19              THE WITNESS:  Sorry.

20        A.   1500 Corporate Drive, Suite 1250, Canonsburg, PA.

21        Q.   What is your job?

22        A.   I am the branch manager.

23        Q.   Of what?

24        A.   Amica Mutual Insurance Company.

25        Q.   That's the Pittsburgh branch?
```

1     A.   Pittsburgh regional office.

2     Q.   What territory does your office cover?

3     A.   The entire State of West Virginia and Western

4  Pennsylvania.

5     Q.   You were the Amica employee with primary

6  responsibility for the Bordens' fire loss claim; is that

7  right?

8     A.   In the Pittsburgh office, yes.

9     Q.   What do you mean by that?

10     A.   There were other people overseeing the loss above

11  me.

12     Q.   Who was the adjuster on the loss?

13     A.   The adjuster would be -- the adjuster was John

14  Schumann.

15     Q.   And who supervised him?

16     A.   Me.

17     Q.   Who wrote the letters to the Bordens in this case?

18     A.   I did.

19     Q.   So you were the -- you were the relationship person,

20  as it were, between Amica and the Bordens; is that right?

21     A.   That's correct.

22     Q.   And you were the person who hired John Schumann?

23     A.   Yes.

24     Q.   Now, you personally -- you don't have very much

25  experience with large fire losses; is that correct?

1          A.    That's correct.

2          Q.    I think that you told me before that you've only

3    been on three or four sites before in your entire career.

4          A.    That's correct.

5          Q.    How long have you been in the fire business?

6          A.    25 years.

7          Q.    And although you were responsible for this claim,

8    and it was within your territory, you had never been to Erie

9    before this fire; is that right?

10         A.    That's correct.

11         Q.    And the first time you were here was about two

12   months after the fire at a meeting which was held on April

13   15th of 2003; is that right?

14         A.    That's correct.

15         Q.    So you were not personally familiar with any of the

16   contractors or home builders or fire restoration people who

17   work in Erie; is that right?

18         A.    That's correct.

19         Q.    However, in this case -- I think you told me before,

20   this case did jog your memory that in the past you had worked

21   with a local fire restoration contractor, Peter Hardner &

22   Son; is that correct?

23         A.    I'm not familiar with their exact description you

24   presented --

25               THE COURT:  Mr. Bennett, you're going to have to

1    keep your voice up.

2            THE WITNESS:  I'm sorry.

3            THE COURT:  That's okay.

4        A.   They're a contractor, to my knowledge, not a

5    restoration contractor.

6        Q.   But you agree that you had worked with them in the

7    past on an Erie claim?

8        A.   That's correct.

9            THE COURT:  When you say "past," do you mean before

10   this fire loss?

11           MR. MURPHEY:  That's what I mean, yes.

12       Q.   And that's what you understood, Mr. Bennett?

13       A.   Yes.  At the time I did not remember them.

14       Q.   That's right.  At the time that this claim came in,

15   you didn't remember Mr. Hardner's name, but when his name

16   surfaced in the file, it occurred to you that you had

17   received a report from him sometime in the distant past?

18       A.   Yes.  It was much later on in the claim.

19       Q.   That you realized that?

20       A.   Yes.

21       Q.   But again, you weren't familiar with him because you

22   don't commonly handle cases in Erie?

23       A.   That's correct.

24       Q.   Now, Amica insured the Bordens against the fire loss

25   under Amica's Platinum policy; is that right?

1      A.   That's correct.

2      Q.   And the Platinum policy is Amica's broadest type of

3   homeowner's policy; is that right?

4      A.   That's correct.

5           MR. MURPHEY:  I have, marked as Exhibit No. 5, a

6   copy of what I believe to be the Amica policy -- may I

7   approach, Your Honor?

8           (Plaintiff's Exhibit No. 5 marked for

9            identification.)

10          THE COURT:  Yes.  You don't have to ask permission.

11          MR. MURPHEY:  Thank you, Your Honor.

12     Q.   Mr. Bennett, do you recognize the document I have

13   marked as Exhibit 5?

14          THE COURT:  Where is that?  Do I have that?

15          MR. MURPHEY:  You should, Your Honor.

16          THE COURT:  Is that a loose one?

17          MR. MURPHEY:  It is, Your Honor.

18     A.   I do recognize that.

19     Q.   Is that an accurate copy of the policy that the

20   Bordens owned at the time of the fire?

21     A.   Appears to be.

22     Q.   Now, you will agree with me that, after this fire,

23   Amica's obligation under its policy was to pay the Bordens

24   whatever it took to restore their home to its prefire

25   condition; is that right?

1    A.    That's correct.

2    Q.    And that obligation is the same whether the

3    homeowner chooses to repair the house, chooses to demolish

4    it, chooses to move out of town and sell it to somebody else;

5    is that correct?

6    A.    That's correct.

7    Q.    So any of the decisions that the Bordens made with

8    respect to whether they were going to stay in Erie or move

9    out of town, that was irrelevant to what Amica's financial

10   obligation was with regard to estimating the loss; is that

11   right?

12   A.    With regard to estimating the loss, but there is

13   additional living expense that ties into that issue.

14   Q.    So the longer it takes them to rebuild the house,

15   the more alternative living expense may be incurred by Amica;

16   is that right?

17   A.    Right.  In this case, after the settlement was

18   reached, the Bordens continued to stay at that rental house

19   at our expense for about seven months, and then ultimately

20   continued to stay after the agreement was reached --

21   Q.    And you continued to pay that; didn't you?

22   A.    We paid it for seven months beyond.

23   Q.    And my question was, Mr. Bennett --

24   THE COURT:  Hold on a second.  Way too fast.  Wait

25   till he finishes, and then you wait till he finishes.

1      Q.    My question was whether Amica's obligation under the

2      dwelling portion of the policy, which you will agree with me

3      is the portion of the policy that is paid to the insured to

4      repair or rebuild their damaged home, that obligation is not

5      affected in any way by what ultimate decisions the

6      homeowner's make?

7      A.    That's correct.

8      Q.    Now, since this fire occurred outside of the

9      physical territory of your Pittsburgh branch, you hired an

10     independent adjuster to adjust the claim; is that right?

11     A.    A general adjuster.

12     Q.    But he's independent in the sense that he's not an

13     employee of Amica?

14     A.    Correct.

15     Q.    And, initially, you had hired a local Erie adjuster

16     from a local -- Crawford & Company Adjusting Service, I think

17     his name is John Levandowski -- you originally hired him, did

18     you not?

19     A.    On the date of the loss, the call was made by the

20     Bordens into our call center.  The call center tried to

21     assist Dr. Borden with emergency services, and then, in --

22     one approach was to contact our local adjuster on call, and

23     that man, in trying to find a contractor, had called Crawford

24     & Company.  And -- which is a local adjusting firm we've

25     used, but never on a large fire loss before.  And then, on

1    the next day, when I was told about the fire loss, that's

2    when I informed them because of the lack of experience with

3    Crawford & Company on large losses to contact Schumann.

4        Q.   And at that time -- looking at one of the first

5    obligations is to find an emergency board-up contractor to

6    come in and secure the property; is that right?

7        A.   That's correct.

8        Q.   Did Mr. Levandowski do that in the time that he was

9    involved in the case?

10       A.   I don't recall exactly.  I wasn't involved in that

11   because I didn't hear about it till the next day.

12       Q.   So by the time you heard about it, there was already

13   an emergency services board-up contractor -- by board-up I

14   mean B-O-A-R-D - U-P contractor -- on site; is that right?

15       A.   That's correct

16           THE COURT:  Let me stop just so I understand the

17   sequence.  Mr. Bennett, is it your testimony that when the

18   call came in from Dr. Borden advising Amica about the loss

19   that someone in your organization on their own then contacted

20   Crawford & Company?

21           THE WITNESS:  The adjuster on call did.  The local

22   adjuster on call.

23           THE COURT:  And if you know, is it your

24   understanding that Mr. Levandowski then, during that initial

25   eight- or 10- or 12- or 14-hour period, would have been the

1    individual responsible for getting some contractor out there

2    to start to board up the property?

3            THE WITNESS:  That was the idea, but that's not what

4    actually happened.

5            THE COURT:  That's not what actually happened.

6            THE WITNESS:  What happened was that the local fire

7    marshal, I'm not sure of his title, called back and spoke

8    with the adjuster on call and said there was someone already

9    on site.

10           THE COURT:  All right.  Go ahead.

11       Q.   Do you know who that was that was already on site?

12       A.   Visions.

13       Q.   Visions, Incorporated?

14       A.   Correct.

15       Q.   Do you know who it was that hired Visions?

16       A.   I would assume Dr. Borden agreed to it.

17       Q.   You said, "agreed to it."  Do you know who brought

18   them to the scene?

19       A.   He was already --

20       Q.   Do you know who brought them to the scene?

21       A.   He was already at the scene because he was a

22   fireman.  The fire marshal called and told us that there was

23   some -- someone there that could do the work, and we said,

24   well, that's fine.

25       Q.   So your understanding is that the principal of

1    Visions, which is Brian Seifert -- that he was a fireman, and

2    therefore, he was already on the scene?

3        A.    That's correct.

4        Q.    So in addition to fighting the fire, he was also

5    going to perform the board-up services?

6        A.    That's correct.

7        Q.    So when you learned of that you decided that was

8    fine and you didn't need to get another contractor?

9        A.    Correct.

10       Q.    Do you know whether Mr. Levandowski contacted anyone

11   else, such as Peter Hardner & Son, for instance, during the

12   brief time he was involved in the case?

13       A.    I believe he did.

14       Q.    Do you know why it was that Mr. Hardner didn't

15   ultimately serve as the board-up contractor?

16       A.    Because Visions was already on site.

17       Q.    Do you know who it was that made the decision to

18   leave Visions on site and not replace it with Hardner?

19       A.    I assume the adjuster on call.

20       Q.    Do you know that?

21       A.    I don't know the answer to that specifically.  I'm

22   assuming.

23       Q.    Do you know whether that decision was ever actually

24   made affirmatively by somebody?  To say, we've called

25   Hardner, Visions is on the scene, I guess we'll leave Visions

1    in place?

2        A.   I'm not sure about that.

3        Q.   You don't know.  Now, at the time you didn't know

4    anything about Seifert or Visions; is that correct?

5        A.   That's correct.

6        Q.   You didn't know anything about any fire restoration

7    contractors in Erie?

8        A.   That's correct.  The call center, when he originally

9    called -- we have an agreement with an outfit called Disaster

10   Cleanup International, and they have contractors in various

11   areas throughout the Country, and Disaster Cleanup

12   International did not have a contractor they could recommend

13   to us, and we did not have any knowledge of a contractor at

14   that time.

15       Q.   So nobody had any information in your organization,

16   or in the contacts that you had, about Erie?

17       A.   That's correct.

18       Q.   Now, the day after the fire you hired John Schumann

19   to adjust the case; is that right?

20       A.   That's correct.

21       Q.   And this was, I think, the second time you had

22   worked with Schumann.

23       A.   Yes.

24       Q.   And he's on a list of national adjusters that you

25   can call for losses like this?

1      A.   Yes.

2      Q.   That are outside the physical territory of your

3    branch?

4      A.   Correct.

5      Q.   What is the physical territory of your branch?  How

6    close to Erie does that get?

7      A.   Can you restate that?

8      Q.   Yes.  You said that Schumann was called because the

9    loss was outside the physical territory of your branch;

10   although, the territory for which you're responsible is all

11   of West Virginia and Western Pennsylvania.

12     A.   We have one adjuster, and he services basically the

13   Pittsburgh area.

14     Q.   So outside of that area you have to use

15   independents?

16     A.   We do.

17     Q.   Now, even before -- I'm sorry, do you know whether

18   Mr. Schumann had ever worked in Erie before?

19     A.   No.

20     Q.   No, you don't know, or no, he had not?

21     A.   I have no knowledge.

22     Q.   You don't know one way or the other?

23     A.   No.

24     Q.   So do you have any idea whether Mr. Schumann had any

25   contacts in Erie?  Whether he knew any restoration

1    contractors?  Knew any homebuilders?

2         A.   No, I do not.

3         Q.   Did he ever tell you that he did?

4         A.   No.

5         Q.   Now, even before Mr. Schumann arrived at the scene,

6    you knew that this was a pretty serious fire?

7         A.   Correct.

8         Q.   That's the initial report you had gotten, was that

9    it was serious?

10        A.   Yes.

11        Q.   Mr. Bennett, I'm showing you a binder which we have

12   marked as Exhibit 3.  If you could take a minute and look at

13   that and let me know whether these are documents which

14   comprise, in part, the Amica claim file for this loss.

15             (Plaintiff's Exhibit No. 3 marked for

16              identification.)

17        A.   They appear so.

18        Q.   Thank you.  Now, Mr. Bennett, you received a

19   telephone loss report, correct?

20        A.   Correct.

21        Q.   That would be, kind of chronologically anyway, the

22   first thing in your file; is that right?

23        A.   One of them, yes.

24        Q.   It would be the -- it would be the way in which you

25   were -- at least in the file, where the whole loss is

1    introduced because that's the loss report you got from the

2    Bordens, correct?

3        A.    Correct.

4        Q.    I put on the screen, Mr. Bennett, a copy of the loss

5    report -- and this is Page 2 of.  Do you see that?

6        A.    Yes.

7        Q.    And you'll see that I've highlighted portions of it.

8    And you'll agree with me that your loss report indicated,

9    "The insured stated that the fire started in the west part of

10   the house, in the basement, at approximately 1:00 p.m.  He

11   was alone and smelled smoke.  The smoke was so thick he left

12   the home and called the fire department.  The smoke damage

13   seems to be very extensive."  Is that correct?

14       A.    Correct.

15       Q.    And further down, highlighted, this report told you,

16   "The insured has been told by the fire department that all

17   the floors in the home are bowed.  The insured stated that

18   the fire department had to cut a large hole in the roof of

19   the home, and the garage that was attached to the home was

20   affected also."  Is that right?

21       A.    That's what it says.

22       Q.    So this is the information to be had at that time.

23   And this is dated February 16th; is it not?

24       A.    That's the information the Bordens conveyed to the

25   rep, yes.

 1         Q.   On the day of the fire?

 2         A.   I believe it was the day of the fire.  I couldn't

 3    see it there.

 4         Q.   I'm sorry?

 5         A.   You moved it.  It would tell you at the bottom.

 6         Q.   I'm sorry, I apologize.  Where would the date be on

 7    here?

 8         A.   The bottom.

 9         Q.   Do you see the date?

10         A.   Yes.  February 16th.

11         Q.   I'm sorry, Mr. Bennett, I didn't mean to distract

12    you.

13              Now, at the top of Page 2, and this is Exhibit 3-3,

14    it also indicates, "The fire marshal had asked for permission

15    to call a demolition company since the west part of the

16    structure is a hazard."  Is that right?

17              (Plaintiff's Exhibit No. 3-3 marked for

18               identification.)

19         A.   Correct.

20         Q.   Now, Mr. Schumann arrived in Erie on February 19,

21    2003, which was three days after the fire; is that right?

22         A.   Yes.  On the day of the fire there was a very --

23         Q.   I'm sorry, Mr. Bennett, if you could just answer the

24    questions that I ask, I'd appreciate that.

25              THE COURT:  Did he come to Erie on February -- what

1    was the date?

2            MR. MURPHEY:  19th.

3            THE COURT:  19, 2003, Mr. Bennett, to the best of

4    your knowledge?

5            THE WITNESS:  Yes.

6        Q.   Now, after Mr. Schumann originally arrived at the

7    scene, he reported to you that the damage was extensive;

8    isn't that correct?

9        A.   Correct.

10       Q.   And he also, on the first day that he was in Erie,

11   estimated that the dwelling loss would amount to at least

12   $250,000; is that correct?

13       A.   I don't recall offhand.

14       Q.   I'll show you a document which is marked Exhibit 3-5

15   from your claim file.  Do you recognize this as an e-mail

16   that you sent to a woman named Lisa St. Onge?

17           (Plaintiff's Exhibit No. 3-5 marked for

18            identification.)

19       A.   Yes.

20       Q.   Who was Lisa St. Onge?

21       A.   She was the examiner at the time.

22       Q.   What was her responsibility with regard to the

23   claim?

24       A.   She oversees a region, that includes the Pittsburgh

25   regional office.

1     Q.   What's her involvement with this particular case?

2  What were her duties?

3     A.   She examines the file, she reviews the work that's

4  being completed, she provides input, she has authority beyond

5  my authority.  I report to her.

6     Q.   At that time, on February 19th of 2003, you were

7  reporting to Ms. St. Onge that Schumann had said that the

8  damage is extensive, and he guesses Coverage A damages of

9  $250,000; is that right?

10     A.   That was his ballpark estimate.

11     Q.   And Coverage A is the dwelling loss?

12     A.   Correct.

13     Q.   Again, that was Exhibit 3-5.

14     Now, Mr. Schumann was in Erie for about a week

15  developing his estimate; is that right?

16     A.   I'm not sure of the time frame.

17     Q.   I'm going to show you an exhibit, which I have

18  marked Exhibit 3-1, which is part of the claim file.  Do you

19  recognize this?

20        (Plaintiff's Exhibit No. 3-1 marked for

21         identification.)

22     A.   Yes.

23     Q.   It is the claim activity log for Mr. Schumann; is it

24  not?

25     A.   Yes, it is.

1      Q.   So it shows what he did on the file at least in

2   summary form; is that right?

3      A.   That's correct.

4      Q.   Can you look at that and tell me how long it was

5   that Mr. Schumann was in Erie?

6      A.   What you provided goes from February 17th through

7   February 27th.

8      Q.   Can you look at it -- may I have it?

9      A.   Sure.

10      Q.   Thank you.  Allow me to refer you to -- now, Exhibit

11   3-1 goes through February 27th, and then let me tell you that

12   the next claim activity note is dated February 28th, that's

13   on Exhibit 3-2, and that indicates that Mr. Schumann met with

14   you in Pittsburgh on February 28th.  Does that allow you to

15   conclude that Mr. Schumann was in Erie from February 19th to

16   February 27th developing his estimate?

17           (Plaintiff's Exhibit No. 3-2 marked for

18            identification.)

19      A.   I think so, yes.

20      Q.   So during the time Mr. Schumann was in Erie, from

21   February 19th to February 27th, he was developing his

22   estimate and keeping you informed of his activities; is that

23   right?

24           THE COURT:  I think you said February -- I

25   apologize.  You're correct, February 19th.  Go ahead.

1          MR. MURPHEY:  Thank you, Judge.

2     Q.   Now, on February 25th you spoke with Mr. Schumann,

3     and he said that he was close to developing an estimate.  Let

4     me show you an exhibit marked 3-7.  Do you recognize this as

5     another e-mail from you to Ms. St. Onge?

6          (Plaintiff's Exhibit No. 3-7 marked for

7           identification.)

8     A.   Yes, I do.

9     Q.   At that point you tell Ms. St. Onge that you spoke

10    with Schumann today, he is still on site working the loss, he

11    feels his estimate will be completed by tomorrow; is that

12    correct?

13    A.   That's what it says.

14    Q.   Do you have any reason to believe that that was

15    inaccurate?

16    A.   No.

17    Q.   Now, the e-mail also says, does it not, in the next

18    highlighted section, again this is Exhibit 3-7, that John --

19    and John is Mr. Schumann, correct?

20    A.   Correct.

21    Q.   "John feels that he will not choose Visions" -- and

22    in the preceding sentence it says, "The insured has not

23    chosen a contractor.  John feels that he will not choose

24    Visions.  He is trying to impress on the insureds for their

25    need to select a contractor."  Did I read that correctly?

1          A.    Yes.

2          Q.    Did Mr. Schumann tell you why it was that the

3     insureds were unlikely to choose Visions to do their repair

4     work?

5          A.    No.

6          Q.    Did you ask him why?

7          A.    No.

8          Q.    At that time did you know anything about Visions?

9          A.    I don't recall at that time, no.

10          Q.    Had you ever spoken to any other insurance companies

11     that had used Visions' services?

12          A.    No.

13          Q.    Had you spoken to any insurance adjusters who had

14     used Visions' services?

15          A.    No.

16          Q.    Had you spoken to any customers, homeowners, anybody

17     that could give you an opinion regarding Visions?

18          A.    No.   I only called Visions.

19          Q.    And you did that later, and we'll talk about that in

20     a minute.

21                Did you ever visit Visions' business locale?

22          A.    No.

23          Q.    Did you ever look them up in the Erie phone book?

24          A.    I don't have an Erie phone book.

25          Q.    Did you ever look them up on the Internet?

1      A.   No.

2      Q.   Now, about two weeks after this, and this is what

3   you were getting to, after Mr. Schumann had delivered his

4   estimate and told Amica that Visions was supportive of his

5   estimate and could do the work for his estimated price, Lisa

6   St. Onge asked you to look into Visions; is that correct?

7      A.   That's correct.

8      Q.   She asked you to find out what kind of company it

9   was and whether they were capable of doing this type of work,

10  correct?

11     A.   Correct.

12     Q.   And you interviewed Mr. Seifert; is that right?

13     A.   That's correct.

14     Q.   But you didn't talk to anybody else?

15     A.   No, I did not.

16     Q.   And your interview with Mr. Seifert, what he told

17  you, is documented in the file somewhere, but again, I don't

18  need to go down through the list, you didn't talk to any

19  other third parties about Visions?

20     A.   No.

21     Q.   Did you ever talk to the Bordens about their

22  concerns with Visions?

23     A.   I didn't know they had any concerns with Visions.

24     Q.   Well, Mr. Schumann had reported to you that he did

25  not think that the Bordens would use Visions, did he not?

1        A.    That doesn't convey to me that they have a problem

2    with Visions or concerns --

3              THE COURT:  Sir, I can't hear you, and I'm sitting

4    next to you.

5              THE WITNESS:  I don't know how close to get.

6              THE COURT:  There's two ways people use these

7    things, sometimes they get right on top of, and it's more

8    than you need, but if you just speak like I'm speaking, but

9    you don't get right onto it -- actually, I'm as concerned

10   about the court reporter as I am about myself.

11             THE WITNESS:  I'm sorry.

12             THE COURT:  That's quite all right.  It's a whole

13   new experience when people get up on these mics.

14        Q.    So, Mr. Bennett, when Mr. Schumann reported to you

15   that the Bordens were unlikely to choose Visions to serve as

16   their contractor, you did not take that to be any negative

17   comment regarding Visions?

18        A.    I don't --

19        Q.    It's a yes or no question.

20        A.    Could you say it again, I'm sorry.

21        Q.    Yes.  We just looked at Exhibit 3-7, which was your

22   e-mail of February 25, 2003, in which you reported that

23   Mr. Schumann had told you that the Bordens were unlikely to

24   use Visions as their repair contractor.  My question was, you

25   did not interpret that to be any negative comment by the

1    Bordens about Visions?

2        A.   No.

3        Q.   And so you thought at that time that it was

4    perfectly reasonable for Schumann to rely on Visions' opinion

5    regarding the estimate even though the Bordens had indicated

6    they weren't going to use Visions?

7        A.   Correct.  We didn't have another contractor's -- we

8    were never provided with another contractor's estimate from

9    the Bordens.

10       Q.   Did you ever suggest any contractors' names to the

11   Bordens?

12       A.   No.  But I did suggest that they have a contractor

13   review the estimate.

14       Q.   Now, when you say that, and it's -- you know, you

15   say that several places in the file.  And, in fact,

16   Mr. Schumann, according to this e-mail to Lisa St. Onge of

17   February 25th, you specifically say, "He is trying to impress

18   on the insureds" --

19            THE COURT:  A little too fast for the reporter.

20            MR. MURPHEY:  I'm sorry, Judge.

21       Q.   "That he is trying to impress on the insureds for

22   their need to select a contractor"; is that right?

23       A.   Right.

24       Q.   Now, Amica has an independent obligation to

25   formulate an estimated amount of repair in this case; is that

1   right?

2       A.   That's correct.

3       Q.   Regardless of whether the person has a contractor or

4   not; is that right?

5       A.   That's correct.

6       Q.   So having the contractor in place is not important

7   for purposes of Schumann developing his estimate?  It's

8   important for the timing of the Bordens getting their repairs

9   done so that they don't have to incur any more alternate

10  living expense; is that correct?

11      A.   It facilitates the process.

12      Q.   Did Mr. Schumann ever tell you that the Bordens had

13  given him names of contractors in Erie?

14      A.   I'm sorry?

15      Q.   Did Mr. Schumann ever tell you that the Bordens had

16  given him names of contractors that they would consider using

17  in Erie?

18      A.   No.

19      Q.   And neither you nor Mr. Schumann ever gave any names

20  to the Bordens; is that correct?

21      A.   That's correct.

22      Q.   Now, during the time that Mr. Schumann was in Erie,

23  you learned a number of things about the Bordens by report

24  from Mr. Schumann; isn't that correct?

25      A.   Correct.

1      Q.    For instance, you knew that they had been -- they
2    were devastated by this fire?
3      A.    Sure.
4      Q.    And that's not an unusual occurrence in your
5    industry; is it?
6      A.    No.
7      Q.    And that they had a daughter, a 3-year-old girl
8    named Emma, who had some particular health issues; is that
9    correct?
10      A.    Yes.
11      Q.    It was reported to you that whatever would happen in
12    this case would require specific attention to -- the young
13    girl's name is Emma -- to Emma's -- to her safety, exposure,
14    and assistance; is that correct?
15      A.    I was told that it was a concern.
16      Q.    That was an awkward question.  You were told early
17    on in the case that the 3-year-old daughter had some
18    particular health issues that the Bordens were concerned
19    about, correct?
20      A.    Yes.  Correct.
21      Q.    And you knew that the Bordens were separated from
22    their children, their children were living in Pittsburgh,
23    they were living in Erie, and Dr. Borden had just taken a new
24    job at Saint Vincent Health Center and had enormous
25    responsibilities, correct?  You were advised of all that?

1        A.   I thought they were living in a hotel here after the

2   fire loss.

3        Q.   I'm going to show you a document, which is marked

4   Exhibit 3-6.  Do you recognize this as a report dated

5   February 21st from Mr. Schumann?

6             (Plaintiff's Exhibit No. 3-6 marked for

7              identification.)

8        A.   Yes, it is.

9        Q.   Now, Mr. Schumann's company is called Property

10  Claims Services, Inc.; is that right?

11            THE COURT:  Can you zoom that up a little bit.

12  Bring that up a little bit more.

13       Q.   Mr. Borden's company is called Property Claims

14  Services, correct?

15       A.   Correct.

16       Q.   I say that because that's the letterhead.

17       A.   Correct.

18       Q.   At any rate, he is reporting to you, at the bottom

19  of this document, on February 21st, Exhibit 3-6, that in

20  addition to Mr. and Mrs. Borden being devastated by the

21  recent fire and their lives being fragmented, the three small

22  children are currently with Mrs. Borden's family in

23  Pittsburgh; is that right?

24       A.   That's correct.

25       Q.   It was also reported to you, this is the second page

1    of that February 21st report, dated -- or dated February

2    21st, Exhibit 3-6, "Mrs. Borden has had a very difficult time

3    dealing with the absence of her children as well as

4    addressing the special needs educational arrangements she has

5    undertaken as one of her children requires this type of

6    attention.  And secondly, Dr. Borden moved to Erie with his

7    family six months ago to undertake and manage a new program

8    related to his expertise.  Dr. Borden is a neurologist at the

9    local hospital and is feeling stressed due to his enormous

10   responsibilities in his new position."  So this is

11   information you had about the Bordens, correct?

12       A.   Correct.

13       Q.   But at this point you were also frustrated with the

14   Bordens because they hadn't selected a contractor to review

15   the estimate, correct?

16       A.   I wouldn't characterize it as frustrated.

17       Q.   Now, the Bordens -- did you at any time suggest that

18   the Bordens get a public adjuster involved in the case?

19       A.   No, I did not.

20       Q.   Now, you will agree with me that at this time the

21   Bordens did make available to Mr. Schumann other members of

22   their family to assist them in the handling of the loss?

23       A.   That's correct.

24       Q.   And that included Dr. Borden's brother and

25   Dr. Borden's mother; is that correct?

1      A.   I'm aware that the mother flew out here because John

2  assisted her -- actually, drove her --

3      Q.   My question, Mr. Bennett -- and I know that you want

4  to tell us the good things that Amica did in this case, and

5  they did many good things, but the focus of my question is

6  whether the Bordens had made available to you two members of

7  their family to assist in the handling of the loss.

8      A.   Well, I'm not sure the extent of the involvement of

9  Dr. Borden's brother.  My understanding was that he was

10  communicating with Dr. Borden.  I'm not familiar with his

11  communicating with Schumann or myself.

12      Q.   But you do agree that Dr. Borden's mother flew in

13  from Connecticut to assist in the handling?

14      A.   Yes.

15      Q.   You were also told by Mr. Schumann the nature of the

16  loss?  That is, the type of home that the Borden's lived in,

17  the type of neighborhood that they lived in, and the extent

18  of the fire; is that correct?

19      A.   Correct.

20      Q.   And Mr. Schumann told you that they lived in a

21  5,500-square-foot house on a 2-acre lot in an upscale

22  neighborhood in Erie; is that correct?

23      A.   That sounds correct.  I don't recall, but that

24  sounds correct.

25      Q.   And that the fire had started in the basement,

1    correct?

2        A.    Correct.

3        Q.    And that the basement sat under about 50 percent of

4    the structure; is that right?

5        A.    I don't remember the percentage.  I know it

6    didn't -- there was a large portion of the house that did not

7    have a basement; it had a crawl space

8            THE COURT:  This isn't germane, but just out of

9    curiosity, did they ever figure out what caused the fire?

10           THE WITNESS:  Yes.

11           THE COURT:  What was it?

12           THE WITNESS:  We had a cause and origin guy that we

13   assigned to the claim that we -- I think that Monday after

14   the fire loss, and it was determined that Dr. Borden had been

15   using linseed oil to -- I think he -- my memory, which is

16   somewhat poor these days, to stain some frames -- picture

17   frames, and linseed oil, apparently if you ball it up, it's

18   an oxidizer, I'm not positive about that, but if you ball it

19   up, it actually generates heat.  And apparently Dr. Borden

20   had left balls of cotton that he was using to apply the

21   linseed oil and he -- left it balled up and that produced

22   heat and actually started the fire.

23           THE COURT:  Go ahead, Mr. Murphey.

24           MR. MURPHEY:  Thank you, Your Honor.

25       Q.    Mr. Bennett, I'm showing you a report dated February

1     25, 2003.  It's Exhibit 3-8, and this is from Mr. Schumann;

2     is that correct?

3               (Plaintiff's Exhibit No. 3-8 marked for

4                identification.)

5          A.   Yes.

6          Q.   And this is his summary of the dwelling loss; is

7     that correct?

8          A.   I -- I can only see part of it.

9          Q.   What does it say at the top?  "Coverage A

10    Summary" --

11         A.   Summary.

12         Q.   -- "Agreed Cost for Repairs"; is that right?

13         A.   Yes, it does.

14         Q.   Now, on Page 2 of that report, Mr. Schumann told you

15    that the Bordens had made available Dr. Borden's brother; is

16    that correct?  At the bottom of Page 2 of this report it

17    says, "Although I have discussed the status of my activity

18    with Dr. Borden while in Erie, his brother Richard will be

19    taking a leave towards assisting with decisions and moving

20    this claim towards conclusion.  Richard Borden is located in

21    Hartford, Connecticut, and is an attorney working with the

22    Hartford Insurance Company."  Is that right?  Did I read that

23    correctly?

24         A.   You did.

25         Q.   So, does that answer the question that I asked you

1   before?  About whether Mr. Richard Borden had been made

2   available by the Bordens to assist in the handling of the

3   claim?

4       A.   Well, I guess --

5       Q.   It's a yes or no question.

6       A.   Made himself available to Dr. Borden, not to me.

7       Q.   Doesn't this indicate that he had made himself

8   available to Mr. Schumann?

9       A.   To make someone available you have to give them

10  contact information.  I don't see that there.

11          THE COURT:  Move on.  I've got it.

12          MR. MURPHEY:  Thank you, Your Honor.

13      Q.   The third page of the report, I have several

14  highlighted sections of it just to show what information

15  Mr. Schumann was showing you.  This is Exhibit 3-8, again, on

16  February 25th.  He told you at that time that the dwelling

17  contained approximately 5,500 square feet of heated living

18  area, with an attached two-car garage.  The dwelling is

19  located on a 2-acre lot in an upscale neighborhood; is that

20  correct?

21      A.   That's correct.

22      Q.   And further down he noted, "The fire department

23  personnel called to the scene broke out several windows on

24  both levels of the structure, as well as cut numerous large

25  openings in the lower level roof."  Is that right?

1        A.    That's what it says.

2        Q.    And further down, in "Interior Considerations", Mr.

3    Schumann noted that, "As this fire began in the basement

4    below the main-level kitchen, den, and formal dining room,

5    the floor system, interior walls, and ceiling joists require

6    replacement to repair these structural areas of obvious

7    damage.  The partially finished basement, used as a

8    combination storage, utility, and laundry area, also

9    sustained significant damage to the extent that the main

10   34-feet-long steel high beam was twisted due to the extreme

11   heat generation in this area during the fire.  Consequently,

12   any basement wall framing, strips, and paneling attached to

13   the exterior block walls was completely destroyed along with

14   the geothermal exchange units and other mechanical elements.

15   A structural engineer was brought in to evaluate and

16   determine necessary structural considerations pertaining to

17   the repair procedures."  Mr. Bennett, did you ever see a

18   report from a structural engineer?

19       A.    I do not recall seeing one.

20       Q.    Do you know if Mr. Schumann ever got a structural

21   engineer?

22       A.    I cannot recall.

23       Q.    Would you have been told by Mr. Schumann if he did?

24       A.    Yes.

25       Q.    And you don't recall him telling you that?

1          A.   I don't recall, no.

2          Q.   The last sentence says, "The remaining interior

3    main-level and second-level areas sustained significant smoke

4    and soot damage to dry wall, ceilings, and walls, and floor

5    covering."  Is that right?

6          A.   That's correct.

7          Q.   So this was -- what I just read from was a report

8    dated February 25, 2003, and about that time, or maybe the

9    next day, Mr. Schumann sent you an estimate of repairs, and

10   his estimate was for about $328,000; is that right?

11              THE COURT:  Wasn't there a figure in that letter?

12   Or did I miss that?  I thought I saw a figure.

13              MR. MURPHEY:  There probably was.

14              THE COURT:  Can you put it back up again.

15              MR. MURPHEY:  This would not have been an estimate

16   itself, but a report that accompanied the estimate.  Yes,

17   Your Honor.

18         Q.   Mr. Bennett, in the middle of Page 2 of Exhibit 3-8

19   there is an estimate summary section.  Do you see that?

20         A.   Yes.

21         Q.   And in that section Mr. Seifert -- I'm sorry,

22   Mr. Schumann estimated the total loss at $328,999.14, is that

23   right?

24         A.   That's correct.

25         Q.   He also indicated that he had reviewed and discussed

1    this estimate with Brian Seifert of Visions; is that right?

2        A.   Yes.

3        Q.   And, of course, just backing up to the prior

4    question, at this time you didn't know anything more about

5    Visions than you already testified?

6        A.   That's right.

7        Q.   So then he sent you the physical estimate, which is

8    many pages long, that concluded what his summary said, and

9    that is that the total loss was 328,000 something?

10       A.   That's correct.

11       Q.   At that time did you speak with Mr. Seifert at all

12   about the estimate?

13       A.   No.

14       Q.   Did you ever get an estimate from Mr. Seifert?

15       A.   No.

16       Q.   Now, you were advised, were you not, that on

17   February 27th of 2003 Mr. Schumann spoke with Jon Borden's

18   brother about the estimate, and he posed some objections to

19   it; is that correct?

20       A.   I don't recall.  I'm sorry.

21       Q.   I'm going to show you an exhibit marked 3-1, which

22   is the claim activity outline that we previously identified

23   that showed Mr. Schumann's day-to-day activities on the file.

24   This is the Page 4 of Exhibit 3-1.  You'll agree with me that

25   this is a summary of Mr. Schumann's activities on February

1    27th?  Do you agree that that's what it is?

2        A.   Yes.

3        Q.   Do you agree that he reported that he had talked

4    with Richard Borden concerning the estimate, and he met with

5    some resistance concerning cleaning versus removal and

6    replacement of dry wall throughout interior of dwelling; is

7    that right?

8        A.   Yes.  That's correct.

9        Q.   And this information would have been passed along to

10   you in the course of --

11       A.   Yes.

12       Q.   Now, Mr. Schumann left Erie on or about February

13   27th, we had talked before about how he had come to

14   Pittsburgh and met with you on the 28th, and he left Erie

15   without changing his estimate in any way; is that right?

16       A.   That's right.

17       Q.   Even after the conversation with Richard Borden?

18       A.   That's right.

19       Q.   In fact, Mr. Schumann never changed his estimate at

20   any time, did he?

21       A.   No.

22       Q.   Now, on March 1st, Mr. Schumann sent you another

23   estimate, but this was for a different thing.  This was an

24   estimate of the value of the house, if you tore it down and

25   rebuilt it.  I'm showing you an exhibit marked 3-10, dated

1    March 1, 2003, and this is a replacement cost evaluation,

2    which would be the amount that Mr. Schumann was estimating it

3    would cost to rebuild the Bordens' house from the ground up;

4    is that right?

5         (Plaintiff's Exhibit No. 3-10 marked for

6          identification.)

7    A.   That's correct.

8    Q.   And his estimate was $762,913; is that right?

9    A.   That's correct.

10   Q.   You get that report because you need to determine

11   whether the house can be repaired or whether it should be

12   totalled; is that right?

13   A.   There's other reasons, too.

14   Q.   Another reason is because of the replacement cost

15   endorsement that the Bordens had; is that right?

16   A.   That's one of them.

17   Q.   Just explain to the Court, the replacement cost

18   endorsement is a provision that Mr. and Mrs. Borden had in

19   their policy which called for an automatic increase in the

20   amount of their coverage for their dwelling loss if it turns

21   out that the total value of their house is greater than the

22   policy limit; isn't that right?

23   A.   That's correct.

24        THE COURT:  Say that again.

25        MR. MURPHEY:  Yes.  Can I address this to Your

1      Honor.  The Bordens had a provision in their policy called a

2      replacement cost endorsement, pursuant to which Amica

3      promised to pay the total value of the house, regardless of

4      the value of the house, if it was totalled.  Even if that

5      amount is greater than the amount of coverage that they

6      purchased.  So, for example, Mr. Bennett --

7              THE COURT:  For instance, that would take into

8      account appreciation of the house?

9          Q.    Well, does it, Mr. Bennett?

10         A.    The -- yes.  Yes, it does.

11         Q.    The replacement cost takes into account depreciation

12     of the house?

13         A.    Appreciation.

14             THE COURT:  Appreciation.

15             MR. MURPHEY:  That's what I didn't understand.  Yes,

16     it absolutely would, Your Honor.  So that's an extra benefit

17     you get under this policy.

18         Q.    So, Mr. Bennett, in this case the Bordens' dwelling

19     limit was $577,000, correct?

20         A.    On the declarations page, yes.

21         Q.    And that would be revised upward if it was

22     determined that their house was totalled, for lack of a

23     better term?

24         A.    If the damages reach that point, yes.

25         Q.    Well, let me understand this:  If your estimated

1    damages were $600,000, even if the house could be rebuilt

2    rather than torn down and rebuilt -- strike that.

3          If you conclude that the damages are $600,000, the

4    Bordens' policy limit would be automatically revised upward

5    to $600,000?

6       A.   That's correct.

7       Q.   So it doesn't matter whether the estimator concludes

8    that the house needs to be torn down and rebuilt or whether

9    it's just going to be real expensive to repair it so long as

10   that number is greater than the $577,000, the policy is going

11   to be revised upward?

12      A.   That's correct.

13      Q.   So when you learned the total value was

14   $760,000-some, that meant Amica had exposure greater than the

15   $577,000 limit that had been purchased by the Bordens?

16      A.   Yes.

17      Q.   In fact, that also revises the other coverages

18   upwards; does it not?

19      A.   Yes, it does.

20      Q.   On a percentage basis?

21      A.   Percentage basis.

22      Q.   So if, just for example, the amount to repair the

23   Bordens' house was 50 percent more than the $577,000 limit,

24   your other coverages, such as the coverage for the contents

25   and the coverage for alternative living expenses, would also

1    be increased by 50 percent; is that right?

2        A.    I'm not sure of the math on that.  The -- I think

3    Coverage C is 75 percent of Coverage A.  So proportionally

4    they would increase.

5        Q.    Thank you.  I understand that.  So they would

6    increase proportionally depending on --

7        A.    That's correct.

8        Q.    But that's another reason why it was important to

9    find out what the total value of the house was?

10       A.    That's correct.

11       Q.    Now, on March 3rd of 2003, this is Exhibit 3-12, you

12   wrote to the Bordens.  You agree this is a letter from you to

13   the Bordens?

14           (Plaintiff's Deposition Exhibit No. 3-12 marked for

15            identification.)

16       A.    Yes, it is.

17       Q.    And at that time you tell the Bordens that John

18   Schumann has completed his dwelling estimate, and that

19   Visions has indicated that they are willing to complete the

20   repairs based on his estimate?

21       A.    Correct.

22       Q.    And from that date, March 3, 2003, forward, the

23   Bordens were never advised that Mr. Schumann had changed his

24   estimate in any way?

25       A.    No.

1      Q.   Now, at this time you also say, in the sentence

2    that's after the highlighted sentence, "If you would like to

3    use another contractor, please make arrangements to have them

4    inspect the house and review Property Claims Services'

5    estimate so repairs can begin as soon as possible."  Is that

6    correct?

7      A.   Correct.

8      Q.   So at that time you were not inviting the Bordens to

9    have a contractor assist with the preparation of the

10   estimate, you were telling them, here's the estimate, and

11   it's time to get the house repaired?

12     A.   No, I was not.

13     Q.   Well --

14          THE COURT:  Put that back up there.

15     Q.   I guess the letter speaks for itself.  It says, does

16   it not, "If you would like to use another contractor, please

17   make arrangements to have them inspect the house and review

18   Property Claims Services' estimate so repairs can begin as

19   soon as possible."

20     A.   My point was for them to review the estimate, we'd

21   consider what they had to say, but we do want the repairs to

22   be completed as soon as possible.

23     Q.   Did the letter say, or another letter say, please

24   have a contractor look at this, and maybe we'll revise the

25   estimate depending on what --

1          A.    No.  No, it does not.

2          Q.    Thanks.  Again, you still don't have any other

3     information on Visions at this time when you tell the Bordens

4     that Visions is prepared to repair it?

5          A.    I don't recall.

6          Q.    Now, after that date, when you told the Bordens that

7     the estimate had been prepared, the Bordens already had a

8     copy of the estimate, did they not?

9          A.    I believe the adjuster leaves a copy of the estimate

10    with the insureds.

11         Q.    So at the same time you would have gotten the

12    estimate, they would have gotten the estimate?

13         A.    Roughly speaking, yes.

14         Q.    That's what Mr. Schumann's notes indicate.  You

15    wouldn't be surprised if that's the case?

16         A.    No.

17         Q.    In fact, to refresh both of our recollections, on

18    February 27th, which is a couple days before your March 3rd

19    letter, he reported that he had already reviewed the estimate

20    with Mr. Borden's brother, right?

21         A.    I don't recall that.  I'm sorry.

22              THE COURT:  Keep your voice up, Mr. Bennett.  The

23    court reporter is having a hard time.

24              THE WITNESS:  Sorry.

25         Q.    After the Bordens receive Mr. Schumann's estimate,

1   and after you have sent a letter to the Bordens saying that

2   this -- that the estimate has been completed and please begin

3   making repairs, the Bordens hired a public adjuster; is that

4   correct?

5       A.   That's correct.

6       Q.   Now, I'm showing you an e-mail from you to Lisa St.

7   Onge, dated March 5, 2003.  And in that letter you state, "I

8   have been informed the insured has retained a public adjuster

9   consulting firm.  When asked if he was a public adjuster, he

10  said he was a consultant licensed in a number of states.  It

11  is not clear that he is licensed in Pennsylvania."  Did you

12  ever do any further investigation to determine whether

13  Mr. Parise, who we know was the public adjuster, was licensed

14  to practice in Pennsylvania?

15      A.   No.

16      Q.   Did the issue of whether or not he was licensed in

17  Pennsylvania have any impact at all on Amica's handling of

18  the claim?

19      A.   No.

20      Q.   You also reported to Ms. St. Onge that you had been

21  told that the public adjuster said that the dwelling estimate

22  would be double what Mr. Schumann had wrote; is that correct?

23      A.   That's correct.

24      Q.   And you were also told that Mr. Schumann had had a

25  conversation with Mr. Borden's brother in which Mr. Borden's

1    brother had expressed concern with smoke in the framing and

2    insulation, and that he feels the house will always smell of

3    smoke; is that right?  Do you see that in the second

4    paragraph?

5        A.    I'm reading it.  I have bifocals, I'm sorry.

6        Q.    That's okay.

7        A.    Yes, I do see that.

8        Q.    So you agree at that time it was reported to you

9    that the Borden family had expressed concern about smoke in

10   the insulation and whether the house would continue to smell

11   like smoke even after repairs; is that right?

12       A.    Yes.

13       Q.    Do you agree that part of Amica's obligation is to

14   put this house back into prefire condition?

15       A.    Yeah.

16       Q.    To pay the amount that's necessary to do that?

17       A.    Yes.

18       Q.    And that would include a house that doesn't smell of

19   smoke, correct?

20       A.    Correct.

21       Q.    Now, further below there's one line that says, "The

22   insureds are not participating in the adjusting process, and

23   this has been difficult for Schumann."  Do you see that?

24   That's the last sentence --

25       A.    Yes.

1    Q.   -- under Coverage A.

2    A.   Yes.  I see it.

3    Q.   But you had not recommended to the Bordens that they

4    hire a public adjuster or an attorney to assist them; is that

5    correct?

6    A.   No.

7    Q.   Also, you will agree with me that the insureds being

8    unavailable, or, I guess you said, not participating in the

9    adjusting process, that didn't affect Mr. Schumann's

10   estimating at all; is that correct?

11   A.   Well, it could be adjusted differently if they had

12   participated, yes.

13   Q.   Mr. Schumann's obligation, as you understood it, was

14   to estimate the cost that it would take to put the house in

15   its prefire condition, right?

16   A.   Right.

17   Q.   And Dr. Borden or Mrs. Borden, or anybody else, they

18   don't participate in that process; is that correct?

19   A.   Well, they can participate in the sense that they

20   can review the estimate and point out anything that he has

21   missed, Corian versus Formica, sure.

22   Q.   And that's what they hired Mr. Parise to do,

23   correct?

24   A.   Yes.

25   Q.   There's also a reference under Coverage C -- which

1    that's the contents section; is that correct?

2        A.    Yes.

3        Q.    That's the contents policy.  "Dr. Borden is

4    researching the issue of carcinogens caused by the fire."  Is

5    that correct?

6        A.    That's correct.

7        Q.    So you were aware that that was a concern that

8    Dr. Borden had expressed; is that right?

9        A.    That's correct.

10        Q.    And you attempted to get some information about

11    carcinogens; is that right?

12        A.    That's correct.

13        Q.    You went through, I think, one of your vendors, I

14    think the Dry Cleaning Restoration Network or something like

15    that, in order to get information about the carcinogens that

16    may remain on fire-damaged clothes or fire-damaged contents

17    or even in the structure; is that right?

18        A.    That's correct.

19        Q.    And I think your words were, they kind of dropped

20    the ball, they didn't get back to you?

21        A.    That's correct.

22        Q.    And that was the only investigation you did on that

23    issue; is that correct?

24        A.    That's correct.

25        Q.    So as of this time, March 3rd, when you sent that

1    e-mail to Ms. St. Onge, you knew that the public adjuster's

2    estimate was going to be considerably more than

3    Mr. Schumann's?

4        A.    Yes.

5        Q.    Although you didn't have the physical estimate at

6    that time?

7        A.    I don't believe so.

8        Q.    Now, you had indicated before that you need

9    authority from time to time from Lisa St. Onge for certain

10   payments in certain cases, and in this case you had asked

11   Ms. St. Onge to give you the authority to make the payment

12   based on Mr. Schumann's estimate; is that right?

13       A.    Yes.

14       Q.    And she sent you an e-mail, dated March 7 of 2003,

15   which gave you that authority; is that right?

16       A.    Correct.

17       Q.    At this time you still don't have any -- we had

18   already talked about the knowledge that you had of Seifert

19   and Visions and that sort of thing, and you testified a

20   couple minutes ago that ultimately you did talk to

21   Mr. Seifert.  As of this time, March 7th, you didn't have any

22   information about Visions, correct?

23       A.    I believe that's correct.

24       Q.    And Ms. St. Onge then asked you to obtain an

25   estimate from Visions or confirmation in writing that they

1      agreed to John's scope; is that right?

2      A.  That's correct.

3      Q.  And then she also asked you to obtain more

4  information, how large of a company, do they normally handle

5  this type and size of loss, and how many years have they been

6  in business, correct?

7      A.  That's correct.

8      Q.  Did Ms. St. Onge talk to you, other than this, to

9  tell you why it was that she felt it was important to find

10  out about Visions?

11      A.  I don't remember that.

12      Q.  Now, you did talk to Visions, as you've said before,

13  and you got some information from them, but -- I don't mean

14  to repeat myself, but you didn't talk to anybody else?

15      A.  That's correct.

16      Q.  Other than Brian Seifert of Visions?

17      A.  That's correct.

18      Q.  He had told you that he had been in business for a

19  couple years?  Since like 2000, I think?

20      A.  I think he said that he'd been incorporated since

21  2000, but he'd been in the business his entire life.

22      Q.  He had worked for his dad?

23      A.  Yes.

24      Q.  Did he tell you that he was a roofer?

25      A.  No.

1    Q.   Did he tell you he was a dry waller?

2    A.   No.

3    Q.   Did he tell you he did concrete work?

4    A.   No.

5    Q.   Did he tell you he plowed snow?

6    A.   No.

7    Q.   How much was Mr. Seifert and Visions paid throughout

8    the life of this?

9    A.   I have no idea offhand.

10   Q.   Is this the only case you've ever worked with

11   Visions?

12   A.   Yes.

13   Q.   In the same e-mail of March 7, 2003, in the last

14   paragraph, Ms. St. Onge tells you, does she not, "It appears

15   we may be heading toward appraisal."  Is that correct?

16   A.   That's what it says.

17   Q.   Had you ever participated in an appraisal before?

18   A.   No.

19   Q.   That was -- how many years you've been in the

20   insurance business?

21   A.   As of today, 25 years.

22   Q.   Literally today?

23   A.   No.  Within the past few months.

24   Q.   I was going to congratulate you.

25        THE COURT:  25 candles.

1           THE WITNESS:  Just means I'm old.

2      Q.   Just means you're experienced.  So you had never

3  been involved in an appraisal before?

4      A.   No.

5      Q.   Now, did you talk to Ms. St. Onge -- strike that.

6  Did you have a conversation with Ms. St. Onge separate and

7  apart from that e-mail about why it was she thought the case

8  was going to appraisal?

9      A.   Not that I recall.

10      Q.   At that time did you think that the case was headed

11  towards appraisal?

12      A.   I can't recall.

13      Q.   I then have an exhibit marked 3-15, dated March 11,

14  2003.  This is another letter from you to the Bordens; is

15  that correct?

16           (Plaintiff's Exhibit No. 3-15 marked for

17            identification.)

18      A.   That's correct.

19      Q.   And in this letter you are enclosing a check in the

20  amount of $295,000-something, which represents the actual

21  cash value based on the $328,000 estimate, correct?

22      A.   Correct.

23      Q.   And you understand that the Bordens don't have any

24  dispute that the holdback is totally legitimate and that was

25  the amount -- assuming that Schumann's estimate was accurate,

1    that was the amount they were owed?

2         A.   Not that was presented to me.

3         Q.   And up to this day nobody's said there's anything

4    wrong with that.  But this payment is based on Schumann's

5    estimate; is that correct?

6         A.   Correct.

7         Q.   Is there anywhere in this letter where it indicates

8    that this is a preliminary estimate?

9         A.   No.

10        Q.   Is there anywhere in this letter that says that this

11   offer is negotiable in some way?

12        A.   No.  I've never done that.

13        Q.   That wasn't my question.  My question was whether

14   this letter indicates that at all.  So you would agree with

15   me that this letter doesn't indicate anywhere that this offer

16   is open to further discussion, correct?

17        A.   Does not say that.

18        Q.   Now, also in this letter you make a reference to a

19   policy provision -- again, this is Exhibit 3-15, letter of

20   March 11, 2003.  You make a reference to a policy provision

21   called duties after loss; is that correct?

22        A.   That's correct.

23        Q.   What was the purpose for that?

24        A.   Can I read the rest of it?

25        Q.   Yes.  Take your time.

1      A.   Isn't there a Page 2?

2      Q.   Yes.  There you go.  Sorry about that.

3      A.   The concern was the basement.  Nothing was being

4  done.

5      Q.   You mean that the Bordens hadn't started repairs

6  yet?

7      A.   They hadn't done anything with the basement.  And I

8  think that letter, on Page 2, also referenced their

9  obligation to prepare an inventory of the contents, which

10 they had not done.

11      THE COURT:  Would you put the front page on for a

12 minute.

13      Q.   Now, they had hired Mr. Parise by that time; is that

14 correct?

15      A.   What's the date of the letter?

16      Q.   March 11th.

17      A.   I had -- I don't know if I received anything from

18 Mr. Parise at that point.

19      Q.   But you had already --

20      A.   But I was aware of that.

21      Q.   Because you had already reported to Lisa St. Onge --

22      A.   Yes.

23      THE COURT:  I have to ask a question.  Mr. Bennett,

24 is the actual cash value of $295,098.92 completely

25 independent of the repair estimate of $328,999.14?

1          THE WITNESS:  What do you mean by "completely
2     independent"?
3          THE COURT:  What I mean is that the actual cash
4     value is not, and was not, affected at all by the estimate as
5     to what it would actually cost to put the thing back in its
6     prefire condition; is that correct?
7          THE WITNESS:  It's based upon -- it's actually a
8     line item on the estimate, and then each particular line item
9     of an estimate, whether it be dry wall, paint, there's an
10    adjustment for the depreciation of that item.  So it's based
11    on line -- item by item of the replacement cost estimate.
12         THE COURT:  I appreciate that.  Let me ask you a
13    question, Mr. Murphey, maybe this will clear this up for me.
14    Is there a dispute in this case as to the reasonableness of
15    the actual cash value figure?
16         MR. MURPHEY:  No.  Only as it relates to the -- as I
17    understand it, that the actual cash value would be,
18    functionally, a percentage of the total loss.  So the total
19    loss should have been much higher; therefore, the actual cash
20    value would have been much higher.  But we don't have any --
21    and I think you understand this, Your Honor, we don't have
22    any dispute that they are entitled to pay only the actual
23    cash value at this time, and then they're supposed to pay the
24    remainder once the repairs are done and the insured can prove
25    that they spent that much money.

1          THE COURT:  But the point is, you don't have a
2    complaint with a piecemeal payment?
3          MR. MURPHEY:  No.  The complaint is with the overall
4    estimate at that time, and then the payment is based on that
5    overall estimate.
6          THE COURT:  We're going to take a few minutes, and
7    then we'll come back.
8          (Pause in the proceedings.)
9      Q.  Mr. Bennett, we were talking about the letter of
10   March 11, 2003 in which you included a provision of the
11   policy, which is called "Duties After a Loss," and in this
12   letter you told the Bordens that their policy had a provision
13   that said, "In case of a loss to covered property, we have no
14   duty to provide coverage under this policy if the failure to
15   comply with the following duties is prejudicial to us."  And
16   on Page 2, one of those following duties was to protect the
17   property from further damage, which would include making
18   reasonable and necessary repairs to protect the property; is
19   that correct?
20     A.  That's correct.
21     Q.  What was Brian Seifert doing?  What was Visions
22   doing at the scene?
23     A.  Visions did the board-up.
24     Q.  And they continued to be at the scene; is that
25   correct?

 1        A.    Yes.  We didn't have them do anything beyond that.

 2        Q.    Were the Bordens ever told that Brian Seifert wasn't

 3   doing anything more than the board-up?

 4        A.    I don't believe so.

 5        Q.    Thank you.  Now, later that week the Bordens

 6   returned the $295,000 check that you had sent to them; is

 7   that right?

 8        A.    They returned it, I remember.

 9        Q.    And then, later they did take it from you after you

10   had explained to them that it was not a release of their

11   claim and that further discussions could ensue; is that

12   right?

13        A.    I don't believe I would characterize it in that

14   manner.

15        Q.    Did they ultimately take the check?

16        A.    Yes.  It was sometime after that.

17        Q.    Was it after you explained to them that it was not a

18   release?

19        A.    It was also after --

20        Q.    I'm sorry, sir, I don't mean to interrupt you.  It's

21   a yes or no question.  Did they return the check after you

22   told them --

23        A.    Yes.

24        Q.    -- that it was not a release of your claim?

25        A.    Yes.

1           THE COURT:  Did they accept the check after or did
2      they return the check?
3           MR. MURPHEY:  They returned the check, and then
4      Amica explained to them that it wasn't a release and then
5      they accepted the check.
6           A.   It was sometime later, yes.
7           Q.   That's right.  But it was after you told them that
8      it was not a release?
9           A.   Correct.
10          Q.   In fact, you sent them a separate letter, dated
11     March 25, 2003, which I have marked Exhibit 3-19, this is
12     directed to the public adjuster who's involved, and in the
13     first paragraph you say, "I would like you to understand that
14     issuance of this check is not a release of the claim."  Is
15     that right?
16              (Plaintiff's Exhibit No. 3-19 marked for
17               identification.)
18          A.   That's correct.
19          Q.   Now, in a March 21st e-mail to Lisa St. Onge, you
20     reported to her --
21              THE COURT:  What's the exhibit?
22              MR. MURPHEY:  Exhibit 3-17, Your Honor.
23              (Plaintiff's Exhibit No. 3-17 marked for
24               identification.)
25          Q.   You reported to her that Mr. Schumann had said that

1    the Bordens had refused to accept dry cleaning which had been
2    delivered to their house; is that correct?
3        A.    That's correct.
4        Q.    And that the Bordens had expressed concern for their
5    child's allergies; is that correct?
6        A.    That's correct.
7        Q.    And that Visions does not have the facility to store
8    these items; is that correct?
9        A.    That's correct.
10       Q.    So Schumann had instructed the dry cleaners to store
11   the dry cleaning in the insureds' garage; is that correct?
12       A.    That's correct.
13       Q.    At this point in time did you have any concern at
14   all about Visions given the fact that you had just been told
15   that they did not have facilities to store the items that had
16   got cleaned?
17       A.    I had concerns about the lack of storage, yes.
18       Q.    Typically, when you work with fire restoration
19   contractors, they have warehouse and storage facilities that
20   can handle a significant loss like this; is that right?
21       A.    Yes.
22       Q.    In that same e-mail -- to be fair to you, this is
23   the e-mail that you sent to Lisa St. Onge in which you
24   describe your conversation with Brian Seifert, under Coverage
25   A, about Visions Corporation and their experience; is that

1    right?

2        A.    Yes.

3        Q.    This is when he told you that they'd been in

4    business since 2000, that he had grown up in the business and

5    worked for his father, et cetera; is that right?

6        A.    That's correct.

7        Q.    It indicates that they do work for State Farm and

8    Farmers Insurance, but you didn't follow up with State Farm

9    or Farmers, right?

10       A.    No.

11       Q.    And it said that they had done work up to $300,000

12   in the past.  You didn't get any more information about that,

13   did you?

14       A.    No.

15       Q.    You've never seen a house that they rebuilt or

16   repaired?

17       A.    No.

18       Q.    Now, on March 23, 2003, Mr. Parise sent you a letter

19   with a five-page report and a 55-page estimate.  Do you

20   remember receiving that?

21       A.    Yes.

22       Q.    When I said, "you," I see the letter was sent to

23   Mr. Schumann, but it was copied to you; is that correct?

24       A.    I received a copy, yes.

25       Q.    Now, did you read the report?

1        A.    Yes.

2        Q.    Did you read the estimate?

3        A.    I'm sure I did.

4        Q.    Did you compare the estimate to Mr. Schumann's?

5        A.    No, I -- I don't know for sure.

6        Q.    Did you identify the areas in which Mr. Parise felt

7    that Mr. Schumann's estimate was light?

8        A.    I think Mr. Parise highlighted that.

9        Q.    In his report?

10       A.    Yes.

11       Q.    That March 23rd report.  I take it that you -- from

12   your answers that you don't remember doing a side-by-side

13   comparison between the Parise estimate and the Schumann

14   estimate?

15       A.    I don't recall.

16       Q.    Did the receipt of Parise's report and estimate

17   cause Amica to make any additional payment at that time?

18       A.    No.

19       Q.    No additional payment, in fact, ever came in this

20   case until after Mr. Jones had done his estimate --

21       A.    That's correct.

22       Q.    -- in July; is that right?

23       A.    That's correct.

24       Q.    Now, in his report of March 23rd, which is Exhibit

25   3-18, on the third page of that exhibit, which is marked with

1    Bates stamp AM558, Mr. Parise reported to you that

2    Mr. Seifert was no longer comfortable with Mr. Schumann's

3    estimate; is that accurate?

4             (Plaintiff's Exhibit No. 3-18 marked for

5              identification.)

6    A.    That's what it says.

7    Q.    Did you follow up with Mr. Seifert to discuss the

8    areas in which he now apparently disagreed with

9    Mr. Schumann's estimate?

10    A.    The date of our meeting with Seifert, Mr. Parise,

11    and Mr. Schumann and I, I discussed that with Mr. Seifert.

12    Q.    That was on the April 15th meeting?

13    A.    Correct.

14    Q.    What did Mr. Seifert say?

15    A.    He characterized it differently than what Mr. Parise

16    had said.  He told us, once again, that he thought the work

17    could be done for Schumann's estimate.

18    Q.    You'll agree with me that Mr. Parise told you that

19    Mr. Seifert said that --

20             THE COURT:  Where does it say that?

21             MR. MURPHEY:  I'm sorry?

22             THE COURT:  Are you referring to the content of the

23    letter for that proposition?  I'm sorry, let me roll the tape

24    back.  Were you indicating that it says somewhere in here

25    that Mr. Seifert indicated he could no longer do the work for

1    that cost?  I'm confused.

2            MR. MURPHEY:  Yes.

3            THE COURT:  Where does it say that?

4            MR. MURPHEY:  What I actually asked the witness,

5    Your Honor, was whether this letter indicated that Seifert

6    was uncomfortable with Schumann's estimate.  That's the way I

7    phrased the question.  And Mr. Bennett said, yes.

8            THE COURT:  Where does it say that?

9        Q.   "I questioned Visions as to why neither they nor

10    Amica took the time to open the walls to verify smoke

11    penetration, it was explained he was not directed to do so.

12    When I questioned him on whether he could repair the home and

13    guarantee a smoke-free house, at this point he stated, not

14    for the estimate as it currently is."  And you took it -- I

15    know your testimony is regarding a later conversation with

16    Mr. Seifert, but at that time you took it that Mr. Parise, at

17    least, was reporting to you that Mr. Seifert was no longer

18    comfortable with Mr. Schumann's estimate?

19        A.   That's correct.

20        Q.   And you'll agree with me that a smoke-free house is

21    what Amica's responsible to pay for?

22        A.   That's the goal.

23        Q.   Now, you did not talk to Mr. Seifert about that when

24    you received it, but you did later talk to him on April 15th

25    when you met at the house?

1       A.   A few weeks later.

2            THE COURT:  Keep your voice up, please.

3       Q.   Now, on March 25th, you sent the letter that we

4  looked at a minute ago, which is marked as Exhibit 3-19.  And

5  we talked about the fact that you are now telling the Bordens

6  that the check is not a release of the claim.  You also

7  addressed another item in the last paragraph, did you not, in

8  which you say, "According to VIP Cleaners," which was the dry

9  cleaner in Erie, "these items have been cleaned according to

10 industry standards, and we disagree with the contention that

11 they were not cleaned satisfactorily."  Is that correct?

12      A.   Correct.

13      Q.   At that time had you seen any of the clothes?

14      A.   No.

15      Q.   Do you know if Mr. Schumann had?

16      A.   I don't believe so.

17      Q.   So the information that you had was from VIP

18 Cleaners?

19      A.   Correct.

20      Q.   And an employee of VIP cleaners later told you that

21 the clothes did smell of smoke; didn't he?

22      A.   Yes.

23      Q.   And later you ultimately saw the clothes and you

24 agreed that at least some of them smelled of smoke?

25      A.   That's correct.

1      Q.   And some of them continued to be stained; is that

2   correct?

3      A.   That's correct.

4      Q.   So ultimately you agreed to pay for the clothes?

5      A.   We paid for the dry cleaning, and ultimately we paid

6   for all the contents.

7      Q.   Now, in this letter, when you are telling Mr. Parise

8   that the items had been cleaned according to industry

9   standards and we disagree with the contention they were not

10  cleaned satisfactorily, you were telling the Bordens that

11  they needed to accept the clothes; is that right?

12     A.   I was telling them what the letter says, my

13  understanding of the dry cleaning.  I would expect, in a fire

14  loss, that some items would not clean and some items would.

15  They were saying that they wouldn't accept any of them.

16     Q.   But you didn't know -- I mean, you're talking about

17  clothes that had been delivered to the Bordens' house, and

18  you said that you talked to VIP Cleaners and they said they'd

19  been cleaned according to industry standards, and we disagree

20  that they weren't cleaned satisfactorily?

21     A.   That's correct.

22     Q.   Were you telling the Bordens they needed to accept

23  the clothes that had been delivered to the house?

24     A.   I was saying I was disagreeing with their total

25  rejection of the dry cleaning.

1        Q.    So you didn't say that you can reject some and
2    accept others?
3        A.    I didn't say that.
4        Q.    But that's what you meant?
5        A.    That's what I meant.
6        Q.    At this time, when you were telling the Bordens that
7    it was Amica's opinion that the clothes had been cleaned
8    satisfactorily, they were stored in the Bordens' garage in
9    the fire-damaged house; is that right?
10       A.    At some point they were, I don't know exactly when
11   that was.
12       Q.    Now, sometime later you received a letter from
13   Mr. Parise dated April 6, 2003, and this letter was sent
14   directly to you; is that correct?
15       A.    Yes.
16       Q.    And in this letter Mr. Parise told you, at the
17   bottom of Page 1 on Exhibit 3-23, "After our joint
18   inspection, Mr. Seifert explained he originally thought
19   Mr. Schumann's estimate was reasonable, but after our joint
20   inspection, he couldn't repair the home or guarantee a
21   smoke-free home with the estimate as it is.  I explained to
22   Mr. Seifert the scope of repairs that I was proposing, and he
23   agreed it was necessary to rid the home of the smoke."  Did I
24   read that correctly?
25            (Plaintiff's Exhibit No. 3-23 marked for

1              identification.)

2      A.    I believe so.

3      Q.    So, again, at this point, when you received the

4  April 6th letter from Mr. Parise, it was your understanding

5  that Mr. Seifert had now backed off of his support of

6  Mr. Schumann's estimate, and actually, at least if you

7  believe Mr. Parise, agreed that Mr. Parise's scope of the

8  work was necessary?

9      A.    That's what Mr. Parise was saying.

10     Q.    And again, you talked to Seifert maybe -- on April

11 15th, but you didn't talk to him upon receipt of that letter?

12     A.    I don't remember the date that you said the letter

13 was.

14     Q.    The letter was April 6th.

15     A.    It was dated April 6th?

16     Q.    It was dated, and I'm not sure when you received it.

17 But the bottom line is, you discussed this with Mr. Seifert

18 on April 15th --

19     A.    Correct.

20     Q.    -- and at no time prior?

21     A.    That's correct.

22     Q.    In that letter of April 6th, Mr. Parise suggested

23 that a meeting be held among the adjusters in the case; is

24 that right?

25     A.    That's correct.

1          Q.    And you agreed to participate in that meeting; is
2     that right?
3          A.    Yes.
4          Q.    And the meeting involved Mr. Parise, Mr. Schumann,
5     Mr. Seifert, and yourself; is that right?
6          A.    The letter suggested that Dr. Borden be present,
7     too, I believe, and he was not there.
8          Q.    He was not there.  Mr. Parise was there on his
9     behalf?
10         A.    Yes.
11         Q.    And this was your first visit to the scene of the
12    fire; is that right?
13         A.    Yes.  That's correct.
14         Q.    It was your first meeting with Mr. Parise; is that
15    correct?
16         A.    Yes.
17         Q.    And Mr. Parise was very nice?
18         A.    Very pleasant, professional.
19         Q.    Very professional.  And very knowledgeable; is that
20    right?
21         A.    Seemed so to me.
22         Q.    You'll agree that the morning of that meeting,
23    again, April 15th of 2003, was spent touring the house?
24         A.    Yes.
25         Q.    And then, later in the day you went and looked at

1    some contents and did other stuff?

2        A.    Yes.

3        Q.    But it was the morning that I wanted to focus on.

4    Do you recall that Mr. Parise kicked holes in the wall?

5        A.    There were holes in the wall.  I didn't see him kick

6    any holes.

7        Q.    Do you know whether Mr. Schumann had created the

8    holes in the wall?

9        A.    I don't believe he did.

10       Q.    Do you know if Mr. Schumann created any holes in the

11   walls anywhere in the house?

12       A.    Not to my knowledge.

13       Q.    Do you know what the purpose was of Mr. Parise

14   putting holes in the wall?

15       A.    He was looking for smoke.

16       Q.    Do you recall Mr. Schumann saying that the soot and

17   smoke smell inside the walls could be covered up with sealer

18   and paint?

19       A.    I'm sorry, can you restate that.

20       Q.    Yes.  Do you remember Mr. Schumann, at any time of

21   this meeting on April 15th, saying to Mr. Parise that

22   although there might be smoke or soot in the walls, that it

23   could be covered up by sealer and paint?

24       A.    I believe what he felt was --

25       Q.    I'm sorry, I don't mean to interrupt you.  What I'm

1    asking is, what do you remember Mr. Schumann saying at that

2    time?

3        A.   I don't remember exactly what he said.

4        Q.   Do you recall him saying anything -- I'm sorry,

5    strike that.  Do you personally recall observing any black

6    substance of any kind in the insulation or anywhere else

7    behind the walls?

8        A.   Yes.

9        Q.   Do you recall Mr. Schumann seeing black substance

10   behind certain walls?

11       A.   Yes.

12       Q.   Do you recall Mr. Schumann saying to Mr. Parise that

13   although that might be soot, how do we know that it was

14   caused by this fire?

15       A.   I'm not sure of him saying that.  He may have said

16   that.

17       Q.   Do you remember him saying that?

18       A.   I remember something about that, I don't remember

19   specifically.  I'm sorry.

20       Q.   Do you remember observing a smoke smell when Mr.

21   Parise was showing you the holes in the wall?

22       A.   I do remember I smelled the insulation, and I did

23   not smell any smoke.

24       Q.   Did you smell any smoke at all when you were on the

25   second floor of the house?

1       A.   I'm sure I did.

2       Q.   You're sure you did?

3       A.   Yes.

4       Q.   There was a smoke smell that pervaded the house; is

5    that right?

6       A.   Yes.

7       Q.   That would include the first floor and the second

8    floor?

9       A.   I believe so.

10      Q.   Do you recall Mr. Parise inviting Amica at -- during

11   that meeting, Mr. Parise suggesting that Amica bring in

12   another contractor to take a look at the loss?

13      A.   I don't remember that, I'm sorry.

14      Q.   Did the tour of the house that morning convince you

15   that Mr. Schumann's estimate was too low?

16      A.   It convinced me that he missed items, sure.

17      Q.   What do you remember that he missed?

18      A.   Tile flooring, and I think a countertop, there was

19   an issue with that.

20      Q.   You mean like he had misidentified a tile floor as

21   some less expensive product?

22      A.   Yes.

23      Q.   And he had misidentified a countertop as some less

24   expensive product?

25      A.   Yes.

1          Q.   Do you remember reaching any conclusion as to by how

2     much Mr. Schumann's estimate was too low?

3          A.   I don't remember, no.

4          Q.   Do you remember Mr. Schumann telling you that he

5     agreed that his estimate was probably at least $20,000 too

6     low?

7          A.   It's something I recall.  I don't know -- I had

8     heard the $20,000 figure, I'm not sure exactly when that was.

9          Q.   So you don't recall Mr. Schumann telling you that at

10    the scene?

11         A.   I don't remember, I'm sorry.

12         Q.   Mr. Bennett, you created a note for your file to

13    document what had occurred at the April 15th meeting, did you

14    not?

15         A.   Yes, I did.

16         Q.   I'm showing you a document which did not make it

17    into your exhibits, it's dated April 30, 2003, and it is a

18    memo to the file, which I believe you testified you created

19    in order to document what had happened at the April 15th

20    meeting.  Do you remember that?

21         A.   Yes.

22         Q.   So do you recognize this as a memo to file?

23         A.   Yes.

24              THE COURT:  Has this been identified?

25              MR. MURPHEY:  It is a memo dated April 30, 2003 --

```
 1            THE COURT:  Exhibit-wise?

 2            MR. MURPHEY:  It doesn't have an exhibit number.

 3            THE COURT:  Let's give it one now.

 4       Q.   I'll mark this as Exhibit 8.  It's a two-page

 5   document.  Just for purposes of the record, could you

 6   identify this two-page document that I've marked as Exhibit

 7   8.

 8            (Plaintiff's Exhibit No. 8 marked for

 9             identification.)

10       A.   It's a report to file dated April 30, 2003.

11       Q.   That you generated and would be part of your claim

12   file?

13       A.   Yes.

14       Q.   Thank you.  I'm going to read the last paragraph,

15   and you tell me if I'm reading it correctly, "After spending

16   a half a day with the public adjuster, it was apparent that

17   we were not going to be able to bridge the difference between

18   our general adjuster's estimate of $327,999.14 compared to

19   the public adjuster's estimate of $680,492.21.  I discussed

20   with our adjuster the issues brought forth by the public

21   adjuster on the areas he missed and not included in his

22   estimate.  Schumann felt these were small issues and fully

23   expects a supplement of $20,000."  Did I read that correctly?

24       A.   Yes, you did.

25       Q.   Did you tell the Bordens that Amica's offer was
```

1    going to increase by $20,000?

2        A.   At that time, no.

3        Q.   And you didn't tell Mr. Parise that the estimate was

4    going to be increased, right?

5        A.   No.

6        Q.   Instead, what you did was, over the noon hour that

7    day you contacted Amica's home office and you received

8    instructions to invoke the appraisal clause of the contract;

9    is that right?

10       A.   That's correct.  It was determined --

11       Q.   Well --

12       A.   Sorry.

13            THE COURT:  I need more than that.

14            MR. MURPHEY:  That's fine.

15            THE COURT:  Go ahead and explain.

16       A.   It was determined that the wide variance between

17   Mr. Parise's estimate and Mr. Schumann's estimate they didn't

18   feel they would be able to bridge the difference.  As far as

19   issuing the $20,000 payment, at that point Dr. Borden had

20   sent both those checks back, so I didn't really feel that

21   issuing a supplemental payment for $20,000, given the

22   monumental differences between the two estimates, was going

23   to make much difference.

24       Q.   Did you tell them, though, that your estimate would

25   increase by $20,000?

1          A.   I don't believe so.

2          Q.   That's a different question.  You didn't tell them

3     that?

4          A.   No.

5          Q.   When you called the home office and received

6     instructions to invoke the appraisal, did you discuss with

7     the people at the home office any other options such as

8     hiring another contractor to come in and take a look at the

9     loss or further negotiating with Mr. Parise?

10         A.   No.

11         Q.   Now, after the April 15th meeting, you received a

12    copy of an Insurance Department complaint, which was made by

13    the Bordens; is that correct?

14         A.   That's correct.

15              MR. GEER:  Objection.  Can I ask for an offer what

16    we're going to do with this because we will -- are we going

17    to talk about the complaint, are we going to talk about the

18    insurance company's response or the insurance commissioner's

19    response?  Because I don't see how it's germane to anything.

20              MR. MURPHEY:  My purpose for offering it is that it

21    has a specific discussion of what happened at the April 15th

22    meeting bringing to Amica's attention what the Bordens'

23    position was.  And, of course, our entire case is about the

24    fact that Amica was provided information that their estimate

25    was too low and they didn't do anything about it.  So the

1    Insurance Department complaint is just another piece of

2    information --

3            THE COURT:  This is a complaint prepared by the

4    Bordens and sent to the Insurance Department?

5            MR. MURPHEY:  And copied to Amica.

6            THE COURT:  Now, what's your objection again,

7    Mr. Geer?

8            MR. GEER:  I don't see that there's any dispute

9    here.  Mr. Murphey seems to be saying that this is germane

10   because it makes it clear that he understood what the dispute

11   was.  But unless there's something in there that's different

12   than what Mr. Bennett just said, I think he said it was

13   pretty clear he understood what the dispute was.

14           THE COURT:  Is it your position that Amica was

15   motivated, in part, by the Insurance Department complaint?

16           MR. MURPHEY:  They may have been.

17           THE COURT:  Put it this way:  It may have some

18   marginal relevance, but we're not going to spend an

19   inordinate amount of time litigating that aspect of it

20   because we don't have to.  So I'll overrule the objection.

21       Q.   I'm showing you a copy of the Insurance Department

22   complaint, which has been marked Exhibit 3-25.  Do you

23   recognize this?

24           (Plaintiff's Exhibit No. 3-25 marked for

25            identification.)

1     A.   Yes, I do.

2     Q.   I'm going to refer to Page 3 of the document.

3          THE COURT:  Is it possible to make that a little bit

4     bigger?

5          MR. MURPHEY:  How's that?

6          THE COURT:  That's better.

7          MR. MURPHEY:  Want it bigger?

8          THE COURT:  Can you see that okay, sir?

9          THE WITNESS:  Yes.

10    Q.   You will agree with me that the letter contains a

11    description of, the Bordens' version anyway, the April 15th

12    meeting; is that correct?

13    A.   That's correct.

14    Q.   In this letter, on the third line that I have

15    highlighted, it says, "Amica acknowledged that soot is in the

16    walls."  Did that happen at the meeting?

17    A.   There was a black substance about the width of a

18    magic marker on the -- on one section of the fiberglass

19    insulation that I saw.

20    Q.   What about Mr. Schumann?

21    A.   He saw the same thing.

22    Q.   Do you know whether Mr. Schumann saw any other

23    evidence of soot?

24    A.   I'm not aware of that.

25    Q.   You don't know one way or another?

1        A.    I'm not sure.

2        Q.    Is it accurate, though, when the Bordens say, "Amica

3    acknowledged that soot is in the walls."?  Is that accurate?

4        A.    It's accurate to the extent that there was -- that

5    we saw some black mark on the insulation.  What that was, I

6    don't know.  We're assuming it was soot.

7        Q.    I'm just trying to determine whether the Bordens

8    were telling the truth when they said that Amica acknowledged

9    that soot is in the walls.

10       A.    We didn't know for sure what it was, but it seems

11   reasonable to assume that.

12       Q.    Because of the fire that happened two months before?

13       A.    Yes.  Yes.

14       Q.    The next sentence says, "First they stated that the

15   soot was not a problem because the house would not smell."

16   Did Amica -- and when I say "Amica," of course, I'm meaning

17   either you or Mr. Schumann.  Did either of you say that the

18   soot was not a problem because the house would not smell?

19       A.    I don't remember that specific statement, but it was

20   Schumann's contention that the method of repair that he was

21   proposing would take care of that problem.

22       Q.    Again, see the sentence that I have my finger on, it

23   says, "Amica has stated that we should just leave it there."

24   Did you or Mr. Schumann tell them that your contention was

25   that you should just leave the soot in the walls?

1        A.   It was Schumann's contention that the house in that

2   section did not need to be gutted.  So the insulation would

3   be left there.

4        Q.   So it's accurate for the Bordens to have said that

5   was Amica's position that it should just be left there?

6        A.   Yes.

7        Q.   The Bordens also said, "The Amica representative at

8   one point said, how do we know the soot wasn't there prior to

9   the fire."  And you recall that being said, but you're not

10  sure who said it?  Is that what you told me?

11       A.   I'm sure it was said.  I don't know -- I can't

12  remember specifically three years later.

13       Q.   But you're sure it was said?

14       A.   I'm sure it was.

15       Q.   The next sentence says, "Our consultant pointed out

16  smoke under tubs and within electrical outlets, but the Amica

17  representatives stated we should not be concerned with soot

18  in those places."  Do you remember you or Mr. Schumann

19  stating that?

20       A.   I don't remember that, no.

21       Q.   As we sit here, do you know that it wasn't said or

22  you just don't remember?

23       A.   I don't remember it being said.  I mean, I saw soot

24  underneath the hot tub.  It was there.

25       Q.   There was a lot of it, right?

```
 1        A.   Yes, there was.

 2        Q.   Now, after the April 15th meeting you wrote to the

 3   Bordens and you invoked the appraisal clause; is that

 4   correct?

 5        A.   Yes.

 6        Q.   You said that you had never done that before in your

 7   career.

 8        A.   Never.

 9        Q.   Did you give the Bordens a chance to demand

10   appraisal first?

11        A.   They had every chance at any point in time to do it,

12   sure.

13        Q.   Did you tell them, we're thinking about appraisal,

14   do you want to invoke the appraisal clause?

15        A.   No.

16        Q.   And you appointed a gentleman named Jack Owens to

17   serve as Amica's appraiser?

18        A.   That's correct.

19        Q.   At the same time you also hired Mr. Owens to serve

20   as Amica's adjuster on the contents portion of the claim?

21        A.   That's what was said, yes.

22        Q.   And you disagreed with that, didn't you?

23        A.   I do.

24        Q.   You thought that was a bad idea?

25        A.   Yes.
```

1          Q.   So that put Mr. Owens, essentially, on Amica's

2     payroll both as an appraiser on the property part and as an

3     adjuster on the property part?

4          A.   He never did any adjustment of the contents part.

5          Q.   I understand that, but that's what you did, though.

6     You hired him to do it, I know he didn't ultimately do it

7     because you changed your mind.  But when Mr. Owens was

8     appointed to serve as your appraiser, you also hired him to

9     adjust the contents?

10         A.   I don't know exactly when it was, but, yes, that was

11    done.

12              THE COURT:  When you say "you," who do you mean?

13              MR. MURPHEY:  I'm referring to Amica.

14              THE COURT:  Mr. Bennett, were you the person who

15    hired Mr. Owens to serve as your adjuster?

16              THE WITNESS:  We hired him to serve as our --

17              THE COURT:  Appraiser, rather.

18              THE WITNESS:  -- appraiser, and at some point I was

19    instructed to ask him to resolve the contents issue.

20              THE COURT:  So you passed that request on to him as

21    well?

22              THE WITNESS:  Yes, I did.

23              THE COURT:  Go ahead.

24         Q.   And you, by your demeanor and by the testimony you

25    had given before, disagreed with that?  You thought they

1    should have been separate?

2       A.   That's correct.

3       Q.   That somebody else should have been hired or just

4    maybe your office handle the contents while Mr. Owens was

5    exclusively the appraiser?

6       A.   That's what happened.  I handled it.

7       Q.   That's what happened ultimately, right?

8       A.   Yes.

9       Q.   Anyway, you were saying you weren't sure of the time

10   frames.  I'm showing you a letter dated May 6, 2003, which is

11   Exhibit 3-28, and this is a letter from you to Mr. Owens; is

12   it not?

13          (Plaintiff's Exhibit No. 3-28 marked for

14           identification.)

15      A.   Yes, it is.

16      Q.   Mr. Owens was your appraiser, correct?

17      A.   That's correct.

18      Q.   The first sentence in the letter says, "This will

19   confirm our request for you to act as our appraiser in the

20   above-captioned fire loss," correct?

21      A.   Correct.

22      Q.   And the last sentence -- or the next to last

23   sentence of the letter says, "I would like your services to

24   include adjustment of the contents claim with Giordano &

25   Associates."  Is that right?

1          A.    That's what the letter says, yes.

2          Q.    I know that you made it very clear that you didn't

3    think it was a good idea.  Why didn't you think it was a good

4    idea?

5          A.    He loses his impartiality.  I think the original --

6          Q.    That was my question, what you were concerned about.

7    Thank you.

8                Now, you wrote to the Bordens and asked them to

9    appoint their appraiser, and you wrote to them a couple of

10    times, and then you received a letter from Attorney Terry

11    Jones, who indicated that he was going to represent the

12    Bordens with respect to further handling this claim; is that

13    right?

14          A.    That's correct.

15          Q.    And at that time Mr. Jones also appointed Mr. Parise

16    to serve as the Bordens' appraiser, correct?

17          A.    That's correct.

18          Q.    And Amica objected to that because Mr. Parise was,

19    in Amica's words, not impartial because of his existing

20    relationship with the Bordens on the claim?

21          A.    That's correct.

22          Q.    But at that time Amica did not tell the Bordens that

23    Mr. Owens had been retained by Amica to adjust the contents

24    part of the claim?

25          A.    That's correct.

1          Q.    So you didn't tell them that you had the

2     impartiality -- same impartiality concerns with Mr. Owens

3     that you did with Mr. Parise?

4          A.    No.

5          Q.    No, you didn't tell them that?

6          A.    No, I did not tell them.

7          Q.    Now, after Mr. Jones sent you a letter indicating

8     that he was going to represent the Bordens, Amica retained

9     Mr. Geer; is that correct?

10         A.    My memory is we retained him before that.

11         Q.    The first letter that appears in the file from

12    Mr. Geer is dated May 28, 2003.  It's Exhibit 3-34.  Do you

13    recognize this?

14              (Plaintiff's Exhibit No. 3-34 marked for

15               identification.)

16         A.    Yes.

17         Q.    And this indicates, "Amica has retained our firm to

18    represent Amica in this matter."  Is that correct?

19         A.    That's correct.

20              THE COURT:  I'm sorry, I missed that.  Who was that

21    from or to?

22              MR. MURPHEY:  It's from Mr. Geer to Terry Jones.

23    Terry Jones is representing the Bordens, and Mr. Geer is

24    representing Amica now.

25              THE COURT:  What's the date of the letter?

1          MR. MURPHEY:  May 28, 2003.  It's Exhibit 3-34.

2      Q.   I'm referring to Page 2 of the letter -- and I note

3   on Page 3, Mr. Bennett, that you were copied with this

4   letter; is that correct?

5      A.   That's correct.

6      Q.   I note on the second page of this letter, the

7   highlighted paragraph, Mr. Geer is explaining the concerns

8   that Amica has with respect to Mr. Parise serving as the

9   Bordens' appraiser; is that right?

10     A.   That's correct.

11     Q.   And then, the paragraph below -- the first

12  highlighted paragraph states, "The appraiser appointed by

13  Amica, Jack Owens, has never previously worked for Amica and

14  has done no previous work on this file.  I believe his

15  qualifications as a claims adjuster are beyond question or

16  dispute."  Did I read that correctly?

17     A.   Yes.

18     Q.   Did you tell Mr. Geer -- strike that.  At any point

19  did you tell the Bordens that Mr. Owens was also adjusting

20  the claim in addition to serving as the appraiser?

21     A.   No.  But he did not actually adjust the claim.

22     Q.   I understand that.  But you did not tell them that

23  he had been hired to do that?

24     A.   No.

25     Q.   The letter of -- the letter of May 28, 2003, which

1    is marked as Exhibit 3-34, that we were just referring to,

2    also addressed the appraisal issue, and Mr. Geer states, in

3    the second highlighted paragraph, "I discussed this with my

4    client, and was advised that one of the reasons that we

5    proceeded with the appraisal in the building was due to the

6    fact that the appraisal was suggested by the representative

7    of the Pennsylvania Insurance Commissioner's office who

8    called in follow up to your client's Complaint."  Is that

9    right?

10        A.    That's what it says.

11        Q.    Did you at any time tell the Bordens that the

12   decision to invoke the appraisal clause had been made on

13   April 15, 2003, two days before the Bordens even sent their

14   complaint to the insurance commission?

15        A.    I believe Paul's letter is not accurate is what

16   you're saying.  It's not.  The insurance commission office

17   contacted me afterwards and merely said to me that they

18   intended to advise Dr. Borden to invoke the appraisal clause.

19   And I told the insurance commissioner's office that we had

20   already done that.

21        Q.    So the letter is inaccurate to the extent it

22   suggests that it was the insurance commissioner's idea to

23   send this case to appraisal because that had occurred after

24   you decided to invoke the process?

25        A.    I believe it's inaccurate, yes.

1           THE COURT:  Mr. Murphey, contrary to my original

2     estimate, I'm not going to break at 12:30 today.  It's

3     necessary for me to break at my regular time, which is now.

4     How much longer do you figure you have with Mr. Bennett on

5     cross?  Just roughly.

6           MR. MURPHEY:  Half an hour.

7           THE COURT:  All right.  We'll start again at 1:15.

8           (Pause in the proceedings.)

9           THE COURT:  Mr. Murphey, please resume.

10     Q.   Mr. Bennett, when we left off, we were talking about

11     some letters which had been exchanged between counsel for

12     Amica, for you, and counsel for the Bordens.  I'm going to

13     show you two of those letters, which are from the lawyer for

14     Amica -- I'm sorry, the lawyer for the Bordens, Attorney

15     Terry Jones, and sent to Mr. Geer.  Do you recognize this

16     letter, which is marked as Exhibit 3-35?

17           (Plaintiff's Exhibit No. 3-35 marked for

18            identification.)

19     A.   Yes.

20     Q.   Do you recognize this letter, which is marked as

21     Exhibit 3-36?

22           (Plaintiff's Exhibit 3-36 marked for

23            identification.)

24     A.   Yes.

25     Q.   So you would have reviewed those letters when they

117

1    came in?

2        A.   Yes.

3        Q.   Did either of those letters cause Amica to change

4    its position in any way in this case?

5        A.   In all honesty, I don't recall what the content of

6    the letters were.

7        Q.   Okay.  Do you want to look at them.

8        A.   Okay.

9        Q.   Mr. Jones was discussing the extent of Amica's

10   liability with respect to the loss, and the letters speak for

11   themselves, so I don't want to go through them in any detail.

12   I just want to find out -- well, actually, I wanted to

13   confirm for myself that neither of these letters caused Amica

14   to change its position in any way in this case.

15            MR. GEER:  Objection.  Could you clarify what you --

16   regarding what?

17            MR. MURPHEY:  Regarding the reliance on the Schumann

18   estimate.  I'm sorry.  Thank you.

19       Q.   Regarding relying on the Schumann estimate.

20       A.   Is there more to the letter?  I'm sorry, go back to

21   that second page.

22            THE COURT:  Do you understand the question,

23   Mr. Bennett?

24            THE WITNESS:  Yes.  I believe so.  What's the third

25   page?  Realize I'm skimming the letter here.

1          Q.    I understand, but you said you're familiar with it.

2          A.    I'm familiar in the sense that I had it in my file.

3    Okay.  What's the other letter?

4          Q.    The first question, then, would be, since we're

5    going piecemeal, is whether this June 5th letter from

6    Attorney Jones, the various things he said about Amica's

7    obligations, whether that changed Amica's position at all

8    with respect to its reliance on the Schumann estimate?

9          A.    I can't comment on the specific letter and what my

10   thoughts were at that specific time, but about that time we

11   had another contractor -- we engaged a second contractor.

12         Q.    Let's take a look at -- well, why was it that you

13   engaged a second contractor?

14         A.    I believe your partner pointed out the issues with

15   Visions that I was not aware of.

16         Q.    What issues?

17         A.    That he wasn't -- that they weren't qualified.

18         Q.    How was that brought to your attention?

19         A.    A letter from your partner.

20         Q.    I'm going to show you a letter that's marked Exhibit

21   3-36.  I'll show you the second page of it.  It's dated June

22   16, 2003.  This is a letter from my partner.  And I've

23   highlighted a section, it says, "Also, at your next

24   convenience, I'd like to know more about the process which

25   Amica utilized to select Visions to do the temporary repairs.

119

1    In other words, what did Amica do to assure itself that

2    Visions was a capable, qualified, and well-regarded building

3    contractor experienced in the construction of 'high-end'

4    residential dwellings?"  Did I read that correctly?

5        A.   Yes.

6        Q.   Is this what you are referring to?

7        A.   No, I don't believe so.  I believe there was another

8    letter where he more specifically questioned their

9    experience.

10       Q.   Let me ask you this, before we get to that:

11    Mr. Jones posed some questions in this about what Amica had

12    done to assure itself that Visions was a capable, qualified,

13    and well-regarded building contractor capable of adjusting a

14    high-end residential home.  Did you ever respond to that in

15    any way?

16       A.   I don't recall what -- how Mr. Geer responded to

17    that.

18       Q.   Did you ever respond?

19       A.   I had an attorney representing me at that point.

20       Q.   So you weren't doing anything with respect to

21    responding to letters from counsel?

22       A.   This letter, I believe, was addressed to Mr. Geer.

23       Q.   I think it was, yes.  My question to you was whether

24    you did anything.

25       A.   I did not respond to that letter.  I don't believe

1    so.

2         Q.   Do you know if Mr. Geer did?

3         A.   I can't recall, honestly.

4         Q.   Do you know whether anybody from Amica provided

5    Mr. Geer any information to respond to this letter and to

6    explain to the Bordens, through their attorney, what Amica

7    had done in investigating the qualifications of Visions?

8         A.   I can't recall.  I know that Mr. Geer has a copy of

9    our file.  I can't recall when my memo was that you had

10   referenced earlier that referred to my call to Visions, that

11   was the extent of it, as I pointed out.

12        Q.   And that's the only thing you did?

13        A.   I pointed that out previously.

14        Q.   You have.  Do you know if anybody else from Amica,

15   or Mr. Geer on Amica's behalf, either doing further

16   investigation or responding to Mr. Jones' request --

17        A.   I know Mr. Geer looked into some things.

18        Q.   Do you know whether he shared any of that with the

19   Bordens or Attorney Jones on behalf of the Bordens?

20        A.   I honestly can't recall.

21        Q.   So you said that you thought that there was another

22   letter whereby somebody more specifically challenged Visions

23   as opposed to simply asking questions about them?

24        A.   My understanding was that Terry Jones was conveying

25   to Mr. Geer, and I thought it was through a letter, about the

1    qualifications of Visions, and --

2        Q.   Do you have that letter or --

3        A.   I'm not sure.  I'm not sure.  I'm just telling you

4    what my memory is, and that was my memory, and that's what

5    prompted us to hire a second contractor.

6        Q.   Because I haven't seen that, but I don't -- you

7    can't point it out to me?

8        A.   I don't have the file in front of me, I'm sorry.

9        Q.   There was a letter that actually specifically

10   challenged Visions' competence?

11       A.   It's just my memory.

12       Q.   So did Amica at any point in time decide for

13   itself -- well, I'll strike that.  Did you at any time decide

14   for yourself that Visions was competent and qualified to

15   render the type of estimate that Mr. Schumann had?

16       A.   I think the qualifications are lacking, yes.

17       Q.   And when did you reach that conclusion?

18       A.   About the time of that -- I think it was in June.

19       Q.   What was it that brought to your attention that

20   their qualifications were lacking?

21       A.   I believe I just said that.

22            THE COURT:  Sir, you're not getting it done for me.

23   You've got to keep your voice up.  You're whispering.  I know

24   it's easy to forget.  And you're starting to talk over each

25   other.  Start that again.

1          Q.   You just said that you reached a conclusion at some

2     point in time that Visions' qualifications were lacking, was

3     the word you used --

4          A.   My understanding was --

5          Q.   No.  That was my question -- that's what you said,

6     right?

7          A.   Say that again, I'm sorry.

8          Q.   Sure.  I just want to make sure I got your answer

9     right.  I believe what you just said, in response to a

10    previous question, was that at some point in time you did

11    reach the conclusion that Visions' qualifications were

12    lacking.

13         A.   Correct.

14         Q.   What caused you to reach that conclusion?

15         A.   The information that was supplied to me by Terry

16    Jones -- that I had heard that came from Terry Jones

17    questioning their qualifications.

18         Q.   There's two different aspects to that.  Somebody can

19    question somebody's qualifications and say, hey, are they

20    qualified, or somebody can bring you information and say, for

21    these reasons this person is not qualified.  Now, we just

22    read a letter from Mr. Jones, and you'll agree with me that

23    that letter was asking you about their qualifications not

24    telling you anything; is that right?  The letter we just

25    read.

1        A.   I didn't read the whole letter.  I skimmed it, I'm

2    sorry.  But my understanding was --

3        Q.   Hang on one second.  Wait till I ask a question.

4             THE COURT:  You're putting up the June 5th letter?

5             MR. MURPHEY:  I am.

6        Q.   Putting back up the June 5th letter, Mr. Bennett,

7    and it says, "Also, at your next convenience, I'd like to

8    know more about the process which Amica utilized to select

9    Visions to do the temporary repairs.  In other words, what

10   did Amica do to ensure itself that Visions was a capable,

11   qualified, and well-regarded building contractor experienced

12   in the construction of 'high-end' residential dwellings?"

13   You'll agree with me that that is a question or those are a

14   series of questions?

15       A.   Yes.

16       Q.   It does not provide you any information regarding

17   Visions' qualifications, correct?

18       A.   Correct.

19       Q.   Now, you also just said that you reached a

20   conclusion at some point that Visions was not -- that their

21   qualifications were lacking, to use your words, correct?

22       A.   Correct.

23       Q.   What information did you have to cause you to reach

24   that conclusion?

25       A.   All I can tell you is my memory, it came from

1   Mr. Jones.

2       Q.   And you're not sure what format or form it came in?

3       A.   I thought it was a letter, I could be wrong, but it

4   could have been a conversation that he had with Mr. Geer, I'm

5   not sure.

6       Q.   What was the information specifically?

7       A.   Some of the stuff that you had alleged earlier.

8   That he doesn't have restoration written on the side of his

9   building, or something to that effect, and that he

10  specializes in dry wall or something like that.  And it was

11  calling into question the qualifications, and so, as a result

12  of that, as I said, we then hired a second contractor to go

13  out there and look at the loss.

14      THE COURT:  Excuse me a second.  I just want to make

15  sure I didn't misunderstand you or mishear you.  Did you say

16  some of the "stuff" that Mr. Jones had told you earlier?

17      THE WITNESS:  No.  I'm sorry, I didn't mean Jones.

18  I mean Mr. Murphey.  That he was talking about earlier.

19      THE COURT:  Oh, here.  Not Mr. Jones had told you.

20      THE WITNESS:  I'm sorry.

21      THE COURT:  Go ahead.

22      Q.   At some point in time, though, you did reach an

23  independent conclusion that Visions' qualifications were

24  lacking and you needed to get a contractor --

25      A.   Correct.

1      Q.   -- you needed to get a contractor who would be more

2   appropriate and more qualified to express an opinion on the

3   loss in this case?

4      A.   Yes.  Up to this point in time I had a general

5   adjuster telling me one thing, I had a contractor telling me

6   he agreed with our general adjuster's opinion, and the only

7   other thing I had was the PA adjuster.  I didn't have

8   anything other than that.  So like I said before, it was two

9   to one.

10     Q.   Two to one, and one of those is Brian Seifert?

11     A.   That's correct.

12     Q.   Brian Seifert never did an estimate, though,

13  correct?

14     A.   That's correct.

15     Q.   The only information you had from Brian Seifert was

16  a one-page letter from him; is that correct?

17     A.   He wrote me a letter saying that he could do the

18  work based upon Schumann's estimate

19     Q.   I have marked, as Exhibit 9, the letter I think

20  you're referring to.

21          (Plaintiff's Exhibit No. 9 marked for

22           identification.)

23     A.   That's correct.

24     Q.   Is this it?

25     A.   Yes.

1        Q.    Again, I have marked that as Exhibit 9, it's a

2    letter from Mr. Seifert dated March 7, 2003; is that correct?

3    And you never got any other information from Mr. Seifert?

4    You didn't get an estimate, or any other letter, and you

5    never talked to Mr. Seifert yourself, correct?

6        A.    No.  I did.

7        Q.    Before April 15th, though?

8        A.    I couldn't be sure about that.

9        Q.    Because you did testify before that you talked to

10    him on April 15th.

11        A.    Yes.

12        Q.    But before that time you don't know whether you

13    spoke with him or not?

14        A.    I don't recall.

15        Q.    But anyway, this was the only letter that you got,

16    and the first paragraph of the letter says, "We at Visions

17    Corp. feel the project can be done at your estimated cost.

18    As all fire claims, there are always hidden costs on areas

19    that couldn't be seen or areas that had no access."  Is that

20    right?

21        A.    Correct.

22        Q.    Did you ever talk to Mr. Seifert about what he meant

23    by that?  Like what hidden costs there might be?  How

24    extensive they might be?

25        A.    I can tell you --

1    Q.   I'm sorry, sir, the only question I asked is whether

2  you ever talked to Mr. Seifert about his reference to hidden

3  costs?

4    A.   No.

5    Q.   You demanded appraisal in this case because you

6  believed that the gap between the Parise estimate on behalf

7  of the Bordens and the Schumann estimate on behalf of Amica

8  was too large to be bridged by anything other than an

9  appraisal procedure, correct?

10    A.   That's true.

11    Q.   And then you later changed course and decided not to

12  go through with the appraisal, and instead, got another

13  contractor to look at the loss; is that correct?

14    A.   My memory is, in all honesty, your partner asked me

15  to slow the appraisal process down, I think that's in the

16  letter.  But basically we continued to listen to -- you know,

17  listen and -- what was happening and we reacted to that, and

18  when the --

19    Q.   The gap didn't get any closer after counsel got

20  involved for the Bordens?  There was still the same gap,

21  right?

22    A.   No.  There was no change there, but what I'm talking

23  about is that you then began to question the qualifications

24  of Seifert.  But when we demanded appraisal, I had a general

25  adjuster telling me that the repairs could be done for this

1    price, and I had a contractor, I believed to be a valid

2    contractor, that was telling me that they could do the work

3    based on the general adjuster's estimate.

4        Q.    Before we get off that subject, and I don't mean to

5    belabor the subject, but you just said that there was a

6    contractor that you believed to be competent or whatever.

7    Ultimately you decided independently that Visions was not

8    competent to render the estimate, and, therefore, you needed

9    to get somebody else, right?

10       A.    Yes.

11       Q.    Because otherwise you would have written back and

12   said, I'm sorry, Visions said they could do the work at this

13   amount, they're a competent contractor, and we're going to

14   have to go to appraisal, right?

15       A.    What I'm saying is, based on that information, we

16   then decided to have a second contractor.

17       Q.    How did you choose Dan Jones?

18       A.    I discussed that with Mr. Geer.

19       Q.    And he did an estimate in this case which, in your

20   mind, corresponded more with Mr. Parise's than it did with

21   Mr. Schumann's; is that right?

22       A.    Pretty close in the middle.

23       Q.    So it didn't correspond more with Mr. Parise's than

24   it did with Mr. Schumann's?

25       A.    Well, it included the -- dollar-wise it was in the

 1    middle.

 2        Q.   I believe you had testified that you felt that it

 3    corresponded more with Mr. Parise's than it did with

 4    Mr. Schumann's?

 5        A.   Well, the big issue was the gutting of the interior,

 6    and Mr. Jones agreed to that.

 7        Q.   So in that sense, that's what you meant when you

 8    said that Mr. Jones' -- when I say you said, you said in your

 9    deposition, that Mr. Jones' estimate corresponded more with

10    Mr. Parise's, you meant in the scope of the work?

11        A.   Yes.

12        Q.   Their prices were different?  Because Mr. Jones'

13    estimate was lower than Mr. Parise's.

14        A.   Yes.

15        Q.   And you made a payment based on the Jones estimate,

16    and then later were able to get the claim resolved with the

17    Bordens for slightly more than that; is that correct?

18        A.   Well, with most estimates, there was a supplement,

19    and there was a supplement with the GS Jones estimate.  And

20    then that supplement concluded the claim.

21        Q.   I'm showing you a 19-page document I have marked as

22    Exhibit 4.  Do you recognize this document?

23             (Plaintiff's Exhibit No. 4 marked for

24              identification.)

25        A.   Yes.

1      Q.    What is that?

2      A.    It's some of our intranet handling guidelines.

3      Q.    So those are claim handling guidelines that Amica

4  has?

5      A.    Yes.

6      Q.    And these are dated August of 1999?

7      A.    That is, yes.

8      Q.    You will agree with me that these guidelines apply

9  to a claim of the type of the Bordens in this case, correct?

10     A.    Those are our goals.

11     Q.    But these goals, whatever you call them, they apply

12  to this type of claim --

13     A.    Sure.

14     Q.    -- correct?  Because this is a -- these are

15  entitled, "First Party Property Loss Handling Expectations,"

16  and this was a first party property loss, correct?

17     A.    Correct.

18     Q.    Now, I have a couple of questions about the

19  guidelines.  First, on Page 1, you will agree with me, will

20  you not, that the second paragraph on Page 1 indicates that,

21  "It is to expected that our insureds may have an emotional

22  reaction to a devastating fire."  Is that correct?

23     A.    That's correct.

24     Q.    And this paragraph also suggests, "You may not be

25  able to get the focussed attention of your insureds for some

1    period of time after the fire."  Is that correct?

2        A.   That's correct.

3            THE COURT:  Let me just jump in here one second.

4    Not by way of slowing you down, but by way of making sure

5    what the real issue is -- in fairness, let me ask you,

6    Mr. Geer, just because it's a legal question I don't want to

7    ask the witness.  It is no part of Amica's defense in this

8    case, is it, that any delay in paying or in reaching an

9    amicable resolution as to the dwelling portion of the loss

10   was related to or involved lack of cooperation from the

11   insureds or insureds that were so bereaved that they weren't

12   meaningfully able to help?

13           MR. GEER:  I believe that's correct, Your Honor.

14           THE COURT:  Then I'm not sure why this is relevant.

15           MR. MURPHEY:  That's fine.  Just by way of

16   response --

17           THE COURT:  I can almost take judicial notice of the

18   fact that if somebody's house burns down, it's likely they're

19   going to be somewhat bereaved.

20           MR. MURPHEY:  There are references in the claim file

21   materials, which are part of the evidence in this case, with

22   respect to the cooperation, or lack thereof, of the insureds.

23           THE COURT:  That's now been taken off the table as a

24   defense.

25           MR. MURPHEY:  Thank you, Your Honor.

1      Q.    I'm now referring to Page 3 of the guidelines.   The

2    first paragraph says, "The adjuster assigned to the file

3    should meet with the insureds within two hours."  Is that

4    correct?

5      A.    That's what it says.

6      Q.    That, of course, didn't happen in this case; is that

7    right?

8      A.    Those guidelines are written with many geographical

9    areas, and frankly, the location of our home office is Rhode

10   Island.  You don't get any smaller than Rhode Island.  And in

11   all honestly, on that particular day, as I was trying to

12   point out before, there was a major snowstorm.  On a Monday,

13   the town that we work in was declared a disaster area.  So I

14   don't think it was physically possible to get an adjuster out

15   there in that particular situation.

16     Q.    To be fair to you, Canonsburg is more than two hours

17   from Erie on the best day?  Unless you're Mr. Geer who drives

18   fast.

19     A.    On Monday, when I tried to contact the cause and

20   origin guy, their office was closed because of the storm.

21     Q.    I understand.  But this is the guideline that Amica

22   has created with respect to first party --

23     A.    I believe it's the goal.

24     Q.    Let me ask you just very, very briefly about the

25   snowstorm.  I think you were trying to say before, and I

1    apologize if I was rude with cutting you off, with regard to

2    some challenges Mr. Schumann may have had due to the weather.

3    I think you were going to suggest that it made it difficult

4    for him to inspect the loss.

5        A.    I think it's clear that it was a very difficult

6    environment at that time.  But in all honestly, that's what

7    he gets paid to do.

8        Q.    It's not Amica's position, is it, that

9    Mr. Schumann's estimate was too low because there was damage

10   he was unable to see because of the bad weather, is it?

11       A.    You'd have to ask Mr. Schumann about that issue.

12   But from my understanding of the situation, it was really

13   that -- the big issue was whether the house had to be gutted

14   or not.  That was the -- that's the whole controversy here.

15       Q.    That could be observed whether there was a snow

16   storm or not?

17       A.    I believe so.

18       Q.    In fact, Amica representatives, you and Mr. Schumann

19   were in the house April 15th -- I know the weather is bad in

20   Erie, but I presume that there wasn't a state of emergency on

21   April 15th?

22       A.    I don't believe there was.

23       Q.    Even after that Mr. Schumann still felt that his

24   estimate was accurate, correct?

25       A.    He did.

1      Q.   So the weather didn't really have anything to do

2    with anything, other than, perhaps, response time?

3      A.   I'm sure it was cold for him, though.

4      Q.   I understand.  The next page, and again, this is

5    covering a bunch of different aspects of a first party claim,

6    the highlighted sentence says, "Coordinate pack-out between

7    insured and reputable cleaner."  My only question is, you

8    didn't know the reputations of any of the cleaners in Erie;

9    is that correct?

10      A.   That's correct.

11      Q.   Because of where you're located, correct?

12      A.   Correct.

13      Q.   And neither did Mr. Schumann because he was not an

14    Erie adjuster either; correct?

15      A.   What I'm saying is I believe that's the goal.  I

16    mean, we certainly don't want to contract with a disreputable

17    cleaner.

18      Q.   I understand.  There's a section with respect to

19    dealing with repair contractors.  This is Page 7 of the

20    guidelines.  Do you see that?

21      A.   Yes.

22      Q.   Now, at the bottom of the letter, the highlighted

23    portion says, "Our contractor becomes a construction

24    consultant, and should be paid for time working the numbers."

25    And I guess I don't understand, in this case, who is your

1    contractor?  Would that have been Mr. Seifert?  Because

2    Mr. Schumann's not a contractor, right?

3        A.    I believe it would reference Mr. Seifert.

4        Q.    So this contemplates a situation where you would

5    have a contractor who was assisting Amica in developing the

6    estimate, correct?

7        A.    That's correct.

8        Q.    Now, the next sentence says, "If an impasse

9    develops, explain appraisal to the insured and document by

10    letter offering the insured the choice to initiate."  And

11    then the next highlighted sentence says, "We will file for

12    appraisal if there's no resolution and the insured declines

13    to request appraisal."  In this case, though, the Bordens

14    were never asked to initiate appraisal, were they?

15        A.    No, they weren't.

16        THE COURT:  Just out of curiosity, if you know,

17    Mr. Bennett, why would it be a goal to give the insured the

18    first crack at initiating appraisal if under the policy

19    either side can initiate appraisal and you end up in the same

20    spot anyway?  What is the advantage to that?

21        THE WITNESS:  I'm sure that the intent of these --

22    all these guidelines is to give options to the insured, and

23    to listen to their input and respond like that.

24        Q.    But you have never been involved in an appraisal in

25    your career, correct?

1          A.    No, sir.

2          Q.    Next, Page 12 of the guidelines, Section I relating

3     to payments, the highlighted paragraph says, "As outlined in

4     PLD basics memo," which is, I take it, another thing on your

5     intranet that helps you know what the company's position is

6     on things, "pay what we know we owe.  If estimator and

7     insured contractor have not reached AP" -- does that mean

8     agreed price?

9          A.    Yes.

10         Q.    "Pay our estimator's ACV figure with letter clearly

11    indicating we remain open for discussion, further review to

12    reach agreement," correct?

13         A.    That's what it says.

14         Q.    So, at least pursuant to those guidelines, the

15    letter that made the ACV payment should have "clearly

16    indicated" that we remain open for further discussion,

17    correct?

18         A.    I believe that was my intent when I asked for the

19    contractor information.  Because in all honesty, why would I

20    ask for a contractor if I wasn't going to continue the

21    dialogue?  If I was forcing the payment, I wouldn't have

22    asked for the contractor's name.  I would have sent the

23    check.

24         Q.    Well, the Bordens could have understood that as the

25    contractor is supposed to begin repairs.  That's all.

1           Section M deals with independent adjusters, and

2    Mr. Schumann would have been an independent adjuster in this

3    case, correct?

4        A.   Correct.

5        Q.   And this says -- the highlighted section says, "We

6    urge you not to rely on independents for bottom-line

7    estimating.  Repair contractors make our best consultants on

8    actual dollar exposures.  Repairers are more believable to

9    our insureds.  Even if your independent has estimating

10   skills, we need to offer our insureds a repair contractor who

11   can put it all together."  Did I read that correctly?

12       A.   Yes.

13       Q.   And that's not what happened in this case, correct?

14       A.   We did have a repair contractor.

15       Q.   Mr. Seifert?

16       A.   That's correct.  And as I said before, we didn't

17   have the name of a contractor to refer to them.

18       Q.   And you didn't give them any names, correct?

19       A.   I didn't have any to give them.

20           MR. MURPHEY:  Judge, that's all the questions I

21   have.  I would move into evidence Exhibits 3, which is the

22   claim file exhibit binder; Exhibit 4, which is the First

23   Party Property Loss Handling Expectations; Exhibit 5, which

24   was the insurance policy; Exhibit 8, which is Mr. Bennett's

25   memo of April 30, 2003; and Exhibit 9 would be Mr. Seifert's

1    letter of March 7, 2003.

2            THE COURT:  There were, of course, other exhibits

3    identified, but those are the only ones you want moved?

4            MR. MURPHEY:  That's correct.

5            THE COURT:  Those are admitted.

6            MR. MURPHEY:  Thank you very much, Mr. Bennett.

7            THE COURT:  Mr. Geer, are you going to take up this

8    witness now or reserve for your case?

9            MR. GEER:  Your Honor, I'm going to stay within the

10   scope of direct.  I'm also going to call him in my case,

11   assuming that meets with the Court's approval.

12           THE COURT:  That's fine.

13

14                       DIRECT EXAMINATION

15   BY MR. GEER:

16

17       Q.   Mr. Bennett, I'm going to jump around on you a

18   little bit, and I'm going to ask you some questions to

19   clarify some of the things that Mr. Murphey covered in your

20   earlier testimony.  One of the things he asked you was about

21   your research or the information you obtained regarding

22   Visions and Mr. Seifert.  Do you recall that?

23       A.   Yes.

24       Q.   I believe I recall you saying you could not recall

25   the date or the time period during which you checked out

1    Mr. Seifert.

2        A.    That's correct.

3        Q.    I'm going to show you what Mr. Murphey marked as

4    Exhibit 3-17.  This is a memo to your file.  Can you read

5    that?

6        A.    Yeah.  The memo is dated March 21, 2003.

7        Q.    I circled a section under the heading, "Coverage A".

8    I would request that you read to the Court what you recorded

9    on March 21, 2003.

10       A.    It says, "I spoke with the owner of Visions

11   Corporation.  I was told that he" --

12           THE COURT:  It's too fast.  Let me do it.  It says,

13   "I spoke with the owner of Visions" -- do we really need this

14   whole thing read in?  I'm happy to do it.

15           MR. GEER:  We don't, Your Honor.

16           THE COURT:  In other words, Exhibit 3, and all of

17   its -- for instance 3-17 is part of Exhibit 3.  It's part of

18   the record.  I don't want to slow you down --

19           MR. GEER:  That's fine.  I wasn't sure.

20           THE COURT:  Yes, it's in.  There was one he referred

21   to and didn't put in that I wanted to put in.

22       Q.    Some of the other concerns that were alleged at one

23   point or another by the Bordens or the representatives, first

24   of all, carcinogens, do you remember that question?

25       A.    Yes.

1       Q.   What did you do when you were confronted with

2   questions regarding carcinogens?

3       A.   I checked with the dry cleaning network about that

4   issue.

5       Q.   And did you get any -- did you get any more

6   information back from them which would clarify those issues?

7       A.   They gave me some information about it.  I can't

8   remember specifically what the memo said.  I think they

9   talked about the dry cleaning methods that they use, and the

10  chemicals that are used in dry cleaning and the fact that you

11  purchase new clothes, the new clothes has -- portions of the

12  clothing that have been previously dry cleaned.  So, in

13  reality, you're getting dry cleaned -- when you buy new

14  clothes, it comes partially dry cleaned already.

15      Q.   In addition, I believe that the information that

16  Mr. Murphey read to you said something about Dr. Borden is

17  researching something regarding carcinogens.

18      A.   Right.

19      Q.   Do you recall that?

20      A.   I never --

21      Q.   Did you ever receive any more information from

22  Dr. Borden or his representatives which would have told you

23  that this cleaning process you were thinking about using on

24  the clothing was dangerous or it shouldn't be used?

25      A.   No.  I never received anything.

1          Q.   Also, while we're on the subject of the cleaning,

2     you talked about the fact that -- or Mr. Murphey asked you

3     questions about the fact that there was a time when you were

4     advised that the Bordens had rejected all of the clothing, do

5     you recall that, that had been cleaned and then you wrote

6     them the letter --

7          A.   Right.

8          Q.   -- that Mr. Murphey talked about?

9          A.   Right.   They actually rejected all the contents.

10         Q.   Right.   I think you explained that you objected to

11    that.   What did Amica ultimately do regarding those contents?

12         A.   Well, we paid to have the dry cleaning cleaned, and

13    then, in the end, we paid for all the clothing.

14         Q.   So you paid for cleaning first after you were --

15    were you satisfied that the cleaning wasn't done

16    satisfactorily?

17         A.   What I believe I said was some items -- in my

18    opinion, some items cleaned, some items didn't, but in the

19    end, I believe we paid for all the dry cleaning.   So we paid

20    for the cost of dry cleaning, and then we paid for the

21    replacement cost of those items.

22              We did the same thing with the contents.   All the

23    furniture contents, that sort of thing, were cleaned -- not

24    everything, but a lot of it was cleaned, they wouldn't accept

25    any of that, so then we ended up paying for that.   And then,

1    after the settlement took place, after they had rejected all

2    of these items, they actually asked if they could take some

3    of these items and we gave them to them.

4        Q.   So you didn't force any items back on the Bordens,

5    correct?

6        A.   We totalled everything.

7        Q.   And you didn't charge them for the dry cleaning, did

8    you?

9        A.   That's correct.

10        THE COURT:  Mr. Geer, I don't fault you for pursuing

11    this because I think Mr. Murphey raised it, but I'm beginning

12    to see this case more clearly now, and we are now into areas

13    that I think have nothing to do with the essence of the bad

14    faith claim here.  And the witness, a moment ago, said the

15    hub or the heart of the matter is whether or not, and I'm

16    paraphrasing you but I think it's accurate, whether or not in

17    order to get the house into prefire condition, it was

18    necessary to knock out the walls or whether it could be -- or

19    to attack the soot and smoke, or whether it could be done

20    through some less drastic measure.  That, in my view, is the

21    heart of the case as well.  So let's focus on that.

22        MR. GEER:  I will, Your Honor.

23        THE COURT:  Once again, you know --

24        MR. GEER:  It's one of the items, I certainly agree

25    that's the heart of the case.

143

1            THE COURT:  No indictment levelled at you.  I'm just

2      trying to make sure we get out of here by Christmas.

3            MR. GEER:  I understand.

4      Q.    There were also questions asked by Mr. Murphey

5      regarding the payments that you submitted to the Bordens.  Do

6      you recall those?

7      A.    Yes.

8      Q.    I'm going to show you a couple of documents.  First

9      was a letter which you submitted with the check that you

10     already discussed.  The date of that letter was?

11     A.    March 11, 2003.

12     Q.    Now, at some point in time you received notice that

13     the Bordens were not going to accept that check; is that

14     correct?

15     A.    That's correct.

16     Q.    You also said the Bordens were issued a check for

17     contents, did you not?

18     A.    Yes.  I believe it was about $39,000.

19     Q.    I'm going to show you -- so you can tell the Court a

20     date, I'm going to show you a copy of your cover letter.

21     First of all, do you see the language in there, second

22     paragraph, "As was explained in our letter"?

23     A.    Yes.

24     Q.    They had returned the contents check?

25     A.    I think it says, "Acceptance of these checks does

1    not affect your ability to contest the estimate -- estimate

2    of damages or make claim for additional damages."

3        Q.    You received a note with the checks from the

4    Bordens, did you not?

5        A.    Yes.

6        Q.    Do you recall what the note said?

7        A.    I believe there was one note that said, "Under

8    advice from Mr. Parise, we are not to accept this check."

9        Q.    Would this be the note you just referred to?

10       A.    Yes.

11       Q.    It is dated?

12       A.    March 17, 2003.

13       Q.    Signed Amy and Jonathan Borden?

14           THE COURT:  Is that identified for the record?

15           MR. GEER:  Yes.  I'm going to identify that for the

16   record as Defendant's Exhibit A-1.

17           (Defendant's Exhibit A-1 marked for identification.)

18           THE COURT:  A-1?

19           MR. GEER:  A-1.  For the record, Your Honor, in my

20   opening statements I referred to some photographs, and I've

21   labeled all the Photographs as P.

22           THE COURT:  Like proof?  Exhibit P?

23           MR. GEER:  P, the documented photographs.

24           THE COURT:  All right.

25       Q.    Looking at the stamp at the top, when, Mr. Bennett,

1       did you receive the letter from the Bordens indicating that

2       they were returning the check?

3           A.    March 25, 2003.

4           Q.    Thereafter you received a second letter from the

5       Bordens that was similar to the first.  I'm going to mark

6       that as A-2.  That indicates what?

7               (Defendant's Exhibit A-2 marked for identification.)

8           A.    They returned the $39,945.48 check.  It says, "We

9       previously returned the check in the amount of $295,000.

10      We're not accepting these as settlements of the claim" --

11              THE COURT:  Too fast.

12              THE WITNESS:  Sorry.

13              THE COURT:  Mr. Bennett, this lady has to get

14      down what you're saying.

15              THE WITNESS:  I understand.

16              THE COURT:  It's easy to slip into it, I'm not being

17      critical.  Just slow down a little bit.  Go ahead.

18          A.    "Enclosed is the check in the amount of $39,945.48.

19      We previously returned the check in the amount of

20      $295,098.92.  We're not accepting these as settlements of the

21      claim.  Sincerely, Jonathan and Amy Borden."

22          Q.    Date received, according to your stamp?

23          A.    March 26, 2003.

24          Q.    Did you recognize at this point that there was some

25      confusion or misunderstanding about the intent of sending the

1    checks?

2        A.    Yes.

3        Q.    How did you respond?

4        A.    With that letter, I believe.

5        Q.    We're going to mark this as A-3.  This letter was

6    sent what date?

7              (Defendant's Exhibit A-3 marked for identification.)

8        A.    It's dated March 26, 2003.

9        Q.    The exact same day that you had received the second

10   check back from Mrs. Borden?

11       A.    That's correct.

12       Q.    And that letter said, "Neither check represents a

13   settlement check.  They are payments we feel we owe based

14   upon our adjuster's estimates of the damages," correct?

15       A.    That's correct.

16       Q.    Now, Mr. Murphey asked you a number of questions

17   about whether sometime later they finally accepted these

18   checks, and you weren't real clear on the number -- he

19   wouldn't let you give a date or you weren't real clear, I'm

20   not sure which it is.  It was sometime later, wasn't it?

21       A.    Yes.

22       Q.    Right after you sent this letter to the Bordens,

23   were you contacted within a week or two or three weeks or

24   four weeks and had someone say, okay, we'll take the checks

25   back now --

1    A.    No.

2    Q.    -- we're going to accept them?

3    A.    No.  As a matter of fact, when we went to the

4    meeting on April 15th, I discussed this issue with Mr.

5    Parise.  And his answer to me was he had recommended that the

6    Bordens take the checks, and they were the ones refusing to

7    take them.

8    Q.    In fact, it was not until they retained counsel,

9    Terry Jones, that Amica was able to convince them to accept

10   the checks; is that right?

11   A.    That's correct.

12   Q.    Do you recall that on one of these letters that

13   Mr. Murphey put up on the board that there was actually

14   specific language in the letter which suggested that we would

15   be willing to resubmit those checks and request that they

16   accept them?

17   A.    I'm sorry, what was the question?

18   Q.    Let me just show you the exhibit.  Let me just go to

19   this.  Did you receive back the checks after they had

20   actually been endorsed or deposited -- or did Amica receive

21   back the checks after they were endorsed or deposited?

22   A.    Yes.

23   Q.    I'm going to show you a copy -- first I'm going to

24   ask you if this document, which is going to be marked as A-4,

25   was, in fact, a copy of the check sent to the Bordens.  Can

1     you see that?

2          (Defendant's Exhibit A-4 marked for identification.)

3     A.   Yes.

4     Q.   That's one check.  We have a second check.  First of

5     all, was there any -- this is the check for $295,098.92.  Is

6     there any notation on that check about full and final

7     settlement or anything like that?

8     A.   No.  I believe that was an allegation that they had

9     presented.

10    Q.   Let me see if I can magnify this.  Can you tell,

11    right here, the date that that was deposited by Amy Borden?

12    Is that June 20th?

13    A.   It looks like June 20, 2003.

14    Q.   So you wrote to them on March 26th telling them they

15    could accept this without prejudice; Mr. Parise told you on

16    April 14th that the Bordens, despite his advice, were not

17    willing to accept it; and ultimately they did accept it on

18    June 20th, correct?

19    A.   Correct.

20    Q.   So we have our chronology as to when they finally

21    received these moneys?

22    A.   Correct.

23    Q.   Accepted these moneys?  Mr. Murphey also asked you

24    questions regarding the report that Mr. Parise sent to you in

25    a letter form that said that he had taken Mr. Seifert through

1    the building, and, apparently, Mr. Seifert had made some

2    comment which he construed to mean that he was no longer

3    comfortable with Mr. Schumann's estimate.  Do you recall

4    that?

5         A.   Yes.

6         Q.   What did you do upon receipt of that information?

7    Did you talk with Mr. Seifert about that allegation?

8         A.   We talked, and he conveyed to me a different story.

9    He, once again, told me that he could do the -- do the

10   repairs based on Schumann's estimate.

11        Q.   Now, there had always been one qualification in

12   Mr. Seifert's offer, was there not?

13        A.   I'm sorry?

14        Q.   There was always a qualification in what Mr. Seifert

15   was saying, was there not?

16        A.   Yes.

17        Q.   What was that qualification?

18        A.   That, as with all losses, additional damages can be

19   found.

20        Q.   Can you explain what you mean by that to the Court.

21        A.   Well, I have never -- especially when you're dealing

22   with a losses of this size, I have never seen a contractor's

23   estimate being perfect.  It's just an estimate of damages.

24   I's not a bill for damages; it's an estimate.  Even on auto

25   claims, I'd say at least 50 percent of the -- of auto claims

1    result in supplements.  As I said, I've -- I don't send out a

2    letter telling people that this is a full release of all

3    claims or anything like that.  We send a check and the

4    process continues.  If there's further negotiations -- I

5    mean, I've seen 6, $700 auto estimates come in with a

6    supplement.  And we consider them and pay them, if

7    appropriate.

8        Q.   In fact, showing you the March 7th letter which

9    Mr. Murphey already put into evidence, the letter from

10   Mr. Seifert.  It specifically says, "As with all fire claims,

11   there are always hidden costs on areas that couldn't be seen

12   or areas that had no access," correct?

13       A.   Correct.

14       Q.   How does Amica normally handle that situation in a

15   fire claim where your adjuster can't access the area or can't

16   see the area and it turns out later that there's more damage?

17       A.   The process continues.  I mean, we'd have further

18   dialogue, inspection of the damages, and continue the -- to

19   review -- review the claim.

20       Q.   Mr. Murphey asked you some questions regarding Jack

21   Owens.  He was the appraiser that you hired, correct?

22       A.   Correct.

23       Q.   And he questioned you regarding the letter you sent

24   to Mr. Owens also suggesting that he might be assigned the

25   contents version.

1        A.    That's correct.

2        Q.    First of all, do you remember the time period that

3    this occurred?

4        A.    It was after the April 15th meeting.

5        Q.    So it was around April or May, correct?  At that

6    point had you even received the Bordens' contents inventory?

7        A.    No.

8        Q.    So you did not have anything for him to work off of,

9    correct?

10       A.    No.

11       Q.    You retained him as an appraiser, and the appraisal

12   never moved forward, correct?

13       A.    Correct.  It was -- the request was by the firm to

14   review other options.  So it basically stopped and never

15   proceeded.

16       Q.    Was your concern -- when you brought in the second

17   contractor, was your concern that Visions had done something

18   wrong or was it your concern that they -- you didn't want --

19   you didn't want that to be the issue in this case?  Or

20   something else, if it was something else?  Why bring in a

21   second contractor, Dan Jones?

22       A.    I was concerned about Visions -- the quality of

23   Visions at that point and decided to bring in a second

24   contractor to look at the damages.

25       Q.    In the end, when Mr. Jones came up with his number,

1    his estimated cost of repairs, did you make payment based

2    upon that estimate?

3        A.   Yes.

4        Q.   Did you do it promptly upon receipt of that

5    estimate?

6        A.   I believe so.

7        Q.   At this point they accepted it?

8        A.   Yes.  Well, there was -- there was some additional

9    items that were hammered out.  There was a subsequent

10   payment, but I believe Mr. Jones' original inspection was in

11   early June.

12       Q.   And this wasn't something -- again, this isn't

13   something you jammed down their throats, correct?

14           MR. MURPHEY:  Objection.  Leading question.

15           THE COURT:  It is, but --

16           MR. GEER:  I'll withdraw it.

17       Q.   Mr. Jones also -- I don't want to confuse you.  I'm

18   referring now to Attorney Terry Jones who you referred to

19   earlier.  Mr. Murphey asked you a number of questions

20   regarding Terry Jones, and I want to refer you to a letter

21   dated June 5th, which Mr. Murphey showed you -- I'm sorry, I

22   was mistaken.  It was June 16th.  Mr. Murphey had shown you a

23   letter dated June 16th and -- I'm sorry, but I didn't write

24   down the exhibit number.  It was a letter written to Paul K.

25   Geer from T. Warren Jones, June 16th.  Mr. Murphey had asked

1  you a question regarding the question asked in that letter.

2  It said, and I'll read it, "At your convenience, I'd like to

3  know more about the process which Amica utilized to select

4  Visions to do the temporary repairs."  Now, to the best of

5  your knowledge, as you sit here today, have the temporary

6  repairs that Visions did ever been at issue in this case?

7      A.   No.

8      Q.   Did you ever get a complaint from the Bordens, Terry

9  Jones, Anthony Parise, or anyone else, that the temporary

10  repairs that Visions did were inadequate?

11      A.   Not that I recall.

12      Q.   As we sit here today, do you have any reason to

13  believe that's at issue in this case?

14      A.   No.

15          THE COURT:  Just so I'm clear, do I take it that the

16  term "temporary repairs" is just another way of saying the

17  boarding up and protecting of the house from further damage?

18          THE WITNESS:  Correct.

19          THE COURT:  In other words, no repair that would in

20  any sense be permanent or that would be there if and when the

21  insureds decided to move back in?

22          THE WITNESS:  I'm sorry, say that again.

23          THE COURT:  The temporary repairs were repairs

24  simply to maintain the status quo of the house?

25          THE WITNESS:  Right.

1          THE COURT:  All right.

2      Q.   That would include such things as pumping the water

3   out of the basement?  The water that the fire department --

4      A.   I don't recall exactly what they did.  But it

5   would -- there was a hole in the roof, and they patched

6   the -- they put a temporary patch on the roof.  That sort of

7   thing.

8      Q.   Shoring up the building so it would be safe for the

9   adjusters to go in and take a look at it?

10     A.   That's correct.  In re-reading the letter, it seems

11  to me that the letter is questioning the expertise of

12  Visions.  You could read it that way very easily.

13         MR. GEER:  That's all I have at this time, Your

14  Honor.

15         THE COURT:  Do you have anything further at this

16  time?

17         MR. MURPHEY:  Yes.

18

19                      RECROSS-EXAMINATION

20  BY MR. MURPHEY:

21

22     Q.   On that last note, you do understand, Mr. Bennett,

23  that Visions did two things in this case, they did the

24  temporary repairs and then they also provided an estimate for

25  Amica -- or at least a letter that supported an estimate?

1      A.   Correct.

2      Q.   And those are two distinct things?

3      A.   Yes.

4           MR. MURPHEY:  That's all I have.

5           THE COURT:  Thank you, sir.  You may be excused.

6           Who would be your next witness?

7           MR. MURPHEY:  Mr. Borden.

8           THE COURT:  We'll go for about 10 minutes and take a

9      break.  Come up on up, Doctor.  Would you raise your right

10     hand, please -- first of all, state your full name for the

11     record.

12          THE WITNESS:  Jonathan Allen Borden.

13

14          J O N A T H A N   B O R D E N, first having

15          been duly sworn, testified as follows:

16

17                      DIRECT EXAMINATION

18     BY MR. MURPHEY:

19

20     Q.   Jon, you've already told us your name.  Can you

21     please tell us about your family.  You're married?

22     A.   My wife's name is Amy.

23     Q.   You have children?

24     A.   I have three children.

25     Q.   How old are they now?

1          A.    They're 6, Sarah and Emma, twins, girls; and David

2     is almost 4.

3          Q.    Where do you live now?

4          A.    Cincinnati.

5          Q.    What do you do for a living?

6          A.    I'm a neurosurgeon.

7               THE COURT:  Just as an aside.  Some of the papers

8     you're referred to as a neurologist.  I presume that that is

9     an error.  You're a neurosurgeon as opposed to a neurologist.

10               THE WITNESS:  It's a common confusion

11               THE COURT:  Common layman mistake.  You're the

12    fellow who operates as opposed to diagnosis.

13               THE WITNESS:  Right.  They do all the thinking and

14    we do the --

15               THE COURT:  You do the cutting.  I hope you can

16    think and cut.

17               THE WITNESS:  I try to.

18               THE COURT:  Go ahead.

19         Q.    When did you move to Cincinnati?

20         A.    I moved to Cincinnati shortly after December -- just

21    before January 1st of 2006.

22         Q.    Where did you live in 2003?

23         A.    In Erie.

24         Q.    Where were you working at that time?

25         A.    At Saint Vincent Health Center.

1    Q.   I take it that you had never had a fire before 2003.

2    A.   No.

3    Q.   You were not familiar with the process of handling a

4    fire loss claim?

5    A.   No.

6    Q.   Had you ever arranged for any major construction

7    before?  Built a house?  Had a significant remodeling

8    project?

9    A.   No.

10   Q.   Where did you live in February of 2003?

11   A.   On --

12   Q.   What was the address?

13   A.   4838 Wolf Road.

14   Q.   When did you move there?

15   A.   We moved there the end of August of 2002.

16   Q.   Why did you move to Erie?

17   A.   I relocated from Boston to take a new job with Saint

18   Vincent as a neurological surgeon.

19   Q.   How much did you pay for the house?

20   A.   720,000.

21   Q.   Was there anything, other than its nice location,

22   that attracted you to the house?

23   A.   Well, it had been made handicapped accessible.

24   Q.   Why was that important to you?

25   A.   Our daughter, Emma, has significant disabilities.

1      Q.    What is Emma's condition?  If you could give us the

2   60-second version, Doctor.

3      A.    She has a fairly rare chromosome disorder called an

4   inverted duplicated chromosome 15.  She was born slightly

5   over a pound, spent four months on a ventilator in a neonatal

6   intensive care unit.

7      Q.    As of the age of 3, did she have developmental

8   delays?

9      A.    She has profound developmental delays.

10      Q.    Does she have any environmental sensitivities that

11   you had noticed?

12      A.    Yes.

13      Q.    What were those?

14      A.    She's very sensitive to certain types of cleaning

15   products, any dust, we don't allow her to get anywhere near

16   smoke, certain perfumes.

17      Q.    Do her symptoms include some respiratory problems?

18      A.    Yes.

19      Q.    Was she living -- was her bedroom in the handicapped

20   accessible area of the house?

21      A.    Yes.

22      Q.    Who was your house insured with?

23      A.    Amica.

24      Q.    Do you know anything in particular about the

25   insurance policy that you had purchased?

1       A.   Well, we had their top policy.  Their most expensive
2  and best policy.
3       Q.   It was called the Platinum Choice policy?
4       A.   Right.
5       Q.   Had you had any claims with Amica before this fire?
6       A.   No.
7       Q.   So did you know any employees of Amica before this
8  fire?
9       A.   No.
10      Q.   We know from prior testimony that the fire happened
11 on February 16, 2003.  Was that a Sunday?
12      A.   Yes.
13      Q.   You were home alone?
14      A.   Yes.
15      Q.   If you could briefly tell the Judge what happened.
16      A.   Well, I -- I was on call that weekend, which is why
17 I wasn't in Pittsburgh, and I had just come back from the
18 hospital.  I can't remember how long I was actually in the
19 house, but it wasn't for a long time.
20      Q.   Were you alone?
21      A.   I was alone.  And I heard the alarm go off telling
22 me to get out of the house.
23      Q.   It was obviously a talking thing?
24      A.   Fire, remove -- exit the house immediately.
25           THE COURT:  What time was it?

1          THE WITNESS:  I later learned approximately 1:00

2    p.m.

3        Q.   You don't remember really?

4        A.   No.

5        Q.   Anyway, what do you recall?  Did you see smoke or

6    flames or --

7        A.   Well, initially, I didn't see anything.  So, instead

8    of listening to this voice, I started to look around to try

9    to see where the so-called fire was coming from.  And I was

10   in the kitchen when a blast of smoke hit my face, and I

11   actually became temporarily blinded, except for the fact I

12   was wearing glasses.  And so I just dropped down to the floor

13   and scooted out of the house.

14       Q.   What did you do then?

15       A.   I -- I had my cell phone attached to me, and I

16   called the fire department from the cell phone.

17       Q.   Did you watch the fire-fighting efforts?

18       A.   For hours.

19       Q.   How long did it take for them to suppress the fire?

20       A.   Well, it wasn't clear to me that it was entirely

21   suppressed when we left that night, but -- I mean, four hours

22   at least.

23       Q.   Did the firemen tell you anything about the fire

24   during the time they were fighting it?

25       A.   They believed it was -- started in the basement.

1      Q.   Did they tell you anything about the extensive

2   damage to your home while they were fighting the fire?

3      A.   Well, at some point we were asked for permission to

4   bulldoze part of the home because they couldn't get the fire

5   out completely.

6      Q.   Did you observe them cut holes in the roof or break

7   windows or do anything else to fight the fire?

8      A.   Certainly.  They cut a large hole in part of the

9   roof.  There was actually smoke oozing from the entire roof,

10   even in the other part of the house that didn't have the

11   active fire.  They took a sledgehammer to part of the brick

12   wall, and they did extensive -- they smashed all of the

13   windows.

14      Q.   There has been, or will be, testimony in this case

15   that this was a very hot fire.  Were you able to -- did the

16   firemen tell you anything about the heat generated or --

17      A.   Well, at some point one of the firemen came up to me

18   and said, do you have any other gas lines going into the

19   basement -- or the house, because there's something very hot

20   in the basement that we can't put out.  And I said, there's

21   no gas going into the house at all.  And he said, oh, and ran

22   over to the gas line and turned it.

23      Q.   So maybe the gas had been turned on?

24      A.   I -- I don't know if he was just checking whether it

25   had been turned off or if it had been inadvertently turned

162

1    on.

2        Q.    You said you were home alone.  Where were Amy and

3    the children?

4        A.    In Pittsburgh.

5        Q.    Did Amy come home that evening?

6        A.    Yes.

7        Q.    Was she with you at any time while you were -- first

8    of all, what did you do?  Did you go to a neighbor's house or

9    what did you do?

10       A.    Well, I was watching what they were doing in the

11   driveway for hours, and there were a lot of people that had

12   gathered around.  At some point they briefly took me to an

13   ambulance just to make sure I didn't have any problems with

14   smoke inhalation, and I called Amy from there and told her

15   what had happened.  And then she drove back up.

16       Q.    I'm sorry, did she get to the scene of the fire or

17   did she meet you at the hotel?  Or do you remember?

18       A.    She was at -- I believe she was at the scene.

19       Q.    At some point did you contact Amica to tell them

20   about the fire?

21       A.    Yes.

22       Q.    When did you do that?

23       A.    At some point in the afternoon I walked over to the

24   neighbor's house and called Amica from the neighbor's house.

25       Q.    While you were at the scene, do you remember, did

1    you have more than one conversation with an Amica

2    representative?

3        A.    I may have had two conversations.

4        Q.    What can you remember about conversations with an

5    Amica representative while you were still, you know, at your

6    neighbor's or at the scene of the fire?

7        A.    Well, I described to a very nice young woman on the

8    phone what had happened, and she said that she was going to

9    call and get someone to come and take care of it.  And they

10    were going to call two people, one was someone to take -- to

11    "board-up" the house, and the second would be an adjuster.

12            THE COURT:  Mr. Murphey, we're going to take a short

13    recess.

14            (Pause in the proceedings.)

15            THE COURT:  All right, Mr. Murphey.

16        Q.    We were talking about your report of the fire to

17    Amica.  You said you talked to a very nice woman on the phone

18    maybe once or twice.  Do you remember them giving you any

19    instructions with respect to handling the case?  Did they ask

20    you to do anything?

21        A.    At the second phone call, they told me that

22    Mr. Hardner would be contacting me regarding the immediate

23    protection of the house.

24        Q.    Did they explain who Mr. Hardner was?

25        A.    Yes.

1        Q.   What did they tell you?

2        A.   A fire restoration expert.

3        Q.   Did you ever talk to Mr. Hardner?

4        A.   Yes.  He called me on two occasions.

5        Q.   During the evening of the fire?

6        A.   Yes.  He initially explained to me -- do you want me

7   to elaborate?

8        Q.   Yes.  Please.

9        A.   He initially explained to me what -- that he was

10   going to be out to the house to board it up, and also would

11   be going in and he would put things like antifreeze in the

12   pipes to prevent further damage.  Because he told me that

13   when it's this cold that you can get secondary damage to the

14   house as a result of the environment.

15        Q.   You said that he called you twice?

16        A.   Correct.

17        Q.   And that was the first phone call?

18        A.   Yes.

19        Q.   What was the second call?  What did he say in the

20   second call?

21        A.   He told me that Amica had selected, I guess, Visions

22   instead, and that --

23        Q.   To do the emergency repairs?

24        A.   To do the emergency repair.

25        Q.   Did you talk to him about that decision, and what

1    did he tell you?

2         A.   Well, he was very professional.  He said, well, you

3    could object if you want.  And I asked him if he knew

4    anything about them, and he said he didn't.

5         Q.   He said he did not?

6         A.   Did not.  And at that point I -- I can't remember

7    the timing of this, but I called Mr. Schumann -- or

8    Mr. Schumann had also called me, and I told him what had

9    happened.

10        Q.   About the conversations with Hardner about Visions?

11        A.   Correct.

12        Q.   Did Mr. Schumann say anything about that?

13        A.   He said, don't worry about it, I'll take care of it

14   when I get there, and informed me that he would be several

15   days.

16        Q.   Now, I take it the house was not habitable.

17        A.   Correct.

18        Q.   Where did you stay for the next couple of days?

19        A.   We were at the Bel-Aire Clarion Hotel.

20        Q.   And that was you and Amy?

21        A.   Yes.

22        Q.   How long was it between the time of the fire and

23   when you were able to get into a rental unit, which we've

24   already heard some testimony about?

25        A.   The fire was the 16th, and shortly after the first

1    of March we took -- we moved into the rental house.

2        Q.   How were you able to locate a rental house?

3        A.   Well, Kathe Rafferty, who is a real estate agent and

4    lives several doors down --

5            THE COURT:  That would be Kathe.  I think there's a

6    plume on the E or something.

7            MR. MURPHEY:  An accent.

8            THE COURT:  Go ahead.

9        A.   And she came over during the fire, as was half the

10   neighborhood, and she told us that, in fact, there was a

11   house right across from her house that was a rental house and

12   the occupants had just sort of moved out early.

13       Q.   In your neighborhood?

14       A.   In our neighborhood, and that she would -- she said

15   that that would be a great place for us to move into.

16       Q.   And ultimately there is where you moved in?

17       A.   Yes.

18       Q.   Amica paid for all that, helped to set up the house?

19       A.   Yes.

20       Q.   And that was a very comfortable place under the

21   circumstances?

22       A.   Yeah.

23       Q.   Did there come a time when you were able to go back

24   to the house and see the damage to it?

25       A.   Over the next several days, yes.  The following

1    day -- morning after the fire we went back to the house.

2        Q.   I'm going to show you a document I've marked as

3    Exhibit 6.

4            (Plaintiff's Deposition Exhibit No. 6 marked for

5             identification.)

6        A.   Yes.

7        Q.   Do you recognize that?

8        A.   Yes.

9        Q.   What is it?

10       A.   It's a diagram of the house.  The floor plan.

11       Q.   The floor plan of the house.  I just want to ask you

12   a couple very quick questions about the house.  Jon, if you

13   could, show us where was the -- where was the area of the

14   house under which the basement sat?  I think can you touch

15   the screen.

16           THE COURT:  You can touch the screen and it'll mark

17   it.

18       A.   I'm circling this, I think maybe it should go like

19   that.  Something like that.

20       Q.   So that area of the house has the basement?

21       A.   Yes.

22       Q.   And that's where the fire started as you understand

23   it?

24       A.   Yes.

25       Q.   So it's directly below the family room, dining room,

1    kitchen, sunroom?

2       A.   Yes.

3       Q.   Under the remainder of the house is there a

4    basement?

5       A.   A crawl space.

6       Q.   Is the crawl space open to the basement?

7       A.   Yes.

8       Q.   The Judge, in his curiosity, asked about how the

9    fire started, and it was reported to you that it may have

10   been caused by a linseed oil project?

11      A.   Yes.

12      Q.   Because the Judge was interested before, can you

13   tell him what you know about that.

14      A.    I had been finishing -- it might have been some

15   picture frames or I think it was a part for a camera -- an

16   old, wooden camera that I was repairing.  And I coated it

17   with some linseed oil, and I know I used a cotton rag to do

18   that, but I didn't have any recollection of what I did with

19   the rag.

20      Q.   Now, back to the house.  There is a diagram in the

21   lower right-hand side of Exhibit 6 with several bedrooms.  Is

22   that the upstairs of the house?

23      A.   Yes.

24      Q.   That's the second floor?

25      A.   Yes.

1          Q.   And over which part of the first level does the

2     second level sit?

3          A.   -- it's --

4          Q.   We'll erase that.

5          A.   It's pretty much directly up.  So if you take

6     this -- I'll draw an arrow here.  I think it sits right on

7     top of that.

8          Q.   In fact, I think we can see where it would fit with,

9     I think, the patio.

10         A.   Exactly.

11         Q.   So there's not two stories throughout the house, but

12    there's two stories on the side of the house away from the

13    basement, correct?

14         A.   Yes.

15         Q.   And then the basement, I take it, does not sit

16    beneath the garage; is that right?

17         A.   Correct.

18         Q.   Now, in the lower left-hand side there's two rooms

19    marked, I think maybe, study and sewing or den --

20         A.   Yes.

21         Q.   -- with some stairs.  Where does that sit?

22         A.   I'll draw another arrow.  Like that.

23         Q.   Right over the garage?

24         A.   Right.  And you can line up the stairwell, here and

25    there.  That would line it up exactly.

1     Q.   I see.  Where is the handicapped accessible area of

2  the house?

3     A.   The first floor --

4     Q.   I'm going to erase those arrows.

5     A.   -- this, this, this.

6     Q.   You're circling the bedroom, parlor, and bath area

7  on the right-hand side of Exhibit 6?

8     A.   Correct.

9     Q.   And that would sit directly below the second

10  story --

11     A.   Yes.

12     Q.   -- in that part of the house.  Did anybody ever tell

13  you what part of the basement the fire started in?  Whether

14  it was directly below the dining room?  Directly below the

15  kitchen?  If you know; if you don't know, that's fine.

16     A.   I don't know.

17     Q.   We've seen some photographs -- at least in our

18  opening statement, we looked at some, can you tell the Judge

19  generally what areas of the house sustained the most

20  catastrophic damage.

21     A.   Well --

22     Q.   The basement, obviously.

23     A.   And right above it was, you know, completely

24  damaged.

25     Q.   When did you go back to the house the first time?

1          A.    The morning after the fire.  The 17th.

2          Q.    Can you estimate for me how many times you were in

3     the house after the damage?

4          A.    Totally?

5          Q.    Yes.  I mean, quite a few times?

6          A.    Sure.

7          Q.    You were able to observe the damage inside the

8     house?

9          A.    Yes.

10         Q.    Did you notice the smoke smell throughout the house?

11         A.    Yes.

12         Q.    For example, in the areas of the house furthest from

13    the basement, such as the second floor on the right-hand side

14    of the picture, as I'm pointing with my pen, could you notice

15    the smoke smell up there?

16         A.    Yes.

17         Q.    Did it permeate the entire house?

18         A.    The entire house.

19         Q.    In the days after the fire -- strike that.  I'm

20    going to ask you to identify an exhibit we have marked as

21    Exhibit 1, a binder of photographs.  Do you recognize these,

22    Jon?

23              (Plaintiff's Exhibit No. 1 marked for

24               identification.)

25         A.    Yes.

1          Q.    Do they depict the damage to the house in various

2     places and at various times?

3          A.    Yes.

4          Q.    Now, when you went back to the house initially, was

5     there anybody doing emergency repairs?

6          A.    Yes.

7          Q.    Who was that?

8          A.    Brian Seifert.

9          Q.    Did you talk to Mr. Seifert?

10         A.    Yes.  And he and several of his associates were

11    pumping water out of the basement.  The basement was

12    essentially completely filled with water.

13         Q.    Was this the day after the fire?

14         A.    Yes.

15         Q.    What else was Mr. Seifert doing?  Did you notice

16    anything else in particular?

17         A.    That's really it.  He told me that he had been

18    instructed to pump the water out, and the fire inspector was

19    unable to get down into the basement until he did that.

20         Q.    Did you talk to him about the fire?  Did he tell you

21    anything about it?  That you remember.

22         A.    I'm sure we did.

23         Q.    Did you know how Mr. Seifert had been hired?  Who

24    had brought him there?

25         A.    Well, when he described the need for the fire

1    inspector to get down there, I thought that the fire

2    department had directed him to do what he was doing.

3        Q.   I take it that you did not arrange for Mr. Seifert

4    to be at the scene.

5        A.   I never spoke to him before I talked to him at the

6    house.

7        Q.   Did you know him or had you ever heard of his

8    business before?

9        A.   No.

10       Q.   Was there anything about your initial contact with

11   Mr. Seifert at the scene that caused you any concern about

12   his qualifications or abilities?

13       A.   Well, in terms of boarding up the house, I mean, it

14   seemed like it was done competently, and he was pumping water

15   out of the basement and that was all fine.  I knew he was

16   going to go in and put some temporary shores, because the

17   ceiling or joists of the floor were dangerous, and all that

18   seemed like something that certainly had to be done.  He told

19   me that he -- he then got into restoration issues and told me

20   that he was going to take everything out of the house, and do

21   ozone cleaning, and talked about his wife and this and that,

22   and he started talking about a variety of things.

23       Q.   Did he talk to you at all about protecting the pipes

24   at all, put antifreeze in?

25       A.   Well, I asked about that, he hadn't done it.

1        Q.    Did he tell you why he hadn't done it?

2        A.    I didn't press the issue.  I just asked if --

3        Q.    Did he tell you anything about how he would

4   recommend repairing the house?  Repairing the structure in

5   any way?

6        A.    Well, he told me -- I think he said he could get it

7   to be as good as new in six months, and I was just listening,

8   and then he said that he would build and match the brick

9   exactly in the area where the sledgehammer had taken out half

10  the wall and that he could do all of those things.

11       Q.    Did you discuss with Mr. Seifert at all why

12  Mr. Hardner was not on this assignment, or that didn't come

13  up?

14       A.    No.  No.

15       Q.    Did you talk to John Schumann at all before he

16  arrived in Erie?

17       A.    Yes.

18       Q.    How many times?

19       A.    Well, once or twice.  Perhaps twice.

20       Q.    Do you recall the content of the conversations with

21  Mr. Schumann before he arrived?

22       A.    Well, actually, during the fire and right

23  afterwards, all sorts of information started pouring in to

24  us, including where we should live and who we should get to

25  fix the place.  And so -- we had neighbors on either side of

1    us who were either involved in building a house or had just

2    built a house.  And the -- Amy Burkowitz, who was friends of

3    my wife, said they were very pleased with Laughlin, and they

4    were actually building a house right next door to us.  So

5    they were going back and forth.

6        Q.    That was Laughlin Brothers Contractors?

7        A.    Right.  They had contractors that were going back

8    and forth at the site, and said, oh, boy, that's a big deal.

9    And I called one of them and talked to him about it, and he

10   said -- I asked him about Visions, and they didn't know

11   anything about them.  He said he thought that he was a roofer

12   but that he didn't know that he did fire restoration work.  I

13   told Mr. Schumann my concerns, and he told me not to worry

14   about anything, just wait until he got there and he would

15   sort everything out.

16       Q.    Did you also identify for Mr. Schumann the fact that

17   you had talked to a contractor?

18       A.    Yes.  But that was just after he arrived in Erie.

19       Q.    We'll talk about that in a minute.  Did you talk to

20   Mr. Schumann about -- strike that.  By the way, just

21   generally speaking, was Mr. Schumann nice and cooperative and

22   pleasant with you?

23       A.    Well, he was very reassuring and very pleasant, yes.

24       Q.    I mean, he didn't do anything to personally offend

25   you?  He wasn't mean or objectionable?

1      A.   No.   Never.

2      Q.   When he arrived, did he tour the house with you or

3   meet with you?  What did he do?

4      A.   Well, we met, and I don't recall whether he toured

5   the house first.  I think he may have before meeting with us

6   initially.

7      Q.   What do you remember about the first meeting with

8   Mr. Schumann?

9      A.   We were in the restaurant at the Bel-Aire Clarion,

10   and we had a conversation with him and -- just about what was

11   going on.

12      Q.   Did you talk to Mr. Schumann at that time about

13   Mr. Seifert?

14      A.   Well, we raised the concerns based on the brief

15   investigation that I had done that people didn't know him.

16   And we gave him the names of the Laughlin Brothers as well as

17   David Haller as being two contractors that came very highly

18   recommended by different people.

19      Q.   Mr. Haller had also worked on neighbors' homes, so

20   you knew of him?

21      A.   Well, he had built a home on the other side of us,

22   and had done significant restoration and contracting work on

23   another home very close to us.

24      Q.   Did Mr. Schumann take their names?

25      A.   He did.

1    Q.   What did -- did he write them down?

2    A.   He wrote them down in his notebook.

3    Q.   Did he carry a notebook with him throughout the --

4    your involvement with him?

5    A.   I don't know throughout the involvement, but I

6    remember he wrote the names down in a notebook at that

7    meeting.

8    Q.   Did Mr. Schumann encourage you to contact Laughlin

9    Brothers or Haller or did he offer to contact them himself at

10    that time?

11    A.   Well, he said that it was too early to do that, and

12    that he would at the appropriate time.  He also told us that

13    he had a lot of work to do to do -- to go through the house

14    room by room with a computer program that he had on his

15    laptop that he would be making measurements and that he

16    needed some "warm bodies" to help him move things out of the

17    way and to allow him to do his job.

18    Q.   Did he tell you that your identification of a

19    contractor to work with him was necessary for him to develop

20    an estimate of the repairs?

21    A.   No.  He actually asked us not to get someone at that

22    immediate time.

23    Q.   Did Mr. Schumann tell you about his relationship

24    with Amica?

25    A.   Well, he said that he worked essentially exclusively

1    for Amica, but he was not an employee specifically.  That he

2    was a contractor, or whatever word you want to use.  An

3    independent adjuster.

4        Q.  Did he attempt to assure you in any way that you

5    would be treated fairly?

6        A.  Well, he told us that he viewed his job as working

7    for us and not for the insurance company.  That he would take

8    care of everything that needed to be done.

9        Q.  Was Mr. Schumann able to tell you anything about --

10   strike that.  Did Mr. Schumann tell you that he was going to

11   work with Mr. Seifert to develop an estimate?

12       A.  No.  But he needed some of Mr. Seifert's men to do

13   things like put heaters into various rooms so that he could

14   go through the house and to -- do his work.

15       Q.  So you, at that time, didn't understand that he

16   would be using any contractor to help him develop an

17   estimate; is that correct?

18       A.  Correct.

19       Q.  The Judge has already taken judicial notice that a

20   devastating fire like this is going to be difficult for a

21   family to deal with, so we don't need to get into that too

22   much.

23           Did Mr. Schumann ever approach you and say, I need

24   your help to develop an estimate?

25       A.  No.  He told us that he would do that, and he sort

1     of didn't want us in the way, I think.  To allow him just to

2     go through room by room and do what he needed to do.

3          Q.    At any time in the process, did Mr. Schumann suggest

4     that you get a public adjuster or a lawyer or anybody else to

5     assist you with this process?

6          A.    Well, he specifically recommended against it.

7          Q.    What did he say?

8          A.    He said that they're just the insurance business

9     equivalent of an "ambulance chaser" and that they would take

10    our money and it wasn't going to affect his estimate in any

11    way, shape, or form.

12         Q.    Now, Mr. Schumann, we know, ultimately created an

13    estimate of repair of about $329,000 --

14         THE COURT:  Let me interrupt you for a second.

15    Doctor, did the subject -- was the subject of possibly

16    retaining a public adjuster brought up by you, if you

17    remember, or was it brought up by Mr. Schumann in the first

18    instance?

19         THE WITNESS:  I'll explain that.  I had no idea what

20    a public adjuster was at the time.  The day after the fire

21    occurred, while we were on the site, it was snowing and some

22    public adjusters from a company called National-something

23    showed up and handed me a pamphlet and gave me information on

24    their services.  And I had no idea who they were or how they

25    got our name or anything.  And I told this to Mr. Schumann,

1    that these people showed up, and that's how the discussion

2    occurred.

3              THE COURT:  All right.  Go ahead.

4         Q.   He ultimately created the estimate that I just

5    mentioned.  Did you get a copy of his estimate of repair?

6         A.   I ultimately got a copy.

7         Q.   Before Mr. Schumann sent you his estimate of repair,

8    did you have any concerns about the quality of the work that

9    Mr. Schumann was doing?

10        A.   No.

11        Q.   You said you ultimately got a copy of the estimate.

12   Explain the process of having the estimate -- of obtaining

13   the estimate.

14        A.   Well, we were in Pittsburgh, he called me on my cell

15   phone --

16        Q.   Just by way of explanation, you were in Pittsburgh

17   with the rest of your family?

18        A.   At Amy's parents'.

19        Q.   This is before you had been resettled into the

20   house?

21        A.   Correct.

22        Q.   The rental house?

23        A.   Correct.

24        Q.   So to be together with the family you were in

25   Pittsburgh?

```
 1        A.    Right.

 2        Q.    Because Amy was staying with her parents --

 3        A.    Right.

 4        Q.     -- with the kids?

 5        A.    My mother came out, took our hotel room, and she was

 6   working on getting the house ready, and Amy and I were in

 7   Pittsburgh at the time.  And he called me and I told him

 8   that, first of all, I didn't have a fax at their house or any

 9   way to get his estimate, but I directed him to my brother,

10   who's a lawyer with The Hartford -- he's not -- he works in

11   their technology section, but nonetheless, he works there.

12   And he took the initial fax of the estimate.

13        Q.    It was faxed to your brother in Hartford?

14        A.    I believe it was faxed.  I assume it was faxed.

15        Q.    But it was sent to him first?

16        A.    Correct.

17        Q.    At your request?

18        A.    At my request.

19        Q.    Just so the Judge understands the whole context,

20   your brother is an attorney with The Hartford in Hartford,

21   but he doesn't handle claims?

22        A.    Right.

23        Q.    So what happened then?

24        A.    Well, my brother showed the estimate to people in

25   the claims department at The Hartford, who outlined a number
```

1      of issues with the estimate to him.  And he was in contact

2      with Mr. Schumann regarding the errors and omissions in the

3      estimate.

4          Q.   So did your brother tell you about learning that

5      there were errors and omissions in the estimate?

6          A.   Yes.

7              MR. GEER:  Objection.  This is all hearsay, Your

8      Honor.

9              MR. MURPHEY:  Your Honor, it's offered for the

10     effect it has on the hearing rather than the substance.

11             THE COURT:  As opposed to what he did you mean?

12             MR. MURPHEY:  Right.

13             THE COURT:  I mean, it's not offered for the truth

14     of the matter asserted?

15             MR. MURPHEY:  No.

16             THE COURT:  All right.  I'm not taking it for the

17     truth.  It's overruled.

18         Q.   At any rate, Rick told you some people that he had

19     reviewed the estimate with raised some concerns?

20         A.   Yes.

21         Q.   Your brother's name is Rick.  I'm not sure the

22     record represents that.

23             What did you do then?

24         A.   Well --

25         Q.   Did you speak with Mr. Schumann about the problems

1    in the estimate that had been identified by Rick?

2        A.   I told Mr. Schumann initially that I had no idea

3    about all this stuff.  I had absolutely no experience with

4    estimates or what would need to be done or what ought to be

5    done, and that while Rick didn't have a lot of experience

6    either, he at least was in contact with people that did.  And

7    I gave him authority to speak to Rick about this on my

8    behalf.  So I told him I would use my brother on my behalf to

9    try to get this resolved in a more intelligent fashion than I

10   could do.

11       Q.   And then, did Rick tell you about any conversations

12   he had with Mr. Schumann about the problems that they had

13   identified in the estimate?

14       A.   Yes, he did.

15       Q.   What did he tell you?

16       A.   He told me that he wasn't willing to acknowledge

17   even the most obvious, and some minor, omissions in the

18   estimate, and indicated that he wasn't willing to negotiate

19   on any part of the estimate.

20       Q.   "He" being Mr. Schumann?

21       A.   Correct.

22            THE COURT:  Did Mr. Schumann tell you that, or did

23   your brother tell you that's what Mr. Schumann said?

24            THE WITNESS:  My brother told me that's what

25   Mr. Schumann said.

1    Q.   Do you remember whether you -- you personally talked

2    to Mr. Schumann about the problems that Rick had identified

3    in the estimate?  If you remember; if you don't --

4    A.   I don't know.  There's a lot of other stuff going on

5    at that point, and I -- I may not have, myself.  I don't

6    specifically recall that.

7    Q.   So you have described Rick's conversation with

8    Mr. Schumann in which Mr. Schumann had indicated that he was

9    not going to change his estimate, correct?

10    A.   Correct.

11    Q.   So what did you do next?  Do you remember?

12    A.   Well, around that time I had been getting increasing

13    amounts of advice from friends and family that we ought to

14    get a public adjuster involved.

15    Q.   Had anybody suggested that to you before

16    Mr. Schumann's estimate was delivered?

17    A.   Yes.

18    Q.   Why had you not taken their advice --

19    A.   Well, I didn't see any need to, and I thought that

20    the best thing to do -- I didn't see any problem, and I

21    thought the best thing to do would be to see if we can let

22    him do his work.  See what he had to say.  I had no reason to

23    question him.

24    Q.   At the time you initially received Mr. Schumann's

25    estimate, were you aware that anybody else was involved in

1    the claim for Amica?

2        A.   No -- well, aware that anyone else -- I'm sorry, for

3    Amica?

4        Q.   Yes.

5        A.   Mr. Bennett.

6        Q.   Did you call Mr. Bennett or did Rick call

7    Mr. Bennett to ask him about the problems in the estimate and

8    whether there could be anything done about it?

9        A.   No.

10       Q.   At that time instead you decided to retain a public

11   adjuster?

12       A.   Yes.

13       Q.   Who did you hire?

14       A.   Anthony Parise of -- well, we hired Giordano &

15   Associates.

16       Q.   And one of their employees or contractors is Anthony

17   Parise?

18       A.   Anthony Parise, right.

19       Q.   How was it that you chose that firm?

20       A.   Well, my family's from Connecticut, and Giordano,

21   and Anthony in particular, had just gotten done taking care

22   of a claim at Yale Medical School, and the doctors there were

23   very pleased with the way he handled it.  It apparently was a

24   very complicated claim, and he did an excellent job in their

25   opinion.

1      Q.   Your parents live in Hartford?

2      A.   Yes.

3      Q.   Your brother does, too?

4      A.   Yes.

5      Q.   Can you tell me, why was it -- if you can summarize

6   for the Judge, why was it that you decided to hire a public

7   adjuster at that point rather than take another step?

8      A.   I was told that I didn't know what I was doing and I

9   needed to get someone to come in and help.

10     Q.   By your family?

11     A.   Correct.

12     Q.   Do you know, was Mr. Schumann -- Mr. Schumann had

13   completed his estimate.  Do you know whether he was

14   continuing to work on supplementing the estimate or further

15   developing it in any way?

16     A.   Well, at that point he left Erie.  So I don't know

17   what work he was doing.

18     Q.   So, by the time you had obtained the estimate -- or

19   at least by the time Rick and Mr. Schumann had talked about

20   the estimate, Mr. Schumann was gone from Erie?

21     A.   Correct.

22     Q.   He had left town?

23     A.   Correct.

24     Q.   Did Mr. Schumann ever tell you, or to your

25   knowledge, Rick, that he had reviewed the estimate with

1    Mr. Seifert?

2        A.   He told Rick that, I believe.

3        Q.   Did you ever speak with Mr. Seifert about his review

4    of Mr. Schumann's estimate?

5        A.   Yes.

6        Q.   When was that?

7        A.   That would have been sometime -- a number of months

8    later.

9        Q.   What did Mr. Seifert tell you?

10       A.   Mr. Seifert apologized for what had happened to us,

11   and said that he felt very sorry for us and that he felt that

12   he was in the middle of Amica and ourselves and that he

13   didn't make the estimate.  All he said was that for the

14   specific work quoted he could -- he would do that work for

15   the price, but he didn't say that he agreed on the scope of

16   the work.

17       Q.   He told you that he didn't agree that that's what

18   was necessary to put the house in its prefire condition?

19       A.   Correct.

20       Q.   Did you participate with Mr. Parise at all in the

21   development of his estimate of the loss?

22       A.   No.

23       Q.   Ultimately you received a copy of Mr. Parise's

24   estimate, correct?

25       A.   Yes.

1      Q.   And that would be in the record that that was more

2   than twice Mr. Schumann's estimate, correct?

3      A.   Correct.

4      Q.   There's already been testimony about your receipt of

5   a payment from Amica by letter of March 11, 2003.  We've

6   already seen it a couple of times today, but I want to look

7   at it one more time.  This is the letter of March 11th marked

8   Exhibit 3-15, and you received this from Mr. Bennett; is that

9   correct?

10      A.   Yes.

11      Q.   And it enclosed the check for the amount indicated,

12   correct?

13      A.   Yes.

14      Q.   And there was also a reference at the bottom of the

15   letter to a policy provision regarding --

16      A.   Yes.

17      Q.   -- protecting the house; is that correct?

18      A.   Yes.

19      Q.   First of all, when you read the section of this

20   letter about the policy provision, what did you understand it

21   to mean?

22      A.   Is that the second section?  Duties after loss?

23      Q.   That's correct.  That's what I was asking you about.

24      A.   I was alarmed.

25      Q.   What was it that alarmed you?

1          A.    I thought it was specifically the job of Visions,

2     who had been hired by Amica, to protect the house against

3     further damage.  So I was alarmed that that -- that something

4     wasn't being done that should be done.

5          Q.    With respect to the first paragraph of the letter,

6     which describes the payment that's being made, did you

7     interpret this letter as sending you a preliminary payment or

8     one that was further negotiable?

9          A.    Based on this, I didn't have any knowledge of how to

10     interpret it.  So I consulted with Mr. Parise and my brother.

11          Q.    What did they tell you to do?

12          A.    Well, Rick was concerned about some language on the

13     check itself --

14          MR. GEER:  I don't have objection to him testifying

15     regarding what someone told him who is going to be in court

16     to testify, because Mr. Parise --

17          THE COURT:  I'm having some difficulty hearing you.

18          MR. GEER:  Again, Mr. Murphey is trying to elicit

19     hearsay evidence.  And I do not have as much concern about

20     Mr. Parise because I understand he's going to be here to

21     testify, and I can ask him questions.  But as to Rick Borden,

22     I understand he's not going to be here to testify.

23          MR. MURPHEY:  Again, Judge, this is offered for the

24     impact on the listener.  About why he did the things he did.

25     Not necessarily the truth of what they're telling him.

1          THE COURT:  I can assure you that that's the limited

2     basis I'm taking it on, and with respect to either of those

3     gentlemen, I am not considering the testimony for the truth

4     of the matter.  Go ahead.

5          MR. MURPHEY:  Thank you, Your Honor.

6     Q.   At any rate, the question was, why is it that you

7     declined the check and sent it back to Amica?

8     A.   Well, we talked about it, and Rick had some

9     concerns, he hadn't reached any conclusion, but he wanted to

10    investigate it and was concerned that by signing the check we

11    might be agreeing that that was -- that we were agreeing with

12    the estimate potentially.  Mr. Parise felt that the amount

13    was too low for us to get started on any repairs, in any

14    case, and that there was no real point in our accepting the

15    check if there were concerns about it until these issues were

16    clarified.  Based on advice, we sent the check back.

17    Q.   Did Mr. Parise tell you whether he had consulted

18    with Mr. Seifert about Mr. Schumann's estimate?

19    A.   Yes.

20    Q.   What did he tell you?

21    A.   He had spoken with Mr. Seifert.

22    Q.   Did he tell you that Mr. Seifert agreed with

23    Mr. Schumann's estimate?

24    A.   He -- he -- he said that Mr. Seifert -- I think

25    substantially the same thing that Mr. Seifert told me.  Do

1    you want me to repeat it?

2        Q.    No.   That's okay.   We have that.   Did Mr. Parise

3    tell you whether he thought that Mr. Schumann's estimate was

4    adequate to remove all of the hidden soot and smoke and the

5    smoke smell from the house?

6        A.    He told me.

7        Q.    What did he tell you?

8        A.    He told me that it was not adequate.

9        Q.    I'm sorry?

10       A.    He told me that it was inadequate.

11       Q.    Was the smell of smoke throughout the house a

12   concern of yours with regard to whether you were going to

13   accept that scope of the loss?

14       A.    It was a big concern.

15       Q.    Why was that?

16       A.    Well, because we wanted the house restored to its

17   preloss condition.

18       Q.    Now, before -- strike that.   We've heard testimony

19   about the meeting that was held at the house on April 15th of

20   2003.   Did you participate in that meeting?

21       A.    No.

22       Q.    Was Mr. Parise there on your behalf?

23       A.    Yes.

24       Q.    Were you told what happened at the meeting?

25       A.    Yes.

1      Q.   By who?

2      A.   By Mr. Parise.

3      Q.   Was it the information from Mr. Parise that you used

4  to put in the Insurance Department complaint that we've

5  already seen?

6      A.   Partially.

7      Q.   What other sources of information did you have for

8  that complaint?

9      A.   Well, we had direct information, and it was a

10  pattern of not being -- willing to concede even the smallest

11  points at any point during the discussions.

12      Q.   What small points are you talking about?

13      A.   Well, even, for example, things that were very

14  obvious, like the lack of a provision for plumbing in the

15  basement.

16      Q.   The Schumann estimate didn't have that?

17      A.   Didn't have that.

18      Q.   Was that brought to Mr. Schumann's attention?

19      A.   Yes.

20      Q.   Was it brought to Mr. Schumann's attention right

21  after you received your estimate?

22      A.   Correct.  That's one of the main things that --

23  when -- that Rick had identified to him.

24      Q.   To your knowledge, was everything that you set forth

25  in that Insurance Department complaint accurate?

1      A.    Yes.

2      Q.    After the April 15th meeting, did Amica ever come to

3   you and tell you that they were going to revise

4   Mr. Schumann's estimate and pay an additional amount to you?

5      A.    What was the time frame again?

6      Q.    After the April 15th meeting, but before the next

7   contractor to look at the house.

8      A.    No.

9      Q.    They didn't tell you that they thought there was

10   $20,000, or some other amount, that would be a supplemental

11   payment?

12      A.    No.

13      Q.    Ultimately Amica demanded appraisal of the house; is

14   that correct?

15      A.    Yes.

16      Q.    What did you do then?

17      A.    We obtained legal counsel.

18      Q.    After that, did you also obtain -- or did you also

19   hire another contractor to take a look at the house and give

20   you an estimate?

21      A.    Yes.  I'm not even sure if it's after that.  At some

22   point -- I identified the two names, David Haller and the

23   Laughlin Brothers, early on, and we had selected David Haller

24   as the person we wanted to work with.  And I started to have

25   discussions with him at some point, but I couldn't tell you

1       the exact date, because the first few discussions were

2       perhaps informal.  I had him come out and look at the house

3       and tell me what he thought.  Just to get a sense of whether

4       or not -- who was being reasonable here.

5           Q.   Mr. Haller is going to testify, but, what did

6       Mr. Haller tell you about the scope of the work necessary to

7       repair the house?

8           A.   He said that it would be very large.

9           Q.   Did he give you an estimate?

10          A.   He gave us a written estimate, yes.

11          Q.   Mr. Geer referred to that in his opening statement

12      as a hidden estimate.  Did you ask Mr. Haller to not give

13      that to Amica or not distribute it to anybody?

14          A.   No.  This is the first time I knew that it was not

15      known to anyone.

16          Q.   You did see the proposal though?

17          A.   Yes.

18          Q.   His estimate.  I think he called it a proposal.

19      What was the amount that he estimated for you?

20          A.   $700,000.

21          Q.   The appraisal procedure, did that ever occur?

22          A.   No.

23          Q.   What did happen after Amica had demanded appraisal?

24          A.   Well, I believe that Attorney Jones had ongoing

25      discussions with Attorney Geer.

1      Q.   Ultimately did Amica hire another contractor?

2      A.   Yes.

3      Q.   Did you ever see that contractor's estimate?

4      A.   Yes.

5      Q.   Did Mr. Parise express to you an opinion on that

6   estimate?

7      A.   Yes.

8      Q.   Because I take it you're still not -- don't feel

9   qualified to read and interpret these estimates and decide

10   whether appropriate or not.

11      A.   I'm still not.

12      Q.   Did Mr. Parise tell you that he found that estimate

13   to be low, but more reasonable?

14      A.   Yes.  I think he -- he was still somewhat defensive

15   of his original estimate, but said that the scope was similar

16   to what he was saying and that one -- different people could

17   argue about the different costs.  Mr. Haller was also closer

18   to Mr. Parise.

19      Q.   So ultimately you chose to settle the claim?

20      A.   Yes.

21      Q.   And the agreed-upon payment for the dwelling was

22   $553,000?

23      A.   Yes.

24      Q.   Mr. Borden -- or Dr. Borden, you had retained --

25   strike that.  Off the record for a second.

1              (Discussion held off the record.)

2              THE COURT:  You have a list -- you have an itemized

3       list of various --

4              MR. MURPHEY:  Yes.

5              THE COURT:  -- uncompensated damages; is that right?

6              MR. MURPHEY:  That's correct.

7              THE COURT:  Primarily in the nature of compensatory

8       loss?

9              MR. MURPHEY:  Yes.  But they're continuing because

10      they're incurring attorney's fees as we speak.

11             THE COURT:  Put it this way:  I will defer in this

12      instance to Mr. Geer.  Is it your preference that some proof

13      get put on here against the possibility that there can't be a

14      stipulation?

15             MR. GEER:  My suggestion in chambers is -- my

16      feeling is I would just prefer that it at least be placed on

17      the record.  As I told the Court, I don't have any contrary

18      evidence.

19             THE COURT:  Let's go ahead and do it.

20             MR. MURPHEY:  That's also included in the summary of

21      the bad faith damages, but they -- you know --

22             MR. GEER:  I guess my suggestion is that we put in

23      the numbers and not the exhibit.

24             MR. MURPHEY:  That's fine.  And the interest is

25      wrong.

1      Q.   You hired a law firm to represent you with regard to

2  the underlying fire loss claim, correct?

3      A.   Yes.

4      Q.   That was the McDonald Illig Firm, correct?

5      A.   Yes.

6      Q.   They charged you fees of $15,383.50 in pursuit of

7  that?

8      A.   Yes.

9      Q.   And the costs of litigation in the underlying case

10 were $425.51?

11     A.   Yes.

12     Q.   And you paid Mr. Parise a percentage of the amount

13 that you ultimately recovered; is that correct?

14     A.   Yes.

15     Q.   You paid him $61,135.55?

16     A.   Yes.

17     Q.   And you paid Mr. Haller $2,000 to develop an

18 estimate in this case?

19     A.   Yes.

20          MR. MURPHEY:  The rest of them, Your Honor, would be

21 bad faith damages, which will be subject to a hearing.

22          THE COURT:  All right.

23          MR. MURPHEY:  I have just a couple of things to

24 clean up.

25     Q.   Dr. Borden, you ultimately received copies of all

1    the estimates that we've talked about today; John Schumann's

2    estimate of 2/27/03, Mr. Parise's estimate of 3/9/03,

3    Mr. Parise's revised estimate also dated 3/9/03, Mr. Haller's

4    estimate dated 6/11/03, and Mr. Dan Jones, the contractor who

5    Amica hired, his estimate of 6/23/03, and they are set forth

6    in this binder.  Do you recognize those?

7        A.   Yes.

8             MR. MURPHEY:  That's Exhibit 2.  And we've already

9    identified the other exhibits.  Judge, I would move for

10   admission of Exhibit 1, which is the photograph binder;

11   Exhibit 2, which is the estimates binder; Exhibit 6, which is

12   the diagram of the house, and that's all.

13            (Plaintiff's Exhibit No. 2 marked for

14             identification.)

15            THE COURT:  Those are admitted.

16            MR. MURPHEY:  Thank you, Your Honor.  Thank you very

17   much, Jon.  I don't have anything else.

18            THE COURT:  All right, Mr. Geer.

19

20                         CROSS-EXAMINATION

21   BY MR. GEER:

22

23       Q.   Good afternoon, Dr. Borden.

24       A.   Good afternoon.

25            MR. GEER:  I believe I'm on Exhibit A-5 --

1          THE COURT:  I'm sorry, Exhibit A-5?

2          MR. GEER:  I believe my next exhibit is A-5.

3     Q.   Dr. Borden, generally, are you in agreement that

4     throughout this claim period Amica kept in pretty close touch

5     with you to tell you what was going on with the claim?

6     A.   No.

7     Q.   What way would you disagree with that?  Do you

8     disagree with my statement that Amica kept in pretty close

9     touch with you to tell you what was going on?

10    A.   Well, in certain aspects, yes; but in other aspects,

11    no.

12    Q.   What aspects do you disagree?

13    A.   Just a variety of aspects about what they thought,

14    about who they were using, or what they -- their obligations

15    they thought were supposed to be.

16    Q.   Well, if --

17    A.   What their concerns were regarding us.

18    Q.   If I limit my question to you, what they were paying

19    for, what they needed for you to do, what estimates they had

20    received, and that type thing, would you agree with me they

21    were sending you regular correspondence on these issues?

22    A.   Yes.

23    Q.   Did you ever have a time during this claim where you

24    felt that you didn't know who to call at Amica or you didn't

25    know who to talk to at Amica if you had a question?

1       A.    Yes.

2       Q.    At what point did that occur?

3       A.    Well, definitely right before the time when we sent
4   the letter to the insurance commissioner was one.

5       Q.    You wouldn't have known who to call if you had a
6   question?

7       A.    Maybe not a question, but I -- I didn't know why
8   Amica wasn't responding to the errors and omissions that we
9   were continuing to raise through my consultants about the
10  issues, and so we weren't getting a response and I was very
11  frustrated.

12      Q.    I understand.  I'm going to ask that you try to --
13  I'm trying to make my question very narrow.  And I realize my
14  first question wasn't very narrow, and your response to that
15  reminded me of that fact.  So now I'm trying to make my
16  questions very narrow.  I hear you saying over the last few
17  hours that you had frustrations and you had concerns.  My
18  question to you was, was there ever a time during this period
19  where you didn't have the name of an Amica representative
20  that you could have called with your question?

21      A.    There was always a time I had the name of a
22  representative.

23      Q.    Let me start off with what I marked as Exhibit A-5,
24  this is a letter dated February 18th.  That would be two days
25  after the fire, correct?

1        (Defendant's Exhibit A-5 marked for identification.)

2    A.   Yes.

3    Q.   This letter indicates that the investigation had

4    been assigned to John Schumann --

5        THE COURT:  Once again, this is just in the interest

6    of keeping us moving down the road at an appropriate speed

7    and not going slower than we have to, let me ask Mr. Murphey

8    this question:  Mr. Murphey, as I understand it, it is not

9    part of your bad faith claim here that Amica's alleged bad

10    faith is based upon a failure to respond promptly; is that

11    correct?

12        MR. MURPHEY:  That's correct, Your Honor.

13        THE COURT:  I take that as a stipulated binding

14    fact.  That having been said, you're free to sketch out some

15    background, but, as I understand it, this is not a delay case

16    per se.  The claim is -- maybe I can get an agreement from

17    both of you, so we'll really target this thing.  As I

18    understand it, the claim is that at a particular point in the

19    adjusting process, Amica became possessed of sufficient

20    knowledge from which they knew or reasonably should have

21    known that it was reckless not to agree to pay -- not to

22    agree to pay for the additional work that would be occasioned

23    by knocking the walls down because of the soot.  Isn't that

24    the essence of this whole claim, Mr. Murphey?

25        MR. MURPHEY:  It is, Your Honor.

1           THE COURT:  Do you agree with that as well?

2           MR. GEER:  I agree with that.

3           THE COURT:  That's how I see it.  I'm not going to

4     lead you folks around by your nose as to how to ask questions

5     consistent with that, but keep it in mind, because I think we

6     might be able to shorten up -- and let me ask one other

7     question on it because at some point when I'm doing an

8     opinion on it, it'll be helpful.  I take it from Amica's

9     standpoint that it is your position that it was not

10    unreasonable within a bad faith sense to have taken the

11    position that it was possible to restore the house to its

12    prefire condition without knocking the walls down, but

13    instead, doing what Mr. Schumann initially proposed; is that

14    correct?

15          MR. GEER:  That's correct.

16          MR. MURPHEY:  And it's -- your position is precisely

17    the opposite?

18          MR. MURPHEY:  That's right.

19          THE COURT:  As an engineering matter or restoration

20    matter or policy matter that is bad faith?

21          MR. MURPHEY:  And the evidence that we tried to

22    present is the accumulating information that Amica is getting

23    to suggest that that original estimate was too low.

24          THE COURT:  That focuses the inquiry, if it needed

25    any more focus.  Go ahead.

1           MR. GEER:  It does, Your Honor.  If I can just

2     respond to that, however, this is a case where the Plaintiffs

3     have requested punitive damages.  Punitive damages call into

4     question the state of mind of Amica, and I don't think the

5     state of mind can be measured entirely in a punitive damage

6     case on one point.  I don't know that we can stop the clock

7     at one point in time and say, as of that moment, did they do

8     something wrong.  Because in the overall context of the

9     claim, the question is, was the overall claim handled in bad

10    faith.  And in this case, on that particular issue, what is

11    there in the case that would indicate that ultimately we got

12    it right.

13          THE COURT:  I'm not saying you're necessarily wrong,

14    nor am I going to limit your proof, because I do think the

15    bad faith case requires an overall context.  But as I view

16    it, it's the Plaintiff's position that that's the straw the

17    broke the bad faith's back; is that right?

18          MR. MURPHEY:  That's right.

19    Q.    Dr. Borden, I'm going to move through this as

20    quickly as I can, and I'm going to mark exhibits and I will

21    ask you some questions to try to move things along.  I am not

22    going to try to rush you through it.  If you need to read any

23    of these letters, I will put in front of you, you just tell

24    me if you need time.  I understand it's a little cumbersome

25    to read letters into the record.  Very often in trials that's

 1    what we do.  But in order to save some time I'm going to mark

 2    an exhibit, I'll put it on the screen, I'll ask you

 3    questions, and if you need to look at the exhibit in order to

 4    answer my question, please feel free to do that and I will

 5    slow down.  Is that fair?

 6        A.   Yes.

 7        Q.   I marked Exhibit A-5.  My question is, were you

 8    given a document right away, two days after the fire, which

 9    came from Amica guiding you through reconstruction?

10        A.   Yes.

11        Q.   It was a pamphlet?

12        A.   Yes.

13        Q.   Did you ever read it?

14        A.   Yes.

15        Q.   I thought you said in your deposition you didn't

16    recall doing that?

17        A.   I still don't recall reading it, but I believe I

18    read it at some point.

19        Q.   You don't recall whether you did or not?

20        A.   I don't recall any of the details in the document.

21    I recall seeing the document.

22        Q.   Ultimately, we know you did not reconstruct your

23    house, correct?

24        A.   Correct.

25        Q.   Now, you had purchased this house, what, just months

1    really before the loss?

2        A.   Yes.

3        Q.   For how much?

4        A.   720,000.

5        Q.   And then, at the end of the day -- at the end of,

6    what, 2004 you demolished the house, correct?

7        A.   Yes.

8        Q.   You completely levelled it?

9        A.   Yes.

10       Q.   You sold the lot that it was on, correct?

11       A.   Yes.

12       Q.   And you received $180,000 for the lot alone,

13   correct?

14       A.   Yes.

15       Q.   So as you sit here today, you have received all the

16   money that Amica has paid you to date --

17           MR. MURPHEY:  I'm going to object, Your Honor.  The

18   issue is -- as Mr. Bennett has acknowledged the issue in this

19   case is whether Amica -- strike that --

20           THE COURT:  Sustained.

21           MR. MURPHEY:  The issue is with respect to them

22   paying --

23           THE COURT:  Don't look a gift horse in the mouth.  I

24   just sustained the objection.

25           MR. MURPHEY:  Thank you, Judge.

1      Q.   Dr. Borden, you were given a claim card, were you

2   not, that allowed you to purchase whatever your family

3   needed, and it would be more or less a debit card?

4      A.   Yes.

5      Q.   And that claim card was renewed from time to time so

6   that as you needed to purchase new things you could; is that

7   right?

8      A.   Yes.

9      Q.   There was testimony earlier about other contractors.

10   Do you recall that?  These names had been provided to you by

11   neighbors or friends of yours.

12      A.   Yes.

13      Q.   I believe, specifically, you referred to Laughlin

14   Brothers, Hardner, and David Haller.  Do you recall that?

15      A.   The names that were given to us by neighbors and

16   friends were the Laughlin Brothers and David Haller.

17      Q.   You said, I believe, that there was a time after the

18   loss when you were at the scene with Mr. Schumann and you

19   talked to him about having another contractor, and he said --

20   he gave you the impression this wasn't the time for that,

21   correct?

22      A.   That was while we were in the restaurant at the

23   Clarion Bel-Aire Hotel.

24      Q.   So that was just a couple days after the fire?

25      A.   Well, it would have to be at least three days.

1      Q.   And that was because he hadn't done his estimate

2   yet, correct?

3      A.   Correct.

4      Q.   Did you understand that to be limited in time?  To

5   tell you you didn't need a contractor that day or the next

6   day, but that there was time to do that after he prepared his

7   estimate, or did you think he meant you never needed a

8   contractor?

9      A.   I knew we would need a contractor at some point, but

10  he wrote down the names and said, I will contact them at the

11  appropriate time.  I had no idea what the appropriate time

12  was at that point.

13     Q.   I'm going to show you what I've marked as A-6.  When

14  this contract was issued.  There was a letter sent to you by

15  Mr. Bennett.  Now, you had had Mr. Bennett's name for a

16  while.  I had previously shown you a letter from Mr. Bennett,

17  and it invited you to call him if you had questions, correct?

18          (Defendant's Exhibit A-6 marked for identification.)

19     A.   Yes.

20     Q.   In fact, just going back to A-5, at the end of the

21  letter Mr. Bennett had given you his phone number and said,

22  if you have any questions, you may contact me directly, and

23  he gave you his direct dial, correct?

24     A.   Yes.

25     Q.   Now, in this letter, A-6, you are sent a copy of

1    Mr. Schumann's estimate, correct?  And you were also -- at

2    that point, you were told that it appears that Amica's

3    suggesting to you that you could consult a contractor at this

4    point in time, and that you should consider having him

5    inspect the house and consider having him review

6    Mr. Schumann's estimate.  Do you agree with that?

7         A.    Yes.

8         Q.    Why didn't you do that at that point in time?

9         A.    Because at that point I was advised to obtain the

10   services of Giordano & Associates.

11        Q.    So in other words, instead of doing what Amica

12   suggested, getting one of these contractors, you had three

13   names at least, you decided to get a public adjuster,

14   correct?

15        A.    Yes.

16        Q.    Did you get advice from Mr. Parise that in addition

17   to having a public adjuster you should not consult a

18   contractor?

19        A.    No.

20        Q.    Did you understand that -- when we were talking

21   about the amount of damage to your building, did you

22   understand that Mr. Parise's company would not rebuild the

23   structure for you?  That Mr. Parise was not a contractor with

24   the capacity to build?

25        A.    He never represented himself in that fashion.

1          Q.   So you understood, when you were dealing Mr. Parise

2     and Mr. Schumann, these were both individuals who would work

3     from computers, they would prepare estimates based on what

4     they saw and knew, but these estimates, if not tied to a

5     contractor, wouldn't necessarily guarantee you that there was

6     someone who would build at that price, correct?

7          A.   Correct.

8          Q.   Now, there was also earlier testimony that you had

9     some concerns about what Mr. Seifert had done regarding the

10    board-up, and you had the name of Mr. Hardner.  Did you

11    consult with Mr. Hardner after that to ask him to come back

12    in and review any of the work that either Schumann or Visions

13    had done?

14         A.   I didn't have major concerns with Mr. Seifert

15    regarding the board-up at all.  The only concern I had was

16    that Mr. Hardner said that he would have put antifreeze in

17    the pipes.  But aside from that, I had no reason to question

18    what Mr. Seifert had done at that point regarding the

19    board-up.

20         Q.   I'm going to show you what's been marked as A-7.

21    You've received this document before.  But this is the letter

22    Brian Seifert wrote to you, and to Mr. Schumann, and this is

23    the letter dated March 7th in which he says, among other

24    things, that he is capable of doing the work at

25    Mr. Schumann's price, but he also says there are always

1    hidden costs on areas that couldn't be seen or areas that had

2    no access.  Do you recall getting that letter?

3              (Defendant's Exhibit A-7 marked for identification.)

4        A.   No.

5        Q.   Are you saying you don't recall or are you saying

6    you did not get it?

7        A.   To be specific, as I mentioned during the

8    deposition, I believe at the deposition that was the first

9    time I saw the letter.

10       Q.   Do you recall at this point in time whether you had

11   voiced to Amica -- we're talking about March, had you voiced

12   any objections or concerns about Mr. Seifert or Visions and

13   their ability to review a property estimate or anything of

14   that nature?

15       A.   Mr. Parise was handling that at that point.

16       Q.   So the answer is, you don't know what Mr. Parise

17   might have done?

18       A.   I believe he did, but I did not specifically voice

19   that concern to Amica myself.

20       Q.   I'm going to show you what I've now marked as A-8.

21   This is the letter that accompanied the first check that was

22   sent to you by Mr. Bennett, the check in the amount of

23   $295,098.02.  Obviously you had questions about this,

24   correct?  You testified about the questions and concerns that

25   this letter and this check caused you, correct?

1                (Defendant's Exhibit A-8 marked for identification.)

2        A.   Yes.

3        Q.   Why didn't you call Mr. Bennett and ask him about

4    it?

5        A.   I was acting on the advice of my brother and

6    Mr. Parise at that point.

7        Q.   Did they tell you not to call?

8        A.   They felt that a verbal explanation would not be

9    enough.  That we needed a written clarification.

10       Q.   You'll agree with me, though, that Mr. Bennett

11   again, as he did in other letters, said, "If you have any

12   questions or concerns, please let me know."?

13       A.   I understand.

14       Q.   It was just your choice not to call and ask

15   questions --

16       A.   Yes.

17       Q.   I mean, you were very concerned about this, you

18   didn't know what the check meant, but you didn't do anything

19   affirmative, you just reacted and said I won't accept this,

20   correct?

21       A.   Yes.

22       Q.   Did you ever see the check?

23       A.   Yes.

24       Q.   Did the check say anything on it about final payment

25   or final settlement of all claims or any words to that

1    effect?

2        A.   Well, what the check said, my recollection is that

3    it says something about for services rendered.  Now, I don't

4    understand what those words mean specifically or in a legal

5    sense.  Rick had a concern about that phrase that he wanted

6    to be clarified before we would accept the check.

7            MR. GEER:  I have a copy of the original check, and

8    at the bottom is the endorsement.  I can put it up, but, Your

9    Honor, I think it's a little clearer if he just looks at it.

10   May I?

11           THE COURT:  All right.

12       Q.   This has been marked as A-4 already --

13           MR. MURPHEY:  Which check is that?

14           MR. GEER:  This is the $295,000 check.

15           THE COURT:  Is that A-4?

16           MR. GEER:  Yes.  That is A-4.

17       Q.   The question is, what was the language on that check

18   that caused concern to you that caused you to reject it?

19       A.   The concern was on Rick's part, but part of the

20   particular phrase was, "For a loss on 2/16/2003 or for

21   services rendered under policy number."

22       Q.   That was it?

23       A.   Yes.

24       Q.   So you are referring to this section here, correct?

25       A.   Perhaps also for the "for a loss" part, but

1    generally, yes.

2         THE COURT:  How much more do you have with this

3    fellow?

4         MR. GEER:  I'm guessing at least an hour.  I would

5    estimate at least an hour.

6         THE COURT:  We're going to break earlier today.

7    We're moving along pretty good.  But we're going to start a

8    little bit earlier tomorrow morning.  We'll start at 8:30

9    tomorrow morning, and we'll probably finish, for scheduling

10   purposes, around 4:00.  Who else do you have after the Doctor

11   is done?

12        MR. MURPHEY:  Mr. Parise, Mr. Seifert, Mr. Haller.

13        THE COURT:  Anybody else?

14        MR. MURPHEY:  Well, no.  The reason I said it that

15   way is because we had -- I had talked about calling

16   Mr. Schumann, it doesn't look like we're going to be able to

17   do that.

18        THE COURT:  Is he going to testify?  Is he going to

19   be called in your case?  Mr. Schumann.

20        MR. GEER:  I told Craig that if he called

21   Mr. Schumann -- it was my plan not to, I couldn't guarantee

22   it, but assuming he goes through the whole scope of the

23   issues with Mr. Schumann, I was planning not to do that.  If

24   he stopped short and didn't cover some of the issues, I would

25   do that.  I anticipate he would be as thorough as he always

 1   is.

 2           MR. MURPHEY:  I am attempting to be cooperative, and

 3   I will -- if we can have Mr. Parise and Mr. Schumann testify

 4   tomorrow, I think that would allow Mr. Schumann to go back to

 5   North Carolina, or wherever he's from --

 6           THE COURT:  So it is your intention to call

 7   Mr. Schumann as on cross-examination?

 8           MR. MURPHEY:  I will call him.

 9           THE COURT:  Then we'll probably finish your case

10   tomorrow, shouldn't you think?

11           MR. MURPHEY:  Yes.  I can't speak for Paul, but I

12   think they'll be much quicker than these witnesses.

13           THE COURT:  What about you, Mr. Geer?  What do you

14   have by way of -- you're kind of getting your case done as we

15   go along here in some form or fashion

16           MR. GEER:  I expect to call Mr. Bennett back, and

17   Dan Jones, the contractor.

18           THE COURT:  So those would be your two witnesses.

19   Then we're moving along pretty good.  We'll finish this thing

20   up probably on Monday, I should expect, barring something

21   unforeseen.  So we'll see you back at 8:30 in the morning

22           MR. GEER:  Do you mind if I ask for an offer of

23   proof on Mr. Haller?  I have some objections --

24           THE COURT:  On who?

25           MR. GEER:  Mr. Haller.  David Haller the contractor.

1              THE COURT:  Come on into my chambers.

2              MR. GEER:  I may call Amy Borden, too.  Craig just

3      told me he's not going to call Amy Borden, so I may call her.

4              THE COURT:  What does she have to say that would be

5      pertinent to this?  Do you know?

6              MR. GEER:  I think it depends on what we elicit from

7      Mr. Schumann.

8              THE COURT:  Anyway, we're here on an offer of proof

9      for Mr. Haller.

10             MR. MURPHEY:  Mr. Haller estimated the loss.  The

11     issue in this case, in the first instance, is the

12     reasonableness of Mr. Schumann's estimate.  Mr. Haller saw

13     the house three months later, and estimated it at twice as

14     much as Schumann's estimate.  It's pretty clear to me that

15     that's relevant evidence.

16             MR. GEER:  I think it's relevant.  Did you disclose

17     Mr. Haller as your expert?  Your Rule 26 disclosure?

18             MR. MURPHEY:  I identified him as an expert.

19             MR. GEER:  As an expert or as a witness?

20             MR. MURPHEY:  He was identified as an expert, I

21     know, in the pretrial.

22             MR. GEER:  I know he was in the pretrial.  Here's my

23     concern, Your Honor:  He was never made -- this is a bad

24     faith case.  So the real question is what did Amica know,

25     what was presented to Amica that they should've considered,

1    didn't consider, did they disregard this evidence.  I think

2    that's the heart of the case that the Court's been getting

3    to --

4              THE COURT:  How reasonable or unreasonable was it

5    for them -- really, as much as dollars and cents it's -- it's

6    as much a scope of the work case as anything else.  I suspect

7    that if there had been an agreement on scope of the work we

8    wouldn't be here today.

9              MR. MURPHEY:  Ultimately they agreed on scope of the

10   work, didn't agree on the ultimate price, but they settled

11   the case.

12             THE COURT:  In any event, your point is?

13             MR. GEER:  My point is, I even took Mr. Haller's

14   deposition.  I didn't know he was going to be called as an

15   expert to say it was unreasonable -- that Schumann's estimate

16   or anybody else's estimate was unreasonable.  I took

17   Mr. Haller's deposition simply because I had some

18   subcontractor's estimates directed to him, and didn't really

19   have any knowledge at that point in time what his involvement

20   was.  And then, when I took his deposition, I happened to ask

21   a question:  Did you ever do an estimate?  And that was the

22   first time I ever received it.

23             THE COURT:  Were there any expert reports that were

24   filed in connection with this case?

25             MR. MURPHEY:  We filed them with our pretrial

1    narrative.  And what I did in the pretrial narrative is, I

2    identified Dave Haller and said his deposition had been

3    taken, and one was his expert report -- I'm sorry, his

4    estimate.

5         THE COURT:  How are you surprised by -- you deposed

6    him, you have his report.  Maybe the problem is mine, I'm not

7    seeing it clearly, but I'm not sure what your concern is.

8         MR. GEER:  It's just this, Your Honor:  He is not a

9    fire restoration contractor, and I know I can cover that on

10   cross, but I had no idea, when I took his deposition, that he

11   was going to be a witness that was going to be used by

12   Mr. Murphey to say that my estimates were unreasonable.  He

13   merely did an estimate for $700,000 on the house, and I was

14   interested at that point because I had never seen that

15   estimate before.  But not that he was going to be used as an

16   expert witness, that he going to be used in the --

17        THE COURT:  Who's the other fellow that came

18   in with -- the name is escaping me --

19        MR. MURPHEY:  Dan Jones?

20        THE COURT:  Yes.  What was his estimate?  That was

21   your guy you got.

22        MR. GEER:  He was our guy.  He was the 553 guy.

23        THE COURT:  And then Parise was higher than that.

24   But is Parise going to testify -- is Parise going to weigh in

25   on the issue of why it was necessary to knock the walls down?

1          MR. MURPHEY:  Sure.  Yeah.  I mean, that's the point

2     of his testimony

3          THE COURT:  And, presumably, you'll have some

4     testimony, either from Mr. Schumann or somebody else, as to

5     why it was reasonable not to knock the walls down, right?

6          MR. GEER:  That's correct.  I guess my objection to

7     Mr. Haller is just that I had no reason to ask him those

8     questions.  I think I asked him one question:  Do you have

9     any fire restoration experience?  I think he said, no.  And I

10    went on.

11         THE COURT:  It seems to me you failed to ask him at

12    your own risk.  I'll see how it goes tomorrow.  It's a

13    nonjury trial, so I have a certain degree of latitude.  Once

14    the cat gets out of the bag with the jury, it's sometimes

15    somewhat different.  But to cut to the chase, I presume

16    Haller gets up, give him the estimate, is this yours, is this

17    what you considered reasonable to redo the house?

18         MR. MURPHEY:  To put it back in its prefire

19    condition, absolutely.

20         THE COURT:  Well, isn't that essentially what

21    happened at deposition anyway?  I mean, was that essentially

22    what happened there?

23         MR. GEER:  Yes.  I guess I don't -- if he goes that

24    far, I knew that much.  I guess the question is the next

25    step, and I anticipate Craig will take it to the next step,

1    which will say whether it's reasonable or not to think that

2    what we call the clean, seal, paint approach was

3    unreasonable.  Is that what you're going to do?

4           MR. MURPHEY:  Yes.  I'm going to say, is this what

5    was necessary to bring it back to its prefire condition.

6    Yes.  Could you have painted it and sealed it.  No.  Why.

7    These are the reasons.  I mean, he's a contractor, you know,

8    too.  I mean, Parise is a public adjuster, just like Schumann

9    is.

10          THE COURT:  As far as all that goes, so far from

11   what I hear I don't see any particular surprise or prejudice.

12   You're going to have an opportunity to cross-examine him if

13   you want till the cows come home, and you'll wheel in your

14   people.  I take it, though, that it -- that it would be

15   Amica's position, through some of these witnesses that

16   testify, that in fire losses like this it is not unusual to

17   forego knocking the walls down and patching and sealing in

18   lieu of knocking the walls down?  Is that essentially right?

19         MR. GEER:  I think that's pretty concise, Your

20   Honor.

21         THE COURT:  We'll go off the record here.

22         (Discussion held off the record.)

23         THE COURT:  The parties informed me -- actually, to

24   be more accurate, Mr. Murphey called to inform me prior to

25   the commencement of trial that David Haller would be called

1    as a witness in the case, which I was unaware of at the time.

2    Mr. Murphey also informed me that he had spoken with Mr. Geer

3    about it, and advised him, if I got this correctly, that

4    Mr. Haller had advised you that he and I have a partnership

5    or business relationship along with another individual, and

6    would that present any particular problem.  I'm informed that

7    it did not present a problem for Mr. Geer, nor your client;

8    is that right?

9          MR. GEER:  That's correct.

10          THE COURT:  And nor does it present a problem for

11    you.  I've considered the matter, and if anybody had an

12    objection, I would certainly have acted on it.  I don't

13    consider it problematic, and I'm certain I can decide the

14    case fairly.

15

16          (Adjourned at 4:13 p.m.)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3         I, Sondra A. Black, a Court Reporter and Notary

4    Public in and for the Commonwealth of Pennsylvania, do

5    hereby certify that the foregoing is a true and accurate

6    transcript of my stenographic notes in the

7    above-captioned matter.

8

9

10

11                             Sondra A. Black

12

13

14

15                        Dated: January 12, 2006

16

17

18

19

20

21

22

23

24

25