1                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

JONATHAN BORDEN and AMY BORDEN,        :
3            Plaintiffs               :
                                       :
4            v.                        : Case No. 04-175 Erie
                                       :
5    AMICA MUTUAL INSURANCE COMPANY,   :
             Defendant                 :
6

7

8                              Volume II

9

10            Trial held in the above-captioned matter on

11       Friday, December 9, 2005, commencing at 8:36 a.m.,

12       before the Honorable Sean J. McLaughlin, in the United

13       States District Court, 17 South Park Row, Erie,

14       Pennsylvania 16501

15

16

17    For the Plaintiff:

18        Craig R. F. Murphey, Esquire
          MacDonald Illi Jones & Britton, LLP
19        100 State Street, Suite 700
          Erie, PA 16507
20

     For the Defendant:
21
          Paul K. Geer, Esquire
22        DiBella Geer McAllister Best
          312 Blvd of the Allies, 3rd Floor
23        Pittsburgh, PA 15222

24

25                    Reported by Sondra A. Black
                 Ferguson & Holdnack Reporting, Inc.

1                              I N D E X

2

3       JONATHAN BORDEN

4            Continued Cross-Examination by Mr. Geer...............224

5            Direct Examination by Mr. Murphey....................245

6            Cross-Examination by Mr. Geer........................247

7

8       JOHN SCHUMANN

9            Cross-Examination by Mr. Murphey.....................248

10           Direct Examination by Mr. Geer.......................271

11           Recross-Examination by Mr. Murphey...................319

12           Redirect Examination by Mr. Geer.....................322

13

14      ANTHONY PARISE

15           Direct Examination by Mr. Murphey....................323

16           Cross-Examination by Mr. Geer........................415

17           Redirect Examination by Mr. Murphey..................450

18

19      EXHIBITS

20
             Plaintiff's Exhibit No. 3-37.........................257
21           Plaintiff's Exhibit No. 10-1.........................349
             Plaintiff's Exhibit No. 10-2.........................350
22           Plaintiff's Exhibit No. 10-5.........................351
             Plaintiff's Exhibit No. 10-6.........................351
23           Plaintiff's Exhibit No. 10-7.........................352
             Plaintiff's Exhibit No. 10-9.........................353
24           Plaintiff's Exhibit No. 10-10........................354
             Plaintiff's Exhibit No. 10-11........................354

25

1    EXHIBITS

2        Plaintiff's Exhibit No. 10-12........................356
         Plaintiff's Exhibit No. 10-16........................358
3        Plaintiff's Exhibit No. 10-17........................360
         Plaintiff's Exhibit NO. 10-18........................361
4        Plaintiff's Exhibit No. 10-19........................389
         Plaintiff's Exhibit No. 10-20........................390
5        Plaintiff's Exhibit No. 10-24........................366
         Plaintiff's Exhibit NO. 10-25........................366
6        Plaintiff's Exhibit No. 10-27........................374
         Plaintiff's Exhibit No. 10-31........................373
7        Plaintiff's Exhibit No. 10-32........................375
         Plaintiff's Exhibit NO. 10-33........................363
8        Plaintiff's Exhibit No. 10-34........................364
         Plaintiff's Exhibit No. 10-35........................377
9        Plaintiff's Exhibit No. 11...........................411
         Plaintiff's Exhibit NO. 12...........................411

10
         Defendant's Exhibit A-9..............................225
11       Defendant's Exhibit A-10.............................229
         Defendant's Exhibit A-12.............................233
12       Defendant's Exhibit A-13.............................235
         Defendant's Exhibit A-15.............................290
13       Defendant's Exhibit P-1..............................296
         Defendant's Exhibit P-35.............................302
14       Defendant's Exhibit P-41.............................305
         Defendant's Exhibit P-45.............................305
15       Defendant's Exhibit P-59.............................313
         Defendant's Exhibit P-60.............................313
16       Defendant's Exhibit P-83.............................306
         Defendant's Exhibit P-84.............................308
17       Defendant's Exhibit P-96.............................309
         Defendant's Exhibit P-121............................311
18       Defendant's Exhibit P-122............................311
         Defendant's Exhibit P-179............................281
19       Defendant's Exhibit P-180............................282
         Defendant's Exhibit P-181............................282
20       Defendant's Exhibit P-182............................282
         Defendant's Exhibit P-183............................282
21       Defendant's Exhibit P-184............................283
         Defendant's Exhibit P-185............................283
22       Defendant's Exhibit P-187............................283
         Defendant's Exhibit P-190............................284

23

24

25

1           THE COURT:  Are we ready to go?

2           MR. GEER:  We wanted to mention to you our plans.

3           THE COURT:  Sure.

4           MR. MURPHEY:  Dr. Borden is still on the stand,

5    Mr. Geer will continue to examine him; after that, I'm going

6    to call, as on cross-examination, Mr. Schumann; and then,

7    after that, we have Mr. Parise, who was the public adjuster

8    for the Bordens; and then, after that, Mr. Haller is going to

9    come in this afternoon.  We think that we may be -- we're not

10   sure, obviously, but we may be done a little bit early, if

11   that's okay for the Judge, because we have -- the other

12   witnesses will travel and be here Monday.

13          THE COURT:  That's okay.  The weather is inclement

14   anyway, and it may make getting here difficult.

15          Doctor, would you resume the stand, please.

16

17                 CONTINUED CROSS-EXAMINATION

18   BY MR. GEER:

19

20      Q.   Good morning, Dr. Borden.

21      A.   Good morning.

22      Q.   As you will recall, yesterday we were talking about

23   the checks which had been sent to you by Amica.  The checks

24   which you returned.  Do you recall that?

25      A.   Yes.

1          Q.   I believe you indicated to us that you had talked

2     about your reasons for rejecting the first check, the

3     $295,000 check, which had been sent to you on March 11th, and

4     if I'm not mistaken, I think that's where we left off.

5               I want to show you now the second check which was

6     sent to you, and the letter that went with it.  First of all,

7     the letter is dated March 17th, it's been marked as Exhibit

8     A-8, and this indicates it's a partial contents replacement

9     cost inventory, and the replacement cost total which was

10    advanced  was $39,945.48, and the itemization was also

11    listed.  Now, I understand you also rejected this check,

12    correct?

13         A.   We sent it back.

14         Q.   What was the reason for doing that?

15         A.   My recollection is that it was the same reason as

16    the first check.

17         Q.   I'm going to put up a copy -- this is Exhibit A-9.

18    I'm going to show you a copy of this check.  Can you read --

19    I can zoom in a little bit --

20              (Defendant's Exhibit A-9 marked for identification.)

21              THE COURT:  Mr. Geer, your voice has a tendency to

22    trail off in this courtroom.

23              MR. GEER:  Okay.  Thank you, Your Honor.

24         Q.   Can you read the check well enough for me to ask you

25    questions or would you like to see it?

1       A.   I can read it.

2       Q.   What was the language on this check that caused you

3  to decide to return it?

4       A.   I don't recall making a separate cognitive decision

5  regarding this check and the previous check.  I think there

6  was -- as I said yesterday, there was language on the first

7  check, and it was my brother who was concerned about it, and

8  we sent it back on his recommendation.

9       Q.   Are you aware that your brother testified that he

10  felt that this check said full and final payment or words to

11  that effect?

12       A.   My understanding was that he wasn't sure if it did

13  or didn't, and that he wanted to get some advice from someone

14  who had more expertise about this before making a

15  recommendation.

16       Q.   Did you send him the check or a copy of the check?

17       A.   Yes.

18       Q.   So it's your recollection -- because he said he

19  talked to Amy about it on the telephone.

20       A.   Okay.  That may have been the case.

21       Q.   So you never actually sent him the check.  Should I

22  assume you also didn't send him a copy of Mr. Bennett's

23  letter that said this was a partial payment?

24       A.   I'm sorry, the letter?

25       Q.   The letter that I showed you earlier, that would be

1    Exhibit A-8.  The one that accompanied the check.  The

2    enclosure letter which said this was a partial payment.  You

3    didn't send him that letter either, correct?

4        A.   I don't recall if we spoke about it on the phone or

5    if he was sent it.

6        Q.   And I'm going to show you exhibits that have been

7    marked, first of all, A-2, and ask you if this is a -- first

8    of all, does that appear to be your handwriting or Amy's

9    handwriting?

10       A.   That's Amy's handwriting.

11       Q.   And that's the note that accompanied the check when

12   it was returned; is that correct?

13       A.   Yes.

14       Q.   And A-1 is a similar note, and this was the second

15   check -- I'm sorry, I have them switched around.  Let me go

16   back for just a second.  A-2 was the second check, the

17   $39,000 check, and can you see it also refers to the previous

18   check which was returned; is that accurate?

19       A.   Yes.

20       Q.   And A-1 is a note dated 3/17/03.  This is also Amy's

21   handwriting?

22       A.   Yes.

23       Q.   This is the note which says, "Thank you for your

24   attention to our claim.  After consulting with Mr. Parise, we

25   cannot accept this check."

1       A.   Yes.

2       Q.   So this accompanied the larger check, the $295,000

3   check; is that correct?

4       A.   Yes.

5       Q.   Mr. Parise testified at his deposition, Page 76 I

6   believe, that he would have suggested accepting the check.

7   So it's interesting to me that in your note to Mr. Bennett --

8   or Amy's note to Mr. Bennett it said this was based upon

9   Mr. Parise's advice?

10      A.   Well, actually it -- it doesn't say that.  But Amy

11  wasn't actually party to the three-way conversation.  So she

12  may have said that not understanding that it was Rick who had

13  the objection rather than Mr. Parise.

14           THE COURT:  Rick who?

15           THE WITNESS:  Borden.  My brother.

16      Q.   Is part of what went into the equation here, you

17  didn't want the money because you hadn't decided whether to

18  rebuild or not?

19      A.   Specifically, he was concerned about the language --

20           THE COURT:  Who is "he"?

21           THE WITNESS:  My brother, Rick, was concerned about

22  the language.

23      Q.   I believe you indicated yesterday that you were not

24  going to accept this until it was cleared up that it was

25  not -- you were concerned it was payment in full or something

1  which would preclude you from making a further claim,

2  correct?

3      A.   It was a legal issue.

4      Q.   All right.  Now, I'm going to show you copies of two

5  letters.  The first one's been marked A-10.  Now, this was a

6  letter sent by Mr. Bennett to Mr. Parise; however, you are

7  CCed on it.  So I'm going to first ask you if you received

8  it?  If you recall receiving this letter?

9           (Defendant's Exhibit A-10 marked for

10           identification.)

11     A.   Yes.  I don't know exactly when, but, yes.

12     Q.   This is the letter which says, "Our check represents

13  the actual cash value of the repairs.  I would like you to

14  understand that issuance of this check is not a release of

15  the claim.  It represents a portion of the dwelling claim

16  that is not in dispute.  If you would like to reconsider your

17  position, please let me know."  This apparently didn't

18  satisfy you enough that you were willing to accept the check?

19     A.   At this point I wasn't making the decisions.  I was

20  acting according -- according to my consultant.

21     Q.   Well, you had said that you didn't accept the check,

22  though, because of your brother's advice, correct?

23     A.   My brother was one of my consultants.  I mean that

24  in a loose term.

25     Q.   And I'm not meaning to argue with you, but if I

1    understood your testimony earlier, you said that Mr. Parise

2    would have -- you agreed that Mr. Parise didn't have a

3    problem with you accepting the check, that it was your

4    brother, correct?

5        A.   Right.

6        Q.   And Mr. Parise said in his deposition that he would

7    have recommended accepting the check, or words to that

8    effect.

9        A.   Correct.

10       Q.   Now, you're acting, really, on your brother's

11   advice --

12       A.   Right.

13       Q.   -- when you don't accept this check.  Did you send

14   this letter on to your brother or tell him of its contents

15   and then ask whether it was okay to accept it?

16       A.   I definitely recall that we discussed part of that

17   letter at least.

18       Q.   He still was not comfortable with the acceptance of

19   it, correct?

20       A.   I don't recall at what point he became comfortable

21   or not comfortable regarding the check.

22       Q.   All right.  And then, the next day, March 26th,

23   Mr. Bennett wrote a letter directly to you and to your wife.

24   This has been marked as Exhibit A-3.  Perhaps even a little

25   more specific he says here, "As was explained in our letter

1    of March 25th, your return of the dwelling payment of

2    $295,000, again neither check represents a settlement check.

3    They are payments we feel we owe based upon the adjuster's

4    estimate of damages."

5         THE COURT:  Mr. Geer, I'm not trying to make your

6    life miserable, but I need a record in the case.  I can't get

7    it unless you speak up.

8         Q.    "They are payments we feel we owe based upon the

9    adjuster's estimate of the damages.  Your acceptance of these

10   checks does not affect your ability to contest our estimate

11   or the damages or make claim for additional damages."  That

12   letter would appear to clear up concerns that you expressed

13   earlier yesterday at the end of the day, and also this

14   morning.  Did it not satisfy your concerns?

15        A.    Frankly, I didn't really understand the technical

16   issue in the first place.  So I just didn't have a strong

17   opinion on that.

18        Q.    So, for whatever reason, you just didn't take Amica

19   up on its offer to send you back the checks and you just --

20   at this point in time, which is March 2003, you were just not

21   willing to accept these checks, even though they were

22   undisputed, correct?  You did understand these were

23   undisputed payments at this point, did you not?  Based on

24   that letter.  Would you like to see it again?

25        A.    Yes.  I -- I didn't understand that the check wasn't

1    undisputed to start out with.

2        Q.   I understand that.  I understand that.  You said

3    that before, but now my question to you is -- would you

4    rather see the letter --

5        A.   No.  I don't doubt that's what it says.  I'm just --

6             THE COURT:  I'm not sure what the question is on the

7    table.

8        Q.   The question I had for the Doctor, was why, when he

9    had been told this, the information that this was an

10   undisputed payment and that this his acceptance did not

11   affect his ability to contest the estimate of the damages or

12   make claim for additional damages, I don't understand what

13   the problem was at this point that would prevent you from

14   accepting the payments of $330,000-and-change.

15            MR. MURPHEY:  Is that a question?

16            THE COURT:  I interpreted it as such.

17            Do you understand the question, Doctor?

18       A.   Yes.  And I know that after it was cleared up, or

19   after -- sometime after this letter that the decision was

20   made that it would be all right to accept the check, but I

21   don't recall the exact timing or who was talked to at that

22   point and how that decision was arrived at on a day-to-day

23   basis.

24            I do know that there are a number of other events

25   going on at that time that we were -- that I at least was

1    focused on.  So I just don't recall immediately after that --

2    I received that letter what we did, because I was focused on

3    other issues at that point.

4        Q.   To finish up the check issue, perhaps this will

5    refresh your recollection, I'm going to show you a letter

6    dated June 5, 2003.  We're going to mark this as A-12.  It's

7    a letter from Attorney Terry Jones -- who was your lawyer at

8    that point?

9            (Defendant's Exhibit A-12 marked for

10            identification.)

11       A.   Yes.

12       Q.   As you can see, it was written to me, and the date

13   is June 5, 2003.  So, this is over two months after that

14   letter that Mr. Bennett had written to you that I just showed

15   you, and it says, "Regarding the undisputed portion of the

16   payment, your offer to obtain a replacement check is

17   appreciated.  The check will be accepted with a clear

18   understanding that our clients are in no way prejudiced with

19   respect to the pursuit of their claim by accepting the

20   undisputed payment."  Of course, that's very similar to the

21   language Mr. Bennett had put in his letter of March 26th;

22   would you agree with that?

23       A.   Yes.

24       Q.   So at that point you and your wife accepted the

25   checks; is that correct?

1       A.   Yes.

2       Q.   So the payments had not been -- you were not willing

3   to accept the offers of over $340,000 between the time they

4   were first mailed to you on March 11, 2003 and the time that

5   your attorney wrote a letter on June 5, 2003, correct, and

6   said that they would accept it?

7       A.   Yes.

8            THE COURT:  Mr. Geer, we have to take about a

9   two-minute break.

10           (Pause in the proceedings.)

11      Q.   Dr. Borden, just to finish up the issue of the

12  payment.  I believe yesterday I showed you copies of the

13  cancelled checks, do you recall?

14      A.   Yes.

15      Q.   We agreed yesterday that Amy actually deposited

16  those checks on June 20, 2003; is that correct?

17      A.   Yes.

18      Q.   So that would be both the check for $295,098.92 for

19  the undisputed payment on the building, and the $39,945.48

20  which was the undisputed payment on the contents, correct?

21      A.   Yes.

22      Q.   Those were the first time you accepted --

23           THE COURT:  Let's move off the checks.  We've gone

24  over that.

25      Q.   I'm going to show you what we've marked as A-13.

1    Dr. Borden, you're aware of the fact that there was a meeting

2    in mid April at your house, and the representatives both of

3    Amica and yourself attended the meeting, correct?

4            (Defendant's Exhibit A-13 marked for

5             identification.)

6        A.   Yes.

7        Q.   And you were not present, correct?

8        A.   Correct.

9        Q.   But you are aware, are you not, that upon -- after

10   the conclusion of that meeting, things did not get worked

11   out, things were not able to be resolved, and would you agree

12   that at that point in time the two sides were very far apart

13   in terms of the amount of money they thought it was going to

14   take to repair your house?

15       A.   Yes.

16       Q.   Mr. Parise was around some number over $680,000, and

17   Mr. Schumann was at a figure of 328 or 329,000, correct?

18       A.   Yes.

19       Q.   And it appeared at that point that there was no way

20   to bridge the gap; is that correct?

21       A.   No.

22       Q.   Other than one side conceding to the other?

23       A.   Well, there might have been a variety of ways to

24   bridge the gap.

25       Q.   One of the ways might be an appraisal, correct?

1    Bringing in impartial people to start it all over again?

2        A.   That would be one way.

3        Q.   In fact, that's what Amica suggested in this letter

4    dated May 2, 2003, correct?  Do you recall this letter that

5    sets forth --

6             THE COURT:  I can't see the date on the letter.

7             MR. GEER:  I'm sorry.

8             THE COURT:  That is May 2nd, all right.

9        A.   Is this when they're demanding an appraisal?

10       Q.   Yes.  That's --

11       A.   Okay.

12       Q.   Can you read it or would you like to see the letter?

13       A.   I can read it.  I just didn't know if that was the

14   clause or if they're actually demanding it at that point.

15   And I'm sure the follow-up -- the rest of the letter

16   clarifies that.

17       Q.   Look at the last sentence in the second paragraph of

18   that letter.  "We advised your consultants that we would be

19   demanding an appraisal as provided in your homeowner's

20   policy."

21       A.   Yes.

22       Q.   Now, as I understand it, this was not your first

23   choice as a way to resolve this dispute, correct?

24       A.   I was told it wasn't my first choice.  I, frankly,

25   have never been involved in any situation like this before,

1    so I really wasn't in a position to have a preference.

2         Q.   Fair enough.  So you were acting upon advice --

3         A.   Yes.

4         Q.   -- in response to this?  And certainly after this

5    you went and obtained counsel, correct?

6         A.   Yes.

7         Q.   Are you aware at that point in time that your

8    attorney, Terry Jones, suggested that we put the appraisal on

9    hold for a minute or at least temporarily?

10        A.   Yes.

11        Q.   And he suggested that perhaps make a -- get a second

12   opinion --

13        A.   Yes.

14        Q.   -- from a contractor, and that Amica did that?

15        A.   Yes.

16        Q.   Are you aware of the fact that the person that Amica

17   retained to provide that second opinion was a contractor from

18   Pittsburgh named Dan Jones of GS Jones & Son?

19        A.   Yes.

20        Q.   Are you aware of the fact that after Mr. Jones came

21   up and did an inspection, I think it was the second week of

22   June, he provided an estimate, which was somewhere in the

23   $550,000 range, maybe the first one was 540, which was lower

24   than Mr. Parise's, higher than Mr. Schumann's, but I believe

25   the claim was eventually settled for about, what?  553?

1          A.   I think that's generally correct.

2          Q.   That payment at least satisfied you, correct?  That

3     it would take care of what you needed in order to get your

4     house back to its prefire condition?

5          A.   Yes.

6          Q.   And you signed a release, correct?

7          A.   Yes.

8               MR. GEER:  Craig, can we stipulate to the release?

9               MR. MURPHEY:  Yes.

10              MR. GEER:  All right.  I won't go through the

11    release now.

12         Q.   Now, I understand that at some point in time you had

13    obtained the services of a David Haller, correct?

14         A.   Yes.

15         Q.   David Haller is a contractor here in the Erie area,

16    correct?

17         A.   Yes.

18         Q.   And he builds high-end homes, correct?

19         A.   Yes.

20         Q.   I think you said he had been recommended to you by

21    neighbors or something like that.

22         A.   Numerous people.

23         Q.   Did you understand that he was not a fire

24    restoration contractor?  He did not specialize in doing fire

25    restoration work, he was a home builder?

1     A.  Yes.

2     Q.  Mr. Haller provided you with an estimate of

3  approximately $700,000, correct?

4     A.  Yes.

5     Q.  Now, you had been receiving letters, and I can go

6  through these if you don't recall -- but you had been

7  receiving letters throughout this time asking if you would

8  hire a contractor or if you were going to get a contractor

9  involved to have them contact Amica or -- there were letters

10  to the effect that we'd like to see your contractor's

11  estimate once you chose one, that type of thing.  Do you

12  remember that correspondence?

13     A.  Generally, yes.

14     Q.  And yet, you never sent Mr. Haller's estimate on to

15  Amica, did you?

16     A.  My understanding was that Mr. Haller was going to do

17  that.

18     Q.  Well, you never sent it on, correct?

19     A.  I didn't, no.

20     Q.  If I told you that I never saw Mr. Haller's estimate

21  until I took his deposition after suit was filed, would you

22  have any reason to disbelieve that?

23     A.  No.

24     Q.  There was also testimony yesterday about your

25  concern about carcinogens and your concern about, you know,

1   your daughter, Emma.

2       A.   Yes.

3       Q.   I believe there was some reference in a letter that

4   Mr. Murphey referred to regarding research that you were

5   doing regarding carcinogens.

6       A.   Yes.

7       Q.   Did you learn anything specific that you can tell us

8   in that research?  We all know carcinogens are bad, they're

9   in the atmosphere, and we all know they're at fire scenes.

10  Was there anything more specific than that that you obtained

11  in the way of scientific information?

12      A.   Yes.

13      Q.   What was that?

14      A.   I mean, how much do you want?  It would be very

15  technical, and I don't --

16      Q.   Well, I guess, here's -- the reason for my question

17  is this, and maybe that'll help you to frame your answer.  We

18  were talking about a couple of different solutions to the

19  question of how to best repair your house, and Mr. Parise's

20  suggestion had been that, you know, we gut it and then we

21  rebuild it from the inside, and Mr. Schumann's approach was

22  everything's that's burned gets gutted, but the areas of

23  smoke damage we're going to clean, seal, paint and handle it

24  that way.  And you understand that was the dispute the two

25  had?

1      A.    Correct.

2      Q.    Did you ever do any research into Mr. Schumann's

3    proposed solution to see if that posed a hazard to your

4    daughter?

5      A.    Specific -- I mean, I think the issue is regarding

6    anyone.  Emma's perhaps more susceptible to the problems than

7    other people, but this would be a general issue that would

8    affect anyone.

9      Q.    I understand your general concern.

10     A.    Yes, I did research.

11     Q.    What I'm trying to find out is, I'm trying to find

12   out whether there was any specific information that you had

13   that this technology that Mr. Schumann -- and this fix that

14   Mr. Schumann was proposing would not have worked in your

15   home --

16     A.    Yes.

17     Q.    -- scientific or medical?  What was that?

18     A.    Well, generally, if you completely seal a wall that

19   has insulation inside of it, then -- walls are supposed to

20   breathe normally during seasons, and so you get what's been

21   called sick building syndrome, where the walls are too

22   tightly sealed, and you can get rot inside of a wall.  So you

23   don't ever want to 100 percent seal any kind of cavity.  So

24   that the proper way to do something like that is to take the

25   drywall off, take out the insulation, then you can seal wood

1    framing.  And that that is an accepted remediation.

2        Q.   But really my question was pertaining to

3    Mr. Schumann's proposed solution because he was proposing

4    using specialized sealing methods.  Did you ever find

5    anything that would indicate that that would not work?

6        A.   Well, he wanted to just seal the whole drywall all

7    the way out to the outside.  He wasn't proposing just to seal

8    the bare wood.

9        Q.   Did you find any information that indicated that

10   that would not work?

11       A.   Yes.

12       Q.   What was that?

13       A.   It's the "sick building syndrome".

14       Q.   Did you provide that to Amica?

15       A.   I didn't personally provide it to Amica.

16       Q.   Do you know if anyone else did on your behalf?

17       A.   Mr. Parise.

18       Q.   What did he provide them?

19       A.   I don't know.

20       Q.   Do you know that he provided them with anything,

21   other than just his opinion?  I mean, he clearly said to

22   Amica that he didn't think it would work.  But beyond saying

23   to them, I don't think that would work, I don't think your

24   proposal would work, what did he provide that you're aware

25   of?

1       A.   I -- I don't know.

2       Q.   Are you aware of any materials or any research, any

3   correspondence, other than his opinion that he didn't think

4   it would work?

5            THE COURT:  Let me interject here for a second

6   because there's a certain ambiguity in the term "work."  Do

7   you mean by the question, when you say "will it work," would

8   it be safe for the inhabitants; is that what you mean?

9            MR. GEER:  Let me break that down, Your Honor.

10  That's a very good point.

11      Q.   First, would it be safe for your family?

12      A.   No.

13      Q.   Do you know if that was ever provided -- I

14  understand you believe it would not be safe for your family,

15  but was there anything provided in support of that opinion?

16      A.   You mean external research.

17      Q.   External research?

18      A.   I don't know.

19      Q.   Internet research?

20      A.   I do not know.

21      Q.   Information on the products?  Anything like that.

22      A.   I don't know.

23      Q.   The second part of the question is, would it have

24  returned the house to its prefire condition?

25      A.   No.

1    Q.   And the reason for that?

2    A.   I believe there were a variety of reasons for that,

3    but if you seal a structure and it causes internal rot inside

4    the walls, then it's not in its original condition.  It's

5    going to cause continual damage to the house.

6    Q.   And is this internal rot thing something you

7    researched and found out or -- I mean, where did you get

8    information that there would be internal rot inside the wall

9    caused by external smoke?

10   A.   In the general -- it's not external.  It's smoke

11   that -- not smoke, but -- and this isn't normal smoke.  It's

12   plastic burning kind of smoke.  If you seal that inside the

13   structure, then it's going to be there.  It's going to stay

14   there.

15   Q.   Did you provide any information to Amica in support

16   of that opinion?

17   A.   Beyond Mr. Parise's opinion or his --

18   Q.   Beyond Mr. Parise telling Amica --

19   A.   No.  I provided no written or printed or text

20   information to Amica regarding this.

21   Q.   As far as you know, Mr. Parise didn't either,

22   correct?

23   A.   I'm unaware.

24   Q.   Your brother didn't, no one else did on your behalf,

25   correct?

1       A.   Correct.

2       Q.   As you sit here today, you've been paid over

3  $880,000 by Amica, correct?

4       A.   Yes.

5       Q.   And you understand that you've been paid actual cash

6  value?  Do you now understand that when you do rebuild you're

7  entitled to further payment?

8       A.   Yes.

9       Q.   And that's all set forth in the release?

10      A.   Yes.

11           MR. GEER:  That's all I have.

12           THE COURT:  Is there anything further?

13           MR. MURPHEY:  Just very quickly, Your Honor.

14           THE COURT:  All right, Mr. Murphey.

15

16                    REDIRECT EXAMINATION

17  BY MR. MURPHEY:

18

19      Q.   Just very quickly, Jon, Mr. Geer had asked you about

20  the estimate that you had obtained from David Haller, and you

21  obtained that after you had retained a lawyer,

22  Mr. Jones; is that correct?

23      A.   I obtained the written estimate afterwards, yes.

24      Q.   In fact, you hired Mr. Haller right around the time

25  that you hired a lawyer as well, right?

1          A.    You know, I had many sort of verbal and informal

2     discussions with Mr. Haller, and I can't recall the specific

3     time that I asked him to --

4          Q.    But you got your estimate after Mr. Jones was

5     already involved in this case; is that right?

6          A.    Yes.

7          Q.    I'm showing you a letter, which is dated March 16 --

8     I'm sorry, June 16, 2003, which has been marked as Exhibit

9     3-36, and this is a letter to Mr. Geer from Mr. Jones, I will

10     show you the third page of it, which reflects that you were

11     copied with this letter, right?

12          A.    Yes.

13          Q.    You remember receiving copies of letters between

14     Mr. Jones and Mr. Geer, correct?

15          A.    Yes.

16          Q.    And this letter, dated June 16th, can you read the

17     highlighted part of the letter?  Can you see that well

18     enough?

19          A.    "Also in attendance at the meeting, at least as it

20     relates to the residence itself, will be Mr. David Haller,

21     the Bordens' building contractor.  Mr. Haller will have

22     available at the meeting the rebuilding, restoration, and

23     replacement estimates which he is presently compiling."

24          Q.    Now, other than that, you don't have any idea about

25     whether Mr. Haller did or did not give an estimate or more

1    than one estimate or anything else to Amica; is that correct?

2        A.   No.

3            MR. MURPHEY:  That's all I have.  Thank you, Your

4    Honor.

5            THE COURT:  You have something else?

6            MR. GEER:  Just on that point I have one question.

7            THE COURT:  All right.

8

9                        RECROSS-EXAMINATION

10   BY MR. GEER:

11

12       Q.   Dr. Borden, that meeting that was referenced in that

13   letter which Mr. Murphey just showed you was, in fact, a

14   meeting where Dan Jones came to the scene, did the

15   inspection, and we ultimately reached the resolution,

16   correct?

17       A.   I presume.  I don't --

18       Q.   That was the meeting with the second contractor that

19   Mr. Jones and I had arranged, correct?  And Mr. Haller was in

20   attendance at that meeting, correct?

21       A.   That seems reasonable.

22           THE COURT:  Thank you, Doctor.  You're excused.

23           You may call your next witness.

24           MR. MURPHEY:  Your Honor, we call John Schumann to

25   the stand.

1            THE COURT:  Mr. Schumann, come on up and spell your

2     name for my court reporter.

3            THE WITNESS:  John, J-O-H-N, Schumann,

4     S-C-H-U-M-A-N-N.

5

6            J O H N   S C H U M A N N, first having

7            been duly sworn, testified as follows:

8

9                         CROSS-EXAMINATION

10    BY MR. MURPHEY:

11

12        Q.   Good morning, Mr. Schumann.

13        A.   Good morning.

14        Q.   Can you please tell me the name of your business.

15        A.   Property Claims Services.

16        Q.   And you incorporated that business around 2000 or

17    2001; is that right?

18        A.   I began the business as a sole proprietorship then.

19    It's not incorporated.

20        Q.   I'm sorry, that's when you started your business?

21        A.   Yes, sir.

22        Q.   Originally Amica was your only client; is that

23    right?

24        A.   Yes, that is correct.

25        Q.   And as of the time of the Borden fire, Amica was

1    essentially still your only client; is that right?

2        A.   Yes.  That's a fair statement.

3             THE COURT:  Do you want to pull up a little bit and

4    speak into the microphone.

5        Q.   You are part of what Amica calls its national

6    adjustment program to handle big losses?

7        A.   Yes, sir.  Large-loss program.

8        Q.   And you're one of a couple adjusters in the Country

9    that do that for Amica; is that right?

10        A.   That's my understanding.

11        Q.   Do you have any -- is there an Amica sign or

12    anything on the truck that you use or --

13        A.   Yes.  There's a magnetic sign that we put on the

14    truck or any vehicle that we drive when we're working on a

15    particular claim.

16        Q.   That says "Amica" on it?

17        A.   Yes.

18        Q.   Now, you don't have any formal insurance schooling

19    or training of any kind;  is that right?

20        A.    I had training years ago when I began as a claims

21    adjuster.

22        Q.   So you have some hands-on experience and some

23    training, but you don't have a CPCU designation; is that

24    correct?

25        A.   No.

1          Q.   Or an AIC designation, which is an Associate in
2     Claims?
3          A.   No, sir.
4          Q.   And you don't have any insurance consultant
5     certification from any state; is that correct?
6          A.   That's correct.
7          Q.   And you're not licensed as an adjuster in any state;
8     is that right?
9          A.   Yes.  I'm licensed in North Carolina, and also have
10    a nonresident license in Connecticut.
11         Q.   You had never worked in Erie, Pennsylvania before
12    this claim; is that right?
13         A.   That is correct.
14         Q.   And you had never been to Erie, Pennsylvania before,
15    right?
16         A.   No, sir.
17         Q.   In fact, I think you said before that you had worked
18    on only one other case in all of Western Pennsylvania before
19    this, and that was down in Washington County somewhere; is
20    that right?
21         A.   Yes, sir.  In Western Pennsylvania, that is correct.
22         Q.   So you didn't have any local knowledge of the
23    contractors or the fire restoration people or anything here
24    in Erie; is that right?
25         A.   No, sir.

1          Q.    We've heard Brian Seifert and Visions referred to in
2     this case already.  He was on the scene when you arrived in
3     Erie; was he not?
4          A.    That's correct.
5          Q.    You didn't play any role in hiring him, correct?
6          A.    No, sir.
7          Q.    He was already here, you didn't know him at all?
8     You didn't know who he was?
9          A.    No, sir.
10         Q.    Had you never worked with his business at all?
11         A.    No, sir.
12         Q.    And you did not do any investigation at any time
13    into Mr. Seifert's qualifications, did you?
14         A.    No, sir.
15         Q.    You didn't interview any insurance companies that he
16    had worked for; is that right?
17         A.    That is correct.
18         Q.    You didn't interview any adjusting services he may
19    have worked for; is that right?
20         A.    No, sir.
21         Q.    You didn't talk to any homeowners or any customers
22    of his?
23         A.    No, sir.
24         Q.    You didn't ever go to his facility of any kind; is
25    that right?

1        A.    No, sir.

2        Q.    You didn't see if he had a warehouse or a truck

3    terminal or anything; is that right?

4        A.    That is correct.

5        Q.    And you didn't see if he had any of the fire

6    restoration equipment that you may have seen on your other

7    jobs; is that right?

8        A.    That is correct.

9        Q.    In fact, there came a time in this case where there

10   was an issue with dry cleaning that had been delivered to the

11   Bordens, they had rejected it, and Visions didn't have a

12   facility to store the clothes, and so you put the clothes, or

13   had them put the clothes in the garage of the fire-damaged

14   house; is that right?

15       A.    That -- that did occur, yes.

16       Q.    That raised a concern with you, did it not, that

17   Visions did not have a warehouse or the ozone equipment that

18   you would have anticipated that a fire restoration company

19   would have; is that right?

20       A.    Yes, sir.

21       Q.    Now, you developed an estimate in this case, we've

22   heard that evidence already, and you reviewed that estimate

23   with Mr. Seifert -- I keep going back and forth between

24   Seifert and Seifert, I think it's Seifert, but we'll see.

25   You developed it with him; is that correct?

1           THE COURT:  Is he going to testify?  Mr. Seifert?

2           MR. MURPHEY:  We think.

3       Q.   How do you pronounce his name?  Seifert?  Seifert?

4           THE COURT:  It doesn't matter for the record it'll

5    come out the way it is.  So people can draw their own

6    conclusions.

7       Q.   I'll call him Mr. Seifert.  You reviewed your

8    estimate with Mr. Seifert; did you not?

9       A.   I recall reviewing the scope of damage that I

10   inspected with Mr. Seifert.

11      Q.   And that was a relatively informal process, correct?

12      A.   Relatively.

13      Q.   I mean, you sort of walked through the house with

14   him and showed him what you thought needed to be done; is

15   that correct?

16      A.   Yes, sir.

17      Q.   And he did not at any time develop an independent

18   estimate of the loss, did he?

19      A.   Not to my knowledge.

20      Q.   In fact, you don't know what he did?  You don't know

21   whether he spent any time in following up on any of the

22   things that you commented on or whether he simply walked

23   throughout house with you; is that right?

24      A.   That's correct.

25      Q.   But nevertheless, at some point in time you told

1    Amica that Mr. Seifert had agreed with your estimate; is that
2    right?
3        A.   He did.
4        Q.   Do you know whether Mr. Seifert's agreement was that
5    he could do the work that you estimated for the price that
6    you estimated, or whether he was agreeing that that was the
7    extent of the work that needed to be done to put the house in
8    its prefire condition?  Do you understand the difference?
9        A.   Yes.
10       Q.   Do you know what Mr. Seifert's opinion was one way
11   or the other?  Do you know which one he's opining on?
12       A.   No.
13       Q.   So he could have been saying to you, given the
14   estimated work -- I'm sorry, given the work that you think
15   needs to be done, I can do it at that price?  He could have
16   been saying that, right?
17       A.   Yes.  That's correct.
18       Q.   Or he could have been saying, I agree that the scope
19   of your estimate is what's necessary to put this house in its
20   prefire condition, right?
21       A.   That's correct.
22       Q.   And you don't know which one he was doing?
23       A.   No, sir.
24       Q.   Did you ever ask him?  Did you ever say, Brian, do
25   you agree with my scope of work versus, Brian, do you agree

1    this is what it's going to cost to do the work that I've

2    already scoped?

3        A.   My best recollection, we talked about the scope of

4    damage, primarily.

5        Q.   But as we sit here today, you don't know whether he

6    meant to tell you he could do your estimated work for your

7    price versus him telling you I agree that that's the amount

8    of work that needs to be done to put the house in prefire

9    condition, right?  You don't know?

10       A.   Not sure.

11       Q.   Now when you came to Erie -- strike that.  You never

12   had your estimate reviewed by any other -- anybody else,

13   other than Mr. Seifert, correct?  Like you didn't have

14   another contractor review your estimate?

15       A.   No, sir.

16       Q.   Now, the first day that you were in Erie, which I

17   believe the record reflects was February 19, 2003, you talked

18   with the Bordens about hiring a contractor to do their

19   repairs; did you not?

20       A.   Yes, sir.

21       Q.   You have a recollection, do you not, that Dr. Borden

22   gave you at least one name of a contractor who was working in

23   his neighborhood who he would consider using?  Do you

24   remember that?

25       A.   Yes, I do.

1          Q.   Do you remember the name of that contractor?

2          A.   I do not.

3          Q.   Dr. Borden has testified that he gave you the names

4     of two contractors, and, in fact, you wrote those names down.

5     Do you remember that?

6          A.   I don't recall.

7          Q.   So you may have?

8          A.   I may have, I'm not sure.

9          Q.   Did you ever talk to any other contractors in the

10    course of developing your estimate, other than Mr. Seifert?

11         A.   No, sir.

12         Q.   Dr. Borden has also testified that when you gave

13    him -- when he gave you the contractors' names, which were

14    Laughlin Brothers and David Haller by the way, according to

15    his testimony, that you wrote them down but you told

16    Dr. Borden that now's the not the time to start to rebuild,

17    I've got to work to do -- "I" being you, I've got work to do,

18    I have a computer program, I have to estimate this loss, and

19    at a later time we can get the contractor involved.  Do you

20    remember that?

21         A.   No, sir.

22         Q.   Now, as of the first week -- how long were you in

23    Erie?  Do you remember?

24         A.   Approximately 10 days.

25         Q.   If your claim file indicates that you were here from

1    February 19th to February 27th, would that sound right to

2    you?

3        A.   Yes.

4        Q.   That's about eight days?

5        A.   Eight days.

6        Q.   Now, during the course of that time, the Bordens

7    indicated to you that they would not be retaining Mr. Seifert

8    to use him to repair their house; is that right?

9        A.   I don't recall that conversation.

10       Q.   I'm showing you a document which has been marked as

11   Exhibit 3-37 in this case.  This is an e-mail from

12   Mr. Bennett to Ms. St. Onge.  Who is Lisa St. Onge, by the

13   way?

14            (Plaintiff's Exhibit No. 3-37 marked for

15             identification.)

16       A.   She is now the assistant property manager for Amica

17   Mutual.

18       Q.   She is somebody that you deal with from time to

19   time?

20       A.   Occasionally.

21       Q.   At any rate, at this time Mr. Bennett sent an e-mail

22   to Ms. St. Onge saying, and I'm referring to the Coverage A

23   section of this e-mail, little more than halfway down it

24   says, "John feels that he will not choose Visions."  Do you

25   see that sentence?

1     A.   Yes.

2     Q.   Does that help you to recall that at one point the

3  Bordens told you that they were unlikely to choose Visions to

4  do the repair for them?

5     A.   That would -- that would follow that that's a

6  correct statement.

7     Q.   That e-mail was dated February 25, 2003.  It was

8  February 26, 2003, was it not, that you reviewed your

9  estimate with Brian Seifert?  Do you remember that?

10    A.   I don't recall the date.

11    Q.   I'm going to show you a document -- actually, it

12 would be easier for me to bring it up to you.  I'm going to

13 show you a document which has been previously marked as

14 Exhibit 3-1.  It is four pages long.  Do you recognize that

15 document, Mr. Schumann?

16    A.   Yes, I do.

17    Q.   What is it?

18    A.   This is my activity log for things that I was doing

19 while in Erie, Pennsylvania on this claim.

20         THE COURT:  You have to keep your voice up just a

21 little bit.

22         What is the exhibit number on that?

23         MR. MURPHEY:  3-1.

24    Q.   So this is -- may I have it back.  Thank you.  I'll

25 put it on the screen for you.

1          So this is the document by which -- or this is the
2     way in which you reported to Amica your activity in the case;
3     is that right?
4          A.   Yes.
5          Q.   You keep a log of all the things that you do, and I
6     know it's in summary fashion, but that's what you do,
7     essentially, in order to get paid by Amica; is that right?
8          A.   Yes.
9          Q.   And to report on your activities?
10         A.   Correct.
11         Q.   I am referring to Page 4 of Exhibit 3-1, which
12    contains your entry for your activities of February 26th.
13    You will agree with me that it was on February 26th that you
14    reviewed the scope and estimate with Brian Seifert of
15    Visions, Inc.; is that right?
16         A.   Yes.
17         Q.   And the next sentence -- or the next line says that
18    Mr. Seifert is a fire restoration contractor; is that right?
19         A.   Yes.
20         Q.   Your information about Mr. Seifert came from
21    Mr. Seifert himself, right?
22         A.   That is correct.
23         Q.   And no other source?
24         A.   Yes, sir.
25         Q.   Did you ever look up in the phone book, whether they

1    were in the phone book, whether they were with any of the

2    claim service organizations locally?

3        A.    No, sir.

4        Q.    Now, the review of the estimate with Mr. Seifert

5    came after -- according to the chronology that we just went

6    through, came after the Bordens had told you that they were

7    unlikely to use Seifert to estimate the loss, but you didn't

8    contact any other contractor or bring in anybody else to

9    review your estimate with you; is that right?

10       A.    Did not, that's correct.

11       Q.    At no point did you assist the Bordens in

12   identifying a contractor to do the repair work for them; is

13   that right?

14       A.    That's correct.

15       Q.    Let me talk to you a little bit about your damage

16   estimate.  We've heard some testimony that your original

17   inspection was done in some poor weather; is that right?  Do

18   you remember that?

19       A.    Yes.

20       Q.    That's probably the thing that you remember most

21   about the case.

22       A.    Well, it was -- it was difficult weather.

23       Q.    And you apparently are -- I see the Judge is doing

24   the same thing I am, we're looking out the window because you

25   brought the bad weather with you again.  You're apparently

1    the cause of this.

2        A.    Sorry.

3        Q.    You do not, however, claim that the weather or the

4    difficult conditions which you were operating under on the

5    first couple of days negatively affected the quality of your

6    estimate in any way, do you?

7        A.    No.   It was more difficult to inspect.  You know,

8    especially outside, I mean, I was in snow up to my knees and

9    climbing a roof with ice.  You know, it was not as safe and

10   not as easy as if it were --

11       Q.    I understand that.  But at no time did you ever

12   change your estimate, correct?

13       A.    No, sir.

14       Q.    You were back in April of 2003, and, in fact, you

15   went through the home again -- and we'll talk about that

16   meeting, but you went through the home again at that time,

17   correct?

18       A.    Yes.

19       Q.    And at no time did you ever change your estimate,

20   correct?

21       A.    No, sir.

22       Q.    Now, we've heard testimony, obviously, that this

23   fire was severe, it totally destroyed the basement of the

24   house; is that correct?

25       A.    Yes.

1          Q.    Or at least the -- from the foundation in?

2          A.    The framing, yes.

3          Q.    And there was smoke damage -- or the -- I'm sorry,

4     strike that.  The rooms directly above the basement were very

5     badly damaged, the floors collapsed, et cetera.

6          A.    That is correct.

7          Q.    And there was smoke damage throughout the house; is

8     that correct?

9          A.    Yes.

10         Q.    And you did an estimate that -- of loss of --

11    somewhere around 328, $329,000; is that correct?

12         A.    That is correct.

13         Q.    And you sent that on to the Bordens; is that right?

14         A.    I believe so.

15         Q.    If your claim activity notes indicate that you sent

16    the estimate to Amica and the Bordens on or about February

17    26, 2003, would you have any reason to disagree with that?

18         A.    No.

19         Q.    So assuming that your estimate was delivered to the

20    Bordens on February 26, 2003, they immediately questioned the

21    scope of your estimate; did they not?

22         A.    I believe there was some concern.

23         Q.    Do you remember what that concern was?

24         A.    I'm not sure that it was nothing more than not

25    enough money to fix the house.

1      Q.   I know that's a general --

2           THE COURT:  That's kind of why we're here.

3      Q.   Do you remember anything more specific about it?

4  About what it was the Bordens immediately brought to your

5  attention that they felt perhaps had not been adequately

6  covered in the estimate?

7      A.   The only area, I guess, would be the smoke odor

8  concern.

9           THE COURT:  The smoke what, sir?

10          THE WITNESS:  The smoke odor concern.

11          THE COURT:  Smoke odor you're saying?

12          THE WITNESS:  Yes.

13     Q.   That question from The Judge prompts me to ask you,

14  I had asked you about your company at first.  Where are you

15  based?

16     A.   North Carolina.

17     Q.   That's where you live?  Do you work out of your

18  home?

19     A.   Yes.

20     Q.   At any rate, back to your claim activity log,

21  Exhibit 3-1, I would refer you to your February 27th note,

22  and again, this is the day after you have sent the estimate

23  to the Bordens, and according to the testimony we've heard

24  already, the estimate actually went to Mr. Richard Borden,

25  who was Dr. Borden's brother.  Do you remember that?

1        A.   Yes, sir.

2        Q.   Now, you will agree with me that your claim activity

3    note of that day says, talked with her son, Richard Borden --

4    and "her" would be Mrs. Borden, and that's the Doctor's

5    mother, correct?

6        A.   Yes.

7        Q.   You were working with her as well; is that right?

8        A.   I did have some communication with her, yes.

9        Q.   At any rate, back to your note of February 27th.  It

10   says, "Talked with her son, Richard Borden, concerning

11   estimate and met with some resistance concerning cleaning

12   versus removal and replacement of dry wall throughout" -- I

13   think is what you meant to type, "interior of dwelling."  Did

14   I read that right?

15       A.   Yes.

16       Q.   Does that refresh your recollection as to what

17   Mr. Borden said at that time about your estimate?

18       A.   Yes, it does.

19       Q.   And so, you will agree with me that at that time

20   they were questioning the extent to which you had -- or the

21   extent to which your estimate presumed that the smoke odor

22   could be removed by simply cleaning, sealing, and painting,

23   as opposed to removing dry wall and removing what was behind

24   it; is that correct?

25       A.   That is correct.

1          THE COURT:  We're going to take a few-minute break.

2                      (Pause in the proceedings.)

3     Q.    Mr. Schumann, we had just talked about the fact that

4     your notes indicate that the Bordens, through Dr. Borden's

5     brother, Rick, had related to you some concerns about your

6     estimate.  And you'll agree with me that at no time did you

7     ever change your estimate in this case; is that right?

8     A.    I did not change the estimate.

9     Q.    And you will agree with me that elimination of smoke

10    odor in a home is essential to putting it in its prefire

11    condition; is that right?

12    A.    Yes.

13    Q.    When you developed your estimate, you considered

14    that issue; is that correct?

15    A.    Yes.

16    Q.    Now, when you developed your estimate, was it

17    designed to be a preliminary estimate and subject to change?

18    A.    Well, yes.

19    Q.    Did it say that anywhere on it?

20    A.    No.

21    Q.    Does it say preliminary estimate or anything?

22    A.    No, sir.

23    Q.    Do you have any idea -- strike that.  Did you tell

24    the Bordens that it was a preliminary estimate?

25    A.    I don't recall specifically saying that.  I may

1    have, I just don't recall.

2        Q.    And you don't recall saying that to Mr. Borden's

3    brother when he called to talk to you about the scope?  You

4    don't recall telling him, well, maybe we'll change it or

5    maybe I'll look at it or this is just preliminary?  Do you

6    remember saying anything like that?

7        A.    I don't recall.

8        Q.    But at the time you developed the estimate, you

9    yourself thought that it was probably going to be

10   supplemented at some time in the future; is that right?

11       A.    Wouldn't be unusual given the size of the house and

12   the extent of damage, and the -- yeah.  It wouldn't be

13   unusual to have a supplement on the house.

14       Q.    At the time when this particular estimate was

15   created, though, sir, do you remember reaching the conclusion

16   that this will probably be supplemented in the future because

17   maybe the difficult weather conditions prevented you from

18   doing a complete scope or there were other questions that you

19   had?

20       A.    It's not unusual for damages to be revealed during

21   the repair process that need to be addressed as supplemental.

22       Q.    I take it that you don't remember then -- based on

23   the way you're answering the questions, I take it you don't

24   remember whether you reached the conclusion, at the time that

25   you prepared this estimate, that it was likely to be changed?

1    I know you said it's not unusual, but in this particular

2    case, did you reach a conclusion that this estimate was

3    likely to be changed in some way?

4         A.   Yes.

5         Q.   Yes, what?

6         A.   It's likely there would be a supplemental amount.

7         Q.   So you knew that when you prepared this estimate?

8         A.   Yes.

9         Q.   And you don't know whether you ever told the Bordens

10   that?

11        A.   Don't recall.

12        Q.   You don't recall.  And your estimate did not change

13   in this case?

14        A.   No.

15             THE COURT:  Let's move off it.

16             MR. MURPHEY:  Thank you, Judge.

17        Q.   Now, there came a time when a public adjuster named

18   Anthony Parise became involved in this case; is that right?

19        A.   That's correct.

20        Q.   And throughout your dealings with Mr. Parise you

21   found him to be pleasant and professional and knowledgeable;

22   is that correct?

23        A.   Yes.

24        Q.   When you were first called by Mr. Parise, you told

25   him, did you not, that you were pleased that he was involved

1    in the case because you felt the Bordens needed some help

2    with adjusting the claim?

3        A.   I don't recall making that statement.

4        Q.   If Mr. Parise says that he recalls you saying that,

5    would you have any reason to disagree?

6        A.   No.

7        Q.   Prior to Mr. Parise's involvement, however, you had

8    never recommended to the Bordens that they obtain a public

9    adjuster or counsel or anybody to assist them; is that right?

10       A.   No.

11       Q.   And Mr. Parise prepared an estimate and you reviewed

12   it, correct?

13       A.   Yes.

14       Q.   Did your review of Mr. Parise's estimate cause you

15   to rethink your estimate in any way?

16       A.   Yes, to an extent.

17       Q.   Your rethinking of your estimate caused you to think

18   that perhaps your estimate was low in some respects?

19       A.   Yes.  That's not -- that's a fair statement.

20       Q.   Did you ever tell the Bordens, or Mr. Parise, that

21   you were prepared to supplement your estimate in light of the

22   information they had given you?

23       A.   I don't recall.

24       Q.   Now, when you originally did your estimating, you

25   did not cut any test holes in the dry wall anywhere in the

1    house; is that right?

2        A.   No.

3        Q.   You agree, however, that there was smoke odor in

4    every room in the house; is that right?

5        A.   Yes.

6        Q.   This was a basement fire, correct?

7        A.   Yes.

8        Q.   I mean, "basement" by that's where it started.

9        A.   Yes, sir.

10       Q.   And there was damage all the way up to the attic of

11   the house; is that correct?

12       A.   Yes.

13       Q.   Now, ultimately we've heard testimony about a

14   meeting that you had with Mr. Parise -- you will recall that

15   on the morning of April 15, 2003 you had a meeting at the

16   house to review your estimate and Mr. Parise's estimate, and

17   Mr. Bennett from Amica was in attendance; is that right?

18       A.   Yes.  I remember that meeting.

19       Q.   At that time do you remember Mr. Parise putting

20   holes in the dry wall in various rooms in the house?

21       A.   Yes.  I remember seeing the holes in the walls --

22            THE COURT:  What was the date of that meeting?

23            MR. MURPHEY:  April 15, 2003.

24       Q.   Do you remember seeing any soot that was in the

25   insulation or in any other materials that was behind the

1    walls in the hidden areas of the house?

2        A.    I did see some minor soot.

3        Q.    At that meeting did you ask Mr. Parise, and I'm

4    paraphrasing you, how do we know that this soot was caused by

5    this fire?  Do you remember saying that?

6        A.    Yes.  I vaguely remember making a statement to that

7    effect.

8        Q.    You agree, do you not, that after your meeting of

9    April 15th you saw some room for compromise with Mr. Parise's

10   estimate?

11       A.    There's always room for compromise.

12       Q.    At that April 15th meeting do you recall telling

13   Mr. Parise that there was room for compromise and that your

14   estimate could be supplemented?

15       A.    I don't remember making that statement.

16       Q.    Do you remember ever telling the Bordens that?

17       A.    I do not recall.

18       Q.    Or any representative of the Bordens?

19       A.    I do not recall.

20       Q.    Just a couple of brief things.  Throughout this --

21   strike that.  On the day of the meeting, April 15th, it was

22   decided by Amica to demand appraisal in this case; is that

23   right?

24       A.    Yes.

25       Q.    As of that time, at least in the four years since

1    you had your own business, you had only been involved in one

2    other appraisal; is that right?

3         A.   Yes.  That's correct.

4         Q.   Now, after that Amica brought in a contractor from

5    Pittsburgh named Dan Jones.  Did you meet Mr. Jones?

6         A.   I did not.

7         Q.   And you never saw his estimate?

8         A.   I know -- I don't believe so.  I can't say that I

9    didn't, but I can't recall.

10        Q.   So you don't recall ever comparing your estimate

11   with Mr. Jones'?

12        A.   No, sir.

13        Q.   Throughout your dealings with the Bordens

14   themselves, were they always friendly and cooperative with

15   you?

16        A.   Yes.

17             MR. MURPHEY:  That's all I have, Your Honor.  Thank

18   you, Mr. Schumann.

19

20                      DIRECT EXAMINATION

21   BY MR. GEER:

22

23        Q.   Good morning.

24        A.   Good morning.

25        Q.   How old are you?

1       A.   Beg your pardon?

2       Q.   How old are you, Mr. Schumann?

3       A.   55.

4       Q.   What previous experience do you have in

5    construction, if any?

6       A.   I built my mother's house in 1986, and then worked

7    my way through college and did a lot of jobs involving

8    construction and painting and -- just to make money to pay

9    for tuition.  And also built three other houses for myself in

10   the last 12 years.

11          THE COURT:  You say you've built three other houses?

12          THE WITNESS:  Yes, sir.

13      Q.   How much experience do you have in estimating

14   construction costs in building fires?

15      A.   I've been writing estimates for houses for 15 to 20

16   years.

17      Q.   What type of claims -- I want to take you back to

18   2003.  You know, not talk about anything since 2003, but up

19   until the time of the Borden loss.  What types of claims had

20   you handled for Amica?

21      A.   Primarily large loss.  Fire large loss claims.

22   Where damages exceed 75 to $80,000, they will call me and I

23   will go.

24      Q.   What type of training and experience do you have

25   that prepared you to adjust losses of that nature and write

1    estimates on losses of that nature?

2        A.   I -- well, I've been around construction a long

3    time, I understand how to use the software, and I understand

4    how houses are built, put together, and I've just had a --

5    I've done a lot of claims starting years ago.

6        Q.   Let's go back -- I'd like to go through your

7    experience so the Court understands what your experience

8    level is.

9        A.   Okay.  I started as a staff adjuster right after

10   college.

11       Q.   For who?

12       A.   Integon in North Carolina

13            THE COURT:  Who was that?

14            THE WITNESS:  Integon Insurange Group.  Worked with

15   them for approximately two and a half years.  Went to work

16   for another company based in North Carolina, Atlantic

17   Casualty, and did a lot of claims with them as well.

18       Q.   Did you receive training or education when you

19   worked for Integon?

20       A.   Yes.

21       Q.   What?

22       A.   I went to Val-Tech.

23       Q.   What is that?

24       A.   It's an adjuster training class where they teach you

25   all types of exposures, all types of coverage.

1          MR. MURPHEY:  Your Honor, excuse me, I'm sorry, I

2     don't mean to interrupt you.  I just -- Paul and I had talked

3     about -- Mr. Schumann is not going to be called in the

4     defense case; is that correct?

5          MR. GEER:  That's correct.

6          MR. MURPHEY:  Because we're beyond the scope, but I

7     don't have any objection.

8          THE COURT:  You can go back and clean it up on

9     recross if there's other areas.

10          MR. MURPHEY:  Thank you.

11          MR. GEER:  Mr. Schumann would like to get home, and

12     I'm trying to accommodate him.

13          THE COURT:  Do you have any snow in North Carolina?

14          THE WITNESS:  I hope not, Your Honor.

15     Q.   What type of training did you have at Val that was

16     in either fire -- you know, estimating fire claims or

17     estimating construction cost of building claims?

18     A.   It was touched on.  It was primarily auto training,

19     but it was touched on.  And I did do some claims for Integon

20     in reference to homeowners, but the focus was on liability

21     investigation and that sort of thing.

22     Q.   Where did you go from Integon?

23     A.   To work with Atlantic Casualty.

24     Q.   What type of claims did you adjust there?

25     A.   I think that was 100 percent auto claims for them

1      for about two years.

2          Q.   Where did you go from there?

3          A.   Then went to work for an independent insurance

4      company in Winston-Salem, Stevens Adjustment & Appraisal, and

5      we did a lot of auto and some small homeowner claims.

6          Q.   Did you have more training and experience at that

7      point?

8          A.   I pretty much understood how to evaluate, how to

9      measure houses and damaged areas, and so -- because my

10     background in college and prior to that was -- was a real big

11     assist.  Just learning coverages was the big help there.

12         Q.   Can you just take me up to the time you started

13     working for Amica, training and experience.

14         A.   Yes, sir.  I worked with Stevens for quite a while,

15     he was a good friend and he was expanding his business, but

16     when we expanded, the business wasn't there.  A lot of

17     competition.  I had an opportunity to work in educational

18     sales for four years, so I did that.  Enjoyed it, but again,

19     price competition was difficult to compete to make a decent

20     income.

21              A good friend of mine had worked for an independent

22     catastrophe claims company doing homeowner claims nationwide.

23     And I was talking with him, and ultimately went to work for

24     that same company.  So I started doing catastrophe claims all

25     over the country, different types of damages, hail and wind

1    and that sort of thing.  And then got involved several years

2    later with large loss for Farmers Insurance Group.  The

3    theory being going out and just writing an estimate and --

4    one at a time.  So I did large loss for Farmers for -- I

5    can't remember, two or three years as part of their team.

6        Which brings me up to the year 2000, which is when I

7    decided I just would like to start my own company and started

8    Property Claims Services.  Met Peter Reed, presented the

9    program to him of doing one at a time, and we started doing

10   claims.

11       Q.   Peter Reed was with Amica, correct?

12       A.   Yes, sir.

13       Q.   Now, in terms of training and experience, have you

14   become knowledgeable over the years in terms of how to write

15   an estimate on a fire loss following some sort of fire?

16   Following a fire?

17       A.   Yes, sir, I have.  In the course of writing these

18   estimates at these houses all over the country, oftentimes

19   there is a contractor involved, which is a big assist.  I

20   like second opinions, especially someone that might do the

21   work, it's a big assist to me.  So that we can discuss and

22   talk about how it happened, and we can address all the

23   issues.

24       Q.   I'll get there.  I don't mean to cut you off.  We'll

25   get there.  Do you have computers that help you with your

1    estimate?

2        A.   Yes.

3        Q.   Do you have a specific computer program that you

4    use?

5        A.   Currently I'm using Exacta-Mate.

6        Q.   Have you found that to be a program used throughout

7    the insurance industry?

8        A.   Yes.

9        Q.   Is it used by insurance companies?

10       A.   Yes.

11       Q.   Is it used by contractors?

12       A.   Yes.

13       Q.   Have you dealt with other people that use

14   Exacta-Mate to estimate rebuilding costs?

15       A.   Can you repeat that.

16       Q.   Have you dealt with other people, other than

17   contractors, insurance companies, that use Exacta-Mate?

18       A.   Yes.

19       Q.   Can you explain how the program works.  In other

20   words, after you measure the building and you've made your

21   observations, how do you, with the help of Exacta-Mate go

22   about printing out an estimate which is used in an insurance

23   claim?

24       A.   I generally do mine on site, and I do it on a

25   room-by-room and area-by-area basis.  So I'll start with

1    exterior, roof; front, left, rear, right elevations, and

2    measure and take pictures, make notes as to what needs to be

3    done to repair or replace damaged items.  And then I'll go to

4    the interior of a house and go room by room with measurements

5    and actually make notes and then enter line items on each

6    category, each room category.

7         The price guide for anywhere in the country is

8    downloaded, so it's area sensitive.  And by entering

9    dimensions of rooms, it computes all your square footage and

10   linear -- you know, that sort of thing, so --

11        Q.   Are you saying you carry a laptop to the fire

12   scenes?

13        A.   Yes, sir.  I take it in this house.

14        Q.   So you're going room to room on your laptop, and

15   you've got Exacta-Mate loaded on your laptop?

16        A.   Yes, sir.

17        Q.   So you're doing this on your computer as you go?

18        A.   Yes, sir.  I've done it other ways, but on site

19   seems to be, for me, most effective to spend the time there,

20   especially if you're working with a contractor.  You know,

21   it's easy to look at things together right then and to make

22   those decisions so you can address the damages.

23        Q.   Now, does Exacta-Mate have numbers -- in other

24   words, prices to go -- say you put in 10 sheets of

25   Sheetrock --

1          A.   Yes.

2          Q.   -- certain size, does it give you a price?

3          A.   Per square foot, yes, sir.

4          Q.   Does it give you a price by area of the country or

5     is it the same everywhere?

6          A.   No.  You download the price guide for the specific

7     area, city and state.  So it's area sensitive anywhere in the

8     country.

9          Q.   You had the correct area for Erie?

10         A.   As I recall, yes, sir.

11         Q.   It was loaded into your computer?

12         A.   Yes, sir.

13         Q.   And that's what you did in the Borden case?

14         A.   Yes, sir.

15         Q.   The way you did it was the way we just described?

16    Can you give us a ballpark estimate of how many fire claims

17    you have adjusted in your career?  Would it be over 100?

18         A.   Yes, sir.  I almost want to -- me personally,

19    probably 150.

20         Q.   How many of those have you actually written

21    estimates on fire damaged buildings?

22         A.   Probably 125.  Just a guess.

23         Q.   Is this the type of claim you commonly handle for

24    Amica after you started working for Amica?

25         A.   Yes, sir.

1      Q.   In working for Amica, did you come to understand
2   their goals and objectives?
3      A.   Yes.
4      Q.   In handling a fire claim for them, what were they
5   asking you to do in terms of the big picture?
6      A.   They wanted me to inspect damages quickly and, you
7   know, meet with the customer and --
8      Q.   What's the ultimate goal?
9      A.   The goal is to arrive at an estimate so that we
10  could provide funds to the customer to begin repairs to their
11  house.
12     Q.   Just any repairs?  What is their goal in terms of --
13  the overall goal?
14     A.   They want to pay to restore the house to its prefire
15  condition.
16     Q.   Now, Mr. Murphey covered with you the fact that you
17  encountered a few difficulties in the Borden adjustment
18  pertaining to the weather and that type of thing.  Were there
19  also problems that you encountered regarding the condition of
20  the building?
21     A.   Yes, sir.  It was kind of dangerous in certain
22  areas.
23     Q.   I'm going to just start off by asking you, did you
24  take a large number of photographs?  Over 100?
25     A.   Yes, sir.

1        Q.   I have those, correct?

2        A.   I believe so.

3        Q.   You and I went over those the other night, and we

4    talked about which photos we wanted to show the Court,

5    correct?

6        A.   Yes, sir.

7        Q.   I'm going to do that now.  What I'm going to do is,

8    I'm going to put the photographs on the screen here and some

9    of them I'll move through very quickly, just describing just

10   generally what they show.  I'm going to start with some

11   exterior photographs.

12            All of our photographic exhibits, Your Honor, have a

13   P in front of them, and I have them in no particular order,

14   but they correspondend to a sheet here that was numbered by

15   Mr. Schumann.

16            I'm going to show you a front view, this has been

17   marked as P-179.  Mr. Schumann, is that a photograph that you

18   took of the Borden house at the time that you originally

19   arrived?

20            (Defendant's Exhibit P-179 marked for

21              identification.)

22       A.   Yes, sir.

23       Q.   Do you recall whether you took these photographs on

24   the first day or whether you took them later on in your

25   adjustment?

1           A.   No.  This was at the very outset.  I think I took

2     this picture the very first day I arrived, which it seems

3     like it was in the -- to the house in the early afternoon.

4           Q.   That's one view.  Here's another outside view,

5     P-180, correct?

6                (Defendant's Exhibit P-180 marked for

7                 identification.)

8           A.   Yes.  That is correct.

9           Q.   We will get to some that actually show the area

10    damaged by fire.  What view is that?  P-181.

11               (Defendant's Exhibit P-181 marked for

12                identification.)

13          A.   That is the front elevation of the house and the

14    garage.

15          Q.   Now, as we get to P-182, we'll see a little bit of

16    the boarded-up area.  What area is P-182?

17               (Defendant's Exhibit P-182 marked for

18                identification.)

19          A.   Yeah, here on the back there is -- there was a porch

20    here, and then this extension, and that was, I believe, some

21    windows and doors across the kitchen area.

22          Q.   P-183, this is the left elevation?

23               (Defendant's Exhibit P-183 marked for

24                identification.)

25          A.   Yes, it is.

1      Q.    Does that show some of the area of board up, which
2    was done by Mr. Seifert of Visions and his people?
3      A.    It does.
4      Q.    P-184, that's pretty much the same view?
5            (Defendant's Exhibit P-184 marked for
6             identification.)
7      A.    Yeah.  It's more from the rear, but that is it.
8      Q.    I'm going to show you two more exterior shots.
9    Here's P-185.  Is that the rear elevation?
10           (Defendant's Exhibit P-185 marked for
11            identification.)
12     A.    Yes, sir.
13     Q.    And another shot, it's hard to get the whole house
14   in one picture, here's the other shot of the rear of the
15   house, correct?
16     A.    Yes, that's correct.
17     Q.    So if we put those two together we'll have most of
18   the rear view of the house?
19     A.    It was a big house.
20     Q.    Then we have side view, which is P-187, correct?
21           (Defendant's Exhibit P-187 marked for
22            identification.)
23     A.    Yes.  That would be the right-rear elevation.
24     Q.    Now, I want to just talk to you generally about your
25   adjustment.  I'm going to show you P-190, which is for the

1    roof.  I assume you went up on the roof; is that correct?

2             (Defendant's Exhibit P-190 marked for

3              identification.)

4        A.   Yes, sir.

5        Q.   Why did you have to go up on the roof?

6        A.   Well, I wanted to acurately measure the roof because

7    I anticipated replacing all of the shingles along with the

8    sheathing covering the lower roof.  I had to measure.

9        Q.   In P-190 we actually have a blue tarp or some sort

10   of covering over part of the lower roof there.  Do you see

11   that?

12       A.   Yes, sir.

13       Q.   Is that something you had to estimate repairs on?

14       A.   That entire section of roofing was replaced because

15   of the -- the smoke that went up into the attic.

16       Q.   When you wrote your estimate, did you just replace

17   the damaged section or did you replace more than the damaged

18   section?

19       A.   I replaced the rafters over that part of the roof,

20   along with the sheathing, and then I replaced all the

21   shingles on the entire house to achieve matching.

22            THE COURT:  This is going to be confusing for the

23   record because you're saying you replaced.  You estimated the

24   replacement for that material, nothing was replaced as a

25   matter of fact; is that right?

1           THE WITNESS:  That's correct.  I estimated it.

2           THE COURT:  A minute ago, when Mr. Geer was asking

3   you a question about the blue tarp, there was no -- for my

4   benefit, is it accurate to say with the exception of

5   Mr. Seifert's temporary repairs, there were no substantive

6   repairs of a permanent nature done to the house?

7           THE WITNESS:  That is correct.

8           THE COURT:  Go ahead.

9       Q.   So when you say, for instance, you replaced all the

10  shingles, did you mean to say in your estimate you wrote

11  enough money into the estimate to have allowed the Bordens to

12  replace every shingle on the house?

13      A.   That is correct.

14      Q.   And that was because of the matching concern?

15      A.   Yes.

16      Q.   Can you explain briefly what the matching concern is

17  you're talking about?

18      A.   Well, these are not new shingles, and they discolor

19  over time.  So if you only replace a part of the roof that's

20  visible, they're not necessarily going to match the shingles

21  on the undamaged area of a roof, and given the visibility of

22  the roofing of the house and having to replace or having to

23  pay to replace -- or estimate to replace the shingles on the

24  lower part, I felt like all the shingles should -- we should

25  pay to replace all the shingles to achieve matching.

1          Q.   Mr. Murphey touched briefly on some problems and

2     difficulties that you incurred in your adjustment.  Was the

3     house dangerous in parts of the inside?

4          A.   Yes, sir.

5          Q.   I'm going to show you just a few photographs that

6     you selected for me the other night of the interior, and --

7               THE COURT:  Let me interpret just a second,

8     Mr. Geer, not to slow you down, but maybe ultimately to speed

9     us up.

10              The pictures speak for themselves, and I can see

11    holes in the floor and I can see slippery roofs, and I think

12    you've already testified that weather-wise and condition-wise

13    it was somewhat of a difficult project to get in there and

14    appraise.  That having been said, did any of the conditions

15    that you encountered there materially interfere with your

16    ability to render what you consider to be a fair and accurate

17    estimate?

18              THE WITNESS:  Not fair and accurate initially, no.

19              THE COURT:  I don't need to see all these things

20    then in excruciating detail.  If you understand what I mean.

21              MR. GEER:  Yes.  Your Honor, I was going to show

22    three or four.  Is that --

23              THE COURT:  You can if you want to, but I'm just

24    trying to keep the marching band marching down the street.

25         Q.   Mr. Schumann, in response to the Court's comment, I

1    think you said an additional estimate.  Were you able to

2    reach --

3            THE COURT:  He said an initial estimate.

4            MR. GEER:  I'm sorry, I didn't hear the answer then.

5    Could you read back his last --

6            THE COURT:  Maybe I can help.  In response to my

7    question, you said it didn't interfere with your ability to

8    render what you consider to be a fair and accurate, I believe

9    you used the term, initial estimate?

10            THE WITNESS:  That's correct.

11            MR. GEER:  I thought he said additional.  I'm sorry.

12    Q.    Were there areas of the house that you could not get

13    into?

14    A.    Yes.

15    Q.    Were there areas that were too dangerous to go near?

16    A.    Initially, yes, that's correct.

17    Q.    Let's talk just briefly about some of the rooms.

18    Were there rooms where it was not safe to walk on the floor?

19    A.    You couldn't.  You would fall through.

20    Q.    And therefore, you couldn't get near certain things

21    in order to examine them closely?

22    A.    That's correct.

23    Q.    Did you then examine them from a distance and do the

24    best you could?

25    A.    I did.

1  Q. There were some rooms you perhaps could not enter at
2 all?

3  A. Yeah.  The formal dining room in the front, you
4 couldn't walk in there.  It was collapsing into the basement,
5 there was no way.

6  Q. What about the kitchen?

7  A. It was also very dangerous.  It was leaning -- there
8 was a hole and it was collapsed in the center, and so very
9 dangerous.  And in addition to the holes, we had ice and snow
10 and water, and it was slippery.  So it was kind of a
11 dangerous area.

12  Q. Now, having said that, when you sent your initial
13 estimate to Amica and to the Bordens, were you aware of any
14 specific errors that you had made in it?  Did you know that
15 there was anything you had missed?

16  A. No.

17  Q. From your experience on other fire claims, would you
18 say that it would be likely or unlikely that you later would
19 have been adding something on that you had not been able to
20 see in your preliminary estimate?

21  A. Yes.  That's -- yes, sir.

22  Q. I'm going to show you what I've marked as A-15, and
23 this is kind of a lump exhibit.  This has two things to it,
24 you have a February 25th report, which was sent to Amica, and
25 then underneath that I have clipped your estimate.  Let me

1    show it to you and just ask you first of all whether these

2    went together.  Because if they went together, I'm going to

3    mark them one exhibit, and if they were separate, I'm going

4    to mark them two different ones.  Did you submit those

5    together to Amica?

6         THE COURT:  Just as a record keeping matter, have

7    both of you been identifying the same document or documents

8    but using different exhibits?

9         MR. MURPHEY:  They're not identical, but for

10   example, those are both already in the record.  The estimate

11   is in the record in Plaintiff's Exhibit 2, and the letter

12   would be part of the claim activity file, Exhibit 3.

13        THE COURT:  I don't see any harm in those exhibits

14   coming in duplicatively under different people's exhibit

15   numbers.

16   A.   These were both --

17   Q.   Are they one or two?

18   A.   I beg your pardon?

19   Q.   Are these one --

20   A.   That is my -- my report and the attached estimate

21   were both sent in at the same time.

22   Q.   So you submitted them together?

23   A.   Yes.

24   Q.   I'm going to mark them then as A-15.  And I'm just

25   going to put up on the screen the first page of your exhibit.

1    Let me ask you:  Is this your Exacta-Mate program, what it

2    looks like when it gets printed out?

3            (Defendant's Exhibit A-15 marked for

4             identification.)

5        A.   Yes.

6        Q.   Let's just go through it.  Is the description what

7    you would have typed in when you were on site?

8        A.   Yes.

9        Q.   And the quantity, do you get that by measuring?

10       A.   Yes.

11       Q.   Where do you get the unit cost?

12       A.   That's in the software, when you download the

13   pricing.

14       Q.   And then we have columns for RCV.  Is that

15   replacement cost?

16       A.   Yes.

17       Q.   DPREC, is that depreciation?

18       A.   It is.

19       Q.   And ACV, is that actual cash value?

20       A.   Yes.

21       Q.   Can you explain about those three columns, starting

22   with RCV, replacement cost.  How does that number come up?

23   Is that something that the computer does for you?

24       A.   Yes.  You -- the pricing that's built into the

25   software you just enter the line item, and it computes based

1    on square footage or linear footage the amount, and that is

2    the cost to either remove or replace, or both, that

3    particular item.  So that comes in as a replacement cost

4    value.

5        Q.   So the computer just makes that number appear?

6        A.   Yes.

7        Q.   Now, do you sometimes adjust it or change what the

8    computer gives you?

9        A.   You can.

10       Q.   Let's be specific with the Borden case.  Were there

11   some items on the Borden estimate which you wrote which you

12   were unsure of, and therefore, you went to get outside help?

13       A.   Yes, I did.

14       Q.   Can you give the Court some examples of things where

15   you consulted with someone in order to come up with a number,

16   other than what the computer program --

17       A.   Yes, sir.  There was a thermal heating system in the

18   basement, and I was real unfamiliar with that.  And -- maybe

19   thermal is not the word, but there was an unusual heating

20   system.  And I had someone come over and meet with me and

21   give me a quote to replace that entire system.  I also

22   brought in an electrician to assist me with the electrical

23   part because all of the heavy electrical was in the basement.

24   So I had that person come in as well.

25       Q.   These are local people that you found?

1      A.   Yes.

2      Q.   So they actually came to the site and looked at it

3  with you?

4      A.   That's correct.

5      Q.   And you put their numbers in your estimate?

6      A.   Yes.

7      Q.   Now, I did notice there was one -- like a

8  subcontractor's bid or something.  Did this go with your

9  estimate or did I just get that?

10     A.   Yeah.  That's in -- that's in my estimate under

11  general items.

12     Q.   What was that?  Is that another add-on that you

13  obtained?  Rindfuss, R-I-N-D-F-U-S-S?

14     A.   Yes.  That was the geothermal heat pump system that

15  was in the basement, and that was the quotation that I

16  entered on my estimate to replace it.

17     Q.   I'm going to show you the last page, this is Page

18  AM-151 of the exhibit we marked as A-15, and ask you,

19  Mr. Schumann, to tell us, on your summary page, what your

20  numbers are.  Can you read all that?

21     A.   Yes.

22     Q.   Let's start with the question of your replacement

23  cost.  What did you conclude for your replacement cost?

24     A.   $328,999.14.

25     Q.   And then the depreciation factor was what?

1      A.   $32,900.22.

2      Q.   So the actual cash value was what?

3      A.   $296,098.92.

4      Q.   So would it be safe to say that if we started with

5   the replacement cost, take off the depreciation, we then come

6   up with the actual cash value of the building?

7      A.   Of the repairs.

8      Q.   Yes.  Of the repairs to the building?

9      A.   Correct.

10      Q.   When you're applying the depreciation, what do you

11   take into consideration in order to set up the computer

12   program?

13      A.   The age of the house; the condition, of course,

14   affects the depreciation.  Here I think I applied 10 percent.

15           THE COURT:  Mr. Schumann, is the amount of

16   depreciation for any given item -- is that a -- is that a

17   percentage that -- let me put it this way:  Does that require

18   your subjective input or is it spit out by the computer just

19   like it would ACV or some other term?

20           THE WITNESS:  It requires my input.

21           THE COURT:  So there's a certain degree of

22   subjectivity on your part?

23           THE WITNESS:  Yes, sir.

24      Q.   I think you used about 10 percent on average; is

25   that what you said?

1         A.    Yes.

2         Q.    Then you applied the policy deductible of $1,000.

3         A.    Yes, sir.

4         Q.    And that takes us to a number of 295,098.92,

5    correct?

6         A.    That's correct.

7         Q.    So that was your calculation of the actual cash

8    value of the repairs of the Bordens' house?

9         A.    Less the policy deductible.

10        Q.    Then, underneath that you have total recoverable

11   depreciation.  Is that what they can recover if they do the

12   repairs?

13        A.    Yes.

14        Q.    I'm going to show you an exhibit of Mr. Murphey's.

15   A building diagram which he marked as Exhibit 6.  And this is

16   a floor plan.  Now, Mr. Schumann, we all know we're here

17   because there was a dispute, and the dispute kind of started

18   with your damage estimate.  So what I'd like to kind of cut

19   to is to talk to you about the area generally that you

20   decided you needed to completely regut and rebuild.  In other

21   words, do your fire restoration in terms of, you know,

22   tearing the whole thing down and building it back up again.

23   What areas, when you wrote your estimate, were you

24   anticipating just gutting?

25        A.    The -- all along the main level.

1          Q.    You can use your hand if you'd like to --

2                THE COURT:  Either with a pen or your finger, you

3     can just go through and scratch in every place that you think

4     needed to be completely gutted and rebuilt.

5          A.    The kitchen, dining area, lavatory, family room, sun

6     room, formal dining room, this living room, part of the

7     foyer.

8          Q.    Are you done or are you still looking?

9          A.    No.

10         Q.    Now, do you see that little section on the lower

11    right-hand corner of Exhibit 6 which represents another story

12    of the house?

13         A.    Yes, sir.  That's the upstairs.

14         Q.    How, generally, did you deal with that section?

15         A.    I looked at it as having to clean the ceiling

16    Sheetrock, seal and paint it, and then replace all the

17    wallpaper, and then also clean the trim and replace all the

18    carpeting.

19         Q.    I'm going to show you -- when we were going through

20    this, you selected for me some of the photographs which

21    showed the areas where you and Mr. Parise had a dispute,

22    correct?

23         A.    Yes, sir.

24         Q.    Areas which he felt -- it was your understanding

25    that he felt these areas should have been gutted and built --

1    you know, built up from the ground, and you felt they could

2    be cleaned, sealed, and painted, right?

3        A.    Yes, sir.

4        Q.    I'm going to show you what's been marked as Exhibit

5    P-1.  This is entitled, "Bedroom 1" on your photo sheet.

6    Could you explain to the Court, for instance, what you would

7    have done in this room.  I mean, obviously the contents have

8    to be taken out, but if you were going to repair this room to

9    restore it to its prefire concern, what would you have done?

10   As your estimate contemplated.

11            (Defendant's Exhibit P-1 marked for identification.)

12       A.    The ceiling was going to be cleaned with a chemical

13   clean and then sealed and painted.  The crown molding also

14   would be cleaned, sealed, and painted.  This wallpaper was

15   all going to come down and be replaced, and the wall would be

16   sized behind it --

17            THE COURT:  I'm sorry, the wall would be what?

18            THE WITNESS:  The wallpaper would be replaced.

19            THE COURT:  Would you seal the wall, too?

20            THE WITNESS:  I did not include that in my initial

21   estimate to seal the wall behind the wallpaper.

22            THE COURT:  For my benefit, what's sealing mean, and

23   how do you do it?

24            THE WITNESS:  You take -- you just basically put a

25   primer coat of paint over what was there after it's cleaned,

1    and it seals -- it doesn't allow anything to bleed through,

2    odor or stains.

3        Q.    What is the cleaning process in a fire-damaged

4    house?  Can you explain what that does because that -- is

5    that what takes care of the smoke and the odor?

6        A.    Well, a great part of it.  It's a chemical sponge

7    that they actually wipe down the walls, and it just removes

8    all the light smoke that I found on the walls in this room --

9    or excuse me, the ceiling.  The wallpaper's being replaced.

10   So that would eliminate that that way.

11       Q.    So you would use the chemical sponge --

12       A.    Yes.

13       Q.    -- to clean the --

14       A.    All the trim, the ceiling, everything that's not

15   being replaced.  The wallpaper in this room is being

16   replaced, so it all comes down with it.

17       Q.    Then you seal it and you paint it?

18       A.    Well, I did not pay to seal -- or I did not suggest

19   sealing the walls, I did the ceiling.  But certainly that

20   wouldn't be something I would argue about as a supplemental

21   item, to seal the walls.

22       Q.    Now, the particular wallcovering that you have

23   here --

24       A.    Yes.

25       Q.    -- what are you doing with that?  Are you just going

 1    to clean that or are you goig to remove it and put up new

 2    wallcovering?

 3        A.    No.  That's being removed and replaced.

 4        Q.    For instance, this is the same bedroom, here we have

 5    a closet area, and you know, we can see some smoke on the

 6    closet door there.  How are you going to deal with an item

 7    like that, which is wood?

 8        A.    That's obviously cleaned, and then sealed and

 9    painted.

10        Q.    Essentially the same process you explained to the

11    Judge that you would use on the ceiling?

12        A.    Yes, sir.

13        Q.    Here's Bedroom 1, and here we see that the room had

14    carpeting, and it's been pulled back and there's hardwood

15    flooring underneath.  How are you going to deal with that?

16        A.    I believe this room had a rug.  On the left side

17    over here is -- I think was an area rug, if I'm not mistaken,

18    and then the hardwood floor.  That also could be cleaned, the

19    wood flooring.

20        Q.    What were you going to do -- what were you going to

21    do with the floor?  Can you explain?  Were you just going to

22    clean it or were you going to finish the wood?

23        A.    I believe, if I'm not mistaken, it was an engineered

24    floor, but I'm not -- I can't -- I'm not absolutely sure

25    about that.  But I know I did figure cleaning the floor and

1   applying a sealer to the floor.

2       Q.   I'm going to skip over to what's been marked as the

3   garden tub and tile steps and the master bathroom now.  Is

4   this or is this not the jacuzzi that we've heard a lot of

5   testimony about where there was an issue about the damage to

6   the pipes underneath?

7       A.   There was a jacuzzi downstairs.  This was in the

8   master bedroom upstairs.

9       Q.   So this is not the jacuzzi -- the Judge has heard

10  testimony earlier about Mr. Parise showing you and

11  Mr. Bennett the underneath of the jacuzzi.  This is not that,

12  correct?

13      A.   No, sir.

14      Q.   What were you contemplating doing in this master

15  bathroom area in terms of repairs?

16      A.   Obviously, you know, the ceiling, the walls,

17  addressing -- either removing and replacing wallpaper or

18  sealing and painting, replacing this garden tub.  As I

19  recall, it was a -- I'm trying to find the word -- fiberglass

20  construction, and it's difficult to get smoke odor out of a

21  fiberglass tub.  So I chose to replace that and the faucets,

22  and clean all that wall tile that surrounds it.

23      Q.   Mr. Parise's approach to the same area was to do

24  what?  Was it to gut the --

25      A.   From what I heard -- yeah, from what I observed he

1    was going to gut the entire room, or wanted to gut the --

2        Q.    So you were removing the areas that you thought

3    you'd have difficulty removing smoke from --

4        A.    Yes.

5        Q.    -- and you were cleaning and sealing the rest,

6    correct?

7        A.    Yes.

8            THE COURT:    When you say "gut the entire room,"

9    would that be, with respect to the master bedroom or the

10   master bathroom that we're talking about here -- would

11   gutting it mean knocking it down to the studs or absolutely

12   knocking everything out and then starting all over?  What

13   does "gutting" mean?

14           THE WITNESS:    Yes, sir.  I understand.  Gutting is

15   just taking everything out of the room, back to the studs.

16           THE COURT:    So the only part of the original room

17   that might remain would be the studs, perhaps, if they were

18   usable?

19           THE WITNESS:    Yes, sir.

20           THE COURT:    Go ahead.  And that would be true in

21   every room where you and Mr. Parise had a disagreement; is

22   that correct?

23           THE WITNESS:    That is correct.

24       Q.    I'm going to go back to Exhibit 6 since we were just

25   in that bedroom and master bath.  Now, Mr. Schumann, the

1    Judge has previously been shown the area where the fire

2    occurred, but can you indicate with your finger where this

3    area is in comparison to the fire.

4         THE COURT:  Where what area is?

5    Q.   This area we just showed, where the master bathroom

6    and master bedroom were, where you and Mr. Parise had this

7    dispute.

8    A.   Yes.

9    Q.   Show the Court where the master bathroom is on

10   Exhibit 6.

11   A.   Okay.  This is the master -- I'm sorry.

12        THE COURT:  Is that right here?  Lower right-hand

13   side, it says "bath"; is that it?

14        THE WITNESS:  No.  That's the hall bath upstairs.

15   Where it says "bedroom" across the hall from that, that's the

16   master bedroom, and there's a sitting area, and it looks like

17   we've got a closet and then the bathroom would be right here.

18   I've just scratched it out.  So that's the bath.  So this

19   entire part of the house is located above right here.

20   Q.   This is an entire -- it's the other wing of the

21   house, and it's also up a story, correct?

22   A.   Yes.  That's correct.

23   Q.   Given the fact that the fire started in the

24   basement, it's actually up two stories; isn't it?

25   A.   Yes.

1          Q.    The first floor, and the fire burned through some of

2     the areas of the first floor, and then this is over the

3     opposite side?

4          A.    On the opposite side of the house.

5          Q.    All right.  I'm just going to show you a few more

6     photographs so we can understand the differences that you and

7     Mr. Parise had.  I'm going to show you photograps of the

8     upstairs hallway, this has been marked P-35.  Now, I don't

9     want to talk about the contents because they're not an issue

10    in this case.  Let's talk about just the building.  We have

11    carpeting there.  Can you see it running down the hallway?

12              (Defendant's Exhibit P-35 marked for

13               identification.)

14         A.    Yes.

15         Q.    In your estimate, did you replace the carpeting?

16         A.    Yes.

17         Q.    Was that or was that not an issue with you and

18    Mr. Parise?

19         A.    I don't believe that was an issue.

20         Q.    So that leaves us with the walls and the woodwork in

21    the hallway.  Can you tell whether this was painted or

22    whether this was wall covered?

23         A.    From what I recall, this was painted.  It was kind

24    of a teal or dark green, from what I can remember, paint.

25         Q.    There seems to be some sort of fancy thing up here,

1    that's why I ask the question.  Do you recall?

2          THE COURT:  It doesn't matter.  Let me ask you,

3    though, with respect to the carpeting, I gather wherever

4    there was carpeting in this section of the house both you and

5    Mr. Parise both agreed that it had to be replaced; is that

6    right?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  Was the reason for that, as a practical

9    matter, where there's smoke damage you can't get smoke out of

10   carpeting?

11         THE WITNESS:  That's a correct statement.

12   Q.   Would you also contemplate cleaning underneath the

13   carpeting?

14   A.   Yes.

15   Q.   None of what you were doing regarding the floor was

16   an issue, correct?

17   A.   Not to my knowledge.  Also, we were replacing the

18   padding under the carpet as well.

19   Q.   You were getting rid of everything down to the

20   floor, cleaning the floor?

21   A.   Down to the subfloor, yes, sir.

22   Q.   Let me just ask you while we're on the subject of

23   carpeting:  Did you do anything special in order to make

24   certain you were providing the Bordens with the quality of

25   carpet that they had before?

1       A.   Yes.  I sent samples to Florida, to Jacksonville, to

2   a company called Itel, and they evaluate the weight and the

3   quality of carpet and send back an e-mail report giving you a

4   price per square foot or square yard for labor and materials

5   for that particular carpet.  That's what they do.

6       Q.   Is that what you included in your estimate of the

7   Bordens' house?

8       A.   It is.

9       Q.   Now, looking at this area again on P-35.  What would

10  you have done with this hallway area, in your estimate?

11      A.   Obviously, cleaned the walls and the ceilings, I'm

12  not sure I replaced the recessed lighting that you see above

13  in the center of the ceiling.  Cleaned all the casings, the

14  baseboard, the doors, replaced the outlets and switches, and

15  seal and then paint -- seal the walls.  And it looks like we

16  had crown molding in there as well, and I also addressed

17  that; replace the carpet and pad.

18           THE COURT:  Did you say you would see the -- excuse

19  me, seal and paint the walls and the ceiling?

20           THE WITNESS:  Yes, sir.  There's no wallpaper on

21  these walls in this hallway, so in order to effectively --

22  after cleaning it with a chemical, you would seal it and then

23  two more coats of paint over that.  So it's a three-coat

24  process.

25      Q.   I'm just going to show you one more.  Just to give

1    you a wider view.  This is the closet in the upstairs

2    hallway?

3        A.   Yes.

4        Q.   Then you took a close-up of that wallcovering here?

5        A.   Yes.

6        Q.   The wallpaper in the hallway closet upstairs.  What

7    did you anticipate doing with this wallcovering?

8        A.   Replacing this.

9        Q.   Is this another area that Mr. Parise wanted to gut

10   the whole wall?

11       A.   Yes.

12       Q.   I'm going to show you a view of the upper landing

13   and stairway.  I'm just going to show you two different views

14   of it.  The first appears to be from the second level looking

15   down to the foyer and the landing.  This is Exhibit P-41.  I

16   have another photograph, which I previously showed to the

17   Court, this is P-45.  This is the foyer and steps up to the

18   second level.  Now, did you and Mr. Parise have a

19   disagreement on these photographs?

20            (Defendant's Exhibit P-41 and P-45 marked for

21             identification.)

22            THE COURT:  That's fine.

23       Q.   Can you explain to the Court what you would have

24   contemplated doing in this area when you wrote your estimate.

25   Here we can see -- let's start with the carpeting.  Are you

1    replacing it?

2        A.   Yes.

3        Q.   And we've got some, what appears to be, nice quality

4    woodwork on the stairwell.

5        A.   Yeah.  The steps are hardwood, and they can be

6    cleaned.  The baluster and the pickets, as I call them, they

7    can all be cleaned and then painted.  There's not a lot of

8    heat at all in this area of the house, and I didn't see any

9    damage to the -- either the wall-mounted handrail on the left

10   side going down, the wing footing, or the baluster on the

11   right side.  There was also a large chandelier hanging down,

12   I think that was either -- I'm not sure if I replaced that or

13   if I just -- estimated to replace it or if I had it detached

14   and reset and cleaned.  I don't know which I did.

15       Q.   What was your understanding, again, looking at P-41,

16   of what Mr. Parise was doing in that area?

17       A.   It was my understanding that he was just taking

18   everything down to the studs, gutting this entire room.

19           THE COURT:  You mean knocking down the staircase,

20   taking the staircase and the railings out?

21           THE WITNESS:  Yes, sir.

22       Q.   Now, let me show you the jacuzzi room that has been

23   discussed previously.  This is P-83.  Is this, in fact, the

24   jacuzzi room?

25           (Defendant's Exhibit P-83 marked for

1              identification.)

2    A.   Yes -- well --

3         THE COURT:  Well, there's two jacuzzi rooms, we've

4    already talked about one, right?

5         THE WITNESS:  That was in the master bedroom

6    upstairs, it had a garden tub.

7         THE COURT:  That's not very clear.  Is that the

8    photograph or is that the machine?

9         MR. GEER:  The photograph is fine.

10         THE COURT:  Why don't you just give it to him.  For

11   some reason the clarity isn't very good on the machine.

12    Q.   Is that the jacuzzi room where the dispute occurred

13   regarding the underneath plumbing?

14    A.   Yes.

15         THE COURT:  Where is that jacuzzi room located?

16         THE WITNESS:  This is on the first level, the

17   opposite side of the house from the kitchen, which is just

18   directly above the basement.

19         THE COURT:  Which exhibit number was that?

20         MR. GEER:  We're going to go back to Exhibit 6 and

21   show you where it's located.

22         THE WITNESS:  This room right here is the jacuzzi we

23   just saw the picture of.

24         THE COURT:  All right.

25         MR. GEER:  To answer the Court's question, that was

1      P-83 I showed you before.

2              THE COURT:  Go ahead.

3      Q.    Is that the jacuzzi in the lower right-hand corner

4      of 83?

5      A.    Yes.

6      Q.    We'll go to 84.  Is that jacuzzi with its cover on?

7              (Defendant's Exhibit P-84 marked for

8               identification.)

9      A.    Yes.

10     Q.    Now, can you explain to the Court what occurred

11     regarding this jacuzzi --

12             THE COURT:  What was the dispute between you and

13     Mr. Parise with respect to this room?

14             THE WITNESS:  First he -- he was gutting the entire

15     room, again, taking it back to the studs.  And I had figured

16     cleaning all the tile here, and he wanted to replace all the

17     tile.  Then there was a plumbing concern about smoke

18     underneath the jacuzzi.

19             THE COURT:  What was the plumbing concern?

20             THE WITNESS:  That he wanted to replace the

21     plumbing -- you know, the drain lines.  I did not include

22     that in my estimate.

23             THE COURT:  Go ahead.

24     Q.    Let me show you the bathroom adjacent to the jacuzzi

25     room.  Can you tell me what the -- was there a dispute

1    between you and Mr. Parise as to how to deal with the repairs

2    of this room?

3         A.   Yes.  He was, again, gutting the entire room.  I --

4    my best recollection, this is wallpaper, and I was replacing

5    the wallpaper; sealing and cleaning, painting the ceiling;

6    cleaning the tile, and I believe I may have tried to clean

7    the tub in here.

8         Q.   I'm just going to show you a couple more,

9    Mr. Schumann.  This is a photograph of the guest bedroom

10   area.  Was this the area furthest away from the fire?

11        A.   On the main level.

12        Q.   So you're saying furthest away on the first floor?

13        A.   Yes.

14        Q.   There was a floor above?

15        A.   Yes.

16        Q.   Did you and Mr. Parise -- I note for the record this

17   is P-96.  Did you and Mr. Parise disagree on P-96?

18             (Defendant's Exhibit P-96 marked for

19              identification.)

20        A.   Yes, we did.

21        Q.   What did you contemplate doing?  What did he

22   contemplate doing?

23        A.   I was replacing the wallpaper border and cleaning,

24   with chemicals, and sealing the dry wall, ceilings, and

25   walls, painting all that, including cleaning and painting

1    trim, including replacing the carpet.  If I remember

2    correctly, this was like an indoor/outdoor grade carpet in

3    this room.  And also, I think throughout the house I replaced

4    all the outlets and switches.

5        Q.   What was he doing?

6        A.   I'm sure he was replacing all the outlets and

7    switches as well, and rewiring the whole house.

8        Q.   Was he gutting everything?

9        A.   Yes.

10       Q.   Now, there's been discussion in this case about the

11   cost incurred in gutting this house.  Now, Sheetrock is not

12   that expensive, correct?

13       A.   No, sir.

14       Q.   Why is it so much more expensive if you do the type

15   of gutting that Mr. Parise was contemplating in his estimate?

16       A.    In order to remove the dry wall from walls, or

17   ceilings, anything that's attached to or on top of that has

18   to come down, baseboards, door casings, doors, crown

19   moldings, window casings, window sills, chair rail.  Anything

20   that's attached to the wall on top of it.  And so, the cost

21   goes up quite a bit when you start gutting rooms.

22       Q.    Even if you're leaving the studs and cleaning them

23   and sealing them -- and I'm not sure if that's what

24   Mr. Parise was indicating or not, I have to ask him that

25   question -- does that still involve removing other things

1    around them?  It might involve plumbing and that type of

2    thing?

3        A.    Yes.  Anything.  The vanities in the bathroom, the

4    tubs, the tile on the wall.  Everything has to be removed.

5        Q.    Electrical?

6        A.    Yes.  Well, excuse me, you can leave the wiring, but

7    the electrical boxes probably need to come down.

8            THE COURT:  Would things like, in a bathroom -- for

9    instance, the bathtub or the commode, fixtures of that

10   nature, that would fall under dwelling coverage; is that

11   correct?

12           THE WITNESS:  That is correct.

13           THE COURT:  As opposed to content coverage?

14           MR. GEER:  Yes, sir.

15           THE COURT:  We're going to take a short break.

16           (Pause in the proceedings.)

17       Q.   Mr. Schumann, we're on the home stretch.  I just

18   have a couple more photographs.  The last couple photos I'm

19   going to show you I'm just going to -- I'm just trying to

20   give the Court a feel for what you're replacing versus what

21   you're going to clean, seal, and paint.  I'm going to show

22   you P-121 and P-122.  You call this a den, and I'm not sure

23   if this is a den or family room because I don't see a den on

24   Mr. Murphey's sheet.  Maybe we can clear that up.  Now, first

25   of all, P-122, this is the room you call the den?

```
 1              (Defendant's Exhibits P-121 and P-122 marked for

 2               identification.)

 3      A.    Yes.

 4      Q.    And that black hole is a hole in the floor, correct?

 5      A.    That is correct.

 6      Q.    I guess it goes without saying we need a new floor.

 7      A.    Yes, sir.

 8      Q.    What about the rest of the room, are you gutting the

 9   rest of the room?

10      A.    Yes, sir.

11      Q.    Coming down to the wall?

12      A.    No.  I believe the brick fireplace was being left,

13   and that was being acid washed.  But the -- everything else,

14   back to the studs.  And then there's also some wall framing

15   being replaced in this area because of the damage that was

16   done to the framing.

17      Q.    Now, this is the ceiling and recessed light in that

18   room, right?

19      A.    Yes, sir.

20            THE COURT:  Was there fire -- in addition to

21   smoke -- obviously there was.  There was fire damage because

22   it came right up through the floor, right?

23            THE WITNESS:  Yes.  The floor joists were damaged

24   significantly, and it allowed the floor to collapse into the

25   basement.  There was also some fire damage to some of the
```

1    wall framing that separates the kitchen from the den.

2        Q.   Now, this is another section of that room.  Just

3    from looking at this one, might not be able to tell how close

4    it was to the fire.  Are you gutting and replacing this

5    entire section?

6        A.   Yes, sir.

7        Q.   For the record, this is P-121.  And then, just by

8    contrast, you had mentioned the master bathroom before.  It

9    came up, and I didn't have the photo handy when you did.  I

10   have now found that.  I'm just going to show you two

11   photographs of sections of the master hallway, bath

12   upstairs -- I'm sorry, this is the upstairs hallway bathroom.

13   59 and 60.

14           (Defendant's Exhibits P-59 and P-60 marked for

15            identification.)

16       A.   Yes.

17       Q.   Were these areas that were in dispute between you

18   and Mr. Parise?

19       A.   Yes, sir.

20       Q.   What were you proposing?  What was he proposing?

21   There's a chandelier there for one thing.

22       A.    From what I recall, I was replacing all the

23   wallpaper and the wallpaper border, and cleaning all the

24   bathroom fixtures, the tile floor, sealing and painting the

25   drywall sealing, and cleaning, of course, the chandelier and

313

1    the other light fixtures.  In the shower, tile surrounding

2    the shower and the tub and the toilet.

3        Q.   So you're going to clean the toilet and the -- and

4    the tile -- is that tile behind the tub?

5        A.   Yes.

6        Q.   And then, the flooring, we can see the black and

7    white flooring.

8        A.   It was black and white tile.

9        Q.   Are you going to clean it and seal it?

10       A.   Just clean it.

11       Q.   What was Mr. Parise doing in that area?

12       A.   He's removing everything in the room back down to

13   the studs.

14       Q.   Have you previously been involved in adjusting fire

15   claims where smoke remediation technology such as what you

16   proposed using here was used?

17       A.   Yes.

18       Q.   What is the technology which was available in 2003

19   to restore a smoke-damaged building to its prefire condition?

20   What are some of the options and what was available?

21       A.   Well, as I did with the upstairs and other areas of

22   this house, use chemical sponges to clean all the smoke off

23   of the wall surfaces that are not wallpapered, and the same

24   chemical for cleaning all the trim and then sealing and

25   painting.  That's -- that's what's available.  And then, as

1    an initial step, that can be done.  You can always come back

2    and take out a wall later if it doesn't accomplish what you

3    want it to accomplish.

4         THE COURT:  Let me interrupt for a second.  When you

5    talk about "sealant," just so I'm clear, is sealant the same

6    as putting a primer on the wood or is sealant -- is sealant a

7    chemical or something that is quite distinct from what a

8    painter would normally do if they were painting a room for

9    the first time?

10        THE WITNESS:  Yes, sir.  Have you ever heard of

11   Kilz, K-I-L-T-Z (sic)?  It's a paint product.

12        THE COURT:  No.

13        THE WITNESS:  It's specifically designed to seal

14   any -- anything under it to keep it from bleeding through.

15   It's not just a latex paint.  It does seal.

16        THE COURT:  Is that Kilz product, or products like

17   Kilz, specifically designed for remediation efforts where

18   there has been smoke damage?  In other words, why would you

19   want to -- I'm trying to get a feel for this.  One reason

20   you'd want to seal is to prevent smoke odors or soot or

21   whatever leaking through.  Is there any other reason that you

22   would use Kilz in connection with painting a room?

23        THE WITNESS:  If you have a stain on a ceiling --

24   for instance, like a dry wall ceiling, a water stain, you can

25   cover it with Kilz, and then, when you paint it, that will

1    not bleed back through.  If you just paint it with latex,

2    it'll come back through.

3              THE COURT:  I got it.  Go ahead.

4        Q.   You indicated there were other products, other than

5    Kilz, that were similar.

6        A.   Yes, there are.

7        Q.   That's what's contemplated in your estimate when

8    you're talking about sealing?

9        A.   Yes, sir.  Sealing the dry wall area prior to

10   painting it.

11       Q.   Were products such as this in common use in the

12   insurance industry in 2003?

13       A.   Yes.

14       Q.   And were products and processes like this commonly

15   used by fire restoration contractors around 2003?

16       A.   Yes, sir.

17       Q.   What have you experienced in terms of success of

18   these products and these processes in losses in which you

19   have been involved?

20       A.   Let me preface that by saying, normally I work

21   closely with a contractor that's chosen by the customer.

22   It's not always necessary, but that's generally what happens.

23   And if this is what we attempt to do, very seldom do I ever

24   hear back from the contractor that we need to take out any

25   dry wall.  Occassionally, 10 percent of the time, you may

1    have to go back and take out a little dry wall here or there

2    because it -- it might still be a slight smoke odor, but

3    that's about 10 percent.

4         Q.   Can you give the Court some general idea of how many

5    differents losses you've worked on where you suggested this

6    type of technology in your proposal, and, in fact, it was

7    used?

8         A.   My best guess, 75 houses.  And again, let me -- if I

9    may elaborate, it's not just my -- my decision that that be

10   done.  It was more or less an agreement with the person who's

11   actually going to be responsible for completing the job that

12   agrees to it.  So it's just an industry standard procedure

13   that works.

14        Q.   Were you ever provided with any technical or

15   scientific information from the Bordens or Mr. Parise, or any

16   of their representatives, which would indicate that the smoke

17   remediation would not have worked at the Bordens' house?

18        A.   No, sir.

19        Q.   Did you ever receive any scientific or technical

20   information indicating that if the smoke remediation process

21   you proposed had, in fact, been done that it would have posed

22   any health hazard to any member of the Borden family?

23        A.   No, sir.

24        Q.   Have you ever received any information, scientific

25   or technical in nature, that would indicate that the smoke

1    remediation technology you proposed using would not have

2    restored the Bordens' house to its prefire condition?

3        A.    No, sir.

4            MR. GEER:  That's all I have, Your Honor.

5            THE COURT:  Let me just ask a quick question,

6    Mr. Schumann, before Mr. Murphey gets up and asks you some.

7    You said in some relatively small percentage of cases that

8    the attempt to ameliorate smoke or soot problems by using the

9    sealant method didn't work; is that right?

10            THE WITNESS:  Yes, sir.

11            THE COURT:  How do you know whether it has worked in

12    terms of getting rid of smoke?  At what point do you know

13    that?  Several months after the job is completed?  Do you

14    know what I mean?  I mean, I can envision a situation where

15    months go by and you wait and wait and wait for the smoke

16    smell to go.  How does that work out in the real world?

17            THE WITNESS:  Well, in the real world usually these

18    repairs are done within a year.  So during the process of

19    repairing the house, it's not real difficult to determine

20    that there still is a residual amount of smoke odor there and

21    you need to go further to address it.  Another item that's

22    used is Thermo Fogging, which is a fog, much like smoke, that

23    penetrates and it eliminates smoke odor that way.  So those

24    things are done occasionally to further address the potential

25    smoke order.

1          THE COURT:  So would a, for instance then -- take,

2     for instance, a bedroom where that was done.  Once that was

3     completed, would a contractor or someone -- once the cleaning

4     process had been completed, would it be true that the

5     contractor would know pretty much right away whether the

6     amelioration process had been successful or not from a smoke

7     standpoint?

8          THE WITNESS:  Yes.  It wouldn't take long.  Because

9     I -- I've actually been back into houses that have done that

10    and it's like night and day.  Once you clean the walls and

11    get the carpet out, it changes everything quickly.  But, yes,

12    they would know -- it wouldn't take very long.

13         THE COURT:  Go ahead, Mr.  Murphey.

14

15                    RECROSS-EXAMINATION

16    BY MR. MURPHEY:

17

18    Q.   Actually, the Judge asked a question that I was

19    going to ask you about the 10 percent or so of the houses.

20    So I'll skip that.

21         Mr. Schumann, I just have a couple of things.  Back

22    to the diagram of the home.  You testified that the fire

23    started in the basement and that these were the rooms

24    directly above the basement, correct?

25    A.   The --

1          THE COURT:  You're going to have to say something

2     for the record.

3          MR. MURPHEY:  I'm sorry, Your Honor.

4     Q.   That the kitchen, the family room, the sun room, the

5     dining room, the dining area off the kitchen, those were the

6     rooms sitting above the basement, correct?

7     A.   Yes, sir.

8     Q.   The right-hand side of the house, as we look at

9     Exhibit 6, which contains the hot tub room, the bedroom, the

10    parlor, the bath, there was a crawl space under that area of

11    the house, correct?

12    A.   Yes.

13    Q.   And that crawl space opened up to the basement,

14    correct?

15    A.   Yes.

16    Q.   I mean, the -- okay.  It was an open area between

17    the basement where the fire started and the crawl space?

18    A.   Yes.

19    Q.   Just a couple more things.  You had reviewed with

20    Mr. Geer Photograph No. 26, which is the garden tub area

21    upstairs, correct?

22    A.   That is correct.

23    Q.   And I just wanted the Judge to understand this

24    because frankly I didn't when I first looked at this.  The

25    dark areas on those steps, that's all soot; isn't it?

1        A.   Yes.

2        Q.   All the tile is white, correct?

3        A.   Yes.

4        Q.   And you'll see that there is a vent there on the

5   first step, correct?

6        A.   Yes.

7        Q.   What is that vent thing?

8        A.   That's a heat/air conditioning vent.

9        Q.   So where would the ductwork behind that vent go?

10        A.   Probably to a trunk line.

11        Q.   Where's the trunk line go?

12        A.   Eventually ends up going down into the basement to

13   the furnace.

14        Q.   Where did the soot come from?

15        A.   Well, it just was in the air and it just settles.

16        Q.   And the same then is true of the jacuzzi room,

17   correct?  These dark areas, that's not brown tile like I

18   thought when I first looked at it, that's the soot; isn't it?

19        A.   Yes.

20        Q.   Mr. Geer had asked you about the carpeting, and he

21   said that -- he asked you whether you did anything special

22   with the carpeting, and you said that you sent it to Itel --

23   is that the name of the company?

24        A.   Yes.

25        Q.   And you do that in every case, right?

1     A.   Most every case.

2          MR. MURPHEY:  That's all I have, Judge.

3          THE COURT:  Anything else?

4

5                         REDIRECT EXAMINATION

6     BY MR. GEER:

7

8     Q.   Just to clarify, Mr. Murphey showed you P-26, which

9     was the garden bathroom.  Did you not say that you replaced

10    that in your estimate anyway?

11    A.   Yes.

12    Q.   Would that include steps?

13    A.   No.  I cleaned the tile steps.  I did replace the

14    tub and the faucets.

15         MR. GEER:  That's all.

16         MR. MURPHEY:  That's all I have.

17         THE COURT:  Thank you, Mr. Schumann.  You may now go

18    back to North Carolina.

19         MR. GEER:  Your Honor, may I move for admission of

20    my exhibits later?

21         THE COURT:  Yes.  You don't have to do it now.

22         MR. MURPHEY:  May I call my next witness, Judge?

23         THE COURT:  You may.  Is it Mr. Parise?  Come on up

24    here and spell your name for my court reporter.

25         THE WITNESS:  Anthony, A-N-T-H-O-N-Y, last name is

```
 1    Parise, P-A-R-I-S-E.
 2              A N T H O N Y   P A R I S E, first having
 3              beeen duly sworn, testified as follows:
 4
 5         MR. MURPHEY:  Your Honor, I have a packet of
 6    exhibits that I'm going to use for Mr. Parise's testimony
 7    that I haven't previously provided.
 8
 9                      DIRECT EXAMINATION
10    BY MR. MURPHEY:
11
12         Q.   Good morning, Mr. Parise.
13         A.   Morning.
14         Q.   Can you please tell the Court where you work.
15         A.   I'm an insurance adjuster under my own company,
16    Anthony M. Parise, LLC, associated with Giordano &
17    Associates, which is out of Connecticut, which is --
18              THE COURT:  Would you speak a little bit more into
19    the microphone.
20         Q.   Where do you live?
21         A.   Connecticut.
22         Q.   You said you have your own public adjusting company?
23         A.   Correct.
24         Q.   We've seen the letterhead of Giordano & Associates
25    in this case.  You work with Giordano sort of as an
```

 1    independent contractor?

 2        A.   Correct.

 3        Q.   Would they do some of your billing, and things like

 4    that, on projects that you are referred to from them?

 5        A.   Correct.

 6        Q.   How many years have you been in the adjusting field?

 7        A.   Including working for insurance companies?

 8        Q.   Yes.

 9        A.   Since 1989.

10        Q.   Can you explain to the Court your experience in

11    adjusting, even with insurance companies.

12        A.   Yes.  Fresh out of college I worked for Georgia

13    Pacific for a short period of time, which was not

14    insurance-related --

15             THE COURT:  What year did you graduate?

16             THE WITNESS:  I graduated college in 1988.

17        Q.   What was your degree in?

18        A.   I had a four-year degree in business.

19        Q.   Where did you go to school?

20        A.   Plattsburgh State University, which is part of the

21    New York State University System.

22        Q.   In Plattsburgh, New York?

23        A.   Yes.

24        Q.   Go ahead.  After college --

25        A.   After college I worked for Georgia Pacific for a

1    short period of time, then I took a job at Nationwide

2    Insurance as a large loss specialist in New York, an

3    insurance adjuster specialist.

4        Q.   How many years were you with Nationwide?

5        A.   Approximately five years.  I believe from '89 to

6    '94.

7        Q.   What sort of training did you get during your time

8    with Nationwide?

9        A.   They had a pretty extensive training program.  They

10   actually had purchased an old Marriott Resort, if you will,

11   in Ohio, turned half of it into classrooms, and half of it

12   stayed as a hotel.  I was out there frequently through that

13   four-year period.  I would say probably for a two-month

14   period if you were to add up all the multiple times I was out

15   there.  And there was training in basic claims one, two;

16   commercial one, two; estimating; liabilities, many different

17   courses.

18       Q.   You have the same problem I do, Anthony, in that you

19   talk a little fast.  That's fine when Sondra's not here

20   trying to type everything down, so if we could both go more

21   slowly, that would be great.

22            What types of losses did you adjust when you were

23   with Nationwide?

24       A.   When I was with Nationwide, their business structure

25   at the time was the auto adjusters handled anything from

325

1    5,000 below on homeowner and auto, and then a large loss

2    commercial specialist, which was what my designation was,

3    handled any homeowner's above 5,000 and all commercial

4    property loss.

5        Q.    Now, you said that you were with Nationwide for

6    about five years.  That brings us up to about 1994.  What did

7    you do after that?

8        A.    Took six months off.  At the time I was working for

9    Nationwide I was also developing some rental properties in

10   Hyde Park and Poughkeepsie, New York, renovations, purchasing

11   older homes, selling some and retaining others.  So I --

12           THE COURT:  You get no points for speed.

13       Q.    I know we're all a little nervous in this setting.

14           THE COURT:  You've got to slow down just a little

15   bit.

16       A.    So I did that for about six months, and then I

17   missed the paycheck, so I went back to work for an insurance

18   company.  I moved to Connecticut and went to work for

19   Middlesex Mutual Insurance.

20       Q.    Middlesex Mutual?

21       A.    Yes.

22       Q.    How long did you work for Middlesex Mutual?

23       A.    Again, approximately five years.

24       Q.    Does that take us up to about 2000?

25       A.    '99, 2000.

1     Q.   What did you do at Middlesex Mutual?

2     A.   I was a -- they only sold personal lines insurance,

3     and I was a senior adjuster on homeowner claims, but --

4     Q.   And then, after you left Middlesex Mutual, what did

5     you do?

6     A.   I was doing a little public adjusting on the side,

7     but I did take a job with a computer software company.  They

8     developed software for the insurance industry, and I was more

9     of a business analyst where I would review what they were

10    building to make sure it fit insurance models.

11    Q.   And then how long were you -- how long did you do

12    that?

13    A.   Approximately a year and a half to two years.

14    Q.   And that takes us up to 2001, 2002?

15    A.   Correct.

16    Q.   Then what?

17    A.   Then I went full-time public adjusting.

18    Q.   Do you have any insurance certifications?

19    A.   I do.

20    Q.   What are they?

21    A.   When I worked with Nationwide I started the CPCU,

22    program, which is Chartered Professional Commercial

23    Underwriter (sic).

24    Q.   Charted Professional Commercial Underwriter?

25    A.   Correct.  It's 10 national exams, if you will, on

 1    all different aspects of insurance, insurance claims,

 2    insurance accounting, insurance law, if you will, and then

 3    you take an exam that's either pass or fail.  It's 10

 4    courses.  I also went on to earn an Associate's in Claims,

 5    which I believe is six courses.  Four or six, I forgot.  And

 6    then I became a Certified Insurance Consultant for the State

 7    of Connecticut, which I believe is six exams.

 8        Q.   You might be talking too fast.  Are you sure that

 9    CPCU isn't chartered property and casualty underwriter?  No?

10        A.   I'd have to check.

11        Q.   Maybe I have it wrong.  At any rate, you have the

12    CPCU designation.

13        A.   Correct.

14        Q.   That takes quite a while, right?

15        A.   Yeah.  At the time, you're only allowed to take two

16    exams a year.  So it would take a minimum of five years.

17        Q.   And you have the Associate in Claims designaiton.

18    How do you obtain that?

19        A.   That was, again, exams. It was either four or six.

20        Q.   And you are a Certified Insurance Consultant in the

21    State of Connecticut?

22        A.   Correct.

23        Q.   How did you get that designation?

24        A.   You do have to take exams, but they recognize the

25    fact that if you -- you have your CPCU, they waive the exams,

328

1    so at that point, it was only an application, if you will.

2        Q.   I identified you when you first sat down as a public

3    adjuster.  What is a public adjuster?

4        A.   Public adjuster is someone who's retained by the

5    insured to assist them through the claim process.  Strictly

6    on property claims.  Nothing to do with bodily injury or

7    nothing to do with autos.

8        Q.   Are you licensed as a public adjuster?

9        A.   In certain states.

10        Q.   What states?

11        A.   Connecticut, Massachusetts, New York; I have a

12    license pending in Florida.

13        Q.   You are not licensed in Pennsylvania?

14        A.   I am not.

15        Q.   Did Amica ever indicate to you during the process of

16    this case that they did not want to deal with you because you

17    are not licensed in Pennsylvania?

18        A.   No.

19        Q.   Can you estimate for the Judge the number of fires

20    that you have investigated or estimated in your career both

21    with the insurance industry and as a public adjuster.

22        A.   It's just a general, but I'd say close to 300.

23        THE COURT:  Let me interrupt you for a second on a

24    minor point.  You say you're not licensed in Pennsylvania,

25    correct?

1          THE WITNESS:  Correct.

2          THE COURT:  Nor were you at the time that you

3     adjusted this loss; is that correct?

4          THE WITNESS:  Correct.

5          THE COURT:  Do I take it, then, that a lack of

6     licensure does not prevent you from going into any state and

7     contracting with an insured for your services?

8          THE WITNESS:  I didn't represent myself as a public

9     adjuster to the Bordens.  We did not solicit this loss.  Most

10    public adjusters aggressivley solicit, that's why I find

11    states regulate them.  The Bordens contacted us through a

12    general friend in Connecticut and asked if we'd come out and

13    consult, take a look at what was going on because they were

14    confused on what was happening, at which point we agreed to

15    come out.  We came out as a consulting agreement.  We

16    presented a consulting agreement to Amica saying we're here

17    as consultants.  And once they obtained an attorney, we

18    basically were consultants through the law firm.  We sent all

19    of our -- they would ask us for our opinion, we would give it

20    to the law firm, and they would take it on.

21         THE COURT:  All right.

22    Q.   So to address the Judge's question, it's not

23    uncommon for you to work as an insurance consultant in states

24    that you are not licensed in?

25    A.   I have done it in the past.

1    Q.    And other people that work with Giordano &
2    Associates do that frequently; don't they?
3    A.    Pretty much the person who would travel -- I have
4    the most experience and education.
5    Q.    You?
6    A.    Within the organization, correct.
7    Q.    At any rate, when you worked on the Borden's --
8    strike that.  I had asked you how many fires that you had
9    investigated or estimated, and you said close to 300.  Have
10   you estimated close to 300?
11   A.    I'm sure.
12        THE COURT:  Pull your chair up.
13   Q.    You mentioned that how you got -- you started to say
14   how you got involved in this case.  Why don't you tell us the
15   whole story?
16   A.    Yes.  There's a -- Mr. Giordano is friends with a
17   big insurance agent in Connecticut, the Levine Agency, and I
18   believe Jerry Levine is the principal there, and he is
19   friends -- somehow friends with Mr. and Mrs. Eddie Borden,
20   which would be Jon Borden's parents.  He had called --
21   Mr. Levine called Mr. Giordano and said a friend of his, his
22   son had a fire in Pennsylvania, they were a little
23   uncomfortable and would we go out take a look at it for him.
24   Jerry being a close friend, we came out to take a look.
25   Q.    So you were retained by the Bordens then under a

1    retainer agreement, correct?

2        A.    Correct.  At the --

3        Q.    Go ahead?

4        A.    Well, at the point we executed the consulting

5    agreement, I wasn't sure if we could help them or not because

6    I needed to come take a look at everything.

7        Q.    Just to get the fundamentals out of the way, you

8    were hired on a percentage agreement?

9        A.    Correct.

10       Q.    Is that standard in the industry?

11       A.    Yes.

12       Q.    And percentage would be the percentage of the

13   recovery, you would get paid that percentage?

14       A.    Correct.

15       Q.    What did you do to prepare your estimate in this

16   case?  Just take us through it chronologically.

17       A.    Upon my first visit, I met with Ms. Eddie Borden at

18   the rental property that they were staying at and just had a

19   general conversation on what had transpired before my

20   arrival.  At which point she presented me with an estimate

21   that was prepared by Mr. Schumann, I think roughly in a

22   $200,000 range.

23            THE COURT:  Did you say Eddie Borden, sir?

24            THE WITNESS:  Eddie

25            THE COURT:  That's the mother?

 1           MR. MURPHEY:  Yes.
 2     Q.   And the prior testimony in this case was that
 3 Mr. Schumann's estimate was 328, $329,000.
 4     A.   That sounds correct.
 5     Q.   So you were presented with that estimate?
 6     A.   I was.
 7     Q.   And then, did you contact Mr. Schumann?
 8     A.   I did.
 9     Q.   Do you remember that conversation at all?
10     A.   Yes.
11     Q.   What did Mr. Schumann say?
12     A.   I basically just introduced myself and told him that
13 we were going to consult on this, and that I had a copy of
14 his estimate and couldn't really say whether it was good or
15 bad, because I had not seen the fire yet, but I just kind of
16 wanted to introduce myself and talk so he knew who I was.  At
17 that point, he said it had been going a little bit difficult
18 and he was happy that they were going to get some assistance.
19 He felt that -- he felt very strong about his building
20 estimate, that he had a local contractor explain -- Visions,
21 Incorporated who had reviewed his estimate and felt his
22 estimate was accurate on the building, and he was more
23 comfortable that I was there to assist with the contents.
24     Q.   So he had -- in that initial conversation did you --
25 did Mr. Schumann say that he thought there might be some room

1    for improvement in his estimate?

2        A.   Not that I recall.

3        Q.   Did he say that there were any specific areas that

4    he was uncertain about in his estimate?

5        A.   Not that I recall.

6        Q.   How long did you spend at the scene to develop your

7    estimate?

8        A.   I was -- the first visit we were here for four

9    days -- there was multiple visits, but to get my general --

10   what I usually do is I like to go through the house, get a

11   general scope.  That doesn't include pricing.  It just

12   includes what I think needs to be done on each room, in each

13   area.  The first visit we were here four days, and I'd say

14   three and a half of it was spent doing that.

15       Q.   Do you use a computer program to generate your

16   estimate?

17       A.   I do.

18       Q.   Is there a certain kind of software that you use?

19       A.   I do.

20       Q.   What's that called?

21       A.   It's called the Vedder, V-E-D-D-E-R.

22       Q.   Is that commonly used in the industry?

23       A.   Yes.

24       Q.   Mr. Schumann testified that he used a computer

25   software program called Exacta-Mate.  Are you familiar with

1    that?

2        A.    I am.

3        Q.    Have you ever used it?

4        A.    I just purchased it, but I haven't started using it

5    yet.

6        Q.    Are these just competing vendors with different

7    products?

8        A.    Correct.

9        Q.    You referenced -- and Mr. Schumann just testified

10    about this, but I wanted to get your understanding of it.

11    You referenced to doing a scope initially, and then you would

12    price it later.

13        A.    Correct.

14        Q.    How does that work?

15        A.    I take my scope sheets back to -- and sit in front

16    of the computer, basically, and the estimating systems are

17    very good.  You basically put in the dimensions of the room

18    and the height, and then you basically enter what you want to

19    do in each room.  You would enter a code for Sheetrock or dry

20    wall, and the computer would automatically compute the square

21    footage for you, and it would also put a price in.  A lot of

22    times these computer systems are very good as far as doing

23    the calculations and such, but it's really how good your data

24    base is, where you're pulling your figures or what numbers

25    you're using.

1        Q.   You're saying they're very good with respect to the

2    scope of the work, but you haven't found them to be quite as

3    good with regard to pricing?

4        A.   I don't think any estimating system really keeps up

5    with the pricing.  A lot of them only do updates to their

6    database every six months.  Which, when you just take the

7    storms we had down south, we're having an issue now settling

8    claims because the material has gone up so much and insurance

9    companies are still using databases that are older, and it

10   doesn't account for the recent increase.

11       Q.   Are the databases also geographically specific?

12       A.   By ZIP code.

13       Q.   So at any rate, during the time that you were at the

14   scene, did you look at every room in the house?

15       A.   Yes.

16       Q.   How much time do you think you spent going through

17   the house?

18       A.   I'd say it was eight hours a day for three and a

19   half days.

20       Q.   Did you cut holes in the walls while you were doing

21   your inspection?

22       A.   I kicked holes in the wall.

23       Q.   Now, we know -- we're going to hear some testimony

24   later, and we've heard it prior to this in the trial about a

25   meeting on April 15th where you kicked a hole in the wall,

1    maybe several.  Did you do that before the meeting?

2         A.    Yes.  When I did my initial scope, I needed to,

3    obviously, figure out what I was doing with the home.  So I

4    always do -- with basement fires I do certain steps to make

5    sure I try to figure out where the smoke penetration is.

6         Q.    Why don't you take us through those steps with a

7    basement fire.

8         A.    Well, with a basement fire it's usually a little bit

9    more difficult because a lot of the piping and wiring of a

10   home would be fed up through the basement.  What I mean "fed

11   up through the basement" is, they actually drilled holes

12   through the framing and stuff that might normally stop some

13   smoke or fire, they drill holes through it and run wires and

14   pipes through it and it's not airtight.  So when you have a

15   basement fire, you have the exposure of smoke flowing up

16   through the pipe channels and through the wire channels.

17        Unlike if had you a kitchen fire and left a pot on

18   the stove, your smoke's external to the walls, if you will,

19   and it might land on a wall, might land on a countertop, but

20   very unusual would it penetrate a wall or penetrate a light

21   fixture.  So when I have a basement fire, I try to go to the

22   basement just to see how much smoke or how much, what I call,

23   buildup did we have.  Because, once again, fire and smoke get

24   caught, if it doesn't have any way to escape, it pressurizes,

25   if you will, which really forces it through all these

1    openings I was just explaining.

2          So I looked at the basement well, and then I went up

3    into the attic because my feeling is if it can make it -- if

4    it's in the attic -- visibly in the attic, then obviously it

5    had to come from somewhere through the first and second floor

6    to get to the attic.  So I went up to -- the master bedroom

7    closet, I believe, is where the panel -- access panel, if you

8    will, is.  I opened that up, and I saw smoke throughout the

9    areas of the attic, especially around some can light

10   fixtures, which made me feel this house pressurized severely.

11   So then I --

12       Q.   You're talking pretty quickly.  Did you explain what

13   you mean by pressurized?

14       A.   Yes.  Basically that the smoke gets hot.  So it just

15   starts to build and build, and if it doesn't have a way to

16   escape or go anywhere, it's going to follow the path of least

17   resistance.  That's why if it goes up pipe chases, it'll go

18   up wiring chases.

19       Q.   Were there any windows or doors in the basement of

20   this this house?

21       A.   I was trying to think about that yesterday.  I don't

22   recall any basement windows.  I could be wrong, but if there

23   were, they were very small.  There was no big opening that I

24   recall, and I do not recall any external basement door except

25   for the one that went up to the kitchen as used for your main

1      entrance.

2          Q.  At any rate, did it appear to you that anybody

3      previous to you had put any holes in the wall?

4          A.  No.  I did not notice any holes in the wall on the

5      main structure.

6          Q.  I apologize.  I don't think you explained fully then

7      why it was you were putting holes in the wall.  You explained

8      what could happen in a basement fire, so what were you

9      looking for by putting holes in the wall?

10         A.  I was looking to see if there was smoke penetration.

11     When I noticed I had a very severe basement fire, and I'm

12     also seeing soot in the attic, just my experience as an

13     adjuster would tell me, obviously, it had to come through the

14     first and second floor in order to get to the attic.  So I

15     had to figure out why and where.

16             THE COURT:  Mr. Parise, you may have said this, and

17     I may know it from another witness, but what date did you

18     conduct your first examination of the property?

19             THE WITNESS:  It was early March.  Exact date, I'd

20     have to look at some correspondence.

21             THE COURT:  Is that a matter of record already?

22             MR. MURPHEY:  I think it is, Judge, in the

23     documentation.

24             THE COURT:  We'll pick that up later.  It was early

25     March.

1          MR. MURPHEY:  Yes.  It's early March.

2          THE COURT:  All right.  Go ahead.

3     Q.   I think that you were explaining what you would look

4     for by putting the holes in the wall.

5     A.   Right.  So basically what I would do at that point

6     then -- what I did on this particular job is, I went back to

7     the basement, starting writing my estimate because now I had

8     a good feel for where I felt smoke would be.  Then, when I

9     got to individual rooms, that's where I started to test

10    whether there was smoke penetration in the walls.  And I

11    would go into rooms where -- if I was in the bedroom and I

12    knew there was a bathroom next to that bedroom, I would go

13    into a place which would make sense there would be smoke and

14    I'd open up the wall.  And what I mean by an area that makes

15    sense is, I would go into an area where I believe there would

16    be pipes coming up to feed the bathroom fixtures, and I would

17    open up that wall, and I was finding dirty insulation,

18    insulation that appeared to have soot on it.

19    Q.   We will go through some photographs in a minute to

20    explain what you're testifying about.  But let me back up one

21    step.  During the time that you were inspecting this house

22    and formulating your estimate, did you meet Brian Seifert?

23    A.   Yes.  I met him a couple different times.

24    Q.   Did you walk through the house with him?

25    A.   After -- I believe, it was the second or third day,

1    correct.

2        Q.   Did you discuss with him Mr. Schumann's estimate?

3        A.   I pointed out -- yes.

4        Q.   Explain your discussion with him about

5    Mr. Schumann's estimate.

6        A.   That the point I told --

7             MR. GEER:  Objection.  This is hearsay.

8             MR. MURPHEY:  Again, Judge --

9             THE COURT:  What he says to him would be hearsay,

10   but I gather what --

11            MR. GEER:  I think what he's looking for is what

12   Mr. Seifert said to him.

13            THE COURT:  Well, I mean, it's hard for me to rule

14   as to whether this is a hearsay exception unless I take the

15   questions one by one.  So object as you feel necessary.  Go

16   ahead.

17       Q.   Backing up, do you recall discussing with

18   Mr. Seifert Mr. Schumann's estimate?

19       A.   Yes.

20       Q.   Did you go through the house where Mr. Seifert?

21       A.   Yes.

22       Q.   During your discussion and your tour of the house

23   with Mr. Seifert, did Mr. Seifert tell you anything about

24   whether he could do the work for Mr. Schumann's estimate?

25            MR. GEER:  Objection.

1           THE COURT:  It's hearsay, sustained.

2           MR. MURPHEY:  Well, Your Honor, the reason I'm

3      trying to illicit that is because this information was then

4      provided to Amica, and again, whether Mr. Seifert really said

5      it or not -- or whether Mr. Seifert really believed it or not

6      is not why we're offering the evidence.  We're offering the

7      evidence as to whether Mr. Seifert told

8      Mr. Parise that.  Because that becomes important with regard

9      to how the Bordens are reacting and how Amica is reacting.

10          THE COURT:  What was the question again?

11          MR. MURPHEY:  The question is whether Mr. Seifert

12     told him whether he could do the work for Mr. Schumann's

13     estimate.

14          THE COURT:  Are you saying it isn't whether he, in

15     fact, could do it, but it runs to the mindset of Amica?

16          MR. MURPHEY:  Mindset of Amica, and the Bordens

17     through Mr. Parise.

18          THE COURT:  What's your position on this?

19          MR. GEER:  I believe it's still hearsay.  It goes to

20     the matter asserted.  The question is whether or not the

21     Schumann estimate couldn't be build at that particular price,

22     which is what the influence is of the case.  I mean, yes,

23     it's an issue passed on to Amica, but I believe it's

24     inadmissible for one purpose --

25          THE COURT:  Is Mr. Seifert going to testify?

1            MR. MURPHEY:  I don't know.  We haven't decided

2    whether we're going to call him or not.  He's on our list,

3    but we haven't decided yet.  But again, it's not offered for

4    the truth of whether Mr. Seifert could or could not build it

5    for that estimate.  It's offered for the fact that he said

6    that he couldn't, which obviously is what --

7            THE COURT:  That he said that he what?

8            MR. MURPHEY:  That he could not.

9            THE COURT:  And then, where was that information

10   transmitted to?

11           MR. MURPHEY:  It's replete.  I mean, there's several

12   letters to Amica from Mr. Giordano -- or from Mr. Parise in

13   which he says that that's what Brian Seifert said.

14           THE COURT:  But whether he could or he couldn't --

15   he's going to testify that he said that he couldn't do it

16   for -- couldn't do the work for, what, 300-some-thousand

17   dollars?

18           MR. MURPHEY:  That's not what we're offering it for.

19           THE COURT:  The relevance is, who then became

20   possessed of that knowledge, and why is it probative on the

21   bad faith claim?  That's my question to you.

22           MR. MURPHEY:  To me?

23           THE COURT:  Yes.

24           MR. MURPHEY:  Because the bad faith claim is

25   Mr. Schumann's estimate was too low, and Amica knew that it

1    was too low.  It is probative on the second issue, and that

2    is whether Amica knew that this estimate was too low.

3    Because Mr. Seifert, who Mr. Schumann had relied upon, is now

4    acknowledging that this estimate would not put the house in

5    prefire condition.

6            THE COURT:  I don't want to spend too much time on

7    this, but it's a relatively significant point.  Whether

8    Mr. Seifert's opinion was correct or not as to whether he

9    could do the work for $328,000, or whatever it was, addresses

10   Mr. Murphey's point that it's not the correctness of his

11   statement, it is his statement being transmitted to Amica,

12   insofar as it relates to a hearsay exception.

13           MR. GEER:  Well, the Court has already heard

14   Mr. Bennett testify that he reacted to that information being

15   transmitted and what he did, and the letter, which this

16   information was transmitted, has already gone in.  I mean,

17   that went in yesterday.  In the form of a letter that

18   Mr. Murphey cross-examined Mr. Bennett about.  So that

19   information is already in.  It does not need to come in

20   through this witness.  It's --

21           THE COURT:  So in that sense, there's no dispute

22   from Amica's standpoint that they did receive information via

23   him from Seifert that Seifert didn't think he could do the

24   work for that amount?

25           MR. GEER:  No.  That's not quite right.  There's no

1    dispute that they received a letter from Mr. Parise

2    indicating that Mr. Seifert had said this; however,

3    Mr. Bennett testified, I believe, that he talked to

4    Mr. Seifert about that, and Mr. Seifert denied stating it.

5         THE COURT:  It's not hearsay in my view.  This

6    question is not.  It goes to the mindset of the carrier and

7    perhaps why people did things, but it's not for the truth.

8    It's overruled.  Go ahead.

9         MR. MURPHEY:  Thank you, Your Honor.

10    Q.    The question was whether you had a conversation with

11    Brian Seifert about Mr. Schumann's estimate?

12    A.    I did, at a very high level.

13    Q.    What do you mean by "high level"?

14    A.    We didn't get into detail, but it's very common for

15    an -- when I worked for the insurance company as well, if I

16    wrote an estimate that seemed to be having a difficult time

17    settling the claim with, then I would try to bring in a

18    contractor to back up my number.  So there is so much obvious

19    damage that was not in this estimate, I was kind of shocked

20    that he actually had someone that would back it up.  So at a

21    very high level I asked him to come back to the house because

22    I wanted to show him --

23         THE COURT:  Slow down.  You're going too fast.

24    A.    I wanted to show him certain things.

25    Q.    You wanted to show Mr. Seifert certain things?

1      A.    Correct.

2      Q.    What did you do?

3      A.    I don't know the exact order, but I brought him into

4   the home, and I remember there were two things that were on

5   Mr. Schumann's estimate that I asked him, did he take a good

6   look at the kitchen area, and he said that he had taken a

7   good look at the kitchen area and he was comfortable with the

8   numbers.  That's when I said, well, on his estimate he had

9   vinyl flooring and you could see the house has ceramic

10  flooring.  There's probably a five-times difference in cost,

11  so are you sure you took your time to understand this

12  estimate before you say you can do this work.  He said, I

13  didn't notice that.

14          Then I went to the countertops, and the estimate did

15  call for a plastic laminate, squared-edge countertop, which

16  is, you know -- and the house had Corian countertops.  The

17  difference in cost is significant.  By probably 100 bucks a

18  foot at least.  So again, I was surprised that he said he

19  could rebuild this home when two obvious things like that

20  that are very costly weren't in the estimate.

21          Then I also asked him if he was a fire restorator,

22  and he said he was.  And I said, well, most fire restorators

23  I know guarantee that the house will be free of smoke smell

24  after the loss, and he agreed.  So I took him upstairs and

25  said, well, you didn't really explore whether the smoke got

1       into the main house, and I opened up some walls and showed

2       him the different areas that I had opened and showed him that

3       I was finding smoke within those walls.  And I asked him, as

4       a fire restorator, how could you guarantee this house

5       wouldn't smell if you didn't take the time to investigate

6       where the smoke went.  He told me he was not instructed to

7       open up walls by Mr. Schumann.  I said, well, are you here as

8       a fire restorator to guarantee the house or are you here for

9       Mr. Schumann.

10              That was pretty much the end of the conversation.

11      At that point I told him that I was going to prepare my own

12      estimate room by room, and I was going to forward it on to

13      Amica.

14          Q.   And that's what you did, correct?

15          A.   Correct.

16          Q.   Do you recall what the amount of your estimate was?

17      It's already in the record as Exhibits 2-2 and 2-3.

18          A.   I did prepare two estimates.  I believe I only

19      presented one to the company.

20              THE COURT:  Why don't you just read the number in

21      and ask him if he has any reason to disagree that that's the

22      number.

23          Q.   The amount of your estimate was in the neighborhood

24      of $680,000 initially --

25          A.   Correct.

1      Q.   -- is that correct?  And it was about $11,000 more

2   the second time?

3      A.   Correct.

4      Q.   What were the primary differences between the two?

5   It's a pretty small amount.

6      A.   Yeah.  I couldn't really tell you.  I can tell you

7   my process when I wrote the estimate is, you spend a lot of

8   time getting detail in each room, you count every outlet, you

9   count every light fixture, and I do an estimate.  Then I go

10   back and go room by room, probably for another half a day, to

11   make sure that I counted the right outlets and I counted the

12   right light fixtures, and then I go make an adjustment on it

13   and come up with my final estimate.

14      Q.   We've already had testimony that Mr. Schumann's

15   estimate was in the 328 or $329,000 range.  You've identified

16   two areas of difference, the Corian countertops and the vinyl

17   flooring versus ceramic tile.  Obviously that would not

18   account for a more than $300,000 difference between your

19   estimate and Mr. Schumann's.  Can you explain to the Judge,

20   generally, why it is that your estimate was so significantly

21   higher?

22      A.   The main difference in the estimates were how we

23   were treating what we call the main structure, a main house,

24   a wing if you will.  And they were not taking -- I didn't

25   think they were appropriately addressing the smoke

1    penetration into the main wall cavities, the ceiling cavities

2    of the main home.

3         Q.   Now, we have some photographs that will help, I

4    think, explain your testimony.  First, you discussed the fact

5    that this was a basement fire, and why that called into

6    question whether there was smoke permeating throughout the

7    house.  Now, these pictures help to explain your concerns?

8         A.   Yes.  Actually, that picture would be reversed.

9    Correct.

10        Q.   That's right.  That's the beam in the ceiling,

11   correct?

12        A.   Correct.

13        Q.   Now, how does this photograph, which is Parise

14   Exhibit 10-1, we've given the packet of exhibits to the

15   Judge -- how does that picture help to explain your concerns?

16             (Plaintiff's Exhibit No. 10-1 marked for

17              identification.)

18        A.   That picture just shows the intensity of the fire.

19   I think because when you start to see the steel beam that has

20   discoloration in it like that, it goes to show to the -- the

21   extent of the fire and the heat that was in the basement,

22   which would cause it to pressurize more than a low-heat fire.

23        Q.   So the hotter the fire, the more pressurization and

24   the greater concern that the smoke has permeated the entire

25   home?

349

1    A.    Correct.

2    Q.    You said that you have estimated hundreds of houses.

3    On a scale of one to 100, where would you put the intensity

4    of this fire and the extent of the damage on this house?

5    A.    I put it about a 95.

6    Q.    It's one of the worst that you've seen?

7    A.    It is.

8    Q.    Exhibit No. 10-2, why was that helpful to your

9    analysis?

10        (Plaintiff's Exhibit No. 10-2 marked for

11         identification.)

12    A.    That picture -- from Day 1 through the entire

13    process, and even to this day, I still have question as to

14    whether the concrete block and the foundation would have been

15    salvageable.  These pictures show -- it's hard to see on the

16    screen, but it shows stress cracking throughout the block.

17    So it was a concern that it took a lot of heat.

18    Q.    So is that more evidence of heat of the fire?

19    A.    Correct.

20        THE COURT:  Did your estimate include or exclude the

21    preservation of the block?

22        THE WITNESS:  I believe I put in for some repair

23    work on them, and then left it as an open item to be looked

24    at further.

25    Q.    Like a structural engineer?

1          A.    Structural engineer, or you wait until you do your

2     demolition to see how it reacts.  Sometimes it'll fall apart

3     in your demolition, and that kind of resolves your issue, or

4     sometimes a local building official will look at it and not

5     allow you to build on it.

6          Q.    I'm showing you Exhibit No. 10-5.  How did that help

7     you in your analysis?

8               (Plaintiff's Exhibit No. 10-5 marked for

9                identification.)

10         A.    That goes to show me that the main electrical panel

11    and the box in the basement, which, again, you can see all

12    the wires coming into that panel, those wires would extend

13    throughout the house, through the holes that are drilled in

14    the framing, which I explained with a pressurized -- a

15    possibility that that smoke could go in there.  Sometimes

16    electrical panels are in the garage, which would then

17    eliminate the possibility or at least lower the possibility

18    of smoke following the wiring through the house.

19         Q.    So the wiring chases in this case emanated from the

20    basement where the fire started?

21         A.    Correct.

22         Q.    I'm showing you Photograph No. 10-6.  How does that

23    help?

24               (Plaintiff's Exhibit No. 10-6 marked for

25                identification.)

1        A.    Again, just the severity of the heat, showing the

2    discoloration of the block.

3        Q.    What is the damage at the top of that photo?

4        A.    It's hard to see.  It looks like insulation --

5    hanging insulation.

6        Q.    How about Exhibit No. 10-7?

7              (Plaintiff's Exhibit No. 10-7 marked for

8               identification.)

9        A.    I believe that's reversed.  I'd have to see the

10    actual picture.  Yes, that's it.

11        Q.    Is that it?

12        A.    Yes.

13        Q.    Sorry about that.

14        A.    No problem.  This home had a big basement area, if

15    you will, under a section of the home, I can show you, and

16    then it had a crawl space area, if you will, that was not a

17    full stand-up basement.

18        Q.    Is this the crawl space area?

19        A.    This is the crawl space area, and I was trying to

20    show that even though the direct fire was not in this area,

21    it took tremendous heat.

22        Q.    The crawl space area took tremendous heat?

23        A.    Yes.

24        Q.    We heard testimony about how the most significant,

25    at least, structural damage in the house was done to the

1    areas immediately above the basement, and we know the areas

2    immediately above the basement were the family room, kitchen,

3    sun room, et cetera on the left-hand side of the main

4    structure, correct?

5         A.    Correct.

6         Q.    But on the right-hand side of the structure there

7    was a crawl space underneath the entire part of that house?

8         A.    Under a good portion.  I don't know if it went under

9    the last bedroom or not.  I don't recall.

10        Q.    Under the last what?

11        A.    The last bedroom.  I don't recall.

12        Q.    But you know that it extended at least a good ways

13   into the right-hand side of the house?

14        A.    Yes.  Very good ways.

15        Q.    Your concern about pressurization, does that include

16   the crawl space?

17        A.    Yes.  And that proved to be true because when I took

18   the panel off the attic area, it was above the crawl space

19   not above the basement area.

20        Q.    This is Photograph No. 10-9.  Is that the crawl

21   space?

22             (Plaintiff's Exhibit No. 10-9 marked for

23              identification.)

24        A.    That is the crawl space, and as you can see, the

25   floor joists are actually burnt in that area.  So the fire

1      did extend into that area.

2          Q.   So that helped to establish that it extended into

3      there?

4          A.   Correct.

5          Q.   I'm showing you Photograph No. 10-10.

6               (Plaintiff's Exhibit No. 10-10 marked for

7                identification.)

8          A.   That's reversed as well.

9          Q.   That's reversed.  What is that --

10         A.   That is a --

11         Q.   -- big pipe or ductwork or whatever?

12         A.   That's exactly what it appears to be.  It appears to

13     be a flex-duct ductwork, but that, again, is a crawl space

14     area.  If you look up at the rafters, you'll see the

15     charring.

16         Q.   So that helps you to conclude that there was going

17     to be smoke damage emanating in the areas above the crawl

18     space, correct?

19         A.   Correct.

20         Q.   Now, let's work our way through the house from the

21     basement up, and show these photos to help the Judge

22     understand your testimony.  Now, this is Exhibit 10-11.

23              (Plaintiff's Exhibit No. 10-11 marked for

24               identificaiton.)

25         A.   Correct.

1      Q.   What does that show?

2      A.   Well, this photo, I was trying to show that -- why

3   it's important to kind of look behind things and see where

4   smoke has entered and not entered.  You can see right in

5   front of the front door there's a ceramic floor.  It appears

6   to be fine, but if you go back to the photo that you just

7   showed me of the crawl space, this is really where the crawl

8   space started.  And those rafters -- those floor joists that

9   were burned out are actually the ones that were supporting

10   this section of floor.

11      Q.   So you're referring to the damage that we see in

12   Exhibit 10-10?

13      A.   Correct.

14      Q.   That is directly below the area that's depicted in

15   Exhibit 10-11?

16           (Plaintiff's Exhibit No. 10-11 marked for

17            identification.)

18      A.   Directly in front of the front door, correct.

19      Q.   So the fact that there doesn't appear to be any

20   damage to that tile --

21      A.   Correct.

22      Q.   -- that does not tell you that there is not hidden

23   smoke damage underneath the floor --

24      A.   Correct.

25      Q.   -- is that correct?  You have a front door shot,

1    Exhibit 10-12.

2                (Plaintiff's Exhibit No. 10-12 marked for

3                identification.)

4        A.    Correct.  And there again, that's just showing the

5    point I just brought up.  The framing that would hold that

6    exterior wall was also charred in the crawl space, which I

7    believe that photo -- at least we tried to show.  So that

8    would have to be -- that wall would have to be taken down so

9    that framing could be repaired.  Even though it looks fine

10   from the first floor, structurally it would not be.

11       Q.    Again, because of the damage you observed

12   underneath?

13       A.    Correct.

14       Q.    And that was the top picture you were referring to?

15       A.    Correct.

16       Q.    The front door damage?

17       A.    Correct.

18       Q.    Now, these are shots of areas of the house that were

19   more obviously damaged.

20       A.    Yes.

21       Q.    And I don't think there was any disagreement between

22   you and Mr. Schumann that, you know, this entire area of the

23   kitchen would have to be gutted and rebuilt, correct?

24       A.    Correct.

25       Q.    Does this help to explain your testimony about your

1  concerns in other areas of the house?

2      A.  Well, it just strictly wasn't a basement fire.

3  Above the kitchen area, there was a small room on portions of

4  it and then there was an attic, if you will, and I think

5  we'll come upon some other pictures, this fire actually

6  extended to the attic on the lower level.  So it wasn't just

7  a basement fire.  It did expand to a floor and a half, if you

8  will.

9          THE COURT:  A what?

10         THE WITNESS:  A floor and a half.  It wasn't a full

11  second story, Your Honor, as far as equivalent to the master

12  house.  The master house, or main house, was here, the

13  kitchen had a wing here with a smaller roof.  So the roofs

14  weren't lined up together as far as the same height.  So I

15  call it one and a half, basically, stories.  It wasn't a full

16  attic.

17     Q.  But anyway, the fact that the fire did extend onto

18  the first floor, what did that tell you about potential

19  damage on the second floor?

20     A.  It just -- in this area, there was no direct rooms

21  above it that we already didn't agree had to come down

22  because the structure below it had to.  So it didn't tell

23  tell me anything as far as pressurizing the rest of the

24  house.

25     Q.  Now, this is a picture that is -- I can't get the

1    zoom to work, Judge.

2        A.   You had it the right way.

3        Q.   I know.  I have it sideways to show that it's

4    Exhibit 10-16.

5            (Plaintiff's Exhibit No. 10-16 marked for

6             identification.)

7        A.   I got you.

8        Q.   What does that show, and how does that help your --

9        A.   It's just showing the magnitude of smoke.  This is,

10   again, over the crawl space area.  And I believe you can see

11   the patch on the floor where maybe a book was laying.  You

12   can see how clear -- it was a clear wood floor, you can see

13   how much soot is on the floor.  If you look at the back of

14   the cabinets, it appears that smoke has come up to the back

15   of the cabinets.

16           THE COURT:  I have no idea what I'm looking at here.

17   Where is this room?

18       A.   That is the living room in front --

19       Q.   Where is that in the house?

20       A.   That is in the main structure.  If you were to --

21       Q.   Was this above the crawl space or above the

22   basement?

23       A.   That was -- part of the living room is above -- is

24   over the crawl space, I believe, and part was over the --

25       Q.   Part was over the basement?

 1      A.   Correct.

 2      Q.   So we see the living room right in the middle of the

 3   house?

 4      A.   Right.  That cabinet, if you walk to where the foyer

 5   entrance is, I believe it was the cabinet directly to your

 6   right on that wall.

 7      Q.   In the living room?

 8      A.   Correct.

 9      Q.   Again, though, that was to show the extent of the

10   soot which would also be consistent with the smoke damage in

11   that area?

12      THE COURT:  Just so I'm clear, for instance, with

13   respect to the living room, was there a dispute between you

14   and Mr. Schumann as to whether that room needed to be gutted

15   or could it be repaired in a less drastic fashion?

16      THE WITNESS:  I would have to look at the estimates

17   for this particular room, but when we got into this section

18   of the house, it was an area where I felt it had to be

19   gutted, and an area where Mr. Schumann didn't.  I'd have to

20   look at his scope for this particular room, but it was my

21   recollection that he was not gutting the entire room.

22      THE COURT:  So I'm clear, the exercise thus far has

23   not necessarily been to demonstrate differences between this

24   witness and Mr. Schumann, but to demonstrate the intensity of

25   the fire, and the presence or evidence of extensive smoke

 1    damage; is that right?

 2            MR. MURPHEY:  That's correct.  Which caused

 3    Mr. Parise to do the further investigation that had not been

 4    done by Mr. Schumann.

 5            THE COURT:  All right.

 6        Q.   Now, I have two pictures, Exhibit No. 10-17, what

 7    area of the house is this?

 8            (Plaintiff's Exhibit No. 10-17 marked for

 9             identification.)

10        A.   This is -- well, would you like -- I can give you

11    the room if you put the map up.

12        Q.   That's what I was going to do.  I just wanted you to

13    identify --

14        A.   This is first floor over the crawl space.  I believe

15    it's here as the exercise room.

16        Q.   It's the hot tub/exercise room on the first floor of

17    the house?

18        A.   Correct.  It was clearly over the crawl space.

19        Q.   Which is over the crawl space.  Now, did you have a

20    difference of opinion with Mr. Schumann about this room?

21        A.   Yes.  Big difference of opinion.

22        Q.   What was that?

23        A.   Basically he felt it could be painted and the tubs

24    and everything were fine, and I was strongly against that.

25        Q.   Why?

1          A.    Well, as you can see, there's two panels under the

2     tub, I took the time to remove one of them because this is

3     obviously an area that you would expect smoke penetration to

4     come through the basement because you have large piping going

5     down to the basement to feed the hot tub.  You'd also have a

6     lot of wiring going to the motor and such of the hot tub.  So

7     this would be an area where I feel it would be evident --

8     even when you look at the panel that's not removed, you can

9     see that it appears smoke has blown out from underneath the

10    tub.  So I took the panel off the bottom of the tub to

11    investigate.

12         Q.    Exhibit No. 10-18, is that a close-up view of the

13    area below the panel?

14              (Plaintiff's Exhibit No. 10-18 marked for

15               identification.)

16         A.    Yes.  You'd have to spin that around again, but --

17    that's the correct way.  That goes to show you, if you can

18    get a close-up on the motor, the motor actually is burnt,

19    it's bubbling, the paint's bubbling on it, and this -- you

20    can see a white spot.  I basically broke off a piece of --

21    that's insulation -- sprayed-on insulation on the bottom of

22    the hot tub.  It's supposed to be white.  I broke a piece off

23    to show what it should look like and what it looks like now.

24         Q.    What did Mr. Schumann have with respect to this

25    area?

1        A.    This area was not addressed as far as replacing the

2    hot tub or treating the smoke.

3            MR. GEER:  Are we in the jacuzzi room now?

4            MR. MURPHEY:  Yes.  We've identified it by hot tub.

5            THE COURT:  We've moved from the exercise room to

6    the jacuzzi room?

7            MR. MURPHEY:  It's the same room.  They're calling

8    it a jacuzzi room, but it's the hot tub/exercise room on our

9    diagram.

10           THE COURT:  We're going to take a break here.  How

11   much longer do you think you have with Mr. Parise?

12           MR. MURPHEY:  Probably just a half an hour.

13           THE COURT:  And then is it Mr. Haller?

14           MR. MURPHEY:  Yes.

15           THE COURT:  And is that it for the day?

16           MR. MURPHEY:  Yes.  If it's okay with Your Honor.

17           THE COURT:  We'll --

18           MR. MURPHEY:  I don't know how long Mr. Geer has

19   with him, but --

20           THE COURT:  Did you say that's it then for you?

21           MR. MURPHEY:  For today.

22           THE COURT:  What do you have next week?

23           MR. MURPHEY:  I'm deciding whether I'm going to call

24   Mr. Seifert or not.

25           THE COURT:  But that'll be the only other --

1              MR. MURPHEY:  I have some exhibits and deposition

2    transcripts, but live witnesses, yes.

3              THE COURT:  We'll resume about 1:15 p.m.

4              (Pause in the proceedings.)

5              THE COURT:  All right, Mr. Murphey.

6              MR. MURPHEY:  Thank you, Judge.

7         Q.   Mr. Parise, we had been talking about your

8    observations of smoke penetration throughout the house, and I

9    just have two more pictures I wanted to show you.  This one

10   is Exhibit No. 10-33.  What is that a photo of?

11             (Plaintiff's Exhibit No. 10-33 marked for

12              identification.)

13        A.   It's a photo of the attic area that's over the

14   master bedroom.

15        Q.   Did you observe some evidence of smoke penetration

16   to that location in the house?

17        A.   I noticed several points on it.  There's a white --

18   I can't point to it from here, but as you can see in the

19   photograph, there's a white --

20        Q.   I think you can point to it.

21             THE COURT:  Yes.  It'll mark it.  With your finger

22   you can do that it.

23        A.   Very good.  That appears to be the top of a high hat

24   or a can known as a recess light -- light fixture, and that

25   would be an area I usually would look at to see if the smoke

1    penetrated through the ceiling around the light fixture

2    itself.  And as you can see, the insulation around that

3    fixture is very dark.  So that meant to me the soot did

4    penetrate.

5         There's a few more areas.  If you look over here as

6    well, you can see that along the beam there appears to be a

7    black mark, and then I noticed some wiring close to that

8    black mark.  So that, again, made me feel some smoke got in

9    there somehow, maybe through the wiring.  And also back where

10   this wiring is as well, it's a little bit darker.  Again, I'm

11   trying to find where wiring and pipes come through to see if

12   there's evidence of soot.

13        Q.   For the Judge's benefit, and I've written on Exhibit

14   No. 6 to identify some rooms by the way they are identified

15   in the estimates.  But the area of the attic that you were

16   just talking about you said was above the master bedroom?

17        A.   It would be -- the access panel's right here, and

18   that area would be right about there.  I'm not certain if the

19   marks are coming out.

20        Q.   Thank you.  And then you also testified that there

21   was an access panel, and there was evidence of smoke damage

22   near there.  This is Exhibit No. 10-34.

23        (Plaintiff's Exhibit No. 10-34 marked for

24          identification.)

25        A.   Correct.  This is just another area of the attic.

364

1    The white area is the access panel I actually pushed up, and

2    then, as you can see, the insulation is very dark.

3        Q.    Thank you.  Now, we've already heard testimony that

4    your estimate and Mr. Schumann's estimate differed

5    significantly.  And that was, in summary fashion, because you

6    recommended gutting many rooms in the house, which

7    Mr. Schumann had recommended cleaning, sealing, and painting

8    could resolve the problem; is that right?

9        A.    Correct.

10       Q.    Now, just for the Judge's benefit, we want to

11   identify the areas of the home in which you recommended in

12   your estimate to put the house in a prefire condition you

13   would have to gut it, in the sense that the Judge has already

14   heard about, as opposed to Mr. Schumann recommending that

15   that area of the house could be cleaned, sealed, and painted.

16   And the first one that you had identified, I believe, was

17   Bedroom No. 1; is that correct?

18       A.    Correct.

19       Q.    And when you call Bedroom No. 1, that was the

20   vernacular that Mr. Schumann used in his estimate?

21       A.    Correct.

22       Q.    Bedroom No. 1 is where on Exhibit 6?

23       A.    It would be the farthest bedroom on the second floor

24   from the fire source.

25       Q.    So the furthest to the right --

1          A.   Correct.

2          Q.   -- on the second floor?  It's identified there as

3     Bedroom No. 1 there on Exhibit 6?

4          A.   Correct.

5          Q.   I will modify Exhibit 6 for submission after this.

6     Why did you recommend gutting, for lack of a better term,

7     Bedroom No. 1 as opposed to cleaning, sealing, and painting

8     it as had been recommended by Mr. Schumann?

9          A.   I actually went to the farthest wall away from the

10    fire, because I wanted to see if we had any smoke penetration

11    the farthest point away, and I opened up the farthest right

12    wall, and -- above an outlet -- or next to an outlet, and I

13    found the insulation had been pretty smoked up.

14         Q.   I am showing you Exhibit No. 10-24.  Is this a

15    photograph from Bedroom No. 1?

16              (Plaintiff's Exhibit No. 10-24 marked for

17               identification.)

18         A.   Correct.

19         Q.   Does it show the insulation that you're talking

20    about?

21         A.   Correct.

22         Q.   Showing you another photograph, which is Exhibit No.

23    10-25.  Does that also show the insulation that you're

24    talking about?

25              (Plaintiff's Exhibit No. 10-25 marked for

1                     identification.)

2         A.   Correct.

3         Q.   And again, what do the black marks in the insulation

4    tell you about what needs to be done?

5         A.   Well, in order to properly rid the room of smoke

6    smell, I would have to take the insulation out, and if it's

7    on the insulation, it's on the framing, the framing would

8    have to be sealed.  In order to do that, I'd have to take the

9    dry wall out of the room.

10        Q.   When you say "the framing would have to be sealed,"

11   what do you mean by that?

12        A.   Well, the framing is very durable, and as long as

13   it's cleaned properly, it can be sealed with Kilz or a Benz,

14   it's a sealing product.  It's more of a spray-on paint, if

15   you will.

16             THE COURT:  You have to stop for a minute here.

17   When you say "framing," you have to tell me what you mean by

18   that.

19             THE WITNESS:  Framing I would mean the 2-by-4 wall

20   studding, the bottom plate and top plate, which is also a

21   lumber, it would also be the outside sheathing on the home.

22        Q.   I believe the Judge, earlier in the case before you

23   testified, might have referred to that as the studs.

24        A.   Yes.

25        Q.   Would that be the vernacular?  The common phrase?

1     A.   Yes.

2          THE COURT:  When you say, "gutting" -- if I asked

3     you this before, I apologize -- you mean taking a room down

4     to its studs; is that right?

5          THE WITNESS:  Yes.

6          THE COURT:  And that's what you would have proposed

7     to do in Bedroom No. 1?

8          THE WITNESS:  Correct.

9          THE COURT:  So I'm clear again, is it because you

10    couldn't get the -- it's the only way you could get the

11    insulation out is to take it all down?

12         THE WITNESS:  Yes.  We'd have to take it down in

13    order to get the insulation out, and also, if smoke appeared

14    to be on the insulation, it would be on the wood framing as

15    well because they touch.  So then in order -- then you would

16    clean it off of the wall framing with a chem sponge, then you

17    would spray-seal the wood studding and wood framing,

18    reinsulate it, and reapply your dry wall.  That would be the

19    proper repair.

20    Q.   What did you understand would be the repair

21    suggested by Mr. Schumann for that room?

22    A.   Mr. Schumann wanted to take a chem sponge and clean

23    the outside of the Sheetrock.

24    Q.   So it's the same chem sponge?

25    A.   Correct.

1          Q.   That is, the sponge with cleaning chemicals on it,

2     and he would have wiped the outside of the wall?  "Outside"

3     meaning the part of the wall that faces the room.

4          A.   Correct.

5          Q.   Without opening the wall?

6          A.   Correct.

7          Q.   Then what else would he have done?

8          A.   Then he would have sealed it with a Kilz or a Benz,

9     whatever product they wanted to use.

10         Q.   Is Benz, B-E-N-Z?

11         A.   I believe it is.

12         Q.   Kilz is K-I-L-Z?

13         A.   I believe it is.

14         Q.   Is that like a primer?

15         A.   It's like a primer, but you can use it on water

16    stains as well.  It's more of a heavy primer to hide

17    staining.  And then he would put the finish product back on,

18    whether it was paint or whether it was wallpaper, whatever.

19         Q.   So when you say "sealing," what are you sealing?

20         A.   Well, you don't seal a room.  You're sealing

21    basically a surface.  So it's not like you're going to a room

22    and saying I can seal this whole room and seal up all the

23    cracks, and then you you won't smell anything coming out

24    from, you know, in the wall cavities or the studding area.

25         Q.   So it's not like you're vacuum-sealing a room?

1          A.    No.

2          Q.    So there's still going to be gaps, small perhaps,

3    but gaps where the dry wall meets in the corner or the floor?

4          A.    Yeah.  You can't really seal a house up tight

5    because -- this happened a lot in the '70s.  People, when oil

6    prices went up, they were putting so much insulation in their

7    house, they were sealing them up so tight that basically the

8    roofs were rotting off the houses because they were sweating

9    a lot.  So you can never seal off a house that tight.

10         Sealing, the process that Mr. Schumann had

11   recommended is common, and it's used a lot on kitchen fires

12   or fires that are external, if you will, where fire -- where

13   smoke doesn't penetrate up pipe chases and wire chases.  If

14   you had a kitchen fire where you left a pot on the stove,

15   smoke would permeate, but then it would settle on the walls

16   or settle on surfaces that could easily be wiped off.  The

17   smoke penetration, because you don't have a combustion, you

18   know, of heat buildup, it really wouldn't enter a wall.  So

19   that would be an area where I'd say, and I have done many

20   times in the past, I'd estimate to wipe down the walls, seal

21   them up, and paint them just like Mr. Schumann had suggested.

22         Q.    Now, did you also then recommend gutting Bedroom No.

23   2?

24         A.    Yes.

25         Q.    Which is identified on Exhibit 6, and that's also

1    upstairs and some distance, physically anyway, away from the
2    fire, correct?
3        A.    Correct.
4        Q.    Why was it that you recommended gutting Bedroom No.
5    2?
6        A.    Well, in this room, I again made a test hole, I made
7    it in a strategical spot because this bathroom here all the
8    plumbing fixtures were along that common wall between that
9    Bedroom 2 and bathroom.  So common sense told me that's
10   obviously where the pipes came up if that's where the faucet
11   is.  So I cut a hole in that area, and there was heavy, heavy
12   soot because it was a pipe chasing.
13       Q.    Tell me, you would have the soot and the smoke in
14   the wall of Bedroom 2 that sat between Bedroom 2 and the hall
15   in the bathroom?
16       A.    Correct.
17       Q.    Why would you have to gut the whole room?
18       A.    That's one area where we tested and found it.
19   There's smoke penetration that came up through these pipes,
20   it's my assumption and belief that it came up through the
21   wiring because it all came from the bottom up.  At that point
22   we don't know where the smoke is, but it's in the room.  So
23   any fire restorator who's going to guarantee this house does
24   not smell of smoke is going to gut this room.  It's a
25   standard procedure.

1           THE COURT:  Excuse me, would there have been

2     insulation material of the same type in Bedroom No. 2 in the

3     walls that there was in Bedroom No. 1?

4           THE WITNESS:  Yes, there was, which was unusual.

5     Usually you would not insulate an interior wall.  This house

6     did have insulation on interior walls.

7           THE COURT:  Did you know that?

8           THE WITNESS:  After I popped the hole in the wall.

9           THE COURT:  I'm trying to understand this.  Did you

10    pop a hole in the wall in Bedroom No. 2 --

11          THE WITNESS:  Yes, I did.

12    Q.    We don't have a picture of that, but you put a hole

13    in the wall of Bedroom No. 2 as well as Bedroom No. 1?

14    A.    Right.  The -- Bedroom No. 2 I popped the hole

15    because of the bathroom location.  I would've -- I needed to

16    check around pipes.  I could have popped a hole on the

17    bathroom side, which is expensive because it's ceramic, so I

18    chose to go to the bedroom on the other side that abuts the

19    batroom.  Sheetrock's cheaper, that's why.

20          THE COURT:  You've already told me about the pipes.

21    What did you see when you popped a hole in the wall?

22          THE WITNESS:  I reached in and pulled out a handful

23    of dirty insulation.

24    Q.    That's Bedroom No. 2?

25    A.    Correct.

1       Q.   Again, keeping on the theme of those rooms that you
2  identified as needing to be gutted as opposed to
3  Mr. Schumann's obsevation, did you also do that for the
4  master bedroom?
5       A.   Yes.  Roughly this area back here.
6       Q.   The master bedroom is also the second floor of the
7  house?
8       A.   Yes.
9       Q.   I have a photograph marked Exhibit 10-31, and what
10 is that?
11           (Plaintiff's Exhibit No. 10-31 marked for
12           identification.)
13      A.   That is the bottom of where the wall meets the
14 floor.  A piece of Sheetrock -- dry wall was taken out, you
15 can see the bottom of the insulation.
16      Q.   So Exhibit 10-31 is showing soot on the insulation
17 in the master bedroom?
18      A.   Correct.
19      Q.   And I take it, so I don't have to ask this question
20 with regard to every room, your testimony regarding why all
21 these rooms would need to be gutted, even though you've only
22 put a hole in one area, is because once you've identified
23 that there's some soot in that part of the wall that you're
24 going to assume that it's everywhere?
25      A.   Yeah.  The only way to test that would be to open up

1    all the walls, and that would defeat the purpose.  At that

2    point they'd have to replace the room anyhow.

3        Q.    Next, the master bath, you did the same?

4        A.    The master bath I popped a hole in this closet wall

5    here, which abutted up to the bathroom.  Again, it's cheaper

6    to go through areas that don't have ceramic tiles and such.

7    But I did go into the master bathroom because it had a raised

8    platform tub and I was able to remove a heat register to look

9    under the tub, and I found a lot of soot underneath the tub,

10   which that picture shows well.

11       Q.    I'm showing you a picture of -- the picture that is

12   Exhibit No. 10-27, and this shows that tub that's in the

13   master bath?

14             (Plaintiff's Exhibit No. 10-27 marked for

15              identification.)

16       A.    Correct.

17       Q.    Again, those dark areas are soot?

18       A.    That's soot on top of white ceramic tile.  It's a

19   raised platform, so I bent back the heat register, looked

20   underneath the tub, and there was heavy soot on the --

21       Q.    So your recommendation with the master bathroom was

22   to do what?

23       A.    To gut the room, treat the framing, replace the

24   finishings.

25       Q.    What was Mr. Schumann's recommendation?

1      A.   This was a clean and paint -- a clean, seal, and

2  paint, excuse me.

3      Q.   Upstairs there's another room and a large closet at

4  the top of the stairs; is that correct?

5      A.   Yes.  Right there.

6      Q.   Shown on Exhibit 6.  Did you recommend gutting that

7  room as well?

8      A.   I did.

9      Q.   Did you check to see if there was any dirty

10  insulation in that room?

11      A.   I did.

12      Q.   I'm showing you Exhibit 10-32 --

13          (Plaintiff's Exhibit No. 10-32 marked for

14           identification.)

15          THE COURT:  I apologize, what room was this?  I

16  missed it.

17          MR. MURPHEY:  This was the upstairs closet, Your

18  Honor, at the top of the stairs.

19      A.   I chose this wall to open because this did abut the

20  master bath that we were just in.  These are plumbing pipes,

21  probably vent pipes, that go to that bathroom.  So this not

22  only showed that the closet, in my opinion, was dirty, if you

23  will, but also the bathroom that we just came out of.

24      Q.   So for the reasons that you've just testified about,

25  was it your recommendation to gut, essentially, the entire

1     second floor of the house?

2          A.   Correct.

3          Q.   Even though it was some distance away from the fire?

4          A.   Correct.

5               THE COURT:  Was there any portion of the second

6     floor that we've just been talking about, per your estimate,

7     that would not have been gutted?

8               THE WITNESS:  No.

9          Q.   The prior testimony that you gave about smoke in the

10    insulation in the attic -- for example, Exhibit No. 10-34,

11    where is that attic in the house?

12         A.   I believe that's above the master bedroom.

13         Q.   So that would be the area -- I've written the word

14    "attic" on Exhibit 6.  Are there two attics in the house?

15         A.   There are.  As I was trying to explain before,

16    there's a lower roof level that was over the kitchen, and I

17    probably have to draw it, but basically the second floor, at

18    the end of the hallway was a little trapdoor that went into

19    that attic area.  Now, it wasn't a full stand-up area, but

20    that -- all those rafters or framing for the roof are burned

21    out, which allowed a lot of smoke to come into the second

22    floor through that access panel.  So that's very close to the

23    main house, very close to the -- the fire source, it's very

24    close to the main house and the second floor.

25         Q.   Is that what Mr. Schumann called the upper attic?

1      A.    I believe that's what he called it.

2      Q.    We'll write that on Exhibit 6.  And so, the upper

3   attic, you just said there was damage to the framing?

4      A.    Yes.  That would be this area here.  This is the

5   hallway for the second floor, and there was a little trapdoor

6   right there, an access door, if you will, that lets you get

7   into here for storage.

8      Q.    I'm showing you an exhibit we've marked Exhibit

9   10-35.  Do these photographs see the damage to the framing

10  that you were talking about?

11        (Plaintiff's Exhibit No. 10-35 marked for

12         identification.)

13     A.    Yes.

14     Q.    Or to the rafters, rather?

15     A.    To the rafters.  You can see right here that's

16  actually where the firemen had cut the rafters and that

17  clean piece of wood is what was used to board up the roof.

18  This was in direct level with the second floor of the main

19  house.

20     Q.    So in addition to the damage that was done because

21  the firemen cut a hole in the roof, was there also evidence

22  of fire damage?

23     A.    Yes.  All these rafters were burnt.

24     Q.    So that is on the same level as the second floor

25  rooms that we just talked about?

1          A.   Correct.

2               THE COURT:  But is that above those second floor

3     rooms or is that on the fire side of the house?

4               THE WITNESS:  It's on the fire side of the house.

5     The floors are level, but the roofs are not.  Because the

6     house was a split level, if you will, so the floors were

7     level, but the roof area that was burned out only came up

8     half of the height of the other house (sic).

9               THE COURT:  But the roof level above the second

10    floor, which was the farthest from the fire, which we were

11    talking about, which was the area of debate, was the attic

12    area up -- did you inspect the attic area above that?

13              THE WITNESS:  That's these photographs here, Your

14    Honor.

15              MR. MURPHEY:  That's Exhibit 10-33.

16              THE COURT:  Are you saying there was evidence of

17    burning there?

18              THE WITNESS:  Evidence of soot there, not burning.

19    Just soot.

20              THE COURT:  Evidence of soot.  I misunderstood.

21         Q.   The previous testimony, to address the Judge's

22    question, Exhibit 10-33 there's evidence of soot near where

23    the recess lighting is?

24         A.   Where you expect penetration, pipes and lighting and

25    wires.

1        Q.   Exhibit 10-33 shows the attic that's actually above
2   the bedroom --
3        A.   Correct.
4        Q.   -- and above the second floor?  Again, to address
5   the Judge's question, Exhibit 10-31 -- I'm sorry.  I guess
6   that's the only one I have.  But that's the attic above the
7   rooms that we just talked about?
8        A.   Correct.
9        Q.   Now, were there ever -- were there any disagreements
10  between your estimate and -- I found it.  Back to that point
11  again.  Excuse me, Exhibit 10-34 shows what?
12       A.   That is the attic area, similar to your last
13  photograph, above the main bedrooms on the second floor.
14       Q.   And that shows the soot damage that you testified
15  about a minute ago?
16       A.   Correct.
17            THE COURT:  Is that insulation I'm looking at?
18            THE WITNESS:  It is.  And the white part, Your
19  Honor, is the access panel, if you will, that I just flipped
20  up into the attic to climb up it.
21       Q.   This is the area above the bedrooms?
22       A.   Correct.
23       Q.   Above the second floor rooms.  Were there any areas
24  of disagreement in the nature of gutting versus cleaning,
25  sealing, and painting on the first floor of the house?

1          A.   Yes.

2          Q.   What rooms did you have that disagreement?

3          A.   The foyer was one area.

4          Q.   The foyer was one?

5          A.   Yes.  I believe Mr. Schumann agreed to gut the

6    ceiling in that room, but not the walls.

7          Q.   He agreed to gut the ceiling, but not the walls?

8          A.   Correct.

9          Q.   What did you estimate?

10         A.   Well, earlier we showed you photographs of this

11   front doorway, the front doorway was here, and we showed you

12   how the floor joists in the basement were burned out.  Well,

13   those beams went over to roughly about here, and then the

14   sill plate, which is the outside wall framing that the

15   exterior of the house sits on, was burnt here and here.  So

16   in order, obviously, to replace the burnt framing you would

17   have to expose it, which means you'd have to take the dry

18   wall down, expose your framing, repair your framing.  In that

19   situation you'd also have to repair the outside of the house,

20   which in this area was brick -- I believe it was brick, and

21   then you have had to reconstruct the room.

22         Q.   Any other rooms on the first floor in which there

23   was this disagreement?

24         A.   Yes.  The stairway going down was a disagreement.

25   Again, I felt it had to come out in order to replace the sill

1    plate and the framing of this flooring system.  The staircase
2    did end up -- land on that.  So in order, obviously, to get
3    the framing out the staircase had to be moved or altered in
4    some manner.
5         Q.   Let me clear this --
6              THE COURT:  I have a hard time following that last
7    explanation.
8              MR. MURPHEY:  We will.  I was going to try to
9    help -- is there a way to get a different color for the
10   arrows?  Because they're white and I can't see them very
11   well.
12             THE COURT:  A multi-colored arrow?
13             MR. MURPHEY:  Just darker.  I don't think we can see
14   it.
15             THE COURT:  Let me ask one of my law clerks.
16             (Pause in the proceedings.)
17             THE COURT:  What I do want to see, I didn't
18   understand the explanation about the stairway.  I think it
19   would be helpful if I saw the photograph of the stairway.
20        Q.   Is that the stairway that you're talking about?
21        A.   Correct.
22        Q.   Is it?
23        A.   Yes.
24        Q.   I thought that -- I thought there was a different
25   picture.  We were talking about areas of disagreement between

1    your estimate and Mr. Schumann's, and one of them was the

2    stairwell.  First of all, can you identify the location of it

3    on Exhibit 6?

4        A.   Yes.  This would be going up to the second floor.

5            MR. MURPHEY:  I'm showing you what are Photograph

6    Nos. 42 -- how did you mark them, Paul?  Plaintiff's 42?

7            MR. GEER:  P.  I called them P.

8            MR. MURPHEY:  P, thank you.

9        Q.   P-42, is this the stairwell that you're talking

10   about?

11       A.   Yes.

12       Q.   And there's also a top view -- or a different view

13   on P-45 and 46?

14       A.   Correct.  And this area here was my main concern --

15   one of my main concerns.  This is a landing that was maybe

16   three steps up off the foyer --

17       Q.   Hang on one second.  I think we might be better on

18   Photographs P-42 -- they're both numbered 42.  Can you see it

19   there?

20       A.   Yes.  Again, this area here was my main concern.

21       Q.   Why were you concerned about that?

22       A.   Because when we looked in the crawl space area, we

23   looked at the floor joists that were near the front door, if

24   you recall, the floor looked fine, but the floor joists were

25   burnt.  Right in this area, a little bit to your right, the

1    exterior of the home goes like this, and then your front door

2    is here, this landing is right here.  This outside wall

3    framing was burned, this outside wall framing was burned,

4    which means this landing had to be taken out in order to

5    repair this exterior wall.  So now I'm already messing with

6    the integrity of the staircase because I'm taking away

7    supports that hold up the main staircase.

8         I also went to the bottom of the staircase in the

9    main foyer, and as you know, a home, you look up, you don't

10   see the bottom of the steps, you see a nice Sheetrocked, flat

11   surface, but that creates a cavity, if you will, and that was

12   one of the areas I popped a hole in and took a flashlight and

13   looked, and there was heavy soot in the back parts of all

14   these steps, and I was getting a heavy odor from that cavity.

15   Therefore, I felt, since I'm already messing with the

16   integrity of this staircase in order to do this framing

17   repair, which I could see -- obviously see from below the

18   crawl space, and I was getting the heavy smell from soot on

19   the staircase looking in below the cavity, I felt it had to

20   come out.

21        These walls here were the common walls between the

22   bedrooms that we had just talked about upstairs, and we

23   already know the backside of those were dirty, so it's safe

24   to assume that the backside of this Sheetrock or dry wall is

25   dirty as well.  And that's why I was gutting the staircase.

1          THE COURT:  Excuse me, do you see like a railing

2     there?  This side rail?

3          THE WITNESS:  Yes.

4          THE COURT:  Would items like that be saved and used

5     again?

6          THE WITNESS:  Actually, on my estimate, Your Honor,

7     I had to remove, reset and clean that railing.  So I was

8     saving that railing.  Other railings, like this, it's so

9     intricately built into the staircase that it would be

10    difficult to remove and reset.  This one, as you can see, is

11    just screwed into the wall, and you can take that out without

12    affecting its integrity, but these would be extremely

13    difficult to do that.

14         THE COURT:  One other question about this, did you

15    poke a hole in one or more of the steps?

16         THE WITNESS:  From underneath?

17         THE COURT:  Yes.

18         THE WITNESS:  It was one area because it does -- it

19    kind of is the whole cavity.  If you poked a hole, you can

20    see three or four steps not just one.

21         THE COURT:  In the walls you testified you saw

22    evidence of soot in the insulation.

23         THE WITNESS:  Correct.

24         THE COURT:  There's no insulation under the stairs.

25         THE WITNESS:  There was not.

1          THE COURT:  So what's the soot hanging onto then?

2          THE WITNESS:  It's on the backside of the wood

3     steps.  Just on the wood itself.  And it had an extremely

4     heavy odor because it is like a chamber in there, if you

5     will.  So I shined a light in there, saw soot on the back

6     part of the steps, and then I also had a heavy smell.

7          THE COURT:  Go ahead.

8     Q.   It'll actually stick to the back of the steps?

9     A.   Sticks to wood, yes.

10    Q.   Gravity won't cause it to fall?

11    A.   You get a darkening of it.  I mean, I don't know if

12    you went in and wiped it you'd get a handful of soot, but the

13    back of the steps were dark.

14    Q.   In response to the Judge's questions, he asked you

15    about saving the railings.  When you prepared your estimate,

16    did you make an effort to save any of the parts of the house

17    which could be saved?

18    A.   There was very few, but I do recall this railing to

19    be one of them.

20    Q.   Now, do you recall other areas of the first floor in

21    which there was a difference of opinion on gutting versus

22    cleaning, sealing, and painting?

23    A.   Yes.  The jacuzzi room was an area.

24    Q.   The original Exhibit 6 marked it hot tub/exercise

25    room.  I have written jacuzzi on there because that's what

1    they called it.  We have seen this photograph before.  Is

2    this a photograph of the jacuzzi room?

3        A.   Yes.

4        Q.   And that's Exhibit 10-17.  Mr. Parise, what was the

5    difference of opinion between you and Mr. Schumann regarding

6    this room?

7        A.   Mr. Schumann's proposed repair was to clean, seal,

8    and paint the room.  I felt the room needed to be gutted down

9    to its studs.  In reviewing Mr. Schumann's estimate, I don't

10   believe he addressed this tub system at all, and I believe it

11   had to be replaced because the motors were melted.

12       Q.   Did you say motors?

13       A.   The motors, yes.  And I think your next photograph

14   will show that.  The motors under here were all melted, and

15   these controls up here all had condensation underneath the

16   lenses.  They were like -- I don't know if they were

17   temperature gauges, or what have you, but they were just in

18   poor shape.

19       Q.   Did you say that Mr. Schumann's estimate didn't

20   address the tub system at all?

21       A.   Not that I recall.

22       Q.   You were referring to a photograph which would show

23   the damage to the motors, and that's Exhibit 10-18.

24       A.   Yes.  And basically this is a foam insulation that's

25   sprayed on the bottom of the tub.  I broke a piece off to

1    show what color it should be, it should be white, and you can

2    see this should be white, and if you look at the motor

3    closely, you can see that there's bubbling of the paint on

4    the motor, especially here, which clearly shows it's a

5    drastic amount of heat and obviously needs to be replaced.

6            THE COURT:  Could you replace the motor without

7    replacing the tub?

8            THE WITNESS:  It would be extremely difficult.  I'm

9    sure people could do it, but I think cost-wise it would be

10   probably a wash.

11       Q.   Did Mr. Schumann recommend replacing the motor and

12   not the tub?

13       A.   No.

14       Q.   He didn't address it at all?

15       A.   I don't believe he addressed it at all.

16       Q.   At any rate, back to Exhibit 6, were there any other

17   areas of the first floor that you and Mr. Schumann disagreed

18   on?

19       A.   Yes.  We disagreed on this bathroom here.

20       Q.   Where's that?  The bathroom next to the jacuzzi

21   room?

22       A.   Correct.

23       Q.   What was your opinion of that?

24       A.   It was to gut the room as well.

25       Q.   Why?

 1        A.    Again, we -- just evidence of smoke coming up pipe

 2   chases.  Anywhere there was pipe -- we're getting very close

 3   to fire areas now.  Mr. Schumann did agree to gut the living

 4   room, we had pipe penetrations through the floor, and I was

 5   finding soot everywhere there's pipe penetrations.

 6        Q.    Any other areas of the first floor?

 7        A.    Yes.  Guest bathroom.

 8        Q.    There's a whole suite of rooms on the right-hand

 9   side.

10        A.    Right.

11        Q.    Guest bedroom, guest parlor, which I think maybe

12   they call the playroom, and the guest bath.  Was that the

13   handicapped accessible area of the house?

14        A.    Yes, it was.  There was a door at the end of the

15   hallway here which kind of separated a handicapped area from

16   the rest of the house.

17        Q.    And this was where the Bordens' daughter Emma's

18   bedroom was?

19        A.    It was my understanding, yes.

20        Q.    At any rate, you had a difference of opinion on all

21   three of those rooms?

22        A.    I did.  I found just a tremendous amount of soot in

23   the location.  And I was told, when they started the case,

24   there was a child in the house that had some special needs

25   and a little bit more sensitive than most children to the

1    environment.  When I looked at -- there's a good picture.

2    Again we're very, very far away from the fire source.

3        Q.    I'm showing you Exhibit No. 10-19.  What area of the

4    house is this?

5            (Plaintiff's Exhibit 10-19 marked for

6             identification.)

7        A.    This is -- I think it's referred to as the

8    playroom -- guest playroom.

9        Q.    On Exhibit 6 it's called the guest parlor?

10       A.    There you go, yes.

11       Q.    Thank you.  Anyway, back to Exhibit No. 10-19.  What

12   is that?  What did that show you?

13       A.    It just was very heavy -- heavy sooted.  As you can

14   see on the countertops, the walls, heavy soot, the cabinets

15   you can see where your -- all along this edge -- the whole

16   room was full of soot.  I don't particularly remember

17   breaking any holes in this room, but I was more concerned

18   with the amount of soot I was seeing in every other part of

19   the home and the fact of the special needs of the child.

20       Q.    And there's also plumbing in that room?

21       A.    There's plumbing right here to feed that sink there,

22   and there's also a bathroom adjoining that room.

23       Q.    And, of course, there'd be outlets in the room as

24   well?

25       A.    Absolutely.

1      Q.    You said there was also a disagreement about the
2   guest bathroom.
3      A.    Correct.  Again, this is in the handicapped area of
4   the home.  This is a good --
5      Q.    This is Exhibit No. 10-20.
6          (Plaintiff's Exhibit No. 10-20 marked for
7           identification.)
8      A.    The area I just circled around the toilet is a
9   pretty good indicator to an adjuster that you probably had a
10  good pressurized fire system because your toilet flanges,
11  which is what your toilet --
12         THE COURT:  Slow down.
13     A.    Your toilet bolts to a flange on the floor.  There's
14  usually a big gap between that and your basement area, and
15  the bottom of it -- the toilet would actually cover that gap.
16  And as you can see, there seems to be a lot of blowout from
17  around the bottom of that, which makes the strong suggestion
18  that it blew up from around the flooring system and up around
19  the toilet.
20     Q.    So you recommended gutting all three of those guest
21  rooms?
22     A.    Correct.
23     Q.    What was Mr. Schumann's recommendation?
24     A.    They were cleaning, sealing, and painting.
25     Q.    Now, did Mr. Schumann agree that the rooms directly

1    above the large basement, the main basement, the living room,

2    the family room, which I think Mr. Schumann called the den,

3    the formal living room, and the kitchen, that they needed to

4    be gutted?

5        A.    Yes, he did.

6        Q.    So any differences of opinion were relatively minor

7    in those areas?

8        A.    Except for the two I raised earlier with the Corian

9    countertops, just because the cost is significant, and the

10   ceramic versus tile flooring, which is pretty much through

11   this whole area, again, the cost is probably five times more

12   for ceramic than tile.  Besides that, the scopes were

13   similar.

14       Q.    What was your recommendation with regard to the

15   garage?

16       A.    The garage, I recommended to gut the garage.  This

17   wall, the common wall between the house and the garage, had

18   been cut through in several locations by the firemen.  The

19   garage itself was not built over a basement, it's on a slab,

20   but I felt, because of the amount of -- actually putting out

21   a fire the house steams up because it's putting cold water on

22   a hot fire, there seemed to be a lot of condensation marks on

23   the Sheetrock through here.  But that would be one area that

24   was really a judgment call.  That might have been an area

25   that needed a little more further investigation.  It might

1    have been an area that you could have cleaned and painted at

2    least a couple of the walls.  But in my judgment I felt that

3    it had to be gutted.

4        Q.   Were there any other areas that you felt was perhaps

5    a judgment call between you and Mr. Schumann as opposed to

6    your testimony with certainty?  The stairway?

7        A.   The stairway, again, you might have been able to --

8             THE COURT:  Hang on.

9        A.   The stairway, you had to remove these two areas in

10   order to replace that landing in the framing that was burnt.

11   There are ways that you can jack and shore framing to hold in

12   place while you fix the items under it.  That might have been

13   a technique that could have been used there.  Until you

14   really got into the work, it would have been hard to make

15   that call.  So I made a -- went on the side of caution and

16   took the staircase out.

17       Q.   Other than the stairway and the garage, do you feel

18   that there was any room for reasonable disagreement with

19   regard to gutting the rooms you testified about?

20       A.   No.

21       Q.   Now, there's another area of the house, a couple of

22   rooms that sit above the garage.

23       A.   Correct.

24       Q.   Where are they located on this diagram, Exhibit 6?

25       A.   Staircase comes up here -- well, they'd be over

1    here.  It's hard for me to read it.  They look like they're

2    here and the staircase would come up here.

3        Q.   But the handwritten thing says "studio," and I think

4    that's what Mr. Schumann called it in his estimate.

5        A.   Yes.

6        Q.   Was there damage to those areas?

7        A.   Yes.  In those areas, if you look at my estimate,

8    you'll see I took the light fixtures down -- they were

9    recessed lights so they were pinned tight against the

10   ceiling.  I took several of those down and found smoke around

11   them on the insulation.  And there was windows that were

12   broken out by the fire department here, and even the front as

13   well.

14       Q.   I have a photograph.  I'm showing you a photograph,

15   which I've marked as Exhibit 12.  Do you recognize the room

16   that's depicted in Exhibit 12?

17           (Plaintiff's Exhibit No. 12 marked for

18            identification.)

19       A.   Yes.  That is what he refers to as the studio.

20       Q.   I'm sorry, could you use the photograph to explain

21   to the Judge the areas of damage in those areas.

22       A.   I noticed the heavy soot on the floor.  You can see

23   where things were moved and what the carpet should have

24   looked like --

25           THE COURT:  Slow down.  First of all, I was writing

1    a note to myself, what room am I looking at?

2         THE WITNESS:  This is the studio that's above the

3    garage.

4    Q.   We'll show you, Judge, on the diagram.

5    A.   You would come off the dining room/kitchen area, go

6    up this staircase, and it's drawn out over here.

7         THE COURT:  This is curiosity, but what was the

8    square footage of this place?

9         THE WITNESS:  It was huge.

10        MR. MURPHEY:  5,500.  There's testimony it's 5,500

11   square feet.

12        THE COURT:  Go ahead.

13   Q.   My question was about whether there was a difference

14   of opinion regard -- between you and Mr. Schumann regarding

15   the two rooms that sat above the garage, which are identified

16   on Exhibit 6 as a den or a billiard room or a study room, but

17   Mr. Schumann called it a studio in his estimate?

18   A.   Yes.  And it started when we came right up the

19   staircase.  The staircase here that led up to that is also

20   the staircase that was directly above this staircase leading

21   to the basement.  And the first three or four steps' framing,

22   if you went underneath into the basement and looked up, were

23   burnt out.  So you obviously had to replace a good portion of

24   the staircase, if not all of it, in order to make it safe.

25   And then I gutted the room because the staircase was burnt

1    and I felt there would be smoke penetration into the wall.

2         When I went up to the studio -- if you can put that

3    photograph up for me, I'd appreciate it.

4    Q.   Yes.  It's Exhibit No. 12.

5    A.   You can see what the carpet should have looked like

6    and then how dark it actually was.  I also went to the

7    ceiling where there are recessed lights, they're the lights

8    that fit very tight to the ceiling and you only basically see

9    the light bulb and the trim, I took that down and pulled out

10   insulation in that ceiling that was very dark around all of

11   those -- I believe I checked two around the ceiling fixtures.

12   So at that point I felt there was smoke penetration, and I

13   gutted the room.

14        All these cabinets were custom-built cabinets in

15   place.  They were a -- just made of wood, not a laminated

16   wood, and they had heavy smoke, and I felt there was no way

17   to clean all the nooks and crannies within them that you

18   would ever be able to get the smoke smell out.  Since they

19   were a natural wood, I'm not familiar with any sealant that

20   you can spray on a natural wood.  All your sealants are

21   usually pigmented.  So I felt there was no way that you could

22   properly clean and seal those.

23   Q.   One more photograph.  I have one more photograph of

24   what I believe to be that studio -- what Mr. Schumann

25   identified as a studio.

1          A.   That is not the studio.

2          Q.   It isn't?

3          A.   That is the room that's off the studio.

4          Q.   But it's the same area?

5          A.   The same area.  It's a bedroom -- or I believe they

6    refer to studio bedroom that's off of the studio.

7          Q.   According to the diagram, there's actually two rooms

8    above the garage.  The diagram calls the one a sewing room or

9    den, and that's this room?

10         A.   Correct.  That's the room you just showed me.

11         Q.   Do you believe that room needed to be gutted?

12         A.   Yes.

13         Q.   Why?

14         A.   Basically you see the windows were broken out of it,

15   and you can see the staining on the natural wood, which I

16   said there would really be no way to clean and seal, but --

17   the photograph doesn't show it, but the common wall over here

18   is really the exterior of the house where the lower roof

19   would come off of it, off to an angle.  That whole wall,

20   including the framing, was burnt out of the home.  So this

21   area took direct physical flame damage on one of its major

22   walls, and for that purpose, being directly -- also directly

23   above the garage, which I felt there was some penetration in,

24   I felt the room had to be rebuilt.

25         Q.   So in all the rooms that we've just talked about,

1    you felt that gutting was the only way to return the house to

2    its prefire condition?

3        A.   Absolutely.

4        Q.   With the exceptions of the stairway and the garage,

5    which you described as judgment calls?

6        A.   It was a judgment call.

7        Q.   And in your judgment, the better estimate was to gut

8    them?

9        A.   Correct.

10        THE COURT:  Mr. Parise, let me ask you a question

11    because I'm going to forget.  You initially used the phrase

12    "judgment call," and it's important that I have a -- I

13    understand what you mean by that.  Without putting words in

14    your mouth, but so we're on the same wavelength, is a

15    judgment call, in your view, insofar as you're using the term

16    here, a choice between two -- a choice between two -- let me

17    say that again.  A choice between two choices of action

18    concerning which reasonable people could differ; is that a

19    judgment call?

20        THE WITNESS:  Yes.

21        THE COURT:  All right.

22        Q.   With only the garage and the stairway did you regard

23    it as a judgment call?

24        A.   Correct.

25        MR. GEER:  Objection.

1           THE COURT:  First of all, I cannot hear you,

2     Mr. Geer.

3           MR. GEER:  Objection.  Mr. Parise has been referring

4     to judgment calls throughout his testimony.  Not just in

5     reference to the last room.

6           THE COURT:  I don't want to do it, but what I'm

7     going to have to do is --

8           MR. MURPHEY:  What is that?

9           THE COURT:  Pardon me?  I can't hear either one of

10    you.  I don't have many rules in my courtroom, but the one I

11    do have is, I have to be able to hear what the heck is going

12    on.  Otherwise, I can't be helpful to litigants, and my court

13    reporter can't do her job.  Shoot again, Mr. Geer, now that

14    you have the mic in front of you.

15          MR. GEER:  My objection, Your Honor, is to the

16    follow-up question, the form of the question.  In response to

17    the Court's question, I understood the question to be asking

18    Mr. Parise generally what he meant by judgment call.

19          THE COURT:  And I'm interpreting it -- I mean, I

20    thought he's talking about where there is -- where reasonable

21    people can differ as to the propriety of one course of action

22    over another.  That's the definition I'm working with.

23          MR. GEER:  Exactly.  And that's not what I'm

24    objectioning to.  I'm objecting to Mr. Murphey's question

25    attempting to limit that to the last room that he just spoke

1    about because he's been talking about judgment calls for some

2    time regarding a number of items.

3            THE COURT:  If we had a jury there, I would say it's

4    for the jury to conclude what the testimony's been.  I take

5    your objection, but I will filter it through what I've heard.

6    Go ahead.

7        Q.   My question actually was, you testified that you

8    felt it was a judgment call with respect to two items, one

9    being the stairway and one being the garage, correct?

10       A.   Correct.

11       Q.   You did not believe that it was a judgment call --

12           MR. GEER:  Objection.  This is leading.  This is

13   leading.  Mr. Parise has already stated his testimony.  Now

14   Mr. Murphey is trying to sum up his testimony and package it

15   so that it suits his purpose.

16           THE COURT:  That was leading.  Rephrase your

17   question.

18           MR. MURPHEY:  I will.

19       Q.   Do you believe it is a "judgment call" with respect

20   to any other parts of the house that you recommended gutting

21   but Mr. Schumann recommended cleaning, sealing, and painting?

22       A.   No.

23       Q.   Now, after you prepared your estimate, you sent it

24   to Mr. Schumann, did you not?

25       A.   Correct.

1          Q.   And you sent him a letter, which has previously been

2     marked in this case as Exhibit 3-18; is that right?

3          A.   Correct.

4          Q.   Attached to that was a six-page report.  I'll just

5     show the first page of it.  But a six-page report in which

6     you summarized your differences of opinion with Mr. Schumann;

7     is that correct?

8               THE COURT:  What's the date of this again?

9               MR. MURPHEY:  It is March 23, 2003.

10              THE COURT:  I'm sorry, who was it sent to,

11    Mr. Parise?

12              THE WITNESS:  Sent to Mr. Schumann.

13              THE COURT:  Go ahead.

14         A.   This is a common letter I prepare when I forward my

15    estimate on to someone I've had an opportunity to review

16    theirs.  And it's basically just a -- I try to follow their

17    estimate format, you know, what areas they went to, and I

18    just kind of higlight in bullet points concerns that I'd like

19    them to consider, and usually a follow-up meeting would

20    occur.

21         Q.   So attached to this letter was a six-page report

22    where you did what you just testified about, going through

23    his estimate?

24         A.   Correct.

25         Q.   Now, in response to this letter, did you hear

1    anything back from Mr. Schumann or Amica?

2       A.   I -- I don't recall if I heard anything directly

3    back from them.  I know that we agreed to have another

4    meeting.  I'm not sure what triggered that.

5       Q.   Before the meeting, did they send you a

6    point-by-point response to the issues that you had raised?

7       A.   No.

8       Q.   You then sent another letter to Amica, this time it

9    was to Mr. Bennett, did you not?

10       A.   Yes.

11       Q.   This is dated April 6, 2003?

12       A.   Correct.

13       Q.   And it is marked as Exhibit 3-23, correct?

14       A.   Right.

15       Q.   What was the purpose of this letter?

16       A.   The purpose of that letter is to inform Amica

17    roughly where we were on the building, explain to them that

18    there appears we had a large difference, and that

19    Mr. Seifert, who was from Visions, who said he could build a

20    home for that amount told me he could not.  I've always, in

21    the industry, heard very good things about Amica as an

22    insurance company.  I felt very strongly that if I could get

23    someone back to the house I could show the hot tub damage,

24    the penetration, it was very straightforward.  So this was

25    kind of my first reach-out to Amica, could someone from Amica

1    come, along with Mr. Schumann so I could show them these

2    damages.

3        Q.    So in Exhibit 3-23, this letter of April 6, 2003,

4    you suggested a meeting?

5        A.    I believe the last page requests --

6        Q.    And a meeting did occur; did it not?

7        A.    Yes, it did.

8        Q.    Who attended that meeting?

9        A.    Mr. Schumann was there, Mr. Bennett was there,

10   Robert Mayo from my office -- or an associate of mine was

11   there.

12       Q.    Mr. Mayo, what was his role in this?

13       A.    He was mostly working on the contents throughout.

14   He had very little to do with the building.

15       Q.    Now, the meeting was held on April 15, 2003; is that

16   correct?

17       A.    That sounds correct.

18       Q.    Tell me what occurred.  I'm just putting the diagram

19   up there in case you want to refer to it.

20       A.    We met in the driveway first, very pleasant

21   introductions.  At that point I suggested that we go up

22   through the estimates, I kind of wanted to highlight some of

23   my areas where I was uncomfortable.  Mr. Schumann had asked

24   if we could work off his estimate, not mine, so we took his

25   estimate out.  And his starts on the exterior of the home.  I

1   informed him that I was fairly comfortable with his exterior

2   of the home and his analysis and we didn't really spend too

3   much time there because it wouldn't be productive.

4            So we went into the main home.  At which time I

5   believe the first thing I did -- we did several things that

6   day, I'm not 100 percent sure of the order.  But we did go

7   through the kitchen where I showed him it was ceramic tile

8   not vinyl.

9       Q.   What response did you get?

10      A.   They would -- I don't remember any verbal response

11  back from that, but I never did get an estimate with that

12  changed on it.

13           THE COURT:  I'm sorry, what?

14           THE WITNESS:  I never did get any estimates with

15  that item changed on it.  I never got a reply estimate with

16  that item fixed.

17      Q.   How did you show them that it was a vinyl floor and

18  not a ceramic tile floor?

19      A.   Went into the kitchen.  You know, it was pretty

20  obvious it was ceramic tile.

21      Q.   And Mr. Schumann and Mr. Bennett were with you at

22  that time?

23      A.   Correct.

24      Q.   Then what?

25      A.   Then -- I don't know if it was the kitchen or one of

1    the bathrooms, but the countertops were the same throughout

2    the house.  I climbed underneath that, because I usually wear

3    a jumpsuit, work boots, and the works -- I climbed underneath

4    that and I pulled off the Dupont sticker.  Dupont is the

5    company who makes Corian countertops.  So I was trying to

6    demonstrate that these were not plastic laminate countertops

7    as he had in his estimate, but they were, in fact, Corian, we

8    were able to prove they were Corian.  And I remember turning

9    around and handing the sticker to Mr. Schumann saying,

10   they're Corian countertops, and we need to have that changed

11   on the estimate.

12        Q.   Did Mr. Schumann have a response at that time?

13        A.   Again, I don't remember a verbal, but I never did

14   receive an estimate with the countertops changed.

15        Q.   Did Mr. Bennett respond at all to either of those

16   two things?

17        A.   Not that I recall.  Mr. Bennett was observing most

18   of it.  Most of the conversations were between Mr. Schumann

19   and myself.

20        Q.   Then what do you remember doing?

21        A.   We went up to -- I took them to the farthest bedroom

22   away on the second floor, which would be Bedroom 1, and

23   that's when I showed them the holes that were made in the

24   wall and that I was actually getting dirty insulation from

25   that wall.

1         Q.    Is the hole that you referred to depicted on Exhibit
2    10-24?
3         A.    Yes, it is.
4         Q.    So you made that hole at the time of the visit or
5    had you made it before?
6         A.    I believe that was made during my first inspection.
7         Q.    And this is the -- Exhibit 10-24 shows the bedroom
8    furthest away from the fire on the second floor?
9         A.    Correct.
10        Q.    Did you show the insulation with the soot on it to
11   Mr. Schumann and Mr. Bennett?
12        A.    Just as it was there.
13        Q.    I'm sorry?
14        A.    Yes.
15        Q.    Did you get a response?
16        A.    Mr. Schumann had said, that's very little soot.  It
17   won't make a difference.
18        Q.    Was the soot that you remember seeing as is shown
19   there on Exhibit 10-24?
20        A.    Yes.
21        Q.    And then what did you do?
22        A.    I asked Mr. Schumann, please be patient.  This is
23   only our first room, and I'll show him many rooms with soot
24   in the walls.  So he needs to kind of look at the whole
25   picture not just this room.

1        Q.    So where else in the house did you go?

2        A.    We went to the master bedroom, along that exterior

3   wall.

4        Q.    And?

5        A.    Again, there was already a hole in the wall, and I

6   showed them, again, dirty insulation.

7        Q.    Any response at that time?

8        A.    No.

9        Q.    Then what?

10       A.    We went to the top, to the hallway closet, where we

11  put another hole.  Again, we have piping in there which is

12  PCV, just a plastic pipe, which had black soot marks on it,

13  and we also had dirty insulation in there.

14       Q.    That's the hallway closet that's at the top of the

15  stairs on the second floor?

16       A.    Correct.  I'm sorry, I marked the wrong area.  Right

17  there.

18       Q.    And you found dirty insulation there as well?

19       A.    Yes.

20       Q.    Did you show that to Mr. Schumann and Mr. Bennett?

21       A.    Correct.

22       Q.    Did you get a response?

23       A.    No.

24       Q.    Then what?

25       A.    Then we went to Bedroom No. 2, where we had made the

1    hole right here on the common wall between the bedroom and

2    the bathroom.  And again, the wall was already open, I might

3    have made another hole, I don't recall, but I pulled out

4    dirty insulation.

5        Q.   Did you show that to Mr. Schumann and Mr. Bennett?

6        A.   I did.

7        Q.   Did you get a response?

8        A.   I did.

9        Q.   You did?

10       A.   I did, yes.

11       Q.   What was their response?

12       A.   At that point, Mr. Schumann said that if you were to

13   paint and seal the rooms the soot in the wall would make no

14   difference.  He said he's done it in hundreds of homes, and

15   that's the way he would like to -- that's how he wanted to

16   proceed.  I think everyone was getting a little frustrated at

17   that point.  I said, I really don't care what you did in

18   other homes --

19            THE COURT:  You have to say that again.

20       A.   I really don't care what you've done in other homes,

21   but the proper repair here is obviously to clean the soot and

22   seal it, which we can't do until we gut this home.  At that

23   point his comment was, well, how do I know it's even soot.

24   Which just kind of appalled me because we had a basement fire

25   and there's soot everywhere.

1      Q.   Do you know whether there was any evidence at all
2   that there had ever been a prior fire in this house?
3      A.   I didn't find any evidence.  I don't know the
4   history of the house, but I didn't have any evidence.  At
5   that point I got a little frustrated and I said, well, I
6   certainly can have it sent to a lab, and if it ever came back
7   with a carcinogen in it, then I might put in to reframe the
8   whole house as well.  And his comment back to me was, well,
9   even if it comes back with carcinogen, how do I know it was
10  soot.
11          THE COURT:  I can't read your lips.  You have to say
12  that again.
13          THE WITNESS:  Sorry, Your Honor.
14          THE COURT:  I don't know what you just said to me.
15      Q.   Just go more slowly.  Go back a couple sentences.
16      A.   When I showed him the soot, he questioned, how does
17  he know it's soot.  We were all getting a little frustrated.
18  At that point I told him I would take it and send it to a lab
19  if he wanted, but if it ever came back with a carcinogen in
20  it, or something toxic, then obviously I would put in to
21  reframe the whole house.  Then he said, how do I know -- I
22  forget the exact -- how it exactly went.  What comment was
23  said when.  But basically, if it came back with soot, how do
24  I know it would be from this fire, which kind of appalled me
25  because there was no evidence that there was ever a previous

1    fire.

2       Q.   Then what happened after that?

3       A.   Then we went downstairs to the hot tub area, the

4    jacuzzi.

5       Q.   What did you do in the hot tub area?

6       A.   I got on -- again, the panel had been removed from

7    underneath the tub previously.  Mr. Bennett and Mr. Schumann

8    were standing behind me.  I got on my hands and knees and

9    that's when I broke off the piece of insulation and I turned

10   around and handed it to one of the gentleman and said, what

11   are we going to do about this hot tub area, the motor's

12   burned and everything else.  And they -- basically no

13   comment, but walked out of the room, which I found kind of

14   interesting.  I'm on my hands and knees trying to show them

15   some damage under the tub and they walked out of the room.

16   There was nothing said at that point.

17      Q.   This was the damage depicted on Exhibit 10-18?

18      A.   Correct.

19      THE COURT:  I have to take a phone call.  It's

20   probably going to be about 10 minutes.

21      (Pause in the proceedings.)

22      Q.   We left off with you describing Mr. Schumann and

23   Mr. Bennett leaving the room after you had shown them the

24   damage to the motor area underneath the jacuzzi.  Did the

25   tour of the house continue at that time?

1        A.    No, it did not.

2        Q.    What happened then?

3        A.    We decided to break for lunch and that we were going

4    to spend the rest of the afternoon talking more about

5    contents.

6        Q.    It was after that meeting that Amica demanded

7    appraisal in this case; is that correct?

8        A.    Correct.

9        Q.    Did you give your opinion to the Bordens about

10   whether appraisal was appropriate in this case?

11       A.    I -- yes.

12       Q.    What did you tell him?

13       A.    I told him that I don't like to go into appraisal

14   situations.  I didn't feel that this case warranted one.

15       Q.    Why not?

16       A.    Because the damage was very straightforward.  It's

17   very simple to look under the hot tub and see that it's

18   damaged.  I felt that if we had a true fire restorer look at

19   this that he would see that as well.  I didn't feel that we

20   should have to go through the time and expense of an

21   appraisal to get such a decision.

22       Q.    Are you limiting that comment to just the area

23   underneath the hot tub?

24       A.    No.  The whole pressurizing of the house, the

25   gutting of the house.  I felt that if I could show that to

1    anyone who truly would put in writing they would guarantee

2    this house would not smell after the restoration --

3        Q.   Did the appraisal ever occur?

4        A.   No, it did not.

5        Q.   What happened then?

6        A.   Soon after we got notice that your firm was

7    retained, and that the insurance company, Amica, had agreed

8    to send out a fire restorator by the name of Dan Jones.

9        Q.   Did you ever meet with Mr. Jones?

10       A.   I did.

11       Q.   How many times?

12       A.   Twice.

13       Q.   Were you given Mr. Jones' estimate?

14       A.   Yes.

15       Q.   Did you prepare a commentary about his estimate?

16       A.   I did.

17       Q.   I'm showing you a document that we have marked as

18   Exhibit 11.  Do you recognize that?

19           (Plaintiff's Exhibit No. 11 marked for

20            identification.)

21       A.   Yes, I do.

22       Q.   Do you recognize Exhibit 11?

23       A.   I do.

24       Q.   It is undated, correct?

25       A.   Correct.

1      Q.   It is a letter to Attorney Terry Jones regarding

2    Dr. Borden's case?

3      A.   Correct.

4      Q.   And it is in this letter that you offered some

5    commentary regarding Mr. Jones' estimate?

6      A.   Correct.

7      Q.   When I say "Mr. Jones," Mr. Dan Jones?

8      A.   Correct.

9      Q.   I note the second line of the letter you say, "I

10   found the estimate to be more logical and detailed than

11   Amica's first offer."  What were you saying -- what did you

12   mean when you said it was more logical?

13     A.   It addressed the soot behind the walls.

14     Q.   How did Mr. Jones' estimate address the soot behind

15   the wall?

16     A.   He took down the dry wall in order to get to the

17   soot.

18     Q.   This letter does contain some comments regarding his

19   estimate.  At that time did you regard those as relatively

20   minor matters?

21     A.   Yes.

22     Q.   What happened after you sent this letter, which was

23   then forwarded onto Mr. Jones?

24     A.   We ended up having a subsequent meeting to go over

25   just these items on the list.

1           THE COURT:  I don't see a date on this letter.

2           MR. MURPHEY:  As I said, it's undated.  We've

3     described it for the record.

4           THE COURT:  Maybe I missed, was there some estimate

5     as to when this letter would have been sent?

6       Q.   It would have been sent -- your letter would have

7     been sent sometime after receiving Dan Jones' estimate?

8       A.   Correct.  I believe I received Dan Jones' at the end

9     of August.

10      Q.   So it was sometime July or August of the summer of

11    2003, correct?

12      A.   Correct.

13      Q.   At any rate, after you received his estimate, you

14    created Exhibit 11 --

15      A.   Correct.

16      Q.   -- and sent that?  Then you had a meeting with

17    Mr. Jones where you reviewed these items?

18      A.   Correct.

19      Q.   Did Mr. Jones say anything about the scope of his

20    estimate?

21      A.   No.  Mr. Jones was very professional.  We met in the

22    driveway, and he said, I understand you have some issues.  I

23    have your list here, Anthony, let's go look at them.  He was

24    very receptive to that.  So I went and showed him things on

25    the letter.  And he told me he would take them under

 1    advisement and let Amica know of his decisions.

 2        Q.   At that time did he say anything about

 3    Mr. Schumann's original estimate?

 4        A.   No.

 5        Q.   After the meeting with Mr. Jones in which you

 6    discussed the issues that you raised on Exhibit 11, what

 7    happened then?

 8        A.   I believe we were contacted again by Terry Jones

 9    with a letter from Dan Jones where he did address the issues

10    that I had discussed with him.  He agreed to some of them,

11    but not all of them.

12        Q.   And ultimately, you understood that the Bordens

13    resolved the claim?

14        A.   Correct.

15        MR. MURPHEY:  That's all I have for you, Mr. Parise.

16    Thank you.

17        THE COURT:  Were you successful in contacting Mr.

18    Haller to waive him off?

19        MR. MURPHEY:  I believe so.  I have somebody doing

20    that.  May I take one minute and go check and make sure he's

21    not here?

22        THE COURT:  Yes.

23        (Pause in the proceedings.)

24

25

1                          CROSS-EXAMINATION

2     BY MR. GEER:

3

4         Q.   Good afternoon, Mr. Parise.

5         A.   Good afternoon.

6         Q.   I guess I want to start at the beginning.  You

7     indicated you were retained early March -- I believe you said

8     late February or early March.  So we're in agreement that

9     that was the time frame, correct?

10        A.   Correct.

11        Q.   Now, the fire occurred on February 16th, you were

12    retained either later that month or early the next month, and

13    we know that there was a check sent by Amica to the Bordens

14    on or about March 11th.  You had nothing to do with getting

15    that check, correct?

16        A.   Correct.

17        Q.   You had not requested it, you had not negotiated for

18    it, anything of that nature, correct?

19        A.   Correct.

20        Q.   We've also heard testimony about the check.  It's my

21    understanding that you did not advise the Bordens not to

22    accept that check, correct?

23        A.   I was asked an opinion.

24        Q.   And your opinion was?

25        A.   I received a call from Rick Borden, who is an

1    attorney for The Hartford Insurance and the brother of John

2    Borden, the insured, he said that they had received the

3    check, and he wanted to know whether -- he wanted my opinion

4    on whether he should accept it or not, and that he was

5    researching it within the company he worked with.

6        Q.   I think we have established that the check said

7    actual cash value on it, did not have any sort of language

8    that said full and final payment or release of all claims or

9    anything like that.

10        MR. MURPHEY:  I'm going to object to the

11    characterization of the exhibit.  It's in evidence.

12        THE COURT:  Overruled because it's my recollection

13    that controls, and if the witness disagrees, plus it's cross.

14    Go ahead.

15        Q.   Assuming, Mr. Parise, that the check did not have

16    language on it that says full and final payment, release of

17    all claim, but did say actual cash value, would you have any

18    objection to them accepting that payment?

19        A.   No.

20        Q.   That would be a common everyday practice in the

21    insurance industry; wouldn't it?  To send an actual cash

22    value payment as an undisputed payment?

23        A.   An undisputed payment.

24        THE COURT:  I still don't know -- I don't know

25    whether at the time he had any objection or not.

1          THE WITNESS:  Well, Dr. Borden had also asked me
2      whether he should accept this check.  And I told him I --
3      it's common, it's done, people -- insurance company will send
4      a nondisputed amount.  You can't do much with the check right
5      now, Dr. Borden, because the differences on the house are so
6      severe, there's no way we can start any work because the
7      house is going to have to stay in that condition while we
8      continue to inspect it and try to work this out.  So there's
9      no real great reason or urgency for you to take this money
10     because we're not going to be able to do anything with it,
11     but your brother is researching it, he is an attorney, and I
12     suggest that you work that out with him.
13         Q.   I understand your response, but I guess by the same
14     token I have to think back to some other people in my life
15     who would have had objections that they didn't have use of
16     the money during that time period, even if they put it in the
17     bank and earned interest.  Wouldn't that be in their best
18     interest to put that money in the bank?
19         A.   That would be Dr. Borden's decision on what to do.
20     I was there to try to put a value on the claim, and he has a
21     brother who's an attorney who's researching whether that
22     check should be taken or not, and I certainly left that in
23     his hands.
24         Q.   Same true with the contents check?
25         A.   Same true with the contents check.

1        Q.    That they refused to accept, you would have advised

2    them to take it?

3        A.    I don't know that they did refuse to take it.  I

4    really did not get too involved with the checks.

5        Q.    Now, you were asked some questions about your role

6    in this case, and I think you indicated that you were a

7    public adjuster but you're not licensed in Pennsylvania,

8    correct?

9        A.    Correct.

10       Q.    Therefore, you were coming in as a consultant,

11   correct?

12       A.    Correct.

13       Q.    You can correct me if I'm wrong, but my experience

14   with consultants is, consultants are normally paid hourly,

15   are they not?

16       A.    When I've done consulting agreements like this, I've

17   always done a percentage.

18       Q.    Public adjusters work by percentages; don't they?

19       A.    Yes.

20       Q.    Always?

21       A.    No.  I've worked on an hourly as a public adjuster.

22       Q.    Well, this particular -- wouldn't you agree with me,

23   though, that a vast a majority of cases where public

24   adjusters represent insureds they have contingency fee

25   agreements, correct?

1      A.   Yes.

2      Q.   They are paid a portion of the -- whatever recovery

3  the insured makes with the insurance company, the public

4  adjuster gets a stated fee?

5      A.   Correct.

6      Q.   In this case, your stated fee was 8 percent of

7  whatever the Bordens recovered, correct?

8      A.   Correct.

9      Q.   That would even include the moneys that the Bordens

10 had received but not accepted back in March, when you had

11 nothing to do with getting those payments, correct?

12     A.   Correct.

13     Q.   So you were working on an 8 percent consulting fee,

14 but I don't understand how your work on this case, as a

15 consultant, was any different than what you would have done

16 as a public adjuster.  Was it different in any way?

17     A.   No.

18     Q.   And your firm made how much on this case?  How much

19 was Giordano & Associates paid?

20     A.   I don't know the exact figure.

21          MR. MURPHEY:  We had stipulated that the amount paid

22 was 61,000-something.

23     Q.   Over $60,000?

24     A.   Sounds about reasonable.

25          MR. MURPHEY:  By way of explanation, that would

1    include the expenses that were paid to the public adjuster as

2    well.

3        Q.   That would be fees and expenses.  Now, if I

4    recall -- I can show you the rest of your estimate if you'd

5    like to see it, but my recollection is you started out around

6    680,000 and then went up to 690,000-some in your final

7    estimate?

8        A.   Correct.

9        Q.   Whereas Mr. Schumann just did one estimate, you

10   actually did two, correct?

11       A.   Correct.

12       Q.   First one and then a supplemental?

13       A.   Correct.

14       Q.   Now, when you did your $690,000 estimate, whatever

15   your final work product was, did you have a contractor who

16   would go through the building and -- I mean, did you go

17   through the process of saying, can you do it cheaper than

18   this?  Can you do my scope at a lower price, or words to that

19   effect?

20       A.   No.

21       Q.   You really have no incentive to do that, do you,

22   when you're working on a contingency fee, correct?

23       A.    I was putting a value on what I felt the damages

24   were.

25       Q.   Now, interestingly enough, Dan Jones came in

1        later -- and I think it's clear from your testimony you

2        respected him, you respected his work, correct?

3            A.   I did.

4            Q.   He was very professional, and I think you indicated

5        in your deposition you knew right away he knew what he was

6        doing, correct?

7            A.   Correct.

8            Q.   And he also happens to be a principal in a very

9        large construction company in Pittsburgh, correct?

10           A.   Correct.

11           Q.   So when he gives you a price, he can do the work at

12       that price; did you understand that?

13           A.   Sure.

14           Q.   So this agreement that was reached at $554,000 was a

15       scope not identical to yours, but similar; was it not?

16           A.   Yes.

17           Q.   So in effect, he was going to do pretty much the

18       same work you were proposing at $554,000 that you had priced

19       at 690, correct?

20           A.   Correct.

21           Q.   So I guess it's safe to say that when you're working

22       on a contingency fee you don't have a lot of incentive to

23       keep the cost law?

24           A.   Well, my computation would be directly related to

25       the amount, if that's what you're getting at.  I'm not sure

1    what the question is.

2        Q.   Let me put the question to you this way:  If we have

3    a question -- you know, if we have a mark on the wall, and

4    you're uncertain as to whether or not that wall can be --

5    let's assume replacement cost is in effect and all that

6    stuff.  You're not sure what the mark is, you're not sure

7    what it's going to take to remove it, and you're not really

8    certain whether we could clean it or not and make it look

9    good, your inclination might be just to replace it because

10   then you're sure it would be done right, correct?

11       A.   I make a judgment call based on each situation, and

12   I think on the staircase I showed that I would remove and

13   reset and clean where I felt it could be done.  In other

14   areas I cut test holes and came up with a logical reason.  I

15   just didn't look at a wall and say, I'll make more money if

16   it comes down.  I looked at it and said, I better cut a test

17   hole because there's pipes behind it, and made a logical

18   decision, not just a money decision.

19       Q.   Wouldn't you agree with me that you really don't

20   have a lot of incentive, when you're working on a contingency

21   fee, to try to clean it to see if it might work properly?

22   You make a lot more money if you decide to replace it --

23       A.   True, but I also have a reputation to uphold.  And

24   I'm not going to be -- go into a room and say gut a room when

25   10 out of 10 times you would say you can clean it.  I would

1    make a decision based on my experience.

2        Q.    Have you not been involved in fire losses before

3    where this type of technology was used to clean smoke?  The

4    same type of technology that Mr. Schumann was proposing?

5        A.    Absolutely.  Every day.

6        Q.    And it is successful; is it not?

7        A.    In certain situations.

8        Q.    Once in a while it's not, correct?  Have you been

9    involved in cases where it was not successful?

10       A.    I've been in situations where it wouldn't -- no.  I

11   have not been in situations where it wasn't successful.

12   Because when it's a kitchen fire, again, where the smoke is

13   exterior part of the house, exterior part of the walls, and

14   it would not penetrate a wall because it's external, that's

15   very commonly used.  You can wipe down a wall because the

16   smoke did not penetrate, you can seal it and clean it.  And I

17   would say, my experience, I never remember being called back

18   to a house that smelled when it was done properly.  But I've

19   never been in a situation where there's actual soot behind

20   the wall that a contractor didn't say, I need to take the

21   wall down and clean it.  I've never seen a person try to seal

22   a wall from the outside when there was clearly insulation

23   that was soot damaged.

24       Q.    Have you ever been involved in a loss where one of

25   these fogging agents was used?  To make the fogger go where

1    the smoke went?

2        A.   Yes.

3        Q.   That is sometimes successful; is it not?

4        A.   My experience it was successful when the fogger was

5    at the location, because basically it's a cover, if you will.

6        Q.   I'm sorry, I didn't understand --

7        A.   It was successful -- I'll give you my experience

8    with it.

9            THE COURT:  Before you do, even more fundamentally,

10   I don't understand the question.  Not because there's

11   anything wrong with the question, but I need to be educated

12   about what a fogger is.

13       Q.   Let me ask the question and do a better job.  In

14   addition to the cleaning, you used examples, I think, of two

15   different -- there was Kilz and Benz?

16       A.   Kilz and Benz.

17       Q.   Kilz and Benz?

18       A.   Correct.

19       Q.   Are there other products that are used to clean and

20   seal areas that have been damaged by smoke?

21       A.   Correct.

22       Q.   And those products, in your opinion, are the

23   products you say have always worked, correct?

24       A.   Correct.

25       Q.   And they're commonly used.  Now, is there also a

1    product on the market which is similar to those, perhaps more

2    expensive, which is sometimes used to enter areas where smoke

3    could enter, but you can't get to it with a sponge, and it's

4    a defogging agent?

5        A.    Not that I'm aware of.

6        Q.    Are you aware of any type of product that would be

7    on the market which can be used to mimic smoke so that it can

8    get up into areas that might be difficult for a person to get

9    get into with cleaning utensils?

10       A.    I've not seen it used.

11       THE COURT:  Let me ask the question, anyway:  What

12    is a fogger?  What is a defogger?

13       MR. GEER:  I can explain.

14       THE COURT:  No.  You're not sworn.  Wasn't that a

15    question -- let me just ask:  What is a defogger?

16       THE WITNESS:  I have seen cleaning companies use a

17    fogger, and it basically is just a machine that puts a fog in

18    the house, but it's been used more for an odor control.  In

19    the situation I had experience with it is, we had bakery two

20    days before Christmas that had a fire in the store and didn't

21    want to lose the Christmas business.  So we put the fogger

22    next door to alleviate the smell till we could get past the

23    Christmas season, and then, when the fogger was removed, the

24    smell came back.  So my experience is they're good for

25    covering up, deodorizing, but not for treating soot.

1       Q.   Now, there was testimony earlier about your

2   walk-through on April 15th with the Amica representatives,

3   Mr. Schumann and Mr. Bennett, and you had indicated you had

4   kicked holes in the wall and pulled out insulation, correct?

5       A.   Correct.

6       Q.   Now, when you did that, didn't dust and other

7   stuff -- sawdust, dirt, other stuff come out with the

8   insulation?

9       A.   Well, I would reach up into the wall, and pull

10  insulation out.  I'm sure some Sheetrock dust came out with

11  it.  The difference -- and it's very common that you will

12  have dust insulation, and I think some of the photos will

13  show -- and one of the tests is, soot is black, where a house

14  dust is gray.  And there will be areas, especially in the

15  master bedroom, where I can point from the photo -- it was my

16  professional opinion what is soot and what is normal house

17  dirt.

18      Q.   How old was this house?

19      A.   I don't recall.

20      Q.   Was it new?

21      A.   Parts of it.  It had many, many renovations over the

22  years.

23      Q.   So you don't know the age of the house in various

24  areas, correct?

25      A.   I would not.

1          Q.   Would you agree with me that in a house, as it gets

2     older, the insulation frequently becomes somewhat discolored?

3          A.   I think that would depend on a lot of factors.

4          Q.   Well, if I told you that I lived in a house that was

5     built in 1970, if you were to open up one of the original

6     walls of my house and pull out insulation, would you expect

7     that insulation to look the same as insulation -- the same

8     type of insulation in a brand-new home?

9          A.   I would say the difference would be hard to detect

10    if the house -- if the older home was built properly and the

11    walls were very tight and secure, it's not something that

12    would get dirty.

13         Q.   You wouldn't expect to see discoloration?

14         A.   It would be very slight to the eye, if you could

15    detect it at all.

16         Q.   But you'd expect to see sawdust and house dust and

17    that type of stuff come out; would you not?

18         A.   To a certain degree.

19              THE COURT:  Can I ask a question here.  I'm still

20    unclear as to where there is a dispute and where there's not

21    a dispute.  Is there a material dispute between the parties

22    as to whether what Mr. Parise was seeing, which he claims to

23    be soot, was really soot or just house dust that accumulated

24    over the years?  Is there a dispute on that?

25              MR. MURPHEY:  I didn't think so, but maybe there is.

 1          MR. GEER:  I don't know that we've really addressed

 2     that issue.  I don't know that I can answer that question.  I

 3     think in some areas the answer's absolutely no.  But I'm not

 4     sure I can say that for the whole house.

 5          THE COURT:  I'm not saying you have to.  I'm just

 6     trying to track the issues.  Go ahead.

 7          Q.   In fact, Mr. Parise, do you recall going into one

 8     room and showing Mr. Schumann and Mr. Bennett the insulation

 9     and there seeming to be some disagreement that that was soot?

10     They didn't seem convinced that that was soot?

11          A.   I remember that very clear.

12          Q.   And I guess that kind of started you guys squabbling

13     a little bit?

14          A.   That one particular area, yes.

15          Q.   We don't know need to go through who said what, but

16     do you recall Mr. Bennett actually taking a handful of that

17     and putting it up to his nose?

18          A.   I don't.

19          Q.   And saying, I can't smell anything?

20          A.   I would say -- I don't recall that.

21          Q.   Do you recall -- well, if I said to you that he

22     recalled you saying, well, maybe you can't smell it, but

23     you're not going to be able to smell anything in this room?

24          A.   That would be where I was going to go with that.

25     After spending 10 minutes in that home, there was so much

1    soot -- I've been doing this job, up to that point, for

2    probably 13, 14 years -- and I expressed this to Dr. Borden

3    just the other night.  After leaving that house for three

4    days, my lungs hurt for two weeks.  From that day forward, I

5    started wearing a respirator.  The smoke in that house was

6    tremendous.  So after spending 10 minutes in that home I

7    don't think you would be able to pick up any product in the

8    home and say whether it had a smell or not.

9         Q.   This is even true in the rooms furthest away from

10   where the fire had been?

11        A.   Yes.  And I think the pictures show on the floors,

12   when you moved towels and rugs, how thick the soot was in

13   that house.

14        Q.   And Mr. Murphey showed the Court a number of

15   photographs during the course of your direct examination, and

16   some of this insulation was very, very dark.  Obviously,

17   seriously charred -- maybe not charred, but carbonized.  But

18   others the insulation didn't seem to be all that greatly

19   discolored; would you agree with me?  And I'm not saying

20   there wasn't smoke on it, but wouldn't you agree with me that

21   there was a wide variety within the house -- there was a wide

22   variety of discoloration in the insulation?

23        A.   Sure.  It fluctuated.

24        Q.   And actually, at some levels, when it's just barely

25   discolored, it might be reasonable to question whether that

1    was really smoke damage or whether that was something else,
2    correct?
3        A.    It's truly in the color, and it's just been my
4    experience -- it's very common that you will -- if you take a
5    chem sponge, or even by looking at it, that house dust is
6    gray and soot is black.  We get into a lot of this when we go
7    into attics.  If you take a chem sponge and wipe down any
8    beam in the house, it'll come up gray, and that's normal
9    house dust.  But if it comes up black, that means the soot
10   made it to the attic, and most companies I work with,
11   insurance companies, will, in fact, make the decision to
12   clean the attic.  If it comes up gray, they don't clean it;
13   if it comes up black, they clean it.  What I was seeing on
14   this insulation was clearly black, in my opinion.
15       Q.    You say the photographs -- I guess I don't
16   understand because the photographs we saw, there were many
17   photographs of insulation -- many that, as I understand it,
18   Mr. Schumann wasn't even arguing with you about.  He was
19   replacing it.  If it wasn't black --
20       A.    I don't agree with many.  I don't believe there was
21   any areas that he was replacing where I was showing him black
22   insulation.
23       Q.    I'm talking about in various areas -- I'm sorry, I
24   didn't listen, my fault --
25           THE COURT:  This is never going to get down.  This

1    is almost a sprint to the goal line between two real fast

2    talkers.  So let's slow down.

3        Q.   Mr. Parise, I did not listen to your answer, I

4    apologize.  Could you say it again --

5             THE COURT:  I didn't even get the question.  Why

6    don't you do the question and let him do the answer.

7             MR. GEER:  Can you repeat the question?

8             (Record read back.)

9        A.   At that point I said that I disagree, I don't think

10   there was many areas at all that I showed Mr. Schumann

11   insulation that he agreed to replace.

12       Q.   You're saying he did agree to it?

13       A.   He did not.

14       Q.   Well, let me just -- I'll show you this.  This is

15   Photograph No. P-57, because this is the first one I could

16   find.  This is insulation in one of the attics, correct?

17       A.   Correct.

18       Q.   Now, I think we can probably see that it's somewhat

19   discolored, that it was once yellow; is that accurate?

20       A.   Yes.

21       Q.   Now, can you tell from looking at that whether

22   that's dust or whether that's smoke or some sort of carbon

23   residue that's discoloring that?

24       A.   Well, from this picture it would be very difficult

25   to tell, but I remember this area, and you can see right here

1     they actually cut a hole and part of the roof fell in on it.

2     But from the picture it's very hard to tell.

3          Q.   Is this an area that was in dispute?

4          A.   I'd have to look at the estimates in general.  I

5     know what I would do in the area.

6          Q.   You would have said that this needed to be replaced?

7          A.   Absolutely.

8          Q.   I'm not even sure, looking at it, whether there was

9     a dispute.  I'm going to look at that in a second.  You're

10    saying insulation -- is this what you're saying is black,

11    because that's what I was having trouble understanding with

12    your answer?  You were saying gray was household dust and

13    black is from the fire.  To me this is not black, what I'm

14    looking at in this photograph, and you're saying this needs

15    to be replaced.  So I'm trying to understand what you mean.

16         A.   There might be other reasons for replacement.  As

17    you can see, they actually cut a whole in the roof and

18    sections of the roof fell in.  So I can assure you that while

19    they were extinguishing this fire that that insulation got

20    soaking wet.  And that might be the reason I replaced it in

21    this area.  It might not be from the soot.  This happens to

22    be just a very poor area to choose, because I believe this is

23    directly over the kitchen, which we would be totally gutting

24    anyway.  So the insulation would come down when you took the

25    ceilings down and would have to be replaced.

1      Q.   So you're saying I picked a really bad example.

2      A.   Yes.  Sorry to inform you.

3      Q.   Let me show you 55.  Is that the same area or a

4  different area?

5      A.   Same area.

6      Q.   That's what I was afraid.

7           THE COURT:  Let's see if we can speed this up a

8  little bit.  Mr. Geer, you're free to show him any pictures

9  you want, but are you looking for those pictures that involve

10  the dispute as to whether to gut or not to gut?

11          MR. GEER:  I don't recall.  There were photographs

12  regarding insulation that were shown that were in dispute --

13          THE WITNESS:  The picture --

14          THE COURT:  I'm trying to see if I can assist you in

15  finding the photograph you're looking for.

16          MR. GEER:  I appreciate that.

17     A.   The master bedroom picture where the wall is open

18  would help me explain my point.

19     Q.   I'm going to show you, first of all, Exhibit 10-33.

20  Now, was it your testimony -- can you hit your button there

21  and get rid of your mark.  All right.  That is 10-34.  Was

22  this in dispute?

23     A.   I believe it was.

24     Q.   This is an attic insulation?

25     A.   It was an attic over the master bedroom.

1        Q.    Your recollection is that was a dispute.  There were

2   two attics, correct?

3        A.    Yes.  I believe this area was in dispute.

4        Q.    And then we have -- there was a second area that was

5   kind of above the second floor.  Was that a dispute?

6        A.    That was that area there.

7        Q.    So you're saying the insulation above the second

8   floor was in dispute, that's your recollection?

9        A.    Correct.

10       Q.    And then, the other insulation in the other attic

11  was not?

12       A.    No.  That's where actually they had cut holes in the

13  roof.

14       Q.    So Mr. Schumann was paying for that?

15       A.    Correct.

16       Q.    This is Exhibit No. 10-33.  Do you recall where this

17  was?

18       A.    That was just another area of the picture you just

19  showed me.  I believe it was above the master bedroom.

20       Q.    And you're saying this was in dispute?

21       A.    I believe it was.

22       Q.    I'm not even agreeing that it was, but assuming it

23  was, I'm asking the question for a different purpose.  I'm

24  trying to understand your answer as to the example you gave,

25  if it's gray, it's household dust; if it's black, it's soot.

1    How do we look at this photograph --

2        A.    I look at this photograph --

3        Q.    -- and prove that this is black?

4        A.    I look at this photograph and look for areas where I

5    feel would make logical sense that I would see black from

6    pressurizing.  And I looked right around this light fixture

7    that protrudes through this Sheetrock, up into this attic

8    area, and you can see right there, that is black.  Look over

9    at this beam right here, where it appears a wire came up,

10   that has black.  Over in this area where wires came up, it

11   was black.  Some of this could be house dust, it settles on

12   top of the insulation.

13          But when you have black coming up through the

14   insulation now, that insulation can be pulled back, and I'm

15   sure if we pulled it back in this area, you would see

16   heavy -- that's sometimes 10 to 12 inches thick, and the soot

17   made it all the way through 10 to 12 inches thick in these

18   areas here, there's a good assumption that it's on the bottom

19   of that insulation.

20       Q.    Now, you also indicated on your direct examination

21   that you felt that, for instance, if there was a pipe

22   underneath this insulation, smoke would have travelled down

23   there; did I understand that correctly?

24       A.    Well, there's pipes that come up through your attic

25   that could be -- come all the way through your basement to

435

 1    your attic.  Like a vent pipe.

 2        Q.   So then you would reach the conclusion that if the

 3    insulation covered that type of pipe that that pipe would

 4    need to be cleaned off?

 5        A.   No.  I was just saying that would provide an access

 6    for the smoke to come up from the basement and needed to be

 7    researched.

 8        Q.   You were explaining how the smoke got there, you

 9    weren't explaining that that was something that needed to be

10    added to Mr. Schumann's estimate, correct?

11        A.   I believe that's one and the same.  If there's soot

12    there, it certainly should be added to the estimate.

13        Q.   Well, I'm not talking about the insulation.  I'm

14    talking about the pipe itself.

15        A.   The pipe itself, depending on what it was made of.

16    If it's made out of copper, it could be wiped off; if it's

17    PCV, which is plastic, plastic attracts soot very much.  If I

18    have a bathroom fire in the home and the kitchen is on the

19    other side, I can go take the Tupperware out and show there's

20    soot on it, and there's no soot in the kitchen at all.  So

21    PCV pipes do attract soot.  So it would depend on the make of

22    the pipe, but some pipes can be cleaned.  And I don't believe

23    I put in for any piping, in my estimate, in these attic

24    areas.

25        Q.   That was really my question.  The piping and other

1     things that are underneath this insulation that you were

2     talking about, did you assume that that needed to be replaced

3     because the insulation above it needed to be replaced?

4         A.   No.

5         Q.   I'm going to show you -- did you look at

6     Mr. Schumann's estimate before you came in today?

7         A.   Yes.

8         Q.   Did you specifically look at this insulation

9     estimate?

10        A.   Not that I recall.

11        Q.   Let me show you -- this is Exhibit A-15, and if you

12     would like to look at this up there, I'll bring it up.

13             THE COURT:  Do you want to hit the clear, reset

14     button, please.

15             MR. MURPHEY:  Can I give him a copy of the estimate?

16             THE COURT:  Why don't you just bring it up.  It'll

17     go quicker.  If you want.  On the other hand, I can't see it

18     at the same time.

19             MR. MURPHEY:  I'll just give him the other copy.

20        Q.   Do you have Page 25?  This is where the attic --

21     this is Mr. Schumann's estimate now, and this is his estimate

22     for repairs to the attic.

23        A.   Okay.

24        Q.   And it appears to me that he is replacing, Item 1,

25     1,280 square feet of 6-inch R19 insulation, and 90 square

1    feet of 4-inch R13 insulation.  Do you see that?

2        A.   I do.  I'm just not sure this is the attic that

3    we're discussing.  There's two attics in the home.  I'm not

4    sure this is the one above the master bedroom.

5        Q.   Would you agree that, at least in this attic, it

6    appears that he's replacing insulation?

7        A.   Yes.

8        Q.   We have rewiring, correct?  All kinds of stuff.  Do

9    you see that?

10       A.   Yeah.

11       Q.   I don't know if it'll help you to look at the rest

12   of it, but if you flip the page, you can see the rest of his

13   scope.

14       A.   Actually, looking at the rest of it I can assure you

15   this is probably the other attic because he has under lining

16   here, which would be part of what was needed to repair the

17   roof that was cut by the fire department.  So this must be

18   referring to the other section of the roof.

19           THE COURT:  Hang on a second.  Is that the section

20   of the attic that would have been more directly over the

21   fire?

22           THE WITNESS:  Correct.

23       Q.   So your conclusion then is that is not the area that

24   was at issue?

25       A.   It doesn't appear to be.

1     Q.   So you and Mr. Schumann agreed there, correct?

2     A.   I agree with what he has.  I think there should be

3 more.

4     Q.   Did you describe this other area in dispute as the

5 insulation above the second-level ceilings?  Did I hear that

6 correctly?

7     A.   Yeah.

8     Q.   I'm going to look at the last item in Mr. Schumann's

9 estimate.  Under "General Items," it's the very last page,

10 No. 67.  "Insulation in attic above second-level ceilings."

11 He's got, "1,500 square feet, at $1,890."

12     A.   Correct.

13     Q.   Would it appear there's no dispute there?

14     A.   It appears he replaced it.

15     Q.   So when you told the Court that that was a dispute,

16 that was incorrect?

17     A.   Correct.

18     Q.   All right.  And I also wanted to clear up something

19 on one of the earlier questions that Mr. Murphey asked you,

20 it had to do with the living room.  Did you understand that

21 Mr. Schumann was not replacing the entire living room?

22     A.   No.  It's my understanding he was.

23     Q.   Okay.  Because I thought I understood -- did not

24 Mr. Murphey show you a picture of this bookcase?

25     A.   There was a picture of this bookcase over here.

1          Q.    Maybe I heard you incorrectly, but my recollection

2     of your testimony was that you thought Mr. Schumann was

3     cleaning the ceiling and painting that particular --

4          A.    This picture was shown to me in the beginning when

5     we were trying to show the severity of the fire.  When we

6     started going room by room and talking about the differences,

7     I agreed with him.

8          Q.    So you agree, then, that -- looking at this

9     photograph, which is P-80, that Mr. Schumann was gutting that

10     entire room, correct?

11          A.    Correct.

12          Q.    That was not a disagreement between the two of you?

13          A.    Correct.

14          Q.    Do you have any reason to believe -- do you have any

15     scientific knowledge or other types of technical information

16     which would indicate that a little bit of soot on insulation,

17     which slightly discolors it, in a closed space would later

18     escape?

19          A.    No.

20          Q.    So until you kicked a hole in the wall and exposed

21     what in your opinion was, you know, a light -- you know, some

22     amount of soot on insulation, that actually would not have

23     come out into the house, correct?

24          A.    Well, when you say "escape," can you define that for

25     me.  Do I think the soot will physically come through the

1   wall, no.  Do I believe it would smell, yes.

2       Q.   Are there not defogging agents that are used to deal

3   with that type of issue that can be sprayed up into spaces

4   like that?

5       A.   There would be no way that I know to get into that

6   space.  You would have -- every 16 inches you would have a

7   cavity.  So I don't -- that's why rooms usually are gutted to

8   treat those cavities because there is no way, that I'm aware

9   of, that you can treat every 16 inches in a room without

10  taking the Sheetrock off to do so.

11      Q.   Just one more point.  You obviously kicked a number

12  of holes in a number of walls of the Borden house, correct?

13      A.   Correct.

14      Q.   Can you give the Court a ballpark idea how much?

15      A.   Sure.  Six.

16      Q.   Just from a practical standpoint, if you kick a hole

17  in the wall and there is no soot in there, you're going to

18  have to replace the wall, right?

19      A.   No.  You can repair the wall, small patch.

20      Q.   Aren't these wallcoverings?

21      A.   Excuse me?

22      Q.   Aren't these rooms with wallpaper and all that

23  stuff?

24      A.   Mr. Schumann had already agreed to replace wallpaper

25  and paint.  So the only additional cost would be to patch up

1    the Sheetrock hole, which would be minimal.  That would be

2    the only additional cost with the hole I've created.

3        Q.   I got off the subject.  When you kicked holes in

4    interior walls, was there insulation in there?

5        A.   Some of the walls, correct.

6        Q.   I understand the exterior walls were insulated,

7    correct?

8        A.   Correct.

9        Q.   But the interior walls of the house didn't

10    necessarily all have insulation in them, did they?

11        A.   I would have to go back line by line, but unlike

12    most houses, this house had quite a few interior walls, if

13    not all, insulated.

14        Q.   You did find them all insulated?

15        A.   If not all -- I found quite a few, if not all,

16    insulated.  I'd have to go back and check each room that I

17    wrote the estimate on.  But unlike most homes, there was a

18    lot of interior walls with insulation.

19        Q.   Did you have any information at any point in this

20    claim which you supplied to Amica which would indicate that

21    doing things the way Mr. Schumann had presented and estimated

22    would have posed any sort of health risk to the Borden

23    family?

24        A.   No.

25        Q.   Did you give any consideration to the possibility of

1    saying to Amica when Mr. Schumann was presenting his idea in

2    the form of his estimate, which basically said let's clean,

3    seal, and paint, let's try it, and if it doesn't work, will

4    you pay to do it my way?

5        A.   I had suggested that they bring out a fire

6    restorator to see if it -- what his opinion would be on the

7    home.

8        Q.   But you didn't do that, did you?

9        A.   I had a strong opinion what had to be done in the

10   home, and I was confident with my decision on what had to be

11   done at the home.

12       Q.   I understand.  But we have two adjusters here, and

13   they both have strong opinions, Mr. Schumann on one side and

14   you on the other.

15       A.   That's why I felt that the third person would be

16   helpful.

17       Q.   But you didn't want to bring that person in, you

18   asked Amica to, correct?

19       A.   I felt that would be most appropriate.

20       Q.   But you could have brought someone in, too, correct,

21   if you wanted to convince Amica that you were correct?

22       A.   I could have, yes.

23       Q.   By the same token, at the point where you and

24   Mr. Schumann were at odds, and I mean really at odds, you're

25   at 690 and he's at 329, at least there was a letter in the

1    file of Amica from Visions saying that they could do the work

2    at that price.  You had no such letter saying that the work

3    couldn't be done at that price or any contractor's document

4    supporting your opinion, correct?

5        A.    I would question what work.  Because he was putting

6    a price on the scope or what had to be done to the house that

7    was improper.  So he's putting a price on work for 328,000

8    that was not to rid the house of smoke, it was to put plastic

9    countertops in, and we didn't have plastic countertops.

10   Maybe he could have done that work for 328, but that work was

11   not sufficient to fix this home.

12       Q.    Let's put aside, for the sake of my question, those

13   items like the countertops, assuming you were right and

14   Schumann was wrong on the countertops and the things of that

15   nature, the tile floor, that would maybe account for $20,000?

16       A.    Yes.

17       Q.    So if they had written you an estimate right after

18   that meeting, Schumann goes from 329 to 349, Parise is still

19   at 690, and you're really far apart; aren't you?

20       A.    Yes.

21       Q.    So the big money issue that you guys have to get

22   through is this issue of the smoke in the walls, correct?

23       A.    Correct.

24       Q.    Now, you've worked for an insurance company; have

25   you not?

1          A.   Yes.

2          Q.   You understand that in Amica's possession at this

3     point in time was a March 7th letter from Visions, a

4     purported restorations contractor in Erie, plus

5     Mr. Schumann's estimate, both of whom more or less said --

6     Schumann said the work could be done proper at 329.  Visions'

7     letter said there are going to be some things I can't see,

8     but that scope of work I can do at that price.  So they

9     really have two documents, a contractor's document and their

10    adjuster's document, correct?

11         A.   Correct.

12         Q.   And you are a public adjuster and you come in with a

13    $690,000 estimate and no contractor to back you up?

14         A.   Correct.

15         Q.   As a person who used to work at an insurance

16    company, would not you expect the insurance company to look

17    at a public adjuster, and then look at a contractor plus the

18    insurance company's adjuster and think that maybe there was a

19    little more weight on their side?

20         A.   Well, that's why I asked for an Amica representative

21    to come look at the fire -- the smoke damage that I was

22    seeing because I really felt strongly that I could show

23    anyone the hot top, I could show anyone the smoke

24    penetration, and I really was under the impression that once

25    I showed an Amica representative that, that they would bring

1    in a third -- a good fire restorator.  And I was comfortable

2    that if a good fire restorator looked at this job that they

3    would side with taking the walls down.  And I wanted them to

4    pick the fire restorator.  Because just as you explained, if

5    I'd picked them, they're going to say, great.  The PA picked

6    the fire restorator, he just got a buddy to write up what he

7    wants.  So I wanted -- the damage was so clear, I wanted

8    Amica to pick the fire restorator because I knew it could be

9    shown to anybody and they would gut this home.

10        Q.   Wouldn't you agree with me that instead of doing

11   what you proposed they did something slightly different, they

12   told you right on the spot they wanted to go to appraisal,

13   right?

14        A.   They had suggested appraisal.  They said maybe

15   appraisal's the way to go.

16        Q.   Then they followed up with a letter after that?

17        A.   Correct.

18        Q.   Formally telling the Bordens they wanted to go to

19   appraisal.

20        A.   Yes.

21        Q.   Now, an appraisal, under this policy -- did you read

22   the appraisal language?

23        A.   I know the appraisal language well.

24        Q.   The appraisal language in this policy actually says

25   that each party will appoint somebody who is impartial and

1    competent, then those people will choose an umpire, and an

2    umpire will select one of their numbers, correct?

3        A.    Any two that agree.

4        Q.    Any two that agree.  And, obviously, if the two

5    appraisers agree, you wouldn't need the umpire, but any two

6    that agree is going to set the price?

7        A.    Correct.

8        Q.    And that's what number somebody has to pay?

9            THE COURT:  Just out of curiosity, this may be a

10    stupid question, but one party picks their representative,

11    another party picks the other, and then, how is the alleged

12    neutral umpire selected?

13            THE WITNESS:  The two appraisers, disinterested

14    parties, agree on a person.  If they cannot agree within, I

15    believe, 20 days, then we ask the court to appoint one.

16            THE COURT:  Does it ever happen, or is it

17    contemplated that it could happen, if you -- you have

18    experience with these appraisal things?

19            THE WITNESS:  I do.

20            THE COURT:  Does it ever happen that the umpire

21    vehemently does not agree with either estimate, or is he

22    contractually bound to throw his lot with one or the other?

23            THE WITNESS:  I've never seen it where they did not

24    resolve with a number.  I've actually seen it where they all

25    three agreed, which was unusual, but I've never seen it where

1      it did not resolve it.

2              THE COURT:  Go ahead.

3          Q.   The appraisal route that Amica was suggesting,

4      immediately after that meeting -- or during that meeting,

5      whatever it was.  Actually would have accomplished pretty

6      much what you were asking for, because it would have required

7      Amica to bring in someone independent and impartial to look

8      at the whole situation, correct?

9          A.   Correct.

10         Q.   So, really, when you're saying bring in a fire

11     restoration contractor to look at it, what this offered

12     Amica, and the Bordens for that matter -- their solution

13     offered not only bringing in another person to look at it,

14     but a solution very promptly.  Because not only is this

15     person going to look at it and file a report, they are then

16     going to submit it to an umpire, and they're going to set an

17     amount of damage and the Bordens are going to get paid,

18     agreed?

19         A.   Agreed, but it's an expensive proposition for the

20     Bordens.

21         Q.   The Bordens would have to pay their appraiser,

22     correct?

23         A.   Yes.  And they have to split the cost of the umpire.

24         Q.   Split the cost of the umpire.

25         A.   And with a claim of this size, if the contents and

1   building went to appraisal, it would be my guesstimate that

2   it would be a 15 to $16,000 cost.

3          THE COURT:  For who?

4          THE WITNESS:  For the Bordens.  I would say the

5   appraiser would be roughly 8 to 10,000, and you'd be

6   splitting the fees of the umpire.

7      Q.   Wouldn't they charge hourly?

8      A.   They would charge hourly.  But what they usually do

9   is, they'll do a side-by-side estimate, I've been involved in

10  it, you put Schumann's up and mine up and you go line by line

11  by line, and our estimates are thousands of lines long.

12     Q.   Do you think that would be cheaper or more expensive

13  than paying you $50,000-some and going and getting a lawyer

14  that charges --

15         MR. MURPHEY:  I'm going to object to the argument.

16         THE COURT:  I'm going to sustain that.  Let's move

17  this out now.

18         MR. GEER:  I'm just about done, Your Honor.

19     Q.   And then you would agree with me, Mr. Parise, I

20  think Mr. Murphey already covered this, the appraisal was

21  just put on hold, correct?

22     A.   Yeah.

23     Q.   You were named an appraiser, but you never actually

24  did any appraising, correct?

25     A.   No.

1        Q.   At that point counsel were involved, and at that
2   point it was agreed that Amica would hire a fire restoration
3   contractor, and that was Dan Jones?
4        A.   Correct.
5        Q.   And then you told us the rest of the story, correct?
6        A.   Correct.
7        Q.   So despite all these differences that we've spent
8   all this time discussing today, ultimately what ended up
9   happening was, they all got resolved, correct?
10       A.   It appears so.
11            MR. GEER:  That's all I have.  Thank you.
12            THE COURT:  Do you have anything else?
13            MR. MURPHEY:  Yes.  Your Honor, just very quickly on
14   two issues.
15                      REDIRECT EXAMINATION
16   BY MR. MURPHEY:
17
18       Q.   First, Mr. Geer asked you questions and we had some
19   photographs regarding replacing insulation in the attic, and
20   ultimately it appeared that Mr. Schumann had recommended to
21   replace the insulation in the attic above the second floor.
22   Did he recommend replacing insulation in the walls that led
23   up to that attic?
24       A.   No.
25       Q.   Did that make any sense to you?

450

1      A.    Well, I would have to look at why -- how would we

2    end up with soot in an attic from fire that was in a

3    basement.  It obviously had to travel through the first and

4    second floor to get there.  So I would question -- I think

5    proved that it came up through the wall through the pipe

6    chasings.

7      Q.    And very quickly, following up on the Judge's

8    question about the appraisal, is it typical -- strike that.

9    Is it your understanding of the appraisal clause, does that

10   require the umpire to pick one or the other of the estimates

11   and go with it, or is there typically either a negotiation or

12   fact-finding by the umpire where he comes in between?

13     A.    It's basically any two numbers that agree.

14   Sometimes they'll even take an insurance company's estimate

15   and my estimate, throw them aside, start from scratch, and

16   write their own.  So it's not that they have to pick one of

17   the two numbers, they look at the loss totally.  And a lot of

18   times they will just set our numbers aside, or do a

19   comparison of estimates, but it's any two of those people who

20   agree that are binding.

21     Q.    Do you often see the decision coming in between the

22   two?

23     A.    Yes.

24     Q.    How many years have you been doing this?

25     A.    Since 1989.

1          Q.    How many appraisals have you been involved in?

2          A.    Five.

3                MR. MURPHEY:  That's all I have.  Thank you.

4                THE COURT:  Anything else, Mr. Geer?

5                MR. GEER:  Nothing.

6                THE COURT:  Thank you, sir.  You're excused.  You're

7     free to go.  Is that it for the day?

8                MR. MURPHEY:  It is, Judge.

9                THE COURT:  You just have Mr. Haller on Monday?

10               MR. MURPHEY:  Yes.  Unless we decide to call

11    Mr. Seifert, and we'll make that decision Monday.

12               THE COURT:  Who do you have again, Mr. Geer?

13               MR. GEER:  Mr. Bennett, who's going to be brief, and

14    Dan Jones.

15               THE COURT:  I'm sorry?

16               MR. GEER:  Dan Jones, the contractor.

17               THE COURT:  And that's it for you then.  I suspect,

18    unless something unusual happens, we'll finish Monday.  All

19    right.

20

21               (Adjourned at 3:33 p.m.)

22

23

24

25

1                    C E R T I F I C A T I O N

2

3          I, Sondra A. Black, a Court Reporter and Notary

4     Public in and for the Commonwealth of Pennsylvania, do

5     hereby certify that the foregoing is a true and accurate

6     transcript of my stenographic notes in the

7     above-captioned matter.

8

9

10

11                              Sondra A. Black

12

13

14

15                         Dated: January 12, 2006

16

17

18

19

20

21

22

23

24

25