# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JONATHAN A. BORDEN and
AMY P. BORDEN,
     Plaintiffs

    v.             CIVIL ACTION NO. 04-175 ERIE

AMICA MUTUAL INSURANCE
COMPANY,
     Defendant


     NON-JURY TRIAL - DAY NO. 3



    Proceedings held before the HONORABLE

    SEAN J. McLAUGHLIN, U.S. District Judge,

    in Courtroom C, U.S. Courthouse, Erie,

    Pennsylvania, on Monday, December 12, 2005.




APPEARANCES:
    CRAIG MURPHEY, Esquire, appearing on behalf of
    the Plaintiffs.

    PAUL K. GEER, Esquire, appearing on behalf of

the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

1         I N D E X

2    WITNESSES:          DIRECT  CROSS  REDIRECT  RECROSS

3  FOR THE PLAINTIFFS:

4  David J. Haller          3     17      --        --

5
   FOR THE DEFENSE:
6
   Daniel J. Jones          32    47      57        61
7
   David J. Bennett         64    80      85
8

9              - - -

10    EXHIBITS:              IDENTIFIED

11  FOR THE PLAINTIFFS:
    Plaintiffs' Exhibit 2-4          10
12  Plaintiffs' Exhibit 14           24
    Plaintiffs' Exhibit 3-13         82
13  Plaintiffs' Exhibit 3-19          84

14

15  FOR THE DEFENSE:
     Defendant's Exhibit C                42
16   Defendant's Exhibit A15              68
     Defendant's Exhibit A8               68
17   Defendant's Exhibit A4               68
     Defendant's Exhibit D                69
18   Defendant's Exhibit A1               70
     Defendant's Exhibit A10              70
19   Defendant's Exhibit A3               70
     Defendant's Exhibit E                71
20   Defendant's Exhibit F                72
     Defendant's Exhibit G                76
21   Defendant's Exhibit A13              77
     Defendant's Exhibit H                79
22   Defendant's Exhibit I                88

23

24

25                    - - -

3

1              P R O C E E D I N G S

2

3          (Whereupon, the proceedings began at 9:00 a.m., on

4   Monday, December 12, 2005, in Courtroom C.)

5

6          THE COURT:  All right, where were we witness wise?

7          MR. MURPHEY:  We're going to call David Haller.

8        THE COURT:  Raise your right hand.

9        DAVID J. HALLER, PLAINTIFFS' WITNESS, SWORN

10               DIRECT EXAMINATION

11  BY MR. MURPHEY:

12  Q.    Good morning, Mr. Haller.

13  A.    Good morning.

14  Q.    Thank you for coming today.  Can you please tell us your

15  occupation?

16  A.    I'm a general contractor engaged in the construction and

17  remodeling of single family, light commercial, residential and

18  agricultural buildings.

19  Q.    Where is your business located?

20  A.    My office is located at 4845 West Lake Road.

21  Q.    In Erie?

22  A.    Erie, Pennsylvania.  My mailing address is 4241 Neptune

23  Drive, which is my residence.

24  Q.    How many years have you been a builder/remodeler?

25  A.    I've been in my own business 25 years, which is September

4

1  19, 1980.  And before that I was engaged in the construction

2   business, heavy and highway, I was an estimator for about 10

3   years.  Before that I worked as a laborer in a sewer gang

4   building manholes.

5   Q.    You said that you were an estimator?

6   A.    Yes.

7   Q.    For who?

8   A.    Milano Construction Company.  That's where I learned the

9   estimating business.

10  Q.    You told us a little bit about the type of work that you

11  do, do you commonly become involved in what I would call

12  high-end residential construction here in the Erie area?

13  A.    Yes.

14  Q.    What does high-end mean to you?

15  A.    To me high-end construction is -- if you want to talk

16  about size, you could talk about anything over 4,000 to 5,000

17  square feet, that's new construction.  If you're talking about

18  remodeling, anything about $250,000 in the remodeling end.  If

19  you're talking new houses, you're talking anywhere between --

20  five and a million dollars.  I hope that defines that for you.

21  Q.    This trial is about the Borden house on Wolf Road in

22  Erie; are you familiar with that house?

23  A.    I'm very familiar with the house.

24  Q.    Can you describe for the record a little bit about the

25  Wolf Road area?


5


1  A.    Well, it's a nice neighborhood.  It's probably one of

2  Erie's premiere neighborhoods.  I've remodeled and built a

3  number of projects in the area.

4  Q.    How many projects do you think you've been involved in

5  over the years in the Wolf Road area?

6  A.    A lot.  I'll define it, I can name them or I can tell you

7  10.

8  Q.    Ten, maybe more than 10?

9  A.    Probably more than 10.

10  Q.    Is that both building and remodeling?

11  A.    Correct.

12  Q.    You defined for yourself high-end construction or

13  high-end homes, would the Borden's house fit that definition?

14  A.    Yes.

15  Q.    You said that you --

16  A.    Can I clarify, also?

17  Q.    Sure.

18  A.   The finishes, you know the materials, that are used in

19  the high-end projects are more expensive and more

20  discriminating than one would find say in a, to use an extreme,

21  a modular home.

22  Q.   You said that you have worked on a number of homes in the

23  Wolf Road area, did that include houses that are very close in

24  proximity to the Borden's house?

25  A.   Yeah.  Right, the ones I can tell you, we remodeled the

6

1  Roger Taft home.  We remodeled the Michael Victor home, the

2  Frank Victor home.  Those are the ones that are closest.  We

3  built several new homes in the area.  I just completed a home

4  for David Hallman in the $800,000 range.

5  Q.   In the Wolf Road area?

6  A.   In the Wolf Road area.  I could name you five or six

7  others.

8  Q.   The remodeling projects, are they large remodeling

9  projects?

10  A.   Yes.  I think the Roger Taft project would be the

11  largest, it was an extensive, 50 percent increase in the size

file:///A|/BORDEN3.TXT

12   of his home.  Matching the slate roof, all kinds of very nice

13   things we did there.

14   Q.   Were you ever involved with the Borden house in

15   particular before this fire?

16   A.   I put a kitchen in the house when it was not owned by the

17   Bordens.  I believe -- I never can remember when I did it.  But

18   I'll tell you it was prior to their ownership.

19   Q.   You described your years of experience as a builder and

20   remodeler in the Erie area, are you involved in any building

21   organizations or other professional organizations?

22   A.   Yeah, I'm in the Builder's Association of Northwestern

23   Pennsylvania.  I was president of the Builder's Association in

24   1992.  I'm one of two people in Erie who owns the certified

25   graduate remodelers degree.

7

1   Q.   What does that mean, how do you get that certification?

2   A.   I have gone and attended classes, it's like a continuing

3   education.

4   Q.   Do you have experience in estimating the extensive

5   remodeling that might be necessary in a house?

6   A.   I've been in the business for 25 years.  If you don't

7   know how to estimate, you're dead.  I'm a professional

8   estimator, I learned how to estimate, that's how I started the

9   business.

10  Q.   Describe how you started, what that was, what were you

11  estimating?

12  A.   When I had worked for Milano Construction for seven

13  years, I was the estimator.  I estimated anything from

14  earthwork to sewer lines to water lines, to buildings that were

15  associated with heavy and highway work.  There weren't a lot of

16  buildings.  Of course my estimating experience then expanded

17  when I started building for myself.  And, of course, the same

18  principles apply in the estimating business.  Whether you're

19  building the World Trade Center or whether you're putting in a

20  sewer line, the same estimating principles apply.

21  Q.   You've explained your involvement in the Builder's

22  Association and that you were formerly the president of that.

23  Mr. Haller, are you familiar with the contractors in the Erie

24  area who regularly get involved in either building or

25  remodeling high-end homes?

1  A.   Yes.

2  Q.   Are you familiar with Brian Seifert and Visions, Inc.?

3  A.   I'm only familiar as they pertain to this case.  I mean I

4  see, as I stated before, I see his trucks.  I believe that he

5  is a fire chaser, excuse me, is a fire restoration contractor.

6        THE COURT:  What does that mean a fire chaser?

7        THE WITNESS:  A fire chaser is a fire restoration

8  contractor.  That is somebody that specializes or regularly

9  works in fire restoration.

10  BY MR. MURPHEY:

11  Q.   So is Mr. Seifert's business one that regularly gets

12  involved in rebuilding, building or remodeling high-end homes

13  in the Erie area?

14  A.   I never competed against him, I do not think he is.

15  Q.   Now, how did you become involved in this particular case?

16  A.   I was called by the Bordens and quite frankly I think it

17  was Dr. Borden.

18  Q.   And what did he ask you to do?

19  A.   He asked me to give him a price on his house.  That he

20  had a fire in February, that it was quite extensive, would you

21   come down and take a look -- you know, I'm discussing my

22   options with the insurance company.

23   Q.   Were you asked to provide an estimate for putting the

24   house back in its pre-fire condition?

25   A.   Yes.

9

1   Q.   And what did you do to put together the estimate?

2   A.   I called -- well, I walked through the house myself,

3   obviously, did some measurements.  We had window guys in there,

4   plumber, electrician, painter -- what I consider to be my key

5   subcontractors who would have the majority of the work, who

6   would perform the majority of the work.

7   Q.   Did you have a framing contractor as well?

8   A.   Yes.

9   Q.   Now, when you inspected the house, what damage did you

10   observe, just generally?

11   A.   The place was trashed.  It was a very, very bad fire,

12   very hot fire.  Very extensive damage.  The heat in the house

13   was extensive, in my opinion.  I'm talking about windows

14   throughout the entire house that had seal failures.  I'm

15  talking about plumbing pipes in the peripheral areas that were

16  shot, melted, damaged, beyond repair.  Plumbing fixtures,

17  extensive smoke damage.  I later, after investigation, found

18  out that the walls really had to be opened up really to see the

19  extent of the heat.  That was the problem, the fire was a very

20  hot fire.

21  Q.    And what evidence did you observe in the house that

22  caused you to reach the conclusion that it was a hot fire?

23  A.    Well, when the windows are "fried" on the second floor,

24  the pipes showed discoloration and deformation on the second

25  floor, I mean -- when you see heat, a book on a table or a


10


1  carpet on the floor and you lift the carpet up and you see what

2  the heat did and what the protective floor, it doesn't take a

3  lot of effort to really realize that it was a hot fire.

4  Q.    Did you notice this evidence of fire residue in areas of

5  the house some distance from where the fire started?

6  A.    Yes.

7  Q.    What was your understanding of where the fire started?

8  A.    Well, it was pretty obvious that the fire started

9   underneath the kitchen.  It totally engulfed the kitchen, the

10  floor collapsed, the beams bent like a pretzel.  And then the

11  heat and the smoke and everything, of course, extended further.

12  But the entire foundation of the building, the basement, the

13  crawl space, all were pretty much affected.  There was a lot of

14  heat down there.

15  Q.    Did you notice a smoke odor throughout the house?

16  A.    Oh, yeah.

17  Q.    Even in areas some distance away from the home?

18  A.    I challenge you, I bet if you go out to the hole right

19  where it was bulldozed over, I bet you could smell it.

20  Q.    I'm going to show you a copy of an exhibit which was

21  already marked in the case as Exhibit 2-4 -- this is part of

22  Exhibit 2, your Honor, Exhibit 2-4.  Mr. Haller, do you

23  recognize that as the estimate, which I think you call it

24  proposal, that you previously did in this case?

25  A.    Yes.


11


1   Q.    Mr. Haller, what was your estimated cost of putting this

2   house back in its pre-fire condition?

3   A.   My estimate was $700,000, it says that on page 2.

4   Q.   Now, is that a firm price?

5   A.   I called it a very, very close ballpark.

6   Q.   What does that mean?

7   A.   That means plus or minus five, ten percent.

8   Q.   And what would cause the plus or minus?

9   A.   I did not extensively -- first of all, this was a

10   preliminary estimate, it wasn't a sign the contract estimate.

11   And after this estimate, I would have expected to enter into an

12   agreement with the owners, either we would have proceeded on a

13   cost plus basis or we could proceed on a firm price basis.  If

14   we would have proceeded on a firm price basis, I would have

15   solicited a couple more firm prices from key people.  I would

16   have gone through the process of picking out materials,

17   surfaces, finishes, and got down to a very detailed analysis of

18   what we were going to do and then make a firm price.

19   Q.   But do you believe that this estimate is within five to

20   ten percent of what the ultimate cost would have been?

21   A.   I believe so, yes.

22   Q.   To put the house in its pre-fire condition?

23   A.   I believe so, yes.

24   Q.   During the course of this, did you meet a man named

25   Anthony Parise, who was serving as an insurance consultant for

12

1   the Bordens?

2   A.   Yes, sir.

3   Q.   Did you find him to be knowledgeable and --

4   A.   Very excellent man, in terms of his abilities, his

5   knowledge, I learned a great deal from Mr. Parise.

6   Q.   Was your estimate influenced in any way by Mr. Parise's

7   own estimate of the damage in this case?

8   A.   No, I never knew what his estimate was.  I could safely

9   say that, no.  I mean -- he and I worked together to determine

10   that the fire, the extent of the fire in the walls, for

11   instance, upstairs was extensive.

12   Q.   Why do you say that?

13   A.   If you want to call that influenced, he and I did some

14   destructive testing, cut holes in the wall, pulled out the

15   insulation, things like that, different testing.

16   Q.   What did you find?

17   A.   I found that the walls were smoky, smelly and hot, real

18   hot.

19  Q.    You mean behind the wall?

20  A.    Behind the drywall, behind the surface finishes of the

21  walls, yes, sir.

22  Q.    Now, the original estimate in this case for the insurance

23  company was done by a man named Mr. Schumann.  Did you ever see

24  his estimate?

25  A.    I never saw his estimate, no.  I did hear, you know how

13

1  you hear, I heard his estimate was, what 330 or something, it

2  heard that.

3  Q.    Right.  Do you find the $330,000 estimate to be

4  reasonable?

5  A.    I laughed at it.

6  Q.    Why?

7  A.    Well, I'm double that price.  I walked in the house, I

8  didn't just walk in there and throw $700,000 at it, I thought

9  about this price.  I had people in.  You know, I don't throw

10  numbers out for laughs, I take my business very seriously.

11  Q.    You said before that you described the business of fire

12  restoration, you used the word fire chaser and the judge asked

13   you about that.  You are familiar that there are fire

14   restoration contractors?

15   A.    Yes.

16   Q.    Do you know who in Erie commonly work as fire restoration

17   contractors, are you familiar with that industry?

18   A.    Yeah, somewhat.  I know that Peter Hardner and Sons works

19   in the fire restoration business.  My painter, who gave his

20   price to me, has worked extensively for Peter Hardner in the

21   past.  There's Al Otteni, I'm not sure how active he is

22   anymore.  There is --

23   Q.    I'm sorry, go ahead.

24   A.    There's maybe one more, but I couldn't name them -- I

25   have to look in the phone book.


                              14


1   Q.    Have you ever heard of Mr. Seifert and Visions working in

2   that field before this case?

3   A.    No, not before this case.

4   Q.    Have you yourself ever performed repairs to a fire

5   damaged home?

6   A.    Yes.

7   Q.    About how many times in your career?

8   A.    Not many compared to the number of homes that I've done.

9   Not many meaning I've probably done about five fire projects.

10  I am not known as a fire restoration contractor.

11  Q.    That's not something that you advertise yourself as?

12  A.    I do not.

13  Q.    Why not?

14  A.    I don't want to be a doctor, I don't want to get a call

15  on Christmas eve.

16  Q.    Do you believe that the fact that you don't do a lot of

17  fire restoration work, limited your ability to provide a

18  realistic estimate in this case?

19  A.    I don't believe so.

20  Q.    Now --

21  A.    I mean, you have to understand -- construction is

22  construction.  I mean, there's no difference really in

23  demolishing a house and rebuilding it, say a second floor

24  addition, there's no difference in that.  You're either taking

25  out dirty, smoky remains or you're taking out clean old

15

1  remains, the same process.  The fact that you're handling

2  smelly, dirty fire-related stuff really doesn't -- I don't

3  think matters.

4  Q.   Have you ever gotten involved in a case where a fire

5  restoration contractor might use some technology to clean and

6  seal and repaint a damaged item rather than to replace it?

7  A.   Yes.

8  Q.   How many times have you been involved in those cases?

9  A.   About five times.  And my painter, as I told you, I rely

10  on my subs.  My painter gave me an extensive look-see at this

11  project.  And we talked about the areas of the house that we

12  could save by using the "technology".  The technology, unless

13  somebody proves me different, you know, the technology is

14  basically coatings and cleaning.  I mean unless somebody has

15  that technology to fix a burned jacuzzi tub, I mean yeah.

16  Q.   Did you --

17  A.   There's no technology to fix behind the walls.  There's

18  no laser beam that you stick next to the wall that pulls the

19  smoke out.

20  Q.   Did you incorporate that information, that is what could

21  be cleaned and sealed and deodorized, in your estimate?

22  A.    Yeah.  I did not detail it, but we talked about that.

23  Q.    With the painting contractor?

24  A.    Uh-huh.  I just refreshed my memory by calling my

25  painting contractor in preparation for this trial.  It's


16


1  exactly as I remember it.  I'm pretty clear on it.

2  Q.    What did he say?

3        MR. GEER:  Objection, hearsay.

4        THE COURT:  Sustained.

5  BY MR. MURPHEY:

6  Q.    In developing your estimate, though, you talked to the

7  painting contractor, is that correct?

8  A.    Repeat that, please.

9  Q.    In developing your estimate in the first instance, you

10  talked to your painting contractor about what could be done?

11  A.    Definitely.

12  Q.    All right.  Now, there came a time that you met Mr.

13  Jones, actually he's in the courtroom, I don't know if you

14  remember him or not, he was working as a consultant for the

15  insurance carrier in providing them an estimate, do you

16  remember that?

17  A.   Yes.

18  Q.   Did you take your estimate to that meeting and give it to

19  Mr. Jones or talk to him about what your estimate was?

20  A.   I don't think I did, I would never do that.

21  Q.   Why wouldn't you do that?

22  A.   Well, I considered him a competitor at the time, possibly

23  if he knew my estimate, maybe he might have had a lower

24  estimate and got the work.  I didn't think that it was

25  appropriate, it usually is not.  But I did meet him, I think we

17

1   showed him through the house, I tried to be cordial.  He

2   appeared to be extremely qualified.  And I believe he is

3   qualified and he went to work and did a job.  We were there

4   simply to help him or to let him in the door.

5   Q.   This was an issue raised before, did either Attorney

6   Jones, who you knew was involved in the case for the Bordens,

7   Terry Jones, or the Bordens, did they ever ask you not to give

8   your estimate to anybody else?

9   A.   I can't recall.  I don't remember that.  I don't remember

10   either way.

11   Q.   Now, you ultimately demolished the house, is that

12   correct?

13   A.   Yes, sir.

14   Q.   Did you find any structural problems with the foundation

15   or anything after you demolished the house?

16   A.   I can't definitively tell you that I did.  But I can tell

17   you that that fire was hot.  That block, the foundation was

18   questionable.  I cannot definitively show you a test or

19   anything like that, no.

20         MR. MURPHEY:  All right, Mr. Haller, thank you very

21   much, I don't have anything else.

22         THE COURT:  Mr. Geer.

23              CROSS-EXAMINATION

24   BY MR. GEER:

25   Q.   Good morning, Mr. Haller.


18


1   A.   Good morning.

2   Q.   Mr. Haller, one detail I think you said in your testimony

3   this morning that you had handled five -- been involved in five

4    cases where fire restoration was done.  I believe I asked you

5    at your deposition, you said three; do you recall that?

6    A.   I may have said three.  If you want to say three, it's

7    been 25 years.  The fact of the matter remains, in the scheme

8    of things, I don't do a lot of fire restoration work.

9    Q.    You also don't do smoke remediation work, do you?

10   A.    No.

11   Q.    The easiest way, would you agree with me, that the

12   easiest way to repair a fire damaged property is to tear a

13   building out, back to the walls, the outside walls, and start

14   all over again, correct?

15   A.    The easiest way?

16   Q.    The easiest way?

17   A.    I don't think --

18        THE COURT:  Hang on, don't talk over him, wait until

19   he finishes, so this guy can get you down.

20        THE WITNESS:  Okay.

21        THE COURT:  Start that again, will you, Mr. Geer.

22   BY MR. GEER:

23   Q.    Would you agree with me that normally the easiest way to

24   repair a fire damaged structure would be to tear it down, tear

25   down the walls and rebuild the interior; I'm assuming the

19

1   outside of the house isn't severely damaged?

2   A.   Well, the easiest way or -- I think it's a question of

3   integrity.  In other words, my take on the situation is given

4   the heat of this particular fire, what did the heat do to the

5   wires behind the walls.  What did the heat do to the integrity

6   of the materials behind the walls.  The only way you'd ever

7   really know that, in my opinion, is to open up the walls and

8   find that out.

9   Q.   Mr. Haller --

10   A.   When you say the easiest, do you mean the cheapest?

11   Q.   Just in terms of getting it done, isn't it easier to tear

12   it down, if you can tear something down in an hour or so, to

13   clean it, seal it, paint it, spend a lot of time, it takes

14   longer than that, doesn't it?

15   A.   I would characterize it as -- the most prudent method,

16   yes.

17   Q.   And you indicated in your direct testimony that you are

18   not familiar with any sort of technology which would be able to

19   clean up the inside of a wall, correct?

20  A.   Correct, other than coating.  I'm familiar with the

21  coatings in the cleaning processes that one would do.

22  Q.   Can you provide the court with the names of any of the

23  coating processes that are used?

24  A.   No, but my subcontractor could.

25  Q.   And they've been successful, in your experience, on three

                                    20

1  to five occasions that they've been used?

2  A.   Yes.

3  Q.   And when you said you've been involved in fire

4  restoration either three times or five times in your many years

5  of experience, was part of the fire restoration in those cases

6  smoke remediation technology or was there some other aspect of

7  fire restoration?

8  A.   It was -- no, I would characterize my knowledge of smoke

9  remediation as being not extensive.  I know how it works, but

10  no, I am not an expert in that field.  Our estimate was based

11  upon tearing walls down and replacing them.  So I think if

12  that's where you want to go, I think that's true.

13  Q.   The document that Mr. Murphey showed to you, which was

14  your estimate, was not a line item estimate, correct?

15  A.   Please repeat that again.

16  Q.   It was not a line item estimate, you didn't go room by

17  room and say how much plywood and how much --

18  A.   No, that would have come on a second go round, yes.

19  Q.   So, in this particular case, what you did was walk

20  through, take some measurements and gave the Bordens a ballpark

21  number of $700,000, correct?

22  A.   I think it's a little more than that.

23  Q.   But you didn't sit down and estimate out room by room,

24  material by material, hour by hour, what type of work it was

25  going to take?


21


1  A.   Could I clarify that?

2  Q.   Yes, you can.

3  A.   Fire restoration contractors and fire insurance companies

4  require that you do go room by room.  They require that you

5  take a room and say you're going to do A, B, C, D and E, and

6  put a price to that.  Then they tell you that on top of your --

7  they want to know your cost.  They usually pay you a profit,

8   usually somewhere in the 20 percent range, 10 percent, meaning

9   10 percent overhead, 10 percent profit.  All right.  If

10  required, I was prepared to approach that job in that manner,

11  and I was prepared to give that sort of estimate to an

12  insurance company because I know that's what they require.  My

13  figure, first of all, was based upon a general line item

14  estimate based on framing the entire house.  Based on window

15  replacement, the entire house.  Based on drywall, based on

16  painting.  In other words, I was breaking down my estimate in

17  my way, not the insurance company's way.  I did not just walk

18  into the house and ballpark it, I think that is a wrong

19  characterization.  I estimated it very, very closely and did

20  not get into the details necessary to provide a firm estimate.

21  Q.    I want to talk a little bit more about your estimate and

22  what you did.  You gave it to the Bordens?

23  A.    I gave the proposal to the Bordens.

24  Q.    I note that you're calling it a proposal rather than an

25  estimate, in fairness, that's exactly what it says, it's a


22


1   proposal, is it not?

2    A.    I believe it is a proposal to do work.  The estimate is

3    my property and my property alone.  It's what I figure what my

4    business -- it's really a culmination of my business knowledge.

5    Q.    So you did not -- did you provide an estimate to the

6    Bordens?

7    A.    No, I provided a proposal.

8    Q.    So you provided, you made clear here two things --

9          THE COURT:  I have this, move on.

10   BY MR. GEER:

11   Q.    You have not provided an estimate to anyone, is that

12   correct?

13   A.    I provided a proposal to the Bordens, that's all I can

14   tell you.  My estimate is part of my internal paperwork.

15   Q.    That's your work product?

16   A.    That's my work product, right.

17   Q.    I'm just trying to make this one point.  You never

18   provided an estimate to Amica then, correct?

19   A.    No.  Not directly, I gave it to the Bordens.

20   Q.    Your estimate or your proposal?

21   A.    My proposal.

22   Q.    I think the court has this, but your estimate is --

23          THE COURT:  Mr. Haller, you never provided either a

24  proposal or an estimate directly to Amica, is that correct?

25          THE WITNESS:  I do not recall doing that.


23


1          THE COURT:  All right, go ahead.

2  BY MR. GEER:

3  Q.    To the best of your knowledge, did either the Bordens or

4  Mr. Parise or any of their other representatives, ever provide

5  a copy of your proposal to Amica prior to the day I got it from

6  you in your deposition, which would have been in December a

7  year ago?

8  A.    I don't know, I honestly can't remember that.  They may

9  have.

10  Q.    One more question.  Again, I think I asked you in your

11  deposition when you applied or you told me when you applied for

12  demolition permits, do you recall when that was?

13  A.    I can tell you that the year of the fire was what year,

14  can I ask you that?

15  Q.    2003?

16  A.    We wanted to make -- there would have been a deadline and

17  it might have been a perceived deadline by -- the demolition

18  guy, it was in December of 2003.

19  Q.    In your deposition you said you applied for the

20  demolition permit on November 6, 2003?

21  A.    Okay, that's fair.  We did the work in December.

22  Q.    You did the work in December?

23  A.    Yeah, that's right.  You're right.

24  Q.    In other words, they would have decided to demolish the

25  building by November in order for you to apply for the permit


                                24


1  on November 6th, correct?

2  A.    Correct.

3          MR. GEER:  That's all I have, thank you.

4          THE COURT:  Anything further?

5          MR. MURPHEY:  I don't, your Honor.

6          THE COURT:  Thank you, Mr. Haller.

7          MR. MURPHEY:  Your Honor, the only other witness I

8  have would be by way of deposition.

9          THE COURT:  Who is it?

10          MR. MURPHEY:  Lisa St. Onge.  She was the claim

11  examiner on the case.  I have marked as Plaintiffs' Exhibit 14

12  the portions of her transcript that I'd like to put into

13  evidence.

14        THE COURT:  All right.

15        MR. MURPHEY:  I will not burden the court with

16  reading it.

17        THE COURT:  All right.

18        MR. MURPHEY:  If that's acceptable?

19        THE COURT:  That's fine.

20        MR. MURPHEY:  And, your Honor, just by way of

21  housekeeping, I want to make sure the court has copies of all

22  of the exhibits that we have referenced, I would like to move

23  them into evidence.

24        THE COURT:  Let's do that now.

25        MR. MURPHEY:  Your Honor, Exhibit No. 1 was a photo


                                25


1  binder.

2        Exhibit No. 2 are packets of the estimates in the

3  case.

4        Exhibit No. 3 was marked claim file exhibits.

5          Exhibit No. 4 were the Amica first party property

6   handling guidelines.

7          Exhibit No. 5 was the insurance policy.

8          Exhibit No. 6 was the diagram of the house.  I have

9   a supplement to that exhibit because, your Honor, when we

10  cross-examined the one witness, we wrote on the diagram the

11  names of the rooms that were described on the estimates.

12          THE COURT:  All right.

13          MR. MURPHEY:  I will offer that up.

14          THE COURT:  How was that identified?

15          MR. MURPHEY:  It's also Exhibit 6.  Do you want me

16  to make this Exhibit 6-A?

17          THE COURT:  Make it 6-A.

18          MR. MURPHEY:  We did not move Exhibit 7 into

19  evidence.

20          Exhibit 8 was Mr. Bennett's memorandum of April 30,

21  2003.

22          Exhibit 9 is Mr. Seifert's letter of March 7, 2003.

23          Exhibit 10 was the packet of photographs from Mr.

24  Parise or for Mr. Parise's testimony.

25          Exhibit 11 is the undated Anthony Parise letter

1  regarding his response to the Jones' estimates.

2         Exhibit No. 12 is a photograph from the studio room

3  in the house, also called the billiards/study room.

4         Exhibit No. 13 was a photograph of a room in the

5  house, which on Exhibit 6 is called the sewing/den room.

6         And Exhibit 14 are the excerpts from Ms. St. Onge's

7  deposition.

8         THE COURT:  Does the deposition transcript of Ms.

9  St. Onge only contain those pages that you went me to read?

10        MR. MURPHEY:  Yes, your Honor.  Is that acceptable?

11        THE COURT:  Yes.  Is there any objection to that,

12  Mr. Geer, the way that's coming in?

13        MR. GEER:  No, your Honor.

14        THE COURT:  All right.  Those are all admitted.

15        MR. MURPHEY:  Your Honor, I believe that the only

16  thing that I actually physically haven't handed up to you are

17  Exhibits 6A, Exhibit 13 and Exhibit 12.

18        THE COURT:  All right.  Is that it?

19        MR. MURPHEY:  Yes, your Honor.

20        THE COURT:  All right, we're going to take a five

21   minute recess.

22        (Recess from 9:35 a.m.; until 9:45 a.m.)

23        THE COURT:  Mr. Murphey.

24        MR. MURPHEY:  Plaintiff rests, your Honor.

25        THE COURT:  All right.


27


1        MR. GEER:  Your Honor, at this time I would make a

2   motion for compulsory nonsuit or judgment as a matter of law.

3   The basis for it, essentially, is what the plaintiffs have

4   done -- plaintiffs have attempted to create a bad faith case

5   out of a number of facts which are not really unusual in any

6   insurance matter.  Mistakes made in the preliminary estimate,

7   which is done a couple weeks after the loss.  Following

8   mistakes made in the preliminary estimate, a meeting was held.

9   At that meeting when Amica did not agree to everything that the

10   plaintiffs wanted them to agree to, it was apparent the two

11   estimates were far apart -- the plaintiffs find, they believe

12   it was wrong for Amica to have requested an appraisal.  An

13   appraisal is a contractually mandated provision, which the

14   Bordens agreed to when they obtained their insurance policy.

15        In the interim of all this occurring, Amica had paid

16   everything that they owed as they believed they owed it.  They

17   sent checks through March 11th, they sent a check for $329,000.

18   And, I'm sorry, $295,000 on a $329,000 estimate.  They paid the

19   actual cash value.  Plaintiffs do not submit that that was not

20   an appropriate thing to do at that time, but they rejected it.

21   Another check was sent a few days later for contents.  Again,

22   it was rejected.  As of the date of this April 15th meeting,

23   there was no -- nearly $340,000 had been put in the plaintiffs'

24   hand, they rejected it.  They had done this despite receiving

25   letters from Amica --


28


1        THE COURT:  Too fast, Mr. Geer, you've got to slow

2   down a little bit for my court reporter.

3        MR. GEER:  They rejected the checks despite

4   receiving letters from Amica saying that these were undisputed

5   payments, they were not intended to settle the claim, they

6   could keep them without prejudice.

7        The appraisal process did not go forward because

8   they obtained counsel.  Their attorney, Terry Jones, suggested

9   a couple of things.  One of the things he suggested was that

10  prior to going into an appraisal, that Amica try to get a

11  second contractor.

12      The contractor issue is another item which the

13  plaintiffs try to exploit here and turn into a bad faith issue.

14  Essentially, their claim has been that Amica here in hiring

15  Visions, the fire restoration contractor, to do repairs on a

16  high-end house.  But in reality, all Amica did was consult with

17  Visions.  No one ever pressured the Bordens, nor is there any

18  testimony, that they tried to use the Bordens to do the work.

19  They simply had a fire restoration contractor walk through the

20  site with Mr. Schumann and provide a letter to Mr. Schumann and

21  the Bordens dated March 7, 2003, saying that they could do the

22  work at that price.

23      Mr. Murphey has attempted to put Visions at issue

24  here, he hasn't even called them as a witness.  But in reality

25  what happened was, when called into question, Amica decided

29

1   that rather than push it, rather than continue to make it an

2   issue, they wanted to try to resolve things, so they hired a

3    second contractor, Dan Jones.  And after Mr. Jones did his

4    estimate, which was closer in scope to Mr. Parise's, the claim

5    moved forward, it was settled.

6            Bad faith, according to Pennsylvania law, was

7    defined in the Terletsky case, and this was found to be
                  _____

8    appropriate law in the Third Circuit case of Polselli_v.
                                              _____ __

9    Nationwide, 23 F.3d 747 (1994).  Polselli talks about bad
     _____                    _____

10   faith, as something which -- a dishonest purpose, meets a

11   breach of non-duty -- through some motive of self-interest or

12   ill-will.  Mere negligence or bad judgment is not bad faith.

13   In addition, Polselli held that plaintiffs are required to
                  _____

14   prove bad faith by clear and convincing evidence.

15           I would respectfully submit to the court that the

16   evidence that we have today falls far short of that statement.

17   For one thing, everything got resolved in the end.  What the

18   plaintiffs have attempted to do here was kind of stop time on

19   the April 15th meeting and ignore everything that transpired

20   after that fact.  And, in addition, tried to establish that

21   mistakes were not immediately admitted, but instead Amica moved

22    forward with an appraisal process, which was something they

23    were permitted to do under the policy.

24            Therefore, under the law of the state and under

25    Third Circuit, I would respectfully submit that the court enter

30

1    judgment in favor of Amica as a matter of law, which is in fact

2    a compulsory nonsuit.  Thank you.

3            THE COURT:  All right.  Mr. Murphey.

4            MR. MURPHEY:  Your Honor, I think it's quite obvious

5    at this stage of the proceedings compulsory nonsuit is not

6    appropriate.  First of all, the burden of proof is, as Mr. Geer

7    indicated, clear and convincing evidence.  But only if two

8    things.  One, that Amica's conduct was unreasonable and two,

9    they knew or should have known that that conduct was

10    unreasonable.  There is no burden on the plaintiff to prove

11    ill-will or an evil motive.  That is the definition of bad

12    faith from Blacks Law Dictionary.  But both Pennsylvania case

13    law and federal case law interpreting Pennsylvania law, they

14    have held that is not a requirement on the burden of proof,

15    that the only two things that need to be proved are

16   unreasonableness and whether the defendant knew or should have

17   known that they were acting unreasonably.

18          Judge, you sat very actively listening to the

19   testimony for the last two and a half days, you know very well

20   plaintiffs' position is that Mr. Schumann's original estimate

21   was unreasonably low and the defendant was provided information

22   that it was unreasonably low, Amica failed to act on that

23   information or recklessly disregarded the information that they

24   did develop as of the April 15th meeting.  They had Mr.

25   Parise's estimate, which was twice that of Mr. Schumann's.


                                    31


1   Mr. Schumann was defending himself by relying on Mr. Seifert.

2   I don't know what they're going to do in their defense case,

3   but Mr. Seifert hasn't testified in this case, there is not a

4   stitch of evidence that he was a competent, reliable

5   restoration contractor, who could be relied on by Mr. Schumann.

6   And they didn't do anything, except for demand an appraisal.

7          It was only after the Bordens then complained to the

8   insurance department and got a lawyer, who, as the record will

9   reflect, accused the defendant of bad faith and threatened a

10  bad faith lawsuit, only then did he say all right, wait a

11  minute, let's go back and get a contractor, which is what they

12  should have done to begin with.  And only then did they get a

13  contractor who was reasonable and the case was able to be

14  resolved at that time.

15       So it's not a matter of what Amica did, it's a

16  matter of what Amica didn't do.  And that is they ignored the

17  evidence that they had that this was too low, instead of acting

18  appropriately, they, the Bordens, had to take the ball, get a

19  lawyer, call the insurance department, threaten a bad faith

20  lawsuit, only then did Amica do what they were supposed to do.

21       And not to foreshadow the short remarks I might have

22  at closing but, your Honor, if the Amica estimate had been

23  accepted by the Bordens at the time, Amica would have had a

24  windfall of more than $200,000.  Because they would have paid

25  based on the Schumann estimate, even though when they did get


32


1  the competent contractor to look at it, he, even working with

2  the insurance company, came up with an estimate more than

3  $200,000.

4           So I think we certainly met our burden of proof with

5    regard to unreasonable conduct in the first instance and

6    knowledge or at least reason to know of unreasonable conduct.

7    Therefore, the nonsuit should not be entered.

8           THE COURT:  I'm going to deny the motion.  Are you

9    ready to go?

10          MR. GEER:  Yes, your Honor.  The first witness is

11   Dan Jones.

12          THE COURT:  Mr. Jones, raise your right hand.

13          DANIEL J. JONES, DEFENSE WITNESS, SWORN

14               DIRECT EXAMINATION

15   BY MR. GEER:

16   Q.   State your full name, please?

17   A.   Daniel J. Jones.

18   Q.   Mr. Jones, what do you do for a living?

19   A.   I'm a fire chaser.  I'm in the restoration business.  I'm

20   owner and vice president of G.S. Jones & Sons, which is a

21   general contracting and consulting firm that specializes in

22   fire damage repair.  And property damage repair in general.

23          MR. GEER:  Excuse me, your Honor, just a second.

24          THE COURT:  There's a type of chaser on the legal

25   side of the fence that has a more pejorative meaning than fire

33

1   chaser, I take it that that's just commonly used?

2           THE WITNESS:  I've heard it before, it hasn't been

3   used for some time, to tell you the truth.  I don't want to say

4   that remodelers and fire restoration contractors are

5   adversarial, but they often see differing points of view.

6           THE COURT:  All right.

7   BY MR. GEER:

8   Q.   Mr. Jones, could you briefly tell the court your

9   educational background and experience in construction?

10  A.   I'm a graduate of Penn State University in the business

11  and finance program.  I'm a third generation contractor in a

12  family of contractors.  Throughout my high school and college

13  years, I worked various trades in the construction industry,

14  including electrical work, tile setting, carpentry and general

15  labor.  After graduation I owned and remodeled and renovated a

16  number of rental units that I had developed.  I worked as a

17  carpenter and then I joined -- well, I joined M. Lischner &

18  Son, which is a company my father was involved in, which also

19  specializes in property damage repair.  And with M. Lischner &

20  Son, I was the manager of their insulation division.  Then I

21  also did estimating and consulting work in the fire damage

22  contracting division.  In 1985 my father and I left M. Lischner

23  & Son and started G.S. Jones & Sons, which is a company that

24  also specialized in fire damage repair.  My duties there

25  involve estimating, project management, consulting and business

34

1  operations.  In the last four to five years I've been working

2  almost exclusively in the fee based consulting area.  Which

3  means that I primarily investigate and evaluate property damage

4  repair for clients to determine various components of the loss.

5  Over the years I've worked on or consulted on hundreds of

6  residential properties.  Some recent projects includes the

7  Ebenezer Baptist Church fire in Pittsburgh.  That was a fire

8  where three firemen were killed, four firemen.  And it was a

9  $3.5 million project.  I've been spending the last few months

10  evaluating the damage from hurricane Katrina to the state of

11  Mississippi schools for the Travelers Insurance Company in the

12  state of Mississippi.  I have a degree or have certification

13  called water loss technician.  Which is a certification from

14   the Water Loss Institute, which a division of the Association

15   of Specialists in Cleaning and Restoration.  I also have a

16   designation called CR or certified restorer, which is the

17   highest designation that you can achieve with the National

18   Institute of Disaster Repair.  Which is also an organization

19   that's an arm of the Association of Specialists in Cleaning and

20   Restoration.  I've attended numerous seminars on mold

21   remediation and components, fire damage, water damage, concrete

22   and various building component systems.  I provided consulting

23   services on property damage repair throughout the east coast in

24   14 states.  I have been qualified as an expert in property

25   damage repair in Erie, Venango County, Beaver County and

35

1   Allegheny County.  I serve on the judges panel for the Penn

2   State architectural and engineering fifth-year student thesis

3   program.  And I was a draft reviewer for the National Institute

4   of Disaster Repair Guidelines for Fire and Smoke Damage Repair.

5   Q.    What experience do you have in fire restoration and smoke

6   remediation?

7   A.    In smoke remediation my company regularly is involved in

8   the repair, cleaning and restoration of residential, commercial

9   and industrial properties that have been damaged by fire. So,

10  in addition to the consulting services, my company also

11  performs those services, and that includes what we would typify

12  as structural restoration, as well as cleaning and remedial

13  restoration.

14  Q.   Are you familiar with the technology and techniques

15  available for the cleaning and restoration of homes which are

16  damaged by smoke?

17  A.   Yes, I am.

18  Q.   Can you give the court some examples of some of the

19  technology which is available without going into a dissertation

20  that will keep us here all day?

21  A.   Okay, you can stop me. Basically, fire or smoke residue

22  is the result of incomplete combustion. When you have complete

23  combustion, the elements are heat, light, carbon dioxide and

24  water vapor. In incomplete combustion, you have those

25  elements, plus you have residue that is different for the

36

1   different types of fuels that are involved. So, for example, a

2  fire that involves wood and paper products, that's a high

3  oxygen fire that creates a lot of heat, it will deposit a light

4  black soot on various surfaces, it's relatively easy to clean.

5      A smoldering fire of the same types of materials will

6  produce a sticky residue, that is a little more difficult to

7  clean, but is similar in characteristic.

8      A plastics fire, a fire that involves pvc's or plastics,

9  produces a very oily or greasy residue that is much more

10  difficult to remove, especially from porous surfaces.

11      Fires that involves meats or poultries, like if you have

12  a fire in a grocery store or something that involves a kitchen,

13  like a stove top fire, it produces a yellowish greasy film that

14  is more difficult to identify and it has an extremely obnoxious

15  odor.

16      In the restoration industry, there are various chemicals,

17  products, techniques and processes, that addresses each of

18  these different types of soot residue.  The general process is

19  really broken down into four primary steps.  The first process

20  is the removal of the smoke residue.  That can either be done

21  by demolition or it can be done by the cleaning process.  In

22  the cleaning process, there's basically three different types

23  of cleaning methods.  Mechanical, absorption and solvent.  In

24  the mechanical cleaning method, it's primarily through the use

25  of vacuuming, terry-cloth tile wiping, chemical sponges, all

37

1  the way from simple vacuuming, all the way up to grit blasting,

2  which might involve the use of typical sandblasting type

3  material where you're removing the residue, plus some of the

4  surface materials.  The absorption method is involved where you

5  will use diatamacious earth or you can use various pastes or

6  materials that you can apply to different types of materials.

7  And the paste or the diatamacious earth will actually absorb

8  over time the smoke and residue particles.  The third method,

9  which is the solvent method, would involve cleaning all the way

10  from using simple water solution up to an acid and pretty much

11  everywhere in between.  You're trying to neutralize the PH of

12  the materials because smoke residue can be corrosive and you

13  want to attempt to remove as much of the particles from the

14  surface as possible.  The second step in the deodorization

15  process is the use of oxidizers.  Oxidizers will typically

16  change the composition of the smoke particles.  Those can be

17  either in gas form or liquid form.  In the gas form the typical

18  oxidizer that is used is ozone.  There is some controversy with

19  regard to ozone and its effectiveness.  Basically, what it does

20  is that the molecules that are generated in the ozone process

21  combined with the soot residue, the hydrocarbons in the soot

22  residues, change the chemical composition of that and render

23  them into different materials, like carbon dioxide which is

24  odorless.  There's also liquid oxidants, such as chlorine,

25  chlorine dioxide and hydrogen peroxide, which is used in liquid


38


1  form.  The next method is the application of counteractants or

2  masking agents.  Which is really just the process of

3  substituting a pleasant odor for an obnoxious one.  In the

4  situation where the residue has been removed and you're left

5  with some remaining residual odor, oftentimes we use

6  counteractants or deodorizers in order to substitute the

7  obnoxious odor for a pleasant one, until the normal odors of

8  the house or business or whatever it might be, eventually takes

9  over the odors from the fire and the counteractants will

10  dissipate.  The final step in the deodorization process would

11  be encapsulation.  And that can be either using an adhesive

12  type encapsulant, such as unsoot or unsmoke, which are

13  materials specifically designed to encapsulate fire damage

14  residue.  Or you can use shellac based products, such as Bins

15  or Bullseye, that are products that have been developed by

16  Zinzer Company, which are specifically designed for fire

17  residue encapsulation.  It prevents bleed through and basically

18  what it will do is block the off gassing that is created by the

19  residue.  In addition to the various materials that are

20  available for the different types of fire and the different

21  materials that you're working with, there are also application

22  products that are available that are specialized in the

23  industry that allow you to clean sub-wall cavities and duct

24  cavities.  And various types of fogging agents that will allow

25  you to fog encapsulants --


39


1        THE COURT:  Mr. Jones, what do you mean when you say

2  a sub-wall cavity, do you mean behind the plaster?

3        THE WITNESS:  Yes.  A sub-wall cavity would be

4  either a wall or ceiling surface, and that's the space between

5    two opposing finishes, that would be a cavity of a stud wall or

6    the ceiling joists.

7            THE COURT:  All right.

8            THE WITNESS:  So, in addition to the products, there

9    are a number of different applications.  Such as specialty

10   spray equipment, ULV fogging and thermal fogging.

11           THE COURT:  I have another question before you go

12   on.  You started out by telling me these are the various

13   approaches to dealing with smoke residue.  When you say smoke

14   residue, you mean two components, don't you, soot and smell?

15           THE WITNESS:  They're actually one in the same.  The

16   smell that you detect when you go into a fire is the result of

17   off gassing of the residue particles.

18           THE COURT:  So it's really cleaning the soot, if you

19   will?

20           THE WITNESS:  If you've removed a 100 percent of the

21   soot, you've removed the odor.

22           THE COURT:  All right, go ahead.

23           MR. GEER:  Your Honor, I would move for the

24   acceptance of Mr. Jones as an expert in construction, fire

25   restoration and smoke remediation.

1        THE COURT:  First, let me see if he has any voir

2    dire.  Do you have any voir dire?

3        MR. MURPHEY:  I don't have any voir dire.

4        THE COURT:  I accept him as an expert in the field

5    so described.

6    BY MR. GEER:

7    Q.   Mr. Jones, based upon your experience, are the various

8    restoration techniques which you have described successful?

9    A.   Yes.  If they're done in the right order with the right

10   application, yes, they can be highly successful.

11   Q.   When we talk about whether it's successful or not, what

12   is the goal of fire restoration?

13   A.   The goal of fire restoration is to return the damaged

14   property to its pre-loss condition, without loss in value or

15   function with regard to structural integrity, cosmetic value or

16   use, using the most cost-effective means and the least

17   aggressive method available.

18   Q.   Just to clear up one thing.  Would you consider it to be

19   a successful fire restoration if the process was complete and

20   the building still had the faintest odor of smoke?

21   A.    No, these days we guarantee odor-free restoration

22   projects.

23   Q.    When were you called in on the Borden fire loss?

24   A.    My call sheet indicates June 20th of '03.

25   Q.    Who called you?

41

1   A.    You did, Paul Geer from the firm of DiBella and Geer.

2   Q.    What were asked to do?

3   A.    I was asked to provide a report and estimate on the fire

4   damage to the Borden residence that had occurred some months

5   earlier.

6   Q.    Did you do an inspection of the Borden home?

7   A.    Yes, I did.

8   Q.    When did you do it?

9   A.    On June 25th of '03.

10   Q.    Can you describe the conditions under which your

11   inspection was conducted?

12   A.    Yes.  It was a sunny day, it was relatively warm.  Some

13   months had passed from the time of the original fire loss until

14   the date of the fire.  I drove up to Erie with an associate,

15   Mr. John Dimento from my office, to help me to do a take-off on

16   the building.  When I got to the site, I met Mr. Parise and Mr.

17   Schumann, and I didn't know the name of the fellow before, I

18   can't remember it now, but the contractor who installed the

19   kitchen cabinets in the residence and done some work there some

20   years previous, I was under the impression it was about 15

21   years before.  We talked to them briefly.  We discussed some of

22   the elements of the loss and some of the concerns that they had

23   with regard to the damage and differences in opinion.  Mr.

24   Parise and Mr. Schumann took me on a tour of the house to show

25   me basically where the fire occurred.  What some of the issues


42


1   with regard to the property were.  And just generally to point

2   out various things, such as a mural on the entry room or in the

3   entry wall, things like that.  At that point Mr. Parise and

4   Schumann left John and I.  I don't know if they left the site,

5   but I think they had other things to discuss.  And John and I

6   continued then and went through and inspected the property.  We

7   were able to get through into pretty much every area of the

8   home.  We photographed it.  We documented various components

9   and types of damage.  Then we left later that evening.

10  Q.   Did you prepare an estimate?

11  A.   Yes, I did.

12  Q.   Is this a copy of your estimate?

13  A.   It is.

14       MR. GEER:  I'd mark this as Exhibit C.

15  BY MR. GEER:

16  Q.   Mr. Jones, what was the amount of your preliminary

17  estimate?

18  A.   $542,598 and some cents.

19  Q.   Was this later revised?

20  A.   Yes, it was.

21  Q.   What number was it later revised to?

22  A.   It was increased by $13,198, to a total of $555,797.

23  Q.   When you did your estimate, did you consider the

24  alternatives you had in terms of smoke remediation, fire work

25  remediation and that type of thing?


43


1  A.   Yes, I did.

2  Q.   What ultimate decision did you make in terms of preparing

3   your estimate as to what component parts you were going to

4   replace in the house?

5   A.   Well, the biggest decision that I made was to a large

6   degree replace many of the components as opposed to attempt to

7   clean and restore.

8   Q.   What was your reason for doing that?

9   A.   Well, there were a number of things that led me to that

10  conclusion.  First of all, the house appeared to be in

11  excellent condition prior to the loss, with good quality

12  materials.  The second thing was is that I was made aware of

13  the fact that the Bordens had a handicapped child that was

14  living in the residence that had some degree of respiratory

15  problems.  The home had been remodeled for handicap use.  The

16  fire did appear to be widespread and a hot fire.  And the loss

17  at that point -- there were two attorneys involved, there were

18  two adjusters involved, there were two estimates present, and

19  there was the potential for litigation.  And at that point

20  there was some degree of contentiousness with regard to the

21  estimate and final repair.

22  Q.   Did you review the estimate which had been provided by

23  John Schumann?

24  A.   Yes, I did.

25  Q.   Why did not your estimate follow Mr. Schumann's approach?


44


1  A.   My approach -- I'm going to basically discuss the concept

2  of cleaning, which was in Mr. Parise's estimate, versus

3  replacement, which was in my estimate.

4        THE COURT:  You said which was in Mr. Parise's

5  estimate, did you mean Mr. Schumann's estimate?

6        THE WITNESS:  I mean Mr. Schumann's estimate, that's

7  correct.  As I said before, the primary objective, the primary

8  job of the estimator is to return the property to its pre-loss

9  condition without loss of value or use.  By using the most

10  cost-effective and least aggressive methods possible.  That

11  would involve an estimator primarily using -- well, could you

12  repeat the question, I kind of got off track there.

13  BY MR. GEER:

14  Q.   Let me put the question to you this way.  Did you review

15  Mr. Schumann's estimate?

16  A.   Yes.

17  Q.   In your opinion was the approach used by Mr. Schumann a

18  reasonable one, assuming that the goal was to restore the house

19  to its pre-fire condition?

20  A.   Okay.  As far as restoring the house to its pre-fire

21  condition, I had talked about what that goal is.  And it really

22  essentially means to restore it without loss in value or

23  function or use, and to do it in the most cost-effective and

24  with the least aggressive means possible.  I do believe that

25  Mr. Schumann's estimate was reasonable from the standpoint that

45

1  when an estimator goes in initially to a fire loss, he should

2  estimate only those items that he knows is going to be required

3  to accomplish those goals.  In just about every fire loss there

4  are unknowns.  And with regard to those unknown items, the

5  estimator should either leave them as open, which means they

6  have a zero value, or they should be addressed in the least

7  aggressive manner possible or reasonable.  And then once the

8  restoration process starts and the initial demolition is done,

9  then the process of testing, of inspections and evaluation of

10  those remaining questionable items can be accomplished and

11  final decisions can be made.  And, quite honestly, that process

12   continues throughout the entire restoration.  In doing that,

13   what you do is that you accomplish the goals of restoring the

14   property using the most cost-effective means and the least

15   aggressive methods.  So from that standpoint it was a

16   reasonable approach.  It certainly was not a complete estimate.

17   There were mistakes that I noted in the estimate.  But from the

18   standpoint of approach, clean versus replace, it was a

19   reasonable first approach.

20   Q.    Is it reasonable to believe that many of the items that

21   you replaced in your estimate could have been successfully

22   cleaned and deodorized?

23   A.    Yes.

24   Q.    Would you give us an example of some of the things that

25   you may have replaced in your estimate which Mr. Schumann was


                                   46


1   going to clean and deodorize that might have fallen into that

2   category?

3   A.    Right.  When I developed my estimate, as I said before,

4   we were some months down the road, there were attorneys

5   involved, there was two estimates, there seemed to be an

6  irreconcilable difference between those two estimates.  So my

7  goal was to provide an estimate that essentially included no

8  open items and no questions.  I wanted to be very conservative

9  in my approach as to what items I saved and what items I didn't

10  save.  There's a likelihood that some of the cabinetry could

11  have been cleaned and restored.  There's a likelihood that some

12  of the walls could have remained and been deodorized.  There's

13  the possibility that some of the plumbing fixtures could have

14  been salvaged and cleaned.  And there's a possibility that some

15  of the windows that I had estimated for replacement could have

16  been cleaned and restored.

17  Q.    You characterized what you did as having a conservative

18  approach, can you explain to the court what you mean by

19  conservative approach?

20  A.    With a conservative approach, I mean that I wanted to

21  develop an estimate that had no open items.  Which means that

22  if I had a question about an item, that I would take the

23  conservative approach of replacing it.  I also did not want to

24  be in a position where I had less than a high degree of

25  certainty that the processes and the repairs that I recommended

47

1  would be entirely successful.

2  Q.  The judge asked you a question earlier about the comment

3  you made in your earlier testimony regarding the cleaning of

4  sub-wall cavities.  In most cases can sub-wall cavities be

5  successfully cleaned, sealed and deodorized?

6  A.  It depends on the material, depends on the sub-wall

7  cavity and conditions present.  But yes, we deodorize sub-wall

8  cavities in our work process on a regular basis.

9  Q.  Has your company successfully repaired and remediated

10  smoke damaged housing using the technology contemplated in the

11  Schumann estimate?

12  A.  Yes, we do that everyday.  We use the techniques that

13  I've talked about here.  We've used cleaning and restoration

14  techniques that have been developed through the various

15  organizations over time.  And we're very successful at it.

16  Q.  Are all the opinions you have offered here today

17  expressed within a reasonable degree of certainty?

18  A.  Yes.

19      MR. GEER:  Thank you.

20      THE COURT:  All right, Mr. Murphey.

21      MR. MURPHEY:  Thank you, your Honor.

22                    CROSS-EXAMINATION

23   BY MR. MURPHEY:

24   Q.   Good morning, Mr. Jones.

25   A.   Good morning.


                              48


1   Q.   Your company does fire restoration work but it does not

2   build houses?

3   A.   Correct.

4   Q.   And insurance companies are your primary clients, is that

5   right?

6   A.   Correct.

7   Q.   In fact, many big insurers, I think Travelers, Zurich,

8   Aetna, is that correct?

9   A.   Correct.

10   Q.    And often times your company will come in and do the

11   insurance company's initial estimate of a fire loss, is that

12   right?

13   A.   Correct.

14   Q.    But it's also not unusual for the company to call you in

15   to give a second opinion when there might be a difference of

16  opinion regarding the estimate, is that right?

17  A.    Correct.

18  Q.    But it is unusual for you to become involved after the

19  appraisal process has begun, is that correct?

20  A.    Unless I'm one of the appraisers.

21  Q.    In fact, I think you told me before that you have very

22  limited experience with appraisals, is that right?

23  A.    The formal appraisal process, yes.

24  Q.    In fact, I think at your deposition you could only think

25  of one other case in which you have been involved where the


49


1  appraisal process had commenced, is that right?

2  A.    That's correct.

3  Q.    And here you became involved after the appraisal process

4  started, right?

5  A.    No, I believe that my involvement was in lieu of the

6  formal appraisal process.

7  Q.    But the appraisal process, the appraisal had already been

8  demanded by the insurance carrier, it was put on hold when you

9  became involved, correct?

10  A.   I'm not aware of the insurance workings.

11  Q.   Okay.  But you were hired by Mr. Geer?

12  A.   That's correct.

13  Q.   We had learned before that Mr. Geer became involved only

14  after the insurance company demanded an appraisal, you were not

15  aware of that?

16  A.   No, I'm not.

17  Q.   You'll agree that the ultimate goal of your estimate is

18  to provide adequate funds to restore the property to its

19  pre-fire condition without a loss in value, is that correct?

20  A.   Correct.  That's to provide -- that estimate would be for

21  my company to be able to accomplish that work.

22  Q.   Right, and that's the goal of any estimate, right?

23  A.   That's correct.

24  Q.   In this business anyway?

25  A.   Correct.


50


1  Q.   In your professional opinion, it was about $543,000 which

2  was necessary to do that, is that correct?

3  A.   Correct.

4   Q.   In fact, then you added about $13,000 to that, or 11

5   maybe?

6   A.   $13,000.

7   Q.   On top of that?

8   A.   I think, yes.

9   Q.   Now, you inspected the property in June, Mr. Schumann had

10  inspected it in February, is that right?

11  A.   Yes.

12  Q.   And you would agree that in all likelihood you would have

13  arrived at the same estimate in February that you did in June,

14  is that correct?

15  A.   No.

16  Q.   Okay.  Now, is the damage that you saw in June the same

17  as the damage that was there in February?

18  A.   Yes, I don't think that there were significant changes in

19  specific damage.

20  Q.   But you don't believe that you would have reached the

21  same estimate in February that you did in June?

22  A.   It's not likely, but it's possible.

23  Q.   You recall giving your deposition in this case, correct?

24  A.   Yes.

25  Q.    Remember you came up to my office and I think asked you

51

1  questions.  Have you reviewed your deposition in preparation

2  for your testimony today?

3  A.    Yes.

4  Q.    Do you have a copy of the deposition with you?

5  A.    No.

6        THE COURT:  Why don't you just take it up.

7  BY MR. MURPHEY:

8  Q.    This is a copy of your deposition transcript, Mr. Jones.

9  Can you refer to page 35 of your deposition testimony, please.

10  I'm referring to page 35, line 7 of your deposition, please let

11  me know if I'm reading this correctly.  My question was,

12  "All right.  So you may have come up with the same estimate

13  that you did if you had been the first estimator?"  And your

14  answer was, "Correct."  My next question was, "You also may not

15  have?"  Your answer was, "Correct."  I said "Okay."  And then

16  you said "the likelihood is, is that I would have come up with

17  the same estimate because the circumstances surrounding the

18  claim I don't think would have changed greatly."

19  A.   Correct.

20  Q.   Was that your testimony?

21  A.   Yes.

22  Q.   I would also refer you to page 36 of your deposition,

23  line 15.  My question began with the words "or time consulting

24  perhaps."  Then I said "Was there anything about this loss

25  which you believe that the weather actually affected the amount


52


1  of damage which occurred such that your estimate would have

2  been different in June than it was in February?"  Your answer

3  was "Not from a -- not from a damage standpoint."

4  A.   Correct.

5  Q.   Is that correct?

6  A.   Correct.

7  Q.   Now, you've testified that the primary differences

8  between yours and Mr. Schumann's estimate relate to the amount

9  of things in the house that you would recommend replacing

10  rather than cleaning, sealing and deodorizing, is that right?

11  A.    That's correct.  Can I back up, I thought we were going

12  to follow-up more with that information with regard to my

13  deposition.

14  Q.   Well, Mr. Geer might have some questions for you.

15  A.   Okay.

16  Q.   When you testified that you recommended replacement

17  versus cleaning in this case for several reasons, and one was

18  because the home was in excellent condition, is that right?

19  A.   Correct.

20  Q.   And that weighs in favor of replacing more items than

21  cleaning them, is that right?

22  A.   Yes.

23  Q.   Okay.  And there was smoke odor throughout the house,

24  that was another reason that you concluded that replacing more

25  items would be necessary rather than cleaning, sealing and

53

1  deodorizing, is that right?

2  A.   Correct.

3  Q.   And that included smoke that was in the areas of the

4  house some distance away from where the fire started in the

5  main basement, is that right?

6  A.   Correct.

7   Q.   In fact, there was smoke throughout the house, including

8   the areas above the crawl space on the right side of the house

9   as we look at it from the street, is that right?

10  A.   Yes.

11  Q.   And you personally smelled smoke throughout the house,

12  did you not?

13  A.   Yes, throughout the house is a little bit of a misnomer,

14  but yes, clearly.

15  Q.   Now, you prepared a report in this case, did you not?

16  A.   Yes.

17  Q.   In that report you explained that there was smoke odor

18  throughout the house because of the extreme heat and the burn

19  time in the basement, is that right?

20  A.   Yes.

21  Q.   That hot gases were able to penetrate through the crawl

22  space and below the far end of the home and drive up into the

23  sub-surfaces and the sub-cavity via the wire holes and the duct

24  tiles, is that correct?

25  A.   Correct.

54

1  Q.   Because the hotter the fire, the greater the pressure and

2  the smaller the fire residue, correct?

3  A.   That's correct.

4  Q.   And that allows more extreme penetration in the cracks

5  and cavities and the areas that are difficult to clean, is that

6  right?

7  A.   Yes.

8  Q.   That was another reason you recommended replacement in

9  this case rather than cleaning, sealing and deodorizing, is

10  that right?

11  A.   Yes.

12  Q.   You also concluded that the replacement was -- because

13  the house had a handicapped accessible section to it, is that

14  right?

15  A.   Yes.

16  Q.   And so even if the Bordens' young daughter didn't move

17  back into the house, that's still a concern with regard to

18  putting this house back in -- putting the house back in,

19  getting the house to the same value it had before the fire,

20  correct?

21  A.   Correct.

22  Q.   Because it has a handicapped section, which means that

23  somebody that might buy the house later, perhaps would have a

24  sick person who was more sensitive to off gases, correct?

25  A.   Yes.


                                    55


1   Q.   And I take it that it was obvious to anybody that there

2   was a handicapped accessible section of the house, is that

3   correct, that had wire doors and ramps and things like that?

4   A.   Anybody that was in the construction business, sure.  In

5   a cursory inspection you may not see it.

6   Q.   But anybody in the construction business?

7   A.   Sure.

8   Q.   And then the fourth reason you identified was indeed

9   because the Bordens had a child with respiratory problems, is

10  that right?

11  A.   Yes.

12  Q.   Now, you said that you testified about the difference

13  between your estimate and Mr. Schumann's estimate and

14  ultimately in many of the locations where he recommended

15  cleaning, sealing and deodorizing, you recommended replacement,

16  is that right?

17  A.   Yes.

18  Q.   You also noted that there were some mistakes that you had

19  noticed in Mr. Schumann's estimate?

20  A.   Yes.

21  Q.   Do you recall those as we sit here today?

22  A.   I think he mislabeled or misidentified a countertop in

23  the kitchen.  I'm not sure if his estimate included a sump.

24  I don't recall if his estimate included cabinetry in the

25  basement.  Other than that, I'n not entirely sure about those

56

1  components, there were some missed items.

2  Q.   With regard to your testimony this morning that Mr.

3  Schumann's estimate was reasonable, I think one of the reasons

4  that you said it was is because it was a preliminary or an

5  incomplete estimate?

6  A.   No, I think it was reasonable in the approach that he

7  took in the estimate, which was essentially to clean a number

8  of components, as opposed to replacing them.

9  Q.   I believe what you said was it was appropriate in the

10  first estimate and that you would ultimately find out as the

11  process went on whether the cleaning, sealing and deodorizing

12  would work.  And then perhaps you could modify the estimate if

13  it wasn't working, is that right?

14  A.   That's the typical process.

15  Q.   Do you know if the Bordens were ever advised that that's

16  the typical process or that this was some sort of incomplete or

17  preliminary estimate?

18  A.   I do not.

19  Q.   Now, you never compared your estimate with Mr. Parise's

20  estimate in this case, did you?

21  A.   No, I didn't.

22  Q.   So you don't have an opinion regarding any of the details

23  of his estimate, is that correct?

24  A.   Not with regard to any of the details.

25  Q.   You said -- you emphasized this morning that you


57


1  recognized that this had become a contentious issue by the time

2  you became involved in the case, is that right?

3  A.   Yes.

4  Q.   I take it that Amica did not ask you to estimate the loss

5  to the most expensive replacement cost that you could justify,

6  did they?

7  A.   They did not.

8        MR. MURPHEY:  That's all I have, thank you, Mr.

9  Jones.

10              REDIRECT EXAMINATION

11  BY MR. GEER:

12  Q.   Mr. Jones, Mr. Murphey asked you a hypothetical question

13  that you will recall regarding whether or not your estimate

14  might have been different if you had been the first estimator

15  to go in there right after the fire.  I believe you wanted to

16  elaborate in one of your responses on that subject, would you,

17  please?

18  A.   Yes, when I inspected the loss, it was sometime following

19  the fire.  The weather conditions were good and I was able to

20  access all of the areas of the house.  I had the availability

21  of two competitive estimates and details that had been gone

22  through in the house to a significant degree.  I was made aware

23  of the various areas of concern and paid particular attention

24  to those areas.  I was able to get into the basement.  I was

25  able to get into the crawl space.  I was able to have access to

58

1    all the areas of the home.  And it was the best of situations

2    with regard to information available, having other experts that

3    had previously inspected the house and having the opportunity

4    to review their estimates, etc.  Had I been the first estimator

5    on the scene and at a time shortly after the fire, I don't know

6    that all of the areas would have been accessible.  I may not

7    have been able to get into the basement.  I may not have been

8    able to get into the crawl space.  I would not have been aware

9    of the areas of difference that had developed, that would have

10   required me to pay particular attention to those areas.  And so

11   it is very likely that had I been the initial estimator on the

12   scene, that my estimate would have been different.

13   Q.    What would your approach have been if a policyholder,

14   such as Dr. Borden in a case like this, came to you and said

15   I'd like you to recommend the most efficient use of my

16   insurance company's proceeds, assuming that I want to restore

17   my house to its pre-fire condition and have absolutely no odor

18   of smoke when we're done?

19   A.    The best way to field a question like that is to look at

20  it and forget about insurance proceeds.  Let's just say an

21  individual comes to me, they've had a fire and they want me to

22  fix it, and they're going to be spending their own money out of

23  their own pocket.  I never give anybody -- basically, the job

24  that I'm going to do is that I'm going to provide them with

25  information so that, if they want to do it right, if they want

59

1  to make sure that it's odor-free, structurally sound and if

2  they have to, they can resell it in original or pre-loss

3  condition.  Under those circumstances what I would do is to

4  develop an estimate that would give them the items that I know

5  had been done and I would advise them of the areas that I

6  thought might be questionable.  And then what I would do would

7  be I would proceed with the repairs on that basis.  And I would

8  not recommend or do anything that I did not know was going to

9  be necessary initially.  So from that standpoint, what I would

10  do is that I would look at the loss and a typical -- any

11  individual is going to want to accomplish the goals of

12  restoration and in the most cost-effective way.  And had that

13  occurred, then that's the approach that I would have taken.  We

14  do that on a regular basis.  In many instances we'll get

15  involved when we have an individual that wants to get back into

16  the house as quickly as possible, wants to do a good job, we

17  will write an estimate that will outline the basic parameters

18  of the job, we'll start the demolition work, we'll complete the

19  demolition, we'll do the testing and evaluation, we'll make

20  decisions with regard to restoration throughout the process.

21  There are going to be changes.  The first estimate is almost,

22  on a significant fire loss, the first estimate is almost always

23  revised in some way.

24  Q.   From your experience, Mr. Jones, are these issues

25  regarding what can and cannot be cleaned, painted, remedial,


60


1  issues which experts commonly disagree on?

2  A.   Yes.  Depending on expertise, depending on backgrounds,

3  remodelers will typically replace.  They have very little

4  experience with regard to deodorization and cleaning techniques

5  and as a result they replace.  Other contractors who have had

6  their origins in the cleaning business, which means, let's say

7  they started out as a cleaning subcontractor or painting

8  contractor and then they grew to be a general contractor, have

9  a stronger emphasis on cleaning and deodorization and that sort

10  of thing.  Other companies that come from the construction side

11  have more of an emphasis on developing or going with the more

12  replaced construction method.  There is a book out that's

13  called the National Institute of Disaster Repair Guidelines for

14  Fire and Smoke Repair --

15      MR. MURPHEY:  I'm going to object, your Honor, this

16  is not part of any report that's been provided to us.

17      THE COURT:  Sustained.

18      THE WITNESS:  It's industry wide accepted.

19      THE COURT:  I just sustained the objection, let's

20  get back to question and answer.

21      MR. GEER:  He answered the question, your Honor.

22  The question was whether or not these experts commonly

23  disagree, I believe he answered.  That's all I have, thank you.

24      MR. MURPHEY:  If I might, your Honor.

25      THE COURT:  Go ahead.


61


1          RECROSS-EXAMINATION

2  BY MR. MURPHEY:

3  Q.   You testified about the different conditions that you

4  estimate the loss in June and Mr. Schumann did in February.  Do

5  you know of anywhere in the house that Mr. Schumann did not

6  have access to when he originally estimated the loss in

7  February?

8  A.   I do not, no.

9  Q.   Do you have any idea what the weather was like in April

10  when Mr. Schumann was back in the house?

11  A.   I do not.

12  Q.   And you'll agree with me that Mr. Schumann never changed

13  his estimate at any time from February until you became

14  involved in the case, is that correct?

15  A.   I'm not aware of any changes.

16  Q.   You said that it's common in the industry that the first

17  estimate is revised, in fact, you said the first estimate is

18  almost always revised after being done, is that correct?

19  A.   On significant fire losses, yes.

20  Q.   Do you know if the Bordens were ever told that?

21  A.   I do not.

22  Q.   And when you estimate a loss for an insurance company and

23  then you realize you made a mistake, you described the wrong

24  type of floor, the wrong type of countertop, you revise your

25  estimate, increase it accordingly, is that right?


62


1  A.    Yes.

2        MR. MURPHEY:  That's all I have.

3        THE COURT:  Mr. Jones, I have just a couple

4  questions before we get you back on your way -- where you from

5  again?

6        THE WITNESS:  Pittsburgh.

7        THE COURT:  I want to make sure I got your testimony

8  correct.  I think you testified that in your opinion Mr.

9  Schumann's initial estimate was reasonable, is that correct?

10        THE WITNESS:  The approach that he took in his

11  estimating was reasonable.  Which means the least aggressive or

12  less aggressive methods as opposed to extremely conservative.

13        THE COURT:  Is your opinion in that regard based in

14  any part on an assumption that Mr. Schumann was unaware as to

15  the scope and nature of the smoke damage behind the walls?

16        THE WITNESS:  No.  Smoke damage behind walls can be

17  effectively cleaned, remediated, deodorized.  It's possible,

18  it's likely, that on the exterior walls that were insulated,

19  that some interior finishes would have to be removed.  If not

20  entire finishes on wall sections.  It's also possible that only

21  portions of the exterior walls would have had to have been

22  removed.  Because in a fire like that, typically the residues

23  are going to be concentrated to the lower level of the walls

24  and at wall penetrations where pipes and wires come up from

25  down below, which is where the fire originated.  The insulation

63

1  makes it difficult for the smoke particles to travel throughout

2  the stud cavities.  And it also makes it difficult for

3  effective restoration.  In wall cavities that are uninsulated,

4  that process can be very effective.

5        THE COURT:  Let me interrupt you and ask you this.

6  And my question runs here, I'm trying to get a handle on this,

7  my question runs not to dollars and cents but to the scope of

8  the proposed work.  And that was the major disagreement in

9  terms of smoke remediation versus replacement between you and

10  Mr. Schumann, is that correct?

11        THE WITNESS:  Yes.

12          THE COURT:  Now, putting aside -- I think you

13   indicated that in an earlier question, litigation concerns,

14   insurance, you're walking into this project and looking at it

15   with a clean slate.  In your opinion, would it have been

16   reasonable or unreasonable for you to have suggested to the

17   Bordens that they could return their house to their pre-fire

18   condition by performing simply smoke remediation, as opposed to

19   replacement?

20          THE WITNESS:  No.  When you say, when you use the

21   term simply smoke remediation, as opposed to restoration, it's

22   not that simple.  There is no simply cleaning versus, it's not

23   either or, it's a combination of the two.  But yes, I do think

24   that it's reasonable to have told the Bordens that many of the

25   items or components in the home may successfully clean to your


                              64


1   satisfaction, if we're allowed to do the appropriate testing

2   and procedures in order to do that.

3          THE COURT:  All right, thank you, sir.  Anything

4   further of this witness?

5          MR. MURPHEY:  No, your Honor.

6          THE COURT:  Thank you, Mr. Jones, have a safe trip

7  back to Pittsburgh.  Anyone else, Mr. Geer?

8          MR. GEER:  David Bennett.

9          THE COURT:  All right.  Mr. Bennett, you're still

10  under oath.

11          THE WITNESS:  I understand.

12          DAVID J. BENNETT, DEFENSE WITNESS, PREVIOUSLY SWORN

13                    DIRECT EXAMINATION

14  BY MR. GEER:

15  Q.    Mr. Bennett, what is Amica's goal in a fire loss?

16  A.    To promptly and fairly adjust the claim and to restore

17  the house to its pre-loss condition.

18  Q.    We have spent a lot of time in this case talking about

19  some of the details and some of the problems.  What I want to

20  do now is move rather briefly through some of the other things

21  Amica did in this particular case.  Following the loss, did

22  Amica pay to perform emergency repairs on the premises?

23  A.    Yes.

24  Q.    What did Amica do?

25          MR. MURPHEY:  Your Honor, I'm going to object to

1    them going through everything that they did in the case.  As

2    you know, a bad faith claim is limited, Mr. Geer has just

3    introduced the topic as if they're going to go through

4    everything --

5        THE COURT:  I guess I have just more of a practical

6    observation.  Didn't I hear all of this in conjunction with

7    your redirecting Mr. Bennett.  I mean, we're going to hear

8    about Mr. Seifert -- haven't I heard this before.  I don't want

9    to cut you off, but I also don't want to plow the field twice?

10        MR. GEER:  Well, I don't intend to plow a field

11    twice.  I will briefly go through the various things which

12    Amica did in this case which brought the claim to a resolution.

13    It's not going to take long.

14        THE COURT:  All right, go ahead.

15    BY MR. GEER:

16    Q.    What were the emergency repairs that Amica paid for?

17    A.    We paid for the shoring of the house, we paid for an

18    electrical pole to be brought in to provide electricity to the

19    house.  There was water extraction and emergency boarding up.

20    Q.    Amica provided the Bordens with a temporary residence in

21  their neighborhood, is that correct?

22  A.    Yes, on the same street.  We worked with a realtor to

23  reach an agreement on the cost of a rental house on the same

24  street.  We arranged to have the driveways plowed and salted.

25  In addition to that, Mr. Schumann drove Mrs. Borden to a

66

1  furniture store --

2        MR. MURPHEY:  Again, I can cross-examine on each one

3  of these items and none of these are part of the bad faith

4  claim.

5        THE COURT:  How is this germane.  Actually, none of

6  these items are in dispute in terms of what they did.  And this

7  is something that you're going to be able to tell me later, how

8  in a meaningful sense does Amica's initial reaction to the loss

9  and the particulars that you've just informed me, inform my

10  decision as to whether there was or was not bad faith relative

11  to what appears to be the critical issue in the case and that

12  is the appropriate scope of remediation and/or new construction

13  relative to the smoke damage?

14        MR. GEER:  I believe Amica's conduct generally,

15  Amica's attitude towards insurers in the way it handles claims

16  is very much an issue here.  Now, there may have been one

17  specific issue which Mr. Murphey seeks to exploit for the

18  purpose of his bad faith case.  However, what this company is

19  all about, what this company has done for the Bordens, what

20  this company attempted to do, but perhaps could not do because

21  of the things which developed in the way of problems, I think

22  are all things that are germane to this case.

23        THE COURT:  I'm going to overrule the objection, go

24  ahead.

25  BY MR. GEER:

67

1  Q.    Did Amica provide new furniture in this temporary

2  residence for the Bordens use?

3  A.    Yes, we did.

4  Q.    How long did Amica continue to pay for the Bordens to

5  live there?

6  A.    I believe it was to March of the following year.

7  Q.    Amica paid all that time?

8  A.    Yes.  It's typically the timeframe that you do it, is the

9   amount of time it would take to complete repairs.  In this case

10   in the end they chose not to do the repairs, they demolished

11   the house.

12   Q.    And Amica provided the Bordens with a claim card?

13   A.    Yes.  That was initially overnighted to Dr. Borden, it

14   was loaded throughout it course up to $20,500.  So within a

15   month there would have been a payment of about $39,000 in

16   contents and payments of $20,500 on a claim card.

17        THE COURT:  Mr. Geer, we're going to take a short

18   recess.

19        (Recess from 10:45 a.m.; until 10:55 a.m.)

20        THE COURT:  All right, Mr. Geer.

21   BY MR. GEER:

22   Q.   Mr. Bennett, does Amica require its large loss adjuster

23   to promptly estimate the damages they can see within a fire

24   damaged property?

25   A.    Yes.


68


1   Q.   In this particular case I show you Exhibit A15, can you

2   tell me when you received the first report and estimate from

3  John Schumann?

4  A.   It was received February 28, 2003.

5  Q.   Upon receipt of that did you send it to the Bordens?

6  A.   I believe it was left at the Bordens.  I enclosed our

7  actual cash value check, I sent a copy of the estimate.

8  Q.   I'm going to show you a copy of that, we've already it

9  marked as A8, ask you what date you sent the Bordens the

10  undisputed payment?

11  A.   It is dated March 11, 2003.

12  Q.   And what has been marked as A4, the amount of the check?

13  A.   I'm sorry.

14  Q.   The amount of the check was $295,098 and change?

15  A.   Yes.

16  Q.   In addition to doing that, did you have Mr. Schumann

17  promptly provide you with the value of the contents which you

18  could see in the house?

19  A.   Yes, he provided a partial list of the contents based on

20  the items he could identify.

21  Q.   As the court's aware, you also sent the Bordens a check

22  for that?

23  A.   That is dated March 17, 2003.

24  Q.   And the cover letter, Exhibit A8, explaining what it was

25  for?

69

1  A.    It states partial contents replace cost inventory,

2  prepared by Mr. Schumann.

3  Q.    All right.  At some point in time you became aware of the

4  fact that Mr. Parise was the adjuster, correct?

5  A.    Correct.

6  Q.    He had been retained as public adjustor -- consultant by

7  the Bordens?

8  A.    Yes, I had a copy of their consulting agreement, I think

9  it was March, that was March 14th, I guess.

10  Q.    As of March 21st -- I'm going to show you what has been

11  marked as Defendant's Exhibit D -- I'm going to show you what

12  has not been marked before, but is now marked Defendant's

13  Exhibit D, a letter of March 21, 2003, to Mr. Parise.  Is this

14  the letter in which you requested that Mr. Parise prepare a

15  contents of inventory and send you a copy of his estimate?

16  A.    Yes.

17  Q.    In fact, even request's a contractor's estimate if he has

18  one, correct?

19  A.    That's correct.

20  Q.    Did ever receive a contractor's estimate from Mr. Parise

21  or the Bordens?

22  A.    No.

23  Q.    Mr. Haller was in here this morning and he testified that

24  he had prepared what he called a proposal which he gave to the

25  Bordens; did you ever receive that document?


70


1   A.    Today was the first day that I saw it.

2   Q.    You received the checks back that you had sent to the

3   Bordens, correct?

4   A.    That's correct.

5   Q.    Can you tell from looking at Exhibit A1 what the date was

6   that you received the check back?

7   A.    That was March 25th.

8   Q.    What did you do the exact same day in response to that, I

9   show you Exhibit A10?

10  A.    I wrote to Mr. Parise and informed him that the check was

11  not a release of the claim.

12  Q.    He could accept it as an undisputed payment?

13  A.   Yes.

14  Q.   You also received the contents check back, as we know, on

15  what date did you receive the contents check back?

16  A.   That was March 26th.

17  Q.   What did you do in response to that on the same day,

18  March 26th?

19  A.   I believe I wrote another letter.

20  Q.   This is Exhibit A3, and what was the content of that

21  letter?

22  A.   I just referenced the March 25th letter, that neither

23  check represents a settlement check.  These were payments that

24  we feel we owe based upon our adjuster's estimate of these

25  damages.  I point out that your acceptance of these checks does

71

1  not affect your ability to contest our estimate of the damages

2  or make a claim for additional damages.

3  Q.   Now, at this point in time you had not yet received Mr.

4  Parise's estimate, correct?

5  A.   That's correct.

6  Q.   Perhaps they crossed in the mail, but at least as of this

7   date you didn't know what Mr. Parise's estimate was for?

8   A.    That's correct.

9   Q.    We are talking about March 26th, which is only what, two

10  weeks, three weeks before the April meeting?

11  A.    Correct.

12  Q.    All right.  Now, I'm going to show you what we marked as

13  Defendant's Exhibit E, this is a letter from Mr. Parise to Mr.

14  Schumann dated March 23rd, and this indicates that he is

15  enclosing a report; to be fair, his entire estimate is attached

16  to this.

17          THE COURT:  What was the date of that letter again?

18          MR. GEER:  March 23rd.  I'm not at this point

19  putting in Mr. Parise's estimate because it's already in there.

20          THE COURT:  That's a letter to Mr. Schumann from Mr.

21  Parise?

22          MR. GEER:  Dated March 23rd.

23  BY MR. GEER:

24  Q.    So, Mr. Bennett, would it be safe to say that we have a

25  February 16th loss and it is actually late March, early April

72

1  before Amica has an estimate from any representative of the

2  Bordens which would put you on notice that they disagreed with

3  your figures, correct?

4  A.  That letter that you just cited was actually sent to Mr.

5  Schumann in North Carolina.  It was sometime after that that it

6  was forwarded to me.

7  Q.  I'm going to show you what we're going to mark as Exhibit

8  F, which is exactly that.  Please strike that, I did the wrong

9  intro on that exhibit.  You received this in early April.

10  Shortly after you received this, did you receive another letter

11  from Mr. Parise requesting a meeting?

12  A.  Yes, after I did receive it, I sent something to Mr.

13  Schumann asking for his review of the PA's, the public

14  adjuster's estimate and his input.  It was within days that I

15  received a letter asking for us to have an actual meeting.

16  Q.  So this is Defendant's Exhibit F, correct, that is

17  attached to Mr. Parise's letter of April 6th.  It says at the

18  beginning, a formal response to your letter dated March 11th,

19  March 17th and March 25th, correct?

20  A.  Correct.

21  Q.  And it is in this letter dated April 6th that Mr. Parise

22  goes on in detail explaining the differences and disagreements

23  he has, correct?

24  A.  That's correct.

25  Q.  At this point in time, did you consider the Schumann

73

1  estimate to be final or preliminary?

2  A.  No.

3  Q.  At this point in time, were you --

4        THE COURT:  I don't understand the answer, had to be

5  one or the other?

6        THE WITNESS:  I answered no to first the part, I

7  considered it a preliminary estimate.

8  BY MR. GEER:

9  Q.  At this point in time, were you trying, was your object

10  in sending these checks to the Bordens to settle the claims at

11  that number?

12  A.  The whole intent of that is to get the money that we feel

13  that we owe them, the amount that we know we owe them in their

14  hands.  We don't want to hold the money, we went them to hold

15  the money.

16  Q.   Is it or is it not an attempt to reach a final settlement

17  based upon those numbers?

18  A.   No.

19  Q.   How does the normal process work?

20  A.   Normally speaking, an insured will select a contractor

21  that is actually going to do the repairs.  Like I said before,

22  I was never made aware of a contractor.  And then if repairs

23  were underway or if there are issues that are developed during

24  the course of repairs, that sometimes you have to re-evaluate

25  the method of repair.  It happens all the time with auto


                                74


1  repairs.  It always happens.

2  Q.   Had the Bordens selected a contractor or at least

3  provided you with a name of a contractor that they were relying

4  upon, how could this have facilitated the resolution of the

5  claim issues?

6  A.   Well, at the time we had the meeting, at that point I had

7  an adjuster's estimate, one that the company had used many

8  times before, an adjuster they used many times before, we had

9  Brian Seifert, who had written to me and told me he could do

10  repairs as outlined by Mr. Schumann's estimate.  I know there's

11  an issue about Mr. Seifert's position about that.  But after

12  the meeting Mr. Seifert told me a completely different story

13  about his initial meeting with Mr. Parise and he reinforced to

14  me that he thought the work could be done based on Schumann's

15  estimate.  If there had been another contractor in there, I

16  think it would have affected how I evaluated the situation.

17  Q.    Regardless of what went on at the meeting of April 15th,

18  I certainly don't want to go through everything that occurred

19  again.  However, so the court doesn't feel that nothing was

20  accomplished at that meeting, let me ask you this.  Were there

21  aspects of the claim which were discussed at the April 15th

22  meeting which were involved at that meeting -- can you answer

23  the question?

24  A.    Well, I believe at that point --

25          MR. MURPHEY:  Objection, your Honor, that was posed


                                    75


1  before, this matter is not an issue.

2          THE COURT:  Overruled.

3          THE WITNESS:  I believe that one of the reasons why

4   we felt that it was best to proceed with the appraisal process

5   is the condition of the house at that point by April 15th, it

6   was getting quite warm.  Nothing other than the emergency

7   services that were provided had been done to the house, there

8   was mold growing on the wall.  I mean the situation wasn't

9   getting any better.

10  BY MR. GEER:

11  Q.    Was there an agreement reached at the April 15th meeting

12  regarding the clothing?

13         THE COURT:  Regarding what?

14  BY MR. GEER:

15  Q.    The clothing, the dry cleaning?

16  A.    Yes, in addition to the dwelling, we did review the items

17  that were dry cleaned, and at that point I believe there was an

18  agreement with Mr. Parise and myself that some of the items did

19  need dry cleaned, some didn't.  I requested him to complete an

20  inventory of those items that didn't.

21  Q.    All right.  In addition to the issues regarding the dry

22  cleaning, there were also issues discussed regarding the

23  contents of the house which were being removed and needed to be

24  cleaned so that they could hopefully be preserved, is that

25  correct?

76

1  A.    That's correct.

2  Q.    Was anything resolved there?

3  A.    Well, I think Mr. Parise's position throughout the whole

4  process were none of the items were ever going to be accepted.

5  But we --

6        MR. MURPHEY:  For the record, your Honor, same

7  objection.

8        THE COURT:  Overruled.  So the record is clear, when

9  I'm overruling these objections, I'm going to make a final

10  determination when I review this transcript as to exactly how

11  and where this all fits together.  So, go ahead.

12  BY MR. GEER:

13  Q.   I'm going to show you an exhibit, Mr. Bennett, that we

14  have not introduced, the May 7th letter, I have marked it as

15  Exhibit G.  This is the letter to Mr. Parise from you, I'm

16  going to ask you look at the first paragraph.  If this kind of

17  summarizes some of the things which were discussed at the

18  meeting, let the court see what the status was on these other

19  issues.  First of all, the first paragraph says "this will

20  confirm our discussions at the April 15th meeting."  The second

21  one says "we agreed there were items that did not dry clean or

22  launder appropriately.  You agreed to include these items in

23  your contents inventory.  We also agreed there were items that

24  did clean," is that safe to say?

25  A.    That's correct.


77


1  Q.    So there were agreements reached, correct?

2  A.    Yes.

3  Q.    You're also asking for contents inventory, and discuss

4  the mold issue, correct?

5  A.    Correct.

6  Q.    And you also say here in our meeting as discussed because

7  of a large variation of the estimated damage, this would move

8  forward most expeditiously to be resolved through appraisal,

9  correct?

10  A.    Correct.

11  Q.    And the court has already seen a copy of the letter which

12  you submitted to the Bordens and Mr. Parise, this is A13, which

13  sets forth the appraisal provision, correct?

14  A.   That's correct.

15  Q.   This is where you formally demand an appraisal.  Did

16  Amica continue, after demanding an appraisal, still look for

17  ways to resolve the claim?

18  A.   Yes, we did.

19  Q.   And Amica found out, did it not, that the Bordens, who

20  had hired counsel, felt there was another way to go, short of

21  appraisal, and that was to request a meeting where another

22  contractor be present, correct?

23  A.   That's correct.

24  Q.   And that was Dan Jones?

25  A.   That's who we hired, yes.

78

1  Q.   The claim was eventually settled based upon Mr. Jones'

2  estimate, correct?

3  A.   That's correct.

4  Q.   Now, as we sit here today, the Bordens never moved passed

5  what I call the actual cash value stage -- have they received

6  all the actual cash value payments on their home which are due

7  to them?

8  A.   For the dwelling, no.  Oh, I'm sorry, the actual cash

9  value, yes, they did, I'm sorry.

10  Q.   And under the Amica policy, they are also entitled to

11  replacement cost, are they not?

12  A.   That's correct.

13  Q.   What do they have to do in order to obtain the

14  replacement cost?

15  A.   We have an agreement that if they purchase a house or

16  rebuild a house in excess of the agreed upon repairs, we will

17  issue the ACV hold back, the amount of depreciation that was

18  withheld.

19  Q.   A lot of discussion in this case has involved what is the

20  replacement cost, but in fact they really haven't qualified to

21  receive that yet, have they?

22  A.   No.

23  Q.   Nevertheless, there is an agreement between Amica and the

24  Bordens which sets forth what that replacement cost is,

25  correct?

79

1  A.   Correct.

2  Q.   And that is the number that Dan Jones came up with,

3  correct?

4  A.   Yes.

5  Q.   I'm going to show you one more document, Exhibit H, and

6  this is the policyholder release, acknowledgement of payment

7  and settlement agreement which was entered into in this

8  particular case.

9       MR. MURPHEY:  What is the date of Exhibit G?

10      MR. GEER:  May 27th.

11      MR. MURPHEY:  Thank you.

12  BY MR. GEER:

13  Q.   Exhibit H is the release -- you will note, Mr. Bennett,

14  that it was signed in April, were the terms of this release

15  worked out at the end of the year 2003?

16  A.   Yes.

17  Q.   Payment was made, correct?

18  A.   Correct.

19      THE COURT:  This was signed in April in 2004?

20      THE WITNESS:  Yes.

21  BY MR. GEER:

22  Q.   Does Exhibit H set forth the payments which had been made

23  up to that point in time?

24  A.   That's correct.

25  Q.   Is that accurate?


80


1  A.   Yes.

2  Q.   So, ultimately, as far as you know, in terms of achieving

3  Amica's goal of putting the Bordens back in pre-fire condition,

4  obviously, you couldn't rebuild the house because they elected

5  to demolish it.  In terms of what it cost to do that, do you

6  feel Amica has done that?

7  A.   Yes, I do.

8        MR. GEER:  That's all I have, thank you.

9        THE COURT:  Mr. Murphey.

10       MR. MURPHEY:  I just have a couple of things, your

11  Honor, because I've already examined Mr. Bennett.

12               CROSS-EXAMINATION

13  BY MR. MURPHEY:

14  Q.   You testified briefly about things that happened

15  initially after the fire, including Amica's payment for a

16  rental house for the Bordens.  It was actually the Bordens that

17  located the rental house, is that right?

18  A.   Yes, and we worked with his realtor.

19  Q.   That was the obligation of Amica's under he alternative

20  living expense section of the policy, correct?

21  A.   That's correct.

22  Q.   And the claim card that you spoke is a way in which Amica

23  satisfies its obligations to provide replacement of damage

24  contents, clothes and that sort of thing and do it in an

25  efficient way after loss, is that correct?


81


1  A.   It's money they can use in any way.

2  Q.   And you testified about that in this case, Mr. Schumann

3  at one point told the Bordens that although they had reached a

4  limit on the claim card, it would be reloaded and then when

5  Mrs. Borden tried to use it, it was twice rejected because it

6  hadn't been reloaded, is that correct?

7  A.   It's a debit card, it depends on how much --

8  Q.   Did that happen, sir?

9  A.   I believe that allegation took place.  But I don't have

10  any documentation in the claim card report that it actually

11  took place.

12  Q.   But you know that was reported?

13  A.   It was reported, yes.

14  Q.   Just some miscellaneous things really.  You said today

15  that you had never seen Mr. Haller's estimate until today, is

16  that correct?

17  A.   That's correct.

18  Q.   Do you know that Mr. Geer took Mr. Haller's deposition

19  last year and at that deposition Mr. Haller produced his

20  estimate, you know that?

21  A.   I was not given the estimate.

22  Q.   You just didn't see it, okay.  Now, you testified a

23  minute ago that Mr. Parise sent you a letter dated March 23rd

24  with his estimate, obviously, you got it a few days after that,

25  correct?


82


1  A.   It was after that, I don't remember the number of days.

2  Q.   Sure.  You testified just a minute ago that was your

3  first notice that Mr. Parise had estimated the loss at

4  something greater than Mr. Schumann, is that correct?

5   A.   I don't recall that, I'm sorry.

6   Q.   Because, in fact, you knew as early as March 5, 2003,

7   that Mr. Parise had estimated the loss and that the estimate

8   was going to be significantly greater than Mr. Schumann's

9   estimate, didn't you?

10  A.   My understanding was, from looking at Schumann's time

11  sheets, that they were contesting the claim.

12  Q.   Okay.  In fact, we saw, we heard testimony before that

13  from Mr. Schumann's time sheet that it was as early as February

14  27, 2003, that the Bordens were questioning the scope of Mr.

15  Schumann's estimate, is that right?

16  A.   That's correct, but they never provided us with any

17  documentation in support of that argument.

18  Q.   Okay, but a minute ago you told the judge that you didn't

19  have any notice of it, I just want to make sure that he doesn't

20  misunderstand that you did have notice of it?

21  A.   I had no documentation.

22  Q.   Okay.  March 5, 2003, I'm showing you the document that's

23  been previously marked as Exhibit 3-13, this is an e-mail from

24  you to Ms. St. Onge, is that correct?

25  A.   That's correct.

1  Q.   The sentence under coverage A says, "I have been informed

2  the insured has retained a public adjuster/consulting firm."

3  And then further down in the first paragraph, it says that

4  "Visions said the consultant says dwelling estimate will be

5  double what he wrote," is that correct?

6  A.   That's correct.

7  Q.   And, of course, Visions never did write an estimate, is

8  that right?

9  A.   No.

10  Q.   Now, you testified that normally a contractor would be

11  selected who would do the repairs and you described what you

12  seen in other cases.  But you will agree with me, will you not,

13  that Amica's obligation is the same, and that is to pay

14  whatever it would cost to put the house to pre-fire condition

15  regardless of whether the insured actually chooses to rebuild,

16  is that right?

17  A.   That's correct, it doesn't facilitate the process.

18  Q.   Okay.  In this case ultimately the Borden's never did

19  rebuild, is that correct?

20  A.   That's correct.

21  Q.   So you dispute the obligation is still the same?

22  A.   Yes.

23  Q.   Correct?

24  A.   Correct.

25  Q.   Now, Mr. Geer referred to Exhibit G.  This is Exhibit G

84

1   that you looked at minute ago, which is the letter of May 7,

2   2003, and in that letter in the second paragraph you tell Mr.

3   Parise that "we agreed there were items that did not dry clean

4   or launder appropriately.  You agreed to include these items in

5   your contents inventory.  We also agreed that there were items

6   that did clean."  Now, at this point you're agreeing, I think

7   you testified about this before, that you personally had

8   examined the dry cleaning and found some of them had not

9   cleaned, is that right?

10  A.   Correct.

11  Q.   Now, this is after, however, you had sent a letter to the

12  Bordens before you ever saw any of the dry cleaning, in which

13  you had insisted that the cleaning had been done adequately and

14  they should accept the clothes, is that correct?

15  A.    Yes, that was based upon a representation from VIP

16  Cleaners to me.

17  Q.    Okay.  What I'm referring to is this letter which is

18  marked Exhibit 3-19, dated March 25, 2003, in which at the

19  bottom you say, "according VIP Cleaners, these items have been

20  cleaned according to industry standards and we disagree with

21  the contention that they were not cleaned satisfactorily," is

22  that correct?

23  A.    That's correct.

24  Q.    And later when you actually saw them you agreed that some

25  of them were not?

85

1  A.    Some of them were not, in the end we paid for them all.

2  Q.    And Mr. Geer finished by asking you about whether the

3  Bordens had ever received their replacement cost money.  They

4  have not because they haven't rebuilt yet.  You explained the

5  agreement.  But, again, that does change Amica's obligation, is

6  that correct?

7  A.    Correct.

8        MR. MURPHEY:  That's all I have, thank you.

file:///A|/BORDEN3.TXT

9          THE COURT:  Do you need a document, Mr. Geer?

10         MR. GEER:  Yes.

11         THE COURT:  Which one is it?

12         MR. GEER:  It's one of the letters --

13         THE COURT:  What is the subject matter, maybe I can

14   help you?

15         MR. MURPHEY:  We'll stipulate to the fact that Amica

16   was told that Dr. Borden was researching carcinogens and they

17   never got anything in writing.  Which I think is what Mr. Geer

18   is asking for.

19         MR. GEER:  That's exactly what I'm asking.

20              REDIRECT EXAMINATION

21   BY MR. GEER:

22   Q.   You received a letter from Mr. Parise indicating that Dr.

23   Borden was researching information regarding carcinogens and it

24   would to be provided to you at some later date.  You never

25   received that, is that correct?


                               86


1   A.   No, I did not.

2   Q.   Have you ever received any information indicating that

3  smoke remediation process and fire restoration process, which

4  was being contemplated in the Schumann estimate, was going to

5  be in a way harmful to anybody in the Borden family?

6  A.   No, I did not.

7  Q.   Did you receive any information during the claim stage

8  which would have indicated that the smoke remediation process

9  would not have restored the Borden home to its pre-fire

10  condition?

11  A.   No, I did not.

12       THE COURT:  What was the timeframe on that last

13  question again?

14       MR. GEER:  During this claim stage, did you ever

15  receive any information --

16       THE COURT:  What is the claim stage, what is the

17  period of time?

18       MR. GEER:  While the claim was open.

19       THE COURT:  Anytime from the filing up to the

20  settlement you mean?

21       MR. GEER:  Yes.

22       THE COURT:  Go ahead, ask the question.

23  BY MR. GEER:

24  Q.   The question was did you receive any information which

25  would indicate the Schumann technology, the smoke remediation

87

1  process, would not have worked, would not have left the house

2  in its pre-fire condition?

3  A.   No, I did not.

4          MR. GEER:  That's all I have.

5          THE COURT:  Do you have anything else?

6          MR. MURPHEY:  No, your Honor.

7          THE COURT:  All right, Mr. Bennett, thank you very

8  much.  Is that it then from your standpoint, Mr. Geer?

9          MR. GEER:  What I have, your Honor, in addition to

10  that, I have very short couple sections from the deposition of

11  Richard Borden.  What I have done is just taken, it's really

12  only four pages, I've circled the sections --

13          THE COURT:  I should have asked the same question of

14  Mr. Murphey, the deposition excerpt of Lisa St. Onge, which is

15  Exhibit 14, has that been filed?

16          MR. MURHPEY:  It has not, your Honor.

17          THE COURT:  It should electronically be filed and be

18  made part of the record.  Have all these other exhibits been

19  electronically filed and made part of the record?

20          MR. MURPHEY:  They have not.

21          THE COURT:  They all should be.

22          MR. MURPHEY:  When will we do that, just post-trial?

23          THE COURT:  I'll talk about the logistics of that in

24  a second.  And I presume the same for you, none of your

25  exhibits have been made part of the record, is that right?


88


1           MR. GEER:  Maybe a few that were attached to

2   pleadings, but that's it.  I think the release maybe.  For the

3   most part, no.

4           THE COURT:  Similarly, you can give me the hard copy

5   of what you have in your hand there, how is that identified?

6           MR. GEER:  We will identify this as Exhibit I.

7           THE COURT:  Well, for present purposes, just give it

8   to Ron and we'll get a paper clip, we'll staple it.  And that's

9   whose deposition?

10          MR. GEER:  Richard Borden, who is the brother of Dr.

11  Borden.  He's the one that was providing the legal advice early

12  on.

13        MR. MURPHEY:  I think these are the same sections

14  that he had identified for me previously.

15        THE COURT:  Is there anything else?

16        MR. GEER:  That's all, your Honor.  Other than my

17  exhibits.  I'm going to need a second just to organize them.

18        THE COURT:  In terms of what I want both of you to

19  do, in terms of filing, I want you to both prepare, you move

20  them in, but it's going to be helpful to actually have a formal

21  document from each of you.  I want you, Mr. Murphey, or someone

22  on your behalf prepare seriatim a list of your exhibits, a

23  brief description of them, also for filing.  That my clerk can

24  easily refer to as we're working on this case.

25        MR. MURPHEY:  Just a cover page with a list of


89


1  exhibits attached?

2        THE COURT:  That's right.  The same for you, Mr.

3  Geer.  Do you need some time to go through and look at your

4  exhibits?

5        MR. GEER:  I need a second.  I have them in various

6  places.

7        THE COURT:  All right, you don't have to do that

8  right now, you can do that in a bit.  For present purposes, if

9  both of you are so inclined, and I think it's always helpful

10  for me at the end of a non-jury case, to hear what if anything

11  each of you would have to say by way of summary.  Mr. Murphey.

12        MR. MURPHEY:  Yes, your Honor.  I know your Honor

13  has been very actively involved in the testimony and that you

14  clearly understand and have followed the evidence.  And, in

15  fact, I'd like to thank you for allowing both Mr. Geer and I to

16  sort of argue as we went along and put things in context.  So

17  I'm not going to give a summary like I would to a jury, I know

18  you would appreciate that.

19        I think, your Honor, that we have proven all the

20  suggested findings of fact that we submitted, that is really

21  what we tried to do, is go down that list and we've proven all

22  of them, either by oral testimony or by the exhibits that are

23  being submitted to you.  As you know, we are required to prove

24  by clear and convincing evidence two things.  One, that the

25  carrier was unreasonable; and two, the carrier knew or should

90

1  have known it was acting unreasonably.  In this case on issue

2  one, and that is whether Mr. Schumann's initial estimate was

3  unreasonable, I don't think there can be any question that it

4  was.

5        THE COURT:  Let me interrupt you because if memory

6  serves me, this may be wrong, I thought your position was not

7  that Mr. Schumann's initial estimate was evidence of bad faith,

8  but that once Mr. Schumann was advised or became possessed of

9  Mr. Parise's opinion, that it was at that point that his

10  continued adherence blossomed into bad faith?

11        MR. MURPHEY:  Well, that's true.  But there's two

12  elements to bad faith.  The first one is the unreasonable

13  conduct to begin with.  Our position is that Mr. Schumann's

14  estimate was unreasonably low.  And then at various times

15  during the course of the claim, Amica was provided with

16  information that should have been, should have let them know

17  that it was unreasonable to rely on Mr. Schumann's estimate.

18  But I think in the first instance we have evidence that the

19  estimate was too low.  And that evidence is that anybody else

20  that's looked at this case, has estimated it at significantly

21  more than Mr. Schumann.  The closest other estimate is Mr.

22  Jones, which is $213,000 more than Mr. Schumann's.  Of course,

23  Mr. Parise's was more than twice Mr. Schumann's.  Mr. Haller's

24  is more than twice of Mr. Schumann's.  So on the insular issue

25  of whether Mr. Schumann was reasonable with his estimate to

91

1  begin with, we think that we proved beyond a shadow of a doubt

2  that it was not.  In fact, Mr. Jones, who came in and actually

3  changed his testimony today slightly, actually more than

4  slightly, he said today that he felt his estimate, if he had

5  done it initially for the insurance company in February, it may

6  have been different from Mr. Schumann's.  And he explained why

7  that is.  But in his deposition he said the opposite.  He said

8  in all likelihood my estimate would have been the same as Mr.

9  Schumann's if I done it in February.

10        The damage aspects of the case haven't changed.

11  They attempt to talk about how Mr. Schumann may have been

12  operating under difficult circumstances, of course, we know his

13  estimate never changed.  We have never been provided any

14  information that Mr. Schumann, Mr. Schumann didn't testify that

15  there was some specific area of the house he couldn't get to,

16  that there was something about the damage that for whatever

17  reason he couldn't see.  Of course, in April he goes back and

18  sees the house, walks through it in what we presume is good

19  weather conditions and he doesn't change his estimate.  But on

20  the insular issue of whether Mr. Schumann's estimate in the

21  first instance was unreasonable, we think that the evidence is

22  overwhelming.  Mr. Seifert doesn't help --

23      THE COURT:  Was it recklessly unreasonable or was it

24  negligently unreasonable to begin with?

25      MR. MURPHEY:  To begin with it's negligently


92


1  unreasonable.

2      THE COURT:  All right.  But I want to understand

3  your position.  Is it your position that that is simple

4  negligence, which will not support a bad faith claim, at some

5  point on the time continuum blossoms, if you will, into a

6  reckless indifference once he becomes possessed of the other

7  expert's opinion and the basis for it, is that essentially your

8  claim?

9      MR. MURPHEY:  That's it, your Honor.  So Mr. Parise

10  provides an estimate, a detailed estimate, it concludes and as

11  we just heard from Mr. Bennett, they knew as early as March

12  5th, the fire was February 16th -- well, I take it back, they

13  knew as early as February 27th that the Bordens disagreed with

14  the scope of the estimate.  They knew as early as March 5th

15  that Mr. Parise significantly disagreed with the scope of the

16  estimate.  They ultimately get Mr. Parise's report at the end

17  of March.  They still don't do anything.  Mr. Parise suggests a

18  meeting.  They didn't suggest a meeting, Mr. Parise did.  They

19  have the meeting, they walk through the house, at that time

20  it's just overwhelming, the evidence, that Mr. Schumann's

21  estimate was way, way too low.  Mr. Schumann or Mr. Parise now

22  is showing them in spades the problems with the smoke residue

23  inside the walls.  He goes to the extreme, actually probably a

24  little theatrical, of kicking holes in the walls and showing

25  them soot.  We saw all the photos, I know you don't need to see

93

1   them again.

2         THE COURT:  Let me ask you this.  At that point or

3   shortly -- it's your opinion that, first of all, is it, in your

4  view, is it evidence of the carrier's bad faith that they

5  demand an appraisal?

6          MR. MURPHEY:  Yes, your Honor.

7          THE COURT:  Why is that?

8          MR. MURPHEY:  Because, your Honor, appraisal is,

9  we've heard testimony from people today that an appraisal is

10  unusual, it's a method of last resort, it's expensive for the

11  insured, and there's no reason why they couldn't have a

12  contractor come in and look at the estimate, re-estimate it if

13  they didn't feel like -- if they felt that the gap was too

14  great to bridge at that point.  They attempted to force the

15  insured to an appraisal, inconsistent with their own

16  guidelines, by the way.  Their own guidelines - are the insured

17  is to have the option of invoking the appraisal process.  If

18  they chose not to, then they can take some other measure to try

19  to resolve the dispute or invoke an appraisal themselves.  The

20  bottom line is they attempted to invoke the appraisal, they

21  decided to invoke the appraisal procedure at that point without

22  doing any negotiating or conceding, and in fact at that time

23  Mr. Bennett and Mr. Schumann agreed between the two of them

24  that their estimate should be increased by at least $20,000.

25  They didn't offer that, they didn't revise the estimate, they

94

1  simply said let's go to appraisal.

2      It was only after Dr. Borden complained to the

3  insurance company and counsel got involved, that the appraisal

4  process slowed down and ultimately never occurred because

5  another contractor got involved.  If you remember at the

6  outset, I asked your Honor to look at this case as if the

7  Bordens hadn't been represented, what would have happened.

8  Well, at that point if they hadn't been represented at all,

9  they would have gotten $328,000 ultimately and that's more than

10  $200,000 less than they admitted that they owed.

11      THE COURT:  Aside from the issue of the scope of

12  work, which is one of the important issues here, what am I to

13  make of the fact that in any event there was a rather -- there

14  was a huge difference in dollars and cents between the Parise

15  estimate and the Schumann estimate?

16      MR. MURPHEY:  Well, Amica's obligation is to pay

17  what they owe when they know that they owe it.  And at the time

18  of the April 15th meeting, they knew they owed more than they

19  offered.  And they didn't revise an offer, they didn't make any

20  supplemental payment.

21          Consider the mind set of the Bordens at this point.

22  Mr. Schumann has been provided, Mr. Schumann and Amica, because

23  Mr. Bennett was at the meeting, too, had been provided clear,

24  clear evidence of mistakes and omissions in that Schumann

25  estimate and it's not revised.  For example, you've heard


                                95


1   testimony about the countertops.  The difference between

2   plastic laminate and Corian countertops, is that individually

3   an important item, maybe not.  However, it indicates to the

4   Bordens that Amica has no intention of revising Mr. Schumann's

5   estimate at any time.  Mr. Parise has crawled under and shown

6   them the Corain sticker.  Did they change their estimate to

7   increase significantly the payment for the countertops, no.

8   Same goes for the floor.  He had estimated vinyl flooring, it

9   was tile flooring.  And this is information that had been

10   provided to Mr. Schumann before, and they make no revisions.

11          THE COURT:  Let me ask you this, then you can tell

12   me whatever else you want to tell me.  If, as a matter of fact,

13  as it played out in the real world, we know an appraisal never

14  took place?

15          MR. MURPHEY:  That's right.

16          THE COURT:  If Mr. Jones had -- Mr. Jones being the

17  contractor, not obviously Terry Jones, the lawyer, if Mr. Jones

18  had been retained by Amica within a week or so of their initial

19  request for an appraisal, as opposed to several weeks later

20  after some further -- how much later was he retained after the

21  April meeting?

22          MR. MURPHEY:  The estimate was done at the end of

23  June, but he went on vacation, they didn't actually get an

24  estimate until later, middle of June.

25          THE COURT:  Let's presume rather than Jones being


                                96


1   brought on a couple months down the road, Jones was brought on

2   in an effort to resolve the claim within a week or 10 days.

3   Would you still be making the argument that there was bad

4   faith?

5           MR. MURPHEY:  Yes, your Honor.

6           THE COURT:  Why and I'm not saying this was or

7  wasn't, I have no fixed opinion, I'm going to read this

8  transcript.  But, you know, the old phrase no harm, no foul;

9  where is the harm and foul here?

10        MR. MURPHEY:  Well, the only reason Amica did that

11  was because Mr. Borden complained to the insurance department

12  and Dr. Borden got counsel.  And it was only after that, and

13  then Amica retained counsel.  It was only after that that Amica

14  changed counsel and decided to get another contractor involved

15  in the case, who ultimately allowed the case to be resolved.

16        We said at the outset that this is not a traditional

17  delay case, in the sense that they knew that they owed X amount

18  on January 1, 2000 and paid it in 2003.  This is a case where

19  the Bordens were compelled to take steps that they shouldn't

20  have had to take in order to get the amount that they were

21  legitimately owed under the policy.  Those steps were to hire

22  the public adjuster, complain to the insurance department, hire

23  a lawyer.  And it was only then that Amica and perhaps once Mr.

24  Geer got involved, it was only then that Amica said well, wait

25  a minute, we don't have a contractor's estimate in this case,

97

1   we recognize that when were at the meeting of April 15th, Mr.

2   Parise showed us that there was significant soot throughout the

3   house, including behind the walls, maybe we need to take a

4   another look at this rather than pushing toward to an appraisal

5   where perhaps the insurance company would do better than what

6   they actually owed under the policy.

7          THE COURT:  What in your view am I to make of the

8   testimony in this case concerning the reasonableness or lack

9   thereof of attempting to remediate smoke damage through the

10   various techniques that have been discussed, as opposed to

11   ripping the thing down to the studs?

12          MR. MURPHEY:  Mr. Jones, again, said today that he

13   changed his --

14          THE COURT:  Wasn't Mr. Jones somewhat unequivocal on

15   the point?

16          MR. MURPHEY:  I thought Mr. Jones made it very clear

17   in his deposition and then when I cross-examined him, I hope

18   your Honor agrees with me, he said that if he had looked at

19   this estimate in February, it would have been the same as he

20   did it in June.  He would not have estimated it in the fashion

21   that Mr. Schumann did.  He's now trying to help his client,

22   he's testifying with respect to what maybe another contractor

23  would have said, another supposedly reasonable contractor, but

24  Mr. Jones himself wouldn't have done it.  I thought he was very

25  equivocal on the question you asked, and that is what would you

98

1  have recommended at the time.  He kind of went back and forth

2  on that.  I think, with all due respect to Mr. Jones, I think

3  he went back and forth because when he originally testified, he

4  acknowledged to me damage hasn't changed in any way.  Amica

5  didn't ask me to do anything other than estimate what it would

6  cost to put this house back in pre-fire condition.  That's what

7  I did.  And my estimate is $542,000.  Mr. Schumann's is

8  $320,000.  My scope is the same as Mr. Parise's.  As Mr.

9  Bennett acknowledged, Mr. Jones' testimony or report was much

10  more consistent with Mr. Parise's than it was with Mr.

11  Schumann's.  So the testimony is could these things be used in

12  another case.  Maybe your Honor was happy to learn about some

13  of this technology, but nobody said it would have worked in

14  this case.  Including Mr. Jones and their own witness, with

15  respect to Mr. Schumann's estimate.

16          THE COURT:  Anything else you want to tell me?

17      MR. MURPHEY:  No, your Honor.

18      THE COURT:  Thank you.  All right, Mr. Geer.

19      MR. GEER:  Thank you, your Honor.  There are a

20  number of things here which have been pretty much

21  uncontradicted.  One is the fact that reasonable people differ

22  and reasonable experts differ on smoke remediation technology.

23  And when it can be used and when it cannot be used.

24      THE COURT:  Let me ask you a question.  And my

25  memory is not sufficient at the present time to permit me to

99

1  say whether this testimony is or is not contradicted by Mr.

2  Schumann.  My recollection is that I think it may not be.  What

3  if anything should I make of what may prove to be a fact,

4  unless I have to do some fact finding or maybe stipulated, not

5  stipulated, but uncontested fact, that Mr. Schumann was of the

6  opinion at the house that -- or expressed the opinion at the

7  house, and I'm paraphrasing it, how do we know that this soot

8  came from this fire, do you recall the testimony?

9      MR. GEER:  I recall him, my recollection is Mr.

10  Schumann said he recalls something of that nature.

11          THE COURT: Was that reasonable -- was that a

12    reasonable speculation under the circumstances?

13          MR. GEER: Well, your Honor, he might have said

14    something which was not prudent to say under the circumstances,

15    if he in fact said it, I would agree with that. I don't think

16    there's any question that meeting did not go well. Mr. Parise

17    was walking around kicking holes in walls, Amica wasn't sure if

18    they didn't need to be destroyed, he was in fact damaging them

19    by doing that. That meeting didn't go well.

20          THE COURT: What am I to make of the testimony about

21    the tub and the engine, if you will, or the machinery that ran

22    the tub. The testimony to the effect that Mr. Parise was --

23    indicating how the tub could not be repaired. I think I even

24    asked a question about the engine, whether that was an integral

25    part. And no response. Is it the carrier's position now or


100


1    was it the carrier's position then that Mr. Schumann's approach

2    to that jacuzzi was the appropriate one?

3          MR. GEER: The carrier's portion is that Mr.

4    Schumann missed it. Mr. Schumann made a mistake, he didn't

5  look under the tub, he should have looked under the tub. He

6  should have seen that it was damaged. He did not identify the

7  proper amount of damage underneath the tub. It wasn't aware of

8  this until the April 15th meeting.

9          THE COURT: I take it in evaluating the carrier's

10  good faith or bad faith here, notwithstanding Mr. Schumann's

11  status as an independent contractor, if you will, I am

12  entitled, am I not, to consider the reasonableness or

13  unreasonableness of Mr. Schumann's actions?

14          MR. GEER: I believe you are, your Honor. What we

15  would request that you do is that you consider the reasonable

16  or unreasonableness of the comments or something that was said

17  in the heat of the moment, in the context of what was going on

18  with the whole claim.

19          What was going on in the whole claim at this stage

20  was no final settlement offer had been made. Mr. Murphey's

21  case, all the arguments are being made in this case based upon

22  a preliminary estimate. There is not a scintilla of evidence

23  in this case indicating that Amica was trying to settle the

24  claim, settle everything based upon this preliminary Schumann

25  estimate. It was preliminary. Everyone said that it was

101

1  preliminary.  It was sent to them, they disagreed with it.

2  When checks were sent based upon this estimate, undisputed

3  checks, they rejected them.  When they got a letter saying

4  these are undisputed, they still wouldn't accept them.  In

5  response to Mr. Murphey's argument, which that they needed a

6  public adjuster, they needed an attorney to deal with this, I

7  say this.  Certainly everyone can make their own decision as to

8  whether or not to get a public adjuster in a case.

9         In the Borden's case, there was a lot to be done

10  here.  You need to go through a huge house, a mansion, you need

11  to find out everything that was damaged.  And the contents

12  alone, it would be a prohibitive job.  But I can certainly

13  understand why they might want a public adjuster to do this and

14  to get help on the building.  However, that is not something

15  that is caused by anything that Amica did.  They retained Mr.

16  Parise in early March.  At that point in time, maybe they had

17  decided they were very uncertain about the Schumann estimate,

18  but I'm not even sure they knew why, they just were not

19  familiar with the insurance process.

20          I think one of the issues that comes up in every

21    case is what harm was done and whether or not the damages the

22    plaintiffs' requested are really related to anything the

23    insurance company did.  I guess there's a couple responses to

24    that.  For one thing, when they retained Mr. Parise, this loss

25    was a couple weeks old.  And with respect to the comment I had,


                                    102


1    he charged them an eight percent fee for being a consultant.

2    He was paid over $70,000 to basically put their claim together

3    and submit it.  And they are trying to pass that on to Amica.

4    They had agreed to pay that before there were really any

5    problems.  Certainly the Bordens didn't know they were going to

6    agree with the Schumann estimate.  But the point is where can

7    there be bad faith where there have been only preliminary

8    discussions.  The Bordens are essentially saying to the court

9    because and Parise was saying this in his testimony, because

10   they didn't do it my way, I don't think they acted properly.

11   Because at the April 15th meeting they didn't agree with

12   everything I said --

13          THE COURT:  Let me ask you this.  Once again I'm

14  drawing a distinction between dollars and cents and the scope

15  of the work, although they are somewhat inextricably tied.  Is

16  it by the close of the meeting on April -- what was that, April

17  15th?

18        MR. GEER:  April 15th.

19        THE COURT:  By the close of the meeting on April

20  15th, does the record reflect that Amica was or was not of the

21  opinion that the appropriate way to deal with the smoke damage

22  was to tear down the walls, as opposed to attempt to remediate

23  the smoke in the various fashions?

24        MR. GEER:  I don't believe there was any record,

25  anything in the record which would indicate that at the close


                                103


1  of the meeting on April 15th Amica believed it was wrong in the

2  approach that the walls, the smoke remediation process could

3  work.  Amica was aware that Schumann had missed things in his

4  estimate, but not relating to that.  But the overriding thing

5  that was going on at this point in time was that Amica had

6  already given the Bordens over $335,000 and the money had been

7  returned.  The court had no evidence in this case that the

8   Bordens delayed rebuilding because of these issues.  This is

9   all kind of something in a vacuum.  Because they've given the

10  Bordens $335,000, why would they think that another check for

11  $20,000 would make a difference.  And it was very obvious at

12  this meeting that Parise's at $690,000 and Schumann's at

13  $328,000 and all the testimony is it didn't appear they could

14  bridge that gap.  And what Amica sought to do here was get a

15  resolution of the process.

16          And I totally disagree with Mr. Murphey that there

17  was any evidence, either the insurance commissioner letter or

18  the appraisal provision, had anything to do with a bad faith

19  issue here.  Now, appraisal, Amica could have lost the

20  appraisal.  But it was a prompt way of resolving this.  Both

21  sides hired an impartial, competent person, they come in and

22  take a second look.  There is certainly no evidence which would

23  indicate, as Mr. Parise said, this would have cost the Bordens

24  10 grand or whatever.  Mr. Haller could have served as their

25  appraiser.  There is evidence that Amica went out and tried to


104


1   retain Jack Owens, who's a large loss adjuster out of McKean,

2  Pennsylvania.  They could have gotten this thing done very

3  quickly and who knows whether it would have been the same

4  number as that number that Dan Jones came up with.

5           The point really is that Amica was not a company

6  here that was only going to do it its way.  The preliminary

7  estimate of John Schumann was challenged, it was challenged by

8  Parise's estimate.  It was not challenged by the contractor's

9  estimate.  The Bordens did not bring in a contractor that said,

10  Amica, you can't do it at this price.  It was a public adjuster

11  writing a high estimate.  Someone who has an eight percent fee

12  at stake here, the more he recovers, the more he gets paid.

13  And it's certainly his job to recover as much he can for the

14  Bordens.

15           Amica has a somewhat different idea.  They wanted to

16  get the house in its pre-fire condition, they didn't want to

17  waste insurance dollars doing it.  So Amica's response to this

18  is let's try to find a way to resolve this.  Certainly an

19  appraisal cannot be in bad faith when it is requested promptly.

20  I've been involved in cases where the insurance company, where

21  one party or another requests an appraisal two years down the

22  road and then the bad faith allegation comes up.

23           But in this case, it seems to me what the Bordens

24  want to do, no matter what way Amica moves, they're going to

25  allege bad faith.  They say it's bad faith to request an


                                105


1   appraisal.  They said it was bad faith because Jones came up

2   with a number between Parise and Schumann, but closer to

3   Parise.  In fact, he was $140,000 below Parise and the Bordens

4   agreed to it.  There is no evidence in the case that they would

5   have agreed to that number at the April 15th meeting.  The

6   Jones' resolution was, what I call the Jones' resolution, was a

7   willingness by Amica to listen, when Terry Jones, the attorney

8   for the Bordens, suggested they bring in a second contractor

9   rather than go to appraisal, Amica agreed to put the appraisal

10  on hold and they listened and they did what the Bordens wanted

11  to do, because they thought it might help resolve things.

12  Ultimately, that's what happened.

13          All the issues and all the evidence that Mr. Murphey

14  has cited in this case is all about something that was in the

15  preliminary stage of the claim.  These were all actually steps

16  towards getting the claim adjusted, getting it resolved and

17  getting the release complete.

18          THE COURT:  All right, I think I have your point,

19  thank you.  You've got to get your exhibits together, is that

20  right?

21          MR. GEER:  Yes, your Honor.

22          THE COURT:  How long is that going to take you?

23          MR. GEER:  Five minutes, maybe ten.

24          THE COURT:  I'll come out in a few minutes.  As a

25  general proposition --


106


1          MR. GEER:  I have them together.  I just want to

2  check to make sure I didn't miss anything.

3          THE COURT:  You start looking at them, I'll start

4  giving you some other directions.  Within 20 days of the

5  receipt of the transcript in this case, which one or both of

6  you I'm sure will be ordering or a combination, I want the

7  plaintiffs', for lack of a better term, supplemental proposed

8  findings of fact and conclusions of law, which both sides, of

9  course, will now have the benefit of having a real record to

10  work from.  And then within 20 days of the filing of the

11  plaintiffs' proposed findings, I would want the defendant's

12  proposed supplemental findings of fact and conclusions of law.

13      MR. MURPHEY:  Your Honor, would it be more helpful

14  to you to redo all the findings of fact, so there's one

15  document or do you want the ones we filed pretrial and then a

16  supplement?

17      THE COURT:  Put it this way.  It doesn't much matter

18  to me what you call them --

19      MR. MURPHEY:  I would assume your clerk would want

20  one document to work off of.

21      THE COURT:  Put it this way.  The initial proposed

22  findings were for me an anticipatory road map of where each

23  party thought the case was going to go, but primarily to help

24  me follow the evidence, because it gave me something to read in

25  advance.  In terms of the significance, I would have to say


107


1  that these are your real proposed findings of fact and

2  conclusions of law.  For purposes of my utilization and my

3  clerk's utilization, it will be these, since they're based on

4  the record, that is going to drive the resolution of the case.

5  I think we talked when we were in chambers about attorney's

6  fees issues, things like that.  There was a conclusion that is

7  all premature pending a determination one way or the other on

8  the liability.  So I don't need to see anything in there from

9  the plaintiff on that.  Similarly, I don't need to see anything

10  in the proposed findings about punitive damages, that's a

11  damage issue, also, which can await.  Nor do I need to see

12  anything about any other aspect of damages, including

13  compensatory damages.  Those issues we will address when and if

14  we have to get to them.  Are you still kind of looking through

15  your exhibits there?

16        MR. GEER:  Yes.

17        THE COURT:  I'm just going to sit here so I don't

18  have to come back out and go to lunch.

19        MR. GEER:  Let me go through everything except the

20  photographs, and then I will go through the photographs.  The

21  first one is Exhibit C, the Jones' estimate.

22        THE COURT:  Is that Defendant's Exhibit C?

23        MR. GEER:  Yes.

24        THE COURT:  All right.

25        MR. GEER:  Exhibit A5, which is the February 18th

1  letter from Mr. Bennett to Dr. Borden.

2         Exhibit A7, which was a Visions Corporation letter

3  to Schumann, Amica and Dr. Borden.

4         June 5th, a letter to Paul K. Geer from Attorney

5  Jones, Exhibit A12.

6         Defendant's Exhibit A6, a letter from David Bennett

7  to Dr. and Mrs. Borden, dated March 3rd.  All these are 2003.

8         Exhibit A13, a letter dated May 2, 2003 to Dr. and

9  Mrs. Borden, from David Bennett.

10         Exhibit G, a letter to Anthony Parise, dated May 7,

11  2003, from David Bennett.

12         Exhibit H, the policyholder release acknowledgment

13  of payment and settlement agreement.

14         Exhibit A8, the March 11th letter to Dr. and Mrs.

15  Borden from David Bennett.

16         Exhibit A4, this is a copy of front and back of the

17  check dated March 11, 2003, for the building damage in the

18  amount of $295,098.92.

19         Exhibit A8, a letter to Dr. and Mrs. Borden from

20  David Bennett dated March 17th.

21          Exhibit A9 --

22          MR. MURPHEY:  Excuse me, you've identified two A8's.

23          MR. GEER:  Let's go with A8(1), I'll put one in

24   parenthesis.  The March 17th letter would be A8(1).

25          A9 is the March 17th check, front and back, with the


                                    109


1   endorsement on it for the undisputed contents payment in the

2   amount $39,945.48.

3          Defendant's Exhibit D is the March 21st letter to

4   Anthony Parise from David Bennett.

5          Defendant's A1 is a copy of the handwritten note to

6   David Bennett from Amy Borden rejecting the check.

7          Exhibit A10 is the March 25th letter to Anthony

8   Parise from David Bennett.

9          Exhibit A2 is the second note to Mr. Bennett from

10   Jonathan and Amy Borden, dated 3/20/03.

11          Exhibit A3 is the March 26th letter to Dr. and Mrs.

12   Borden from David Bennett.

13          Exhibit E is the March 23rd letter to John Schumann

14   from Mr. Parise.

15          Exhibit F is the 8/4/03 memo to John Schumann from

16  David Bennett, enclosure for the Giordano letter of April 6th

17  of 2003.  Letter to Mr. Bennett from Mr. Parise.

18          Exhibit I are the excerpts from the Richard Borden

19  transcript.

20          THE COURT:  Let me ask you a question.  The big

21  books, trial exhibits volume one, volume two and volume three,

22  those are of course yours?

23          MR. GEER:  Yes.

24          THE COURT:  One is just the policy guidelines and

25  the others are various exhibits with various times frames.  And

110

1  of course I open them up and go through them.  Each of the

2  documents has a defendant's sticker on the exhibit, but it's

3  not numbered?

4          MR. GEER:  That's correct.  I attempted to put them

5  in order but we didn't use them all.

6          THE COURT:  Okay.  So what you're doing now is you

7  are supplying numbers to some of these that are in the book?

8          MR. GEER:  Practically, here's what happened.  These

9   were prepared weeks ago.  After all these were all prepared and

10  assembled, Mr. Murphey and I discussed limiting some of the

11  issues which were going to be before the court in this

12  proceeding.  At that point in time it is unclear as to what

13  exhibits would be needed -- but many of those are not in

14  evidence and will not be used.

15          THE COURT:  I'm going to give you back those trial

16  books, but I'll tell you what you can do.  First of all, are

17  you done going through your exhibits?

18          MR. GEER:  No, I'm not.

19          THE COURT:  All right, finish that up.

20          MR. GEER:  Exhibit A-15 is the February 25th report

21  and estimate from John Schumann.

22          The rest are photographs, all of which have been

23  marked as letter P.  Each of the photographs has a number

24  besides it, I'm just going to read the number of each one

25  should have a P in front of it.


111


1           THE COURT:  All right.

2           MR. GEER:  The numbers are 186.  42.  95.  96.  88.

3    1.  8.  We have a second 1 -- I'm sorry, that's 3.  85.  110.

4    112.  113.  118.  117.  123.  124.  128.  130.  132.  133.

5    134.  135.  45.  83.  84.  25.  26.  59.  60.  121.  122.  41.

6    80.  81.  37.  35.  192 and 191.

7         THE COURT:  Those are all admitted.  Is that it?

8         MR. GEER:  That's it, your Honor.

9         THE COURT:  What I want you to do then, as I said

10   before, both of you within a week, I think a week would be

11   sufficient, file your exhibits electronically, number one,

12   along with the cover sheet with their number and a description.

13   That's number one.  Number two, what I want you to do, Mr.

14   Geer, is within the next couple of weeks, I want you to send to

15   me a new folder that has the exhibits as they really exist and

16   have been admitted.  Because these are not, through no fault of

17   your own, will not be helpful to me.  Send that directly to

18   chambers.  Now, the books that you have given me, they've all

19   been admitted?

20        MR. MURPHEY:   They have, your Honor.

21        THE COURT:  I have 1, 2, 3 -- I have a book marked

22   10, Exhibit 10.

23        MR. MURPHEY:  Hang on a second, I'm sorry, your

24   Honor.  There should be a photo binder, which is number 1.  The

25　estimates which are number 2.  The claim file exhibits, which

112

1　is number 3.  The Parise photos, which are number 10.

2　　　　THE COURT:  Weren't their loose exhibits, too, you

3　gave me?

4　　　　MR. MURPHEY:  Yes.

5　　　　THE COURT:  11.  4.  6A.  12.  13, is that right?

6　　　　MR. MURPHEY:  Well, there's several others.

7　　　　THE COURT:  14.  These were loose.

8　　　　MR. MURPHEY:  There should be 5, 6, 8 and 9.

9　10, I have another copy.

10　　　　THE COURT:  Let me make sure I don't already have

11　them up here.  I have 4, 11, 6A -- let me see those other ones,

12　for some reason I don't apparently have them.  I just received

13　Exhibits 8 and 9.  What am I missing, 5 and 6, whatever they

14　are?

15　　　　MR. MURPHEY:  Five is the insurance policy.  I think

16　this is the way it was put in.  I believe a copy was handed up

17　at that time, I have another copy.  5 and 6 I handed up.  Then,

18　your Honor, you said you have 11?

19        THE COURT:  Yes.  So then I don't need that from

20    you, I already have all your exhibits.  Every exhibit that I

21    have, either loss or in a binder, you have now moved and have

22    been admitted, is that right?

23        MR. MURPHEY:  That's right, your Honor.  I went down

24    that list of 14 and the binders were included.

25        MR. GEER:  Your Honor, I have a few that I omitted.


113


1         THE COURT:  All right, what are those?

2         MR. GEER:  Those are P-179, 180, 181, 182, 183, 184,

3    187, 188 and 190, these are all exterior views of the home.

4         THE COURT:  All right, those are admitted.  Those

5    will be part of your exhibit list.  When you submit your

6    exhibit list, do it in order, if you will, 1 through or A

7    through.  That will make it easier.  I'm going to put this in

8    the box over here.  Those are the trial exhibits that you had

9    given to me, would you can take back.  Does anybody have any

10    questions -- all right, we're all done.

11

12        (Whereupon, at 12:05 p.m., the Non-Jury Trial

13   proceedings were concluded.)

14

15           - - -

16

17

18

19

20

21

22

23

24

25

114

1           C E R T I F I C A T E

2

3

4

5       I, Ronald J. Bench, certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-entitled matter.

8

9

10

11

12   _____

13   Ronald J. Bench

14

15

16

17

18

19

20

21

22

23

24

25