IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE

| | | |
|---|---|---|
| JONATHAN A. BORDEN and | ) | |
| AMY P. BORDEN, | ) | |
|     Plaintiffs | ) | |
| | ) | |
|       v. | ) | NO. 04-175 E |
| | ) | |
| AMICA MUTUAL INSURANCE | ) | |
| COMPANY, | ) | |
|     Defendant | ) | ELECTRONICALLY FILED |

## PLAINTIFFS' PROPOSED FINDINGS OF
## FACT AND CONCLUSIONS OF LAW

Plaintiffs JONATHAN A. BORDEN and AMY P. BORDEN (hereinafter "Bordens"), by their attorneys, MacDonald, Illig, Jones & Britton LLP, hereby submit the following Proposed Findings of Fact and Conclusions of Law:

I.      Findings of Fact

A.      Liability

1.      On August 30, 2002, the Bordens purchased a home at 4838 Wolf Road, Erie, Pennsylvania for $720,000.  (Trial Transcript (hereinafter "Tr.") p. 158)

2.      As of February 16, 2003, the Bordens lived in the Wolf Road home with their three children:  Three-year-old twin girls (Sara and Emma) and a one-year-old boy (David).  (Tr. p. 157-158)

3.      On Sunday, February 16, 2003, an accidental fire severely damaged the Bordens' home.  (Tr. p. 160)  It was apparently caused by spontaneous combustion of cotton rags used to apply linseed oil by Jonathan "Jon" Borden in a wood-working project.  (Tr. p. 62, 160, 169, Plaintiffs' Exhibit 3-20)

4.      The fire began in the basement of the house and burned for many hours.  (Tr. p. 161, Plaintiffs' Exhibit 3-20)

5.      The fire totally destroyed one section of the house and caused extensive smoke damage throughout the rest of the structure.  (Tr. p. 171-172, Plaintiffs' Exhibit 3-20)

6.      As of the day of the fire, the Bordens owned an Amica Mutual Insurance Company "Platinum Choice" homeowner's insurance policy, no. 630837-1183.  (Tr. p. 37-38, Plaintiffs' Exhibit 5)

7.      The Amica policy was in full force and effect as of the date of the fire.  (Tr. p. 37-38, 159-160, Plaintiffs' Exhibit 5)

8.      The Amica policy provided coverage to the Bordens for fire loss occurring to the Wolf Road house and the contents of the home.  (Tr. p. 37, Plaintiffs' Exhibit 5)

9.      Amica does not dispute its liability under the policy to reimburse the Bordens for the damage to the Bordens' home and contents resulting from the February 16, 2003 fire.  (Tr. p. 38-39)

10.     Amica admits that its obligation under the insurance contract was to pay the Bordens whatever amount was necessary to restore the home to its pre-fire condition, including

total elimination of the smell of smoke.  Amica further admits that this obligation exists regardless of whether the Bordens chose to repair their house, demolish it and rebuild or sell the property and move to another location.  (Tr. p. 38-39, 76)

11.    The "Platinum Choice" policy owned by the Bordens provided the broadest coverage of any Amica homeowner's policy form available in 2003.  (Tr. p. 38)

12.    The Bordens' policy had the following relevant coverage limits:

Coverage A (Dwelling) – $577,000
Coverage C (Personal Property, *i.e.*, Contents) – $432,750
Coverage D (Loss of Use – including Additional Living Expense) – $173,100

(Plaintiffs' Exhibit 5)  Only Amica's handling of the "Dwelling" coverage claim is at issue in this case.

13.    If the fire had totally destroyed the Bordens' house, Amica's own estimate established that the cost to replace it by rebuilding would have been $762,913.  (Tr. p. 69, Plaintiffs' Exhibit 3-10)

14.    Amica had several reasons to seek the lowest possible estimated cost of repair. The first is the usual goal of an insurer to settle a claim as economically as possible, which is present in every claim.  The second was unique to this case and the "Platinum Choice" policy owned by the Bordens.  The policy contained a provision which guaranteed the Bordens the replacement cost of their house even if that cost exceeded the $577,000 policy limit.  That is, if the estimated cost of repair exceeded $577,000, the policy limit would automatically be revised upward, in which case Amica would be required to provide coverage in excess of the policy limit upon which the insurance premium was based.  The other coverages on the policy would also be increased proportionally.  This unaccounted for increase in exposure was a real possibility in the

Bordens case given the significant damage to the house and the $762,913 estimated cost of rebuilding.  (Tr. p. 69-72)

15.     Jon Borden was the only family member at home when the fire started, and he escaped without injury.  (Tr. p. 160)

16.     Jon Borden promptly reported the fire to the authorities and to Amica.  (Tr. p. 40, 161, 163)

17.     On the afternoon of the fire, February 16, 2003, from various sources, Amica received the following information:

      a.    The fire started in the basement of the west part of the house.  (Tr. p. 47, Plaintiffs' Exhibit 3-3)

      b.    The smoke damage was "very extensive." (Tr. p. 47, Plaintiffs' Exhibit 3-3)

      c.    The whole house had been affected by the fire and smoke damage. (Plaintiffs' Exhibit 3-3)

      d.    The fire department told Jon Borden that all the floors in the home were "bowed."  (Tr. p. 47, Plaintiffs' Exhibit 3-3)

      e.    The attached garage was damaged by the fire.  (Tr. p. 47, Plaintiffs' Exhibit 3-3)

      f.    The fire department had to cut a "large hole" in the roof.  (Tr. p. 47, Plaintiffs' Exhibit 3-3)

      g.    The west part of the home was so severely damaged, including collapse of portions of the roof, that the fire marshal sought permission to demolish the structure, although they ultimately decided to wait until daylight on February 17th to decide whether demolition would be necessary.  (Tr. p. 48, 162, Plaintiffs' Exhibit 3-3)

      h.    There was approximately five feet of water in the basement of the home. (Plaintiffs' Exhibit 3-4)

      i.    The home was not habitable.  (Plaintiffs' Exhibit 3-3)

18.     Adjustment of the claim was coordinated by Amica's Pittsburgh Regional Claims Office, primarily Claims Manager David J. Bennett.  (Tr. p. 35)

19.     Bennett does not regularly handle fire loss claims.  He admitted that he has been to only three or four fire scenes in his 25 year adjusting career.  (Tr. p. 35-36)

20.     As of the Borden fire, Amica had in place several sets of guidelines and/or instructions governing the handling of fire loss claims such as the Bordens.  Among those guidelines was a 19 page document called First Party Property Loss Handling Expectations, dated August 1999.  (Tr. p. 130-131, Plaintiffs' Exhibit 4)

21.     Amica's Pittsburgh claim handlers did not have contacts in the Erie area adequate to allow them to identify a "board-up" contractor to undertake the measures necessary to protect the damaged house against the elements.  (Tr. p. 44, Plaintiffs' Exhibit 3-3)

22.     Amica never located or hired a "board-up" contractor.  Instead those services were provided by a man named Brian Seifert, the principal of Visions, Inc.  Seifert was a volunteer fireman who helped fight the fire, who then offered his "board-up" services.  (Tr. p. 42-43) Someone from Amica authorized Seifert to perform the "board-up" work since he was already on the scene.  (Tr. P. 42-44).

23.     Also on the same day as the fire, someone working on Amica's behalf contacted a well-known Erie fire restoration and building contractor, Peter Hardner of Peter Hardner & Son, Inc., to perform board-up services.  (Tr. p. 43, 164)  Mr. Hardner called Jon Borden, said he had been called by Amica and explained what services he would provide.  (Tr. p. 165)  Later the same day, Hardner called Borden back and said that Seifert was already on the scene and Amica had decided to use Seifert instead of Hardner.  Borden asked Hardner about Seifert, but Hardner said he did not know him.  (Tr. p. 165-166)

24.    On February 17, 2003, the day after the fire, Claims Manager Bennett assigned an adjuster named John Schumann to adjust the claim.  (Tr. p. 44)

25.    At the time, Schumann was the principal of a firm called Property Claims Services based in Schumann's house in Lillington, North Carolina.  (Tr. p. 248)

26.    Although not an employee of Amica, from the time Schumann formed Property Claims Services in 2001, the vast majority of his work had been for Amica.  (Tr. p. 248-249) Amica acknowledges that throughout this case Schumann was working on their behalf and thus they are accountable for his actions.  (12/12/05 Tr. p. 100)

27.    Before arriving in Erie, Schumann spoke with Jon Borden on the phone.  They discussed the call Borden had received from Peter Hardner.  (Tr. p. 166)  Jon Borden told Schumann that he had visited the house and spoken with Seifert, and he had concerns about Seifert's experience and qualifications.  (Tr. p. 176)  Seifert had not done some of the emergency work which Hardner, in his phone call with Borden, had suggested was necessary.  (Tr. p. 174) Borden told Schumann that Hardner seemed more reputable and experienced, but Schumann told Borden that Schumann would sort everything out when he got to Erie.  (Tr. p. 176)

28.    Schumann arrived in Erie on February 19, 2003.  (Tr. p. 48)

29.    Several witnesses testified that a snowstorm occurred in the Erie area at or around the time of the fire, but Amica admits that Schumann's ultimate estimate was in no way affected by the weather conditions.  (Tr. p. 134-135, 261)

30.    Schumann went to the Bordens' house where he met Brian Seifert, and the two agreed to work together to develop an estimate for repair of the house. (Plaintiffs' Exhibit 3-1)

31.     As of February 19, 2003, neither Schumann nor Amica had any information of any kind about Seifert and/or Visions, Inc.  They knew nothing about his qualifications or experience as a fire restoration contractor, general contractor, or homebuilder.  (Tr. p. 251-252)

32.     On February 19, 2003, Schumann completed an initial walkthrough of the damaged house and recommended that Amica place a $250,000 reserve on the dwelling coverage.  (Tr. p. 50, Plaintiffs' Exhibits 3-1, 3-5)

33.     On the evening of February 19, 2003, Schumann had dinner with the Bordens, at which time Schumann was very pleasant and reassuring.  He explained to the Bordens that he "worked for them" and he would take care of everything.  (Tr. p. 177, 179)

34.     During the February 19, 2003 meeting, the Bordens expressed "serious concerns" to Schumann about hiring the correct contractor to perform the repairs.  (Plaintiffs' Exhibit 3-1)  Jon Borden reiterated his concerns about Seifert.  Jon Borden also gave Schumann the names of two contractors whom the Bordens would consider for repair/rebuild, David J. Haller Construction and Laughlin Builders, whose names Borden knew because of their work on neighboring houses.  Schumann wrote the names down, but said that it was too early in the process to contact anyone.  (Tr. p. 177-178)  (Schumann recalls that Borden gave him the name of at least one contractor, whom Schumann never contacted.  (Tr. p. 256)

35.     At some point between February 20 and 25, Borden reiterated to Schumann his concerns about Seifert/Visions.  Borden related that he had been told that Seifert was not known as either a fire restoration contractor or a general contractor.  Rather, he was a roofing subcontractor.  (Tr. p. 176)  Borden suggested that Hardner seemed more experienced, but Schumann said he needed "warm bodies" at the scene and Visions was already there.  (Tr. p. 178)

36.     Later, on February 25, 2003, Schumann reported to Amica that the Bordens had serious reservations about Seifert and Visions, and it was unlikely that the Bordens would select Seifert/Visions to repair the house.  (Tr. p. 52, 257-258, Plaintiffs' Exhibit 3-7)  No Amica representative ever asked the Bordens why they would not consider Visions to do the work.  (Tr. p. 53)

37.     During the time Schumann was in Erie inspecting the loss (February 19-27, 2003), Amica, through Bennett, also learned the following about the Bordens:

a.     The Bordens were "devastated" by the fire.  (Tr. p. 58, Plaintiffs' Exhibit 3-6)

b.     One of the Bordens' children, three-year-old Emma, "was born with serious health issues which require specific attention to safety, exposure and assistance."  (Plaintiffs' Exhibit 3-8)  (Also by letter of February 28, 2003, Schumann reported that Emma "is subject to allergies and reaction from pollutants to an extreme degree.")  (Tr. p. 58, Plaintiffs' Exhibit 3-9)

c.     Because their home was uninhabitable, Amy Borden and the three children were staying in Pittsburgh with her family.  Amy Borden was extremely distressed by the fire, relocation, and disruption to the family's life.  (Tr. p. 58, Plaintiffs' Exhibit 3-7)

d.     Jon Borden's professional obligations required him to stay in Erie without his family.  Borden is a neurosurgeon and had moved to Erie only six months before to implement a new neurosurgical team at St. Vincent Health Center.  (Tr. p. 58, Plaintiffs' Exhibit 3-6)  The job entailed "enormous" and time-consuming responsibilities.  (Tr. p. 60, Plaintiffs' Exhibit 3-8)

e.     The above-referenced circumstances prevented the Bordens from being fully involved in the adjustment of their claims, but that the Bordens had made Jon Borden's brother and mother available to assist.  (Plaintiffs' Exhibit 3-8)  Jon's mother came to Erie from her home in Connecticut to assist with the process.  (Tr. p. 60-61, Plaintiffs' Exhibit 3-7)

38.     In a report dated February 25, 2003, Schumann told Amica the following about the house and the fire damage:

a.     The house contained approximately 5,500 square feet of heated living area, and was located on a two-acre lot in an upscale neighborhood. (Tr. p. 64, Plaintiffs' Exhibit 3-8)

b.     The fire started in the basement, which was present below about 50% of the main structure. (Tr. p. 61-62, Plaintiffs' Exhibit 3-8)

c.     In their fire fighting efforts, the fire department broke out "several" windows and "cut numerous large openings" in the roof. (Tr. p. 64, Plaintiffs' Exhibit 3-8)

d.     The basement was essentially totally destroyed, and the main thirty-four foot long steel support I-beam in the basement was twisted due to the extreme heat of the fire. A structural engineer was called to evaluate the basic integrity of the house. (Tr. p. 65, Plaintiffs' Exhibit 3-8)

e.     The rooms above the basement, the kitchen, den and formal dining room, were largely destroyed, requiring replacement of interior walls and ceiling joists. (Tr. p. 65, Plaintiffs' Exhibit 3-8)

f.     The areas of the main level and second level of the house which were not completely destroyed but "sustained significant smoke and soot damage to drywall ceilings and walls and floor coverings." (Tr. p. 66, Plaintiffs' Exhibit 3-8)

39.     Between February 20 to 26, 2005, Schumann inspected the house and found significant damage – the dining room floor had collapsed, the kitchen floor had collapsed, part of the family room floor had collapsed, and there was smoke damage throughout the remainder of the house. He noted extreme smoke and soot damage on the main level of the house, and smoke damage throughout the two-story structure. There was smoke odor throughout the house, but Schumann did not cut test holes in any walls to see the extent of fire residue which may be present. (Tr. p. 261, 268-269, Plaintiffs' Exhibits 3-1, 3-5, 3-8)

40.     On February 26, 2003, Schumann "reviewed" his estimate with Seifert. (Tr. p. 259, Plaintiffs' Exhibit 3-1)

41.     At trial, Schumann admitted that his review of the estimate with Seifert was a "relatively informal" process, and that Seifert never created his own estimate of the loss.  (Tr. p. 253)

42.     Schumann also admitted that although he told Amica and the Bordens that Seifert had "approved" his estimate and wrote a letter to that effect, Schumann never knew if Seifert meant that he believed Visions could do the repairs described by Schumann for the estimated price, **or** if Seifert meant that he believed that the work described on Schumann's estimate would restore the house to its pre-fire condition.  (Tr. p. 254-255)

43.     Schumann estimated that it would cost $328,999.14 to put the house back in its pre-fire condition. (Tr. p. 262, Plaintiffs' Exhibits 2-1, 3-8)

44.     On February 26, 2005, Schumann provided copies of his estimate to Amica and the Bordens.  (Tr. p. 66, 262, Plaintiffs' Exhibit 2-1, 3-8)

45.     Schumann's estimate papers contained no indication that it was only a "preliminary" or "initial" estimate subject to change.  Nor does Schumann recall telling the Bordens that the estimate was likely to be revised during the restoration process.  (Tr. p. 265-267)

46.     Schumann never at any time revised his $328,999.14 estimate.  (Tr. p. 68, 72, 265-267)

47.     Immediately after they received the estimate, the Bordens expressed concern about it.  Schumann spoke with Jon Borden's brother about the estimate and "met with some resistance concerning cleaning vs. removal and replacement of drywall throughout interior of dwelling."  (Tr. p. 68, 262-265, Plaintiffs' Exhibit 3-1)  Jon Borden's brother also raised with Schumann specific mistakes or omissions in the estimate, such as an omission of an estimate to

replace the plumbing in the totally destroyed basement.  Schumann flatly refused to consider changing his estimate.  (Tr. p. 184)

48.      Also on February 27, 2005, Schumann and Jon Borden had a conversation in which Borden raised the subject of hiring a public adjuster to assist with the damage evaluation. Schumann discouraged Borden from hiring a public adjuster, telling him that they are "ambulance chasers," and that hiring a public adjuster would not change Schumann's estimate. (Tr. p. 180)

49.      On February 27, 2003, Schumann left Erie, without considering the Bordens' objections and without revising his estimate.  (Tr. p. 187)

50.      In early March, the Bordens retained the services of an insurance consultant, Anthony N. Parise, of Giordano Associates, Inc. to review Schumann's estimate and, if necessary, prepare his own estimate of the cost of repairs.  (Tr. p. 186)

51.      On March 1, 2003, Schumann told Amica his estimated cost of rebuilding the Borden house from the ground up would be $762, 913.  (Tr. p. 69, Plaintiffs' Exhibit 3-10)

52.      On March 3, 2003, Bennett wrote to the Bordens and advised them that Schumann had completed his dwelling repair estimate and that Visions was willing to complete the repairs based on the estimate.  (Tr. p. 72, Plaintiffs' Exhibit 3-12)  At this point, Amica still had no information whatsoever regarding Visions'/Seifert's competence or experience.  (Tr. p. 74)

53.      As of March 2003, Parise had nearly fifteen years of experience adjusting large fire losses and had inspected over 100 fire scenes.  Parise held several insurance certificates, including Certified Insurance Consultant, Associate in Claims, and Chartered Property Casualty Underwriter.  He was licensed to adjust claims in several states, including Connecticut,

Massachusetts and New York.  (Tr. p. 324-331)  (Although Amica knew throughout that Parise was not licensed in Pennsylvania, they never objected to Parise serving as the Bordens' consultant in this case.)  (Tr. p. 75)

54.     Parise testified knowledgeably, persuasively and credibly.  He supported his testimony with numerous photographs and specific examples of why he estimated the loss as he did.  (Tr. p. 336-414, Plaintiffs' Exhibits 6, 6A, 10-1 through 10-35, 11 and 12)  Even the Amica witnesses testified that they found Parise to be knowledgeable and professional throughout the handling of this claim.  (Tr. p. 98, 267)

55.     Parise came to Erie on or about March 2, 2003.  Before inspecting the damage, Parise spoke with Schumann, who indicated that he was pleased that Parise was now involved because of the difficulty the Bordens' were having in assisting with the adjustment. (Tr. p. 333)[1]

56.     In their initial conversation, Schumann also advised Parise that Schumann was confident about his estimate because it was "backed up" by Seifert/Visions.  (Tr. p. 333)

57.     Parise inspected the house the week of March 2, 2003. (Tr. p. 339)

58.     Parise found significant damage.  He rated the damage a "95" on a scale of 1-100.  (Tr. p. 350)

59.     In the part of the house which was not completely gutted by the fire, Parise noted heavy smoke damage throughout.  He found soot and other evidence of smoke damage in the wiring and plumbing chases throughout the house.  Thus, Parise created an estimate which involved stripping the entire house down to its framing, taking out the flooring, cleaning and repairing the framing, and rebuilding from that point.  The Parise estimate also included

---

[1]     Amica admits that no part of their defense in this case involves lack of cooperation on the part of the Bordens.  (Tr. p. 137)

obviously damaged items which were not included in Schumann's estimate. (Tr. p. 338-339, Plaintiffs' Exhibit 2-2, 2-3)

60.    On March 5, 2003, Amica received a verbal report that Parise had found significant deficiencies in Schumann's estimate and that Parise's estimated cost of repair would likely be much greater.  (Tr. p. 75, Plaintiffs' Exhibit 3-13)

61.    Before making any payments on this claim, Bennett was required to obtain approval from Lisa St. Onge, a claims examiner working out of Amica's corporate headquarters in Lincoln, Rhode Island.  (Tr. p. 79)

62.    On March 7, 2003, St. Onge gave Bennett authority to make a payment to the Bordens based on Schumann's $328,999.14 repair estimate.  (Tr. p. 79, Plaintiffs' Exhibit 3-14)

63.    At the same time she was instructing Bennett to make payment for repair of the dwelling based on Schumann's estimate, St. Onge also asked Bennett to investigate the experience and qualifications of Seifert/Visions by asking how many years they had been in business, how large of a company they are, and whether they normally handle losses of this size. (Tr. p. 80, Plaintiffs' Exhibit 3-14)

64.    Also on March 7, 2003, St. Onge told Bennett that she believed the claim was "heading towards appraisal," although Amica had yet to see Parise's estimate or report.  (Tr. p. 81, Plaintiffs' Exhibit 3-14)

65.    Finally, also on March 7, 2003, St. Onge asked Bennett to investigate the Bordens' concerns about residual carcinogens or other toxins by contacting a dry cleaning expert who may have information on the subject.  (Plaintiffs' Exhibit 3-14)  (Bennett contacted the dry cleaning expert on or about March 11, 2003, but the expert "dropped the ball" and never gave Amica a substantive response to address the Bordens' concerns.)  (Tr. p. 78)

66.    On March 11, 2003, Bennett sent the Bordens a letter enclosing a check in the amount of $295,098.92, which he said "represents the actual cash value of the dwelling repairs less our $1,000.00 deductible."  (This payment was based upon Schumann's repair estimate of $328,999.14 with a "hold-back", permitted by the policy, of the difference between the actual cash value and the replacement cost.  The "hold-back" would be paid after reconstruction of the house, assuming the cost of repair was equal to or greater than the estimate.)  (Tr. p. 82, Plaintiffs' Exhibit 3-15)

67.    The March 11, 2003 letter did not say that the $295,098.92 payment was negotiable, or preliminary, or anything else which would indicate that further payments (other than the "hold-back") would be forthcoming or that the payment was for anything other than Amica's final estimate of the cost to repair the house.  (Tr. p. 83, Plaintiffs' Exhibit 3-15)

68.    The March 11, 2003 letter also referred the Bordens to a portion of their policy entitled "Duties After Loss" which said, in part, as follows:

> In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us.  These duties must be performed by either you ... or a representative:
>
>> 4.    Protect the property from further damage.  If repairs to the property are required, you must:
>>
>>> a.    Make reasonable and necessary repairs to protect the property.

(Tr. p. 83-84, Plaintiffs' Exhibit 3-15)

69.    After receiving the March 11th letter with the settlement check, the Bordens believed Amica was threatening to withdraw coverage unless the Borden's accepted the check and began to make repairs immediately.  (Tr. p. 191)

70.    After consulting with Jon Borden's brother and Parise, by letter of March 17, 2003, the Bordens returned the Amica settlement check because the amount was obviously inadequate to repair the house.  (Tr. p. 87, 191, Plaintiffs' Exhibit 3-16)

71.    On or about March 18, 2003, clothes which were dry cleaned per Schumann's instructions were delivered to the Bordens at their rental house.  Upon opening the dry cleaning bags, the Bordens noticed a distinct smoke odor and, therefore, advised Schumann that they could not accept the clothes.  Schumann asked Visions to store the items, but learned that they did not have the facilities to do so.  Schumann, therefore, instructed Visions to store the cleaning in the garage of the fire-damaged house.  (Tr. p. 89, Plaintiffs' Exhibit 3-17)

72.    The fact that Visions did not have facilities adequate to store the dry cleaning concerned Bennett, since he believed an experienced, qualified fire restoration contractor would ordinarily have such facilities.  (Tr. p. 89)

73.    On or about March 21, 2003, Bennett spoke with Brian Seifert about his qualifications and experience.  Seifert told him he had been in business for 3 years, although he claimed to have "grown up" in the construction business working for his father.  Seifert said that Visions "specialized" in fire restoration work and had done work on projects with a value up to $300,000.00 in the past.  They claimed to have as clients at least two other insurance companies. (Tr. p. 90, Plaintiffs' Exhibit 3-17)

74.    Neither Schumann nor Bennett, nor anyone else form Amica, ever further investigated Seifert or Visions in any way, *i.e.*, they never spoke directly to any insurance companies or homeowners for whom Visions had worked, nor did they inspect, or even view, any of the homes or buildings repaired or constructed by Visions.  (Tr. p. 90)  Neither Schumann nor Bennett ever visited Visions' facilities in Erie.  (Tr. p. 251-252)

75.     Sometime in March, 2003, Parise met with Seifert at the house to review Parise's thoughts on the damage, because Schumann had said that he was confident about his estimate because Seifert was willing to do the repairs for the estimated amount. (Tr. p. 341, 345-347, Plaintiffs' Exhibit 3-23)

76.     After touring the damaged house with Seifert, Seifert admitted to Parise that the house could **not** be restored to its pre-fire condition for the amount estimated by Schumann.  (Tr. p. 92, 401, Plaintiffs' Exhibit 3-18, 3-23)

77.     Later in the process, Seifert also told Jon Borden that Seifert had never agreed that Schumann's estimate would put the house in its pre-loss condition.  Seifert said he had simply told Schumann and Amica that he could do the estimated work at the estimated price. (Tr. p. 188)

78.     At no time did Amica ever receive an estimated cost of repair from Seifert/Visions.  (Tr. p. 67)

79.     On March 23, 2003, Parise sent Schumann a letter, which was forwarded to Amica, which contained his 55-page estimate of repairs and a five-page report outlining the major areas of disagreement between his estimate and Schumann's.   (Tr. p. 90, 399-400, Plaintiffs' Exhibits 2-2, 3-18)

80.     Parise's estimate of repair was $680,492.21 (Plaintiffs' Exhibit 2-2) and was later amended slightly to $691,117.98.  (Tr. p. 347-348, Plaintiffs' Exhibit 2-3)

81.     Parise's March 23, 2003 report also advised Schumann and Amica that Seifert was no longer comfortable with Schumann's original estimate.  (Tr. p. 92, Plaintiffs' Exhibit 3-18)

82.     Parise's March 23, 2003 report also specifically identified 19 different areas of the house for which Parise believed Schumann's estimate was inadequate, and identified a number of

obviously destroyed items which Schumann completely failed to mention in this estimate.  (Tr. p. 91, Plaintiffs' Exhibit 3-18)

83.    On March 25, 2003, Bennett wrote to Parise and, for the first time, indicated that the $295,098.22 check previously sent to the Bordens could be accepted by the Bordens without prejudice against pursuing further damages.  (On those terms, and after retaining counsel, the Bordens later accepted the check.)  (Tr. p. 88, 234, Plaintiffs' Exhibit 3-19)

84.    Bennett's letter to Parise of March 25, 2003 also insisted that the Bordens must accept delivery of the dry cleaned clothes because "these items have been cleaned according to industry standards and we disagree with the contention that they were not cleaned satisfactorily." (Tr. p. 94-96, Plaintiffs' Exhibit 3-19)  Bennett made this representation despite the fact neither he nor Schumann had ever seen the clothes.  When he did finally see the clothes, Bennett had to admit that some of the clothes were stained and/or smelled of smoke and Amica paid to replace the clothes.  (Tr. p. 94-95)

85.    On or about March 28, 2003, Amica received the West Lake Fire Department Fire Report for the Borden fire.  It indicated that the fire began in the basement and extended to "entire basement, fire & structural damage 1st floor, fire damage in attic, smoke & heat damage throughout remainder of home."  (Plaintiffs' Exhibit 3-20)

86.    On or about April 4, 2003, Bennett sent Schumann Parise's estimate and asked for his review and comments.  (Plaintiffs' Exhibit 3-21)

87.    On or about April 4, 2003, Bennett investigated the Bordens' assertion that the dry cleaned clothes still smelled of smoke.  He spoke with the dry cleaning firm, and one of their employees confirmed that the clothes still smelled of smoke when delivered to the Bordens.  (Tr. p. 94, Plaintiffs' Exhibit 3-22)

88.    On April 6, 2003, Parise wrote to Bennett and addressed several items:

    a.    That, as Parise's estimate indicated, the necessary repairs would cost far in excess of Schumann's estimate.  (Plaintiffs' Exhibit 3-23)

    b.    That Seifert had acknowledged that Schumann's estimate was too low. (Tr. p. 96, Plaintiffs' Exhibit 3-23)

    c.    That Parise had personally inspected the clothes and they smelled of smoke and many were stained.  (Plaintiffs' Exhibit 3-23)

    d.    That Parise did not understand how Bennett could say the clothes were clean when no one from Amica, or working on their behalf, had personally seen the clothes. (Plaintiffs' Exhibit 3-23)

    e.    That Parise believed a meeting including himself, Schumann, and Amica representatives could help Amica understand the obvious deficiencies in Schumann's estimate.  (Tr. p. 96, 402, Plaintiffs' Exhibit 3-23)

89.    The meeting proposed by Parise was held at the Bordens' fire-damaged house on April 15, 2003.  (Tr. p. 98,402)

90.    At the April 15, 2003 meeting, Parise toured the house with Schumann and Bennett.  (Tr. p. 98, 402-403)

91.    The April 15, 2003 visit was Bennett's first to the scene.  At no time before that did any employee of Amica visit Erie to inspect the fire scene or meet with anyone involved in adjusting the claim.  (Tr. p. 98)

92.    Parise pointed out numerous locations throughout the house where soot and other evidence of smoke damage was present behind walls, in insulation materials, under tubs, and in other "hidden" areas.  Bennett admits that he and Schumann personally observed soot behind the drywall, and extensive soot and damage under the hot tub.  (Tr. p. 100-101, 109-110)  Bennett also admits that a smoke smell was present through the entire house.  (Tr. p. 101)  Nevertheless, Schumann and Bennett refused to consider revision of his estimate.  Instead, Schumann responded by saying that the soot and smoke smell could be covered up with sealer and paint,

and that the black substance on insulation may not be soot, and that if there was soot behind the walls, there is no way to tell if the soot was caused by the February 16, 2003 fire. (Tr. p. 99-100, 403-408)

93.     Parise also pointed out ceramic flooring, which Schumann had priced as vinyl flooring, and a countertop with a Corian sticker on the underside, which Schumann had priced as plastic laminate, but neither Schumann nor Bennett conceded that the estimate should be changed. (Tr. p. 101-102, 403-404)

94.     Parise recommended that Amica bring in another contractor to review the estimates, because Parise thought it would be obvious to any competent contractor that Schumann's estimate was low. (Tr. p. 410)

95.     After spending the morning of April 15, 2003 touring the house with Parise, Schumann and Bennett conversed and agreed that Schumann's estimate should be revised by at least $20,000.00. But instead of telling Parise about the increased estimate, or accepting Parise's offer to have another contractor inspect the loss, over the noon hour Schumann and Bennett telephoned Amica Senior Assistant Vice President Peter Reid at Amica's corporate headquarters and received instructions to invoke the Appraisal clause of the policy. (Tr. p. 101-104, 410, Plaintiffs' Exhibit 3-24)

96.     On the afternoon of April 15, 2003, Parise, Schumann, and Bennett examined the clothes and other contents which were in the process of being cleaned. Bennett personally examined the clothes which Amica had previously insisted were adequately cleaned, and agreed that a good portion of the clothing was still stained or smelled of smoke. (Tr. p. 94-95, Plaintiffs' Exhibit 8)

97.     The Bordens' Amica policy contains the following Appraisal provision:

E.    **Appraisal**

If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the **residence premises** is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to sue, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

Each party will:

1.      Pay its own appraiser; and

2.      Bear the other expenses of the appraisal and umpire equally.

(Plaintiffs' Exhibit 5)

98.    In the insurance industry, Appraisal is obviously regarded as a remedy of last resort. Appraisal is expensive for both parties, since often both parties must bring in yet another contractor to estimate the loss, and also pay for the services of their appraiser and the umpire. (Tr. p. 410, 448) In his 25-year career, Bennett had never invoked the Appraisal process. (Tr. p. 110) Schumann had been involved in only one other Appraisal in his career. (Tr. p. 271) Daniel Jones could only recall one other case which went to Appraisal in his fire restoration career of over twenty years. (12/12/05 Tr. p. 33, 48)

99.    Bennett admitted that the Bordens were not offered the opportunity to ask for Appraisal -- Amica demanded Appraisal. (Tr. p. 110)

100.    After the unsuccessful meeting of April 15, 2003, Jon Borden sent a letter of complaint, dated April 17, 2003, to the Pennsylvania Insurance Department, with a copy to

Amica.  The letter outlined the obvious deficiencies in the Schumann estimate, and expressed disappointment that Amica had continued to refuse to revise its estimate in the face of overwhelming evidence that it was inadequate.  (Tr. p. 105-106, Plaintiffs' Exhibit 3-25)

101.    On or about May 1, 2003, in response to Amica's demand for Appraisal, the Bordens hired T. Warren Jones and the firm of MacDonald, Illig, Jones & Britton LLP to represent them in further pursuit of adequate payment from Amica. (Tr. p. 194, Plaintiffs' Exhibit 3-33)

102.    By letter of May 2, 2003, Amica appointed Jack Owens of York Claim Services, Inc. of McKean, Pennsylvania to serve as its appraiser.  (Tr. p. 110, Plaintiffs' Exhibit 3-27)

103.    At the same time, Amica also hired Owens to replace Schumann as its adjuster for further handling of the Bordens' claim for damage to the contents of the house.  (Tr. p. 112, Plaintiffs' Exhibit 3-28)

104.    Bennett admits that he disagreed with Amica's decision to hire Owens to simultaneously adjust the claim for Amica and serve as Amica's appraiser because "he loses his impartiality" when employed by Amica.  (Tr. p. 113)

105.    Bennett wrote to the Bordens on May 2, 2003 and May 20, 2003 asking them to appoint an appraiser.  (Tr. p. 113, Plaintiffs' Exhibits 3-27, 3-32)

106.    On May 22, 2003, Attorney Jones wrote to Bennett, advised him of his representation of the Bordens, appointed Anthony Parise to serve as the Bordens' appraiser, offered to provide suggestions for an umpire, and noted his surprise that Amica had invoked the appraisal process despite the "obvious flaws, omissions and errors" in Schumann's estimate.  (Tr. p. 113, Plaintiffs' Exhibit 3-33)

107.    On May 27, 2003, Attorney Paul Geer of DiBella & Geer, P.C. contacted Attorney Jones to advise of his representation of Amica.  (Tr. p. 114, Plaintiffs' Exhibit 3-34)

108.    Attorney Geer followed the conversation with a letter dated May 28, 2003.  In the May 28th letter, Attorney Geer wrote that Amica objected to the appointment of Parise as the Bordens' appraiser, on the grounds that Parise was not impartial because he had been serving as the Bordens' adjuster in the case.  The letter did not, however, disclose that Amica's appraiser, Jack Owens, was also not impartial because he had been hired by Amica to adjust the remaining contents claim presented by the Bordens.  (Tr. p. 115, Plaintiffs' Exhibit 3-34)

109.    Attorney Geer's May 28th letter also said that one of the reasons that Amica invoked the Appraisal clause was because Appraisal had been suggested by the Pennsylvania Insurance Department investigator who had been assigned the case after the Bordens' complaint. The letter failed to note that Amica had decided to cut off negotiations with the Bordens and demand Appraisal on April 15, 2005, two days before the Bordens' letter was written to the Insurance Department.  (Tr. p. 115-116, Plaintiffs' Exhibit 3-34)

110.    Also in his letter of May 28, 2003, Attorney Geer noted that Amica did not believe its policy required them to pay to repair items damaged only by "smoke or water."  Thus, at this point, Amica apparently believed that "covering up" damaged areas was adequate, rather than repairing or replacing damaged structures.  (Plaintiffs' Exhibit 3-34)

111.    On June 5, 2003, Attorney Jones wrote to Attorney Geer about several topics. Among them, Attorney Jones addressed Amica's contention that the smoke damage evident in "hidden" places in the house could be covered up with sealant and/or paint:

> I am somewhat curious about the question which you asked on the second page of your letter as follows:  "Why should Amica accept a proposed scope of damage presented by your clients and their adjuster

> which suggests that areas damaged only by smoke and water should be
> gutted and rebuilt?" It would appear to me that to ask the question is to
> answer it. This is Amica's Platinum policy; and it purports to provide for
> replacement cost of that part of the building damaged, with materials of
> like kind and quality. Simply stated, therefore, it would seem that areas
> damaged by smoke and water should be "replaced." This is precisely the
> sort of problem which caused my clients to become concerned about
> whether Amica is acting in good faith.

(Plaintiffs' Exhibit 3-35)

112.    In the letter of June 5, 2003, Attorney Jones also advised that he had scheduled a

meeting with Parise and a building contractor (David J. Haller of David J. Haller Construction)

selected by the Bordens to assist with the process, at which they would review the estimates and

then be in touch with Schumann and Amica to further discuss the claim.  (Tr. p. 118, Plaintiffs'

Exhibit 3-35)

113.    On June 16, 2003, Attorney Jones again wrote to Attorney Geer and advised him

of several things, including:

> a.    The meeting involving Parise and Haller had been held.
>
> b.    Attorney Jones was scheduling a meeting among Schumann, Parise, and
>       Haller so that Schumann could again hear the Bordens' position regarding
>       his estimate, and so Schumann could review Haller's estimate, which
>       would be available at that meeting.

(Plaintiffs' Exhibit 3-36)

114.    The Attorney Jones letter of June 16, 2003 also posed two questions to Amica:

> a.    Could Amica please clarify its position regarding the scope of its policy
>       obligations in light of Attorney Geer's prior comment that Amica should
>       not be required to replace damaged structures?
>
> b.    How had Amica gone about hiring Seifert/Visions, and "what did Amica
>       do to assure itself that Visions was a capable, qualified and well-regarded
>       building contractor experienced in the construction of 'high-end'
>       residential dwellings?"

(Plaintiffs' Exhibit 3-36)

115.    Amica never responded to Attorney Jones' question about how it had come to select Seifert/Visions or about the investigation it had done to assure itself he was competent and adequately experienced.  (Tr. p. 120, Plaintiffs' Exhibit 3-36)

116.    David Haller is a general contractor with over 24 years of experience in residential and commercial construction in the Erie area.  He has constructed and/or extensively remodeled numerous "high-end" homes in the Erie market, including several in the neighborhood of the Borden house.  In fact, Haller had done remodeling work on the Borden house a number of years before the Bordens took possession. (12/12/05 Tr. p. 3-6)

117.    In preparing his estimate of the cost necessary to restore the house to its pre-fire condition, Haller closely examined the house and the damage thereto, and obtained estimates from framing, plumbing, and electrical subcontractors, and quotes from door and window suppliers.  (12/12/05 Tr. p. 9, Plaintiffs' Exhibit 2-4)

118.    Haller reviewed Schumann's estimate when he began his own work.  He describes Schumann's estimate as so inadequate that he "laughed" at it.  (12/12/05 Tr. p. 13)

119.    Haller's estimated cost of repair, dated June 11, 2003, was $700,000.00. (12/12/05 Tr. p. 11 Plaintiffs' Exhibit 2-4)

120.    By letter of June 16, 2003, Attorney Geer advised that Amica had decided to select a second contractor, Daniel J. Jones of G.S. Jones and Sons, to estimate the loss. (Plaintiffs' Exhibit 3-37)

121.    Bennett claims that Amica chose Jones to estimate the loss because the Bordens, through Attorney Jones, had challenged Seifert's experience and qualifications.  However, Bennett offered no documentary evidence that any such challenge was ever made.  To the contrary the Bordens had simply asked Amica to tell them if Seifert was qualified, and to explain

what Amica had done to satisfy itself that Seifert was indeed qualified.  (Tr. p. 119-122; Plaintiffs' Exhibit 3-36)

122.    Bennett did ultimately conclude for himself that Seifert's qualifications were "lacking" and therefore his opinions could not be relied upon.  (Tr. P. 122-125)  Amica never told the Bordens that they had concluded that Seifert could not be relied upon, but it is clear that was the reason they hired Jones.  (Tr. p. 122-125, 129)

123.    The parties agreed to postpone the Appraisal process until after Daniel Jones prepared his estimate.  (Plaintiffs' Exhibit 3-38)

124.    On June 25, 2003, Daniel Jones inspected the Borden house to prepare his estimate of loss.  (12/12/05 Tr. p. 41, Plaintiffs' Exhibit 2-5)

125.    On July 23, 2003, Attorney Geer wrote to Attorney Jones and admitted that, "[i]t appears that the scope of damage to the building is broader than what was previously estimated" by Amica.  (Plaintiffs' Exhibit 3-38)

126.    Also in his letter of July 23, 2003, Attorney Geer asked if the Bordens could supply Daniel Jones with copies of the subcontractor's estimates Haller had obtained so Jones could incorporate them into his estimate.  The Bordens complied and provided those estimates. (Plaintiffs' Exhibit 3-38, 3-39)

127.    Daniel Jones prepared a Report and Estimate dated July 28, 2003.  (Plaintiffs' Exhibit 2-5)

128.    Jones testified that even when he inspected the house in late June, a smoke smell pervaded the house, even in locations some distance from the source of the fire, which he attributed to the "extreme heat and burn time" of the fire.  He explained that such a hot fire creates pressurization, which results in extreme penetration of smoke and fire residue into the

cracks and cavities of the house.  He explained this was one of the reasons his estimate agreed with Parise's on the key issue, *i.e.,* the need to remove, clean and replace drywall, ceilings and floors instead of cleaning, sealing and painting them as suggested by Schumann.  (12/12/05 Tr. p. 53-54)

129.    Jones' estimate for repair of the home was $542,598.42, later revised slightly to $555,797.00).  (12/12/05 Tr. p. 42, Plaintiffs' Exhibit 2-5)

130.    With his letter of August 13, 2003 enclosing the estimate, Bennett enclosed a check to the Bordens calculated pursuant to the Jones estimate.  (Plaintiffs' Exhibit 3-41)

131.    The Bordens had Parise review the Jones estimate.  (Tr. p. 411)

132.    With Attorney Jones' letter of October 20, 2003, the Bordens provided Amica with Parise's seven-page letter commenting on various areas of disagreement he had with the Jones estimate.  However, in that report Parise also noted that he found Jones' report to be "more logical and detailed" than Amica's original estimate.  (Tr. p. 411-412, Plaintiffs' Exhibits 3-40, 11)

133.    The parties negotiated the dwelling loss claim in October and November, 2003.

134.    On or about November 30, 2003, the parties came to a substantial agreement regarding the dwelling loss claim.

135.    Amica ultimately agreed upon a cost of repair of approximately $11,000.00 more than the Jones estimate.  (Tr. p. 195)

136.    On April 5, 2004, the parties entered into a settlement agreement whereby the Bordens signed a release in favor of Amica which called for payment of $553,982.14, minus a $1,000.00 deductible, for repair of the fire-damaged house.  Amica has complied with the settlement agreement.  The release excepted extra-contractual claims such as the present one.

II.    <u>Conclusions of Law</u>

1.    This Complaint was brought pursuant to 42 Pa.C.S. § 8371, and alleges that Amica handled the fire loss claim of Jon and Amy Borden in bad faith.

2.    Jurisdiction lies with this Court pursuant to diversity of citizenship, 28 U.S.C.A. § 1441(a).

3.    Accordingly, Pennsylvania law applies to this case.

4.    "It is well settled that an insurer is obligated to act in good faith and fair dealing with its insured." *O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901 (Pa. Super. 1999).

5.    The Court finds that Amica did not adjust the Bordens' fire loss fairly and in good faith.

6.    Under Pennsylvania case law, in order to prevail on a bad faith claim, an insured must present clear and convincing evidence of the following:

        a.    that the insurer did not have a reasonable basis for denying benefits on a policy; and

        b.    that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying a claim.

*Klinger v. State Farm Mutual Auto. Ins. Co.*, 115 F.3d 230 (3d Cir. 1997); *Anderson v. Nationwide Insurance Enterprise*, 187 F. Supp.2d 447, 458 (W.D. Pa. 2002); *MGA Ins. Co. v. Bakos*, 699 A.2d 751, 754 (Pa. Super. 1997). Although the controlling caselaw describes an insured's duties in the context of "denial" of claims, it is clear that an insurer can be held liable for bad faith whenever it takes an unreasonable position, and knows or recklessly disregards its unreasonable conduct. *See, e.g., Anderson*, 187 F. Supp.2d at 455 (Insurer liable for bad faith for refusing to arbitrate insured's claim.)

7.    In order to prevail in a section 8371 bad faith case, the plaintiff is not required to prove anything more than these two elements.  For example, the plaintiff need not prove that the carrier's conduct was motivated by some evil motive, or ill-will or self-interest.  *Klinger*, 115 F.3d at 233, citing *Terletsky v. Prudential Property & Casualty Ins. Co.*, 649 A.2d 680 (Pa. Super. 1994), *app. den.* 659 A.2d 560 (Pa. 1995).

8.    The Court finds that Schumann's original estimate was unreasonably low.  (Amica has admitted that although Schumann was an independent contractor at the time he was involved in this case, at all times relevant he was acting on behalf of Amica and Amica can be held responsible for his actions.)

The photographs offered into evidence and discussed by the witnesses amply demonstrate the extensive fire damage, in the form of burned material, water, soot, smoke, and smoke residue, which was present in all areas of the house, from the basement to the attic. Several witnesses confirmed that a smoke smell was present throughout the structure, even months after the fire.  Despite the obvious, extensive damage, Mr. Schumann estimated the cost of repair to be only $328,999, less than half the $762,913 he estimated it would cost to totally rebuild the structure from the ground up.

Further, after inspecting the property again on April 15, 2003, Mr. Schumann found that his estimate was at least $20,000 low, although he never revised his estimate.

More importantly, upon inspecting the same damage shortly after the fire, Mr. Parise estimated the cost of repair to be $680,492 (later revised slightly to $691,117), more than twice Schumann's estimate.  At trial, Parise persuasively explained in convincing detail, with photos, documents and oral testimony, how Schumann's estimate contained numerous obvious errors, and how Schumann unreasonably suggested that a less expensive process of

"cleaning, sealing and painting" was sufficient in many areas of the house, rather than the process Parise regarded as necessary, *i.e.,* gutting much of the house to its frame, cleaning the fire and smoke damaged areas, and rebuilding the house from that point.

Further evidence of the unreasonableness of Schumann's estimate was provided by the testimony of David Haller. Mr. Haller was the trial witness who unquestionably has the most experience and expertise with the building and remodeling of houses similar to the Bordens'. Haller has built or remodeled numerous houses in the Bordens' neighborhood and, indeed, had remodeled part of the Bordens' house before the Bordens owned it. Haller was also the witness with the most knowledge of construction costs in the Erie area.

Haller conducted a detailed inspection of the house, with several subcontractors (including a painting contractor who is very familiar with the "cleaning, sealing and painting" processes recommended by Schumann), and estimated the cost of repair to be $700,000, well more than double Schumann's estimate. Indeed, Mr. Haller found Mr. Schumann's estimate to be "laughable."

Finally, Amica hired its own expert, contractor Daniel Jones, to inspect the damage. Jones acknowledged there was no significant change to the condition of the house between February, when Schumann did his estimate, and June, when Jones inspected the house. Nevertheless, Jones estimated the cost of repair to be $555,797, or about $236,000 more than Schumann's estimate. Moreover, Jones admitted (after being confronted with his prior deposition testimony) that in all likelihood he would have reached the same $555,797 estimate if he had been in Schumann's place as the original estimator. Jones agreed that Parise's "replacement" recommendations were necessary and rejected Schumann's "clean, seal and paint" proposal.

Jones attempted to assist his client, Amica, by testifying that, despite the great difference in their estimates, Schumann's original estimate was, although incomplete, reasonable in its "clean versus replace" approach. (12/12/05 Tr. p. 45) However, Jones's explanation of this point actually highlights the harm caused to the Bordens by Schumann's methods. Jones attempted to explain away Schumann's inadequate estimate by saying it was an "initial" estimate, which should be conservative because it is likely to be revised upward as additional damage is found during the renovation process. (12/12/05 Tr. p. 45) In other words, Jones was excusing Schumann's grossly low estimate not by saying it was accurate, but instead by explaining that it would likely have been increased as the Bordens' house was repaired. But this ignores the fact that in this case, the Bordens' house was never rebuilt.[2] Rather, Dr. Borden changed jobs and the family moved to Cincinnati. The process of "upward revision" of the estimate as the repair process proceeds would **never** have occurred. So, if the Bordens had accepted Amica's original offer, based on Schumann's original estimate, they would have recovered about $236,000 less than the amount all parties eventually acknowledged the Bordens were owed. This shows that Jones's excuse for Schumann, *i.e.,* that it is reasonable to lowball the first estimate because it is likely to increase later, is actually no excuse in this case. In sum, Jones's testimony can only be described as helping to prove that Schumann's original estimate was unreasonable.

For these reasons, the Court finds that Schumann's initial repair estimate was unreasonably low.

9. The Court finds that Amica knew that Schumann's estimate was unreasonably low, or they recklessly disregarded objective evidence that the Schumann estimate was

---

[2]     Amica, through Mr. Bennett, acknowledges that its obligation under the policy was to pay the Bordens whatever amount was necessary to restore the house to its pre-fire condition, regardless of whether the insured chooses to repair the house, demolish it, sell it, or move out of it. (Tr. p. 38-39)

unreasonably low, yet persisted in relying on the estimate until after the Bordens obtained the services of a public adjuster, complained to the insurance department, and hired an attorney. Only then did Amica stop relying on the unreasonably low estimate and take steps to resolve the claim. This is clear evidence of bad faith claim handling.

Schumann provided a copy of his $328,999 estimate to Amica on February 26, 2005. By that time, Amica's representatives had already been told that the fire was quite serious, had burned a long time, and caused very extensive smoke damage to the "whole house." They knew that the firefighters had broken several windows and "cut numerous large openings" in the roof. They knew that the basement had been destroyed, the rooms above the basement had either collapsed into the basement or had otherwise been destroyed, and the rest of the house had "sustained significant smoke and soot damage to drywall ceilings and walls and floor coverings."

By this time, Amica also knew that on or about February 19th, Schumann had discussed his estimate with Dr. Borden's brother, who had expressed concern about Schumann's proposal to clean the interior drywall instead of removing it and replacing it. On March 1, 2003, Schumann told Amica his estimated cost of rebuilding the Borden house from the ground up was $762,913. Amica also knew from the outset that the Bordens owned Amica's premier policy, the "Platinum Choice" homeowner's coverage, and that the house was insured for $577,000.

Thus, by March 1, 2003, Amica knew or had reason to know that Schumann's estimate may be inadequate. The estimated amount was hundreds of thousands of dollars less than the insured value or replacement value, which was inconsistent with the reports of devastating damage. This should have triggered Amica to investigate further. But it did not. Schumann left Erie on February 27, 2003, without revising his estimate or being asked to do so by Amica. Indeed, Schumann never revised his estimate.

The Bordens hired Parise in the first week of March.  On or about March 5, 2003, Amica received a verbal report that Parise had found significant deficiencies in Schumann's estimate and that Parise's estimated cost of repair would likely be much greater.  Despite that, claims examiner St. Onge instructed Bennett to issue payment based on the Schumann estimate, at the same time predicting that the case was "heading towards appraisal" despite the fact Amica had yet to actually see Parise's estimate or report.

Amica justified its reliance on Schumann's estimate on the fact that Schumann claimed to have reviewed his estimate with Seifert.  However, at that time Amica had absolutely no grounds to conclude that reliance on Seifert's opinions was reasonable.  Neither Amica nor the Bordens had hired Seifert -- he was a volunteer fireman who parlayed that job into board-up work.  The record is clear that the Bordens questioned Seifert's experience and qualifications within days of the fire, and made their concerns known to Amica through Schumann.  The Bordens even gave Schumann the names of reputable contractors, but Schumann persisted with his reliance on Seifert.

Amica became concerned about Seifert's qualifications when they learned he did not have the facilities Amica expected of a qualified fire restoration contractor.  They did a cursory investigation of Seifert's experience and qualifications, but Bennett never spoke to anyone except Seifert.  Not surprisingly, Seifert claimed to have the necessary experience and qualifications, but at no time did Amica ever seek independent, objective verification of Seifert's qualifications.  They never spoke to other insurance companies, other adjustors, homeowners or anyone at all who had worked with Visions.  They never asked Seifert if he had a certification of any kind, or if he was a member of any relevant professional organization.  They never even looked for his name, or that of Visions, Inc., in the phone book or in an Internet directory.  In

sum, Schumann and Amica repeatedly defended Schumann's estimate on the grounds that a man about whom they knew nothing other than he was a volunteer fireman had said that he could do the estimated work for the estimated price.

At trial, Schumann admitted that his review of his estimate with Seifert was a "relatively informal" process. Seifert never developed his own estimate. Schumann never knew whether Seifert's "approval" of Schumann's estimate meant that Seifert believed merely that Visions could do the work estimated by Schumann for the price estimated by Schumann, **or** if it meant that Seifert actually believed that the repair work estimated by Schumann was adequate to put the house back in its pre-fire condition. By March 23, Amica had been told by Parise that Seifert had admitted he did **not** believe that the house could be put in its pre-fire condition at the price estimate by Schumann. Yet Amica continued to rely on Seifert's "approval" of the estimate. Ultimately, in June, 2003, Amica concluded that Seifert's qualifications were indeed "lacking," so they hired a second contractor. But Amica was unable to offer any evidence to establish that they had any more information about Seifert in June than they had in February, March or April. The only things that had changed was that the Bordens had hired a public adjuster, complained to the Insurance Department and retained an attorney.

Amica did not present Seifert's testimony at trial. The obvious inference to be drawn is that Seifert's testimony would not have helped Amica prove that its continued reliance on his "approval" of the Schumann estimate was reasonable.

For these reasons, the Court finds that Amica's reliance on Seifert's "approval" of Schumann's estimate was unreasonable.

Parise's report and estimate dated March 23, 2003 provided Amica even more information which caused, or should have caused, Amica to know that Schumann's estimate was

unreasonably low. Parise's report and estimate contained specific and detailed explanations of the deficiencies in Schumann's estimate. Yet Amica took no action to revise its offer and continued to rely on Amica's estimate.

Parise proposed a meeting to provide Amica even more evidence that Schumann's estimate was grossly low. The meeting was held on April 15, 2003. Parise took Bennett and Schumann on a thorough inspection of the house. He showed them several specific instances where Schumann had obviously misidentified the features of the home (e.g. flooring, countertops) and estimated replacement with a much less expensive item. Parise also showed them numerous places in the house where smoke residue and soot were present in "hidden" areas, such as behind walls and under tubs, which Schumann had simply neglected to inspect. (Indeed, Schumann suggested that maybe the February fire was not the cause of the soot inside the walls.)

After the inspection, Schumann and Bennett agreed that Schumann had "missed" a number of items in his estimate and agreed that it should be increased by at least $20,000. But instead of telling Borden (through Parise) of the increased estimate, or accepting Parise's suggestion that another contractor be brought in, Bennett received instructions from his superiors to stop the adjusting process and demand Appraisal. This suggests that Amica never had any intention of attempting to reach a resolution with the Bordens at the April 15 meeting. (It is important to keep in mind that Bennett's superior, claims examiner Lisa St. Onge, had predicted that the case would wind up in Appraisal as early as March 7, 2003, before Amica had ever seen Parise's estimate.)

Amica had all the information necessary to know that reliance on Schumann's estimate was unreasonable even before the April 15 meeting. But to continue to ignore the

evidence after the April 15th meeting is particularly egregious. Nevertheless, instead of increasing its offer, or accepting Parise's suggestion to bring in another contractor, it demanded Appraisal.

Schumann, Parise, Bennett and Daniel Jones all testified that Appraisal is a rare occurrence and usually the option of last resort. It is an added expense for the insured, which should not have been necessary in this case. Amica's own internal guidelines discourage Amica from invoking Appraisal. They suggest that the insured should be the one to demand Appraisal if the insured believes it is in their best interests.

Nevertheless, Amica demanded Appraisal but then backed off after receiving the Bordens letter to the Pennsylvania Department of Insurance **and** receiving notice that the Bordens had hired an attorney. Suddenly Amica made an about face and agreed to hire a contractor they knew to be reputable and experienced to give them a reasonable estimate. The fair inference from this sequence of events is that Amica would have persisted in its refusal to accept Parise's estimate, or to even negotiate with the Bordens, and would have rushed the case to Appraisal if the Bordens had not complained to the Insurance Department and/or retained an attorney.

For these reasons, the Court finds that Amica knew, or had reason to know, that its reliance on Schumann's estimate was unreasonable from the time it received Schumann's estimate, which estimated repair costs at less than half the replacement value of the house despite the devastating damage Amica had been told about. From that point forward, Amica exhibited additional bad faith each time it was provided more information about the inadequacies of Schumann's estimate but chose to do nothing except blindly rely on Schumann's estimate. The additional information came in various forms outlined above, including Parise's report and

estimate dated March 23, 2003, and the meeting of April 15, 2003.  The bad faith claim handling continued when Amica failed to increase its offer after the meeting of April 15, and instead demanded Appraisal.  Amica began conducting itself reasonably **only** after it received both the Bordens' complaint to the Insurance Department and notice that the Bordens were represented by counsel.  The fair inference is that the bad faith claim handling would have continued if the Bordens had not complained to the Insurance Department and/or retained counsel.

10.    In evaluating the conduct of an insurer under section 8371, the court may consider those insurance practices which Pennsylvania's legislature considers "unfair" as set forth in Pennsylvania's Unfair Insurance Practices Act, 40 P.S. § 1171.5.  *Hayes v. Harleysville Mut. Ins. Co.*, 841 A.2d 121, 125 (Pa. Super. 2003); *O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa. Super. 1999).

11.    The Unfair Insurance Practices Act proscribes the following acts by an insurer:

(10)(iv)  Refusing to pay claims without conducting a reasonable investigation based upon all available information.

(10)(vi)   Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear.

(10)(vii)   Compelling persons to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts due and ultimately recovered in actions brought by such persons.

40 P.S. § 1171.5(10).

12.    The Court finds Amica violated 40 P.S. § 1171.5(10)(iv) by failing to conduct a reasonable investigation of the adequacy of Schumann's estimate after being provided information that the estimate was unreasonably low.  The Court finds that Amica violated 40 P.S. § 1171.5(10)(vi) by failing to increase its settlement offer when it became reasonably clear that

Schumann's estimate was inadequate. The Court finds that Amica violated 40 P.S. § 1171.5(10)(vii) by invoking the Appraisal clause of the policy, after offering substantially less than the amounts due, instead of increasing its offer after receiving information which made it reasonably clear that Schumann's estimate was inadequate.

13.    An insurer's failure to follow its own internal guidelines with regard to a claim can also be evidence of bad faith. *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 381 (Pa. Super. 2002); *W.V. Realty, Inc. v. Northern Ins. Co.*, 334 F.3d 306, 317-8 (3d Cir. 2003).

14.    Amica had internal guidelines which governed the handling of this claim, set forth in a document called First Party Property Loss Handling Expectations, dated August 1999 (hereinafter "Expectations"). Amica's handling of this claim was inconsistent with its guidelines in numerous respects, including the following:

a.    Failing to have an Amica adjuster meet with the Bordens within two hours of the loss report (Expectations, p. 3). In this case the Amica adjuster (Schumann) did not arrive at the scene until three days after the fire;

b.    Failing to have a supervisor visit the loss site within the first week (Expectations, P. 6). In this case, the supervisor was Bennett, and he did not visit the site until two months after the fire;

c.    Failing to clearly explain that the initial "ACV" offer, based on Schumann's estimate, was not Amica's final offer and did not foreclose further negotiation of the ultimate payment. (Expectations, p. 7, 12). Instead, Amica sent the original "ACV" payment, based on Schumann's estimate, with no indication whatsoever that it was anything other than Amica's one and only, final offer on the dwelling;

d.    Failing to offer the Bordens the choice to initiate the Appraisal process. (Expectation, p. 7). Instead, Amica demanded Appraisal;

e.    Relying on an independent adjuster (Schumann's) estimate of the loss instead of hiring a competent repair contractor to estimate the loss. (Expectations, p. 17). Amica hired a competent repair contractor only after the Bordens hired an insurance consultant (Parise), complained to the insurance department, hired an attorney and hired the Bordens' own repair contractor (Haller).

15.    An insurer can be liable for bad faith for extending an unreasonably low settlement offer, and failing or refusing to increase an offer despite the presence of evidence which would lead a reasonable insurer to conclude that its offer understates the amount of its contractual liability.  See, e.g., *Hollock v. Erie Ins. Exchange*, 54 Pa. D. & C.4th 449 (Luzerne Co. 2002), *aff'd*, 842 A.2d 409 (Pa. Super 2004), *appeal gr. in part*, 878 A.2d 864 (Pa. 2005); *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378 (Pa. Super. 2002).  Amica acted in bad faith by extending an unreasonably low settlement offer based on Schumann's flawed estimate, and persisting with that offer despite the presence of evidence which would lead a reasonable insurer to conclude that its offer understates the amount owed.

16.    An insurer can be liable for bad faith for extending an unreasonably low offer and compelling the insured to institute litigation, even if the "litigation" is a dispute resolution mechanism provided for in the insurance policy, such as arbitration or appraisal.  *See, e.g., Hollock*, 54 Pa. D. & C.4th at 518 (Bad faith for insurer to compel the insured to institute litigation, in the form of arbitration under the insured's underinsured motorist policy, by extending an unreasonably low offer and paying the amount owed only after an arbitration award.)  Amica also acted in bad faith by attempting to compel Appraisal instead of increasing its unreasonably low settlement offer after receipt of information which would have led a reasonable insurer to know its offer was inadequate.

WHEREFORE, plaintiffs Jonathan Borden and Amy Borden request a finding that the defendant handled the Bordens' claim in bad faith, in violation of 42 Pa.C.S.A. § 8371, and an Order scheduling a damages hearing.

Respectfully submitted,


 /s/ Craig Murphey
Craig Murphey
Pa Bar ID No. 53324
MacDONALD, ILLIG, JONES & BRITTON LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507-1459
(814) 870-7655
FAX (814) 454-4647
cmurphey@mijb.com

Attorneys for Plaintiffs
  Jonathan A. Borden and Amy P. Borden

932634