IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE

|  |  |  |
|---|---|---|
| JONATHAN A. BORDEN and AMY P. BORDEN, | ) ) ) ) | |
| Plaintiffs | ) ) | |
| vs. | ) ) | CIVIL ACTION NO.: 04-175 - E |
| AMICA MUTUAL INSURANCE COMPANY | ) ) ) ) | |
| Defendant. | ) ) | |

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Amica Mutual Insurance Company (hereinafter "Amica") respectfully submits the following Proposed Findings of Fact and Conclusions of Law.

1.     Amica issued a Homeowner's Policy No. 6308371183 to Jonathan and Amy Borden (hereinafter "Bordens") for the time period August 30, 2002 to August 30, 2003.  The fire occurred at the Borden home at 4838 Wolf Road, Erie, PA on February 16, 2003 and thus, the policy was in effect at the time of the loss.  (See Plaintiffs' Trial Exhibit 5.  Also see Trial Transcript Bennett page 38-day one.)

2.     The "Platinum Choice" policy issued to the Bordens contained an endorsement which guaranteed the replacement of their home even if the costs exceeded their limit of liability.  The endorsement also proportionally increased the other

coverages applicable to the policy. (See Trial Transcript Bennett pages 69-71-day one.)[1]

3.    The applicable insurance contract contained policy limits of $577,000 for the building, $432,750 for personal property and $173,100 for loss of use. (See Defendant's Trial Exhibit A15. Also see Trial Transcript Bennett pages 70-71-day one.)

4.    The fire burned approximately four hours, causing some portions of the Borden home to be destroyed by fire; however, an entire wing of the Borden home suffered only smoke damage and the attached garage suffered water damage as a result of the fire fighting efforts. (See Trial Transcript Borden page 161, Schumann pages 261-262, Parise pages 352-353 and pages391-392 and Jones pages 53-day three.)[2]

5.    The applicable insurance contract contained the following policy conditions, which set forth the duties the Bordens had to follow after the loss. Of the various duties, the following were applicable to the issues of this lawsuit:

### B.    Duties After Loss

1.    Give prompt notice to us or our agent;

4.    Protect the property from further damage. If repairs to the property are required, you must:

---

[1] Plaintiffs Proposed Finding of Fact #14 argues Amica had reasons to "seek the lowest possible" estimate and that the first goal of an insurer is to "settle a claim as economically as possible, which is present in every claim." These arguments are not findings of fact and are not supported by the record in this matter.

[2] Plaintiffs Proposed Finding of Fact #3 indicates that the fire "severely damaged" the Borden home wherein the testimony on the record indicates that only a portion of the home was damaged by the fire and the remainder of the home suffered only smoke damage. Plaintiffs Proposed Finding of Fact #4 states the fire burned for "many" hours when in fact Borden testified that the fire burned for about 4 hours. (See Trial Transcript Borden page 161.) Plaintiffs Proposed Finding of Fact #17e states that the garage was "damaged" by the fire wherein the testimony on the record from Parise indicates that the sheetrock in the garage had only "condensation marks" on it due to fire fighting efforts in nearby parts of the home. (See Trial Transcript Parise page 391.)

a.    Make reasonable and necessary repairs to protect the property; and

b.    Keep an accurate record of repair expenses;

5.    Cooperate with us in the investigation of a claim;

6.    Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

(See Amica's First Request for Admission and the Plaintiffs' Response to it, attached hereto as part of Exhibit A. Also see Plaintiffs' Trial Exhibit 5 and Defendant's Trial Exhibit A8.)

6.    The terms of the applicable insurance policy permitted the Bordens to collect repair costs if they decided to repair the premises. The Bordens also had the option to be paid the actual cash value of the loss, in which case, they did not have to repair it. (See Trial Transcript Bennett pages 38-40-day one, Borden page 245 and Bennett page 78-day three.)

7.    After being notified of the fire, Amica retained Visions, which conducted emergency repairs at Amica's expense. The evidence indicates that Amica made efforts to protect the Bordens' property, both real and personal. (See Trial Transcript Bennett pages 42-43-day one, Borden pages 173-174 and Bennett page 65-day three.)

8.    On the day of the fire, Amica accepted the offer of services of Brian Seifert (hereinafter "Seifert"), principal of Visions, Inc. to provide board up services. There were no issues in this case which are in any way relevant to the board up work done by

Seifert and Visions on the Bordens' home.  (See Trial Transcript Bennett pages 42-43-day one and Borden pages 173-173 and 210.)

9.     After the loss, Amica promptly retained the services of an independent adjuster, John Schumann (hereinafter "Schumann"), who met with the Plaintiffs, took them to dinner and explained the policy requirements regarding loss presentation. (See Amica's Second Request for Admission and the Plaintiffs' Response to it, attached hereto as part of Exhibit A.  Also see Trial Transcript Borden pages 176-179 and Schumann page 255.)[3]

10.    Amica's adjuster, Schumann, prepared a preliminary estimate of the damage to the property and submitted it to the Plaintiffs on or about February 26, 2003. (See Amica's Third Request for Admission and the Plaintiffs' Response to it, attached hereto as part of Exhibit A.  See Defendant's Trial Exhibit A6.  Also see Trial Transcript Borden page 181 and pages 208-209, Schumann page 262 and pages 265-266 and Bennett page 68-day three.)[4]

11.    Pursuant to the initial repair estimate prepared by Schumann, the repair cost of the building was $328,999.14.   The actual cash value of the damage was

---

[3] Plaintiffs Proposed Finding of Fact #91 states that no "employee of Amica" visited the fire scene before Bennett on April 15, 2003.  Employee was not defined by the Plaintiffs.  Plaintiffs Proposed Finding of Fact #26 states that "Amica acknowledges that throughout this case Schumann was working on their behalf and thus they are accountable for his actions."  (12/12/05 Tr. P. 100)  Although the citation provided by the Plaintiffs is inaccurate, Amica does not dispute the subject matter.  Therefore, an agent of Amica was present at the Borden residence prior to April 15, 2003.

[4] Plaintiffs Proposed Finding of Fact #49 states that Schumann left Erie "without considering the Bordens' objections and without revising his estimate."  (Tr. P. 186)  The citation to the transcript also has Borden testifying the "at the point he (Schumann) left Erie. So I don't know what work he was going to do."  The purported statement of fact by the Plaintiffs is pure speculation and there is no evidence in the record to support it as a fact.

$296,098.92.  (See Defendant's Trial Exhibit A15.  Also see Trial Transcript Bennett page 66-day one and Schumann pages 292-294.)[5]

12.    The approach used by Schumann in estimating cost of repair was to attempt cleaning and smoke remediation in areas of the home damaged only by smoke before deciding to go the expense of demolition and replacement.  (See Trial Transcript Schumann pages 314-315 and Jones pages 42-43-day three.)[6]  Schumann's estimate contemplated gutting and rebuilding all areas which were fire damaged.

13.    The approach used by Schumann was reasonable and was consistent with industry standards.  (See Trial Transcript Jones pages 44-45, page 56 and pages 62-64-day three.)

14.    The smoke remediation technology which was contemplated in the Schumann estimate was described by witnesses for both parties to be reasonable in terms of success rate and frequency of use.  (See Trial Transcript Parise pages 423-425 and Jones pages 36-39-day three.)

15.    After learning from Seifert that he had fire restoration experience, adjuster Schumann asked Seifert to walk through the Borden house with him while the estimate was being prepared.  Neither Schumann, Amica nor the Bordens ever asked Seifert or

---

[5] Plaintiffs Proposed Finding of Fact #56 cites (Tr. P. 333) and summarizes an alleged conversation between Parise and Schumann wherein Parise testifies that Schumann said Visions "reviewed his (Schumann's) estimate and felt his estimate was accurate on the building."  The purported statement of fact by the Plaintiffs is Parise's recollection of a conversation.  There is no corroborative testimony on the record from Schumann regarding this alleged conversation.

[6] Plaintiffs Proposed Finding of Fact #110 inaccurately states that "Attorney Geer noted that Amica did not believe its policy required them to pay to repair items damaged only by 'smoke or water'" in his May 28, 2003 correspondence to Attorney Jones which Plaintiffs cite as their Trial Exhibit 3-34.  The correspondence speaks for itself in that Attorney Geer merely asked why they should rely on a public adjuster's estimate to gut and rebuild areas of the home that suffered only smoke and/or water damage.  Attorney Geer was in no way suggesting that Amica was not required, by their insurance contract with the Bordens, to repair the damage.  Furthermore, testimony shows that the method by which Schumann proposed repair was reasonable, consistent and often successful.  (See Trial Transcript Jones pages 36-39, pages 44-45, page 56 and pages 62-64-day three and Parise pages 423-425.)

Visions to prepare a repair estimate for the home.  (See Trial Transcript Borden page 179, Schumann page 253 and pages 258-259 and Bennett page 83-day three.)

16.    Plaintiffs introduced no evidence indicating that Schumann or Amica ever asked the Bordens to retain Seifert and/or Visions to conduct the building repairs or fire restoration work on their home.

17.    Within days of the loss, Amica found a comfortable temporary home for the Bordens to live in at a cost (to Amica) of $1,800 per month.  In order to permit the Bordens to move into the home, Amica paid to plow the driveway rather than waiting on the property owner to do so.  (See Amica's Twelfth Request for Admission and the Plaintiffs' Response to it, attached hereto as part of Exhibit A.  Also see Trial Transcript Borden pages 166-167 and Bennett page 65-day three.)

18.    In late February or early March 2003, the Bordens retained Anthony Parise (hereinafter "Parise") of Giordano Associates, a public adjusting firm.  Because Parise and Giordano Associates were not licensed to adjust claims in Pennsylvania, they were referred to as insurance consultants throughout this claim.  For all intents and purposes, however, Giordano Associates carried out the duties and responsibilities which are traditionally handled by public adjusters.  The agreement between the Bordens and Giordano Associates required the Bordens to pay to Giordano Associates 8% of the total insurance proceeds received from Amica.  (See Amica's Fortieth Request for Admission and the Plaintiffs' Response to it, attached hereto as part of Exhibit A.  Also see Trial Transcript Parise pages 329-330, page 415 and pages 418-419 and Bennett page 69-day three.)[7]

---

[7] Plaintiffs Proposed Finding of Fact #48 states that Schumann and Borden discussed hiring a public adjuster and Borden recalled that Schumann characterized public adjusters as "ambulance chasers."

19.    On March 11, 2003 Amica sent the Bordens a check in the amount of $295,098.92 representing the undisputed actual cash value of the building, less the $1,000 policy deductible.   The check contained no language that the payment represented a "full and final payment" or any other words to that effect. (See Amica's Eighth and Ninth Request for Admissions and the Plaintiffs' Response, neither admitting nor denying the same, attached hereto as part of Exhibit A.   See Defendant's Trial Exhibit A4.  Also see Trial Transcript Borden pages 211-213, Parise pages 415-417 and Bennett page 68-day three.)[8]

20.    On March 17, 2003, Amica paid Plaintiffs the sum of $39,945.38 as a partial contents payment.  There was no language on this check which indicated that it was a final payment.  The Plaintiffs rejected this check.  (See Amica's Eleventh Request for Admission and the Plaintiffs' Response to it, attached hereto as part of Exhibit A. See Defendant's Trial Exhibit A9.  Also see Trial Transcript Borden pages 225-226, Parise pages 417-418 and Bennett pages 68-70-day three.)

21.    Throughout the claim period, Amica communicated frequently with the Bordens and their representatives, made a variety of payments and provided a number of services to them despite the dispute which existed regarding the building loss.  Those included the following:

      a.    Rental payment in the amount of $1,800 per month for the rental home through March of 2004;

---

This is not an undisputed fact; it is merely Borden's recollection of a conversation.  There is no corroborative testimony on the record from Schumann regarding this alleged conversation.
[8] Plaintiffs Proposed Finding of Fact #69 states that the "Bordens believed Amica was threatening to withdraw coverage unless the Borden's accepted the check and began to make repairs immediately." (Tr. P. 191)  This citation to the record is inaccurate as there is no testimony on that page which indicates the above information; Amica does not believe the information in #69 is contained anywhere in the trial transcript, nor was any such threat ever made by Amica.

      b.      $11,976.94 for temporary new furniture to be used in the rental home;

      c.      $15,500 in credit placed upon a claim card provided to the Bordens; and

      d.      Three payments for emergency repairs to the house were made by Amica in the amounts of $11,874.20, $8,013.80 and $3,860.40.

(See Defendant's Trial Exhibit A6.  Also see Trial Transcript Borden pages 208-209.)

22.    The consulting agreement between Parise of Giordano Associates and the Bordens reveals that they retained the public adjuster in late February or early March 2003.  The written fee agreement was signed on March 10, 2003.  The first undisputed payment rejected by the Bordens was sent to the Bordens on March 11, 2003 and thus, Parise and Giordano Associates were retained prior to existence of any dispute between the Bordens and Amica.  (See Defendant's Trial Exhibit A8.  Also see Trial Transcript Bennett pages 83-84-day one, Borden pages 190-191,  pages 211-213 and pages 225-228, Parise pages 415-418 and Bennett page 69-day three.)

23.    Parise wrote a Preliminary Estimate dated March 5, 2003 in the amount of $680,492.  In May of 2003, this was increased to $691,117.98.  (See Plaintiffs' Trial Exhibits 2-2 and 2-3. Also see Trial Transcript Parise pages 347-348 and page 420.)[9]

24.    On March 26, 2003, Amica wrote a letter to the Bordens explaining that the checks which they had returned were not sent to them in an attempt to settle the claim.  Amica explained that these were undisputed payments and offered to resend

---

[9] Plaintiffs Proposed Finding of Fact #135 comments on a subsequent increase to Jones' estimate after comments made by Parise to items missed by Jones.  It should be noted that pursuant to Amica's Finding of Fact #49 the parties ultimately agreed upon the building damage estimated at $553,982 which is $137,135 less than the final amount as estimated by Parise, the Bordens' public adjuster.  It should also be noted that Amica's Finding of Fact #18 points out Parise is paid 8% based on what the Bordens received from insurance proceed benefits.

them. (See Defendant's Trial Exhibit A3. Also see Trial Transcript Bennett page 88-day one, Bennett page 147-day one and Bennett page 70-day three.)

25.     During the months of March and April 2003, the parties exchanged documents and information pertaining to the repair of the premises and more specifically, items which Parise believed were left off of the estimate prepared by Amica's adjuster, Schumann. (See Amica's Fourth Request for Admission and Plaintiffs' Response to it, attached hereto as part of Exhibit A. Also see Trial Transcript Parise pages 399-401 and Bennett pages 71-73-day three.)[10]

26.     On April 6, 2003, the Bordens' adjuster, Parise, requested a meeting with all parties at the house to discuss the differences between the estimates, to inspect the clothes which had been cleaned by VIP Cleaners of Erie, but not cleaned to the Borden's satisfaction and to discuss other issues. Amica agreed to the meeting, which was ultimately held on April 15, 2003. (See Plaintiffs' Trial Exhibit 3-23. Also see Trial Transcript Bennett pages 97-98-day one, Parise pages 400-402 and Bennett page 72-day three.)[11]

---

[10] Plaintiffs Finding of Fact #75, #76, #77, #81 and #88b all cite trial testimony of Parise and/or Borden and trial exhibits prepared by Parise (Plaintiffs' Trial Exhibits 3-18 and 3-23) regarding conversations with Seifert wherein they allege that Seifert told them he was unable to perform the work as estimated by Schumann. Both the testimony of Parise and Borden are recollections of conversations held with Seifert, as well as Parise's writings regarding summaries of the conversations, are not undisputed facts in this matter. Plaintiffs even incorrectly cite trial testimony of Bennett saying that Seifert acknowledged that Schumann's estimate was too low. In fact, on or about March 3 or 4, 2003, Parise inspected the Borden house with Seifert and on March 7, 2003 only 3 or 4 days following Seifert's inspection of the Borden home with Parise, Seifert penned a letter to Schumann confirming that he could perform the work as estimated by Schumann. (See Defendant's Trial Exhibit A7.) Also Bennett spoke to Seifert upon receipt of Parise's April 6th letter summarizing Seifert as saying he could not do the work as estimated by Schumann. Seifert told Bennett that Parise characterized it differently than what Seifert actually said and Seifert confirmed to Bennett that "he thought the work could be done for Schumann's estimate." (See Trial Transcript Bennett page 92-day one.) Seifert was under subpoena by the Plaintiffs and listed as their witnesses and they chose not to call him to corroborate the testimony of Parise.

[11] Plaintiffs Proposed Finding of Fact #88e cites the fact that Parise requested a meeting between himself, Schumann and Bennett by referring to Plaintiffs' Exhibit 3-23 which is an accurate representation; however, they also cite (Tr. P. 96, 402) and no where in those citations is that fact supported.

27.    As of mid-April 2003, the repair estimates for the building supplied by the insurance public adjuster, Parise and Amica's adjuster, Schumann, revealed substantial discrepancies.  A meeting was held on April 15, 2003 to discuss the differences.  At the meeting, the parties were unable to resolve their differences regarding estimated damage.  (See Amica's Thirteenth Request for Admissions and the Plaintiffs' admission of same, attached hereto as part of Exhibit A.  Also see Trial Transcript Bennett pages 103-104-day one, Borden pages 192-194, Parise pages 402-403, page 410 and page 446.)[12]

28.    The only witness produced by Plaintiff at trial with an expertise in construction was David Haller (hereinafter "Haller.")   Haller, an experienced general contractor who builds "high end" homes, admitted on the witness stand that he was not a fire restoration contractor.  Although Amica had frequently requested copies of the Bordens' contractor's estimate (See Plaintiffs' Trial Exhibits 3-3 and 3-27 and Defendant's Trial Exhibits A6 and D) and Haller had been hired by the Bordens in the spring of 2003, his estimate was not provided to Amica until his deposition was taken during discovery of this case.  (See Trial Transcript Haller pages 4-5, page 14, page 18 and pages 20-23-day three.)

29.    Because Haller's estimate was not provided to Amica until his deposition was taken during this litigation, Haller's opinions were not known to Amica during the period that it was determining the cost of repair and whether to submit the claim to

---

[12] Plaintiffs Proposed Finding of Fact #92 states that Bennett admits to having personally observed "soot behind the drywall" during the April 15, 2003 meeting when in fact Bennett testified affirmatively to a question posed by Attorney Murphey as observing a "black substance" behind the drywall and further testified that he did not smell smoke in the insulation.  (See Trial Transcript Bennett pages 100-101-day one.)

appraisal.  (See Trial Transcript Borden page 195 and page 239, Haller page 22-day three and Bennett pages 69-70-day three.)

30.    The insurance policy provides for an appraisal in the event the parties failed to agree on the amount of the loss.  The appraisal provision states:

> ### E.    Appraisal
>
> If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss.  In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other.  The two appraisers will choose an umpire.  If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the **residence premises** is located.  The appraisers will separately set the amount of loss.  If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two will set the amount of loss.

(See Amica's Fourteenth Request for Admission and the Plaintiffs' admission of same, attached hereto as part of Exhibit A.  See Plaintiffs' Trial Exhibit 5.  Also see Defendant's Trial Exhibit A13.  Also see Trial Transcript Bennett page 77-day three.)[13]

31.    On May 2, 2003, Amica sent the Plaintiffs a letter invoking the appraisal provision in the policy.  Amica advised the Bordens of the appointment of Jack Owens (hereinafter "Owens") as Amica's appraiser.   In the same letter, Amica advised the Bordens of its concern regarding the failure to clean up the damage to the basement, despite the insurance coverage made available to the Plaintiffs to do so.  (See Amica's

---

[13] Plaintiffs Proposed Finding of Fact #99 states that "Bennett admitted that the Bordens were not offered the opportunity to ask for Appraisal – Amica demanded Appraisal" (Tr. P. 110) is an inaccurate statement.  The record speaks for itself.  (See Trial Transcript Bennett page 110-day one.)  In fact, the insurance commission investigator also recommended appraisal.  (See Trial Transcript Bennett page 116-day one.)

Fifteenth Request for Admission and the Plaintiffs' Admission of same, attached hereto as part of Exhibit A.    See Defendant's Trial Exhibit A13.  Also see Trial Transcript Bennett page 110-day one, Borden pages 234-236, Parise page 446 and Bennett page 77-day three.)

32.    At the point when Amica demanded an appraisal of the building, over two and a half months had passed since the fire had occurred.  The Bordens had not provided Amica with a contents inventory, nor had they provided a building estimate from a contractor who was willing to repair the premises.  (See Amica's Sixteenth and Twenty-Fourth Request for Admission and the Plaintiffs' admission of same, attached hereto as part of Exhibit A.    Also see Trial Transcript Borden page 239 and Bennett pages 74-77-day three.)

33.    At the point when Amica demanded an appraisal on the building, the basement of the structure where the fire had originated had not been cleaned or repaired. (See Amica's Seventeenth Request for Admission and the Plaintiffs' admission of same, attached hereto as part of Exhibit A.  Also see Trial Transcript Bennett pages 74-75-day three.)

34.    Following the request for an appraisal, the Bordens retained counsel, Attorney Jones of the firm MacDonald, Illig, Jones & Britton.  (See Trial Transcript Borden page 194 and pages 235-236.)

35.    In response to Amica's demand for appraisal, the Bordens appointed their public adjuster, Parise, as a "competent and impartial appraiser".  (See Amica's Nineteenth Request for Admission and the Plaintiffs' admission of same, attached hereto

as part of Exhibit A.  Also see Trial Transcript Bennett page 113-day one and Parise page 449.)

36.     At the time when the Bordens appointed Parise as their appraiser, he and his firm, Giordano Associates had signed a contract with the Bordens which provided that the public adjusting firm was to be paid on a contingency fee basis of 8%.   (See Amica's Twentieth and Fortieth Requests for Admissions and the Plaintiffs' admissions of each, attached hereto as part of Exhibit A.  Also see Trial Transcript Parise pages 418-419.)

37.     Following the hiring of counsel by the Bordens, Amica did the same, retaining Attorney Geer of the firm of DiBella, Geer, McAllister & Best.  (See Plaintiffs' Trial Exhibit 3-34.  Also see Trial Transcript Bennett page 114-day one.)

38.     Pursuant to discussions which occurred between the parties following the selection of counsel, it was mutually agreed that the appraisal proceedings would be put off until a later date.  (See Trial Transcript Borden page 237, Parise page 411 and page 450 and Bennett pages 77-78-day three.)

39.     The Bordens first submitted their claim for contents damage to Amica in late June of 2003, over four months after the fire.  (See Amica's Twenty-Fourth Request for Admission and the Plaintiffs' Response admitting that their contents claim was submitted in June of 2003 and that Amica had made payment on the contents claim in March of 2003, attached hereto as part of Exhibit A.)

40.    In June 2003, Amica retained Daniel Jones (hereinafter "Jones") of G.S. Jones & Sons to provide a second opinion on the repair cost of the building.  (See Trial Transcript Borden pages 237-238, Parise page 411 and Jones pages 40-41-day three.)[14]

41.    On June 20, 2003, the Bordens accepted the undisputed payments sent to them in March.  (See Defendant's Trial Exhibits A4, A9 and A12.  Also see Trial Transcript Bennett page 149-day one and Borden pages 233-234.)

42.    On or about August 12, 2003, Amica sent a copy of the revised estimate prepared by G.S. Jones & Sons which included repairs to the dwelling in the amount of $540,788.42.   In addition, landscaping damage was included for a total estimate of $542,598.42.  Amica submitted a check in the amount of $154,508.92 which represented the actual cash value of the repairs less the previous payment of $295,098.92 which was based upon the G.S Jones & Sons' depreciation schedule.  Amica also promised to issue a check for the balance after the Bordens completed repairs.  (See Amica's Twenty-Fifth Request for Admission and the Plaintiffs' admission of same attached hereto as part of Exhibit A.  See Defendant's Trial Exhibit H.  Also see Trial Transcript Parise pages 413-414 and Jones page 42-day three.)

43.    On August 25, 2003, Amica paid the Plaintiffs $189,439.76 representing a partial payment of the Bordens' contents loss.  (See Amica's Twenty-Sixth Request for Admission and the Plaintiffs' admission of same, attached hereto as part of Exhibit A. Also see Defendant's Trial Exhibit H.)

44.    On or about September 9, 2003, Amica paid the Bordens an additional $22,959.55 for 30 additional contents items.  (See Amica's Twenty-Seventh Request for

---

[14] Plaintiffs Proposed Finding of Fact #94 states that "Parise recommended that Amica bring in another contractor" to review Schumann's estimate because it was too low citing (Tr. p. 410); however, the citation they provided does not support their Finding of Fact.

Admission and the Plaintiffs' admission of same, attached hereto as part of Exhibit A. Also see Defendant's Trial Exhibit H.)

45.    On October 30, 2003, the Plaintiffs' public adjuster, Parise, provided written material in support of their contents claim.  This included a claim in the amount of $94,178.49 and a proposed agreement that depreciation should be applied to the entire contents list on a 25% basis rather than on an item by item basis.  (See Amica's Twenty-Ninth Request for Admission and the Plaintiffs' admission of same, attached hereto as part of Exhibit A.)

46.    In January of 2004, the Plaintiffs advised Amica that they had decided to demolish the building instead of repairing it.  (See Amica's Thirtieth Request for Admission and the Plaintiffs' admission of same, attached hereto as part of Exhibit A.)

47.    Amica continued paying the additional living expense cost to the Bordens through March of 2004 – 14 months after the fire occurred.  (See Amica's Thirty-First Request for Admission and the Plaintiffs' admission of same, attached hereto as part of Exhibit A.  Also see Trial Transcript Bennett page 67-day three.)

48.    Amounts paid to the Bordens as of the date of trial total $880,156.34 and are divided by coverage as follows:

Payments

| | |
|---|---|
| Coverage A – Dwelling | $472,629.90 |
| Coverage B – Other Structures | $    1,815.00 |
| Coverage C – Personal Property | $364,666.62 |
| Coverage D – Loss Of Use | $  41,044.82 |
| **Total Payments to date** | **$880,156.34** |

(See Amica's Thirty-Second Request for Admission and the Plaintiffs' admission of same, attached hereto as part of Exhibit A.  See Defendant's Trial Exhibit H.  Also see Trial Transcript Borden page 196 and page 245 and Bennett page 79-day three.)

49.    The parties agreed that the cost of repair of the building was $553,982. (See Defendant's Trial Exhibit H.  Also see Trial Transcript Borden pages 237-238.)[15]

50.    The Bordens are still entitled to the agreed upon replacement cost of the building, should they build a home on or off site.  (See Trial Transcript Borden page 245 and Bennett page 78-day three.)

## CONCLUSIONS OF LAW

51.    There is no common law action for bad faith against an insurer in Pennsylvania.  The Pennsylvania legislature provided for a statutory bad faith cause of action in 42 Pa. C.S.A. §8371.  No definition of bad faith was provided in the statute.

52.    In an insurance context, the term "bad faith" has been defined as follows:

> Bad faith on the part of an insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent.  For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and meets a breach of a known duty through some motive of self interest or ill will; mere negligence or bad judgment is not bad faith.

*Terletsky v. Prudential Property and Casualty Insurance Co.,* 649 A.2d 680 (Pa. Super.) app. Den. 659 A.2d 560 (1994).

53.    The *Terletsky* definition has been relied upon in decisions by the Third Circuit Court of Appeals, as well as the District Courts.  See, *Polselli v. Nationwide Mutual Fire Insurance Co.*, 23 F. 3d 747 (3d Cir. 1994); *Coyne v. Allstate Insurance Co.*,

---

[15] Plaintiffs Proposed Finding of Fact #93 notes that "neither Schumann nor Bennett conceded that the estimate should be changed" which is accurate; however, Plaintiffs fail to note that upon re-inspection by Jones, many of the outstanding issues were conceded and payment was made.

771 F. Supp. 673 E.D. (Pa. 1991) and *Klinger v. State Farm Mut. Auto. Ins. Co.*, 895 F. Supp. 709 (M.D. Pa. 1995).

54.    In the *Polselli* decision, the above definition, which was quoted from Black's Law Dictionary, was cited as "peculiar [to] and universally acknowledged" in the insurance arena.  *Polselli*, 223 F.3d at 751.

55.    In the context of the case where coverage was not denied, payment was made and a full policy release has been executed, the definition of bad faith requires that the Plaintiff prove that the insurer acted frivolously or without foundation, with a dishonest purpose and through some ill-will or self-interest.  *Terletsky*, Supra. 649 A.2d at 688.

56.    Negligence, and even gross negligence cannot support a finding of bad faith.  *Klinger v. State Farm Mut. Auto. Ins. Co.*, 895 F. Supp. 709 (M.D. Pa. 1995).

57.    Where an insured alleges an insurer has committed bad faith based upon unreasonable delay, the delay can be grounds for liability only when an insurer knows of or recklessly disregards the lack of any reasonable basis for its delay.  The delay, for all practical purposes, must "function as the equivalent of a denial".  *Ania v. Allstate Insurance Company,* 161 F. Supp. 2d 424, 430 n.7 (E.D. Pa. 2001).

58.    Bad faith must be proven by clear and convincing evidence.  *Polselli v. Nationwide Mutual Fire Insurance Co.*, 23 F. 3d 747 (3d Cir. 1994).

59.    Appraisal is a contractual means of resolving disputes between insureds and insurers which has been utilized to resolve disputed claims throughout the country for many, many years.  In fact, the inclusion of an appraisal provision in a homeowner's fire insurance policy is required by Pennsylvania law, 60 P.S. §636.

60.   Amica has no burden to establish that it acted in good faith.  However, the undisputed facts of the case reveal that (1) the home was promptly boarded up and protected at Amica's expense; (2) the Bordens were put up in a hotel until they were able to find a comfortable home which they were then permitted to live in at Amica's expense for over a year; (3) that the initial dispute over repair costs of the building was promptly addressed by Amica's request for an appraisal; and (4) when the Bordens requested that the appraisal proceedings be delayed, Amica agreed to their wishes and hired a contractor to provide an independent second estimate (Jones.)   Upon his estimate, the claim was eventually settled.

61.   Both at the pretrial and at trial, the Plaintiffs' bad faith claim was limited to the omissions in the preliminary estimate of Schumann, which was prepared approximately ten days after the fire.   Plaintiffs alleged that, upon being advised of the errors in estimate, Amica failed to properly respond or revise the estimate, but, instead, demanded an appraisal.  Schumann's estimate was just that, an estimate.  It was never Amica's position that it would not pay more than Schumann estimated.  In fact, Plaintiffs ignore the fact that Amica obtained a second estimate from a fire restoration contractor, Jones, adopted his estimate and settled the Bordens' claim based upon Jones' estimate.   Amica demonstrated good faith and open mindedness in considering the Bordens' request that they retain a second contractor to evaluate the damage to the building and by ultimately settling the claim.

62.   The dispute involved the most cost effective way to accomplish a common goal.  At issue is whether Amica acted in bad faith from March to June of 2003 in relying on an estimate prepared by Schumann which contemplated demolition, gutting and

replacing the areas damaged by fire and smoke remediation in areas damaged only by smoke.   All of the witnesses who testified at trial regarding smoke remediation technology agreed that the technology is generally effective.   Parise, the Borden's public adjuster, testified that he has frequently been involved in claims where this technology was used and that, in his experience, it has been successful.  (See Trial Transcript Parise page 423.)  Thus, Schumann was not advocating that an unproven or unknown technology be used in the Borden's house.   Had this been attempted unsuccessfully, David Bennett (hereinafter "Bennett") of Amica testified that "if repairs were underway or if there are issues that developed during the course of repairs, that sometimes you have to re-evaluate the method of repair…It always happens."  (See Trial Transcript Bennett pages 73-74-day three.)

63.     At the trial no evidence of ill will or malice by Amica was introduced.  To the contrary, Plaintiffs, who have a burden of proof in this case, produced no evidence which would indicate that Amica intended to do anything less than to restore the Borden's home to its pre-fire condition and to remove all smoke odors from the premises.

64.     Plaintiffs admit that the bad faith issue in this case revolves around whether the approach taken by Schumann which essentially involved attempting to clean, seal and paint smoke damaged areas, was reasonable under the circumstances (See Trial Transcript Parise page 343 and Borden page 202.)   Amica presented testimony of a well qualified fire restoration contractor who testified, as an expert, that the Schumann approach was reasonable.  (See Trial Transcript Jones pages 62-63-day three.)   The Bordens, who had the burden of proof on the matter, provided no

alternative evidence that would permit the Court to conclude that the Schumann approach was unreasonable or egregious.

65.    The Bordens' argument that they had to retain Parise, a public adjuster, because Amica "persisted and relied" on the estimate which was "unreasonably low" is contradicted by the evidence provided by Parise who testified that he was retained during the first week of March 2003, just days after the Schumann estimate was prepared and mailed to the Bordens.   The "persisted and relied" argument is contradicted by the undisputed fact of when Parise was retained.

66.    In support of their argument that Amica knew or should have known that the Schumann estimate was unreasonable from the time it was received, the Bordens presented only the testimony of Parise, public adjuster, whose estimate was significantly higher than Schumann's, but more importantly, significantly higher than the amount the Borden's agreed was fair and reasonable for the settlement of the building claim.   Amica never insisted that it would pay no more than the amount estimated by Schumann.   The Bordens have also attempted to prove that the Schumann estimate and the technology it contemplated using was unreasonable by pointing out that after Amica agreed to retain Jones (a fire restoration contractor) to reevaluate the building repair cost and Jones' approach ultimately found more agreement with Parise's estimate than with Schumann's.   This argument also ignores the fact that the Jones' final estimate which was ultimately agreed upon by the Bordens was $553,982.   This number is lodged between the Schumann and Parise estimates and in fact, is $137,136 less than the final Parise estimate.   Thus, the mere fact that the claim was ultimately resolved at a number higher than the preliminary estimate provided by Schumann is not

indicative of bad faith. If it were, the same would be true of the Bordens, who relied upon the Parise $691,000 estimate.

67. If however, the Jones estimate and the ultimate number at which the claim was resolved are to be used as a measure for bad faith conduct, it is only fair and reasonable to consider the underlying basis and considerations upon which the Jones estimate was based. Jones testified at trial; he was a qualified, credible witness with expertise in both building repairs and fire restoration techniques. His testimony included several significant aspects which the Bordens seek to ignore: (1) that the Schumann approach of cleaning, sealing and painting was a reasonable one (See Trial Transcript Jones pages 44-45, page 56 and pages 62-64-day three); (2) that when he became involved, the loss was five months old and Jones saw his responsibility as finding a way to resolve a dispute (See Trial Transcript Jones pages 40-41 and page 43-day three); (3) the presence of lawyers and the threat of litigation influenced Jones' decision (See Trial Transcript Jones page 43-day three;) and (4) finally, Jones considered it his responsibility to absolutely guarantee the work he was estimating due to information he had received that the Bordens' daughter Emma had respiratory problems (See Trial Transcript Jones page 43-day three.) At trial, however, the Bordens produced no evidence (whether scientific, technical or opinion) which would create any basis for this Court to conclude that the fire restoration techniques originally contemplated by Schumann would have endangered Emma Borden or any other member of the family. (See Trial Transcript Borden pages 239-245 and Bennett pages 85-87-day three.) Thus, Jones' decision to gut and replace many of the interior components of the house was based on considerations other than the damage to the building. It was made

notwithstanding his belief that many of the items he replaced could have been cleaned and deodorized (See Trial Transcript Jones page 45-day three.)

68.    The Bordens have failed to prove that Schumann's initial approach, which contemplated cleaning, sealing and painting areas damaged only by smoke was so egregious as to justify the finding of bad faith.  The Bordens seeks to pick and choose among the statements made by Jones at trial.  In doing so, they fail to note that Jones unequivocally stated that (1) smoke damage even behind the walls can be effectively cleaned, remediated and deodorized (See Trial Transcript Jones page 62-day three) and that (2) Schumann's approach was reasonable.  (See Trial Transcript Jones pages 62-63-day three.)

69.    The Bordens failure to notify Amica of its selection of Haller as a contractor during the time period that the building damages were in dispute is significant because the only information the Bordens had presented to Amica in support of their claim was an estimate from their public adjuster, Parise, who was handling the claim on an 8% contingency fee and thus, had no incentive to prepare an estimate which was cost effective and economically reasonable.  Thus, during the time period that the Bordens contend Amica acted in bad faith (April to May of 2003), Amica had Schumann's estimate which had been reviewed and approved by a local contractor, Visions, but no contractor's estimate presented by the Bordens which would provide Amica with an alternative.

70.    The Plaintiffs contend that Amica acted in bad faith in relying upon a letter written by Seifert/Visions which allegedly indicated that the Bordens' home could be restored to its pre-fire condition with the amount estimated by Schumann.  Defendant's

Trial Exhibit A7 is a letter written by Seifert dated March 7, 2003 to Schumann and Borden indicating that "the project can be done at your (Schumann's) estimate cost". Seifert's letter also said "in all fire claims, there are always hidden costs on areas that couldn't be seen or areas that had no access."

71.    The Bordens' public adjuster, Parise testified that he spoke with Seifert and walked through the house with him sometime before March 7th. (See Trial Transcript Parise pages 345-347.)    Nowhere in that testimony did Parise testify that Seifert said that he could not do the work at the price Schumann had estimated. Parise wrote a letter to Bennett (See Plaintiffs' Trial Exhibit 3-18) which indicated that Seifert admitted to Parise that the house could not be restored to its pre-fire condition for the amount estimated by Schumann. In his testimony, however, Parise interpreted his own letter to say that Seifert said "he could build a home for that amount, told me he could not." (See Trial Transcript Parise page 401.)    When permitted by the Court to ask Parise a hearsay question as to statements made to him by Seifert (a witness who was not called at trial), Parise never stated that Seifert said he could not repair the house to the cost estimated by Schumann.    Regardless, however, Bennett followed up with Seifert at the April 15 meeting and was advised that "he thought the work could be done for Schumann's estimate" (See Trial Transcript Bennett page 92-day one.)

72.    In their post-trial submission, the Bordens seek to convince the Court that Amica acted in bad faith and relied upon "opinions" provided by Seifert and Visions. At trial, the only evidence introduced which was relevant to the issues of this bad faith lawsuit was that Schumann reviewed his estimate with Seifert.    The Bordens produced no evidence which would indicate that Amica asked Visions to write an estimate, that

Visions was too inexperienced to write an estimate or that Visions/Seifert's "approval" of the estimate resulted in any attempt by Amica to force the Bordens accept Visions as a building repair contractor.  Having not made Seifert/Visions a sufficient issue at trial to warrant calling him as a witness (Bordens had him under subpoena and on their witness list), the Bordens argue on page 33 of their Conclusions of Law that "an obvious inference can be drawn that Seifert's testimony would not have helped Amica".

73.    The Bordens implied that Seifert/Visions were incompetent and/or inexperienced; however, they produced no actual evidence at trial which would indicate the Visions was incompetent and/or incapable of performing fire restoration work.  Amica's reliance on Visions was short lived; however, because after the Bordens' attorney questioned Visions' qualifications, Bennett made a decision to obtain an estimate from fire restoration contractor, Jones.  (See Trial Transcript Bennett pages 121-122-day one.)  Both parties listed Seifert on their pretrial statements.  Neither called him as a witness.  Accordingly, there was no evidence on the record which would cause the Court to conclude whether or not Visions was competent or qualified.  Accordingly, the Court cannot conclude that Amica's reliance upon the representation of Seifert of Visions was in any way egregious or in bad faith.

74.    There is no evidence indicating that Amica's initial estimate, upon which an undisputed payment was promptly made, was offered as a claim settlement.  There is no evidence that Amica coerced or pressured the Bordens to accept its initial claim evaluation.  There is no credible evidence which would indicate that any of the payments made to the Bordens by Amica contain the words "full and final payment" or any other words to that effect.

75.    The Bordens failed and refused to accept Amica's undisputed payments on both building and contents, until June 2003. The evidence reveals that Amica's checks written to the Bordens on March 11 and March 17 were negotiated by Amy Borden on June 20, 2003. (See Defendant's Trial Exhibits A4, A9 and A12. Also see Trial Transcript Bennett page 149-day one and Borden pages 233-234.)

76.    The fact that the Bordens failed to accept any payments from Amica until June 20, 2003 and did not make a decision to repair the premises renders many of the Bordens' complaints about Amica moot, for Amica was paying for the Bordens temporary living space, a house described by the Bordens as "comfortable" and Amica continued to make payments to the Bordens for building and contents as liability became clear. In fact, the Bordens had made no decision to repair the building until December 2003 when they decided to demolish it instead of repairing it. (See Amica's Thirtieth Request for Admission and Plaintiffs' Response to it, attached hereto as part of Exhibit A.)

77.    Amica never denied the Borden claim. In fact, Amica has paid the Bordens $880,156.34. There is no dispute regarding the amount paid or that it was fair and reasonable. (See Defendant's Trial Exhibit H.)

78.    The appraisal provision in the Bordens' policy reads as follows and is fair and reasonable:

> If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within twenty days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within fifteen days, you or we may request that the choice be made by a Judge of a court of record in the state where the residence premises is located.

> The appraisers will separately set the amount of loss.  If the appraisers submit a report of an agreement to us, the amount agreed upon will be the amount of loss.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two, will set the amount of loss.

Each party will:

1.     Pay its own appraiser; and
2.     Bear the other expenses of the appraisal and umpire equally.

79.     Another issue addressed by the Bordens at trial was Amica's demand for an appraisal.  It is undisputed that the insurance policy contains an appraisal provision and thus, an appraisal is a contractually mandated method of resolving disputes without going to court (See Plaintiffs' Proposed Finding of Fact #97.)  As Finding of Fact #109 of the Plaintiffs' submission indicates, Amica demanded an appraisal two days before the Bordens wrote a letter to the insurance department addressing various complaints they had regarding their claim.  Ironically, the insurance department recommended that an appraisal be held to resolve the dispute over damages.  (See Trial Transcript Bennett page 116-day one.)  Although Plaintiffs still contend that the request for an appraisal was an act of bad faith, the appraisal was never held.  Thus, the Court is asked to address the propriety of a contractually mandated damage resolution process which was recommended by the insurance commissioner but never actually occurred. Amica's demand for appraisal was reasonable, appropriate and was not an act of bad faith.   Amica's decision to submit the disputed damage claims to appraisal in approximately April of 2003 was consistent with the contractual provisions, which Plaintiffs and Amica agreed to at the inception of the policy and therefore, was not an act of bad faith.

80. The retention of counsel by the Bordens in response to the request for appraisal was not caused by any wrongful act of Amica.

81. Following the request for an appraisal, Amica retained an independent insurance adjuster, Owens, of McKean, Pennsylvania to act as its appraiser. Owens was impartial, having no previous connection with this. (See Trial Transcript Bennett page 110-day one.)

82. The Borden's selection of Parise as an appraiser was incompatible with the policy provision, which required that each appraiser choose an "impartial appraiser" because Parise's firm, Giordano Associates was being paid 8% of the loss recovered by the Bordens. Thus, Amica's objection to the appointment of Parise was appropriate and not an act of bad faith.

83. The appraisal language in the policy would not have necessarily resulted in the Bordens receiving anything less than the full repair cost of the building. The language strongly implies that if the appraisers cannot agree on the amount of loss, then the decision of the umpire and any one appraiser will set the amount of loss.

84. The undisputed evidence indicated that the appraisal was put "on hold" by consent of both parties after the Bordens' attorney suggested that Amica retain a fire restoration contractor to provide a second opinion on the repair cost of the building. (See Trial Transcript Borden page 237, Parise page 411 and page 450 and Bennett pages 77-78-day three.)

85. When considered in total, Amica demonstrated ongoing good faith attempts to fairly resolve the Bordens' claims, first by appraisal and then by negotiation.

86.    Although trial evidence was primarily limited to building repair issues, Plaintiffs proposed Findings of Fact address issues involving contents (See Plaintiffs Proposed Findings of Fact #65, #71, #72, #84, #88c, #88d and #96.)  The Plaintiffs' Findings of Fact and Conclusions of Law is replete with proposed findings dealing with the dry cleaning of the Bordens' clothes, conversations during the early days of the claim and board up of the premises by Seifert/Visions.   (See Plaintiffs Proposed Findings of Fact #33, #35, #36, #48, #65, #84, #87, #88 and #96.)   The Bordens admitted that they did not supply a contents inventory to Amica until late June of 2003, over four months after the fire.  (See Amica's Twenty-Fourth Request for Admission and the Plaintiffs' Response admitting that their contents claim was submitted in June of 2003, attached hereto as part of Exhibit A.)  At this point, Amica had already submitted payment to the Bordens for contents in excess of $39,900 based upon the undisputed value of the property Schumann was able to observe within the property.   (See Defendant's Trial Exhibit A8(1) and Trial Transcript Bennett page 144-day one.)   The evidence reveals that the Bordens continued to supplement their contents claim throughout the year of 2003, including a submission of a claim in the amount of $94,178 on or about October 30.  (See Amica's Twenty Ninth Request for Admission and the Plaintiffs' Response to it, attached hereto as part of Exhibit A.)   Additional contents submissions were made after that time.   Therefore, there was no bad faith or unreasonable delay in Amica's resolution of the Bordens' contents losses.

87.    In paragraph 14 of the Plaintiffs' Conclusions of Law, Plaintiffs seek to prove bad faith based upon violation of internal first party property loss handling "expectations" which were discussed at trial only in reference to appraisal procedure.

More importantly, however, the measure of bad faith is not what expectations a company has of itself, but, rather, whether the insurer knew or recklessly disregarded its lack of reasonable basis for denying a claim.  In this regard, the Plaintiffs attempt to invoke the company's own "expectations" in connection with the claim which was ultimately paid and settled to the insured's satisfaction, is misguided.  An insurer's conduct is measured by the law, not its own expectations, which could be so lofty as to be unattainable.  As a matter of public policy, insurers should be encouraged to set lofty expectations, not punished for failing to meet all of them.

88.    It would seem that a bad faith claim would be more likely to arise under this unusual set of circumstances if the Bordens had argued that they were inconvenienced by having to stay in substandard living conditions when, in reality, all they really wanted to do was repair and rebuild their home.  That did not occur either. The Bordens never demonstrated that they made any significant effort to repair or rebuild and, to the contrary, decided that they would demolish the house and build a new one elsewhere.  While this was unquestionably their right, it presents a glaring inconsistency when placed up against their argument that the estimate written by Amica's adjuster in February somehow caused them grievous injury.

89.    There was no evidence introduced at trial which would indicate that Amica's actions unduly delayed the settlement of the claim or that Amica acted out of any motive involving a dishonest purpose, breach of a known duty or ill will towards the Plaintiffs.

90.    The Bordens also failed to show that they suffered from any additional hardship as a result of the difficulties experienced during the time period that

Schumann's estimate was an issue.  Amica's attempts to pay significant amounts of money to the Bordens (over $235,000) as undisputed amounts were rebuffed by the Bordens who refused to accept the checks even after being told by Amica the were undisputed payments which were not intended to settle any of the claims.  The Bordens lived in a comfortable, rented home at Amica's expense for over a year after the loss occurred.  They eventually accepted Amica's undisputed payments, but not until June of 2003 after they retained counsel.  While the retention of Parise may have been related to the Bordens' concerns when they first saw Schumann's estimate, Borden's testimony at trial revealed that he received numerous letters from Bennett inviting the Bordens to contact him directly if they had questions or concerns.  The Bordens never once availed themselves of the opportunity to talk to Bennett.   (See Defendant's Trial Exhibits A5, A6, A8 and A8(1).  Also see Trial Transcript Borden pages 200-202, page 205 and page 208.)  Had Borden done so and been rebuffed or had he hired Parise after there was a breakdown in negotiations, his argument that Schumann's estimate compelled him to retain both Parise and Attorney Jones would be more compelling.  The undisputed facts reveal that the Bordens either hired Parise before receiving Schumann's estimate or days after receiving it.  Either way, they have not proven that Amica had taken a position or committed any act or omission which compelled them to go out and sign a public adjuster's contract which would ultimately result in paying a contingent fee of over $80,000.

91.    The Bordens seek to freeze the claim adjustment process during the time period from April 15, 2005 (when a meeting was held and the alleged errors in the Schumann estimate were pointed out to Bennett) to late May of 2003.  This is much like

judging the outcome of a baseball game by the score after three innings or a football game at the end of the first quarter.  While the Bordens are free to point the specific events within a claim and argue that they are bad faith, whether Amica demonstrated a dishonest purpose and breach of a known duty through some motive of self-interest or ill will is better evaluated by its conduct in the claim as a whole.  Here we are not dealing with a claim which was denied.  We are not even dealing with a claim where the insurer accepted liability, but then paid what it believed it owed and refused to address the insureds' requests for a higher payment.  Here, the bad faith claim arose from a case where the parties agreed on the amount of damage and where a release of all contractual claims was voluntarily executed.

92.    At trial, the Bordens agreed that the legal issue in this case involved the Bordens' allegation that Schumann's estimate was unreasonably low and that Amica's failure to force him to increase it after learning that it was insufficient in the amount of approximately $20,000 was an act of bad faith.  Plaintiffs seek to stop the timeline of events in the case and ask the Court to essentially conclude that if at any given point in time an insurer is aware that it owes more money and fails to amend its estimate, an act of bad faith has occurred.  In the overall context of the claim, however, Amica was faced with two estimates.  The public adjuster, Parise sought to essentially gut the entire structure.  His estimate totaled $691,117.98.  The Schumann estimate which listed the repair cost of $329,000 left a wide difference - - too much to be bridged by an additional offer of $20,000.  In addition, it is noteworthy that in March 2003, Amica had sent the Bordens checks totaling over $235,000 and after having the checks returned, written to the Bordens and advised them that these payments were undisputed and that they

could be kept without prejudice to the Bordens' right to contest the amount of damage. The Bordens still refused to accept the checks. Having had undisputed payments of over $235,000 returned, revising Schumann's estimate by $20,000 was hardly likely to settle the claim. Amica decided to demand appraisal in an effort to have the differences resolved by an independent umpire.

93.    When a party alleges bad faith during the course of an insurance claim, it is appropriate to review the allegations in the context of all relevant events during the time period involved, the handling of the claim by the insurer, the attention to the claim (or lack thereof) by the insured and when the claim was amicably resolved or denied.

94.    In the context of a claim which was amicably resolved, where there is no evidence of coercion by the insurer, no evidence of undue delay and no allegation that the carrier acted with the intention of forcing a claim settlement for an amount less than what it was worth, proof of bad faith can only be accomplished if the carrier committed some egregious act, which caused significant harm to the Plaintiffs.

95.    In this case, Plaintiffs failed to prove any egregious act or that they suffered any significant harm as a result of any improper act by Amica.

96.    Amica has no legal obligation to demonstrate perfect or mistake free claim handling or damage evaluation in this case. However, Amica did demonstrate a determined attempt to act reasonably, consider the Bordens' requests and to advance monies to the Bordens throughout the claim period.

97.    Based upon the law and evidence presented at trial, the Plaintiffs failed to prove by clear and convincing evidence that Amica acted in bad faith.

98.    To the contrary, the evidence in this case reveals that, when viewed in its entirety, Amica demonstrated good faith and fair dealing in its handling of the Bordens' claim.

Respectfully submitted,

DiBella, Geer, McAllister & Best, P.C.


By: /s/  Paul K. Geer, Esquire
        Paul K. Geer, Esquire
        Attorney for Defendant, Amica
        Mutual Insurance Company