IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JONATHAN A. BORDEN, et al., )
        Plaintiffs, )
        v. )   Civil Action No. 04-175 Erie
AMICA MUTUAL INSURANCE CO., )
        Defendant. )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

      Plaintiffs, Jonathan and Amy Borden ("Plaintiffs" or "Bordens"), filed the instant suit against Defendant Amica Mutual Insurance Co. ("Amica") alleging that Amica acted in bad faith during the adjustment and settlement of a building loss claim resulting from an accidental fire that destroyed the Bordens' home. This case does not involve a denial of benefits or unreasonable delay in the payment of benefits. (See Oral Argument Transcript, 06/05/2005, pp. 14-15). Rather, it is the Bordens' contention that Amica acted in bad faith by offering an unreasonably low figure to resolve the building loss claim and in requesting arbitration to resolve the dispute.

      Amica did not dispute its liability under the policy to reimburse the Bordens for the damage to their home and contents resulting from the fire. (Trial Transcript. pp. 38-39).[1] Amica also admitted that its obligation under the insurance contract was to pay whatever amount was required to restore the home to its pre-fire condition, including the total elimination of the smell of smoke. This obligation existed whether the Bordens elected to repair the home, demolish and rebuild it, or sell the property and move to another location. (Tr. pp. 38-39, 76). Amica denied, however, that it acted in bad faith throughout the settlement of the damage claim.

      This matter came before the Court for a bench trial on Thursday, December 8, 2005. The following constitutes our findings of fact and conclusions of law.

---

[1] Hereinafter, all references to the trial transcript for the first two days of trial will appear in the following format: (Tr. p. X). References to trial proceedings that occurred on December 12, 2005 will take this form: (Tr. 12/12/05, p. X).

1

## **FINDINGS OF FACT**

1.     On August 30, 2002, the Plaintiffs purchased a home at 4838 Wolf Road, Erie, Pennsylvania, for $720,000. (Trial Transcript, p. 158). On the same date, Defendant, Amica Mutual Insurance Company, issued a "Platinum Choice" Homeowner's Policy, no. 630837-1183, to the Plaintiffs for the time period extending between August 30, 2002 and August 30, 2003. (Tr. P. 37-38; Plaintiffs' Ex. 5).  The applicable insurance contract contained policy limits of $577,000 for the building, $432,750 for personal property, and $173,100 for loss of use. (Tr. pp. 70-71; Defendant's Ex. A15). The policy also contained an endorsement which guaranteed the replacement of the Plaintiffs' home, even if the costs exceeded their limit of liability.  (Tr. pp. 69-71).  The Platinum Choice policy provided the broadest coverage of any Amica insurance policy available in 2003.  (Tr. p. 38).

2.     On Sunday, February 16, 2003, an accidental fire severely damaged the Plaintiffs' home. The fire originated in the basement of the west part of the house and burned for approximately four hours, completely destroying large portions of the home and causing extensive smoke damage throughout the remainder of the structure. (Tr. pp. 47, 171-72; Plaintiffs' Ex. 3-3).

3.     Jon Borden promptly reported the fire to both the proper authorities and to Defendant. (Tr. pp. 40, 161, 163).

4.     On the afternoon of the fire, Amica learned, from various sources, that all of the floors in the house were "bowed," there was approximately five feet of water in the basement of the home, the garage had been damaged, a large hole had been cut in the roof by the fire department, and that the home was not habitable. (Tr. pp. 47-48; Plaintiffs' Ex. 3-3, 3-4).

5.     The damage to the west portion of the home was so severe that the fire marshal initially sought permission to demolish the entire structure before ultimately deciding to wait until the following day to reassess the damage in the daylight. (Tr. pp. 48, 162).

6.     Claims Manager David J. Bennett, an adjuster in Amica's Pittsburgh Regional Claims Office,

coordinated the adjustment of the Bordens' claim. (Tr. p.35). Bennett did not regularly handle fire loss claims and had only been to three or four fire scenes in the course of his adjusting career. (Tr. p. 35-36).

7.     After being notified of the fire, Amica retained Brian Seifert, the principal of a company known as Visions, Inc. to conduct "board-up" services on the damaged house. Seifert, a volunteer fireman, was hired because he was already on the scene fighting the fire. The board-up service was performed satisfactorily and without issue. (Tr. pp. 42-44, 173, 210).

8.     On February 17, 2003, the day following the fire, Claims Manager Bennett retained the services of an independent adjuster, John Schumann, to adjust the claim. Schumann, who operated a firm called Property Claims Services from his home, conducted the vast majority of his work for Amica and, in this case, was admittedly working on Amica's behalf. (Tr. pp. 248-49).

9.     Upon being retained, Schumann met with Seifert and conducted an initial walkthrough of the home on February 19, 2003. (Tr. p. 50; Plaintiffs' Ex. 3-1, 3-5). Schumann and Seifert agreed to work together on an initial estimate. (Tr. pp. 251-52).

10.    Following this initial walkthrough, Schumann recommended that Amica place a $250,000 reserve on the dwelling coverage. (Tr. p. 50). Schumann met with the Bordens for dinner that evening and explained to them the policy requirements regarding loss presentation. (Tr. p. 176-78; Plaintiffs' Ex. 3-1).

11.    Between February 20 and February 26, 2003, Schumann continued to inspect the house, finding significant damage. Schumann noted that floors had collapsed or partially collapsed in three different rooms and that there was smoke damage, soot, and the odor of smoke throughout almost the entire house. (Tr. pp. 261, 268-69; Plaintiffs' Ex. 3-1, 3-5, 3-8). Schumann did not cut test holes in the walls to examine the extent to which fire residue may have been present. Id.

12. Based upon his findings, Schumann prepared an estimate of the damage to the property, reviewed the estimate with Seifert, and submitted it to the Plaintiffs on or about February 26, 2003. (Tr. pp. 181, 208-09, 259, 262, 265-66).

13. The repair estimate prepared by Schumann estimated that the repair cost of restoring the building to its pre-fire condition was $328,999.14. (Tr. p. 262, 292-94; Defendant's Ex. A15). The approach used by Schumann in estimating the repair cost was to attempt cleaning and smoke remediation in areas of the home suffering only minor damage, while demolishing and rebuilding those areas of the home which were severely damaged by fire. (Tr. pp. 314-15; Tr. 12/12/05, pp. 44-45).

14. Smoke remediation technology utilizes several steps to attempt to remove soot residue from a fire-damaged structure without completely demolishing and rebuilding the structure. In a successful smoke remediation, the soot must be cleaned away, whether mechanically, through absorption, or by use of solvent; chemically deodorized, to change the composition of the smoke particles and remove the scent of smoke; and masked, by the application of a masking agent or counteractant, such as a shellac based coating. (Tr. 12/12/05, pp. 47-50).

15. In early March, 2003, the Bordens retained Anthony Parise, of Giordano Associates, Inc., a public adjusting firm, to review Schumann's estimate and, if necessary, prepare an estimate of his own for the cost of repairs. (Tr. p. 186). Parise traveled to Erie on or about March 2, 2003. Before inspecting the damage, Parise spoke to Schumann. (Tr. p. 333).

16. Parise inspected the home during the week of March 2, 2003, and noted heavy smoke damage throughout, including soot and other evidence of smoke damage in the wiring and plumbing chases throughout the house. (Tr. pp. 338-39, Plaintiffs' Ex. 2-2, 2-3).

17. Parise's estimate contemplated stripping the entire house down to the framing, taking out the flooring, cleaning and repairing the framing, and rebuilding the house from that point. (Tr. pp. 338-

4

39, Plaintiffs' Ex. 2-2, 2-3). In contrast to Schumann's estimate, Parise did not recommend attempting smoke remediation techniques to repair the home.

18. On March 5, 2003, Parise prepared a preliminary estimate of damage in the amount of $680,492. On that same date, Parise communicated verbally to Amica that he had found significant deficiencies in Schumann's estimate and that Parise's estimate would likely be much greater. In May, 2003, Parise increased his estimate to $691,117.98. (Tr. pp. 75, 347-48, 420, Plaintiffs' Ex. 2-2, 2-3, 3-13).

19. On March 7, 2003, Bennett received authority to make a payment to the Bordens based on Schumann's $328,999.14 repair estimate. (Tr. p. 79; Plaintiffs' Ex. 3-14). This payment was not intended as a final offer to settle the claim because Amica still viewed the Schumann estimate as a preliminary, rather than final, estimate of damages. (Tr. 12/12/05, pp. 73-74).

20. On March 11, 2003, Amica sent the Bordens a check in the amount of $295,098.92 representing the undisputed actual cash value of the building, less the policy deductible. The check contained no language indicating that the payment represented a "full and final payment." (Tr. pp. 82, 211-13, 415-17; Plaintiffs' Ex. 3-15; Defendant's Ex. A4).

21. After consulting with Jon Borden's brother and Parise, the Bordens, by letter dated March 17, 2003, returned the settlement check to Amica. (Tr. pp. 87, 191; Plaintiffs' Ex. 3-16).

22. Throughout the claim period, Amica communicated frequently with the Bordens and their representatives, made a variety of payments to them, and provided a number of services required by the policy. This included paying rental costs in the amount of $1,800 per month for a temporary residence for the Bordens, $11,976.94 for temporary furniture, a $15,500 credit claim card provided to the Bordens, and three payments for emergency repairs to the home. (Tr. pp. 208-09; Defendant's Ex. A6).

5

23.     During the months of March and April, 2003, the parties continued to exchange documents and information pertaining to the items Parise believed had been overlooked by Schumann's estimate. (Tr. pp. 399-401).

24.     On March 23, 2003, Parise submitted a 55 page estimate of repairs. In that report, he provided details as to the nature of his disagreements with the Schumann estimate. (Tr. pp. 90-92; Plaintiffs' Ex. 3-18).

25.     On March 25, 2003, Bennett wrote to Parise and indicated that the $295,098.22 check previously sent to the Bordens could be accepted without prejudice to their rights under the policy. (Tr. pp. 88, 234; Plaintiffs' Ex. 3-19).

26.     The Bordens, after retaining counsel, later accepted the check. (Tr. pp. 88, 234; Plaintiffs' Ex. 3-19).

27.     On April 4, 2003, Bennett sent Parise's estimate to Schumann for review and comment. (Plaintiffs' Ex. 3-21).

28.     On April 6, 2003, Parise requested a meeting with all parties at the house to discuss the differences between his estimate and Schumann's, as well as some issues related to the allegedly inadequate dry cleaning of the Bordens' clothing. (Tr. pp. 97-98, 400-02; Plaintiffs' Ex. 3-23). The meeting was held at the house on April 15, 2003. (Tr. pp. 98, 402).

29.     At the April 15th meeting, Parise toured the house with Schumann and Bennett. (Tr. p. 98). Parise pointed out numerous locations throughout the house where soot and other evidence of smoke damage was present behind walls, in insulation materials, under tubs, and in other hidden areas. (Tr. pp. 100-101, 109-110).

30.     Bennett and Schumann were able to observe soot behind the drywall and under the hot tub,

and Bennett noted that the smell of smoke permeated the entire house. (Tr. pp. 100-101, 109-110).

31. At the meeting, Parise recommended that Amica bring in another contractor to review the estimates of Schumann and Parise. (Tr. p. 410).

32. Following the walk-through of the house, Schumann and Bennett placed a telephone call to Amica's corporate headquarters and received instructions to invoke the Appraisal clause of the policy. The appraisal clause stated:

> **E.    Appraisal**
>
> If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the **residence premises** is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agree to by any two will set the amount of loss.

(Plaintiffs' Ex. 5; Defendant's Ex. A13).

33. On May 2, 2003, Amica sent a letter to the Bordens informing them that Amica was invoking the appraisal provision in the policy. Amica further advised the Bordens of the appointment of Jack Owens as Amica's appraiser. (Tr. pp. 110, 234-36, 446; Defendant's Ex. A13; Plaintiffs' Ex. 3-27).

34. In response to the request for appraisal, the Bordens retained Attorney T. Warren Jones from the firm of MacDonald, Illig, Jones & Britton LLP. (Tr. pp. 194, 235-36). The Bordens also appointed Parise as their appraiser. (Tr. pp. 113, 449).

35. Amica, in turn, retained Attorney Paul Geer of DiBella & Geer, P.C. (Tr. p. 114; Plaintiffs' Ex. 3-34). Pursuant to discussions between the parties following the retention of counsel, it was agreed that the appraisal proceedings would be postponed to permit Amica to obtain a second

estimate. (Tr. pp. 237, 411, 450).

36. On June 16, 2003, Amica informed the Bordens that it would be retaining Daniel Jones of G.S. Jones & Sons to provide a second estimate of the cost to restore the house to its pre-fire condition. (Tr. pp. 237-38, 411; Tr. 12/12/05, pp. 40-41).

37. On June 25, 2003, Jones inspected the Borden house in order to prepare the estimate of loss. On July 28, 2003, Jones prepared a Report and Estimate, a copy of which was sent by Amica to the Bordens on August 12, 2003. (Plaintiffs' Ex. 2-5; Defendant's Ex. H; Tr. pp. 413-14; Tr. 12/12/05, p. 42). Jones' estimate of the cost to repair the home was $542,598.42. (Tr. 12/12/05, p. 42; Plaintiffs' Ex. 2-5).

38. On August 13, 2003, Bennett forwarded a copy of the Jones estimate to the Bordens. Bennett also enclosed a check to the Bordens calculated pursuant to Jones' estimate. (Plaintiffs' Ex. 3-41). This amount was later slightly revised upwards to $555,797.00 and the case was settled for approximately that amount. (Defendant's Ex. H; Tr. pp. 237-38).

39. At trial, Daniel Jones was called as an expert in fire remediation by Amica. Jones testified that an adjuster's goal is to restore the property to its pre-fire condition in the most cost-effective and least aggressive manner possible. He expressed the opinion, which we find credible, that Schumann's use of smoke remediation in his estimate was not unreasonable as an initial approach. (Tr. 12/12/05, pp. 44-45).

40. Schumann testified at trial that smoke remediation technology is an industry standard procedure and that he had proposed using smoke remediation in approximately 75 damage estimates prior to issuing the Borden estimate. Schumann further testified that smoke remediation technology had been successful in completely eliminating smoke odor in approximately 90 percent of the homes in which he had observed its use. (Tr. pp. 316-17). Finally, Schumann noted that his estimate had been an initial estimate, rather than a final one, and could have been modified if smoke remediation

had later proved unsuccessful. (Tr. pp. 265-66; 316-17).

41. Parise, testifying at trial, agreed with Schumann and Jones that smoke remediation could successfully remove the smell of smoke from a fire-damaged home where the soot had not penetrated the walls of the structure. However, Parise credibly testified that he had never seen a contractor attempt smoke remediation on a structure where there was actual soot behind the walls and in the insulation. (Tr. pp. 423-25).

### **CONCLUSIONS OF LAW**

1. In order to recover on a bad faith claim, the insured must prove: (1) that the insurer did not have a reasonable basis for denying benefits under the policy; and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim. Northwestern Mutual Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3rd Cir. 2005); see also Keefe v. Prudential Property and Cas. Ins. Co., 203 F.3d 218, 225 (3rd Cir. 2000).

2. The insured is required to meet its burden of proving "bad faith" by clear and convincing evidence. Babayan, 430 F.3d at 137. Mere negligence, even gross negligence, is insufficient to support a finding of bad faith. Polselli v. Nationwide Mutual Fire Ins. Co., 23 F.3d 747, 751 (3rd Cir. 1994).

3. The insured must ultimately show that the "insurer breached its duty of good faith through some motive of self-interest or ill will." Babayan, 430 F.3d at 137 (quoting Brown v. Progressive Ins. Co., 860 A.2d 493, 501 (Pa. Super. 2004).

4. There can be no bad faith in the absence of a denial of benefits. UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 505 (3rd Cir. 2004).

5.    This case does not involve a denial of benefits or unreasonable delay in the payment of benefits. Rather, it is the Bordens' contention, as discussed more fully above, that Amica acted in bad faith by offering an unreasonably low figure to resolve the building loss claim and in requesting arbitration to resolve the dispute.

6.    We find that the Bordens' bad faith claim fails because Amica had never adopted a final and intractable position relative to the Shuman estimate in general and the appropriateness of smoke remediation as opposed to gutting and rebuilding in particular.

7.    A request for appraisal (a dispute resolution mechanism specifically provided for in the insurance contract) followed within days by an agreement on the part of the carrier to hire an expert to provide a second opinion (i.e., Jones) is not the "stuff" of which bad faith is made.

8.    We also find that the bad faith claim fails because the Plaintiffs failed to demonstrate by the heightened "clear and convincing" standard that the smoke remediation approach initially propounded by the carrier was objectively unreasonable under the circumstances. While Parise sharply disagreed with Schumann as to the reasonableness of utilizing smoke remediation, as opposed to a more extensive gutting, Mr. Jones suggested that smoke remediation was a reasonable *initial* approach.

9.    At most, in our view, Plaintiffs demonstrated by a preponderance of the evidence that it was more likely than not that the preferred method for restoring the structure to its pre-fire condition was gutting as opposed to smoke remediation.

10.   Amica's failure to have concluded on or before April 15th that gutting, as opposed to smoke remediation, was the preferred method of restoration under the circumstances demonstrates at worst

bad judgment on its part, as opposed to intentional or reckless behavior.

11.	In sum, we find based on a careful review of all the evidence and a consideration of the demeanor of each of the witnesses, that the defendant did not breach its duty of good faith in the handling of this fire loss claim and was not motivated by self interest or ill will vis a vis the Plaintiffs.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JONATHAN A. BORDEN, et al., | ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 04-175 Erie |
| AMICA MUTUAL INSURANCE CO., | ) |
| Defendant. | ) |

## ORDER

In accordance with the findings of fact and conclusions of law set forth in the accompanying Memorandum Opinion, JUDGMENT is hereby entered in favor of Defendant Amica Mutual Insurance Co. and against Plaintiff Jonathan and Amy Borden.

The clerk is hereby directed to mark the case closed.

/s/ Sean J. McLaughlin
Sean J. McLaughlin
United States District Judge

cm: All parties of record. ___