IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


JONATHAN A. BORDEN and
AMY P. BORDEN,
        Plaintiffs


v.                      CIVIL ACTION NO. 04-175 ERIE


AMICA MUTUAL INSURANCE
COMPANY,
        Defendant



ARGUMENT ON POST-TRIAL MOTIONS




Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Monday, June 5, 2006.




APPEARANCES:
        CRAIG MURPHEY, Esquire, appearing on behalf of
        the Plaintiffs.

        PAUL K. GEER, Esquire, appearing on behalf of

the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

1          P R O C E E D I N G S

2

3          (Whereupon, the proceedings begin at 1:10 p.m., on

4     Monday, June 5, 2006, in Courtroom C.)

5

6          THE COURT:  This is the time we set for argument on

7     post-trial findings of fact and conclusions of law at Civil

8     Action No. 04-175 Erie.  All right, Mr. Murphey, do you want to

9     come on up.

10          MR. MURPHEY:  Yes, your Honor.

11          THE COURT:  I have had an opportunity to read the

12     transcript to refamiliarize myself with what I heard at the

13     actual trial.  So I have questions for both of you, and they

14  will come at you in no particular necessarily order of

15  importance.  What are your damages in this case, even if you're

16  right, what are your damages?

17       MR. MURPHEY:  Well, damages, your Honor, our

18  position is that the attorney's fees that were made necessary

19  by conduct of the insurance company.  Interest on the amount of

20  the claim from the time when the original offer, which we

21  regard as inadequate was made, up to the time an adequate offer

22  was made.  Plus punitive damages.

23       THE COURT:  A finding of bad faith and a finding of

24  punitive damages are not necessarily synonymous, are they?

25       MR. MURPHEY:  They are not, your Honor.


                              3


1        THE COURT:  All right.  In other words, would it be

2  accurate to say that in order to recover punitive damages in a

3  bad faith action, the court, the fact finder, in this case me,

4  would have to make a determination that the conduct of the

5  insurer rose to that level of outrageousness, which is a

6  prerequisite under Pennsylvania law?

7        MR. MURPHEY:  Actually, I don't believe that that's

8   the law, your Honor.

9        THE COURT:  What do you think it is?

10       MR. MURPHEY:  I think that a finding of bad faith

11  per se can allow the court to award punitive damages without

12  the additional finding of outrageous conduct.  And, your Honor,

13  if you'll recall, you had scheduled or you had planned to

14  schedule an additional hearing on damages.  I did not prepare

15  an argument with regard to damages.  That is my understanding

16  of the law, your Honor.

17       THE COURT:  All right.  But bad faith is not per se

18  punitive damages, not per se?

19       MR. MURPHEY:  It is not.  The statute says the court

20  may award punitive damages upon a finding of bad faith.

21       THE COURT:  So, presumably, the court retains some

22  discretion as to whether the bad faith is so bad that punitive

23  damages are appropriate, I would think?

24       MR. MURPHEY:  Yes, I would think so, too.  The court

25  has discretion, but the case law I think is very clear that you

4

1   do not need to establish outrageousness.  And of course my

2 argument for punitive damages would be this is precisely the

3 kind of case in which punitive damages are appropriate because

4 it is the detrimental effect of the finding of bad faith, which

5 is important in this case.

6          THE COURT:  All right.  Now, let's talk a little

7 about the liability aspect of the case.  I don't think there's

8 any dispute but that in order to find bad faith, the conduct of

9 the insurer has to have been unreasonable, number one?

10          MR. MURPHEY:  That's right.

11          THE COURT:  And the insurance carrier has to know or

12 recklessly disregard the fact that its conduct was

13 unreasonable?

14          MR. MURPHEY:  That's correct.

15          THE COURT:  Now, with respect to the first prong,

16 the unreasonable prong, do I take it that it is your position

17 that from the day that Schumann inked that estimate, that it

18 was unreasonable on that day?

19          MR. MURPHEY:  That Mr. Schumann's estimate was

20 unreasonably low, that's correct.

21          THE COURT:  All right.  So the real focus -- I

22 shouldn't characterize it, but the secondary focus of the case

23 then is whether or not -- really it's this.  At what point in

24  time, if ever, have you proven by clear and convincing evidence

25  that the carrier knew or recklessly disregarded that fact;


                                5


1  isn't that really the heart of the case?

2       MR. MURPHEY:  That's right, your Honor.  Because I

3  think we clearly proved at trial that the estimate was

4  unreasonable.  Therefore, you get to the second element that

5  you described.

6       THE COURT:  Now, it clearly was not your position,

7  nor is it your position, that the carrier was on notice that

8  Schumann's estimate was unreasonably low contemporaneous with

9  his production of that estimate, is that right?

10      MR. MURPHEY:  That's right.

11      THE COURT:  The next event, significant event that

12  would have occurred, would have been in March, the carrier

13  would have received a copy of Mr. Parise's, the public

14  adjuster's estimate, is that right?

15      MR. MURPHEY:  That's right, your Honor.  Although,

16  as I think we tried to spell out in our conclusions of law,

17  by March 1st of 2003, which is after the insurance company has

18   received Mr. Schumann's estimate, they had a couple of other

19   pieces of information; including the fact that Mr. Schumann's

20   estimate was less than half of the total rebuild costs.  They

21   also had a lot of information --

22        THE COURT:  That in and of itself -- assuming that

23   smoke remediation was a viable method to go, it would not shock

24   you that you could do it at a substantially reduced price?

25        MR. MURPHEY:  Well, I think, your Honor, if you look

6

1   at the evidence in a chronological order about what information

2   the insurance company had about the severity of the damage,

3   including Mr. Schumann's initial reports, the initial report

4   that was made by Dr. Borden to the insurance company.

5        THE COURT:  Well, everybody knew that the fire was

6   extremely hot, it was extremely destructive and that most of

7   the house was gone, no one disputes any of that.  But in terms

8   of red flags that should have gone up for the carrier, as

9   reflected in this record, walk me through the flags, give me

10   the timeframe, so cumulatively you tell me the point in time

11   when negligence bloomed into reckless?

12          MR. MURPHEY:  Judge, in our conclusions of law we

13   identify three different dates.  The first one was on or about

14   March 1, 2003.

15          THE COURT:  What happened on that date?

16          MR. MURPHEY:  Well, they already had the information

17   about the severity of the fire.  They have Mr. Schumann's

18   estimate, which is less than half the total rebuild costs.

19   They also know that Dr. Borden has complained about the

20   estimate, he has challenged certain elements.

21          THE COURT:  Dr. Borden doesn't know anything

22   about -- that's not unusual for an insured to dispute -- let me

23   put it this way.  Wouldn't it be more significant if Dr. Borden

24   were a building contractor as opposed to a physician?

25          MR. MURPHEY:  Sure.  It was Dr. Borden's brother who


                                    7


1   called it to the attention of Mr. Schumann.  That they felt

2   that the estimate was unreasonably low.

3          THE COURT:  He was an attorney for Hartford?

4          MR. MURPHEY:  Right, he worked for an insurance

5   company and reviewed it with the claims people.  The next

6   important date, though, judge, is the date that you identified

7   and that is when Mr. Parise, the public adjuster, then supplies

8   the insurance company with a five-page summary of his

9   criticisms of Mr. Schumann's estimate and a 55-page estimate.

10          THE COURT:  What was the date of that, March --

11          MR. MURPHEY:  March 23rd, we'll certainly give the

12   insurance company the benefit of the doubt.

13          THE COURT:  End of March, last week of March?

14          MR. MURPHEY:  Yes, because we don't know how it was

15   delivered or when.  By that time, by March 23rd, Mr. Parise had

16   already given a verbal report.  In fact, he gave a verbal

17   report at the beginning of March, that said the estimate is

18   going to be much, much higher, there's much more significant

19   damage.  By this time, too, your Honor -- by this time, too,

20   the insurance company is on notice that Mr. Seifert, who Mr.

21   Schumann had said was a local contractor that he had reviewed

22   the estimate with, by this time the insurance company knew or

23   should have known that Mr. Seifert had questionable

24   qualifications at best.  In fact, that's the reason that we

25   talked about at trial this problem with the dry cleaning.  We

8

1   made it very clear to your Honor that that was not a specific

2   element of the claim, the way in which the insurance company

3   handled the drying cleaning.  However, Mr. Schumann found out,

4   in the course of handling the dry cleaning, that Mr. Seifert

5   didn't even have any facilities with which to maintain or

6   warehouse the dry cleaning.  And Mr. Schumann said himself that

7   was of concern to me because typically an experienced

8   restoration contractor would have such facilities.  And so

9   they're on notice, in fact internally they've already discussed

10   whether Mr. Seifert has qualifications to support.

11        THE COURT:  But, in any event, it's of some moment,

12   isn't it, that Mr. Seifert never prepared an estimate himself?

13        MR. MURPHEY:  That's right.  I think that actually

14   supports the allegation of bad faith.  And that is that he

15   never prepared an estimate.  That, in fact, Mr. Schumann, when

16   he came in and testified, said you know it was a relatively

17   informal process, I sort of walked room to room with him, and

18   then the insurance company felt compelled to investigate his

19   qualifications and all they did was talk to him.

20        THE COURT:  Isn't the record somewhat cloudy on this

21  point.  Whether Seifert expressed the opinion that he could do

22  the scope of the work that was requested by Mr. Schumann at the

23  price quoted by Mr. Schumann, as opposed to whether he thought

24  the scope of the work was inappropriate to bring the house back

25  to pre-fire condition?


9


1        MR. MURPHEY:  That's right, your Honor.  The

2  witnesses testified in two different ways on that.

3        THE COURT:  All right.

4        MR. MURPHEY:  Although, I would point out, judge,

5  upon your review of the record, Mr. Parise specifically

6  discussed that issue with Mr. Seifert, at least that's what he

7  testified about, while Mr. Bennett simply said that I ran it by

8  Mr. Seifert and he said he could do the work for that price.

9        THE COURT:  But when you suck the hearsay out of it,

10  it's a little bit unclear what really is there?

11        MR. MURPHEY:  It is.  And of course the important

12  thing is the information that's being provided to the insurance

13  company, as opposed to the truth of the matter.

14        THE COURT:  All right, so that's March 23rd, March

15  24th or whatever.  The next significant -- well, if memory

16  serves, there was something that occurred on or about April

17  6th, is that right, was that when they were setting up the

18  April 15th meeting?

19       MR. MURPHEY:  That's correct, your Honor, that's the

20  letter from Mr. Parise that sets up the April 15th meeting.  I

21  have a chronology right here -- yes, that's when he wrote again

22  and again spelled out his problems with the adjustment of the

23  claim and suggested a meeting for April 15th.

24       THE COURT:  But, to be clear, the next significant

25  event was the April 15th meeting?


                              10


1        MR. MURPHEY:  I agree.

2        THE COURT:  Now, at that meeting, and the carrier --

3  and that meeting occurred, does the record reflect, at the

4  suggestion of the carrier or at the suggestion of Mr. Parise or

5  how?

6        MR. MURPHEY:  At the suggestion of Mr. Parise.  His

7  letter is very clear on that point and I believe Mr. Bennett

8  acknowledged that.

9          THE COURT:  So Mr. Bennett shows up, Mr. Schumann is

10   there, Mr. Parise is there and -- I'm missing the fourth?

11          MR. MURPHEY:  Another fellow from Mr. Parise's

12   office.

13          THE COURT:  All right.  Now, at that walk-through,

14   among the things that happened, was either while they were

15   walking through or before they walked through, Mr. Parise had

16   knocked some holes in the wall so he could show the Amica

17   people in various rooms how there was soot behind the walls, is

18   that right?

19          MR. MURPHEY:  That's right.

20          THE COURT:  And the record fairly read suggests that

21   up to this point -- let me put it this way.  Mr. Schumann, in

22   connection with his investigation, had not independently poked

23   holes in the walls?

24          MR. MURPHEY:  That's correct.

25          THE COURT:  So it would not be a stretch for me to


11


1   conclude that this was the first time that he was actually

2   seeing and Mr. Bennett was actually seeing what happened inside

3   the walls?

4        MR. MURPHEY:  That's right.  Although, Mr. Schumann

5   acknowledged that there certainly could have been damage inside

6   the walls.

7        THE COURT:  All right.  In terms of actual notice or

8   recklessly indifferent rejection of the need for more

9   extensive -- the need for gutting, as opposed to smoke

10  remediation, particularly if the standard is by clear and

11  convincing, if I were to find it at all, why would I find it

12  before this April 15th walk-through, where Amica voluntary

13  shows up, they're shown the first time the soot, I mean

14  everything else is kind of paper back and forth, but isn't that

15  really the trip wire, if there is one?

16        MR. MURPHEY:  I think April 15th is the most obvious

17  date, your Honor.  But all the way back to March 6th, I believe

18  it was, when Mr. Parise gave them a verbal report that his

19  estimate was going to be much greater, and if you look at the

20  February 27th log note from Mr. Schumann, Dr. Borden is

21  specifically questioning the scope of the loss at that time.

22  Smoke damage, cleaning, painting and sealing versus gutting and

23  rebuilding.  So they're on notice from the end of February, and

24  it takes Mr. Parise suggesting the meeting to even get

25  somebody, other than Mr. Schumann, up to look at the loss.

12

1       THE COURT:  Now, they walk through and, of course,

2  in addition to the smoke remediation issue, there are other

3  things pointed out, like the countertops and the floors, to the

4  tune of about $20,000 or $25,000.  But, in any event, there are

5  no agreements reached at the walk-through, and shortly

6  thereafter, and I'm not sure if it's at the suggestion of

7  St. Onge or whatever her name is, or Mr. Bennett, within a day

8  or so there's correspondence, internal correspondence I think,

9  which suggests that Amica reaches the conclusion that the gap

10  is too great and that the case is going to go to appraisal, is

11  that right?

12       MR. MURPHEY:  Actually, the meeting happens on the

13  morning of April 15th and the witnesses testified that they

14  decided at lunchtime, they received approval from home office

15  to initiate the appraisal process.  So it was just that very

16  day.

17       THE COURT:  So within a day or so or right there

18  because maybe they told Mr. Parise, I can't remember, within a

19  day or two the insureds would have been aware that the carrier

20  was invoking the appraisal clause, is that right?

21      MR. MURPHEY:  That's right, your Honor.

22      THE COURT:  Okay.  After the carrier invoked the

23  appraisal clause, how long after it does the record reflect it

24  was that they retained Terry Jones?

25      MR. MURPHEY:  I believe they retained him on or

13

1  about May 1st, which would have been two weeks later.  I think,

2  I'm sorry, I don't have that part memorized, your Honor, but I

3  think there may have been some testimony that they communicated

4  with him shortly after the April 15th meeting.

5      THE COURT:  All right.  It was within days after the

6  retention, literally days after the retention of Jones,

7  Attorney Jones, not to be confused with Dan Jones, that the

8  carrier and Attorney Jones agreed that they would not go the

9  appraisal route and the carrier agreed to bring in another

10  expert to examine the damages, is that right?

11      MR. MURPHEY:  That's right, your Honor.  Although,

12  one other thing happened and that is that Amica hired Attorney

13  Geer.  It was after Attorney Geer was hired, then the appraisal

14  process came to a halt and another contractor was hired.  Which

15  is exactly our point, judge, that that's what had to happen for

16  this to occur.

17          THE COURT:  That was less than four weeks after the

18  April 15th walk-through, wasn't it?

19          MR. MURPHEY:   It was sometime in May.

20          THE COURT:  In that timeframe?

21          MR. MURPHEY:  It was sometime in May.

22          THE COURT:  Now, at what point does the record

23  reflect that your clients complained to the insurance

24  department and when?

25          MR. MURPHEY:  Two days after the April 15th meeting,


                                    14


1  I think it was April 17th of 2003.

2          THE COURT:  What evidence is there that the carrier

3  was on notice that that complaint had been filed?

4          MR. MURPHEY:  There's evidence that, the exhibit

5  itself I think came from Amica, it has a stamp that they

6  received it, Mr. Bennett testified that he received it and

7   reviewed it.

8          THE COURT:  All right.  As of mid May then, there is

9   an agreement that Amica will bring in someone and they bring in

10  Dan Jones.  Mr. Jones comes in, if memory serves, towards the

11  end of May or early June, and conducts a two or three day

12  inspection.  He then produces I think a report, sometime in the

13  mid to latter part of June, is that right?

14         MR. MURPHEY:  I think the report didn't come until

15  the end of July because of Mr. Jones' vacation schedule.

16         THE COURT:  But, in any event, all the parties at

17  this point knew something was in the works because he had been

18  there and was producing -- and then he produces the report,

19  which is considerably higher than Mr. Schumann's, but somewhat

20  lower than Mr. Parise's.  And a settlement is reached which is

21  closer to Mr. Jones' estimate than anybody else's?

22         MR. MURPHEY:  That's right, your Honor.

23         THE COURT:  Okay.  If rather than requesting

24  appraisal on the 15th, the carrier had said all right, we'll

25  bring in Mr. Jones.  And Mr. Jones came in within a week or so

15

1   and did what he did and produced a report roughly on the same

2   timetable. Would you still be crying bad faith?

3        MR. MURPHEY: I don't think so, judge.

4        THE COURT: So this is really narrow, isn't it?

5        MR. MURPHEY: It is, there is no question.

6        THE COURT: This is a very unusual case because I'm

7   hard pressed to see it -- it's not a delay case?

8        MR. MURPHEY: No, it's really not.

9        THE COURT: It's a one statement case which

10  required, by your lights, the insureds to go out and retain an

11  attorney, which they did, which then immediately, rather than

12  delay further, the carrier acquiesced and bring somebody in?

13        MR. MURPHEY: Well, judge, you said whether we would

14  have brought a bad faith lawsuit, I don't think so. It doesn't

15  mean that we agree that the insurance claim had been properly

16  handled up to that point --

17        THE COURT: I understand that.

18        MR. MURPHEY: But that's what puts it into the realm

19  of bad faith.

20        THE COURT: Is this bad faith claim like a tree

21  falling in the forest where no one hears it. I mean, doesn't

22  it really, I'm talking about the impact on the insureds here,

23  is this so theoretical it's like how many angels can you fit on

24  the head of a pin?

25      MR. MURPHEY:  I don't think so at all, your Honor.


16


1  In fact, this is very real.  I think right in my opening

2  statement I asked your Honor to look at this case and think

3  about what would have happened to the Bordens if they had not

4  hired the public adjuster, complained to the insurance

5  department or hired an attorney.  What would have happened in

6  this case is they would have received in the neighborhood of

7  $225,000, $230,000 less than the acknowledged value of their

8  loss.  The reason that would have happened is because Mr.

9  Bennett and Mr. Jones both emphasized that that original

10  estimate was just preliminary, in all of these cases there are

11  changes as the contractor gets in there and finds out the

12  extent of the damage, and they negotiate additional increases

13  in the amounts to be paid when they're rebuilding the house.

14  But in this case the Bordens never rehabilitate the house.

15  That process would never have occurred.  So it was necessary

16   for them to take these additional steps to get what they were

17   owed.  And that's why it's bad faith.  You're right, that in

18   the greater scheme of things, the fire occurred in February and

19   they reached a settlement in principal anyway by the later part

20   of the summer.  But it's those steps that they had to go

21   through which makes this a bad faith case.  It similar to --

22   you wrote an opinion in a UIM case called Anderson v.

23   Nationwide.  Where you entered summary judgment for the

24   plaintiffs on a bad faith case.  And in that case it really

25   wasn't delay, it wasn't really -- you know, ultimately the


                                    17


1    claim was being handled by the insurance company, but you found

2    bad faith because the insurance company required the plaintiffs

3    to go through a hoop that they shouldn't have had to go

4    through.  In that case they had to go to court to compel

5    arbitration when Nationwide knew or should have known that they

6    were required to arbitrate that case.  And so that's a

7    demonstration, and there are other reported cases, too, but

8    that's a demonstration where the bad faith statute is designed

9    to prevent this precise kind of conduct.  Even though there's

10  not exorbitant delay, even though the Bordens were, as the

11  defendant continues to point out, were in a comfortable place

12  and didn't have to, they didn't miss any bills or anything,

13  that they had to go through these hoops in order to get what

14  the insurance company knew or should have known they were owed

15  long before.  So it is really that specific failure, and the

16  reason that they got Mr. Jones, I think a fair inference can be

17  drawn is because they hired a lawyer.  And why did they hire a

18  lawyer, because the Bordens hired a lawyer.

19        THE COURT:  Here's my question on invoking

20  appraisal.  Now, it might appear that typically it's the

21  insureds who invoke appraisal.  But the policy doesn't restrict

22  it, it can be done by either side.  If the carrier here was

23  really interested in minimizing its exposure, which is implicit

24  in the claim, in terms of low balling the thing, the appraisal

25  route would have smoked out, no pun intended, the


18


1  unreasonableness of their position, wouldn't it, just assuredly

2  as Mr. Jones did?

3        MR. MURPHEY:  It is another hoop that the insureds

4   should not have had to go through.

5        THE COURT:  But here's my point.  If there was an

6   impasse on April 15th, and there was, there were two ways to

7   solve it.  Either bring in a Mr. Jones to get a second opinion,

8   if you will, or go to appraisal.  How can a carrier be accused

9   of bad faith by invoking a contractually viable option in its

10  policy?

11       MR. MURPHEY:  Well, that's been addressed by the

12  Pennsylvania courts, judge.  As I'm sure you know from your own

13  research, most bad faith cases have developed in the UM/UIM

14  setting.  As you also know, all UM/UIM policies have an

15  arbitration clause in them that can be invoked by either party

16  if there's a disagreement in the value of the case.  Well,

17  there's specific reported decisions, two of which were cited in

18  our materials Halluck_v._Erie_Insurance; Bonnenberger_v.
    _____ __ ____ _____ _____ __

19  Nationwide, in which it was found that the insurance carrier
    _____

20  was in bad faith for requiring the insured to go through the

21  hoop of the arbitration.  Even though it was a contractual

22  clause.  Because they didn't evaluate the damages fairly in

23  advance.  And then like, to use your words, in both of those

24  cases the true damages were smoked out at the arbitration,

25  nevertheless, the courts said, well, these are hoops they

19

1  should not have had to go through, therefore, it's bad faith.

2       THE COURT:  Assume that this happened, assume that

3  the carrier said we're going to go to appraisal on April 15th.

4  Rather than retain with Mr. Jones, the insureds didn't retain

5  Attorney Jones.  But they're arguing back and forth with the

6  carrier.  A week later, after vehemently argument back and

7  forth between Dr. Borden and Amica, Amica says, okay, you know

8  what, we'll put this appraisal on hold and we'll bring in Mr.

9  Jones.  Mr. Jones comes in and does the same thing.  The

10  scenario is identically the same with the exception that

11  Attorney Jones never enters the scene; is there bad faith?

12       MR. MURPHEY:  I don't know, that's a closer call.

13  I still think they required the insurance carrier --

14       THE COURT:  How do I split these things down to

15  nanoseconds.  I mean the danger here is you require a carrier

16  to act so swiftly that, and I'm only talking from April 15th

17  here, it's kind of a slippery slope, isn't it?

18       MR. MURPHEY:  It might be, but as you say, you can't

19  just talk from April 15th, because they've had the other

20  information that I have identified.  After April 15th, the

21  Borden's complained to the insurance department and hired a

22  lawyer.  Those were the two things.  I think it's a very fair

23  inference to be drawn that that is what caused the defendant to

24  change its mind.

25          THE COURT:  Even if the hiring of a lawyer or the

                              20

1  complaint to the insurance department motivated the carrier to

2  do what it did, that doesn't prove bad faith because carriers

3  frequently act in response to prodding of that nature from

4  insureds?

5          MR. MURPHEY:  Well, they do frequently act due to

6  prodding of that nature from the insured, but it doesn't mean

7  it's not bad faith, your Honor.

8          THE COURT:  No, it doesn't.  But my point is the

9  mere fact that they may have been reacting to the retention of

10  counsel doesn't necessarily establish bad faith?

11          MR. MURPHEY:  It doesn't.  But in the circumstances

12  of this case, I think it does.  If you go back to the day of

13  the fire and all of the information that was provided to the

14  carrier from that day forward, I think the fair inference from

15  the facts is that those are the things that triggered the

16  change in the insurance company's position.

17         THE COURT:  Now, a couple other questions here.

18  Let's talk about what really is expert testimony on the

19  question of the appropriateness of smoke remediation under

20  these circumstances.  Haller came in and testified as to what

21  he thought it would take to put the building back in place.  I

22  think his estimate may be the highest, I'm not exactly sure,

23  but it was quite high.  But he specifically disclaimed, didn't

24  he, in his testimony, any expert knowledge about smoke

25  remediation?


                                21


1          MR. MURPHEY:  I think he said he is not a fire

2   chaser, were his words.  What he said was, to be fair to him,

3   first of all, his testimony was offered for one primary reason,

4   that is to establish that Mr. Schumann's original estimate was

5   absurdly low.  There are two elements to the original estimate.

6   One is how much it's going to cost to repair damaged items.  Of

7    course, Mr. Haller is more than competent to testify about

8    that.  Also, whether this technology can be used.  Now, Mr.

9    Haller did say that he has not used that technology, he's not

10   familiar with it.  He did say he developed his estimate through

11   the use of several subcontractors, one of which was a painting

12   contractor, which he said who is familiar with these processes

13   and agreed with him.

14        THE COURT:  Is it fair to say I shouldn't focus on

15   Mr. Haller as being a prime source of information to me as to

16   what the appropriate smoke remediation is?

17        MR. MURPHEY:  That's right, your Honor, but he is an

18   important piece of information regarding the reasonableness of

19   Mr. Schumann's estimate in the first place.

20        THE COURT:  Now, the people who do talk about smoke

21   remediation are Mr. Parise.  And Mr. Parise, in essence, says

22   you use it in smoky kitchen fires, but he has never seen it

23   used in a fire where smoke got from a basement up to an attic,

24   permeates the interiors of the walls because it won't work,

25   that's essentially what he says, right?

22

1          MR. MURPHEY:  Yes.

2          THE COURT:  But then Mr. Jones comes on -- does Mr.

3    Jones, on the subject of remediation versus gutting, doesn't he

4    can kind of weigh in against Mr. Parise's testimony.  In fact,

5    he says at one point that he seen it utilized before and it can

6    be successful.  Don't I have a material issue of fact on the

7    question as to whether smoke remediation is an appropriate way

8    of solving a problem like this?

9          MR. MURPHEY:  Sure.  Although, I think the dispute

10   really is between Mr. Schumann and Mr. Parise.  I think it's

11   those two witnesses that you as the fact finder need to

12   reconcile.  Mr. Jones I think put himself or was put in a

13   difficult position.  He was trying to help his client, he knew

14   his client's position in this case.  But when I confronted him

15   on cross-examination with his own deposition testimony, he

16   agreed that if he had come back in February, he would have come

17   closer to Mr. Parise's estimate than Mr. Schumann's estimate.

18          THE COURT:  What's the difference between -- what I

19   don't understand in this case is, aside from the difficulty of

20   maybe crawling around, there's no evidence that weather

21   impeded, that I can see, that weather impeded an estimate?

22          MR. MURPHEY:  That's right.

23          THE COURT:  So wouldn't one expect, without hardly

24   even asking the question, that the estimate you would give in

25   February would be the same estimate you would give in April?


                                23


1           MR. MURPHEY:  That's right.  But when I asked him on

2    cross-examination, I said your estimate would have been similar

3    to the one that you gave in July if you would had gone back in

4    February.  And he said no.  The reason he said no was because

5    he was led to testify that there were all these other

6    considerations, the fact that there was litigation, the fact

7    that there were complaints about the health of the young

8    daughter.  That all of those things caused him to be ultra

9    conservative and conclude that gutting and rebuilding was

10   necessary.  But at his deposition and then on cross-examination

11   he acknowledged that, he said, well, because we agree that the

12   damages didn't change at all between February and July, that he

13   would have come up with the same estimate.  He was trying to

14   walk a fine line.  I think what's revealing is what his actual

15   estimate is, not the way he tries to write it off.

16          THE COURT:  Finally, in part, in order to find in

17    your favor, don't I have to find on this expert issue of

18    remediation versus gutting, that the evidence is clear and

19    convincing, that the industry standard would have been to gut

20    rather than to remediate?

21          MR. MURPHEY:  Well, I don't know.  I know that you

22    have to find that the evidence of bad faith is clear and

23    convincing.  I'm not sure that you need to find that every

24    element of the evidence in the case is clear and convincing.

25    I think that if you find that it's more likely than not that


                              24


1    Mr. Parise and Mr. Jones frankly were right and Mr. Schumann

2    was wrong, then you can go on and find that there was clear and

3    convincing evidence of bad faith because the way the insurance

4    company did or did not react to that evidence.

5          THE COURT:  If I find it's more likely than not that

6    remediation would be the accepted industry standard, I would

7    then have to find by clearing and convincing evidence that the

8    carrier knew or recklessly disregarded that fact?

9          MR. MURPHEY:  That's right, so that probably answers

10  the question.  But in my position, we have proved that.  Mr.

11  Parise's testimony and Mr. Jones.  If you read Mr. Jones, he

12  tries to explain all these other circumstances in which

13  cleaning, sealing and painting would work, but he is belied by

14  the fact that his own report and his own estimate recommended

15  gutting and rebuilding.

16       THE COURT:  All right.  Let me hear from Mr. Geer.

17       MR. MURPHEY:  Thank you, judge.  One more thing, I

18  did prepare a very brief reply because the defendant had

19  identified various places where they thought that we had

20  mis-cited the record, I limited the reply to that and I'm

21  filing it electronically and I have a paper copy, too.

22       THE COURT:  All right.  Mr. Geer.

23       MR. GEER:  Good afternoon, your Honor.

24       THE COURT:  We're going to do the same thing we did

25  with Mr. Murphey.  On the first prong, first of all, you don't


25


1  disagree with the standard of bad faith that I articulated, it

2  is the law, it is what it is?

3       MR. GEER:  That's correct, your Honor.

4    THE COURT:  Is it the carrier's position in this

5    case based on the record, I'm talking about the first prong

6    now, that under all the evidence as it came in, that Mr.

7    Schumann's estimate was not unreasonably low?

8    MR. GEER:  I believe that Mr. Schumann's estimate

9    was not unreasonably low except he had made mistakes.  It

10   depends on what you're considering unreasonably low.  We've

11   admitted that he missed about $20,000.

12   THE COURT:  That's not the lawsuit.  The lawsuit is,

13   doesn't the evidence here suggest that his estimate of $270,000

14   or $280,000, as compared to Mr. Parise's, as compared to Mr.

15   Jones, as compared to Mr. Haller's, was palpably unreasonably

16   low?

17   MR. GEER:  Respectfully, no, your Honor.

18   THE COURT:  Okay, why not?

19   MR. GEER:  It's $329,000.

20   THE COURT:  You're quite right.

21   MR. GEER:  It was all about the technology.  If the

22   technology that Mr. Jones eventually talked about, but did not

23   use, had been used, then it would have been much lower.  Mr.

24   Jones testified at the very end of his testimony --

25   THE COURT:  Mr. Jones said something and I read his

26

1  testimony twice, Mr. Jones said the approach that Mr. Schumann

2  took was reasonable as an initial approach.  He was very

3  careful on that.  But the fact of the matter is that was no

4  initial approach.  That estimate never changed, that was their

5  first and final estimate.  So what am I to make of Mr. Jones'

6  statement on that point -- it wasn't initial, that was it, that

7  was all the insureds were ever going to get because you said

8  you got to go to appraisal?

9        MR. GEER:  Your Honor, that's not the case and I'll

10  tell you why.  Mr. Schumann wrote an estimate.  There was a

11  meeting.  At the point where they had the meeting, they were so

12  far apart, Parise I think was at $691,000, and Schumann was at

13  $329,000.  The decision was made at that point to go to an

14  appraisal.  The case could have gone two different ways.

15  Schumann could have written a second estimate had they been

16  closer, but the decision was made that they were so far apart

17  let's just go to an appraisal.  So Schumann said that he didn't

18  consider this to be a final estimate.  There's no statement of

19  law --

20          THE COURT:  Is there anything in the record that

21   would have let the insureds know that they were going to change

22   their mind on that Schumann estimate?

23          MR. GEER:  Absolutely not, there is not.  But the

24   important point is the timeframe.  We were so early in the case

25   at this point.  This was our first face-to-face meeting with a


                              27


1   representative of the other side, it occurred on April 15th.

2          THE COURT:  In my mind April 15th is the critical

3   date, I will say that.  Now, but on April 15th they walk

4   through and they kick holes, Parise kicks holes in the wall,

5   and there is soot everywhere, I see it.  I've been doing this a

6   long time, and this testimony came in uncontradicted, and I

7   think out of Schumann's own mouth.  Here's a guy, you have a

8   house that's basically falling down around you because it's a

9   95 on a 100 percent fire, it's as bad as that.  And in

10   response -- isn't this the testimony, in response to Parise

11   pointing out soot on the wires and in the interior of the

12   walls, at one point Schumann turns to him and says well how do

13   we know that was caused by this fire.  To which Parise

14  testified, I think these were his words, I was appalled that

15  anyone would make such a stupid statement -- isn't that the

16  dumbest thing you've ever heard in your life from somebody -- I

17  mean in a vacuum, those are the kind of statements that sink

18  carriers, aren't they?

19       MR. GEER:  Judge, I would certainly agree that that

20  was not a prudent response if in fact it was made.

21       THE COURT:  It was made, he admitted that it was

22  made.  What does that tell me about the carrier's mind set,

23  you're knee deep in soot and this guy says -- geez, maybe this

24  was caused by something else?

25       MR. GEER:  Your Honor, I think when you look at what

28

1  happened and you look at the overall context, there's a large

2  portion of this house which is burned, and there's no question

3  that that part that's burned is going to be gutted and

4  replaced.  This is a huge house.  And there's a whole other

5  wing of the house that only has smoke damage.  And Parise is

6  walking around kicking holes in the walls.  One of the big

7  issues between Mr. Parise and Mr. Schumann is whether this can

8   be cleaned, sealed and painted.  Now, Parise is walking around

9   kicking holes in every wall.

10        THE COURT:  So what?

11        MR. GEER:  Perhaps doing that is not the best way to

12  appeal to human nature to give in, I'm certainly not -- I don't

13  think mere words said perhaps during the course of an

14  argument -- should be all you need to prove bad faith --

15        THE COURT:  I'm not suggesting it is.

16        MR. GEER:  Immediately after that we tried to fix

17  the situation.

18        THE COURT:  I'm not asking you to fall on your own

19  sword because this will not be a fatal wound even if you admit

20  to this.  But it was an awfully stupid thing to say, wasn't it,

21  in the context of adjusting this loss?

22        MR. GEER:  It certainly was not prudent, your Honor.

23        THE COURT:  All right.  Now, let's talk about

24  appraisal.  You had the right to ask for it.  But, you know, if

25  you went through with it, that would have cost the insureds a

29

1   pretty penny, wouldn't it; they would have had to split the

2    cost of that thing?

3          MR. GEER:  I don't know that it would cost a pretty

4    penny, especially when you consider that they had already

5    retained Mr. Parise, who they paid $70,000 to.

6          THE COURT:  Well, they retained Mr. Parise, with all

7    respect, because you wouldn't pay them what they thought they

8    were owed, isn't that correct?

9          MR. GEER:  That's not correct, your Honor, they

10   employed Mr. Parise at the beginning of March, and at that

11   point they had seen one estimate, they hadn't seen anything

12   that would tell them Amica was not moving.  They didn't see

13   anything from Amica that indicated that Amica was not willing

14   to deal with them.  What was happening here, of course, was Dr.

15   Borden had a lot of things to do, he was not the type of person

16   who wanted to do it himself.  So he wanted a representative,

17   that is his right.  We certainly did not cause Dr. Borden or

18   his wife to call Mr. Parise in on this.  That was their choice.

19   It's a huge undertaking.  When you have a big house and you

20   have a lot of contents, it's a huge undertaking to try to

21   itemize them and get the claim in.

22          THE COURT:  Should I -- let me check my note on

23  this -- should I make anything of the fact that Mr. Schumann

24  testified, I think he testified that, or maybe it was Bennett,

25  Schumann, I can't remember, but as a general rule, it was never

30

1  the carrier that invoked the appraisal clause, they always left

2  that up to the insured; does the record reflect that?

3        MR. GEER:  I don't recall that, your Honor.  That

4  certainly it is not my experience, either, it can be invoked by

5  either party.

6        THE COURT:  The record fairly read, does this

7  reflect and I'm talking about Mr. Schumann, a guy who comes in

8  and low balls the thing, he then becomes defensive about it,

9  digs his feet in, in the face of almost overwhelming evidence

10  to the contrary, until the carrier itself has to turn it around

11  and bring somebody else in; isn't that what really happened

12  here, looking at it from a human standpoint?

13        MR. GEER:  Perhaps from a human standpoint Mr.

14  Schumann dug his feet in on April 15th.  Also on April 15th,

15  Mr. Bennett was present and he told Mr. Parise that they had

16  talked about going to an appraisal and they would probably be

17  getting a letter saying that.  Now, one thing I don't think we

18  can disregard is that insurance losses are settled by give and

19  take.  This was somewhat of a negotiation when they were up

20  there, and they were very far apart.  What Amica was looking

21  for, if the court looks at the case as a whole, there's no

22  point where Amica is not looking for a way to resolve this

23  claim and there is no point in this record, that the plaintiffs

24  can point to a place where Amica was trying to settle the claim

25  for something less than it was worth.  Yes the estimate was

31

1  low, yes there were mistakes in the estimate.  There was never

2  any pressure put on the Bordens or Mr. Parise to settle the

3  case at that number.  There was never a walk away.  There was

4  never a hey, take it or leave it, you can sue us if you want,

5  there was none of that because they were trying to get it

6  resolved.

7        THE COURT:  What does the record reflect, in terms

8  of big fire losses of this magnitude, what does the record

9  reflect that Mr. Schumann's experience was?

10        MR. GEER:  He indicated that he was a large loss

11  adjuster, I think he had had -- I don't want to misstate, my

12  recollection is it was over a hundred.

13        THE COURT:  Several?

14        MR. GEER:  Yes, it was a frequent experience.  Also,

15  that he has a background in construction.

16        THE COURT:  Why did the carrier, I'm not talking

17  speculative, what does the record reflect, why the carrier put

18  the brakes on appraisal and move with Mr. Jones and bring in

19  Dan Jones?

20        MR. GEER:  Well, it was because Attorney Terry Jones

21  suggested that before we go to the expense of the appraisal,

22  you're going to have to bring in an independent expert, you're

23  going to have to bring in an unbiased independent person anyway

24  under your appraisal clause.  Why not bring him in now, we'll

25  have a meeting and see if we can get it resolved.  There seemed


32


1  to be -- you know, Amica essentially was trying to make it as

2  easy as they could and they were avoiding anything which ended

3  in controversy.  A lot of this came down to that.  When Dr.

4  Borden or his representatives put their back up on a certain

5      issue and said we don't want to do this, Amica listened.  This

6      is just a case where the course was changed because they asked

7      that it be changed.

8            THE COURT:  What am I to make of Amica's reliance

9      for some period of time on this Visions fellow, Seifert or

10     whatever his name was, who is completely credential-less,

11     completely credential-less, who apparently shows up at fires

12     with the firemen, gets his foot in the door and then suggests

13     he can rebuild the house?

14           MR. GEER:  I believe it's a red herring, with all

15     due respect, your Honor.  First of all, Mr. Murphey brought in

16     no evidence in this case that Visions had no credentials.  He

17     could have called Visions in to show they had credentials.

18     Visions didn't even provide an estimate, he did a walk-through

19     with Mr. Schumann.  He was a second set of eyes and ears and he

20     walked around and they talked about it.  As the court is well

21     aware, there was a lot of hearsay in that and there was

22     contradictory evidence as to whether Mr. Seifert said that work

23     could be done at that price.  But he was really not a person

24     that Amica retained to do an estimate.  We weren't at that

25     stage yet.  I think that's the whole key to this thing.  There

33

1  has not even been a meeting yet between the parties.  April

2  15th is the first meeting.

3        THE COURT:  Should I make anything of this, in terms

4  of the overall bad faith allegation.  That although there was a

5  dispute when they walked through on the 15th about smoke

6  remediation versus gutting, which didn't get resolved until

7  they settled the case, there was no dispute, none whatsoever,

8  that Schumann had dropped the ball in other particulars,

9  including the tub, a jacuzzi, a tile, I think the tile on the

10  countertop, he had that wrong, and maybe some other type of

11  flooring, all to the tune of about $20,000.  They never

12  offered -- the carrier never came forward with a $20,000

13  increase, did they?

14        MR. GEER:  That's correct.  Again, let's look at it

15  in the entire context of what had occurred.  At this point the

16  carrier has sent the Bordens checks totaling $330,000.  They've

17  been returned and they've written to the Bordens and said these

18  are undisputed payments, it will not prejudice your right to

19  make further claim or do whatever else you need to do.  They

20  still were not taking the $330,000.  That's a lot of money to

21  have returned.  And we're looking at two estimates.  The two

22  estimates are I think $691,000 and $329,000.

23       THE COURT:  So the point was you're so far apart, if

24  you will, that throwing an extra 20 on the hill wouldn't have

25  made any difference?

34

1       MR. GEER:  That's correct, and it also would have

2  been caught in the appraisal.  There's one more thing to keep

3  in mind and this came out in Mr. Bennett's testimony.  This

4  April 15th meeting was not held just for the purpose of going

5  over the building damage.  There were three issues at this

6  point and two of the three got resolved.  One was the dry

7  cleaning.  There had been an issue in the case as to whether

8  VIP Cleaners, it wasn't Mr. Seifert that did the dry cleaning,

9  Mr. Seifert merely took the dry cleaning to VIP Cleaners --

10       THE COURT:  To me the dry cleaning is completely

11  irrelevant.

12       MR. GEER:  Exactly, I agree.  But my point is, just

13  bear with me a minute.  We had three issues.  We had the

14  contents of the house which had not yet been cleaned because

15  the Bordens had not authorized it.  We had the dispute as to

16  whether the VIP had been adequate or not.  Then we had this

17  thing that has developed into a bad faith case.  What happened

18  after, after there was an impasse reached, we still moved on to

19  the other two issues and we resolved them.  The way to resolve

20  the impasse was through appraisal.  So, again, Amica was

21  seeking a resolution of all three issues, the first two were

22  reached through negotiation on April 15th, and the third one,

23  which was probably not going to be reached because the parties

24  were so far apart, was intended to be resolved through

25  appraisal.  And the problem with Schumann's estimate would have

35

1  been picked up.

2          THE COURT:  Finally, a couple other questions for

3  you.  If I find evidence of bad faith here, does that mean I

4  find punitive damages?

5          MR. GEER:  No, your Honor.

6          THE COURT:  Tell me how do you view the law on that

7  issue?

8          MR. GEER:  My understanding of the law is that if

9  there's a finding of bad faith, there can be some finding of

10  compensatory damages, then there could be a finding of punitive

11  damages.  And, of course, as the court is well aware, punitive

12  damages are for outrageous conduct.

13          THE COURT:  Well, you don't get non-economic damages

14  in a bad faith claim case, as I understand it, you get

15  attorney's fees, you get interest or you get punitive damages,

16  isn't that right?

17          MR. GEER:  That's correct, that's what the statute

18  says.

19          THE COURT:  Okay.  Anything else you want to tell

20  me?

21          MR. GEER:  No, your Honor.

22          THE COURT:  Anything else, Mr. Murphey?

23          MR. MURPHEY:  I made a couple notes during Mr.

24  Geer's comments.

25          THE COURT:  All right, go ahead.


36


1          MR. MURPHEY:  First, I don't think that it's

2  accurate to say that Mr. Parise was not retained because of

3    anything that Mr. Schumann or Amica did, he was retained

4    specifically because Mr. Schumann's estimate was low or at

5    least it was perceived to be low by the Bordens.  And, in fact,

6    Dr. Borden testified that although his family had mentioned the

7    use of a public adjuster right after the fire, he said that he

8    didn't have any reason to hire a public adjuster, he was

9    willing to have Mr. Schumann do his work.  They got the

10   estimate, his brother reviewed it, his brother thought it was

11   too low, his brother spoke with Mr. Schumann, this is from Mr.

12   Schumann's own testimony, that he raised questions about it and

13   it was only after Mr. Schumann said that he was not going

14   further negotiate it, that his estimate was what it was and of

15   course we know it never changed, it was only then that Mr.

16   Parise was hired.

17        THE COURT:  Isn't, and I don't say this

18   pejoratively, but isn't part of the problem here a failure to

19   communicate, in the sense that your client got every Tom, Dick

20   and Harry involved in this thing, he goes to his brother, who's

21   a lawyer at Hartford.  I'm not being critical, a non-lawyer,

22   the doctor had to go out, geez, my brother is a lawyer maybe he

23   knows something, he's with Hartford.  Maybe my brother will get

24  involved in the action.  It just became a circus, didn't it?

25       MR. MURPHEY:  I don't think that created any

37

1  problems for the insurance company with respect to the handling

2  of the claim.  They didn't say that.  In fact, they

3  specifically said there was no conduct or lack thereof on the

4  part of Dr. Borden that affected the adjustment of this claim.

5  Or at least the parts that we're litigating.

6       THE COURT:  What is the amount of your attorney's

7  fees that you're looking for?

8       MR. MURPHEY:  You know what, judge, I didn't prepare

9  the damages.

10      THE COURT:  You don't know yet?

11      MR. MURPHEY:  I actually had submitted, I submitted

12  the proposed findings before the trial started and I had it up

13  to that date, and then the additional for trial.  But because

14  this wasn't the damages hearing, I didn't prepare that.

15      THE COURT:  Conceptually, the fees that you would be

16  looking for if you won the case, would be the fees that would

17  have been generated by Attorney Jones early on when he first

18   got involved, and then the fees that would have been generated

19   by you and whoever else in connection with the actual bad faith

20   action?

21        MR. MURPHEY:  That's correct, your Honor.  You asked

22   a question of Mr. Geer about the invocation of the appraisal

23   process.  And it's their own internal guidelines, which are

24   part of the evidence in this case, which suggests that the

25   insured should be offered the opportunity to invoke appraisal,


38


1   that the carrier should not do it.  That's what you were

2   thinking of when you asked him the question.

3        Finally, Mr. Geer said that there was never any

4   pressure on the insured to accept a certain amount or Amica

5   would walk away.  Certainly the perception was created, if

6   you'll take a look at the letter of March 11, 2003, which is

7   the letter which the insurance company sent, the initial offer

8   amount, with the amount based on Mr. Schumann's estimate, they

9   specifically laid out a section of the policy that said if

10   repairs are not done, we can withdraw coverage.  And that

11   created, that alarmed Dr. Borden, according to his testimony.

12  And that sort of got the ball rolling which respect to, wait a

13  minute, this is really a non-negotiable estimate and we're

14  going to have to do something about this.

15          And then finally with respect to whether Mr. Seifert

16  is a red herring or not, Mr. Bennett specifically testified in

17  defending his own actions and Amica's own actions, that he had

18  a conundrum because he had two people, according to his

19  testimony, two people telling him that the house could be

20  repaired at X amount.  One, Mr. Schumann, and the other, Mr.

21  Seifert.  And if they really had reason to rely on that or if

22  Mr. Seifert really felt that way, presumably, he would have

23  come in and testified to that fact.  And that's why I think the

24  fact that Mr. Seifert didn't testify in this case is because he

25  could not testify or would not testify that he agreed with Mr.


39


1  Schumann's estimate at any given time.  So Mr. Seifert was

2  important, at least to Mr. Bennett, in explaining his own

3  actions.

4          THE COURT:  All right.

5          MR. MURPHEY:  Thank you, your Honor.

6          THE COURT:  Let me see both lawyers back in my

7  chambers before you leave.

8

9          (Whereupon, at 2:02 p.m., the proceedings were

10  concluded.)

11

12                    - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

40

1              C E R T I F I C A T E

2

3

4

5        I, Ronald J. Bench, certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-entitled matter.

8

9

10

11

12

13   _____

14   Ronald J. Bench

15

16

17

18

19

20

21

22

23

24

25